**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| TRANSCANADA KEYSTONE PIPELINE, LP and TC OIL PIPELINE OPERATIONS INC. | § § § § § | |
| Plaintiffs, | § § | |
| vs. | § § § | Civil Action No. _____ |
| JOHN F. KERRY, Secretary of the Department of State; | § § § | |
| LORETTA E. LYNCH, Attorney General of the United States; | § § § | |
| JEH CHARLES JOHNSON, Secretary of the Department of Homeland Security; and | § § § | |
| SALLY JEWELL, Secretary of the Department of Interior; | § § § | |
| Defendants. | § § | |
| _____ | § § § § § § § § § § § § § | |

**<u>COMPLAINT</u>**

## I.    <u>INTRODUCTION</u>

1.      This case presents the question whether the Constitution grants the President unilateral power, unsupported by any statute and contrary to the expressed wishes of Congress, to prohibit the further development of the Keystone XL Pipeline on the basis that the pipeline would cross a U.S. border and would, if permitted to proceed, undercut the President's influence in international climate change negotiations.

2.      In particular, this case challenges the President's assertion of unilateral power to prevent the domestic and international commerce reflected in the development and operation of a major U.S. oil pipeline extending abroad from established domestic oil pipeline systems when (i) the Constitution expressly commits regulation of domestic and international commerce to Congress; (ii) Congress has acted to facilitate the development of such cross-border facilities generally and has passed legislation specifically authorizing the construction and operation of the Keystone XL Pipeline across the U.S.-Canada border; (iii) no previous President has ever prohibited the development of any major oil pipeline undertaking significant domestic commerce based on an assertion of unilateral power; and (iv) no previous President has ever asserted or exercised the unilateral authority to prohibit the construction of cross-border facilities supporting international commerce based on any objection to the nature of the commerce undertaken by the facility, his need to enhance his negotiating powers with foreign states, or any other basis not directly related to the particular cross-border considerations presented by the facility at issue.

3.      The U.S. component of the proposed Keystone XL Pipeline would be owned, developed, and operated by plaintiffs, two Houston-based and U.S.-registered subsidiaries of TransCanada Corporation, a Canadian company (each of the three companies separately, or together, "TransCanada").  The pipeline would be one of the largest oil pipelines in the United States and would interconnect with and extend from extensive existing oil pipeline facilities in

2

the United States. Those existing facilities include the original Keystone I Pipeline, which was approved by the U.S. government in 2008 and built and operated by TransCanada to transport to the United States the same type of crude oil from the same region in Alberta, Canada that the Keystone XL Pipeline would transport. Those existing facilities also include subsequent extensions of the Keystone I Pipeline that are part of the larger Keystone System of oil pipelines in the United States. As with the Keystone I Pipeline, only a small portion of the Keystone XL Pipeline would extend across the U.S.-Canada border into Canada.

4.      Congress unquestionably has the power, under the Constitution's foreign commerce clause and domestic commerce clause, to determine whether a pipeline of this type should be developed. In addressing oil pipeline development generally, facilitating cross-border trade in petroleum products, and authorizing the Keystone XL Pipeline directly, Congress has already exercised those powers in a manner incompatible with any assertion that the President can unilaterally prohibit development of the Keystone XL Pipeline.

5.      Even had Congress not acted, the President's assertion of power far exceeds any prior Presidential practice that could, through Congressional acquiescence or otherwise, possibly support the constitutionality of his action here. Congress has enacted statutes that limit the Executive Branch's authority over certain cross-border commercial facilities and foreclose any role for unilateral Presidential action. For facilities not yet addressed by statute (including oil pipelines), certain prior Presidents have claimed and exercised limited unilateral powers to regulate those cross-border commercial facilities. Until now, those limited regulatory powers have been directly related to issues concerning the border crossing and have never been asserted to bar the development of a significant, predominantly domestic facility. No President has ever prohibited the development of a major oil pipeline, much less one supporting significant

domestic commerce.  Nor has any President prohibited the development of any cross-border commercial facility on the ground that he must restrict foreign and domestic commerce to enhance his influence in foreign affairs.

6.      Basic principles of constitutional law establish that the President exceeds his authority where, as here, he purports to act without statutory authority and contrary to the expressed will of Congress to resolve an issue of domestic and international commerce that the Constitution authorizes Congress to address.  That conclusion is especially clear where the President's stated reason for aggrandizing his power at the expense of Congress's is that he needs heightened powers to negotiate with foreign states.  That is, he claims that he needs more power here to have more power elsewhere.  That novel assertion of power has unprecedented effect and nearly boundless scope: under that rationale, the President could control domestic or foreign commerce whenever that might enhance his dealings with a foreign state.  The President's lawful power must arise from a statute or the Constitution.  Here, it is grounded in neither.

7.      Federal courts are empowered to declare that a purported exercise of Presidential power is unsupported by statutory or constitutional authority and to prevent Executive branch officials from enforcing the unconstitutional decision.  Plaintiffs have been harmed by the determination that TransCanada is prohibited from constructing and operating the Keystone XL Pipeline and request a declaration that the determination is unlawful and an injunction barring Executive branch efforts to give effect to it.

## II.     THE PARTIES

8.      Plaintiff TransCanada Keystone Pipeline, LP is a Delaware limited partnership owned by affiliates of TransCanada Corporation, a Canadian public company organized under the laws of Canada.  TransCanada Keystone Pipeline, LP maintains its principal place of

business at 700 Louisiana Street, Suite 700, Houston, Texas, 77002.  Its principal business is to own crude oil pipelines in support of TransCanada's businesses.  TransCanada Keystone Pipeline, LP owns the Keystone I Pipeline, and it would own the U.S. facilities of the proposed Keystone XL Pipeline.  TransCanada Keystone Pipeline, LP applied for a Presidential permit to enable the construction and operation of cross-border facilities for the proposed Keystone XL Pipeline.  The denial of that application for a Presidential permit embodied the Presidential determination that TransCanada cannot build the Keystone XL Pipeline and gave rise to this lawsuit.

9.     Plaintiff TC Oil Pipeline Operations Inc. is a Delaware corporation and is wholly-owned, indirectly, by TransCanada.  Its principal business is to develop and operate the Keystone I Pipeline and the proposed Keystone XL Pipeline. TC Oil Pipeline Operations Inc. maintains its principal place of business at 700 Louisiana Street, Suite 700, Houston, Texas, 77002.

10.    Defendant John F. Kerry is named in his official capacity as the Secretary of the Department of State.  The Department of State is responsible for communicating and coordinating with the Canadian government with respect to issues affecting the U.S.-Canada border.  Secretary Kerry is also responsible for exercising certain asserted Presidential powers over cross-border facilities that the President claims to possess and to have delegated to the Secretary.

11.    Defendant Loretta E. Lynch is named in her official capacity as the Attorney General of the United States.  Lynch is the chief law enforcement officer of the United States and directs litigation on behalf of the United States.

12.    Defendant Jeh Charles Johnson is named in his official capacity as the Secretary of the Department of Homeland Security, the agency primarily responsible for law enforcement

at the nation's borders.  Johnson has oversight responsibility for U.S. Customs and Border

Protection and U.S. Immigration and Customs Enforcement, two agencies devoted to border

concerns.

13.     Defendant Sally Jewell is named in her official capacity as the Secretary of the

Department of Interior.  The Department of the Interior oversees the Bureau of Land

Management, which in turn manages the public lands of the United States.  Portions of the

Keystone XL Pipeline, including the border crossing, would traverse federal property.

## III.     <u>JURISDICTION AND VENUE</u>

14.     The Court has federal question jurisdiction under 28 U.S.C. § 1331.

15.     Venue is proper in this District under 28 U.S.C. § 1391(e).  Plaintiffs maintain

their principal place of business in Houston, and the Keystone Pipeline System extends into this

District.

16.     This Court is authorized to award the requested relief under the Declaratory

Judgment Act, 28 U.S.C. §§ 2201-2202, and under Article III of the United States Constitution.

## IV.     <u>BACKGROUND</u>

### A.     **The Construction and Proposed Expansion of the Keystone Pipeline System**

17.     TransCanada owns 2,639 miles of interconnected petroleum pipelines in the

United States ("Keystone System").  Those facilities include the Keystone Pipeline ("Keystone I

Pipeline"), which commenced operation in 2010; the Cushing Extension Pipeline, an early

extension of the Keystone I Pipeline to Cushing, Oklahoma, which commenced operation in

2011; the Gulf Coast Pipeline, an extension of the Keystone I Pipeline originally proposed as

part of the Keystone XL Pipeline project and which commenced operation in 2014; and the

Houston Lateral, a pipeline originally proposed as part of the Keystone XL Pipeline project,

which extends from the Gulf Coast Pipeline to points in Harris County, Texas, and which will

commence operations in 2016.  The proposed Keystone XL Pipeline would connect to the

existing Keystone System, delivering oil from Hardisty, Alberta, to Steele City, Nebraska, as

shown below, and would affect the operation and profitability of the Keystone System, including

the Houston Lateral.



18.     TransCanada commenced preparations to build the Keystone I Pipeline and

Cushing Extension in 2005.  The Keystone I Pipeline extends from an oil supply hub near

Hardisty, Alberta to terminals in Illinois and transports crude oil produced from areas often

referred to as the "oil sands."

