# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS

TRANSCANADA KEYSTONE XL
PIPELINE, LP and TC OIL PIPELINE
OPERATIONS INC.,

*Plaintiffs*,

v.

JOHN F. KERRY, Secretary of the
Department of State; LORETTA E.
LYNCH, Attorney General of the United
States; JEH CHARLES JOHNSON,
Secretary of the Department of Homeland
Security; and SALLY JEWELL, Secretary
of the Department of the Interior,

*Defendants*.

No. 4:16-cv-00036

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

**Page**

INTRODUCTORY STATEMENT AND SUMMARY .................................................... 1

BACKGROUND ................................................................................................... 3

I.   THE EXECUTIVE'S EXERCISE OF AUTHORITY OVER BORDER-
     CROSSING FACILITIES ............................................................................... 3

II.  TRANSCANADA'S PERMIT APPLICATIONS AND THE DEPARTMENT
     OF STATE'S EVALUATION ......................................................................... 6

     A.   The 2008 Application and Temporary Payroll Tax Cut
          Continuation Act of 2011 ................................................................ 6

     B.   The 2012 Application and the Vetoed Keystone XL Pipeline Approval Act ......... 8

     C.   The Executive's Denial of the Keystone XL Application .................... 10

III. TRANSCANADA'S COMPLAINT ................................................................. 11

ARGUMENT ...................................................................................................... 11

I.   STANDARD OF REVIEW .............................................................................. 11

II.  THE DENIAL OF A PRESIDENTIAL PERMIT TO TRANSCANADA IS
     WITHIN THE PRESIDENT'S CONSTITUTIONAL AUTHORITY ..................... 12

     A.   Justice Jackson's Tripartite Framework in *Youngstown* ..................... 12

     B.   The Executive Has Constitutional Authority to Control Border-
          Crossing Facilities .......................................................................... 13

          1.   The President's authority over border-crossing facilities
               stems from his foreign relations and Commander-in-Chief
               powers .................................................................................... 13

          2.   Historical practice is significant in assessing the President's
               exercise of authority over border-crossing facilities .............. 16

          3.   The Executive has long exercised authority over border-crossing
               facilities .................................................................................. 18

          4.   Congress has explicitly affirmed or at least accepted the Executive's
               authority over cross-border facilities throughout history .......... 22

              a.    Congress has explicitly affirmed the President's authority over cross-border oil pipelines in legislation addressing the Keystone XL project ............................................................ 23

              b.    Legislation regulating other types of border-crossing facilities has confirmed the President's permitting authority over those facilities ............................................................. 24

              c.    Legislation regulating commodities that are transported through cross-border facilities subject to Presidential permitting requirements reflects congressional acquiescence in the Executive's authority ....................................................... 27

    C.    The Execitive's Decision Falls Within the Scope of Presidential Authority Over Border Crossing Facilities, Encompassing A Complex And Multi-Factored Determination of National Interest ............................. 29

III.    TRANSCANADA'S CHALLENGES TO THE PRESIDENT'S DENIAL OF THE KEYSTONE XL PERMIT ARE WITHOUT MERIT .............................. 32

    A.    TransCanada's Reliance on Past Presidential Permitting Decisions Is Misplaced ............................................................................. 32

    B.    The Executive's Reasons for the Denial of the Permit Are Unreviewable .........33

    C.    The President's Exercise of Cross-Border Permitting Authority Does Not Require Explicit Congressional Authorization .............................. 36

    D.    Congress Has Not Enacted Legislation that Would Displace the President's Authority to Prevent the Construction of Cross-Border Facilities That Run Against the National Interest ................................. 38

        1.    Legislation impacting the construction and operation of oil pipelines is in harmony with the Executive's authority over cross-border oil pipeline facilities............................................ 39

        2.    Unenacted bills cannot serve to displace longstanding Presidential authority .......................................................... 40

CONCLUSION ........................................................................... 45

# TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Am. Ins. Ass'n v. Garamendi*,
539 U.S. 396 (2003).................................................................. passim

*Am. Int'l Group, Inc. v. Islamic Republic of Iran*,
657 F.2d 430 (D.C. Cir. 1981)............................................... 16

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................................ 12

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................ 11

*Bancoult v. McNamara*,
445 F.3d 427 (D.C. Cir. 2006)............................................... 35

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................ 11

*Chicago & Southern Air Lines v. Waterman S.S. Corp.*,
333 U.S. 103 (1948)................................................... 15, 16, 34

*Dakota Central Telephone Co. v. South Dakota ex rel. Payne*,
250 U.S. 163 (1919).......................................................... 34, 35

*Dalton v. Specter*,
511 U.S. 462 (1994)................................................................ 34

*Dames & Moore v. Regan*,
453 U.S. 654 (1981).......................................................... passim

*Davis v. Bayless*,
70 F.3d 367 (5th Cir. 1995) ................................................... 12

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
--F. Supp. 3d --, 2015 WL 5726601 (D.D.C. Sept. 30, 2015) .......................................... 15, 26

*Greene Cty. Planning Bd. v. Fed. Power Comm'n*,
528 F.2d 38 (2d Cir. 1975)..................................................... 15

*Haig v. Agee*,
453 U.S. 280 (1981).......................................................... passim

*Harisiades v. Shaughnessy,*
    342 U.S. 580 (1952)..................................................................... 34

*Haverda v. Hays Cty.,*
    723 F.3d 586 (5th Cir. 2013) ...................................................... 12

*INS v. Chadha,*
    462 U.S. 919 (1983)................................................................ 41, 43

*Kaplan v. Corcoran,*
    545 F.2d 1073 (7th Cir. 1976) .............................................. 16, 22

*Kent v. Dulles,*
    357 U.S. 116 (1958)..................................................................... 32

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC,*
    594 F.3d 383 (5th Cir. 2010) ...................................................... 12

*Medellin v. Texas,*
    552 U.S. 491 (2008)........................................................... 12, 41, 42

*Mistretta v. United States,*
    488 U.S. 361 (1989)..................................................................... 17

*NLRB v. Noel Canning,*
    134 S. Ct. 2550 (2014)................................................................. 16

*NRDC v. Dep't of State,*
    658 F. Supp. 2d 105 (D.D.C. 2009) ........................................... 15

*Quality Infusion Care, Inc. v. Health Care Serv. Corp.,*
    628 F.3d 725 (5th Cir. 2010) ...................................................... 12

*Schooner Exch. v. McFaddon,*
    11 U.S. (7 Cranch) 116 (1812)............................................... 14, 19

*Sierra Club v. Clinton,*
    689 F. Supp. 2d 1147 (D. Minn. 2010)....................................... 15

*Sisseton-Wahpeton Oyate v. Dep't of State,*
    659 F. Supp. 2d 1071 (D.S.D. 2009) .......................................... 15

*Spacil v. Crowe,*
    489 F.2d 614 (5th Cir. 1974) ...................................................... 36

*Spectrum Stores, Inc. v. Citgo Petroleum Corp.*,
   632 F.3d 938 (5th Cir. 2011) ..................................................... 36

*Springer v. Philippine Island*,
   277 U.S. 189 (1928)............................................................ 13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)............................................................ 12

*United States v. Curtiss-Wright Exp. Corp.*,
   299 U.S. 304 (1936).................................................. 13, 14, 33

*United States v. George S. Bush & Co.*,
   310 U.S. 371 (1940)............................................................ 35

*United States v. La Compagnie Francaise Des Cables Telegraphiques*,
   77 F. 495 (S.D.N.Y. 1896)............................................. 19, 20, 24, 25

*United States v. Midwest Oil Co.*,
   236 U.S. 459 (1915)....................................................... 16, 18

*United States v. Pink*,
   315 U.S. 203 (1942)............................................................ 17

*United States v. W. Union Tel. Co.*,
   272 F. 311 (S.D.N.Y 1921), *aff'd* 272 F. 893 (2d Cir. 1921), *rev'd and
   dismissed by stipulation of the parties*, 260 U.S. 754 (1922) ...................... 19, 24, 25

*White Earth Nation v. Kerry*, 14-cv-4726,
   2015 WL 8483278 (D. Minn. Dec. 9, 2015)....................................... 15

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952)........................................................ <u>passim</u>

*Zivotofsky v. Clinton*,
   132 S. Ct. 1421 (2012)......................................................... 44

*Zivotofsky v. Kerry,*
   135 S. Ct. 2076 (2015)...................................................... <u>passim</u>

**STATUTES**

Clean Water Act
   33 U.S.C. § 1251 *et seq*........................................................ 39

Department of Energy Organization Act,
   Pub. L. No. 95-91, § 204, 91 Stat. 565 (1977), 42 U.S.C. § 7172 ................... 28

Endangered Species Act of 1973,
     16 U.S.C. § 1536................................................................................. 7, 39

Federal Power Act,
     41 Stat. 1063 (1920), 16 U.S.C. § 824a(e)....................................... 27, 28

Foreign Relations Authorization Act, Fiscal Year 2003,
     116 Stat. 1350 .......................................................................................... 41

General Bridge Act of 1946,
     60 Stat. 847, 33 U.S.C. § 525-34 ............................................................ 26

International Bridge Act of 1972,
     Pub. L. No. 92-434, 86 Stat. 731 (1972), 33 U.S.C. § 535-535j.......... 26, 27, 29

Kellogg Act,
     42 Stat. 8, 47 U.S.C. § 34 *et seq.* .............................................. 25, 26, 27, 29

Labor Management Relations Act of 1947
     61 Stat. 13629 U.S.C. §§ 401-531 ......................................................... 40

National Environmental Policy Act of 1969,
     42 U.S.C. § 4321 *et seq*............................................................................ 7

National Historic Preservation Act of 1966,
     54 U.S.C. § 300101 *et seq*................................................................... 7, 39

Natural Gas Act,
     52 Stat. 822 (1938), 15 U.S.C. § 717b(a) .......................................... 27, 28

Pipeline Safety Act,
     49 U.S.C. § 60101 *et seq*......................................................................... 39

Passport Act of 1926,
     22 U.S.C. § 221a...................................................................................... 32

Rivers and Harbors Appropriation Act of 1899,
     30 Stat. 1121, 33 U.S.C. § 401................................................................ 26

Temporary Payroll Tax Cut Continuation Act of 2011,
     Pub. L. No. 112-78, § 501................................................................ <u>passim</u>

The Act of May 5, 1866, 39 Cong. Sess. 1, ch. 74, 14 Stat. 44 .................. 4, 25

**FEDERAL REGISTER**

Notice of 30 Day Public Comment Period Regarding National Interest Determination for
 TransCanada Keystone Pipeline, LP's Presidential Permit Application,
 79 Fed. Reg. 6,984 (Feb. 5, 2014) ...................................................................... 9, 230

**EXECUTIVE ORDERS**

Exec. Order No. 8202, 4 Fed. Reg. 3,243 (July 15, 1939).................................................. 5, 21, 28

Exec. Order No. 10485, 18 Fed. Reg. 5,397 (Sept. 3, 1953) ............................................. 5, 21, 28

Exec. Order No. 10530, 19 Fed. Reg. 2,709 (May 12, 1954).................................................. 5, 21

Exec. Order No. 11423, 33 Fed. Reg. 11,741 (August 16, 1968)......................................... passim

Exec. Order No. 12038, 43 Fed. Reg. 4,957 (Feb. 3, 1978) .............................................. 5, 21, 28

Exec. Order No. 13337, 69 Fed. Reg. 25,299 (Apr. 30, 2004) ............................................. passim

**OPINIONS OF THE ATTORNEY GENERAL**

Cuba-Cables,
 22 Op. Att'y Gen. 408 (1899) ...................................................................................... 4, 21

Cuba-Cables,
 22 Op. Att'y Gen. 514 (1899) ...................................................................................... 4, 21

Diversion of Water from Niagara River,
 30 Op. Att'y Gen. 217 (1913) ................................................................................. 4, 21, 27

Foreign Cables,
 22 Op. Att'y Gen. 13 (1898) ....................................................................................... passim

Granting of License for the Construction of a Gas Pipeline,
 38 Op. Att'y Gen. 163 (1935) ................................................................................. 4, 21, 27

Wireless Telegraphy-International Agreement,
 24 Op. Att'y Gen. 100 (1902) .................................................................................... 4, 21

**CONGRESSIONAL MATERIALS**

American Energy Renaissance Act of 2015, S. 791 and H.R. 1487,
 114th Cong. (2015) ……………………………………………………………..10

American Jobs Now: A Legislative Hearing on H.R. 3548, the North American
  Energy Access Act: hearing before the Subcommittee on Energy and
  Power of the Committee on Energy and Commerce, 112th Cong.
  (Jan. 25, 2012) (Testimony of Dr. Kerri-Ann Jones, Assistant Secretary of State) ................. 30

Hearing on 2015 Paris International Climate Negotiations before the Subcommittee
  on Multilateral International Development, Multilateral Institutions, and
  International Economic, Energy, and Environmental Policy, 114th Cong.
  (Oct. 20, 2015) (Testimony of Todd D. Stern, Special Envoy for Climate Change) .............. 31