19.     In connection with those plans, plaintiff TransCanada Keystone Pipeline, LP in

2006 sought to obtain a permit from the U.S. Government to construct and operate pipeline

facilities that would cross the U.S.-Canada border.  Certain U.S. Presidents had previously

asserted a narrow authority to require and grant such permits for certain facilities, including oil

pipelines, that cross a U.S. border.  TransCanada Keystone Pipeline, LP sought the permit from

the Secretary of State, who the President had "designated and empowered" to receive such

permitting requests and to lead an interagency evaluation process.  *See* Exec. Order. No. 13337,

69 Fed. Reg. 25,299 (Apr. 30, 2004).

20.     Executive Order 13337 further delegated to the Secretary of State the asserted

Presidential power to decide whether the issuance of a permit would serve the national interest

and to notify other federal officials of that determination.  Under that Order, the Secretary must

then issue or deny the permit unless within 15 days "an official required to be consulted . . .

notif[ies] the Secretary of State that he or she disagrees with the Secretary's proposed

determination and requests the Secretary to refer the application to the President."  *Id.*  In the

event of such disagreement, the Secretary of State "if necessary, shall refer the application . . . to

the President for consideration and a final decision."  *Id.*  As with any other delegated

Presidential power, the President may determine to exercise the power personally.

21.     In 2008, the State Department determined that issuing a permit for TransCanada

"to construct, connect, operate and maintain facilities at the border of the United States and

Canada for the transport of crude oil between the United States and Canada across the

international boundary at Cavalier County, North Dakota, would serve the national interest."

The State Department raised no objections regarding any effect the pipeline's operation might

have on greenhouse gas production, and the order reflecting the Department's national interest

determination did not address the subject.

22.     The Department concluded that construction and operation of the Keystone I

Pipeline project served the national interest because, among other reasons, "[i]t increases the

diversity of available supplies among the United States' worldwide crude oil sources," "increases

crude oil supplies from a source region that has been a stable and reliable trading partner of the United States," "does not require exposure of crude oil in high seas transport and railway routes that may be affected by heightened security and environmental concerns," and "provides additional supplies of crude oil to make up for the continued decline in imports from several other major U.S. suppliers."

23.     Although the State Department's order assessed the Keystone I Pipeline and Cushing Extension, the permit specifically applied only to the limited pipeline facilities extending from the border "to and including the first mainline shut-off valve or pumping station in the United States."  The Department explained that the President had asserted authority over only "facilities at the border of the United States," that no such authority existed over equivalent domestic facilities, that the President's interest arose from "the impact the proposed cross-border facility … will have upon U.S. relations with the country in question, whether Canada or Mexico," and thus no reason existed that "the permit [the Department] issues in this case should extend any further than necessary to protect that foreign relations interest."  Key provisions of the order permitted the Department to "take possession" or "direct the permittee to remove the facilities," and the Department concluded that limiting the permit to "the first mainline shut-off valve or pumping station would adequately protect [the Department's] foreign relations interest in implementing [the President's Executive Orders]."

24.     Since 2010, the Keystone I Pipeline has transported crude oil from Alberta to Nebraska, and then to facilities in Illinois and, since the Cushing Extension began to operate in 2011, to facilities in Cushing, Oklahoma.  The transported oil originates from the same area and is indistinguishable from the oil that the Keystone XL Pipeline would transport from Canada to the United States.

25.     In July, 2009, the State Department granted a permit authorizing another Canadian company to construct, connect, operate, and maintain facilities at the U.S.-Canadian border for the transport of crude oil from the oil sands region of Alberta into the United States. This major pipeline, proposed by a pipeline company that is a direct competitor to TransCanada, is commonly known as the "Alberta Clipper."

26.     The Department, then led by Secretary Clinton, concluded that the Alberta Clipper Pipeline would serve the public interest for reasons including those leading to the Department's approval of the Keystone I Pipeline, noted above, and because "[a]pproval of this permit will also send a positive economic signal, in a difficult economic period, about the future reliability and availability of a portion of United State's [sic] energy imports, and in the immediate term, will provide construction jobs."

27.     In assessing the Alberta Clipper application for a cross-border facilities permit, the State Department addressed greenhouse gas issues only to conclude that changes in greenhouse gas production was not an appropriate basis for denying a cross-border permit. Instead, the preferred approach for addressing concerns about greenhouse gas emissions was "in the context of the overall set of domestic policies that [both countries] will take to address their respective greenhouse gas emissions."  As with the Keystone I Pipeline permit, the Alberta Clipper pipeline permit applied only to facilities immediately on or near the U.S. border.  The Alberta Clipper pipeline commenced operation in 2010.

28.     In 2008, TransCanada proposed to expand the Keystone System by building the Keystone XL Pipeline, which would facilitate the transport of up to 900,000 barrels per day of crude oil to the interior and Gulf Coast regions of the United States from Alberta and Montana.

Approximately 100,000 barrels per day of that capacity would be devoted to transporting oil originating in Montana.

29.     The pipeline was to be constructed overwhelmingly within the United States.  In addition to a new, 327-mile pipeline segment from Hardisty, Alberta to the U.S.-Canada border, the proposed project was comprised of three other principal sections:  (i) a segment from the U.S.-Canadian border to Steele City, Nebraska, connecting with the Keystone I Pipeline (approximately 850 miles); (ii) the Gulf Coast Pipeline, extending from the existing Keystone Pipeline System at Cushing, Oklahoma to Nederland, Texas (approximately 478 miles); and (iii) the "Houston Lateral" pipeline segment extending from the Gulf Coast Pipeline beginning in Liberty County, Texas to Harris County, Texas (approximately 47 miles long).

30.     In September, 2008, TransCanada applied to the State Department for a permit to construct facilities on and near the border, specifically the 1.2 mile segment from the U.S.-Canada border to the first pipeline isolation valve in Montana.  In addition to detailing matters like the pipeline's planned route, the application explained that the estimated capital cost of the U.S. portion of the project would exceed $5.4 billion and that shippers of crude oil had "already committed to binding contracts totaling 300,000 [barrels per day]."   These early commitments, which swiftly increased to 720,000 barrels per day, demonstrated "a material endorsement of support for the Project, its economics, proposed route, and target market, as well as the need for incremental pipeline capacity and access to Canadian crude supplies."

31.     The State Department commenced an extensive, multi-year review of the environmental impacts of the entire Keystone XL Pipeline, using a process consistent with but not required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. 4321 *et seq.*  This initial round of environmental analysis would produce the first three of five determinations by

the Department that granting a permit to permit construction of the Keystone XL Pipeline would have no material effect on greenhouse gas emissions.

32.     First, in April 2010, the State Department issued a Draft Environmental Impact Statement ("DEIS"), which concluded, among other things:

- "the proposed Keystone XL Project would result in limited adverse environmental impacts during both construction and operation";

- "assuming constant demand for refined oil products, the incremental impact of the Project on GHG emissions would be minor";

- "since the crude oil delivered by the Project would be replacing similar crude oils from other sources, the incremental impact of these emissions would be minor"; and

- "the transport of crude oil by tanker and other means such as truck and rail would likely result in greater GHG emissions than those that would occur as a result of the proposed Project.  Finally, the No Action Alternative would not meet the purpose and need of the proposed Project."

33.     In October 2010, then-Secretary of State Clinton publicly stated that the State Department was "inclined" to approve a Presidential Permit for the Keystone XL Pipeline. TransCanada subsequently agreed to adopt 57 project-specific conditions for the design, construction, and operation of the Keystone XL Pipeline.  These conditions were similar to the conditions the government had required of prior cross-border oil pipelines, including the Keystone I Pipeline.

34.     New information prompted the State Department to prepare a Supplemental DEIS ("SDEIS"), which was issued in April 2011.  The State Department again concluded that the proposed pipeline would not materially affect greenhouse gas emissions.  It found that "on a global scale, emissions are not likely to change [as a result of the Pipeline]" and that "the information provided in this SDEIS does not alter the conclusions reached in the draft EIS regarding the need for and the potential impacts of the proposed Project."

35.     In August 2011, the State Department issued its Final EIS ("FEIS"), concluding for a third time that the pipeline would not materially increase greenhouse gas emissions.  The FEIS concluded that the proposed project is not likely to impact the amount of crude oil produced from the oil sands and that, "on a global scale, the decision whether or not to build the Project will not affect the extraction and combustion of WCSB oil sands crude on the global market."

36.     Despite these findings, the State Department stated in November, 2011 that it could not make a National Interest Determination on the Keystone XL Pipeline at that time.  The Department claimed that it would first have to evaluate alternative routes for the portion of the pipeline that would pass through Nebraska.

37.     This more than three-year delay following the application's submission in September, 2008 far exceeded the periods the Department required to review and grant permits for the Keystone I Pipeline (less than two years) and the Alberta Clipper Pipeline (approximately two years and two months).  In December 2011, Congress passed, and the President signed, the Temporary Payroll Tax Cut Continuation Act of 2011.  Title V of this Act required the President, acting through the Secretary of State, within 60 days to grant a permit authorizing construction of the Keystone XL Pipeline or to report to Congress the reasons why the President did not believe construction of the pipeline would be in the national interest — leaving to Congress whether to take further action.

38.     On January 18, 2012, President Obama directed the Secretary of State to deny the initial Keystone XL permit application, stating that "60 days is an insufficient period to obtain and assess the necessary information …."  The State Department issued an order denying the

permit on January 31, 2012.  The President and the Department made clear that they would consider a renewed permit application in due course.

39.     In February 2012, TransCanada decided to extend the Keystone System by building the Gulf Coast Pipeline along a 478-mile pathway from Cushing, Oklahoma to Nederland, Texas.  TransCanada advised the State Department that it was proceeding with the Gulf Coast segment on a stand-alone basis because that segment had some utility independent of the Steele City segment of the proposed Keystone XL Project that the President had directed the State Department to deny the month before.