House of Representative, Annals,
  6th Cong., col. 613 (March 7, 1800) ..................................................................... 14

Keystone XL Pipeline Approval Act,
  S.1, 114th Cong. (2015) ............................................................................. 2, 9, 40, 42

Keystone XL Pipeline,
  S. Rep. No. 114-1 (2015) ........................................................................... 42

Keystone for a Secure Tomorrow Act,
  H.R. 28, 114th Cong. (2015)…………………………………………...………………… ..10

North American Energy Infrastructure Act,
  S. 1228, 114th Cong. (2015) .................................................................... 10

Report of the Veto of S. 1, Keystone XL Pipeline Approval Act,
  161 Cong. Rec. S1,073 (daily ed. Feb. 24, 2015) ................................................... 9

Unauthorized Landing of Submarine Cables in the United States,
  H. Rep. 67-71 (1921) ................................................................................ 24, 25

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 12(b)(6) .................................................................................. 11

Fed. R. Civ. P. 56(a) ...................................................................................... 11

**MISCELLANEOUS**

Department of State Report to Congress Under the Temporary Payroll Tax Cut
  Continuation Act of 2011, Section 501(b)(2) ..................................................... 7, 8

2 John Bassett Moore, Digest of International Law 452-66 (1906) ................................. 5, 19, 20

9 Marjorie M. Whiteman, Digest of International Law 917-33 (1968) ................................ 4, 20

IV G.H. Hackworth, Digest of International Law (1942) .......................................... 5, 20

National Security Strategy, White House (Feb. 2015) ................................. 31

North American Free Trade Agreement .................................................................. 40

Presidential permit authorizing US-Canada oil pipeline cross-border facilities signed by
    President John F. Kennedy, dated Oct. 18, 1962………………………………………… .5, 29

Presidential permit signed by President Lyndon B. Johnson, dated Jan. 22, 1968……………….5

President Ulysses Grant's Seventh Annual Message to Congress, *reprinted in*
    Papers Relating to the Foreign Relations of the United States, Vol. 1,
    44th Cong. 1st Sess., H.R. Ex. Doc. 1, Pt. 1, (Dec. 6, 1875) .......................................... 4, 18, 37

Press Release, the White House, *U.S. Leadership and the Historic Paris Agreement
    to Combat Climate Change* (Dec. 12, 2015) .......................................................... 11

Quadrennial Defense Review 2014, Department of Defense ....................................... 31

Record of Decision and National Interest Determination for Keystone XL
    Pipeline (Nov. 6, 2015) .............................................................................. passim

Record of Decision and National Interest Determination Regarding the Alberta
    Clipper Pipeline (Aug. 3, 2007) ...................................................................... 30

## INTRODUCTORY STATEMENT AND SUMMARY

TransCanada brings this suit to challenge the decision of the Secretary of State, with the concurrence of the President of the United States, to deny TransCanada's application to construct and operate oil pipeline facilities to cross the border from Canada into the United States for the transport of up to 830,000 barrels per day of crude oil through the proposed Keystone XL pipeline.  Despite having vigorously defended the President's constitutional authority over cross-border oil pipeline facilities in previous litigation, TransCanada now remarkably asserts that the President has no authority to deny the permit.  According to TransCanada, this Court should invalidate the Executive's decision because it differs from prior decisions and because it conflicts with congressional bills that never became law.  TransCanada essentially seeks to construct and operate a facility that will pump millions of gallons of oil across the United States' international border with no Government authorization—*i.e.*, without Executive approval and under no statutory authority otherwise governing cross-border oil pipelines.

TransCanada's extraordinary request has no basis in law, is inconsistent with historical practice, and is contrary to the allocation of authority in this area between the two political branches.  The Supreme Court has recognized that "a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned . . .  may be treated as a gloss on 'executive Power' vested in the President" by Article II, Section 1 of the Constitution.  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610-11 (1952) (Frankfurter, J., concurring); *see also Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981).  It is well established that the President's Article II power encompasses the authority to control border crossings into the United States.  For close to 150 years, Presidents have exercised authority over a wide range of physical connections between the United States and foreign countries pursuant to the President's powers over foreign affairs and as Commander in Chief.  Congress has affirmed or accepted this authority by legislating to require Presidential approval for certain types of border crossings and by leaving undisturbed the Presidential permitting requirement for others.  Indeed, Congress has enacted no law to question the President's permitting authority in the close

to one and a half centuries of the Executive's exercise of such authority.  As the Supreme Court has said, "[g]iven the President's independent authority 'in the areas of foreign policy and national security . . . congressional silence is not to be equated with congressional disapproval.'" *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 429 (2003) (quoting *Haig v. Agee*, 453 U.S. 280, 291 (1981)).

In 1968, after nearly 100 years of Executive exercise of authority over border-crossing facilities, President Lyndon Johnson reaffirmed this authority over oil pipeline border crossings in an Executive Order, and President George W. Bush did so again in 2004, *see* Executive Order No. 13337, 69 Fed. Reg. 25,299 (Apr. 30, 2004) (Ex. 1).  Those Executive Orders govern a complex policy inquiry to determine whether, in the judgment of the Secretary of State, issuance of any particular permit would "serve the national interest."  In the decades that followed President Johnson's order, Congress has enacted no law to displace the President's authority or alter the applicable standard that governs the Executive's decision.  On the contrary, the only law that Congress enacted regarding any oil pipeline border crossing—section 501 of the Temporary Payroll Tax Cut Continuation Act of 2011, Pub. L. No. 112-78, 125 Stat. 1280 (2011)— expressly affirmed the President's constitutional authority to grant the Keystone XL permit "under Executive Order No. 13337" unless the "President determine[d] that the Keystone XL pipeline would not serve the national interest," which the President did both at that time and upon TransCanada's reapplication.  Even the bill vetoed by the President that sought to approve the application, the Keystone XL Pipeline Approval Act, S.1, 114th Cong. (2015), did not question the President's constitutional authority in the absence of contrary law; indeed, it was premised on the existence of that authority.  The President's authority to deny the permit is indisputable, therefore, both as a matter of law and as a matter of practice.

Specifically, the Executive appropriately exercised its Article II authority in determining that denying the Keystone XL permit was, among other concerns, important to avoid adversely impacting our ability to encourage other countries to take ambitious action to combat an urgent global environmental threat—climate change—that has serious implications for national and

international security, in light of the impending December 2015 climate change negotiations among more than 190 nations.  Despite TransCanada's attempt to question the Executive's reasons for the decision, this type of foreign policy and national security assessment belongs to the Executive and is beyond the purview of this Court.

TransCanada invokes the tripartite framework first articulated by Justice Robert Jackson in *Youngstown*, 343 U.S. at 635-38 (Jackson, J., concurring), for evaluating the scope of Executive authority.  But unlike the circumstances that led to the outcome in *Youngstown*, this case does not present a conflict between the political branches of the type calling for the Court to determine whether the President's power is "so conclusive and preclusive" as to "disabl[e] Congress from acting upon the subject." *Id.* at 637-38 (Jackson, J., concurring).  President Harry Truman's power to seize the nation's steel mills in order to avert a strike was at its lowest ebb in *Youngstown* because it conflicted with statutes governing precisely when seizure could be used to remedy labor disputes.  Here, in contrast, the President's action is not in conflict with any enacted statute.  TransCanada tries to manufacture a conflict by pointing to unenacted bills that sought to approve the Keystone XL project or otherwise restrict Presidential authority in this area.  But bills that did not become law cannot restrict the President's exercise of long-standing Article II authority without violating the constitutional structure of checks and balances.  This Court accordingly cannot invalidate the denial of a Presidential permit to TransCanada on the basis of action that Congress did not take.

For these reasons, as set forth further below, this Court should grant the United States' motion to dismiss or, in the alternative, for summary judgment.

## BACKGROUND

## I.  THE EXECUTIVE'S EXERCISE OF AUTHORITY OVER BORDER-CROSSING FACILITIES

Presidential authority to control a physical connection between the United States and a foreign country was exercised at least as far back as 1869 by President Ulysses Grant when a private company sought to lay a telegraph cable from France.  *See* President Ulysses Grant's

Seventh Annual Message to Congress, *reprinted in* Papers Relating to the Foreign Relations of the United States, Vol. 1, 44th Cong. 1st Sess., H.R. Ex. Doc. 1, Pt. 1, (Dec. 6, 1875) (Ex. 2), at XIII-XIV.  Although the first submarine telegraph cable from a foreign country had landed upon the shores of the United States two years earlier pursuant to an exclusive license granted by Congress,[1] no statutory framework existed for the approval or regulation of such other cables. Recognizing that the federal government must act to control the establishment of any physical connection between the United States and a foreign country, and in the absence of congressional action, President Grant exercised Executive authority to impose conditions on the laying of the cable from France to ensure that its landing and operation would be in the interest of the United States.  *Id.* at XV-XVI.  Despite President Grant's subsequent entreaties, *see id.* at XV, Congress did not enact legislation to regulate foreign submarine cables for decades, and several subsequent Presidents exercised authority to control the landing of such cables.  *See* Foreign Cables, 22 Op. Att'y Gen. 13, 18-25 (1898) (Ex. 3).

Since 1898, the Executive Branch has consistently taken the position that "the President has the power, in the absence of legislative enactment, to control the landing of foreign submarine cables" and the establishment of other cross-border physical facilities, including oil pipelines.  *Id.* at 27; *see* Cuba-Cables, 22 Op. Att'y Gen. 408 (1899) (Ex. 4); Cuba-Cables, 22 Op. Att'y Gen. 514 (1899) (Ex. 5); Wireless Telegraphy-International Agreement, 24 Op. Att'y Gen. 100 (1902) (Ex. 6); Diversion of Water from Niagara River, 30 Op. Att'y Gen. 217 (1913) (Ex. 7); Granting of License for the Construction of a Gas Pipeline, 38 Op. Att'y Gen. 163 (1935) (Ex. 8).  *See also* 9 Marjorie M. Whiteman, Digest of International Law 917-32 (1968) (Ex. 9) (documenting various permits including eight oil pipeline permits between 1941 and

---

[1] *See* the Act of May 5, 1866, 39 Cong. Sess. 1, ch. 74, 14 Stat. 44; Foreign Cables, 22 Op. Att'y Gen. 13, 15 (1898).  The 1866 Act granted a New York corporation the sole privilege for a term of fourteen years of laying and operating telegraphic cables from Florida to Cuba, the Bahamas, and other West Indian islands.  14 Stat. at 44.

4

1966); IV G.H. Hackworth, Digest of International Law 247-56 (1942) (Ex. 10); 2 John Bassett Moore, Digest of International Law 452-66 (1906) (Ex. 11).

The Executive's exercise of power over such facilities has also been committed to the Executive's judgment and discretion. *See, e.g.*, Presidential permit authorizing US-Canada oil pipeline cross-border facilities signed by President John F. Kennedy, dated Oct. 18, 1962 (Ex. 12) at 2-3 (providing, among other things, that "[t]his permit is subject to such conditions as the President of the United States may see fit, expedient or necessary hereafter to impose"; "this permit may be terminated at the will of the President of the United States or may be amended by the President of the United States at will"; and "when, in the opinion of the President of the United States, the safety of the United States demands it . . . the United States shall have the right to enter upon and take possession of [the cross-border facilities] and to take such measures as it deems necessary"); Presidential permit signed by President Lyndon B. Johnson, dated Jan. 22, 1968 (Ex. 13) (same).

Moreover, Presidents have issued Executive Orders regulating the permitting process for specific types of cross-border facilities and sometimes delegating their permitting authority to various agency heads. *See* Exec. Order No. 10530, 19 Fed. Reg. 2,709 (May 12, 1954) (submarine cables) (Ex. 14); Exec. Order No. 10485, 18 Fed. Reg. 5,397 (Sept. 3, 1953) (natural gas pipelines and electricity transmission lines) (Ex. 15), as amended by Exec. Order No. 12038, 43 Fed. Reg. 4,957 (Feb. 3, 1978) (Ex. 16); *see also* Exec. Order No. 8202, 4 Fed. Reg. 3243 (July 15, 1939) (same) (Ex. 17).

In 1968, President Johnson issued Executive Order No. 11423, 33 Fed. Reg. 11,741 (Aug. 16, 1968) (Ex. 18), to establish "a systematic method in connection with the issuance of permits for the construction and maintenance of . . . facilities connecting the United States with a foreign country." The order delegated to the Secretary of State the President's authority to grant or deny permits for a wide range of border-crossing facilities, including oil and other pipelines, monorails, aerial cable cars, aerial tramways, bridges, and water and sewer pipes, *see id.* § 1(a), to the extent they are not already governed by other Executive Orders.