40.     In March 2012, well into a Presidential election year, President Obama stood before stacks of oil pipe segments in a pipe yard owned by TransCanada in Cushing, Oklahoma, and praised "a company called TransCanada [that] has applied to build a new pipeline to speed more oil from Cushing to state-of-the-art refineries down on the Gulf Coast."  He stated that he was "directing my administration to … make this project a priority, to go ahead and get it done" and released an order to that effect the same day.  He also cited concerns surrounding the originally proposed Keystone XL Pipeline route near aquifers in Nebraska, and attributed the delayed decision-making concerning the Presidential permit to the view of "our experts" that more time was needed to review the project "properly to make sure that the health and safety of the American people are protected."  The Gulf Coast Pipeline was completed in January 2014. TransCanada then extended the Keystone System in 2014 by building the Houston Lateral Project, a 47-mile pipeline extension from the Gulf Coast Pipeline to the Houston refining market.  However, without the Keystone XL Pipeline, both the Gulf Coast Pipeline and the Houston Lateral will remain underutilized to a significant degree.  They were designed and built to accommodate the volume of crude oil that would be transported by the Keystone XL Pipeline.

Because the Keystone XL Pipeline has not yet been constructed, these southern sections of the Keystone System will transport significantly less crude oil than their full capacity would permit.

41.     In May 2012, TransCanada submitted a renewed application to the State Department for a cross-border permit for the Keystone XL Pipeline.  The application again proposed that the facility would cross the border near Morgan, Montana and interconnect with the Keystone I Pipeline at Steele City, Nebraska, transiting the same route originally proposed through Montana and South Dakota.  The application additionally stated that TransCanada would supplement the application with an alternative route in Nebraska, once Nebraska selected the route.  The permit application advised that the portion of the Keystone XL Pipeline running from the U.S.-Canada border to Steele City, Nebraska would have an estimated capital cost of $5.3 billion.

42.     The Nebraska Department of Environmental Quality ("NDEQ") thereafter proceeded with its analysis of proposed routes through Nebraska, ultimately evaluating a route that would avoid environmentally sensitive areas in Nebraska.  The Governor of Nebraska then approved the route.

43.     In March, 2013, the State Department released a new Draft SEIS ("DSEIS"), reflecting the new route through Nebraska.  The DSEIS concluded, for a fourth time, that the pipeline would produce "no substantive change in global [greenhouse gas] emissions."

44.     The State Department completed its Final Supplemental Environmental Impact Statement ("SEIS") in January, 2014.  The SEIS concluded, for the fifth time, that the proposed Keystone XL Pipeline would not substantially increase carbon emissions and that "approval or denial of any one crude oil transport project, including the proposed Project, is unlikely to significantly impact the rate of extraction in the oil sands or the continued demand for heavy

crude oil at refineries in the United States based on expected oil prices, oil-sands supply costs, transport costs, and supply-demand scenarios."

45.     In January, 2015, the State Department resumed its broader review of the Keystone XL Pipeline and requested the views of the Departments of Defense, Energy, Justice, Interior, Commerce, Homeland Security, and Transportation, and the Environmental Protection Agency.

46.     As the State Department delayed its determinations regarding the Keystone XL Pipeline, Congress began to act on measures to authorize construction of the Keystone XL Pipeline.  As described below, on five separate occasions between 2011 and 2014, the House of Representatives passed bills authorizing the development of the Keystone XL Pipeline.  The development of the Keystone XL Pipeline featured prominently in the Senate elections of 2014, and following those elections, the Senate voted on whether to proceed to vote on a measure to authorize the development of the pipeline.  That measure secured the support of 59 Senators but failed to secure the 60 votes required to advance the bill.

47.     After the 114th Congress convened in January 2015, the first bill introduced in the Senate was a measure to authorize the development of the Keystone XL Pipeline, without and despite any further action or inaction by the President.  The Senate passed that bill, the Keystone Pipeline Approval Act, on January 29, 2015.  The House of Representatives followed suit on February 11, 2015.  The Congress thereafter forwarded the enrolled bill to the President.

48.     President Obama vetoed the Keystone Pipeline Approval Act on February 24, 2015, characterizing it as an "attempt[] to circumvent longstanding and proven processes for determining whether or not building and operating a cross-border pipeline serves the national interest."

49.     As of December, 2015, TransCanada had invested billions of dollars in the

portion of the Keystone XL Pipeline project that would run from Western Canada to Steele City,

Nebraska.

     **B.**      **The President's Prohibition of the Construction and Operation of the Keystone XL Pipeline.**

50.      On November 6, 2015, the President announced that the Secretary of State, acting

pursuant to an Executive Order delegating the President's constitutional power under Article II

of the Constitution, had denied a border crossing permit for and thus prohibited the construction

and operation of the Keystone XL Pipeline.  The President said that he agreed with the Secretary

of State's determination that the pipeline would not serve the national interest and should not be

constructed.  A true and correct copy of the Statement by the President on the Keystone XL

Pipeline, obtained from the White House website, is attached as Exhibit A.

51.     The State Department issued a Record of Decision and National Interest

Determination ("Decision") explaining the reasons and legal basis for the Secretary's denial of

the permit and prohibition on constructing the pipeline.  A true and correct copy of the Decision,

obtained from the State Department website, is attached as Exhibit B.

52.     In the Decision, the Secretary confirmed that the prohibition was "based on [the

President's] Constitutional powers" which had been "delegated to the Secretary of State" and

that "[n]o statute established criteria for this determination" or otherwise supported the exercise

of unilateral Presidential powers.

53.     The Secretary also concluded that constructing the Keystone XL Pipeline would

advance the national interest in three important respects.   First, constructing the Keystone XL

Pipeline would increase "energy security by providing additional infrastructure for the

dependable supply of crude oil."

54.     Second, constructing the pipeline would have "meaningful" economic benefits for the United States.  The Secretary found that spending on the Keystone XL Pipeline project would support approximately 42,100 jobs over a two-year construction period; the pipeline "would also generate tax revenue for communities in the pipeline's path;" and "pipeline activity would contribute .02 percent to the national G.D.P. based on 2012 statistics."

55.     Third, the Secretary found that proceeding with the pipeline would advance the United States' relationship with Canada.  In contrast, prohibiting construction "may lead to a cooling of U.S.-Canadian relations and could affect Canadian cooperation on Western Hemisphere issues and international security cooperation."

56.     Separately, the Secretary concluded that the Keystone XL Pipeline is "unlikely to significantly impact the level of GHG-intensive extraction of oil sands crude or the continued demand for heavy crude oil at refineries in the United States."  The President likewise said that the Keystone XL pipeline is "not the express lane to climate disaster."  In fact, the Decision concluded that if the pipeline did not proceed, the crude oil could be transported from Alberta by rail, other pipelines, and tankers and that "annual GHG emissions (direct and indirect)" would be *greater* than if the Keystone XL Pipeline were constructed, assuming "movement of equivalent amounts of oil from Alberta to the Gulf Coast."  A senior State Department official explained that "we don't believe that this project denial will affect production" of oil in Canada.

57.     Despite these conclusions that the pipeline would not increase greenhouse gas emissions, the Secretary's Decision reasoned that the government must "prioritize actions that are not perceived as enabling further GHG emissions globally."  And here, "the general understanding of the international community is that a decision to approve the proposed Project would precipitate the extraction and increased consumption of particularly GHG-intensive crude

oil.  Such a decision would be viewed internationally as inconsistent with the broader U.S. efforts to transition to less-polluting forms of energy and would undercut the credibility and influence of the United States in urging other countries to put forward ambitious actions and implement efforts to combat climate change, including in advance of the December 2015 climate negotiations."

58.     This purely symbolic role a permit denial would play abroad, in turn, provided the basis for prohibiting construction.  The Secretary concluded that "a key consideration at this time is that granting a Presidential Permit for this Project would undermine U.S. climate leadership and thereby have an adverse impact on encouraging other States to combat climate change and work to achieve and implement a robust and meaningful global climate agreement."  Permitting the pipeline to proceed "would undercut the credibility and influence of the United States in urging other countries … to implement efforts to combat climate change, including in advance of the December 2015 climate negotiations."  In turn, "an effective global climate agreement … would have a direct and beneficial impact on the national security and other interests of the United States."

59.     The President agreed with that analysis.  He said that "approving this project would have undercut [America's] global leadership" on the issue of climate change.  "And three weeks from now, I look forward to joining my fellow world leaders in Paris, where we've got to come together around an ambitious framework to protect the one planet that we've got while we still can."

60.     Nothing in the President's statement or the Decision's rationale concerns issues presented by the fact that the pipeline would cross the border, the ostensible basis for any exercise of Presidential power and the exclusive basis for prior permit reviews.  There was no

claim, for example, that Canada would deny reciprocal rights to use the pipeline, that a monopoly would extend from Canada to harm U.S. citizens, or even that relations with the bordering state required blocking the pipeline.  To the contrary: the President and Secretary both acknowledged that Canada *supported* the pipeline and urged the United States government to approve its construction.  Nor was there any claim that TransCanada would deny the United States government access to the facility, or fail to implement measures to mitigate safety risks or the risks of an oil spill, the traditional regulatory concerns underlying prior Presidential permitting decisions.  On the contrary, the Decision states that "Keystone has agreed to incorporate additional mitigation measures in the design, construction, and operation of the proposed Project, in some instances exceeding what is normally required."