In 2004, President Bush issued Executive Order No. 13337, 69 Fed. Reg. 25,299 (Apr. 30, 2004), to revise some of the procedural requirements of Executive Order No. 11423 for the permitting of facilities at the borders of the United States that transport oil or other fuels into or out of the country.  The order also expands the categories of facilities subject to the requirements of Executive Order No. 11423.  *See* Exec. Order No. 13337, § 2(a) (referring to "similar facilities above or below ground" as well as "border crossings for land transportation, including motor and rail vehicles").  The order provides (as did Executive Order No. 11423) that the Secretary of State, after considering the views of certain other agency heads, shall determine whether allowing the border crossing would "serve the national interest" and what terms and conditions, if any, should apply.  *Id.* § 1(g)-(h).  The Secretary's determination becomes final after other agency heads have had an opportunity to object, and, if necessary, the Secretary may refer the application to the President for final resolution.  *Id.*

## II.  TRANSCANADA'S PERMIT APPLICATIONS AND THE DEPARMENT OF STATE'S EVALUATION

### A.  The 2008 Application and the Temporary Payroll Tax Cut Continuation Act of 2011

Plaintiffs TransCanada Keystone Pipeline, LP and TC Oil Pipeline Operations Inc. are U.S. subsidiaries of TransCanada, a Canadian corporation (collectively or separately "TransCanada").  Compl. ¶¶ 8-9.  In September 2008, TransCanada applied for a permit to build and operate pipeline facilities at the U.S.-Canada border in Phillips County, Montana, which would facilitate the transport of crude oil produced in the Western Canadian Sedimentary Basin (or "oil sands" region) from Alberta, Canada into the United States.  *Id*. ¶¶ 28-29; Record of Decision and National Interest Determination for Keystone XL Pipeline (Nov. 6, 2015) (hereinafter "ROD"), Ex. B to Compl., at 2.  These border-crossing facilities—in this case, a "1.2 mile segment" proposed to run from the U.S.-Canada border to the first pipeline isolation valve in Montana, Compl. ¶ 30—would have formed part of the proposed Keystone XL project, consisting of approximately 1,700 miles of pipelines extending from Alberta, Canada to the interior and Gulf Coast regions of the United States.  *Id*. ¶ 29.  The Keystone XL pipeline would

6

connect to TransCanada's existing Keystone I pipeline, which has been transporting oil sands crude oil from Alberta, Canada to Illinois and Oklahoma since 2010.[2]  *Id.* ¶¶ 17-18, 24.

As part of its determination of whether granting an application would "serve the national interest" as set forth in Executive Order 13337, the Department of State, as a matter of policy and where appropriate, considered the potential impacts of the project on environmental and cultural resources in a manner consistent with statutes such as the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.*, Section 106 of the National Historic Preservation Act of 1966, 54 U.S.C. § 306108, and Section 7 of the Endangered Species Act of 1973, 16 U.S.C. § 1536.  *See, e.g.*, ROD at 2, 3.  As originally proposed, the Keystone XL route would "traverse[] a substantial portion of the Sand Hills Region of Nebraska," *id.* at 8, a sensitive terrain that includes a high concentration of wetlands of special value, among many other unique characteristics.  *See* Department of State Report to Congress Under the Temporary Payroll Tax Cut Continuation Act of 2011, Section 501(b)(2) ("Payroll Tax Act Report") (Ex. 22) at 2 n.2. The Department of State heard "nearly unanimous opposition" from Nebraska officials and residents to the proposed route through the Sand Hills region.  *Id.*  To address these concerns, TransCanada agreed to move the proposed route, and Nebraska enacted a law in November 2011 directing its environmental agency to review potential alternative routes.  *Id.* at 3.  The Department of State in turn determined that additional information—in particular, information about alternative routes around the Sand Hills region—was needed to fully evaluate the 2008 Keystone XL application.  ROD at 8.

---

[2] TransCanada received a permit in 2008 for the Keystone I pipeline, which crosses the U.S.-Canada border in North Dakota.  Compl. ¶¶ 18, 21.  In litigation brought by other parties challenging the Department of State's issuance of the Keystone I permit, TransCanada twice intervened to defend the permit.  *See, e.g.*, *Sisseton-Wahpeton Oyate v. Dep't of State*, 3:08-cv-3023, TransCanada's brief in support of motion to dismiss, ECF No. 28 (Feb. 1, 2009) ("*Sisseton* MTD") (Ex. 19), and MTD Reply, ECF No. 48 (Apr. 13, 2009) ("*Sisseton* MTD Reply") (Ex. 20); *Natural Res. Def. Council, Inc. v. Dep't of State*, 1:08-cv-01363, TransCanada's brief in support of motion to dismiss, ECF No. 25 (Oct. 20, 2008) ("*NRDC* MTD") (Ex. 21).  As will be discussed later, many of TransCanada's arguments in those cases contradict its arguments here.

In December 2011, Congress passed the Temporary Payroll Tax Cut Continuation Act of 2011, Pub. L. No. 112-78, 125 Stat. 1280 ("Payroll Tax Act").  Section 501 of the Act required the President to "grant a permit under Executive Order No. 13337" for the Keystone XL project within 60 days of the Act, unless the "President determine[d] that the Keystone XL pipeline would not serve the national interest" and submitted a report providing "a justification for determination, including consideration of economic, employment, energy security, foreign policy, trade, and environmental factors."  125 Stat. 1289-90.  The President denied the 2008 Keystone XL application the following month without prejudice to TransCanada's re-filing it. Payroll Tax Act Report at 1.  The President determined that granting the permit at that time would not serve the national interest because the 60-day time period was inadequate to conduct the necessary analysis.  *Id.* at 1, 5.  Thereafter, TransCanada decided to proceed with construction of the Gulf Coast portion of the originally proposed Keystone XL project—a 478 mile pathway extending from the Keystone I pipeline in Cushing, Oklahoma to Nederland, Texas—because this purely domestic segment did not require a Presidential permit and TransCanada determined that it had independent economic utility.  Compl. ¶ 39; ROD at 8.[3]

### B.  The 2012 Application and the Vetoed Keystone XL Pipeline Approval Act

In May 2012, TransCanada filed a new permit application, which included a new route that avoided the environmentally sensitive areas of Nebraska's Sand Hills region.  Compl. ¶¶ 41, 42; ROD at 8.  With construction of the Gulf Coast Pipeline already underway, the U.S. portion of the revised Keystone XL project would have approximately 875 miles of pipeline from the Canadian border to Steele City, Nebraska, and would still deliver up to 830,000 barrels

---

[3] In 2014, TransCanada proceeded with the construction of another purely domestic portion of the originally proposed Keystone XL project, the Houston Lateral Project, which is a 47-mile extension from the Gulf Coast Pipeline to the Houston refining market.  Compl. ¶¶ 29, 40. TransCanada now owns 2,639 miles of oil pipelines in the United States.  *Id.* ¶ 17.

per day of crude oil produced from the oil sands areas.  ROD at 6.[4]  The Department of State reviewed the revised the Keystone XL project, *see id.* at 3, and issued a final supplemental environmental impact statement in January 2014, supplementing its earlier environmental review of the 2008 application, *id* at 8-9.

In considering TransCanada's new application, the Department of State conducted a broad range of consultations with state, local, tribal, and foreign governments and other federal agencies.  *Id.* at 2.  It also solicited public comments, ultimately receiving more than 4.5 million submissions throughout all stages of its review of the application.  *See id.* at 4, 5;  Notice of 30 Day Public Comment Period Regarding National Interest Determination, 79 Fed. Reg. 6,984 (Feb. 5, 2014) (Ex. 23) (soliciting comments for the Department of State's "national interest" determination regarding the Keystone XL application, noting that the decision "will take into account a wide range of factors, including energy security; environmental, cultural, and economic impacts; foreign policy; and compliance with relevant federal regulations and issues").

In January 2015, while the Department of State's review was ongoing, Congress passed the Keystone XL Pipeline Approval Act, S. 1, 114th Cong. (2015) (Ex. 24), in an attempt to directly approve the Keystone XL project.  *See id.* § 2(a); Compl. ¶¶ 45-47.  The bill, however, never became law.  The President vetoed the bill because it would "circumvent [the] longstanding and proven processes for determining whether or not building and operating a cross-border pipeline serves the national interest."  Report of the Veto of S. 1, the Keystone XL Pipeline Approval Act, 161 Cong. Rec. S1,073 (daily ed. Feb. 24, 2015) (Ex. 25).  Congress did not override the Presidential veto.  Similar bills seeking to authorize the Keystone XL project—

---

[4] An additional domestic project, the Bakken Marketlink, was planned to provide transportation of up to 100,000 barrels per day of light crude oil from the Bakken formation of North Dakota and Montana to the Keystone XL pipeline.  ROD at 7.

the American Energy Renaissance Act of 2015, S. 791 and H.R. 1487, 114th Cong. (Ex. 26) and Keystone for a Secure Tomorrow Act, H.R. 28, 114th Cong. (2015) (Ex. 27)—remain pending.[5]

### C. The Executive's Denial of the Keystone XL Application

Secretary of State John F. Kerry denied the Keystone XL application on November 6, 2015, after considering a wide range of factors, including foreign policy; energy security; environmental, cultural, and economic impacts; and compliance with applicable law and policy. ROD at 2-3, 8-32. The Secretary concluded that the project would have "negligible-to-limited benefit to energy security" and "minimal" impact on prices for refined petroleum products. *Id.* at 30. While recognizing that the proposed project could have "meaningful" economic benefits in the short term, the Secretary concluded that the project's advantages do not outweigh the fact that an approval "would undermine the United States' successful foreign policy engagement in efforts to combat climate change on a global scale." *Id.* at 30. Even if the pipeline "by itself is unlikely to significantly impact the level of [greenhouse gas]-intensive extraction of oil sands crude or the continued demand for heavy crude oil at refineries in the United States," the Secretary determined that "it is critical for the United States to prioritize actions that are not perceived as enabling further [greenhouse gas] emissions globally." *Id.* at 29. Approving the project, the Secretary concluded, would be viewed as inconsistent with U.S. efforts to transition to less-polluting forms of energy and would undercut the credibility and influence of the United States in urging other countries to make ambitious efforts to combat climate change, "including in advance of the December 2015 climate negotiations" in Paris. *Id.* at 30-31.

The President concurred with Secretary Kerry's determination. Ex. A to Compl. He agreed that the Keystone XL pipeline would not "make a meaningful long-term contribution to our economy," "lower gas prices for American consumers," or "increase America's energy

---

[5] Also pending is a proposed bill that seeks to remove the Presidential permitting requirement for for the construction, connection, operation, or maintenance of an oil or natural gas pipeline or electric transmission facility, including any cross-border segment. North American Energy Infrastructure Act, S. 1228, 114th Cong. (2015) (Ex. 28).

security." *Id.* at 2-3.  While the President recognized that "the United States will continue to rely on oil and gas as we transition . . . to a clean energy economy," the transition is moving "more quickly than many anticipated."  *Id.* at 3.  The President emphasized that the United States "is now a global leader when it comes to taking serious action to fight climate change" and "approving this project would have undercut that global leadership."  *Id.* at 4.  Three weeks later, U.S. leadership proved critical to the urgent negotiations in Paris when the President and more than 190 world leaders secured "the most ambitious climate change agreement in history" by committing to the Paris Agreement.  *See* Press Release, the White House, *U.S. Leadership and the Historic Paris Agreement to Combat Climate Change* (Dec. 12, 2015) (Ex. 29).

## III.  TRANSCANADA'S COMPLAINT

TransCanada brought this suit on January 6, 2016, to challenge the denial of the Keystone XL application.  The Complaint alleges that the denial is unauthorized by any act of Congress, is contrary to the express will of Congress, exceeds the President's Article II powers, and infringes on Congress' commerce powers under Article I of the Constitution.  Compl. ¶¶ 127-34.  In addition to the Secretary of State, TransCanada names as defendants the Attorney General and the Secretaries of Homeland Security and the Interior.  TransCanada seeks declarations that the denial is unlawful and that the defendants are without legal authority to prohibit development of the Keystone XL pipeline.  *Id.* at 48-49.  They also seek to enjoin the defendants from taking any action to enforce the denial of the Keystone XL permit.  *Id.* at 49.  Defendants now move to dismiss or, in the alternative, for summary judgment.

## ARGUMENT

## I.  STANDARD OF REVIEW

In evaluating the defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(6), this Court must accept all factual allegations in the complaint as true, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), but need not accept as true the legal conclusions in the complaint, *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).  Moreover, this Court "must consider the complaint in its entirety, as well as other . . . documents incorporated into the complaint by reference, and

matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also, e.g.*, *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010); *Davis v. Bayless*, 70 F.3d 367, 372 n.3 (5th Cir. 1995).

The defendants are moving in the alternative for summary judgment. This Court may grant summary judgment if "'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Quality Infusion Care, Inc. v. Health Care Serv. Corp.*, 628 F.3d 725, 728 (5th Cir. 2010) (quoting Fed. R. Civ. P. 56(a)). A dispute is "genuine" so long as "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"; a fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This Court must also construe all facts and evidence in the light most favorable to the nonmovant. *Haverda v. Hays Cty.*, 723 F.3d 586, 591 (5th Cir. 2013).