61.     Rather, this novel exercise of Presidential power rests on pure symbolism and has nothing to do with the pipeline's crossing the border.  The expansion of Presidential control over international trade and the domestic economy was justified only by the claim that the President needs greater Presidential powers in this instance to have greater Presidential powers elsewhere, reflected in negotiations with foreign powers.  Every limitation on international trade could be said to have the same effect, and regulation of domestic economic activity could have precisely the foreign negotiating benefit that the President invokes.  However, the Constitution commits such regulation of international trade and domestic economic affairs to the Congress, and not to the President.  He simply has no such unilateral powers.

## V.     LIMITATIONS ON PRESIDENTIAL POWERS

### A.     The Constitutional Framework

62.     The exercise of Presidential power that purports to prohibit construction of the Keystone XL Pipeline is unauthorized by statute, encroaches upon the power of the Congress to regulate domestic and foreign commerce, has been foreclosed by affirmative Congressional

action, and unlawfully exceeds the powers granted to the President under the Constitution or acquiesced in by Congress.

63.     The Supreme Court's cases make clear that the federal courts are to decide whether the President has purported to exercise a power that properly belongs to the Congress or is otherwise contrary to the Constitution.  *See, e.g.*, *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014) (President exceeded constitutional authority in making certain recess appointments); *Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1428 (2012) (judicial duty to decide "what the law is" encompasses cases "where the question is whether Congress or the Executive is "'aggrandizing its power at the expense of another branch'") (citation omitted).

64.     Thus, courts regularly consider challenges to the lawfulness of a President's action when they are undertaken through a "suit seeking to enjoin the officers who attempt to enforce the President's directive."  *Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring) (citing various cases).  The Supreme Court has repeatedly made clear that federal courts are obligated to address claims that the President or officials exercising his powers have acted beyond their Constitutional authority and to enforce the separation of powers.  *See, e.g., Zivotofsky v. Clinton*, 132 S. Ct. at 1428; *Medellin v. Texas*, 522 U.S. 491, 523 (2008); *Franklin v. Massachusetts*, 505 U.S. at 801 (plurality); *Webster v. Doe*, 486 U.S. 592, 603-05 (1988); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U. S. 579 (1952) (holding Presidential Executive Order unconstitutional and invalid); *Panama Ref. Co. v. Ryan*, 293 U. S. 388 (1935) (same); *see also Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690 (1949) (courts may enter injunctions against federal officers where the "order conferring power upon the officer . . . is claimed to be unconstitutional").  Indeed, the government has "acknowledge[d]" that because the scope of the President's discretion to act under law "is limited by the Constitution . . . an

independent claim of a President's violation of the Constitution would certainly be reviewable." *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1326 (D.C. Cir. 1996).

65.     To decide whether a specific Presidential action has exceeded the powers of that office, courts use a three-part framework that begins with the understanding that "[t]he President's authority to act, as with the exercise of any governmental power, 'must stem either from an act of Congress or from the Constitution itself.'"  *Medellin*, 552 U.S. at 524 (quoting *Youngstown*, 343 U.S. at 585).

66.     This framework also recognizes that "[p]residential powers are not fixed but fluctuate, depending upon their disjunction or conjunction with those of Congress." *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring).  The President's power must thus be assessed in light of Congress's extensive powers, set forth in the Domestic Commerce Clause and the Foreign Commerce Clause, over domestic and cross-border commercial facilities such as the Keystone XL Pipeline.  U.S. Const. art. I, § 8, cl. 3.

67.     First, when Congress has approved the President's action, "'his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate.'"  *Medellin*, 552 U.S. at 524 (quoting *Youngstown*, 343 U.S. at 635).

68.     Second, when the President "'acts in absence of either a congressional grant or denial of authority, he can only rely *upon his independent powers.*'"  *Medellin*, 552 U.S. at 524 (quoting *Youngstown*, 343 U.S. at 635) (emphasis added).  In such a case, "the validity of the President's action . . . hinges on a consideration of all the circumstances which might shed light on the views of the Legislative Branch toward such action."  *Dames & Moore v. Regan*, 453 U.S. 654, 668 (1981).  Courts then consider, on one hand, whether Congress has "enacted legislation, or even passed a resolution, indicating its displeasure with the" President's action, *id.* at 687,

and, on the other, whether Congress previously has acquiesced in a *"particular exercise* of Presidential authority."  *Medellin*, 552 U.S. at 528 (emphasis added).  Where a claim of executive power is "expressed in broad terms," but that same power has in practice been "exercised quite narrowly," courts will find acquiescence only where the claimed power has been both exercised by the executive and implicitly approved by the Congress.  *See Kent v. Dulles*, 357 U.S. 116, 127-28 (1958); *see also Medellin*, 552 U.S. at 531 (confining claim of acquiescence to the "narrow set of circumstances" directly supported by past practice).

69.     Third, when the President's action is "'incompatible with the expressed or implied will of Congress, his power is at its lowest ebb,' and [a court] can sustain his actions 'only by disabling the Congress from acting upon the subject.'"  *Medellin*, 552 U.S. at 525 (quoting *Youngstown*, 343 U.S. at 637-38).  In other words, only in the rare circumstances where the President's power is exclusive may "Congress … not enact a law that directly contradicts" his assertion of that power.  *Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2095 (2015).  Any "[p]residential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system."  *Youngstown*, 343 U.S. at 638 (Jackson, J., concurring).

70.     This framework applies even where the President asserts that his challenged actions were motivated by foreign affairs concerns.  The Supreme Court in *Medellin* set aside a Presidential Memorandum directing state courts to give effect to a decision of the International Court of Justice even though the President claimed to be exercising his authority over foreign affairs, and it set aside the President's seizure of the steel mills in *Youngstown* even though the President claimed he was acting to protect the national security.   Last year, the Court again reaffirmed that "[t]he Executive is not free from the ordinary controls and checks of Congress

merely because foreign affairs are at issue." *Zivotofsky v. Kerry*, 135 S. Ct. at 2090.  Rather, "whether the realm is foreign or domestic, it is still the Legislative Branch, not the Executive Branch, that makes the law," and "it is essential that the congressional role in foreign affairs be understood and respected."  *Id.*  Still further caution is warranted, moreover, when the President's unilateral powers turn from their usual focus "against the outside world for the security of our society," and are redirected "inward" toward domestic matters.  *Youngstown*, 343 U.S. at 645 (Jackson, J., concurring).  With respect to domestic affairs, the President's powers are properly "subject to limitations consistent with a constitutional Republic whose law and policy-making branch is a representative Congress."  *Id.* at 645-46.

71.     The asserted Presidential power to prohibit construction of the Keystone XL Pipeline exceeds the Constitution's limits because it concerns a matter committed to Congress and is contrary to the express and implied will of Congress.  The dispute falls within the third *Youngstown* category, and no basis exists to argue that Congress is without power over the pipeline's construction.  Even had Congress not spoken directly to the issue, the asserted Presidential power would violate the Constitution within the framework of the second *Youngstown* category because Congress has not acquiesced in the rationale for or nature of the Presidential power invoked to block the pipeline.  The President's need to prohibit international and domestic trade to secure greater negotiating power with foreign states resembles no rationale any President has asserted to limit any transborder facilities in the past, the breadth of its effect is unprecedented, and the prohibition encroaches on the power committed by the Constitution to Congress to regulate foreign and domestic commerce.

**B.     Congress Is Empowered to Regulate the Cross-Border Trade at Issue and has Displaced any Unilateral Presidential Power to Prohibit the Keystone XL Pipeline's Development.**

72.     Article I, Section 8 of the Constitution provides for Congress "[t]o regulate Commerce with foreign Nations, and among the several States."  The Constitution thus provides Congress with the express power to authorize, regulate, or prohibit the development of commercial transportation facilities such as the Keystone XL Pipeline, which crosses both international and interstate borders.

73.     Congress could choose to exercise this power by directing or authorizing the President or other officials of the Executive Branch to regulate the construction or operation of cross-border oil transportation facilities.

74.     But here, there is no claim that any statute authorizes the President or his delegates to prohibit the construction or operation of the Keystone XL Pipeline.  The Decision acknowledged that "[n]o statute establishes criteria for this determination."  Instead, as the Decision also acknowledges, the determination to block the pipeline is based solely on claimed Presidential powers allotted by the Constitution (and delegated by the President to the Secretary of State by Executive Order 13337).

75.     The President's assertion of the unilateral power to prohibit the construction and operation of the Keystone XL Pipeline is incompatible with Congress's own exercise of its express powers.  The short version of this point is that, as described in paragraph 88, Congress has expressly and directly spoken to the issue and directed that the Keystone XL Pipeline proceed without further Presidential consideration or action.  The longer version, set out below, is that Congress through a variety of measures has established criteria regulating and facilitating the construction and operation of cross-border pipelines in general, and has authorized the construction of the Keystone XL Pipeline in particular.

76.    <u>First</u>, Congress has extensively regulated interstate oil pipelines such as the Keystone XL Pipeline, including by establishing the pre-conditions for their operation and regulatory mechanisms to govern their rates and terms of service.  Congress first established such regulatory mechanisms and related substantive obligations in a 1906 amendment to the Interstate Commerce Act, *see* 49 U.S.C. app. § 1 (1988), and has since established and directed the Federal Energy Regulatory Commission to administer these provisions, *see* Department of Energy Organization Act of 1977, Pub. L. 95-91, 91 Stat. 565, 584 (1977), 42 U.S.C. § 7172.  Congress created additional safety requirements for oil pipelines through enactment of the Pipeline Safety Act, 49 U.S.C. § 60101 *et seq*., and created and directed the Pipeline and Hazardous Materials Safety Administration to administer and enforce those requirements.