## II.  THE DENIAL OF A PRESIDENTIAL PERMIT TO TRANSCANADA IS WITHIN THE PRESIDENT'S CONSTITUTIONAL AUTHORITY

### A.  Justice Jackson's Tripartite Framework in *Youngstown*

In evaluating challenges to claims of Presidential power, the Supreme Court generally has applied Justice Jackson's tripartite framework from his concurrence in *Youngstown*, 343 U.S. at 635-38 (Jackson, J. concurring). *See, e.g.*, *Zivotofsky v. Kerry,* 135 S. Ct. 2076, 2083-84 (2015); *Medellin v. Texas*, 552 U.S. 491, 524 (2008); *Dames & Moore*, 453 U.S. at 668-69. First, "[w]hen the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring). Second, "[w]hen the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain." *Id.* at 637. In this area, "congressional inertia, indifference or quiescence may sometimes, at least as a practical matter, enable, if not invite, measures on independent presidential responsibility." *Id.* And, "any

actual test of power is likely to depend on the imperatives of events and contemporary imponderables rather than on abstract theories of law." *Id.* Third, "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter," and the Court can sustain his actions "only by disabling the Congress from acting upon the subject." *Id.* at 637-38.

The Supreme Court has admonished that while the *Youngstown* categories provide a useful analytical framework for evaluating executive action, "it is doubtless the case that executive action in any particular instance falls, not neatly in one of three pigeonholes, but rather at some point along a spectrum running from explicit congressional authorization to explicit congressional prohibition." *Dames & Moore*, 453 U.S. at 669; *see also id.* ("'[t]he great ordinances of the Constitution do not establish and divide fields of black and white'") (quoting *Springer v. Philippine Island*, 277 U.S. 189, 209 (1928) (Holmes, J. dissenting)).

As discussed below this case falls comfortably along the continuum within the first or second *Youngstown* category because the President was acting pursuant to his independent constitutional authority, because Congress not only has explicitly affirmed the President's authority to grant or deny the Keystone XL permit but also has long accepted the Presidential authority over border crossing facilities, and because there is no conflict between the President and Congress of the type that would require this Court to disable Congress from acting upon the subject in order to sustain the President's action.

**B.   The Executive Has Constitutional Authority to Control Border-Crossing Facilities**

**1.   The President's authority over border-crossing facilities stems from his foreign relations and Commander-in-Chief powers**

The President's authority to deny the Keystone XL permit is rooted in his powers over foreign affairs and as Commander in Chief. The Supreme Court has long recognized that "'[t]he President is the sole organ of the nation in its external relations, and its sole representative with foreign nations.'" *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319 (1936)

(quoting John Marshall's statement in the House of Representative, Annals, 6th Cong., col. 613 (March 7, 1800)).  While the Executive is "not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue," *Zivotofsky*, 135 S. Ct. at 2090, the "historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations,'" *Garamendi*, 539 U.S. at 414 (quoting *Youngstown*, 343 U.S. at 610-11 (Frankfurter, J., concurring)).  Thus, "in foreign affairs the President has a degree of independent authority to act."  *Id.*; *see also Curtiss-Wright*, 299 U.S. at 320 (the President's power in the field of international relations "does not require as a basis for its exercise an act of Congress"); *Youngstown*, 343 U.S. at 635-36, n. 2 (the President can "act in external affairs without congressional authority").

The President also has independent authority as Commander in Chief to take action necessary to protect the Nation's territorial integrity.  Because the extension of physical facilities into our borders necessarily implicates relations with foreign governments as well as foreign policy and national security considerations, the Constitution vests the President with independent responsibility to ensure that any border crossing comports with the national interest.  And because no one may intrude on this Nation's sovereignty over its borders without the national Government's consent, *see Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116, 136 (1812) (Marshall, C.J.) ("[t]he jurisdiction of the nation within its own territory is necessarily exclusive and absolute"), the President certainly may determine whether to permit any physical extension

14

across our borders in the absence of congressional legislation.  Numerous courts therefore have recognized the President's constitutionally-derived authority to take such actions.[6]

*Chicago & Southern Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103 (1948), confirmed these independent powers of the Executive in the context of public carriage over the territory or waters of this country.  The case involved a U.S. air carrier's challenge to the Civil Aeronautics Board's denial of a certificate to engage in overseas and foreign air transportation, which was approved by the President.  *Id.* at 104.  At issue was the reviewability of the denial as contemplated by statute, which explicitly precluded judicial review if the Presidential decision involved a foreign carrier but was unclear as to U.S. carriers.  *Id.*  The Supreme Court held that the Presidential decision was unreviewable, reasoning that while Congress may delegate large grants of its foreign commerce power to the President, the President "also possesses *in his own right* certain powers conferred by the Constitution on him as Commander-in-Chief and as the Nation's organ in foreign affairs," and the certification order at issue "dr[ew] vitality from either or both sources."  *Id.* at 109-10 (emphasis added).  Indeed, the Court noted that it was common knowledge that "aerial navigation routes and bases should be prudently correlated with facilities and plans for our own national defenses" and that they also "raise[d] new problems in conduct of

---

[6] *See Greene Cty. Planning Bd. v. Fed. Power Comm'n*, 528 F.2d 38, 46 (2d Cir. 1975) (Executive Order requiring permits for cross-border natural gas and electricity transmission lines delegates an executive function that is "rooted in the President's power with respect to foreign relations if not as Commander in Chief of the Armed Forces"); *White Earth Nation v. Kerry*, 14-cv-4726, 2015 WL 8483278, at *1 (D. Minn. Dec. 9, 2015) (because the oil pipelines "cross the border between Canada and the United States," they "are thus subject to the President's inherent constitutional authority concerning foreign relations"); *Detroit Int'l Bridge Co. v. Gov't of Canada*, --F. Supp. 3d --, 2015 WL 5726601, at *22 (D.D.C. Sept. 30, 2015) ("the President and his delegee here are acting pursuant to the President's inherent foreign affairs power" regarding cross-border bridges) (citation omitted); *Sierra Club v. Clinton*, 689 F. Supp. 2d 1147, 1163 (D. Minn. 2010) ("that the President's authority to issue the border-crossing Permit comes by way of his constitutional authority over foreign affairs and authority as Commander in Chief is well recognized"); *NRDC v. Dep't of State*, 658 F. Supp. 2d 105, 109 (D.D.C. 2009) (President has "inherent foreign affairs power to issue cross-border permits [for oil pipelines], even in the absence of any congressional authorization"); *Sisseton-Wahpeton Oyate v. Dep't of State*, 659 F. Supp. 2d 1071, 1081 (D.S.D. 2009) (same).

15

foreign relations." *Id.* at 108.  *Waterman* therefore confirms that the President has independent constitutional authority to act here.

### 2.   Historical practice is significant in assessing the President's exercise of authority over border-crossing facilities

This Court, however, "need not consider whether, as an original question," the President's Article II authority encompasses the power to control border-crossing facilities because the Executive has long exercised such power.  *United States v. Midwest Oil Co.*, 236 U.S. 459, 469 (1915).  "In separation-of-powers cases [the Supreme] Court has often 'put significant weight upon historical practice.'"  *Zivotofsky*, 135 S. Ct. at 2091 (quoting *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2559 (2014)).  As discussed above,

> a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned, engaged in by Presidents who have also sworn to uphold the Constitution, making as it were such exercise of power part of the structure of our government, may be treated as a gloss on 'executive Power' vested in the President by § 1 of Art. II.

*Youngstown*, 343 U.S. at 610-11 (Frankfurter, J., concurring); *see also Dames & Moore*, 453 U.S. at 686; *Haig*, 453 U.S. at 291-92; *Am. Int'l Group., Inc. v. Islamic Republic of Iran*, 657 F.2d 430, 443 (D.C. Cir. 1981); *Kaplan v. Corcoran*, 545 F.2d 1073, 1077 (7th Cir. 1976). Although past practice does not, by itself, create power, a "long-continued practice, known to and acquiesced in by Congress, would raise a presumption that [it] had been made in pursuance of [congressional] consent or of a recognized [] power of the Executive."  *Midwest Oil Co.*, 236 U.S. at 474.

*Midwest Oil* is a good illustration.  There, the Supreme Court held that the Executive had the power to withdraw from private acquisition public lands containing petroleum that Congress had made available and open to exploration and purchase.  *Id.* at 483.  The Court said that it "need not consider whether, as an original question," the President had such power because there was a "long continued practice" since the beginning of our Government of Presidents reserving public lands from sale for various purposes "without express statutory authority—but under the claim of power so to do."  *Id.* at 469; *see also id.* at 471-72 (discussing various contemporaneous

Attorneys General's and other government officials' opinions confirming the President's authority). Although Congress had also withdrawn public lands from sale from time to time, it "did not repudiate the power claimed or the withdrawal orders made" by the President but had instead "uniformly and repeatedly acquiesced in the practice." *Id.* at 471; *see also id.* at 479. The Court recognized that past practice does not establish validity but reasoned that:

> [G]overnment is a practical affair, intended for practical men. Both officers, law-makers, and citizens naturally adjust themselves to any long-continued action of the Executive Department—on the presumption that unauthorized acts would not have been allowed to be so often repeated as to crystallize into a regular practice. That presumption is not reasoning in a circle but the basis of a wise and quieting rule that, in determining the meaning of a statute or the existence of a power, weight shall be given to the usage itself even when the validity of the practice is the subject of investigation.

*Id.* at 472-73.

The Supreme Court has followed this line of reasoning. In *Garamendi*, which involved the Executive's practice of making executive agreements to settle claims of American nationals against foreign governments, the Court said that "[g]iven the fact that the practice goes back over 200 years and has received congressional acquiescence throughout its history, the conclusion 'that the President's control of foreign relations includes the settlement of claims is indisputable.'" 539 U.S. at 415 (quoting *United States v. Pink*, 315 U.S. 203, 240 (1942) (Frankfurter, J., concurring)); *see also Dames & Moore*, 453 U.S. at 679-81 ("Crucial to our decision today is the conclusion that Congress has implicitly approved the practice of claim settlement by executive agreement."); *Mistretta v. United States*, 488 U.S. 361, 401 (1989) (explaining that "'traditional ways of conducting government . . . give meaning' to the Constitution" (quoting *Youngstown*, 343 U.S. at 610 (Frankfurter, J., concurring))).

In contrast, in *Youngstown* Justice Frankfurter observed that there was no such consistent historical practice in the circumstances of that case; there had been only "three isolated instances" of executive assertions of power of seizure prior to *Youngstown*, which "[did] not add up, either in number, scope, duration or contemporaneous legal justification, to the kind of

17

executive construction of the Constitution revealed in the *Midwest Oil* case." *Youngstown*, 343 U.S. at 613 (Frankfurter, J., concurring).  Nor were they "sanctioned by long-continued acquiescence of Congress giving decisive weight to a construction by the Executive of its powers." *Id.*  Similarly, in *Medellin*, 552 U.S. at 532, a Presidential Memorandum issued to require States to give effect to a judgment of the International Court of Justice was admitted by the Executive to be an "unprecedented action," one "not supported by a particularly longstanding practice of congressional acquiescence," and was ultimately held unenforceable.

As discussed below, there is a long history of Presidents exercising authority over border-crossing facilities, and that practice is also "sanctioned by long-continued acquiescence of Congress giving decisive weight" to the President's authority.  *Youngstown*, 343 U.S. at 613 (Frankfurter, J., concurring).

### 3.  The Executive has long exercised authority over border-crossing facilities

As noted before, President Grant exercised Executive authority over a physical connection between the United States and a foreign nation as early as 1869.  *See* President Ulysses Grant's Seventh Annual Message to Congress, at XIII-XIV.  In that matter, a company that had been granted an exclusive right by France of telegraphic communication between France and the United States had sought to lay a submarine telegraphic cable on U.S. shores.  *Id.* President Grant recognized that "[t]he right to control the conditions for the laying of a cable within the jurisdictional waters of the United States, to connect our shores with those of any foreign state, pertains exclusively to the Government of the United States."  *Id.* at XV.  Because no congressional legislation governed the matter, President Grant was "unwilling . . . to yield to a foreign state the right to say that its grantees might land on our shores while it denied a similar right to our people to land on its shores."  *Id.*  President Grant therefore conditioned his permission on the removal of the monopolistic features of the concession granted by the French government.  *Id.*

In his annual message to Congress in 1875, President Grant urged legislation governing telegraphic cables connecting the United States and a foreign state and outlined the conditions he

intended to impose on future cables, until such legislation was enacted:  the foreign state must grant reciprocity for the landing of U.S. cable lines; the cable could not be laid for monopolistic or anticompetitive purposes; and the company must give precedence to the transmission of official messages of the two Governments and consent to the power of the two Governments to fix the rates of the transmission of messages.  *Id.* at XV-XVI.  Congress chose not to act at that time, and as discussed below, when it did act decades later, it did so to confirm the President's permitting authority.