77.    Congress has also adopted a broad range of other statutes that in discrete respects govern the development of oil pipelines and other infrastructure projects with significant domestic effects.  These include, for example, the Clean Water Act, the National Historic Preservation Act, and the Endangered Species Act.

78.    Congress has thus extensively regulated the facilities at issue and established the conditions indicating whether their construction and operation are in the national interest.  Absent Congressional acquiescence in specific assertions of and rationales for Presidential powers, which this case does not implicate, such regulation by statute displaces any authority the President may have to regulate or prohibit those facilities on different grounds.  Congress has adopted statutory regulations for oil pipelines that are similar in nature, but even broader in sweep, than the provisions of the Interstate Commerce Act and Postal Roads Act that the federal courts in *United States v. Western Union Telegraph Co.* found sufficient to "free" the cross-border submarine cable at issue in that case "from the executive control sought to be exercised"

by the President.  272 F. 311, 323 (S.D.N.Y 1921); *see United States. v. W. Union Tel. Co.*, 272 F. 893, 894 (2d Cir. 1921) (affirming district court and similarly finding Presidential authority over cross-border facility extending from the United States to be unconstitutional), *rev'd as moot on consent of the parties*, 260 U.S. 754 (1922).

79.     Second, Congress has sought to advance international trade and investment undertaken through the construction and operation of cross-border oil pipelines, and limited the Executive Branch's ability to prevent or distort such trade and investment, by enacting legislation approving and implementing the North American Free Trade Agreements ("NAFTA") and the World Trade Organization ("WTO") Agreements.  *See* North American Free Trade Agreement Implementation Act, H.R. 3450, 103d Cong., 1st Sess. (1993); Uruguay Round Agreements Act, H.R. 5110, 103d Cong., 2d Sess. (1994).

80.     Like NAFTA itself, the related implementing legislation passed by Congress is designed to facilitate cross-border trade and investment between Canada and the United States – including trade in petroleum products and petroleum-related investment.  NAFTA and its implementing legislation commit the United States, acting through its Executive Branch officials, to regulate cross-border trade in a manner designed to ensure consistent and non-discriminatory regulation with respect to "energy and basic petrochemical goods.  *See* NAFTA Art. 603(1).  Limitations on such cross-border trade are permitted only in limited circumstances.

81.     In particular, the legislation provides the statutory approval that was necessary to have NAFTA Articles 1102, 1103, 1105 and 1110 go into effect.  NAFTA Articles 1102 and 1103 provide that the United States shall provide national treatment and most favored nation treatment, respectively, to Canadian investors.  These provisions prohibit discrimination against Canadian investors.  NAFTA Article 1105 provides that the United States shall accord to the

investments of Canadian investors "treatment in accordance with international law, including fair and equitable treatment and full protection and security."  This provision has been construed to prohibit regulations or prohibitions on investment that are arbitrary or inconsistent with the investor's legitimate investment expectations.  Given the unprecedented basis for and nature of the denial of the Presidential Permit for construction and operation of the Keystone XL Pipeline, the denial is arbitrary and frustrated plaintiffs' legitimate investment expectations.  NAFTA Article 1110 prohibits indirect expropriations of investments, which occur when a government action significantly reduces the value of an investment, without compensation.  TransCanada is separately invoking rights provided to it under NAFTA and has announced its intent to file an arbitration claim against the United States, seeking damages for violations by United States officials of Articles 1102, 1103, 1105, and 1110.

82.     Similarly, passage by Congress of implementing legislation, the Uruguay Round Agreements Act, was necessary to make effective an important provision of the WTO Agreements related to import restrictions:  Article XI:1 of the General Agreement on Trade and Tariffs 1994 ("GATT").  That article provides:  "No prohibition or restrictions other than duties, taxes, or other charges, whether made effective through quotas, import or export licences [sic] or other measures, shall be instituted or maintained by any [Member] on the importation of any product of the territory of any other [Member] …."  This provision applies to the United States and other WTO Members.  A prohibition of the construction and operation of the pipeline, affecting the competitive opportunities of Canadian petroleum products in the United States, amounts to a "restriction" by the United States "on the importation of any product of the territory" of Canada.  The Government of Canada has not yet announced whether it will initiate a

WTO dispute settlement proceeding against the United States for violations of the WTO
Agreements in connection with the Keystone XL Pipeline.

83.     Through legislation implementing NAFTA and the WTO Agreements, Congress
addressed and sought to facilitate the type of cross-border trade and investment that is reflected
in the construction and operation of the Keystone XL Pipeline.  Through that legislation,
Congress committed Executive Branch officials to facilitate such trade and investment and
limited their power to block or distort such cross-border trade and investment.  Although
limitations contained within the implementing legislation preclude those Agreements from
serving as an independent basis for judicial relief in U.S. federal courts, the statutes nonetheless
express Congress's views that such international trade and investment are desirable and reflect
its disapproval of actions by U.S. government officials that would impede that trade and
investment.

84.     Third, and most fundamentally, Congress has repeatedly and directly expressed
opposition to the President's attempt to unilaterally exercise power over the Keystone XL
Pipeline.

85.     Initially, Congress objected to the President's assertion that the pipeline's
construction could proceed only with his approval and that he was empowered to withhold
decision on the matter.  As a result, more than three years after TransCanada had filed a permit
application and in the absence of any Presidential determination, Congress on December 23,
2011 enacted Section 501 of the Temporary Payroll Tax Cut Continuation Act of 2011.  Section
501 directed that "the President, acting through the Secretary of State, shall grant a permit"
enabling construction of the Keystone XL Pipeline within 60 days. The statute also provided that
the President need not grant the permit if he determines that the pipeline would not serve the

national interest, but it required the President to submit a report to Congress providing a justification for the President's determination. The statute also provided that if the President did not grant the permit or make a finding within 60 days that the permit would not be in the public interest, a permit containing conditions specified in the statute "shall be in effect by operation of law." Pub. L. 112-78, 125 Stat. 1289-1290 (Dec. 23, 2011).

86.    Based on "the fact that the Department does not have sufficient time to obtain the information necessary to assess whether the project … is in the national interest," the State Department recommended that the President deny TransCanada's application. The President did so, stating that "[t]his announcement is not a judgment on the merits of the pipeline, but the arbitrary nature of a deadline that prevented the State Department from gathering the information necessary to approve the project and protect the American people." The State Department made clear that this action did "not preclude any subsequent permit application," and, as noted, TransCanada promptly reapplied for a Presidential permit to allow construction of the Keystone XL Pipeline.

87.    Thereafter, both houses of Congress further registered their support for the Keystone XL Pipeline and their disapproval of the President's power to deny a permit for the pipeline. From 2012 to 2014, the House of Representatives passed four separate bills authorizing the development of the Keystone XL Pipeline. *See* H.R. 5682, 113th Cong., 2d Sess. § 1 (2014); American Energy Solutions for Lower Costs and More American Jobs Act, H.R. 2, 113th Cong., 2d Sess. § 103 (2014); Northern Route Approval Act, H.R. 3, 113th Cong., 1st Sess. (2013); North American Energy Access Act, H.R. 4348, 112th Cong., 2d Sess. § 201-204 (2012). For example, Section 3 of the Northern Route Approval Act provided that "[n]otwithstanding Executive Order 13337 … and any other Executive order … , no Presidential permit shall be

required for the pipeline described … " in the application for the Keystone XL Pipeline.  In addition, the House of Representatives sought to strip the President of unilateral authority over oil pipelines generally by passing  the North American Energy Infrastructure Act. That Act declared that "[n]o Presidential permit required under Executive Order 1337 … Executive Order No. 12038, Executive Order 10485 or any other Executive Order shall be necessary for the construction, connection, operation, or maintenance of an oil or natural gas pipeline … or any cross-border segment thereof."  H.R. 3301, 113th Cong., 2d Sess. § 6 (2014).  Instead the Department of State would be granted statutory authority to act. *Id.* § 3. These measures did not secure sufficient support to advance past procedural hurdles in the Senate; the Senate version of H.R. 5682 fell just one vote shy of the procedural sixty vote mark.  *See* S. 2280, 113th Cong., 2d Sess. § 1 (2014).

88.     When the 114th Congress convened in January 2015, the first bill introduced in the Senate was the "Keystone Pipeline Approval Act," a measure to authorize the development of Keystone XL Pipeline.  That bill authorized TransCanada to "construct, connect, operate, and maintain the pipeline and cross-border facilities" described in the permit application without the need for any action by the President or any Executive branch official.  S. 1, 114th Cong., 1st Sess. §§ 1, 2(a) (2015).  The Senate passed the Act on January 29, 2015, and the House of Representatives passed it on February 11, 2015.  The enrolled bill was presented to the President, who vetoed it, stating that it would "circumvent longstanding and proven processes for determining whether or not building and operating a cross-border pipeline serves the national interest."  The President, however, did not question Congress's constitutional authority to enact the Keystone Pipeline Approval Act or object that it infringed any of his constitutional powers.