Thereafter Presidents Hayes, Garfield, Arthur, Cleveland (first term), and Harrison also exercised authority to control the landing of foreign cables by imposing conditions similar to those of President Grant's.  *See* 22 Op. Att'y Gen. at 18-25; 2 Moore, Digest of International Law at 461.  The only break in this continuous Executive position was during President Cleveland's second term, when his two Secretaries of State had a different view.  *See* 22 Op. Att'y Gen. at 23-24; *see also United States v. W. Union Tel. Co.,* 272 F. 311, 317 (S.D.N.Y 1921), *aff'd* 272 F. 893 (2d Cir. 1921), *rev'd and dismissed by stipulation of the parties*, 260 U.S. 754 (1922).  As a consequence, a French company landed a cable at Coney Island, New York from Haiti without the Government's permission.  22 Op. Att'y Gen. at 24.  The Attorney General immediately brought suit to prevent the landing and operation of the cable, *id.*, but the court declined to issue an injunction because the cable had been laid.  *See United States v. La Compagnie Francaise Des Cables Telegraphiques*, 77 F. 495 (S.D.N.Y. 1896).

In 1898, Acting Attorney General John K. Richards opined that the President had the power to control the landing of submarine cables on U.S. shores and must act to grant or deny the consent of the Government of the United States because "[t]he preservation of our territorial integrity and the protection of our foreign interests is entrusted, in the first instance, to the President."  22 Op. Att'y Gen. at 25-26.  He relied on Chief Justice Marshall's opinion in *Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 136 (1812), that "[t]he jurisdiction of the nation within its own territory is necessarily exclusive and absolute."  He also drew support

19

from *La Compagnie Francaise Des Cables Telegraphiques*, 77 F. at 495, in which Judge

Lacombe had observed that

> without the consent of the General Government, no one, alien or native, has any
> right to establish a physical connection between the shores of this country and that
> of any foreign nation.  Such consent may be implied as well as expressed, and
> whether it shall be granted or refused is a political question, which, in the absence
> of congressional action, would seem to fall within the province of the executive to
> decide.

*Id.* at 496.

Beyond the authority to protect our territorial integrity, Acting Attorney General Richards

further opined that in the absence of congressional legislation, the Executive has the authority to

impose the conditions originally outlined by President Grant.  Specifically, because the President

"has charge of our relations with foreign powers," it was "his duty to see that in the exchange of

comities among nations we get as much as we give" by requiring reciprocity, and it was his duty

"to impose such restrictions as will forbid unjust discriminations, prevent monopolies, promote

competition, and secure reasonable rates."  22 Op. Att'y Gen. at 26-27.  Moreover, because "[a]

submarine cable is of inestimable service to the Government in communicating with its officers

in the diplomatic and consular service, and in the Army and Navy when abroad," the Executive

properly could demand as Commander in Chief that the cable lines give precedence to the

transmission of official messages of the two Governments.  *Id.*

Since Acting Attorney General Richards' opinion in 1898, the Executive has consistently

exercised control over cross-border facilities, including oil pipelines, to the extent that no

congressional approval is otherwise required.  *See* 9 Whiteman, Digest of International Law 917-

32 (documenting various permits including eight oil pipeline permits between 1941 and 1966);

IV Hackworth, Digest of International Law 247-56; 2 Moore, Digest of International Law 452-

66; *see, e.g.*, Exec. Order 11423, § 1(a)(iv) (requiring Presidential permits for international

bridges "to the extent that congressional authorization is not required").  Specifically, Acting

Attorney General Richards' opinion was followed by subsequent Attorneys General as to both

submarine cables and other cross-border physical facilities.  *See* Cuba-Cables, 22 Op. Att'y Gen. 408 (1899); Cuba-Cables, 22 Op. Att'y Gen. 514 (1899); Wireless Telegraphy-International Agreement, 24 Op. Att'y Gen. 100 (1902); Diversion of Water from Niagara River, 30 Op. Att'y Gen. 217 (1913); Granting of License for the Construction of a Gas Pipe Line, 38 Op. Att'y Gen. 163 (1935).  Presidents also have issued Executive Orders affirming their constitutional authority to require permits for a wide range of cross-border facilities and/or delegating their permitting authority to various agency heads.  *See* Exec. Order No. 10530, § 5, 19 Fed. Reg. 2,709, 2,711 (May 12, 1954) (submarine cables); Exec. Order No. 10485, 18 Fed. Reg. 5,397 (Sept. 3, 1953) (natural gas pipelines and electricity transmission lines), as amended by Exec. Order No. 12038, § 4(a), 43 Fed. Reg. 4,957-58 (Feb. 3, 1978); *see also* Exec. Order No. 8202, 4 Fed. Reg. 3,243 (July 15, 1939) (same).

For example, in Executive Order No. 11423, the first order to govern oil pipelines, President Johnson declared that "the proper conduct of the foreign relations of the United States requires that executive permission be obtained for the construction and maintenance at the borders of the United States of facilities connecting the United States with a foreign country." 33 Fed. Reg. at 11,741 (Aug. 16, 1968).  The Executive Order noted that Executive permission had from time to time been sought and granted for various border-crossing facilities, and that it was desirable to have a systematic method in connection with the issuance of permits.  *Id.*  The President then designated, "by virtue of the authority vested in [him] as President of the United States and Commander in Chief," the Secretary of State to receive permit applications for a number of border crossing facilities, including other pipelines, conveyor belts, tunnels, monorails, aerial cable cars, aerial tramways, bridges, and water and sewer pipes, to the extent they are not already covered by Executive Order Nos. 10485 and 10530.  *Id.* § 1(a).  Indeed, Executive Order No. 13337, § 2(a), 69 Fed Reg. 25,299 (Apr. 30, 2004), which amended Executive Order No. 11423, further expanded these categories to include "similar facilities above or below ground" as well as "border crossing for land transportation, including motor and rail vehicles."  Further, these Executive Orders require the Secretary of State to determine, in his or

her judgment and upon consultation with other agency heads, whether any border crossing serves the "national interest" and to impose any terms and conditions that the Secretary deems appropriate.  Exec. Order No. 11423, § 1(d)-(e); Exec. Order No. 13337, § 1 (g)-(h).  The Executive practice of requiring permits for a spectrum of cross-border facilities, including for cross-border oil pipelines, continues today, as does Congress' recognition that cross-border permitting decisions are committed to the Executive's discretion and judgment.

### 4.   Congress has explicitly affirmed or at least accepted the Executive's authority over cross-border facilities throughout history

In the nearly one and a half centuries of Executive exercise of authority over a wide range of cross-border facilities, Congress has never questioned the President's authority.  Instead, it has either explicitly affirmed the Executive's authority over specific types of border-crossing facilities or has remained silent and thereby accepted the President's authority.  *Kaplan*, 545 F.2d at 1077 ("Since the promulgation of Executive Order 10096 on January 23, 1950, there has been Congressional acquiescence in the order by the failure of Congress to modify or disapprove it.").  As the Supreme Court has said, "[g]iven the President's independent authority 'in the areas of foreign policy and national security . . . congressional silence is not to be equated with congressional disapproval.'"  *Garamendi*, 539 U.S. at 429 (quoting *Haig*, 453 U.S. at 291); *see also Dames & Moore*, 453 U.S. at 678 (same).  The President's claim of authority over border-crossing facilities thus either falls within the first *Youngstown* category, where the President has acted pursuant to the express or implied authorization of Congress, or at the very least is in the second *Youngstown* category's "zone of twilight," where the concurrent, or unspecified distribution of, powers of the Executive and Congress has been settled by the President's exercise of the authority and longstanding congressional acquiescence.  *See Youngstown*, 343 U.S. at 635, 637.

*Dames & Moore*, 453 U.S. at 669, illustrates why that is so.  There, the Court upheld the President's settlement of American claims against Iran to resolve the Iranian Hostage Crisis.  The President's direction that attachments against Iranian assets be nullified and the assets

transferred to Iran fell in the first *Youngstown* category because it was found to be authorized by an Act of Congress. *Id.* at 672-74. Although the President's suspension of claims pending in American courts was not specifically authorized by two particular statutes, the Court found those statutes relevant and concluded that the "general tenor of Congress' legislation in this area" evidenced congressional acceptance of, or acquiescence in, a broad scope of Executive action. *Id.* at 687. Specifically, the Court noted that there was "a history of congressional acquiescence in the conduct of the sort engaged in by the President" and that Congress had had opportunities to act on the matter but did not. *Id.* at 677, 678-79.

As discussed below, the same is true here, both as to the existence of an express congressional affirmation by statute of the Executive's authority and a history of congressional acquiescence.

### a. Congress has explicitly affirmed the President's authority over cross-border oil pipelines in legislation addressing the Keystone XL project

In the only enacted law regarding Keystone XL, Congress has affirmed the President's constitutional authority over cross-border oil pipelines as set forth in Executive Order 13337. As discussed above, in section 501(a) of the Payroll Tax Act, Congress required "the President, acting through the Secretary of State," to "grant a permit *under Executive Order No. 13337*" for the Keystone XL project within 60 days of the Act, unless the President determined, as he did, that the project would not serve "the national interest"—exactly the same discretionary standard provided in the Executive Order itself. 125 Stat. 1289-90 (emphasis added). The Payroll Tax Act is the only law governing the approval process of cross-border oil pipelines. While Congress evidently sought to expedite Executive deliberation on the application, the Payroll Tax Act is an explicit congressional affirmation of the President's constitutional authority with respect to the Keystone XL permit, providing compelling evidence that the Executive's action here falls within

the first *Youngstown* category and is entitled to "the strongest of presumptions and the widest latitude of judicial interpretation." *Youngstown*, 343 U.S. at 637.[7]

### b. Legislation regulating other types of border-crossing facilities has confirmed the President's permitting authority over those facilities

Congress also has explicitly affirmed the President's permitting authority with respect to certain other cross-border facilities. While those statutes do not specifically address oil pipelines, the "general tenor of Congress' legislation in this area" is relevant and demonstrates that "the President [was] acting . . . at least with the acceptance of Congress," *Dames & Moore*, 453 U.S. at 678, in exercising his authority to deny the Keystone XL permit.

Despite President Grant's urging the enactment of legislation to govern submarine cables in 1875, Congress did not act until 1921. In fact, it acted only as a response to the United States' unsuccessful attempt to enjoin a submarine cable from being laid between Barbados and Miami Beach without the President's consent. *See* Unauthorized Landing of Submarine Cables in the United States, H. Rep. 67-71, at 3-4 (1921) (Ex. 30). President Woodrow Wilson had dispatched a warship to stop the Western Union Telegraph Company from laying the cable. *Id.* at 3. The company was forced to fasten the cable to a buoy three miles off the coast of Miami while the parties litigated the issue. *Id.* Although the district court there did not take issue with Judge Lacombe's observation in *La Compagnie Francaise Des Cables Telegraphiques*, 77 F. 495—that in the absence of congressional action the President could approve or deny a physical connection to the territory of the United States—the court found the proposed cable landing authorized by the Post Roads Act of July 24, 1866, 14 Stat. 221. *Western Union Tel.*, 272 F. at 318-20. The court reasoned that the proposed cable "amount[ed] to nothing more than carrying foreign messages beyond the shores of this country, which it at least initiates in the United States and

---

[7] As discussed below in Part III, the Keystone XL Pipeline Approval Act, S. 1, 114th Cong. (2015), ultimately vetoed by the President, also did not question the President's permitting authority in the absence of contrary congressional legislation.

transmits to the marginal waters under a federal franchise." [8]  *Id.* at 320, 323.  The Second Circuit affirmed, while also expressing its view that "no practice ha[d] been established" to indicate that the President had authority in this area, as consent was sometimes granted by Congress or not obtained at all.  272 F. 893, 894 (2d Cir. 1921), *rev'd and dismissed by stipulation of the parties*, 260 U.S. 754, 754 (1922).

While the *Western Union* case was pending in the Supreme Court, Congress quickly enacted the Kellogg Act to specifically require Presidential approval of submarine cables connecting the United States and a foreign country.  Act of May 27, 1921, ch. 12, 42 Stat. 8 (1921) (codified at 47 U.S.C. § 34); H. Rep. 67-71, at 2-4 (1921).  The Act confirmed the President's discretion to determine whether granting a permit would be in the Government's interest.  It provided that the President could grant or deny a permit if such action would assist in "maintaining the rights or interests of the United States or of its citizens in foreign countries, or [would] promote the security of the United States," among other considerations that echoed some of the conditions initially laid out by President Grant in 1875.  *Id.* § 2 (codified as amended at 47 U.S.C. § 35).  The Act also addressed the situation presented in *La Compagnie Francaise Des Cables Telegraphiques*, 77 F. 495, where the United States' motion to enjoin the laying of a submarine cable was found to be mooted by the cable's landing.  The Act strengthened the Executive's power by granting district court jurisdiction to hear not only the United States' motions to enjoin the landing of cables but also motions "to compel, by injunction, the removal thereof."  Kellogg Act, § 3, 42 Stat. 8 (codified at 47 U.S.C. § 36).

---

[8] The federal franchise to which the court referred was granted by Congress in 1866 to Western Union's predecessor company.  *Western Union*, 272 F. at 319 (citing the Act of May 5, 1866, 14 Stat. 44).  As discussed before (at 4 and n.1), the 1866 Act was the first authorization of any cable landing on U.S. shores.  Although the term of the franchise was only fourteen years, the district court concluded that the company had continued its operation by "long-continued acquiescence."  272 F. at 323.