89.     By these actions, Congress approved of the construction and operation of the Keystone XL Pipeline and rejected any role for the President in refusing to permit the pipeline to proceed.  These are the very type of Congressional actions that the Supreme Court has used to determine whether the President has acted contrary to the "express or implied will of Congress," *Medellin*, 552 U.S. at 525, and without any implicit approval of Congress, *see Kent v. Dulles*, 357 U.S. at 128; *see, also, e.g.*, *Youngstown*, 343 U.S. at 586 (opinion of Black, J., for the court) (legislative history of relevant statutes, including rejection of a proposed amendment, demonstrated that "Congress had refused to adopt" a statute granting the claimed power to the President); *id.* at 599-601 (concurring opinion of Frankfurter, J.) (similar reliance on legislative history); *id.* at 639 & nn.6-8 (concurring opinion of Jackson, J.) (agreeing with opinions of J. Black, Frankfurter & Burton on this issue); *id.* at 657 (concurring opinion of Burton, J.) (legislative history demonstrated Congress had "reserved to itself the opportunity to authorize seizure to meet particular emergencies").  Even a resolution by Congress may indicate that Congress opposes the President's assertion of power.  *Dames & Moore v. Regan*, 453 U.S. 654 at 687-88 ("Just as importantly, Congress has not disapproved of the action taken here.  Though Congress has held hearings on the Iranian Agreement itself, Congress has not enacted legislation, or even passed a resolution, indicating its displeasure with the Agreement.").  The Executive Branch has acknowledged that what is required is the "tacit acquiescence" of Congress, and that even congressional measures short of enacted statutes, including the statements of individual members of Congress, are relevant to that determination.  *See* Foreign Cables, 22 Opp. Att'y Gen. 13, 19 (1898).

90.     Congress has thus rejected the President's assertion of authority to block the construction and operation of the Keystone XL Pipeline:  Both houses of Congress passed and

presented to the President a bill that expressly authorized TransCanada to construct and operate the pipeline and the cross-border facilities described in the permit application.  Although Congress was unable to override the President's veto, the passage of the bill itself expresses the will of Congress.  That bill and Congress's general regulation of domestic oil pipelines and efforts to facilitate cross-border commerce (including oil transport) are incompatible with the denial of a permit for the Keystone XL Pipeline, a major cross-border oil pipeline that also would engage in substantial domestic commerce and be built largely in the United States.

91.     Because the denial of the permit for the Keystone XL Pipeline is "incompatible with the expressed or implied will of Congress," the President's power "is at its lowest ebb" and can be sustained "only by disabling the Congress from acting upon the subject." *Medellin*, 552 U.S. at 525 (quoting *Youngstown*, 343 U.S. at 637-38 (concurring opinion)).  But Congress cannot be disabled from acting on the subject of the construction and operation of pipeline to transport crude oil from Canada for sale to and within the United States, because Article I, § 8 of the Constitution gives Congress the authority to regulate foreign and domestic commerce.  No President has asserted a claim to the contrary, and neither the President nor the Secretary did so with regard to the Keystone XL Pipeline.

92.     Congress's action thus precludes any unilateral Presidential power over the Keystone XL Pipeline.  Indeed, this case is stronger than *Youngstown*, where the Supreme Court held that President Truman lacked authority to seize domestic steel mills, *see* 343 U.S. at 585, because Congress has regulated the commercial activity at issue more comprehensively and directly than it had in *Youngstown* and has, in contrast to the Congressional action in *Youngstown*, expressly disapproved the specific Presidential action at issue.  The lack of Presidential authority here is also supported by the fact that the prohibition on construction of the

Keystone XL Pipeline directly interferes with foreign and domestic commerce, the regulation of which is textually committed to the Congress by the U.S. Constitution.  *See Medellin*, 552 U.S. at 524.

       **C.**      **The Unprecedented Nature of and Basis for the President's Assertion of Unilateral Power To Prohibit Development of a Cross-Border Facility.**

93.      Under the governing constitutional framework set out above, Congress's specific disapproval of the President's asserted power to prohibit the construction of the Keystone XL Pipeline, as well as its more general actions inconsistent with the exercise of that power, would suffice to require a declaration that the denial of the permit exceeded the President's constitutional powers and was without a lawful basis.

94.      The conclusion that the prohibition of the Pipeline's construction exceeded the President's lawful authority is further confirmed and separately compelled by the unprecedented reasons provided for prohibiting construction and by the unprecedented scope of the domestic and interstate commerce affected by the decision.  As described below, the prohibition of construction goes well beyond the limited authority to regulate cross-border facilities that has been exercised by prior Presidents, subject to Congress's ongoing control—as prior Presidents have acknowledged.

95.      The limited scope of the President's authority is reflected in the first, limited claim of unilateral Presidential power to address cross-border commercial facilities for discrete reasons, which would guide and set the boundaries on the Presidential power in the decades that followed.  In 1875, President Grant informed Congress that he had approved a French company's request to land communications cables in the U.S.  The approval was based on and subject to a limited set of conditions:  his review was designed to ensure only that U.S. citizens received reciprocal rights and that the company proposing to build the facility would not be able to

monopolize related services or exclude the U.S. government from access to the facility. President Grant emphasized that his approach was also subject to "such limitations and conditions as Congress may impose" and that he had acted only "[i]n the absence of legislation by Congress."  He further committed to adhere to the principles he had outlined "unless Congress otherwise direct[s]."  22 Op. Att'y Gen. at 16, 18.

96.     Applying these principles, the Executive Branch declined to object to the landing of foreign cables in 1877, 1879, and 1884, observing in the first instance that the power to impose the limited conditions asserted by President Grant had "met the approval of Congress . . . indicated by the tacit acquiescence of the Congress, and by the expressed approval of individual members of that body . . . ."  22 Op. Att'y Gen. at 19.

97.     At times during the next decade, the Executive Branch denied that the President possessed even this limited unilateral power over cross-border facilities.  In 1892, a French company sought to land a cable in Virginia and secured authorization from the government of that state.  The company then argued that it should be able to proceed because the President lacked authority to either grant or refuse permission to land.  Secretary of State Gresham agreed that because "[t]here is no Federal legislation conferring authority upon the President to grant such permission, and in the absence of such legislation, Executive action … would have no binding force."  22 Op. Att'y Gen. at 23.  Similarly, in 1895, Secretary of State and former Attorney General Olney confirmed, in addressing a cable landing request, that "in the absence of Federal legislation conferring authority upon the Executive to grant permission, this Department has no power to act in the matter."  22 Op. Att'y Gen at 24.

98.     The Executive Branch reversed its position again in 1898 and claimed that it had the limited powers advanced by President Grant with respect to cables proposed to enter the

United States from abroad.  Reviewing President Grant's statement of limited authority and subsequent practice, Acting Attorney General Richards concluded that "the President has the power, in the absence of legislative enactment, to control the landing of foreign submarine cables" and defended the potential limitations outlined by President Grant.  He also acknowledged that any Executive action is "subject to subsequent Congressional action."  22 Op. Att'y Gen. at 27.  The Richards opinion reflected the most extensive Executive Branch defense of the limited exercise of Presidential power and served as the basis for various approvals of cross-border facilities in the following decades.  *See, e.g.*, Granting of License for the Constr. Of a Gas Pipe Line, 38 Op. Att'y Gen. 163 (1935); Diversion of Water from Niagara River, 30 Op. Att'y Gen. 217 (1913); Wireless Telegraph-Int'l Agreement, 24 Op. Att'y Gen. 100 (1902); Cuba Cables, 22 Op. Att'y Gen. 408 (1899).

99.    Many subsequent Presidents wrote a similar acknowledgment of Congress's pre-eminent role directly into the permits they granted to other cross-border commercial facilities. For example, when President Wilson issued a permit for a pipeline running under the Detroit River between the U.S. and Canada in 1919, he made clear that the permit was subject to any action "by the Congress of the United States confirming, revoking, or modifying in whole or in part the conditions and terms upon which this consent is granted."  Similar language respecting the power of Congress to control commercial cross-border facilities was included in permits granted by Presidents McKinley, Roosevelt, and Taft.

100.    In 1920, the Executive Branch unsuccessfully sought to expand its previously asserted power to a different context: an effort by a company to *extend* its existing, U.S.-based facilities outside the United States.  Western Union Telegraph Company had planned to extend, from Florida, a submarine cable that would connect off-shore with facilities operated by a British

Western Union affiliate.  The U.S. government contended that the extension would be inconsistent with the anti-monopoly and reciprocity conditions outlined by President Grant because the British affiliate operated under a monopoly franchise in a foreign country.  The government sought an injunction in federal district court against Western Union's construction of an extension of U.S.-based facilities.

101.   The district judge, the renowned Augustus Hand, held that the President lacked the power to prohibit Western Union's construction and operation of the cross-border cable.  He reasoned, initially, that it was "most questionable" whether the President had any such power with respect to any cross-border cable, *United States v. Western Union Telegraph Co.*, 272 F. at 315, observing:

> The implications of the power contended for by the government are very great.  If the President has the right, without any legislative sanction, to prevent the landing of cables, why has he not a right to prevent the importation of opium on the ground that it is a deleterious drug, or the importation of silk or steel because importation may tend to reduce wages in this country and injure the national welfare . . . [or] in the absence of an act of Congress, have the right to refuse to admit foreigners to our shores, and to deport those aliens whose presence he regards as a public menace?

102.   Judge Hand ultimately reserved judgment on whether the President might have power to stop a purely foreign network from entering the United States, *id.* at 318-19, but held that the President did not have any such power to stop the extension of a domestic network that Congress had regulated through the Interstate Commerce Act and Postal Roads Acts, and thus "free[d] . . . from the executive control sought to be exercised."  *Id.* at 323.

103.   The Second Circuit affirmed, concluding that the underlying power over cross-border facilities "is in Congress," that "no practice has been established" that would provide the

President with such powers, and that the Postal Roads Act likely also supported Western Union's actions. *United States v. W. Union Tel. Co.*, 272 F. at 893.