Congress also specifically affirmed the President's permitting authority over another type of cross-border facility in the International Bridge Act of 1972 ("IBA"), Pub. L. No. 92-434, 86 Stat. 731 (1972) (codified at 33 U.S.C. §§ 535-535j).  As with the Kellogg Act, the IBA requires Presidential approval for international bridges, but does not seek to interfere with the Executive's exercise of its permitting authority or change the terms of Executive Order No. 11423 as applied to international bridges, including the fact that any approval is committed to the Executive's judgment.  33 U.S.C. § 535b.[9]  The procedural requirement that the IBA imposes—that "the President shall secure the advice and recommendations" of heads of relevant federal departments and agencies "as he deems appropriate," 33 U.S.C. § 535b—is also consistent with the Executive Order's consultation requirement.  *See* Exec. Order No. 11423, § 1(b), 33 Fed Reg. 11,741. Thus, one district court observed recently that although the IBA requires Presidential approval, it is only Executive Order 11423 that sets forth the standards for the President's issuance of international bridge permits.  *Detroit Int'l Bridge Co. v. Gov't of Canada*, --F. Supp. 3d --, 2015 WL 5726601 at *21 (D.D.C. Sept. 30, 2015).  As TransCanada previously has acknowledged, "in the International Bridge Act of 1972, Congress recognized Presidential authority over bridges that cross international borders."  *NRDC* MTD at 4; *see also Detroit Int'l Bridge*, 2015 WL 5726601, at *21 (fact that Congress enacted IBA to govern international bridges over navigable waters "does not undermine the President's authority to control international border crossings in

---

[9] Four years earlier in 1968, when designating the Secretary of State to receive permit applications for oil pipelines and a range of other facilities, President Johnson had also included international bridges "to the extent that congressional authorization [was] not required."  Exec. Order No. 11423, § 1(a)(iv).  At the time, congressional consent was required for international bridges.  Congress had enacted the Rivers and Harbors Appropriation Act of 1899, ch. 425, § 9, 30 Stat. 1121, 1151 (codified at 33 U.S.C. § 401), to require congressional consent to any new bridge extending over navigable waters of the United States.  When Congress enacted the General Bridge Act of 1946, 60 Stat. 847 (codified at 33 U.S.C. §§ 525-34), to delegate its approval authority to the then Department of War, however, it specifically excluded international bridges from the Act.  33 U.S.C. § 531.  The IBA bridged this gap by providing congressional consent for international bridges, subject to certain conditions, including Presidential approval. 33 U.S.C. § 535.

connection with his inherent constitutional authority over foreign relations"). The IBA, therefore, is another example of congressional affirmation of Presidential authority over cross-border facilities.

Even though the Kellogg Act and the IBA address other types of cross-border facilities, "both statutes [are] highly relevant in the looser sense of indicating congressional acceptance" of Presidential authority over the permitting of cross-border facilities. *Dames & Moore*, 453 U.S. at 677. Both statutes preserve, and stamp with congressional imprimatur, Executive authority to grant or deny permits for specific types of cross-border facilities, and both commit the permitting decisions to the discretion of the President. These laws therefore indicate congressional acceptance of the President's exercise of authority over cross-border oil pipelines. *See id.* at 678 (relying on "the enactment of legislation closely related to the question of the President's authority in a particular case which evinces legislative intent to accord the President broad discretion" to uphold an exercise of Executive authority).

### c. Legislation regulating commodities that are transported through cross-border facilities subject to Presidential permitting requirements reflects congressional acquiescence in the Executive's authority

Congressional acquiescence in the President's authority is also reflected in legislation regulating commodities that are transported through cross-border facilities subject to Presidential permitting requirements. For example, the Federal Power Act, ch. 285, 41 Stat. 1063 (1920), and the Natural Gas Act, ch. 556, 52 Stat. 822 (1938), required the former Federal Power Commission's approval of, respectively, the transmission of electric energy from the United States to a foreign country, 16 U.S.C. § 824a(e), and the export and import of natural gas, 15 U.S.C. § 717b(a). In enacting these laws, Congress did not disturb the existing requirement of Presidential approval of the construction or maintenance of electric energy or gas pipeline facilities at the United States border. *See, e.g.*, Diversion of Water from Niagara River, 30 Op. Att'y Gen. 217 (1913) (electrical transmission); Granting of License for the Construction of a Gas Pipe Line, 38 Op. Att'y Gen. 163 (1935) (natural gas).

Any doubt that Congress has acquiesced in the President's exercise of power as to those cross-border facilities is removed by the long line of Presidents continuing to exercise their permitting authority without congressional objection.  For these specific types of border-crossing facilities, the Presidential permitting requirement has coexisted with, and is complementary to, regulatory requirements imposed by Congress.  Thus, in 1939, when President Roosevelt issued Executive Order 8202, 4 Fed. Reg. 3243 (July 13, 1939), to designate the Federal Power Commission (whose powers mostly have now been transferred to the Federal Energy Regulatory Commission, *see* 42 U.S.C. § 7172) to receive applications for cross-border facilities for the transmission of electric energy and natural gas across international borders, he also referenced the Federal Power Commission's separate responsibilities under the Federal Power Act, as amended, and the Natural Gas Act.  Subsequent Executive Orders concerning electric energy and natural gas are similar.  *See* Exec. Order No. 10485, 18 Fed. Reg. 5,397 (Sept. 3, 1953); Exec. Order No. 12038, 43 Fed. Reg. 4957 (Feb. 3, 1978).  These Executive Orders have drawn no congressional objections in the decades that followed, indicating that Congress has accepted the President's authority in these areas.[10]

In sum, dating back to the nineteenth century, Presidents have exercised their constitutional authority over foreign affairs and as Commander in Chief to require permits for cross-border infrastructure projects creating physical connections between the United States and foreign countries where Congress has not provided for approval for such projects.  This authority has not only explicit congressional approval but also longstanding congressional acquiescence..  Congress also has specifically confirmed the President's authority over cross-border oil pipelines in legislation directed at accelerating the decision-making process for the Keystone XL application.  To this day, Congress has not enacted a statutory framework governing the approval

---

[10] As discussed *infra*, no statutory framework governs cross-border oil pipelines, and Executive Orders issued by President Johnson and President George W. Bush operate in this area with congressional acquiescence.

of cross-border oil pipelines.  "[A]s a practical matter," this history "enable[s], if not invite[s] measures on independent presidential responsibility."  *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).  The President, therefore, indisputably has authority to act with respect to oil pipeline border crossings.

### C.     The Executive's Decision Falls Within the Scope of Presidential Authority Over Border Crossings, Encompassing A Complex And Multi-Factored Determination of National Interest

The denial of the Keystone XL permit falls within the President's authority over border crossings.  Since President Grant conditioned the landing of a submarine cable from France in 1869, the Executive's exercise of permitting authority has been flexibly responsive to the type of border crossings at issue and the pressing needs of the time.  President Grant himself imposed conditions he deemed necessary to protect the interests of the United States regarding submarine cables, including conditions to forbid unjust discriminations, prevent monopolies, promote competition, and secure reasonable rates.  Legislation on cross-border facilities correspondingly confirms the President's discretion to determine whether granting a particular permit would assist in "maintaining the rights or interests of the United States or of its citizens in foreign countries, or [would] promote the security of the United States."  Kellogg Act, § 2 (codified as amended at 47 U.S.C. § 35); *see also* the IBA, 33 U.S.C. § 535b (requiring a Presidential permit for international bridges without changing the "national interest" standard in Executive Order No. 11423).

In keeping with past Presidential practice of making permits subject to "such conditions as the President of the United States may see fit," *see, e.g.*, Ex. 12 at 2-3 (oil pipeline permit issued by President Kennedy), President Johnson's Executive Order in 1968 and President Bush's Executive Order in 2004 both require the Secretary of State to examine whether, in the Secretary's judgment, any oil pipeline border crossing (as well as a wide range of other cross-border facilities) would serve the "national interest."  *See* Exec. Order 11423, § 1(d), (e); Exec.

Order 13337, § 1(h).[11]  As the Department of State has explained to Congress, the Secretary's national interest determination involves a case-by-case assessment of "a full range of issues, including energy security, foreign policy, economic effects, health, safety and environment consideration, including climate change, as well as any other factor the Department believes is relevant to the national interest."[12]  The Executive necessarily weighs and balances these competing concerns in assessing whether granting any particular permit is in the national interest at a given time.[13]  TransCanada itself has recognized previously that the national interest determination "dictates the broadest possible policy inquiry."  *Sisseton* MTD at 19.

The decision at issue falls comfortably within this inquiry.  Secretary Kerry explained that the decision was informed by, among many other considerations, the project's "negligible-to-limited benefit" to energy security, "minimal" impact on pricing of refined petroleum products and marginal long-term economic benefits, as well as the United States' credible leadership role on climate change issues, which has become "a major factor in determining U.S. foreign policy success."  ROD at 26, 30.  The Secretary determined that approving the Keystone XL project would be understood by foreign governments and their citizens as reflecting a lack of

---

[11] This is similar to the "public interest" inquiry for determining whether permits should be issued for natural gas and electric energy cross-border facilities.  *See* Exec. Order No. 10485, § 3, 18 Fed. Reg. 5,397 (Sept. 3, 1953), as amended by Exec. Order No. 12038, 43 Fed. Reg. 4,957 (Feb. 3, 1978).

[12] *American Jobs Now: A Legislative Hearing on H.R. 3548, the North American Energy Access Act*: *hearing before the Subcommittee on Energy and Power of the Committee on Energy and Commerce*, 112th Cong. (Jan. 25, 2012) (statement of Dr. Kerri-Ann Jones, Assistant Secretary of State) (Ex. 31); *see also* Notice of 30 Day Public Comment Period, 79 Fed. Reg. 6,984 (Feb. 5, 2014) (soliciting comments for the Department of State's "national interest" determination and identifying a broad scope of inquiry); ROD at 3 ("[t]he President or his delegate may take into account factors he or she deems germane to the national interest," including "foreign policy; energy security; environmental, cultural, and economic impacts; and compliance with applicable law and policy").

[13] *See, e.g.*, Record of Decision and National Interest Determination Regarding the Alberta Clipper Pipeline, (Aug. 3, 2007) (Ex. 32) at 3 (noting that concerns were raised "about higher-than-average levels of greenhouse gas (GHG) emissions associated with oil sands crude," but it was determined that "on balance they do not outweigh the benefits to the national interests identified"); *see also* Compl. ¶ 27.

"resolve to undertake significant and difficult decisions to address climate change," which "would undercut the credibility and influence of the United States in urging other countries to put forward ambitious actions and implement efforts to combat climate change, including in advance of the December 2015 climate negotiations [in Paris]." *Id.* at 30-31.  The President agreed with this assessment, emphasizing that the United States "is now a global leader when it comes to taking serious action to fight climate change" and "approving this project would have undercut that global leadership." Ex. A to Compl. at 4.

Further, Secretary Kerry determined that diplomatic success in this area "would lead to a reduction in global [greenhouse gas] emissions that would have a direct and beneficial impact on the national security and other interests of the United States." ROD at 31.  Indeed, the Executive has recognized that "[c]limate change is an urgent and growing threat to our national security" and has made the reduction of global emissions a national security priority.  National Security Strategy, White House (Feb. 2015) (excerpt attached as Ex. 33) at 12; *see* ROD at 26-28.  The Department of Defense also has found that the effects of climate change "are threat multipliers that will aggravate stressors abroad such as poverty, environmental degradation, political instability, and social tensions – conditions that can enable terrorist activity and other forms of violence."  Quadrennial Defense Review 2014, Department of Defense (excerpt attached as Ex. 34) at 8; *see id.* at VI ("The impacts of climate change may increase the frequency, scale, and complexity of future missions."); ROD at 25.[14]  These considerations clearly fall within the "national interest" determination.

---

[14] *See also Hearing on 2015 Paris International Climate Negotiations before the Subcommittee on Multilateral International Development, Multilateral Institutions, and International Economic, Energy, and Environmental Policy*, 114th Cong. (Oct. 20, 2015) (Testimony of Todd D. Stern, Special Envoy for Climate Change) (Ex. 35) ("[a] strong Paris Agreement . . . is in the economic, diplomatic and national security interests of the United States and the American people"; noting, among other things, that "[o]ur military and intelligence leaders have been sounding the alarm now for years" regarding threats posed by climate change).

In sum, the Executive's denial of the Keystone XL permit is a proper exercise of, and is fully grounded in, the President's Article II authority.