104.    Congress responded by passing a statute that conferred legislative authority guiding such Presidential determinations and confirming that the President would not have the power to act unilaterally, *see* Act of May 27, 1921, ch. 12, 42 Stat. 8 (codified at 47 U.S.C. §§ 34-39), leading the parties by stipulation to reverse the injunction order and dismiss the *Western Union* case as moot, *see* 260 U.S. 754 (1922).  This statute, the Kellogg Act, comprised the first of a series of enactments by which Congress barred the President from acting unilaterally and instead conferred limited, express authority to regulate cross-border commercial facilities.  The Kellogg Act authorized the President to condition licenses on terms related only to the "landing or operation" of the cables, and to deny licenses only after a hearing and only to promote U.S. security or ensure reciprocal rights of U.S. citizens and companies abroad.  47 U.S.C. §§ 34, 35.

105.    Through subsequent statutes, Congress further disavowed and reduced the scope for unilateral Presidential action over cross-border commercial facilities.  Those statutes also established specific statutory frameworks addressing cross-border facilities for electrical transmission facilities, natural gas pipelines, and international bridges.  *See* Federal Water Power Act, 41 Stat. 1063 (1920) (codified as amended at 16 U.S.C. § 824(e)); Natural Gas Act, 52 Stat. 822 (1938) (codified as amended at 15 U.S.C. § 717b(a), (c)); International Bridge Act of 1972, 86 Stat. 731 (1972) (codified at 33 U.S.C. § 535).  In two of those three instances, Congress vested the approval power in an administrative agency, the Federal Power Commission ("FPC"), rather than in the President himself.   Like its successors that today exercise that statutory power (the Federal Energy Regulatory Commission and the Department of Energy), the FPC was

principally responsible for domestic facilities and services and not for the implementation of

foreign policy.  In each case, Congress made clear that the Executive Branch action was to

conform to and be based on statutory authority.

106.    President Roosevelt and President Eisenhower thereafter established procedures

governing how the Executive Branch would exercise powers over the cross-border facilities

authorized by the Federal Power Act, the Natural Gas Act, and the Kellogg Act.  *See* Exec. Order

No. 10530, 19 Fed. Reg. 2709 (May 10, 1954) (cable connections addressed by the Kellogg Act);

Exec. Order No. 10485, 18 Fed. Reg. 5397 (Sept. 9, 1953) (natural gas and electricity

transmission facilities); Exec. Order No. 8202, 4 Fed. Reg. 3243 (July 15, 1939).  Executive

Orders 10530 and 10485 remain in effect, as subsequently modified.

107.    In 1968, President Johnson issued Executive Order 11423 to address cross-border

facilities that Congress had not yet authorized the Executive Branch to address, including oil

pipelines.  The order designated the Secretary of State as the appropriate recipient for

applications for facilities used for "the exportation of petroleum [and] petroleum products," "the

exportation or importation of water or sewage," and other cross-border purposes.  *See* 33 Fed.

Reg. 11741 § 1(a) (Aug. 20, 1968).  The order further required the Secretary to request the views

of a range of other officials, and generally empowered the Secretary of State to grant a permit

upon determination that "issuance of a permit to the applicant would serve the national interest."

*Id.* § 1(d).  This order also created a process for direct Presidential review in the event of a

disagreement between departments about whether to grant or deny the permit.  *Id.* § 1(f).

108.    Upon information and belief, the President has never prohibited the development

of any major cross-border oil pipeline facility for which a permit was sought pursuant to

Executive Order 11423, has not prohibited such a facility comprised principally of domestic

components, has not prohibited such a facility that would also undertake significant domestic commerce, and has not prohibited the development of a cross-border oil pipeline facility based on an objection to the nature of the cross-border commerce it would facilitate.

109.    In 2004, President George W. Bush issued Executive Order 13337 to address and "expedite reviews of permits as necessary to accelerate the completion of energy production and transmission projects, and to provide a systematic method for evaluating and permitting the construction and maintenance of certain border crossings." *See* 69 Fed. Reg. 25299 (May 5, 2004).  Like Executive Order 11423, Executive Order 13337 designates the Secretary of State to receive all cross-border facility applications addressed by the order and to coordinate a process of interagency consultation that may culminate, in the event of disagreements, in a referral to the President for decision.  Executive Order 13337 remains in effect.  As described above, Secretary Kerry purported to exercise Presidential powers delegated pursuant to Executive Order 13337 when he asserted that TransCanada could not construct the Keystone XL Pipeline.

110.    As described above, permit applications granted for cross-border oil pipelines have been limited in scope to the facilities immediately adjacent to the U.S.-Canadian border. *See supra* para. 23.   This limited applicability to the immediate cross-border facilities reflects the Executive Branch's previously expressed view that the President's interest in the permitting process arises from "the impact the proposed cross-border facility … will have upon U.S. relations with the country in question, whether Canada or Mexico" and is consistent with the longstanding limits on the assertions of unilateral power in this area — focused on discrete, border-related considerations.

111.    District court decisions noting the President's power to grant permits for cross-border oil pipelines have pointed to this tradition of the exercise of limited powers and the (then-

existing) absence of any objection by Congress.  *See Sierra Club v. Clinton*, 689 F. Supp. 2d

1147, 1162 (D. Minn. 2010); *Natural Res. Def. Council, Inc. v. Dep't of State*, 658 F. Supp. 2d

105, 109 (D.D.C. 2009); *see also Sisseton-Wahpeton Oyate v. Dep't of State*, 659 F. Supp. 2d

1071, 1081 (D.S.D. 2009).  But none of these decisions affirmed the denial of a permit, much

less one undertaken over the objection of Congress and based on a novel rationale well beyond

the traditional criteria or scope of Presidential action.

112.    Upon information and belief, the permit applications submitted by TransCanada

for the Keystone XL Pipeline are the only applications for a major infrastructure project

addressed pursuant to Executive Order 13337 that any President has ever denied.  No previous

President has prohibited the development of major cross-border facilities for which a permit was

sought pursuant to Executive Order 13337, prohibited the development of such a major cross-

border facility comprised principally of domestic components, prohibited such a facility that

would undertake significant domestic commerce, or prohibited the development of such a major

cross-border facility based on an objection to the nature of the cross-border commerce it would

facilitate.

113.    Upon information and belief, the actions of the Executive Branch at issue in this

case and those rejected by the federal courts in the *Western Union* case mark the only times in

U.S. history that a President has attempted to prohibit the expansion abroad of a major U.S.-

based commercial facility based upon an assertion of unilateral Presidential power.  Even for the

unsuccessful actions at issue in the *Western Union* case (and unlike the action at issue in this

case), the Executive Branch's actions did not have the effect of prohibiting the development of a

major domestic infrastructure project, did not impede significant domestic commerce, were not

based on any criteria other than the limited grounds for action set forth by President Grant, and

did not purport to prohibit the construction of the cross-border facility based upon an objection to the nature of the commerce it would facilitate.

114.     There is thus no tradition of Presidents using unilateral powers to prohibit the construction of such major cross-border facilities, and especially none related to predominantly domestic facilities designed to undertake significant domestic commerce.  Even had Congress not specifically disapproved of any adverse assertion of unilateral Presidential action with respect to the Keystone XL Pipeline, no basis exists to claim that Congress has acquiesced in the prohibition of the pipeline here under *any* asserted rationale.  That is so because Congressional acquiescence can be found only in the acceptance and implicit endorsement of the President's actual exercise of unilateral powers, not his reservation of rights to seek to exercise broader powers in the future.  *See, e.g.*, *Kent v. Dulles*, 357 U.S. at 128; *see also Medellin*, 552 U.S. at 531 (confining claim of acquiescence to the "narrow set of circumstances" directly supported by past practice).

115.     The particular rationale for prohibiting construction of the Keystone XL Pipeline makes even clearer that the President has exceeded his constitutional authority.  Neither the need for the United States to be perceived in the international community as making efforts "to transition to less-polluting forms of energy" nor the need to enhance the President's negotiating power in Paris reflects any traditional concern related to the border crossing.  Nor does it reflect the border-related considerations set forth by President Grant and employed in subsequent Administrations.  The President did not prohibit the construction of the Keystone XL Pipeline because the Canadian government denied U.S. companies the reciprocal right to build connections to pipelines in Canada, or even to ensure better relations with Canada.  Nor did he

prohibit the pipeline because TransCanada would have monopoly power in the United Sates or would deny the U.S. government access to the facility.

116.    In contrast, and without precedent, the President's asserted basis for prohibiting the pipeline's construction and operation is wholly incidental to the fact that the Keystone XL Pipeline would cross an international border.  The asserted concerns about the international community's perception of U.S. efforts to transition to less greenhouse gas-intensive forms of energy, and the enhancement of the President's negotiating position, would apply equally to blocking construction of a wholly domestic oil or natural gas pipeline, or to blocking the import of heavy petroleum products.  For example, those concerns would apply as well to prohibiting construction of the Gulf Coast Pipeline, which facilitates the transport of crude oil (some of it originating in Alberta) from Oklahoma to refineries on the Gulf Coast.  Likewise, the same interests would be served by barring U.S. persons from facilitating the development of pipeline facilities or oil reserves that lie entirely outside the United States.  Indeed, any restriction by the President upon international trade would inherently strengthen the President's negotiating position with affected foreign nations.  But the President's rationale invoked here would not justify the lawfulness any of those actions undertaken without a statutory basis.  Any power to prohibit such activities unquestionably would rest in the Congress, not the President acting without statutory authority.  The President cannot justify his expansion of powers at Congress's expense by asserting simply that he needs to enhance other Presidential powers exercised elsewhere.