## III. TRANSCANADA'S CHALLENGES TO THE PRESIDENT'S DENIAL OF THE KEYSTONE XL PERMIT ARE WITHOUT MERIT

### A. TransCanada's Reliance on Past Presidential Permitting Decisions Is Misplaced

TransCanada argues that the permit denial is a "novel exercise of Presidential power rest[ing] on pure symbolism and ha[ving] nothing to do with the pipeline's crossing the border." Compl. ¶ 61. That simply is not so. The President's exercise of authority was far from novel or merely symbolic, but has everything to do with the fact that 830,000 barrels of crude oil per day would be crossing the United States border through the pipeline and would impact U.S. foreign policy goals and national security priorities. Even if the Executive's prior approval of oil pipeline permits had weighted the various considerations differently under the particular circumstances of each permit application, nothing suggests that those past decisions can operate to restrict the President's authority as a one-way ratchet, thus turning the "national interest" determination on its head.

*Kent v. Dulles*, 357 U.S. 116 (1958), upon which TransCanada relies, is inapposite. There, the Supreme Court held that the Secretary of State could not refuse to issue passports on the ground of Communist affiliations under the Passport Act of 1926, 22 U.S.C. § 221a, which authorized the Secretary of State to issue passports under such rules as the Executive shall prescribe. *Kent*, 357 U.S. at 130. The issue before the Court was one of "statutory construction," and the Court expressly recognized that "a different case" would be presented "[i]f we were dealing with political questions entrusted to the Chief Executive by the Constitution." *Id.* at 129. Moreover, the Court's narrow construction in *Kent* was grounded in two considerations. First, at the time of the Passport Act of 1926, the Department of State's administrative practice of refusing passports under a predecessor statute had centered primarily on two grounds, citizenship and illegal conduct, and thus, "those two [were] the only ones which it could fairly be argued were adopted by Congress." *Id.* at 127-28. Second, because the

Secretary's exercise of discretion curtailed a citizen's liberty interest, the Secretary's statutorily delegated power had to be "construe[d] narrowly." *Id.* at 129 ("Since we start with an exercise by an American citizen of an activity included in constitutional protection, we will not readily infer that Congress gave the Secretary of State unbridled discretion to grant or withhold it."). The Court found that "[i]f that liberty is to be regulated, it must be pursuant to the lawmaking functions of Congress." *Id.*

Here, in contrast, the Secretary's denial of the Keystone XL permit does not hinge on the exercise of a general statutory authority, the scope of which may depend upon past administrative practice adopted by Congress when enacting the statute. Nor does the permit denial involve the curtailment of a citizen's personal liberty interest. Instead, the nature of the Executive's decision here is grounded in the exercise of the President's authority over foreign policy and national security, which is necessarily delicate, fluid, and complex. *See Haig*, 453 U.S. at 291 (noting the "volatile nature of problems confronting the Executive in foreign policy and national security") (citing *Curtiss-Wright*, 299 U.S. at 304). Given the President's independent authority in this area, congressional acquiescence also is more readily inferred from congressional silence. *Haig*, 453 U.S. at 291. Thus, in *Haig*—a case also involving the Passport Act, the Supreme Court upheld the Secretary's refusal to issue a passport on national security grounds, where the Executive had asserted a policy of denying passports on that ground (even though the policy was infrequently implicated) and Congress had foregone opportunities to narrow the broad authority granted to the Executive in the Passport Act. *Id.* at 293-301.

**B. The Executive's Reasons for the Denial of the Permit Are Unreviewable**

TransCanada's argument that the Executive's decision is beyond the scope of the President's authority because it is inconsistent with prior decisions that were limited to "traditional regulatory concerns," "discrete, border-related considerations," or relations with Canada, *see* Compl. ¶¶ 60, 95, 110-15, is essentially a challenge to the Executive's judgment. But once this Court determines that the Executive has the constitutional authority, then how the Executive exercised that authority is beyond the purview of the judiciary.

In *Waterman*, for example, the President's decision to deny an air carrier's request to engage in overseas or foreign air transportation was unreviewable because the denial "embod[ied] Presidential discretion as to political matters beyond the competence of the courts to adjudicate." 333 U.S. at 114. As the Supreme Court explained, "the very nature of executive decisions as to foreign policy is political, not judicial," and "whatever of this order emanates from the President is not susceptible of review by the Judicial Department." *Id.* at 111. Instead, "[s]uch decisions are wholly confided by our Constitution to the political departments of the government" and "are delicate, complex, and involve large elements of prophecy." *Id.* "They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry." *Id.* at 111 (citing cases); *accord Haig*, 453 U.S. at 292; *Harisiades v. Shaughnessy*, 342 U.S. 580 (1952).

The Supreme Court consistently has found the President's exercise of discretion unreviewable whether the Presidential discretion is derived from the Constitution or from a statute that entrusts decisions to the President. *See Dalton v. Specter,* 511 U.S. 462, 475 (1994) ("Although the President's discretion in *Waterman S. S. Corp.* derived from the Constitution, we do not believe the result should be any different when the President's discretion derives from a valid statute."). As the Supreme Court has said, where a claim

> concerns not a want of [Presidential] power, but a mere excess or abuse of discretion in exerting a power given, it is clear that it involves considerations which are beyond the reach of judicial power. This must be since, as this court has often pointed out, the judicial may not invade the legislative or executive departments so as to correct alleged mistakes or wrongs arising from asserted abuse of discretion.

*Id.* at 474 (quoting *Dakota Central Tel. Co. v. South Dakota ex rel. Payne*, 250 U.S. 163, 184 (1919)). In *Dalton v. Specter*, for example, the Supreme Court refused to review the President's decision under a statute to approve a Commission's recommendation to close certain military bases because the statute "does not at all limit the President's discretion in approving or

disapproving the Commission's recommendations . . . nothing in [the statute] prevents the President from approving or disapproving the recommendations for whatever reason he sees fit." *Id.* at 476; *see also United States v. George S. Bush & Co.*, 310 U.S. 371, 379-80 (1940) (judicial review unavailable for a challenge to the factual basis of the President's decision to change a tariff rate using procedure prescribed by Congress; holding that the Presidential decision that a change of rate was necessary was "no more subject to judicial review under this statutory scheme than if Congress itself had exercised that judgment").

Similarly unreviewable was the Presidential action in *Dakota Central Telephone Co. v. South Dakota ex rel. Payne*, 250 U.S. 163 (1919), which was taken pursuant to a congressional joint resolution authorizing "the President during the continuance of the present war . . . whenever he shall deem it necessary for the national security or defense, to supervise or to take possession and assume control of any . . . telephone [lines]." *Id.* at 181. The Supreme Court refused to consider the claim that the President abused the discretion granted him under the joint resolution because "it involve[d] considerations which are beyond the reach of judicial power." *Id.* at 184. Significantly, the Court did consider, yet ultimately rejected, an argument that there was an "absence of power in the President" to take the action that he did. *Id.*

Here, the manner in which the President exercised his authority to deny the Keystone XL permit is similarly beyond the reach of the judiciary. The Executive determined that granting the permit would undercut the United States' global leadership and thereby have an adverse impact on the United States' ability to influence other nations to be ambitious and conclude an international agreement intended to mitigate the national security threats associated with climate change. *See* Compl., Ex. A at 4; ROD at 30-31. He further judged that, despite Canada's disappointment in the denial of TransCanada's application, our strong and historic relationship with Canada would endure. *See* Compl., Ex. A at 2; ROD at 30. These are the type of judgments that belong to the President. *See Bancoult v. McNamara,* 445 F.3d 427, 437 (D.C. Cir. 2006) (in matters involving executive branch decisions relating to foreign policy and

35

national security, "[t]he courts may not bind the executive's hands . . . whether directly—by restricting what may be done—or indirectly—by restricting how the executive may do it").

Indeed, the Fifth Circuit has recognized that "[t]he executive's institutional resources and expertise in foreign affairs far outstrip those of the judiciary." *Spacil v. Crowe*, 489 F.2d 614, 619 (5th Cir. 1974). "Perhaps more importantly," the Fifth Circuit said, "in the chess game that is diplomacy only the executive has a view of the entire board and an understanding of the relationship between isolated moves." *Id.*; *see also Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 951 (5th Cir. 2011) (noting that the Fifth Circuit "has consistently followed the command that matters implicating foreign relations and military affairs are generally beyond the authority or competency of a court's adjudicative powers" and declining to "reexamin[e] critical foreign policy decisions" made by the Executive Branch (internal quotation marks omitted)). In sum, the Executive's "national interest" determination is unreviewable.

## C. The President's Exercise of Cross-Border Permitting Authority Does Not Require Explicit Congressional Authorization

TransCanada also argues that the President has no authority to deny the Keystone XL permit in the absence of legislation authorizing the denial. According to TransCanada, because the Keystone XL project implicates domestic and international commerce and because these areas are committed exclusively to Congress by the Constitution, the President lacks authority to prevent TransCanada from building the cross-border pipeline. *See, e.g.*, Compl. ¶¶ 2, 61-62, 72-74, 127. TransCanada is effectively arguing that, in the absence of a statutory framework governing the construction of cross-border facilities for oil pipelines, any private company could proceed to build such transborder infrastructure without governmental approval. This simply cannot be so.

As demonstrated above, the President has independent constitutional power to permit or deny extensions of physical infrastructure into the United States. The President does not need legislation to act in this area. When defending the Keystone I permit, TransCanada itself argued that the President could issue the permit pursuant to his "inherent constitutional authority over

national security and foreign affairs," *Sisseton* MTD at 3, and that the Presidential permit was "simply one more example in the lengthy history of the exercise of Presidential powers involving foreign policy and national security." *NRDC* MTD at 3; *see also Sisseton* MTD Reply at 15 (arguing that the President could issue the Keystone I permit pursuant to his "constitutional authority to control the nation's borders").

Moreover, the President's exercise of such independent authority is not only permitted but required precisely because Congress has not acted to regulate cross-border oil pipelines. As President Grant explained regarding his exercise of authority to ensure that the landing of a foreign telegraph cable comported with this Nation's interest, the power to control the physical connection between this country and any foreign state must "pertain[] exclusively to the Government of the United States," and "[i]n the absence of legislation by Congress," he was "unwilling . . . to yield to a foreign state the right" to authorize a physical connection with monopolistic features harmful to U.S. interests. President Grant's Seventh Annual Message at XV. And Acting Attorney General Richards long ago explained that "[t]he preservation of our territorial integrity and the protection of our foreign interest is entrusted, in the first instance, to the President." 22 Op. Att'y Gen. at 25-26. As already demonstrated above, the President's authority to act in the absence of legislation has long been accepted by Congress.

Moreover, although TransCanada variously characterizes the permit as involving a "predominantly domestic facility," a "facility comprised principally of domestic components," or "a major domestic infrastructure project," Compl. ¶¶ 5, 105, 108, 112, 113, 114, 119, 129, a Presidential permit is required only for facilities that cross the U.S. border—in this case, a "1.2 mile segment from the U.S.-Canada border to the first pipeline isolation valve in Montana," *id.* ¶ 30; *see also id.* ¶ 23. While the Executive considered the impact of the entire proposed project to determine whether granting the permit was in the national interest, it was through these cross-border facilities that TransCanada sought to transport up to 830,000 barrels per day of crude oil into the United States, *id.* ¶ 28, and it was the proposed crossing of the international border that implicated the Executive's authority. As TransCanada previously acknowledged, "cross-border

facilities can present important foreign relations and national security concerns." *NRDC* MTD at 3.  The Executive found that those concerns counseled against issuing a permit.

TransCanada's speculation that domestic pipelines might pose the same foreign policy concerns as the proposed Keystone XL pipeline, *see* Compl. ¶ 116, is well beside the point.  The fact that the President could not require permits for the construction of new domestic pipelines without congressional authorization does not mean that he lacks the power to act with respect to international pipelines.  The President, of course, is not seeking to regulate domestic commerce.  Indeed, TransCanada constructed the Gulf Coast Pipeline and the Houston Lateral, the purely domestic elements of the originally proposed Keystone XL project, without the need for Presidential permits.  *Id.* ¶¶ 17, 39-40.

### D.   Congress Has Not Enacted Legislation that Would Displace the President's Authority to Prevent the Construction of Cross-Border Facilities that Run Against the National Interest

TransCanada also argues that Congress has acted to prevent the President from exercising authority in this area "through a variety of measures . . . regulating and facilitating the construction and operation of cross-border pipelines in general," and through a bill that would have "authorized the construction of the Keystone XL pipeline in particular."  Compl. ¶ 75; *see also id.* ¶¶ 76-92, 128.  Against the background of this purported legislative activity, TransCanada's argument continues, the assertion of Presidential authority in this area is "incompatible with the expressed or implied will of Congress."  *Id.* ¶ 91 (quoting *Medellin*, 552 U.S. at 525).  And invoking Justice Jackson's third *Youngstown* category, TransCanada contends that the President's denial of the Keystone XL application "can be sustained 'only by disabling the Congress from acting on the subject.'"  *Id.* (quoting *Medellin*, 552 U.S. at 525).  This Court, however, is not presented with such a dire choice.