117.    The President's asserted basis for prohibiting the pipeline's construction also rests on an objection to the nature of the commerce the pipeline is intended to facilitate – indeed, it rests on *foreigners*' mistaken objections to that commerce.  Such determinations lie at the core of

the Congressional power over domestic and foreign commerce and have never served as a basis for the President to exercise unilateral powers to prohibit or impose permit conditions on other cross-border pipelines.

118.    The assertion of unilateral power in this case also significantly departs from prior practice because the proposed Keystone XL Pipeline would expand an existing, extensive domestic U.S. pipeline system that is already regulated by U.S. law.  Indeed, the existing Keystone Pipeline System already crosses the Canadian border and already transports oil products from Alberta into the United States that are indistinguishable from those the Keystone XL Pipeline would transport.  The President's action thus implicates the two concerns that led federal judges to reject the Executive Branch's efforts to block the cross-border facility in the *Western Union* case:  the President's actions are least defensible when they limit the extension abroad of domestic facilities and when they affect facilities already regulated by acts of Congress.  *See* 272 F. at 894; 272 F. at 323.

119.    As a further departure from prior practice, the President's action prohibits development of a large domestic infrastructure project that would undertake extensive domestic commerce.  The Keystone XL Pipeline would be comprised predominantly of facilities extending from the U.S. border to existing facilities at Steele City, Nebraska, and their construction and operation necessarily depend on the ability of the pipeline to cross the border. The State Department found that during construction over a two-year period, spending on the Keystone XL Pipeline project would support approximately 42,100 jobs. The Department further found that the project would generate tax revenue for communities in the pipeline's path and would contribute .02 percent to the national G.D.P. based on 2012 statistics.

120.     The prohibition of the Keystone XL Pipeline's construction and operation impairs substantial domestic commerce as well as foreign commerce. The Keystone XL Pipeline would transport significant volumes of oil from the Bakken formation in Montana to destinations in the Midwest and Gulf Coast Region.  The permit denial also impairs the operation and financial returns of closely related, previously approved, and otherwise regulated domestic facilities, including portions of the existing Keystone I Pipeline and the Gulf Coast Pipeline and Houston Lateral.

121.     The prohibition of an extensive domestic infrastructure project based on a perception in the international community that the project would precipitate the extraction and increased consumption of particularly greenhouse gas-intensive crude oil points to a further reason that the President lacks authority to deny the permit.  Absent express statutory authority, the President simply does not have the power to regulate such domestic facilities based on asserted harms arising from greenhouse gas emissions, as the Supreme Court has recently confirmed in addressing the powers of the Environmental Protection Agency, acting under the direction of the President.  *See Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2439-47 (2014).

122.     In short, both the nature and the basis for the assertion of unilateral Presidential power to prohibit construction of the Keystone XL Pipeline depart markedly from any established practice to which Congress could have acquiesced.  Thus, even if the prohibition on construction of the Keystone XL Pipeline were not incompatible with the express and implied will of Congress, the denial of the permit would be beyond any constitutional authority that the President has or could delegate to the Secretary of State.

## VI.    **HARM TO TRANSCANADA**

123.    Defendants' actions giving effect to the denial of the permit authorizing TransCanada to build, own, or operate the portion of the Keystone XL Pipeline that crosses the U.S.-Canada border would prevent the construction and the operation of the portion of the Keystone Pipeline XL Pipeline extending from Hardisty, Alberta to Steele City, Nebraska.

124.    If TransCanada is precluded from constructing and operating the Keystone XL Pipeline from Hardisty, Alberta to Steele City, Nebraska, it will be unable to provide oil transport services demanded by shippers and their customers for oil from Alberta and Montana destined to points in the United States, will lose the value of the capital expenditures made and expenses incurred in preparing to build that portion of the Keystone XL Pipeline, and will be unable to profit from providing those services.  TransCanada has expended billions of dollars in preparation for constructing the portion of the Keystone XL Pipeline extending from Hardisty, Alberta to Steele City, Nebraska.

125.    Portions of the originally proposed Keystone XL Pipeline, including the Gulf Coast Pipeline and the Houston Lateral, have been completed or are nearing completion and are or soon will be in operation.  Those facilities were designed and constructed to provide services to shippers including those that sought to transport oil from Hardisty, Alberta and the Bakken formation in Montana to destinations near Gulf Coast refineries in the United States.  If TransCanada is precluded from completing and operating the portion of the Keystone XL Pipeline from Hardisty, Alberta to Steele City, Nebraska, it will be unable to provide the anticipated levels of service over the Gulf Coast Pipeline and the Houston Lateral.  As a result, the revenues it will secure from operating the Gulf Coast Pipeline and the Houston Lateral will be significantly reduced, and TransCanada will be unable to recover a significant portion of the expenses associated with constructing and operating those facilities.

## VII.    CLAIMS FOR RELIEF

### Count One

### Unlawful Executive Action

126.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

127.    The decision to prohibit TransCanada from extending the Keystone System into Canada, and efforts to give effect to that denial, are not authorized by any Act of Congress.

128.    The decision to prohibit TransCanada from extending the Keystone System into Canada is contrary to the express will of the United States Congress, as reflected in statutes generally regulating and facilitating the development of oil pipelines, in statutes and Congressional action supporting and addressing the cross-border commerce facilitated by the Keystone XL Pipeline, and, through the Keystone XL Pipeline Approval Act, the direct authorization by both Houses of Congress of the pipeline's construction and operation.

129.    Even apart from Congressional measures disapproving of any Presidential actions to halt the construction of the Keystone XL Pipeline, the prohibition of construction of the Keystone XL Pipeline, and efforts to give effect to that prohibition, markedly exceed every prior exercise of unilateral Presidential authority to prohibit domestic and foreign commerce transacted through a cross-border commercial facility.  No President has successfully relied on unilateral powers to prohibit the extension of a major domestic oil pipeline or other significant domestic facilities beyond U.S. territory; no President has invoked unilateral powers to prohibit construction of a major domestic infrastructure project supporting significant domestic commerce; and no President has sought to prohibit development of such a major cross-border facility on grounds unrelated to the particular effect the facility may have of impairing commerce in the United States, to U.S. citizens' ability to obtain reciprocal privileges to construct or operate pipelines in other countries, or to the government's ability to use the facility.

130.     The determination that TransCanada may not construct or operate the Keystone XL Pipeline, and efforts to give effect to that determination, are null and void because they exceed the powers vested in the President and Executive Branch by law and by Article II of the United States Constitution.

131.     The determination that TransCanada may not construct or operate the Keystone XL Pipeline, and efforts to give effect to that determination, are null and void because they infringe upon the powers that Article I of the United States Constitution provides to the United States Congress.

132.     Any action taken by Defendants, or any other officer or employee of the United States, to implement, enforce, or give effect to the determination that TransCanada may not construct or operate the Keystone XL Pipeline would be unlawful.  Their own conduct, no less than that of the President, "must stem either from an act of Congress or from the Constitution itself."  *Youngstown*, 343 U.S. at 585.

133.     In such a circumstance, where an officer's "power has been conferred in form but the grant is lacking in substance because of its constitutional invalidity," courts are authorized to order declaratory and injunctive relief to halt the officer from acting unlawfully.  *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690 (1949).

134.     Defendants' actions to implement, enforce, or give effect to the determination that TransCanada cannot construct and operate the Keystone XL Pipeline would harm plaintiffs TransCanada Keystone Pipeline, LP and TC Oil Pipeline Operations Inc.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for an order and judgment:

1.       Declaring that Defendants are without legal authority to prohibit

TransCanada from extending the Keystone System into Canada through

the construction and operation of the Keystone XL Pipeline or to

otherwise impede the development and operation of the Keystone XL

Pipeline other than through the lawful exercise of statutory authority;

2.     Declaring that the Decision purporting to prohibit TransCanada from

extending the Keystone System into Canada through the construction and

operation of the Keystone XL Pipeline is without lawful effect;

3.     Declaring that Defendants have no lawful basis to take any action to

enforce, implement or otherwise put into effect the Decision purporting to

prohibit TransCanada from extending the Keystone System into Canada

through the construction and operation of the Keystone XL Pipeline; and

4.     Enjoining Defendants from taking any action to enforce, implement, or

otherwise put into effect the Decision purporting to prohibit TransCanada

from extending the Keystone System into Canada through the construction

and operation of the Keystone XL Pipeline; and

5.     Granting such other and further relief, not including damages, as this

Court deems just and proper.

Dated:   January 6, 2016

By: s/ Penny P. Reid

Peter D. Keisler, Attorney in Charge
D.C. Bar No. 417204, *pro hac vice pending*
pkeisler@sidley.com
Richard Klingler
D.C. Bar No. 438908, *pro hac vice pending*
rklingler@sidley.com
Kathleen Moriarty Mueller
D.C. Bar No. 995385, *pro hac vice pending*
kmueller@sidley.com
Lauren Freeman
D.C. Bar No. 1018089, *pro hac vice pending*
lfreeman@sidley.com
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711

Penny P. Reid
Texas Bar No. 15402570
S.D. Texas Bar No. 23583
preid@sidley.com
Margaret Hope Allen
Texas Bar No. 24045397
S.D. Texas Bar No. 2751992
Tiffanie N. Limbrick
Texas Bar No. 24087928, *pro hac vice pending*
tlimbrick@sidley.com
Sidley Austin LLP
2001 Ross Avenue
Suite 3600
Dallas, TX 75201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

Attorneys for Plaintiffs TransCanada Keystone
Pipeline, LP and TC Oil Pipeline Operations
Inc.