38

1. **Legislation impacting the construction and operation of oil pipelines is in harmony with the Executive's authority over cross-border oil pipeline facilities**

TransCanada first contends that Congress has "extensively regulated interstate oil pipelines such as the Keystone XL Pipeline" thus "displac[ing] any authority the President may have to regulate or prohibit those facilities on different grounds." Compl. ¶ 76. But when the Presidential permit for its Keystone I pipeline was challenged in court, TransCanada advanced the contrary argument that, "[w]ith regard to oil pipelines . . . there is no federal legislation addressing this presidential authority," and "the President is entirely unconstrained by statute with respect to border crossings for oil pipelines, and retains full discretion to approve or deny cross-border energy facilities." *NRDC* MTD at 4, 17-18; *see also Sisseton* MTD Reply at 15 ("Congress has chosen not to regulate oil pipeline border crossings" and "the President has the sole authority to permit oil pipeline border crossings"). The statutes TransCanada points to now, *see* Compl. ¶¶ 76-77, were enacted before the litigation over the Keystone I pipeline.

Moreover, the laws that TransCanada cites do not directly regulate cross-border facilities for oil pipelines. Some, as TransCanada acknowledges, concern the *interstate* operation of oil pipelines, *id.* ¶ 76 (citing, *e.g.*, Pipeline Safety Act, 49 U.S.C. § 60101 *et seq.*), and others are generally applicable laws that regulate broad swaths of government conduct, *see id.* ¶ 77 (citing the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, the National Historic Preservation Act, 54 U.S.C. § 300101 *et seq.*, and the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*). None of these statutes address the conditions under which new cross-border infrastructure projects should be permitted to proceed, much less restrict the President's complex and discretionary "national interest" determination with respect to oil pipeline projects. Applicants requesting approval for the construction and operation of cross-border facilities no doubt need to comply with any domestic laws implicated by the proposed project. But there is no support for the proposition that such laws and the Presidential permitting requirement are mutually exclusive. In the absence of contrary congressional directive, the requirements imposed by these laws merely co-

exist with the Presidential permitting requirement and help inform the Executive's decision whether issuance of any particular permit would serve the national interest.  *See* ROD at 2.

TransCanada also points to laws concerning international trade.  *See* Compl. ¶¶ 79-82 (citing legislation implementing the North American Free Trade Agreement and the World Trade Organization agreements).  While the Secretary of State necessarily considers a proposed project's potential impact on international trade as he weighs and balances multiple competing considerations, these statutes likewise do not purport to displace the distinct requirement of Presidential approval.

### 2.   Unenacted bills cannot serve to displace longstanding Presidential authority

Ultimately, TransCanada's challenge to the President's authority hinges on a series of unsuccessful bills that never made it out of Congress and the Keystone XL Pipeline Approval Act, which was presented to, and vetoed by, the President.  TransCanada argues that these bills registered Congress' "disapproval of the President's power to deny a permit for the pipeline," Compl. ¶ 87, and under the third *Youngstown* category, the Court can only sustain the President's action if it finds the Presidential power to be "so conclusive and preclusive" that Congress is disabled from "'enact[ing] a law that directly contradicts' [the President's] assertion of power." *Id.* ¶ 69 (quoting *Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2095 (2015)).  TransCanada is wrong.

A conflict between the political branches falls into the third *Youngstown* category only when the President takes measures incompatible with the expressed or implied will of Congress as reflected in duly enacted laws (or other constitutionally sufficient congressional action). *Youngstown* itself fell within the third category because the President's action there—*i.e.*, seizure of the nation's steel mills to avert a strike threatening the war effort in Korea—was in direct conflict with the Labor Management Relations Act of 1947, which was enacted via congressional override of a Presidential veto, and two other duly enacted statutes.  *Youngstown*, 343 U.S. at 586-87, n.5; *see also id.* at 599-602 (Frankfurter, J., concurring); *id.* at 639 & nn.6-8 (Jackson, J., concurring); *id.* at 657, 660 (Burton, J., concurring); *id.* at 662 (Clark, J., concurring in judgment).  Justice Jackson's concurrence explained that the case was "clearly eliminated" from

the second category because Congress had not left seizure of private property an open field but instead, had legislated specifically concerning how to resolve labor disputes, prescribed methods to be followed by the President in meeting the emergency at hand, and unequivocally removed seizure as an available remedy in the circumstances of the case.  *Id.* at 639; *see also id.* at 585-86 (describing the relevant statutory authorities).  "In choosing a different and inconsistent way of his own," *id.*, the President's actions could be sustained only if "seizure of such strike-bound industries [was] within [his] domain and beyond control by Congress."  *Id.* at 640 (Jackson, J., concurring).  Because neither the President's power as Commander in Chief nor as the Nation's Chief Executive included the power to take possession of domestic private property in order to keep labor disputes from stopping production, the President's action was invalid.  *Id.* at 587-88.

In *Zivotofsky v. Kerry*, 135 S. Ct. 2076 (2015), another *Youngstown* category three case, the President refused to enforce section 214(d) of the Foreign Relations Authorization Act, Fiscal Year 2003, 116 Stat. 1350, which directed the Secretary of State, upon request of U.S. citizens born in Jerusalem to record "Israel" as the place of birth on their passports.  135 S. Ct. 2082. The statute was intended to override the Executive's policy of declining to recognize any country's claim of sovereignty over Jerusalem.  *Id.*  The Supreme Court held that the power to recognize foreign states resides with the President alone, and thus, despite Congress' substantial authority over passports, Congress could not contradict the Executive's recognition determination.  *Id.* at 2095-96.

And in *Medellin v. Texas*, 552 U.S. 491, 527 (2008), the Supreme Court explained that Presidential action in conflict with a treaty ratified by the Senate would also fall "within Justice Jackson's third category."  *See INS v. Chadha*, 462 U.S. 919, 955 (1983) (noting that the ratification of treaties is one of the four "explicit and unambiguous" exceptions to the rules of bicameralism and presentment).  There, the Court considered whether a Presidential directive requiring States to give effect to a judgment of the International Court of Justice was authorized by international treaties.  But the relevant treaties were non-self-executing, and because a non-self-executing treaty is "one that was ratified with the understanding that it is not to have

domestic effect of its own force," the President's attempt to unilaterally "enforce" the treaties at issue "conflict[ed] with the implicit understanding of the ratifying Senate." *Medellin*, 552 U.S. at 527.

Here, unlike in *Youngstown*, *Zivotofsky*, and *Medellin*, Congress has enacted no law or otherwise asserted its Constitutional authority in a manner that limits or conflicts with the President's exercise of authority here. The Keystone XL Pipeline Approval Act never became law, and even this bill did not seek to divest the President of authority to make other permitting determinations for cross-border oil pipelines, but instead reflected the recognition that the President was free to deny the Keystone XL permit in the absence of the proposed statute. Indeed, the Senate majority report accompanying the bill specifically acknowledged that "the President has, for more than a century, asserted authority to approve energy and telecommunication facilities that cross international borders pursuant to the President's constitutional authority over foreign affairs," and that the President has delegated the permitting authority over oil pipelines to the Secretary of State, "based upon the Secretary's determination of whether issuance of the permit would serve the national interest." Keystone XL Pipeline, S. Rep. No. 114-1, at 1 (2015) (Ex. 36).

To be sure, legislative activities falling short of enactment of laws could evidence Congress' knowledge of the Executive's exercise of authority and the opportunity by Congress to act on that knowledge. In these circumstances, Congress' failure to respond to the Executive's exercise of authority may be construed as implicit approval of the authority or action. In *Haig*, for example, the Court cited, among other things, committee hearings on proposed bills to support its assumption of congressional knowledge and acquiescence in Executive construction of the Passport Act. 453 U.S. at 298 & n.43. Similarly, in *Dames & Moore*, in finding congressional acquiescence in the President's suspension of American claims against Iran, the Court noted that Congress had held hearings on the Iranian Agreement itself yet declined to act. 453 U.S. at 687.

But legislative activities, which do not result in the enactment of laws, cannot be deemed to express congressional *disapproval* of Presidential action such that they can displace Presidential authority. Indeed, the Supreme Court has never relied on unenacted legislation to find that Presidential authority otherwise supplied by the Constitution should be considered "at its lowest ebb." *Youngstown*, 343 U.S. at 637. That is for a good reason. "[T]he prescription for legislative action in [Article I, sections 1 and 7 of the Constitution] represents the Framers' decision that the legislative power of the Federal government be exercised in accord with a single, finely wrought and exhaustively considered, procedure." *Chadha*, 462 U.S. at 953. Under that procedure, "[e]very bill" passed by the Houses of Congress "shall, before it becomes a Law, be presented to the President." *Id.* If the President returns the bill to Congress with his objections, the bill "shall become a Law" only if two-thirds of each House passes the bill on reconsideration. *Id.* As the Supreme Court explained in *Chadha*, the President's veto power serves to "check whatever propensity a particular Congress might have to enact oppressive, improvident, or ill-considered measures," *id.* at 947-48, and "[t]he President's unilateral veto power, in turn, [is] limited by the power of two thirds of both Houses of Congress to overrule a veto thereby precluding final arbitrary action of one person," *id.* at 951. Indeed, "[p]resentment to the President and the Presidential veto were considered so imperative that the draftsmen took special pains to assure that these requirements could not be circumvented." *Id.* at 947. TransCanada is attempting to do exactly that here by asking this Court to give the unsuccessful bills the same practical effect as if they were enacted laws—to disable Presidential authority to act on this cross-border pipeline. This argument disregards the constitutional structure of checks and balances and renders the Presidential veto meaningless.

Nothing in the Supreme Court opinions cited by TransCanada suggests that the requirements of bicameralism and presentment can be disregarded in a *Youngstown* analysis. *See* Compl. ¶ 89. Although the various opinions in *Youngstown* considered legislative history, they did so to support their conclusion that the seizure of steel mills was incompatible with validly passed statutes. *See, e.g.*, *Youngstown*, 343 U.S. at 586 (opinion of Black, J., for the court)

43

(discussing the legislative history of the Labor Management Relations Act); *id.* at 599-600 (Frankfurter, J., concurring) (same, to demonstrate that Congress "clearly understood that as a result of that legislation the only recourse for preventing a shutdown in any basic industry, after failure of mediation, was Congress").  The Supreme Court's passing reference to resolutions in *Dames & Moore*, 453 U.S. at 687 (stating that "Congress has not disapproved of the action taken here" where it "has not enacted legislation, or even passed a resolution, indicating its displeasure"), cannot possibly be read to signal that legislative activity without the force of law could diminish Presidential authority.  The Supreme Court's more recent statement in *Garamendi* confirms that abortive legislative activities simply are insufficient to displace Presidential authority.  There, the Court said that "Congress ha[d] done nothing to express disapproval of the President's policy," even though the Court also noted that legislation contrary to the President's position "ha[d] been introduced in Congress repeatedly, but none of the bills ha[d] come close to making it into law."  539 U.S. at 429.

In any event, contrary to TransCanada's argument, Congress is not disabled from acting upon the subject pursuant to its domestic and foreign commerce power.  *Cf. Youngstown*, 343 U.S. at 637-38 (Jackson, J., concurring) ("when the President acts in contravention of the will of Congress," the Court can sustain his actions "only [by] disabling the Congress from acting upon the subject").  The fact that the Constitution vests Congress with authority over domestic and foreign commerce does not mean the President lacks the authority exercised here in the absence of congressional action.  The political branches "have nonjudicial methods of working out their differences," *Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1441 (2012) (Breyer, J., dissenting), including through the method set forth by the Constitution, if and when such differences arise.  In the meantime, the Court should not treat legislation that was vetoed as if it were statutory law precluding or governing the President's exercise of authority.

Finally, as noted before, the three *Youngstown* categories are not clearly distinct but represent a spectrum from explicit authorization to explicit prohibition.  *See Dames & Moore*, 453 U.S. at 669.  Whether this case falls within category one or two, it is clear that it does not

fall within category three.  The analysis is made simpler by the practical reality of TransCanada's request.  TransCanada is asking this Court to invalidate a Presidential action, exercised pursuant to a constitutional authority long pursued to the knowledge of Congress and never before questioned, on the strength of a vetoed bill.  To accept TransCanada's argument, this Court would be effectively overriding the Presidential veto (which Congress has declined to do) and permitting TransCanada to freely transport an enormous amount of crude oil across the United States border without Government authorization.  That anomalous result would have no basis in the Constitution's structure of separation of powers and would run counter to its system of checks and balances.  TransCanada's argument therefore should be rejected.

## CONCLUSION

For the foregoing reasons, the defendants respectfully request that the Court grant their motion to dismiss or, in the alternative, for summary judgment.

Dated:  April 1, 2016                                    Respectfully submitted

BENJAMIN MIZER
Principal Deputy Assistant Attorney General

KENNETH MAGIDSON
United States Attorney

JOSEPH H. HUNT
Branch Director
Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director
Federal Programs Branch

/s/ *Jean Lin*
JEAN LIN, Attorney in Charge
NY Bar No. 4074530, admitted *pro hac vice*
Senior Trial Counsel
U.S. Dept. of Justice, Civil Division
Federal Programs Branch
20 Mass. Ave., N.W.
Washington, DC 20530

Phone: (202) 514-3716
Fax: (202) 616-8202
Email: jean.lin@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on April 1, 2015, I electronically filed a copy of the foregoing. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

*/s/ Jean Lin* _____
JEAN LIN