# EXHIBIT 1

Executive Order No. 13337, 69 Fed. Reg. 25,299
(Apr. 30, 2004)

# Presidential Documents

Executive Order 13337 of April 30, 2004

## Issuance of Permits With Respect to Certain Energy-Related Facilities and Land Transportation Crossings on the International Boundaries of the United States

By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 301 of title 3, United States Code, and in order to amend Executive Order 11423 of August 16, 1968, as amended, and to further the policy of my Administration as stated in Executive Order 13212 of May 18, 2001, as amended, to expedite reviews of permits as necessary to accelerate the completion of energy production and transmission projects, and to provide a systematic method for evaluating and permitting the construction and maintenance of certain border crossings for land transportation, including motor and rail vehicles, that do not require construction or maintenance of facilities connecting the United States with a foreign country, while maintaining safety, public health, and environmental protections, it is hereby ordered as follows:

**Section 1.** (a) Except with respect to facilities covered by Executive Order 10485 of September 3, 1953, and Executive Order 10530 of May 10, 1954, the Secretary of State is hereby designated and empowered to receive all applications for Presidential permits, as referred to in Executive Order 11423, as amended, for the construction, connection, operation, or maintenance, at the borders of the United States, of facilities for the exportation or importation of petroleum, petroleum products, coal, or other fuels to or from a foreign country.

(b) Upon receipt of a completed application pursuant to paragraph (a) of this section, the Secretary of State shall:

  (i)   Request additional information needed from the applicant, as appropriate, before referring the application to other agencies pursuant to paragraph (b)(ii) of this section;

  (ii)  Refer the application and pertinent information to, and request the views of, the Secretary of Defense, the Attorney General, the Secretary of the Interior, the Secretary of Commerce, the Secretary of Transportation, the Secretary of Energy, the Secretary of Homeland Security, the Administrator of the Environmental Protection Agency, or the heads of the departments or agencies in which the relevant authorities or responsibilities of the foregoing are subsequently conferred or transferred, and, for applications concerning the border with Mexico, the United States Commissioner of the International Boundary and Water Commission; and

  (iii) Refer the application and pertinent information to, and request the views of, such other Federal Government department and agency heads as the Secretary of State deems appropriate.

(c) All Federal Government officials consulted by the Secretary of State pursuant to paragraph (b)(ii) or (b)(iii) of this section shall provide their views and render such assistance as may be requested, consistent with their authority, in a timely manner, but not to exceed 90 days from the date of the request.

(d) Should any of the Federal Government officials consulted pursuant to paragraph (b)(ii) or (b)(iii) of this section request from the Department of State additional information that is necessary for them to provide their views or to render such assistance as may be required, the time elapsed

between the date of that request for additional information and the date such additional information is received shall not be counted in calculating the time period prescribed in paragraph (c) of this section.

(e) The Secretary of State may also consult with such State, tribal, and local government officials and foreign governments, as the Secretary deems appropriate, with respect to each application. The Secretary shall solicit responses in a timely manner, not to exceed 90 days from the date of the request.

(f) Upon receiving the views and assistance requested pursuant to paragraphs (b) and (e) of this section, the Secretary of State shall consider, in light of any statutory or other requirements or other considerations, whether or not additional information is needed in order to evaluate the application and, as appropriate, request such information from the applicant.

(g) After consideration of the views and assistance obtained pursuant to paragraphs (b) and, as appropriate, (e) and (f) of this section and any public comments submitted pursuant to section 3(a) of this order, if the Secretary of State finds that issuance of a permit to the applicant would serve the national interest, the Secretary shall prepare a permit, in such form and with such terms and conditions as the national interest may in the Secretary's judgment require, and shall notify the officials required to be consulted under paragraph (b)(ii) of this section of the proposed determination that a permit be issued.

(h) After consideration of the views obtained pursuant to paragraphs (b) and, as appropriate, (e) and (f) of this section and any public comments provided pursuant to section 3(a) of this order, if the Secretary of State finds that issuance of a permit to the applicant would not serve the national interest, the Secretary shall notify the officials required to be consulted under paragraph (b)(ii) of this section of the proposed determination that the application be denied.

(i) The Secretary of State shall issue or deny the permit in accordance with the proposed determination unless, within 15 days after notification pursuant to paragraphs (g) or (h) of this section, an official required to be consulted under paragraph (b)(ii) of this section shall notify the Secretary of State that he or she disagrees with the Secretary's proposed determination and requests the Secretary to refer the application to the President. In the event of such a request, the Secretary of State shall consult with any such requesting official and, if necessary, shall refer the application, together with statements of the views of any official involved, to the President for consideration and a final decision.

**Sec. 2.** (a) Section 1(a) of Executive Order 11423, as amended, is amended to read as follows: "Except with respect to facilities covered by Executive Order Nos. 10485 and 10530, and by section 1(a) of the Executive Order of April 30, 2004, entitled "Issuance of Permits with Respect to Certain Energy-Related Facilities and Land Transportation Crossings on the International Boundaries of the United States" (the order of April 30, 2004), the Secretary of State is hereby designated and empowered to receive all applications for Presidential permits for the construction, connection, operation, or maintenance, at the borders of the United States, of:

    (i) pipelines, conveyor belts, and similar facilities for the exportation or importation of all products, except those specified in section 1(a) of the order of April 30, 2004, to or from a foreign country;

    (ii) facilities for the exportation or importation of water or sewage to or from a foreign country;

    (iii) facilities for the transportation of persons or things, or both, to or from a foreign country;

    (iv) bridges, to the extent that congressional authorization is not required;

    (v) similar facilities above or below ground; and

(vi) border crossings for land transportation, including motor and rail vehicles, to or from a foreign country, whether or not in conjunction with the facilities identified in (iii) above.

(b) Section 1(b) of Executive Order 11423, as amended, is amended by deleting the text "(a)(iii), (iv), or (v)" and by inserting the text "(a)(iii), (iv), (v), or (vi)" in lieu thereof.

**Sec. 3.** (a) The Secretary of State may provide for the publication in the **Federal Register** of notice of receipt of applications, for the receipt of public comments on applications, and for notices related to the issuance or denial of applications.

(b) The Secretary of State is authorized to issue such further rules and regulations, and to prescribe such further procedures, including, but not limited to, those relating to the International Boundary and Water Commission, as may from time to time be deemed necessary or desirable for the exercise of the authority conferred by this order.

**Sec. 4.** All permits heretofore issued with respect to facilities described in section 2(a) of this order pursuant to Executive Order 11423, as amended, and in force at the time of issuance of this order, and all permits issued hereunder, shall remain in effect in accordance with their terms unless and until modified, amended, suspended, or revoked by the appropriate authority.

**Sec. 5.** Nothing contained in this order shall be construed to affect the authority of any department or agency of the United States Government, or to supersede or replace the requirements established under any other provision of law, or to relieve a person from any requirement to obtain authorization from any other department or agency of the United States Government in compliance with applicable laws and regulations subject to the jurisdiction of that department or agency.

**Sec. 6.** This order is not intended to, and does not, create any right, benefit, or trust responsibility, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities, or entities, its officers or employees, or any other person.

THE WHITE HOUSE,
*April 30, 2004.*

[FR Doc. 04–10378
Filed 5–4–04; 8:45 am]
Billing code 3195–01–P

# EXHIBIT 2

President Ulysses Grant's Seventh Annual Message to Congress, *reprinted in* Papers Relating to the Foreign Relations of the United States, Vol. 1, 44th Cong. 1st Sess., H.R. Ex. Doc. 1, Pt. 1, (Dec. 6, 1875)

44TH CONGRESS, } HOUSE OF REPRESENTATIVES. { Ex. Doc. 1,
1st Session. } { Part. 1.

# PAPERS

RELATING TO THE

# FOREIGN RELATIONS

OF

# The United States,

TRANSMITTED TO CONGRESS,

WITH THE ANNUAL MESSAGE OF THE PRESIDENT,

DECEMBER 6, 1875.

PRECEDED BY A

LIST OF PAPERS AND FOLLOWED BY AN INDEX OF
PERSONS AND SUBJECTS.

## VOLUME I.

WASHINGTON:
GOVERNMENT PRINTING OFFICE.
1875.

# MESSAGE.

To the Senate and House of Representatives:

In submitting my seventh annual message to Congress, in this centennial year of our national existence as a free and independent people, it affords me great pleasure to recur to the advancement that has been made from the time of the colonies, one hundred years ago. We were then a people numbering only three millions. Now we number more than forty millions. Then industries were confined almost exclusively to the tillage of the soil. Now manufactories absorb much of the labor of the country.

Our liberties remain unimpaired; the bondmen have been freed from slavery; we have become possessed of the respect, if not the friendship, of all civilized nations. Our progress has been great in all the arts; in science, agriculture, commerce, navigation, mining, mechanics, law, medicine, &c.; and in general education the progress is likewise encouraging. Our thirteen States have become thirty-eight, including Colorado, (which has taken the initiatory steps to become a State,) and eight Territories, including the Indian Territory and Alaska, and excluding Colorado, making a territory extending from the Atlantic to the Pacific. On the south we have extended to the Gulf of Mexico, and in the west from the Mississippi to the Pacific.

One hundred years ago the cotton-gin, the steamship, the railroad, the telegraph, the reaping, sewing, and modern printing machines, and numerous other inventions of scarcely less value to our business and happiness, were entirely unknown.

In 1776, manufactories scarcely existed even in name in all this vast territory. In 1870, more than two millions of persons were employed in manufactories, producing more than $2,100,000,000 of products in amount annually, nearly equal to our national debt. From nearly the whole of the population of 1776 being engaged in the one occupation of agriculture, in 1870 so numerous and diversified had become the occupation of our people that less than six millions out of more than forty millions were so engaged. The extraordinary effect produced in our country by a resort to diversified occupations has built a market for the products of fertile lands distant from the seaboard and the markets of the world.

The American system of locating various and extensive manufactories next to the plow and the pasture, and adding connecting railroads and steamboats, has produced in our distant interior country a result noticeable by the intelligent portions of all commercial nations. The ingenuity

and skill of American mechanics have been demonstrated at home and abroad in a manner most flattering to their pride. But for the extraordinary genius and ability of our mechanics, the achievements of our agriculturists, manufacturers, and transporters throughout the country would have been impossible of attainment.

The progress of the miner has also been great. Of coal our production was small; now many millions of tons are mined annually. So with iron, which formed scarcely an appreciable part of our products half a century ago, we now produce more than the world consumed at the beginning of our national existence. Lead, zinc, and copper, from being articles of import, we may expect to be large exporters of in the near future. The development of gold and silver mines in the United States and Territories has not only been remarkable, but has had a large influence upon the business of all commercial nations. Our merchants in the last hundred years have had a success and have established a reputation for enterprise, sagacity, progress, and integrity unsurpassed by peoples of older nationalities. This "good name" is not confined to their homes, but goes out upon every sea and into every port where commerce enters. With equal pride we can point to our progress in all of the learned professions.

As we are now about to enter upon our second centennial—commencing our manhood as a nation—it is well to look back upon the past and study what will be best to preserve and advance our future greatness. From the fall of Adam for his transgression to the present day, no nation has ever been free from threatened danger to its prosperity and happiness. We should look to the dangers threatening us, and remedy them so far as lies in our power. We are a republic whereof one man is as good as another before the law. Under such a form of government it is of the greatest importance that all should be possessed of education and intelligence enough to cast a vote with a right understanding of its meaning. A large association of ignorant men cannot, for any considerable period, oppose a successful resistance to tyranny and oppression from the educated few, but will inevitably sink into acquiescence to the will of intelligence, whether directed by the demagogue or by priestcraft. Hence the education of the masses becomes of the first necessity for the preservation of our institutions. They are worth preserving, because they have secured the greatest good to the greatest proportion of the population of any form of government yet devised. All other forms of government approach it just in proportion to the general diffusion of education and independence of thought and action. As the primary step, therefore, to our advancement in all that has marked our progress in the past century, I suggest for your earnest consideration, and most earnestly recommend it, that a constitutional amendment be submitted to the legislatures of the several States for ratification, making it the duty of each of the several States to establish and forever maintain free public schools adequate to the

MESSAGE OF THE PRESIDENT.                  V

education of all the children in the rudimentary branches within their respective limits, irrespective of sex, color, birthplace, or religions; forbidding the teaching in said schools of religious, atheistic, or pagan tenets; and prohibiting the granting of any school-funds, or school-taxes, or any part thereof, either by legislative, municipal, or other authority, for the benefit or in aid, directly or indirectly, of any religious sect or denomination, or in aid or for the benefit of any other object of any nature or kind whatever.

In connection with this important question, I would also call your attention to the importance of correcting an evil that, if permitted to continue, will probably lead to great trouble in our land before the close of the nineteenth century. It is the accumulation of vast amounts of untaxed church-property.

In 1850, I believe, the church-property of the United States which paid no tax, municipal or State, amounted to about $83,000,000. In 1860, the amount had doubled; in 1875, it is about $1,000,000,000. By 1900, without check, it is safe to say this property will reach a sum exceeding $3,000,000,000. So vast a sum, receiving all the protection and benefits of government, without bearing its proportion of the burdens and expenses of the same, will not be looked upon acquiescently by those who have to pay the taxes. In a growing country, where real estate enhances so rapidly with time as in the United States, there is scarcely a limit to the wealth that may be acquired by corporations, religious or otherwise, if allowed to retain real estate without taxation. The contemplation of so vast a property as here alluded to, without taxation, may lead to sequestration without constitutional authority and through blood.

I would suggest the taxation of all property equally, whether church or corporation, exempting only the last resting-place of the dead, and, possibly, with proper restrictions, church-edifices.

Our relations with most of the foreign powers continue on a satisfactory and friendly footing.

Increased intercourse, the extension of commerce, and the cultivation of mutual interests have steadily improved our relations with the large majority of the powers of the world, rendering practicable the peaceful solution of questions which from time to time necessarily arise, leaving few which demand extended or particular notice.

The correspondence of the Department of State with our diplomatic representatives abroad is transmitted herewith.

I am happy to announce the passage of an act by the General Cortes of Portugal, proclaimed since the adjournment of Congress, for the abolition of servitude in the Portuguese colonies. It is to be hoped that such legislation may be another step toward the great consummation to be reached, when no man shall be permitted, directly or indirectly, under any guise, excuse, or form of law, to hold his fellow-man in bondage. I am of opinion also that it is the duty of the United States, as contrib-

uting toward that end, and required by the spirit of the age in which we live, to provide by suitable legislation that no citizen of the United States shall hold slaves as property in any other country or be interested therein.

Chili has made reparation in the case of the whale-ship Good Return, seized without sufficient cause upward of forty years ago. Though she had hitherto denied her accountability, the denial was never acquiesced in by this Government, and the justice of the claim has been so earnestly contended for that it has been gratifying that she should have at last acknowledged it.

The arbitrator in the case of the United States steamer Montijo, for the seizure and detention of which the Government of the United States of Colombia was held accountable, has decided in favor of the claim. This decision has settled a question which had been pending for several years, and which, while it continued open, might more or less disturb the good understanding which it is desirable should be maintained between the two republics.

A reciprocity treaty with the King of the Hawaiian Islands was concluded some months since. As it contains a stipulation that it shall not take effect until Congress shall enact the proper legislation for that purpose, copies of the instrument are herewith submitted, in order that, if such should be the pleasure of Congress, the necessary legislation upon the subject may be adopted.

In March last an arrangement was made, through Mr. Cushing, our minister in Madrid, with the Spanish government, for the payment by the latter to the United States of the sum of eighty thousand dollars in coin, for the purpose of the relief of the families or persons of the ship's company and certain passengers of the Virginius. This sum was to have been paid in three installments at two months each. It is due to the Spanish government that I should state that the payments were fully and spontaneously anticipated by that government, and that the whole amount was paid within but a few days more than two months from the date of the agreement, a copy of which is herewith transmitted. In pursuance of the terms of the adjustment I have directed the distribution of the amount among the parties entitled thereto, including the ship's company and such of the passengers as were American citizens. Payments are made accordingly, on the application by the parties entitled thereto.

The past year has furnished no evidence of an approaching termination of the ruinous conflict which has been raging for seven years in the neighboring island of Cuba. The same disregard of the laws of civilized warfare and of the just demands of humanity which has heretofore called forth expressions of condemnation from the nations of Christendom has continued to blacken the sad scene. Desolation, ruin, and pillage are pervading the rich fields of one of the most fertile and productive regions of the earth, and the incendiaries' torch, firing

plantations and valuable factories and buildings, is the agent marking the alternate advance or retreat of contending parties.

The protracted continuance of this strife seriously affects the interests of all commercial nations, but those of the United States more than others, by reason of close proximity, its larger trade and intercourse with Cuba, and the frequent and intimate personal and social relations which have grown up between its citizens and those of the island. Moreover, the property of our citizens in Cuba is large, and is rendered insecure and depreciated in value and in capacity of production by the continuance of the strife and the unnatural mode of its conduct. The same is true, differing only in degree, with respect to the interests and people of other nations; and the absence of any reasonable assurance of a near termination of the conflict must, of necessity, soon compel the states thus suffering to consider what the interests of their own people and their duty toward themselves may demand.

I have hoped that Spain would be enabled to establish peace in her colony, to afford security to the property and the interests of our citizens, and allow legitimate scope to trade and commerce and the natural productions of the island. Because of this hope, and from an extreme reluctance to interfere in the most remote manner in the affairs of another and a friendly nation, especially of one whose sympathy and friendship in the struggling infancy of our own existence must ever be remembered with gratitude, I have patiently and anxiously waited the progress of events. Our own civil conflict is too recent for us not to consider the difficulties which surround a government distracted by a dynastic rebellion at home, at the same time that it has to cope with a separate insurrection in a distant colony. But whatever causes may have produced the situation which so grievously affects our interests, it exists, with all its attendant evils operating directly upon this country and its people. Thus far all the efforts of Spain have proved abortive, and time has marked no improvement in the situation. The armed bands of either side now occupy nearly the same ground as in the past, with the difference, from time to time, of more lives sacrificed, more property destroyed, and wider extents of fertile and productive fields and more and more of valuable property constantly wantonly sacrificed to the incendiaries' torch.

In contests of this nature, where a considerable body of people, who have attempted to free themselves of the control of the superior government, have reached such point in occupation of territory, in power, and in general organization as to constitute in fact a body politic, having a government in substance as well as in name, possessed of the elements of stability, and equipped with the machinery for the administration of internal policy and the execution of its laws, prepared and able to administer justice at home, as well as in its dealings with other powers, it is within the province of those other powers to recognize its existence as a new and independent nation. In such cases other nations

simply deal with an actually existing condition of things, and recognize as one of the powers of the earth that body politic which, possessing the necessary elements, has, in fact, become a new power. In a word, the creation of a new state is a fact.

To establish the condition of things essential to the recognition of this fact, there must be a people occupying a known territory, united under some known and defined form of government, acknowledged by those subject thereto, in which the functions of government are administered by usual methods, competent to mete out justice to citizens and strangers, to afford remedies for public and for private wrongs, and able to assume the correlative international obligations, and capable of performing the corresponding international duties resulting from its acquisition of the rights of sovereignty. A power should exist complete in its organization, ready to take and able to maintain its place among the nations of the earth.

While conscious that the insurrection in Cuba has shown a strength and endurance which make it at least doubtful whether it be in the power of Spain to subdue it, it seems unquestionable that no such civil organization exists which may be recognized as an independent government capable of performing its international obligations and entitled to be treated as one of the powers of the earth. A recognition under such circumstances would be inconsistent with the facts, and would compel the power granting it soon to support by force the government to which it had really given its only claim of existence. In my judgment, the United States should adhere to the policy and the principles which have heretofore been its sure and safe guides in like contests between revolted colonies and their mother country, and, acting only upon the clearest evidence, should avoid any possibility of suspicion or of imputation.

A recognition of the independence of Cuba being, in my opinion, impracticable and indefensible, the question which next presents itself is that of the recognition of belligerent rights in the parties to the contest.

In a former message to Congress I had occasion to consider this question, and reached the conclusion that the conflict in Cuba, dreadful and devastating as were its incidents, did not rise to the fearful dignity of war. Regarding it now, after this lapse of time, I am unable to see that any notable success, or any marked or real advance on the part of the insurgents, has essentially changed the character of the contest. It has acquired greater age, but not greater or more formidable proportions. It is possible that the acts of foreign powers, and even acts of Spain herself, of this very nature, might be pointed to in defense of such recognition. But now, as in its past history, the United States should carefully avoid the false lights which might lead it into the mazes of doubtful law and of questionable propriety, and adhere rigidly and sternly to the rule, which has been its guide, of doing only that which is right and honest and of good report. The question of accord-

Case 4:16-cv-00036   Document 42-3   Filed in TXSD on 04/01/16   Page 13 of 59

ing or of withholding rights of belligerency must be judged, in every case, in view of the particular attending facts. Unless justified by necessity, it is always, and justly, regarded as an unfriendly act, and a gratuitous demonstration of moral support to the rebellion. It is necessary, and it is required, when the interests and rights of another government or of its people are so far affected by a pending civil conflict as to require a definition of its relations to the parties thereto. But this conflict must be one which will be recognized in the sense of international law as war. Belligerence, too, is a fact. The mere existence of contending armed bodies, and their occasional conflicts, do not constitute war in the sense referred to. Applying to the existing condition of affairs in Cuba the tests recognized by publicists and writers on international law, and which have been observed by nations of dignity, honesty, and power, when free from sensitive or selfish and unworthy motives, I fail to find in the insurrection the existence of such a substantial political organization, real, palpable, and manifest to the world, having the forms and capable of the ordinary functions of government toward its own people and to other states, with courts for the administration of justice, with a local habitation, possessing such organization of force, such material, such occupation of territory, as to take the contest out of the category of a mere rebellious insurrection, or occasional skirmishes, and place it on the terrible footing of war, to which a recognition of belligerency would aim to elevate it. The contest, moreover, is solely on land; the insurrection has not possessed itself of a single sea-port whence it may send forth its flag, nor has it any means of communication with foreign powers except through the military lines of its adversaries. No apprehension of any of those sudden and difficult complications which a war upon the ocean is apt to precipitate upon the vessels, both commercial and national, and upon the consular officers of other powers, calls for the definition of their relations to the parties to the contest. Considered as a question of expediency, I regard the accordance of belligerent rights still to be as unwise and premature, as I regard it to be, at present, indefensible as a measure of right. Such recognition entails upon the country according the rights which flow from it difficult and complicated duties, and requires the exaction from the contending parties of the strict observance of their rights and obligations. It confers the right of search upon the high seas by vessels of both parties; it would subject the carrying of arms and munitions of war, which now may be transported freely and without interruption in the vessels of the United States, to detention and to possible seizure; it would give rise to countless vexatious questions, would release the parent government from responsibility for acts done by the insurgents, and would invest Spain with the right to exercise the supervision recognized by our treaty of 1795 over our commerce on the high seas, a very large part of which, in its traffic between the Atlantic and the Gulf States,

and between all of them and the States on the Pacific, passes through
the waters which wash the shores of Cuba. The exercise of this super-
vision could scarce fail to lead, if not to abuses, certainly to collisions
perilous to the peaceful relations of the two states. There can be little
doubt to what result such supervision would before long draw this
nation. It would be unworthy of the United States to inaugurate the
possibilities of such result, by measures of questionable right or expe-
diency, or by any indirection. Apart from any question of theoretical
right, I am satisfied that, while the accordance of belligerent rights to the
insurgents in Cuba might give them a hope and an inducement to pro-
tract the struggle, it would be but a delusive hope, and would not
remove the evils which this Government and its people are experienc-
ing, but would draw the United States into complications which it has
waited long and already suffered much to avoid. The recognition of
independence, or of belligerency, being thus, in my judgment, equally
inadmissible, it remains to consider what course shall be adopted should
the conflict not soon be brought to an end by acts of the parties them-
selves, and should the evils which result therefrom, affecting all nations,
and particularly the United States, continue.

In such event, I am of opinion that other nations will be compelled to
assume the responsibility which devolves upon them, and to seriously
consider the only remaining measures possible, mediation and interven-
tion. Owing, perhaps, to the large expanse of water separating the
island from the peninsula, the want of harmony and of personal sym-
pathy between the inhabitants of the colony and those sent thither to
rule them, and want of adaptation of the ancient colonial system of
Europe to the present times and to the ideas which the events of the
past century have developed, the contending parties appear to have
within themselves no depository of common confidence, to suggest
wisdom when passion and excitement have their sway, and to assume
the part of peace-maker. In this view, in the earlier days of the
contest the good offices of the United States as a mediator were
tendered in good faith, without any selfish purpose, in the interest
of humanity and in sincere friendship for both parties, but were at
the time declined by Spain, with the declaration, nevertheless, that
at a future time they would be indispensable. No intimation has
been received from Spain that in the opinion of Spain that time has been reached.
And yet the strife continues with all its dread horrors and all its
injuries to the interests of the United States and of other nations.
Each party seems quite capable of working great injury and damage
to the other, as well as to all the relations and interests dependent on
the existence of peace in the island; but they seem incapable of reach-
ing any adjustment, and both have thus far failed of achieving any suc-
cess whereby one party shall possess and control the island to the ex-
clusion of the other. Under these circumstances, the agency of others,
either by mediation or by intervention, seems to be the only alternative

which must, sooner or later, be invoked for the termination of the strife. At the same time, while thus impressed, I do not at this time recommend the adoption of any measure of intervention. I shall be ready at all times, and as the equal friend of both parties, to respond to a suggestion that the good offices of the United States will be acceptable to aid in bringing about a peace honorable to both. It is due to Spain, so far as this Government is concerned, that the agency of a third power, to which I have adverted, shall be adopted only as a last expedient. Had it been the desire of the United States to interfere in the affairs of Cuba, repeated opportunities for so doing have been presented within the last few years; but we have remained passive, and have performed our whole duty and all international obligations to Spain with friendship, fairness, and fidelity, and with a spirit of patience and forbearance which negatives every possible suggestion of desire to interfere or to add to the difficulties with which she has been surrounded.

The government of Spain has recently submitted to our minister at Madrid certain proposals which it is hoped may be found to be the basis, if not the actual submission, of terms to meet the requirements of the particular griefs of which this Government has felt itself entitled to complain. These proposals have not yet reached me in their full text. On their arrival they will be taken into careful examination, and may, I hope, lead to a satisfactory adjustment of the questions to which they refer, and remove the possibility of future occurrences, such as have given rise to our just complaints.

It is understood also that renewed efforts are being made to introduce reforms in the internal administration of the island. Persuaded, however, that a proper regard for the interests of the United States and of its citizens entitle it to relief from the strain to which it has been subjected by the difficulties of the questions, and the wrongs and losses which arise from the contest in Cuba, and that the interests of humanity itself demand the cessation of the strife before the whole island shall be laid waste and larger sacrifices of life be made, I shall feel it my duty, should my hopes of a satisfactory adjustment and of the early restoration of peace and the removal of future causes of complaint be, unhappily, disappointed, to make a further communication to Congress at some period not far remote, and during the present session, recommending what may then seem to me to be necessary.

The Free Zone, so called, several years since established by the Mexican government in certain of the States of that republic adjacent to our frontier, remains in full operation. It has always been materially injurious to honest traffic, for it operates as an incentive to trades in Mexico to supply without customs-charges the wants of inhabitants on this side the line, and prevents the same wants from being supplied by merchants of the United States, thereby, to a considerable extent, defrauding our revenue and checking honest commercial enterprise.

Depredations by armed bands from Mexico on the people of Texas

near the frontier continue. Though the main object of these incursions is robbery, they frequently result in the murder of unarmed and peaceably-disposed persons; and in some instances even the United States post-offices and mail-communications have been attacked. Renewed remonstrances upon this subject have been addressed to the Mexican government, but without much apparent effect. The military force of this Government disposable for service in that quarter is quite inadequate to effectually guard the line, even at those points where the incursions are usually made. An experiment of an armed vessel on the Rio Grande for that purpose is on trial, and it is hoped that, if not thwarted by the shallowness of the river and other natural obstacles, it may materially contribute to the protection of the herdsmen of Texas.

The proceedings of the joint commission under the convention between the United States and Mexico of the 4th of July, 1868, on the subject of claims, will soon be brought to a close. The result of those proceedings will then be communicated to Congress.

I am happy to announce that the government of Venezuela has, upon further consideration, practically abandoned its objection to pay to the United States that share of its revenue which some years since it allotted toward the extinguishment of the claims of foreigners generally. In thus reconsidering its determination that government has shown a just sense of self-respect which cannot fail to reflect credit upon it in the eyes of all disinterested persons elsewhere. It is to be regretted, however, that its payments on account of claims of citizens of the United States are still so meager in amount, and that the stipulations of the treaty in regard to the sums to be paid and the periods when those payments were to take place should have been so signally disregarded.

Since my last annual message the exchange has been made of the ratification of a treaty of commerce and navigation with Belgium, and of conventions with the Mexican Republic for the further extension of the joint commission respecting claims; with the Hawaiian Islands for commercial reciprocity, and with the Ottoman Empire for extradition; all of which have been duly proclaimed.

The Court of Commissioners of Alabama Claims has prosecuted its important duties very assiduously and very satisfactorily. It convened and was organized on the 22d day of July, 1874, and, by the terms of the act under which it was created, was to exist for one year from that date. The act provided, however, that should it be found impracticable to complete the work of the court before the expiration of the year, the President might, by proclamation, extend the time of its duration to a period not more than six months beyond the expiration of the one year.

Having received satisfactory evidence that it would be impracticable to complete the work within the time originally fixed, I issued a proclamation (a copy of which is presented herewith) extending the time of

duration of the court for a period of six months from and after the 22d day of July last.

A report made through the clerk of the court (communicated herewith) shows the condition of the calendar on the 1st of November last, and the large amount of work which has been accomplished. Thirteen hundred and eighty-two claims have been presented, of which six hundred and eighty-two had been disposed of at the date of the report. I am informed that one hundred and seventy cases were decided during the month of November. Arguments are being made and decisions given in the remaining cases with all the dispatch consistent with the proper consideration of the questions submitted. Many of these claims are in behalf of mariners, or depend on the evidence of mariners, whose absence has delayed the taking or the return of the necessary evidence.

It is represented to me that it will be impracticable for the court to finally dispose of all the cases before it within the present limit of its duration. Justice to the parties claimant, who have been at large expense in preparing their claims and obtaining the evidence in their support, suggests a short extension, to enable the court to dispose of all of the claims which have been presented.

I recommend the legislation which may be deemed proper to enable the court to complete the work before it.

I recommend that some suitable provision be made, by the creation of a special court or by conferring the necessary jurisdiction upon some appropriate tribunal, for the consideration and determination of the claims of aliens against the Government of the United States which have arisen within some reasonable limitation of time, or which may hereafter arise, excluding all claims barred by treaty-provisions or otherwise. It has been found impossible to give proper consideration to these claims by the Executive Departments of the Government. Such a tribunal would afford an opportunity to aliens other than British subjects to present their claims on account of acts committed against their persons or property during the rebellion, as also to those subjects of Great Britain whose claims, having arisen subsequent to the 9th day of April, 1865, could not be presented to the late commission organized pursuant to the provisions of the treaty of Washington.

The electric telegraph has become an essential and indispensable agent in the transmission of business and social messages. Its operation on land, and within the limit of particular States, is necessarily under the control of the jurisdiction within which it operates. The lines on the high seas, however, are not subject to the particular control of any one government.

In 1869, a concession was granted by the French government to a company which proposed to lay a cable from the shores of France to the United States. At that time there was a telegraphic connection between the United States and the continent of Europe, (through the possessions of Great Britain at either end of the line,) under the control of an association

which had, at large outlay of capital and at great risk, demonstrated the practicability of maintaining such means of communication. The cost of correspondence by this agency was great, possibly not too large at the time for a proper remuneration for so hazardous and so costly an enterprise. It was, however, a heavy charge upon a means of communication which the progress in the social and commercial intercourse of the world found to be a necessity, and the obtaining of this French concession showed that other capital than that already invested was ready to enter into competition, with assurance of adequate return for their outlay. Impressed with the conviction that the interests, not only of the people of the United States, but of the world at large, demanded, or would demand, the multiplication of such means of communication between separated continents, I was desirous that the proposed connection should be made; but certain provisions of this concession were deemed by me to be objectionable, particularly one which gave for a long term of years the exclusive right of telegraphic communication by submarine cable between the shores of France and the United States. I could not concede that any power should claim the right to land a cable on the shores of the United States, and at the same time deny to the United States, or to its citizens or grantees, an equal right to land a cable on its shores. The right to control the conditions for the laying of a cable within the jurisdictional waters of the United States, to connect our shores with those of any foreign state, pertains exclusively to the Government of the United States, under such limitations and conditions as Congress may impose. In the absence of legislation by Congress, I was unwilling, on the one hand, to yield to a foreign state the right to say that its grantees might land on our shores, while it denied a similar right to our people to land on its shores; and, on the other hand, I was reluctant to deny to the great interests of the world and of civilization the facilities of such communication as were proposed. I therefore withheld any resistance to the landing of the cable on condition that the offensive monopoly feature of the concession be abandoned, and that the right of any cable which may be established by authority of this Government to land upon French territory, and to connect with French land-lines, and enjoy all the necessary facilities or privileges incident to the use thereof upon as favorable terms as any other company, be conceded. As the result thereof the company in question renounced the exclusive privilege, and the representative of France was informed that, understanding this relinquishment to be construed as granting the entire reciprocity and equal facilities which had been demanded, the opposition to the landing of the cable was withdrawn. The cable, under this French concession, was landed in the month of July, 1869, and has been an efficient and valuable agent of communication between this country and the other continent. It soon passed under the control, however, of those who had the management of the cable connecting Great Britain with this continent, and thus what-

ever benefit to the public might have ensued from competition between the two lines was lost, leaving only the greater facilities of an additional line, and the additional security in case of accident to one of them. But these increased facilities and this additional security, together with the control of the combined capital of the two companies, gave also greater power to prevent the future construction of other lines, and to limit the control of telegraphic communication between the two continents to those possessing the lines already laid. Within a few months past a cable has been laid, known as the United States Direct Cable Company, connecting the United States directly with Great Britain. As soon as this cable was reported to be laid and in working order, the rates of the then existing consolidated companies were greatly reduced. Soon, however, a break was announced in this new cable, and immediately the rates of the other line, which had been reduced, were again raised. This cable being now repaired, the rates appear not to be reduced by either line from those formerly charged by the consolidated oempanies.

There is reason to believe that large amounts of capital, both at home and abroad, are ready to seek profitable investment in the advancement of this useful and most civilizing means of intercourse and correspondence. They await, however, the assurance of the means and conditions on which they may safely be made tributary to the general good.

As these cable telegraph lines connect separate states, there are questions as to their organization and control, which probably can be best, if not solely, settled by conventions between the respective states. In the absence, however, of international conventions on the subject, municipal legislation may secure many points which appear to me important, if not indispensable for the protection of the public against the extortions which may result from a monopoly of the right of operating cable-telegrams, or from a combination between several lines :

I. No line should be allowed to land on the shores of the United States under the concession from another power, which does not admit the right of any other line or lines, formed in the United States, to land and freely connect with and operate through its land-lines.

II. No line should be allowed to land on the shores of the United States which is not by treaty-stipulation with the government from whose shores it proceeds, or by prohibition in its charter, or otherwise to the satisfaction of this Government, prohibited from consolidating or amalgamating with any other cable telegraph line, or combining therewith for the purpose of regulating and maintaining the cost of telegraphing.

III. All lines should be bound to give precedence in the transmission of the official messages of the governments of the two countries between which it may be laid.

IV. A power should be reserved to the two governments, either conjointly or to each, as regards the messages dispatched from its shores,

to fix a limit to the charges to be demanded for the transmission of messages.

I present this subject to the earnest consideration of Congress.

In the mean time, and unless Congress otherwise direct, I shall not oppose the landing of any telegraphic cable which complies with and assents to the points above enumerated, but will feel it my duty to prevent the landing of any which does not conform to the first and second points as stated, and which will not stipulate to concede to this Government the precedence in the transmission of its official messages, and will not enter into a satisfactory arrangement with regard to its charges.

Among the pressing and important subjects to which, in my opinion, the attention of Congress should be directed are those relating to fraudulent naturalization and expatriation.

The United States, with great liberality, offers its citizenship to all who in good faith comply with the requirements of law. These requirements are as simple and upon as favorable terms to the emigrant as the high privilege to which he is admitted can or should permit. I do not propose any additional requirements to those which the law now demands. But the very simplicity and the want of unnecessary formality in our law have made fraudulent naturalization not infrequent, to the discredit and injury of all honest citizens, whether native or naturalized. Cases of this character are continually being brought to the notice of the Government by our representatives abroad, and also those of persons resident in other countries, most frequently those who, if they have remained in this country long enough to entitle them to become naturalized, have generally not much overpassed that period, and have returned to the country of their origin, where they reside, avoiding all duties to the United States by their absence, and claiming to be exempt from all duties to the country of their nativity and of their residence by reason of their alleged naturalization. It is due to this Government itself and to the great mass of the naturalized citizens who entirely, both in name and in fact, become citizens of the United States, that the high privilege of citizenship of the United States should not be held by fraud or in derogation of the laws and of the good name of every honest citizen. On many occasions it has been brought to the knowledge of the Government that certificates of naturalization are held, and protection or interference claimed, by parties who admit that not only they were not within the United States at the time of the pretended naturalization, but that they have never resided in the United States; in others, the certificate and record of the court show on their face that the person claiming to be naturalized had not resided the required time in the United States; in others, it is admitted upon examination that the requirements of law have not been complied with; in some cases even, such certificates have been matter of purchase. These are not isolated cases, arising at rare intervals, but of common occurrence, and which

are reported from all quarters of the globe. Such occurrences cannot, and do not, fail to reflect upon the Government and injure all honest citizens. Such a fraud being discovered, however, there is no practicable means within the control of the Government by which the record of naturalization can be vacated; and should the certificate be taken up, as it usually is, by the diplomatic and consular representatives of the government to whom it may have been presented, there is nothing to prevent the person claiming to have been naturalized from obtaining a new certificate from the court in place of that which has been taken from him.

The evil has become so great and of such frequent occurrence that I cannot too earnestly recommend that some effective measures be adopted to provide a proper remedy and means for the vacating of any record thus fraudulently made, and of punishing the guilty parties to the transaction.

In this connection I refer also to the question of expatriation and the election of nationality.

The United States was foremost in upholding the right of expatriation, and was principally instrumental in overthrowing the doctrine of perpetual allegiance. Congress has declared the right of expatriation to be a natural and inherent right of all people; but, while many other nations have enacted laws providing what formalities shall be necessary to work a change of allegiance, the United States has enacted no provisions of law, and has in no respect marked out how and when expatriation may be accomplished by its citizens. Instances are brought to the attention of the Government where citizens of the United States, either naturalized or native-born, have formally become citizens or subjects of foreign powers, but who, nevertheless, in the absence of any provisions of legislation on this question, when involved in difficulties, or when it seems to be their interest, claim to be citizens of the United States, and demand the intervention of a government which they have long since abandoned, and to which for years they have rendered no service, nor held themselves in any way amenable.

In other cases naturalized citizens, immediately after naturalization, have returned to their native country; have become engaged in business; have accepted offices or pursuits inconsistent with American citizenship, and evidence no intent to return to the United States until called upon to discharge some duty to the country where they are residing, when at once they assert their citizenship, and call upon the representatives of the Government to aid them in their unjust pretensions. It is but justice to all *bona-fide* citizens that no doubt should exist on such questions, and that Congress should determine by enactment of law how expatriation may be accomplished, and change of citizenship be established.

I also invite your attention to the necessity of regulating by law the status of American women who may marry foreigners, and of defining

more fully that of children born in a foreign country of American parents who may reside abroad; and also of some further provision regulating or giving legal effect to marriages of American citizens contracted in foreign countries. The correspondence submitted herewith shows a few of the constantly occurring questions on these points presented to the consideration of the Government. There are few subjects to engage the attention of Congress on which more delicate relations or more important interests are dependent.

In the month of July last the building erected for the Department of State was taken possession of and occupied by that Department. I am happy to announce that the archives and valuable papers of the Government in the custody of that Department are now safely deposited and properly cared for.

The report of the Secretary of the Treasury shows the receipts from customs for the fiscal year ending June 30, 1874, to have been $163,103,833.69, and for the fiscal year ending June 30, 1875, to have been $157,167,722.35, a decrease for the last fiscal year of $5,936,111.34. Receipts from internal revenue for the year ending the 30th of June, 1874, were $102,409,784.90, and for the year ending June 30, 1875, $110,007,493.58; increase, $7,597,708.68.

The report also shows a complete history of the workings of the Department for the last year, and contains recommendations for reforms and for legislation which I concur in, but cannot comment on so fully as I should like to do if space would permit, but will confine myself to a few suggestions which I look upon as vital to the best interests of the whole people—coming within the purview of "Treasury"—I mean specie resumption. Too much stress cannot be laid upon this question, and I hope Congress may be induced, at the earliest day practicable, to insure the consummation of the act of the last Congress, at its last session, to bring about specie resumption "on and after the 1st of January, 1879," at farthest. It would be a great blessing if this could be consummated even at an earlier day.

Nothing seems to me more certain than that a full, healthy, and permanent reaction cannot take place in favor of the industries and financial welfare of the country until we return to a measure of values recognized throughout the civilized world. While we use a currency not equivalent to this standard, the world's recognized standard, specie, becomes a commodity like the products of the soil, the surplus seeking a market wherever there is a demand for it.

Under our present system we should want none, nor would we have any, were it not that customs-dues must be paid in coin, and because of the pledge to pay interest on the public debt in coin. The yield of precious metals would flow out for the purchase of foreign productions and leave the United States "hewers of wood and drawers of water" because of wiser legislation on the subject of finance by the nations

with whom we have dealings. I am not prepared to say that I can suggest the best legislation to secure the end most heartily recommended. It will be a source of great gratification to me to be able to approve any measure of Congress looking effectively toward securing "resumption."

Unlimited inflation would probably bring about specie payments more speedily than any legislation looking to the redemption of the legal tenders in coin. But it would be at the expense of honor. The legal tenders would have no value beyond settling present liabilities, or, properly speaking, repudiating them. They would buy nothing after debts were all settled.

There are a few measures which seem to me important in this connection, and which I commend to your earnest consideration:

A repeal of so much of the legal tender act as makes these notes receivable for debts contracted after a date to be fixed in the act itself, say not later than the 1st of January, 1877. We should then have quotations at real values, not fictitious ones. Gold would no longer be at a premium, but currency at a discount. A healthy reaction would set in at once, and with it a desire to make the currency equal to what it purports to be. The merchants, manufacturers, and tradesmen of every calling could do business on a fair margin of profit, the money to be received having an unvarying value. Laborers and all classes who work for stipulated pay or salary would receive more for their income, because extra profits would no longer be charged by the capitalist to compensate for the risk of a downward fluctuation in the value of the currency.

Second, that the Secretary of the Treasury be authorized to redeem say not to exceed two million ($2,000,000) dollars monthly of legal tender notes, by issuing in their stead a long bond, bearing interest at the rate of 3.65 per cent. per annum, of denominations ranging from $50 up to $1,000 each. This would in time reduce the legal tender notes to a volume that could be kept afloat without demanding redemption in large sums suddenly.

Third, that additional power be given to the Secretary of the Treasury to accumulate gold for final redemption, either by increasing revenue, curtailing expenses, or both—it is preferable to do both; and I recommend that reduction of expenditures be made wherever it can be done without impairing Government obligations or crippling the due execution thereof. One measure for increasing the revenue—and the only one I think of—is the restoration of the duty on tea and coffee. These duties would add probably $18,000,000 to the present amount received from imports, and would in no way increase the prices paid for those articles by the consumers.

These articles are the products of countries collecting revenue from exports, and as we, the largest consumers, reduce the duties, they proportionately increase them. With this addition to the revenue, many duties now collected, and which give but an insignificant return for the

cost of collection, might be remitted, and to the direct advantage of consumers at home.

I would mention those articles which enter into manufactures of all sorts. All duty paid upon such articles goes directly to the cost of the article when manufactured here, and must be paid for by the consumers. These duties not only come from the consumers at home, but act as a protection to foreign manufacturers of the same completed articles in our own and distant markets.

I will suggest, or mention, another subject bearing upon the problem of "how to enable the Secretary of the Treasury to accumulate balances." It is to devise some better method of verifying claims against the Government than at present exists through the Court of Claims, especially those claims growing out of the late war. Nothing is more certain than that a very large percentage of the amounts passed and paid are either wholly fraudulent or are far in excess of the real losses sustained. The large amount of losses proven—on good testimony according to existing laws, by affidavits of fictitious or unscrupulous persons—to have been sustained on small farms and plantations are not only far beyond the possible yield of those places for any one year, but, as every one knows who has had experience in tilling the soil, and who has visited the scenes of these spoliations, are in many instances more than the individual claimants were ever worth, including their personal and real estate.

The report of the Attorney-General, which will be submitted to Congress at an early day, will contain a detailed history of awards made, and of claims pending of the class here referred to.

The report of the Secretary of War, accompanying this message, gives a detailed account of Army operations for the year just passed, expenses for maintenance, &c., with recommendations for legislation to which I respectfully invite your attention. To some of these I invite special attention:

First, the necessity of making $300,000 of the appropriation for the Subsistence Department available before the beginning of the next fiscal year. Without this provision troops at points distant from supply production must either go without food or existing laws must be violated. It is not attended with cost to the Treasury.

Second, his recommendation for the enactment of a system of annuities for the families of deceased officers by voluntary deductions from the monthly pay of officers. This again is not attended with burden upon the Treasury, and would for the future relieve much distress which every old Army officer has witnessed in the past—of officers dying suddenly or being killed, leaving families without even the means of reaching their friends, if fortunate enough to have friends to aid them.

Third, the repeal of the law abolishing mileage, and a return to the old system.

Fourth, the trial with torpedoes under the Corps of Engineers, and

appropriation for the same.  Should war ever occur between the United States and any maritime power, torpedoes will be among, if not the most effective and cheapest auxiliary for the defense of harbors, and also in aggressive operations, that we can have.  Hence it is advisable to learn by experiment their best construction and application as well as effect.

Fifth, a permanent organization for the Signal-Service Corps.  This service has now become a necessity of peace as well as war, under the advancement made by the present able management.

Sixth, a renewal of the appropriation for compiling the official records of the war, &c.

The condition of our Navy at this time is a subject of satisfaction.  It does not contain, it is true, any of the powerful cruising iron-clads which make so much of the maritime strength of some other nations, but neither our continental situation nor our foreign policy requires that we should have a large number of ships of this character, while this situation and the nature of our ports combine to make those of other nations little dangerous to us under any circumstances.

Our Navy does contain, however, a considerable number of iron-clads of the monitor class, which, though not properly cruisers, are powerful and effective for harbor defense and for operations near our own shores. Of these all the single-turreted ones, fifteen in number, have been substantially rebuilt, their rotten wooden beams replaced with iron, their hulls strengthened, and their engines and machinery thoroughly repaired, so that they are now in the most efficient condition and ready for sea as soon as they can be manned and put in commission.

The five double-turreted iron-clads belonging to our Navy, by far the most powerful of our ships for fighting purposes, are also in hand undergoing complete repairs, and could be ready for sea in periods varying from four to six months.  With these completed according to the present design, and our two iron torpedo-boats now ready, our iron-clad fleet will be, for the purposes of defense at home, equal to any force that can readily be brought against it.

Of our wooden navy also, cruisers of various sizes, to the number of about forty, including those now in commission, are in the Atlantic, and could be ready for duty as fast as men could be enlisted for those not already in commission.  Of these, one-third are in effect new ships, and though some of the remainder need considerable repairs to their boilers and machinery, they all are, or can readily be made, effective.

This constitutes a fleet of more than fifty war-ships, of which fifteen are iron-clad, now in hand on the Atlantic coast.  The Navy has been brought to this condition by a judicious and practical application of what could be spared from the current appropriations of the last few years, and from that made to meet the possible emergency of two years ago.  It has been done quietly, without proclamation or display, and though it has necessarily straitened the Department in its ordinary

expenditure, and, as far as the iron-clads are concerned, has added nothing to the cruising force of the Navy, yet the result is not the less satisfactory, because it is to be found in a great increase of real rather than apparent force. The expenses incurred in the maintenance of an effective naval force in all its branches are necessarily large, but such force is essential to our position, relations, and character, and affects seriously the weight of our principles and policy throughout the whole sphere of national responsibilities.

The estimates for the regular support of this branch of the service for the next year amount to a little less in the aggregate than those made for the current year; but some additional appropriations are asked for objects not included in the ordinary maintenance of the Navy, but believed to be of pressing importance at this time. It would, in my opinion, be wise at once to afford sufficient means for the immediate completion of the five double-turreted monitors now undergoing repairs, which must otherwise advance slowly, and only as money can be spared from current expenses. Supplemented by these, our Navy, armed with the destructive weapons of modern warfare, manned by our seamen, and in charge of our instructed officers, will present a force powerful for the home purposes of a responsible though peaceful nation.

The report of the Postmaster-General, herewith transmitted, gives a full history of the workings of the Department for the year just passed. It will be observed that the deficiency to be supplied from the General Treasury increased over the amount required for the preceding year. In a country so vast in area as the United States, with large portions sparsely settled, it must be expected that this important service will be more or less a burden upon the Treasury for many years to come. But there is no branch of the public service which interests the whole people more than that of cheap and rapid transmission of the mails to every inhabited part of our territory. Next to the free school, the post-office is the great educator of the people, and it may well receive the support of the General Government.

The subsidy of $150,000 per annum given to vessels of the United States for carrying the mails between New York and Rio de Janeiro having ceased on the 30th day of September last, we are without direct mail facilities with the South American states. This is greatly to be regretted, and I do not hesitate to recommend the authorization of a renewal of that contract, and also that the service may be increased from monthly to semi-monthly trips. The commercial advantages to be gained by a direct line of American steamers to the South American states will far outweigh the expense of the service.

By act of Congress approved March 3, 1875, almost all matter, whether properly mail-matter or not, may be sent any distance through the mails, in packages not exceeding four pounds in weight, for the sum of sixteen cents per pound. So far as the transmission of real mail-matter goes, this would seem entirely proper. But I suggest that

MESSAGE OF THE PRESIDENT.          XXIII

the law be so amended as to exclude from the mails merchandise of all descriptions, and limit this transportation to articles enumerated, and which may be classed as mail-matter proper.

The discovery of gold in the Black Hills, a portion of the Sioux reservation, has had the effect to induce a large emigration of miners to that point. Thus far the effort to protect the treaty rights of the Indians to that section has been successful, but the next year will certainly witness a large increase of such emigration. The negotiations for the relinquishment of the gold-fields having failed, it will be necessary for Congress to adopt some measures to relieve the embarrassment growing out of the causes named. The Secretary of the Interior suggests that the supplies now appropriated for the sustenance of that people, being no longer obligatory under the treaty of 1868, but simply a gratuity, may be issued or withheld at his discretion.

The condition of the Indian Territory, to which I have referred in several of my former annual messages, remains practically unchanged. The Secretary of the Interior has taken measures to obtain a full report of the condition of that Territory, and will make it the subject of a special report at an early day. It may then be necessary to make some further recommendation in regard to legislation for the government of that Territory.

The steady growth and increase of the business of the Patent-Office indicates, in some measure, the progress of the industrial activity of the country. The receipts of the Office are in excess of its expenditures, and the Office generally is in a prosperous and satisfactory condition.

The report of the General Land-Office shows that there were 2,459,601 acres less disposed of during this than during the last year. More than one-half of this decrease was in lands disposed of under the homestead and timber-culture laws. The cause of this decrease is supposed to be found in the grasshopper scourge and the droughts which prevailed so extensively in some of the frontier States and Territories during that time as to discourage and deter entries by actual settlers. The cash receipts were less, by $399,342.23 than during the preceding year.

The entire surveyed area of the public domain is 680,253,094 acres, of which 26,077,531 acres were surveyed during the past year, leaving 1,154,471,762 acres still unsurveyed.

The report of the Commissioner presents many interesting suggestions in regard to the management and disposition of the public domain and the modification of existing laws, the apparent importance of which should insure for them the careful consideration of Congress.

The number of pensioners still continues to decrease, the highest number having been reached during the year ending June 30, 1873. During the last year, 11,557 names were added to the rolls, and 12,977 were dropped therefrom, showing a net decrease of 1,420. But while the number of pensioners has decreased, the annual amount due on the pension-rolls has increased $44,733.13. This is caused by the greatly

increased average rate of pensions, which, by the liberal legislation of
Congress, has increased from $90.26 in 1872 to $103.91 in 1875 to each
invalid pensioner, an increase in the average rate of fifteen per cent. in
the three years.   During the year ending June 30, 1875, there was
paid on account of pensions, including the expenses of disbursement,
$29,683,116, being $910,632 less than was paid the preceding year.  This
reduction in amount of expenditures was produced by the decrease in
the amount of arrearages due on allowed claims, and on pensions, the
rate of which was increased by the legislation of the preceding session
of Congress.   At the close of the last fiscal year there were on the pen-
sion-rolls 234,821 persons, of whom 210,363 were Army pensioners,
105,478 being invalids and 104,885 widows and dependent relatives ;
3,420 were Navy pensioners, of whom 1,636 were invalids and 1,784
widows and dependent relatives ; 21,038 were pensioners of the war of
1812, 15,875 of whom were survivors and 5,163 were widows.

It is estimated that $29,535,000 will be required for the payment of
pensions for the next fiscal year, an amount $965,000 less than the esti-
mate for the present year.

The geological explorations have been prosecuted with energy during
the year, covering an area of about forty thousand square miles in the
Territories of Colorado, Utah, and New Mexico, developing the agri-
cultural and mineral resources, and furnishing interesting scientific and
topographical details of that region.

The method for the treatment of the Indians, adopted at the begin-
ning of my first term, has been steadily pursued, and with satisfactory
and encouraging results.   It has been productive of evident improve-
ment in the condition of that race, and will be continued, with only such
modifications as further experience may indicate to be necessary.

The board heretofore appointed to take charge of the articles and
materials pertaining to the War, the Navy, the Treasury, the Interior,
and the Post-Office Departments, and the Department of Agriculture,
the Smithsonian Institution, and the Commission of Food-Fishes, to be
contributed, under the legislation of last session, to the International
Exhibition to be held at Philadelphia during the centennial year 1876,
has been diligent in the discharge of the duties which have devolved
upon it ; and the preparations so far made with the means at command
give assurance that the governmental contribution will be made one of
the marked characteristics of the exhibition.  The board has observed
commendable economy in the matter of the erection of a building for the
governmental exhibit, the expense of which it is estimated will not ex-
ceed, say, $80,000.   This amount has been withdrawn, under the law, from
the appropriations of five of the principal Departments, which leaves
some of those Departments without sufficient means to render their
respective practical exhibits complete and satisfactory.  The exhibition
being an international one, and the Government being a voluntary con-
tributor, it is my opinion that its contribution should be of a character,

in quality and extent, to sustain the dignity and credit of so distinguished a contributor.   The advantages to the country of a creditable display are, in an international point of view, of the first importance, while an indifferent or uncreditable participation by the Government would be humiliating to the patriotic feelings of our people themselves. I commend the estimates of the board for the necessary additional appropriations to the favorable consideration of Congress.

The powers of Europe, almost without exception, many of the South American states, and even the more distant eastern powers, have manifested their friendly sentiments toward the United States and the interest of the world in our progress by taking steps to join with us in celebrating the centennial of the nation, and I strongly recommend that a more national importance be given to this exhibition by such legislation and by such appropriation as will insure its success.  Its value in bringing to our shores innumerable useful works of art and skill, the commingling of the citizens of foreign countries and our own, and the interchange of ideas and manufactures will far exceed any pecuniary outlay we may make.

I transmit herewith the report of the Commissioner of Agriculture, together with the reports of the commissioners, the board of audit, and the board of health of the District of Columbia, to all of which I invite your attention.

The Bureau of Agriculture has accomplished much in disseminating useful knowledge to the agriculturist, and also in introducing new and useful productions adapted to our soil and climate, and is worthy of the continued encouragement of the Government.

The report of the Commissioner of Education, which accompanies the report of the Secretary of the Interior, shows a gratifying progress in educational matters.

In nearly every annual message that I have had the honor of transmitting to Congress I have called attention to the anomalous, not to say scandalous, condition of affairs existing in the Territory of Utah, and have asked for definite legislation to correct it.  That polygamy should exist in a free, enlightened, and Christian country, without the power to punish so flagrant a crime against decency and morality, seems preposterous.  True, there is no law to sustain this unnatural vice, but what is needed is a law to punish it as a crime, and at the same time to fix the status of the innocent children, the offspring of this system, and of the possibly innocent plural wives.  But, as an institution, polygamy should be banished from the land.

While this is being done, I invite the attention of Congress to another, though perhaps no less an evil, the importation of Chinese women, but few of whom are brought to our shores to pursue honorable or useful occupations.

Observations while visiting the Territories of Wyoming, Utah, and Colorado, during the past autumn, convinced me that existing laws regulat-

ing the disposition of public lands, timber, &c., and probably the mining laws themselves, are very defective, and should be carefully amended, and at an early day. In territory where cultivation of the soil can only be followed by irrigation, and where irrigation is not practicable the lands can only be used as pasturage, and this only where stock can reach water, (to quench its thirst,) cannot be governed by the same laws as to entries as lands every acre of which is an independent estate by itself.

Land must be held in larger quantities to justify the expense of conducting water upon it to make it fruitful, or to justify utilizing it as pasturage. The timber in most of the Territories is principally confined to the mountain regions which are held for entry in small quantities only, and as mineral lands. The timber is the property of the United States, for the disposal of which there is now no adequate law. The settler must become a consumer of this timber whether he lives upon the plain or engages in working the mines. Hence every man becomes either a trespasser himself, or, knowingly, a patron of trespassers.

My opportunities for observation were not sufficient to justify me in recommending specific legislation on these subjects, but I do recommend that a joint committee of the two Houses of Congress—sufficiently large to be divided into subcommittees—be organized to visit all the mining States and Territories during the coming summer, and that the committee shall report to Congress at the next session such laws, or amendments to laws, as it may deem necessary to secure the best interests of the Government and the people of these Territories who are doing so much for their development.

I am sure the citizens occupying the territory described do not wish to be trespassers, nor will they be if legal ways are provided for them to become owners of these actual necessities of their position.

As this will be the last annual message which I shall have the honor of transmitting to Congress before my successor is chosen, I will repeat or recapitulate the questions which I deem of vital importance, which may be legislated upon and settled at this session :

First. That the States shall be required to afford the opportunity of a good common-school education to every child within their limits.

Second. No sectarian tenets shall ever be taught in any school supported in whole or in part by the State, nation, or by the proceeds of any tax levied upon any community. Make education compulsory, so far as to deprive all persons who cannot read and write from becoming voters after the year 1890, disfranchising none, however, on grounds of illiteracy who may be voters at the time this amendment takes effect.

Third. Declare church and state forever separate and distinct, but each free within their proper spheres; and that all church-property shall bear its own proportion of taxation.

Fourth. Drive out licensed immorality, such as polygamy and the importation of women for illegitimate purposes. To recur again to the centennial year, it would seem as though now, as we are about to begin

## Seventh Annual Message
*December 7, 1875*



Ulysses S. Grant

The electric telegraph has become an essential and indispensable agent in the transmission of business and social messages. Its operation on land, and within the limit of particular states, is necessarily under the control of the jurisdiction within which it operates. The lines on the high seas, however, are not subject to the particular control of any one government.

In 1869 a concession was granted by the French Government to a company which proposed to lay a cable from the shores of France to the United States. At that time there was a telegraphic connection between the United States and the continent of Europe (through the possessions of Great Britain at either end of the line), under the control of an association which had, at large outlay of capital and at great risk, demonstrated the practicability of maintaining such means of communication. The cost of correspondence by this agency was great, possibly not too large at the time for a proper remuneration for so hazardous and so costly an enterprise. It was, however, a heavy charge upon a means of communication which the progress in the social and commercial intercourse of the world found to be a necessity, and the obtaining of this French concession showed that other capital than that already invested was ready to enter into competition, with assurance of adequate return for their outlay. Impressed with the conviction that the interests, not only of the people of the United States, but of the world at large, demanded, or would demand, the multiplication of such means of communication between separated continents, I was desirous that the proposed connection should be made; but certain provisions of this concession were deemed by me to be objectionable, particularly one which gave for a long term of years the exclusive right of telegraphic communication by submarine cable between the shores of France and the United States. I could not concede that any power should claim the right to land a cable on the shores of the United States and at the same time deny to the United States, or to its citizens or grantees, an equal

fight to land a cable on its shores. The right to control the conditions for the laying of a cable within the jurisdictional waters of the United States, to connect our shores with those of any foreign state, pertains exclusively to the Government of the United States, under such limitations and conditions as Congress may impose. In the absence of legislation by Congress I was unwilling, on the one hand, to yield to a foreign state the right to say that its grantees might land on our shores while it denied a similar right to our people to land on its shores, and, on the other hand, I was reluctant to deny to the great interests of the world and of civilization the facilities of such communication as were proposed. I therefore withheld any resistance to the landing of the cable on condition that the offensive monopoly feature of the concession be abandoned, and that the right of any cable which may be established by authority of this Government to land upon French territory and to connect with French land lines and enjoy all the necessary facilities or privileges incident to the use thereof upon as favorable terms as any other company be conceded. As the result thereof the company in question renounced the exclusive privilege, and the representative of France was informed that, understanding this relinquishment to be construed as granting the entire reciprocity and equal facilities which had been demanded, the opposition to the landing of the cable was withdrawn. The cable, under this French concession, was landed in the month of July, 1869, and has been an efficient and valuable agent of communication between this country and the other continent. It soon passed under the control, however, of those who had the management of the cable connecting Great Britain with this continent, and thus whatever benefit to the public might have ensued from competition between the two lines was lost, leaving only the greater facilities of an additional line and the additional security in case of accident to one of them. But these increased facilities and this additional security, together with the control of the combined capital of the two companies, gave also greater power to prevent the future construction of other lines and to limit the control of telegraphic communication between the two continents to those possessing the lines already laid. Within a few months past a cable has been laid, known as the United States Direct Cable Company, connecting the United States directly with Great Britain. As soon as this cable was reported to be laid and in working order the rates of the then existing consolidated companies were greatly reduced. Soon, however, a break was announced in this new cable, and immediately the rates of the other line, which had been reduced, were again raised. This cable being now repaired, the rates appear not to be reduced by either line from those formerly charged by the consolidated companies.

There is reason to believe that large amounts of capital, both at home and abroad, are ready to seek profitable investment in the advancement of this useful and most civilizing means of intercourse and correspondence. They await, however, the assurance of the means and conditions on which they may safely be made tributary to the general good.

As these cable telegraph lines connect separate states, there are questions as to their organization and control which probably can be best, if not solely, settled by conventions between the respective states. In the absence, however, of international conventions on the subject, municipal legislation may secure many points which appear to me important, if not indispensable for the protection of the public against the extortions which may

result from a monopoly of the right of operating cable telegrams or from a combination between several lines:

I. No line should be allowed to land on the shores of the United States under the concession from another power which does not admit the right of any other line or lines, formed in the United States, to land and freely connect with and operate through its land lines.

II. No line should be allowed to land on the shores of the United States which is not, by treaty stipulation with the government from whose shores it proceeds, or by prohibition in its charter, or otherwise to the satisfaction of this Government, prohibited from consolidating or amalgamating with any other cable telegraph line, or combining therewith for the purpose of regulating and maintaining the cost of telegraphing.

III. All lines should be bound to give precedence in the transmission of the official messages of the governments of the two countries between which it may be laid.

IV. A power should be reserved to the two governments, either conjointly or to each, as regards the messages dispatched from its shores, to fix a limit to the charges to be demanded for the transmission of messages.
I present this subject to the earnest consideration of Congress.

In the meantime, and unless Congress otherwise direct, I shall not oppose the landing of any telegraphic cable which complies with and assents to the points above enumerated, but will feel it my duty to prevent the landing of any which does not conform to the first and second points as stated, and which will not stipulate to concede to this Government the precedence in the transmission of its official messages and will not enter into a satisfactory arrangement with regard to its charges.

# EXHIBIT 3

Foreign Cables, 22 Op. Att'y Gen. 13 (1898)

FOREIGN CABLES, 22 U.S. Op. Atty. Gen. 13 (1898)

Case 4:16-cv-00036   Document 42-3   Filed in TXSD on 04/01/16   Page 35 of 59

22 U.S. Op. Atty. Gen. 13 (U.S.A.G.), 1898 WL 427

United States Attorney General

FOREIGN CABLES.

January 18, 1898

The President has the power, in the absence of legislation by Congress, to control the landing of foreign submarine cables on the shores of the United States. He may either prevent the landing, if the rights intrusted to his care so demand, or permit it on conditions which will protect the interests of this Government and its citizens.If a landing has been effected without the consent or against the protest of this Government, respect for its rights and compliance with its terms may be enforced by applying the prohibition to the operation of the line unless the necessary conditions are accepted and observed.No one has a right to land a foreign cable upon our shores and establish a physical connection between our territory and that of a foreign state without the consent of the Government of the United States.The jurisdiction of this nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself.The preservation of our territorial integrity and the protection of our foreign interests is intrusted in the first instance to the President.Under the obligation entered into by the President it is his duty to preserve, protect, and defend the Constitution, to do which he must preserve, protect, and defend those fundamental rights which flow from the Constitution itself and belong to the sovereignty it created.

**1**  The SECRETARY OF STATE.

SIR:

On May 4, 1897, the French ambassador submitted to your Department the application of the French Company of Telegraphic Cables (the successor of 'La Compagnie Francaise du Telégraphe de Paris à New York') for permission to land a cable supplementary to that which it has between Brest and Cape Cod, upon the same terms and conditions  **14**  as those which were imposed by the President in 1879 when the original cable was landed.

On May 11, 1897, your Department replied to this request, saying:

'The present Executive does not regard himself as clothed, in the absence of legislative enactment, with the requisite authority to take any action upon the application which you present. A bill was introduced in the last Congress giving the President of the United States express authority to authorize the landing of submarine cables on the shore of the United States, subject to conditions therein specified, but it failed to become a law. Until Congress shall see fit to clothe the President with power to act in matters of this kind he will be compelled to refrain from doing so.'

FOREIGN CABLES, 22 U.S. Op. Atty. Gen. 13 (1898)

Case 4:16-cv-00036  Document 42-3  Filed in TXSD on 04/01/16  Page 36 of 59

On June 4, 1897, your Department addressed a note to the French ambassador calling his attention to the fact that it had been represented to the Department that a steamer from France had arrived at Cape Cod with the avowed purpose of laying the shore end of the new cable, and saying:

'It is the expectation of the Federal Government that that company (the French Cable Company) will take no steps toward laying its proposed cable from Cape Cod without express authorization of the President or of Congress, before which, as I have observed to you, a bill was introduced at the last session, but which has not yet been enacted into law. If that company should, however, take action in the manner proposed, it is proper to say that it would do so at its peril.'

 **2  On June 5, 1897, another note was sent, informing the French ambassador of advices received to the effect that about 1,000 feet of the new French cable had been laid at Cape Cod the day before, and saying:

'Before taking any further action in the matter, I request that you will promptly instruct the proper authorities of the French Telegraph Company, in case the Department's information should be correct, to immediately desist from its work, pending the necessary authorization either of the President or of Congress.'

The French ambassador's notes, two of the 5th and one each of the 6th and 8th of June, disclose the fact that, although the Department's notes of the 4th and 5th of June  *15  had been promptly forwarded to the company's agent, the work of landing the cable had been completed before their receipt.

In view of the situation outlined, and the fact that Congress has not acted upon the matter, you request an official expression of my views as to the power of the President, in the absence of legislative enactment, to control the landing of foreign telegraphic cables.

What the President can do and ought to do in the case of projected cables may possibly be ascertained from what he has done; at any rate, a recurrence to the history of the landing of certain existing cables may prove of service in considering the question you propound.

The first cable from a foreign country landed upon the shores of the United States was one connecting the island of Cuba with the State of Florida, and was landed in 1867, under supposed authority of the act of Congress of May 5, 1866 (14 Stat., 44), granting to the International Ocean Telegraph Company, a New York corporation, the sole privilege for fourteen years, of laying and operating telegraphic cables from the shores of Florida to Cuba, the Bahamas, and other West India islands, upon these conditions, namely, the United States to have the free use of the cable for military, naval, and diplomatic purposes; the company to keep all its lines open to the public for the

FOREIGN CABLES, 22 U.S. Op. Atty. Gen. 13 (1898)

Case 4:16-cv-00036   Document 42-3   Filed in TXSD on 04/01/16   Page 37 of 59

daily publication of market and commercial reports and intelligence; all messages to be forwarded in the order received; no charge to exceed $3.50 for messages of ten words, and Congress to have the power to alter and determine the rates. (Forty-ninth Congress, second session, Senate Doc. 122, p. 63; letter of Mr. Frelinghuysen to the President, January, 1885).

In 1869 a concession was granted by the French Government to a company which proposed to lay a cable from the shores of France to the United States. One of the provisions of this concession gave to the company for a long period the exclusive right of telegraphic communication by submarine cable between France and the United States. President Grant resisted the landing of the cable unless this offensive monopoly feature should be abandoned. The French company accordingly renounced the exclusive privilege, **\*16** and the President's objection was withdrawn. The cable was laid in July, 1869; it ran from Brest, France, to St. Pierre, a French island off the southern coast of Newfoundland, thence to Duxbury, Massachusetts, and was known as the 'First French Cable.' It soon passed, however, into the control of the Anglo-American Company, controlling the cables connecting Great Britain with this continent. (Senate Doc. 122, pp. 63, 71).

 **\*\*3** In a note respecting this cable, dated July 10, 1869, and addressed to the French and British ministers, Mr. Fish said:

'It is not doubted by this Government that the complete control of the whole subject, both of the permission and the regulation of this mode of foreign intercourse, is with the Government of the United States, and that, however suitable certain legislation on the part of a State of the Union may become, in respect to its proprietary rights in aid of such enterprises, the entire question of the allowance or prohibition of such means of foreign intercourse, commercial and political, and of the terms and conditions and its allowance, is under the control of the Government of the United States.' (Senate Doc. 122, p. 65.)

In his annual message of December, 1875, President Grant recounts his action respecting the French cable of 1869, and says:

'The right to control the conditions for the laying of a cable within the jurisdictional waters of the United States, to connect our shores with those of any foreign state, pertains exclusively to the Government of the United States, under such limitations and conditions as Congress may impose. In the absence of legislation by Congress I was unwilling, on the one hand, to yield to a foreign state the right to say that its grantees might land on our shores while it denied a similar right to our people to land on its shores; and, on the other hand, I was reluctant to deny to the great interests of the world and of civilization the facilities of such communication as were proposed. I therefore withheld any resistance to the landing of the cable, on condition that the offensive monopoly feature of the concession be abandoned, **\*17** and that the right of any cable which may be established by authority of this Government to land upon French territory and to connect with

French land lines, and enjoy all the necessary facilities or privilege incident to the use thereof upon as favorable terms as any other company, be conceded.' (Senate Doc. 122, p. 70.)

After adverting to the need of new cables in order to provide competition and reduce rates, President Grant continues:

'As these cable-telegraph lines connect separate States, there are questions as to their organization and control which probably can be best, if not solely, settled by conventions between the respective States. In the absence, however, of international conventions on the subject, municipal legislation may secure many points which appear to me important, if not indispensable, for the protection of the public against the extortions which may result from a monopoly of the right of operating cable telegrams, or from a combination between several lines:

'I. No line should be allowed to land on the shores of the United States under the concession from another power which does not admit the right of any other line or lines formed in the United States to land and freely connect with and operate through its land lines.

 **4** 'II. No line should be allowed to land on the shores of the United States which is not by treaty stipulation with the Government from whose shores it proceeds, or by prohibition in its charter, or otherwise to the satisfaction of this Government, prohibited from consolidating or amalgamating with any other cable-telegraph line or combining therewith for the purpose of regulating and maintaining the cost of telegraphing.

'III. All lines should be bound to give precedence in the transmission of the official messages of the Governments of the two countries between which it may be laid.

'IV. A power should be reserved to the two Governments, either conjointly or to each, as regards the messages dispatched from its shores, to fix a limit to the charges to be demanded for the transmission of messages.

 **18**  'I present this subject to the earnest consideration of Congress.

'In the meantime, and unless Congress otherwise direct, I shall not oppose the landing of any telegraphic cable which complies with and assents to the points above enumerated, but will feel it my duty to prevent the landing of any which does not conform to the first and second points as stated, and which will not stipulate to concede to this Government the precedence in the transmission of its official messages, and will not enter into a satisfactory arrangement with regard to its charges.' (Senate Doc. 122, pp. 71, 72.)

WestlawNext © 2016 Thomson Reuters. No claim to original U.S. Government Works.

FOREIGN CABLES, 22 U.S. Op. Atty. Gen. 13 (1898)

Case 4:16-cv-00036   Document 42-3   Filed in TXSD on 04/01/16   Page 39 of 59

It will be observed that President Grant rested his authority to annex conditions to the landing of a foreign cable upon his power to prevent its landing altogether, if deemed by him inimical to the interests of this Government, its people, or their business. The right to prevent carried with it the right to control.

The Direct United States Cable Company completed its line in 1875 from Ballinskelligs Bay, Ireland, to Ryebeach, N. H., by way of Torbay, Nova Scotia. This cable was laid under the act of March 29, 1867 (15 Stats., 10), conferring upon the American Atlantic Cable Telegraph Company the privilege for twenty years to land a submarine telegraph cable at any place on the Atlantic coast except the coast of Florida, and to operate the same, the Government to have the preference in its use, on terms to be agreed upon between the Postmaster-General and the company, Congress reserving the right to alter, amend, or repeal the act. Application was made to the Department of State for the privilege of landing, accompanied by the voluntary assurance of the company that no amalgamation should take place with any other company for the purpose of controlling rates.

In view of these assurances, the landing of the cable was acquiesced in by the President, Mr. Fish, in his letter to Mr. Eckert of January 2, 1877, saying:

'On receiving such assurances from the promoters of the company, the President decided to withhold resistance to the landing of their cable.

 **\*19** 'The President adheres to the views which he expressed to Congress in December, 1875, that no line should be allowed to land on the shores of the United States which is not, by prohibition in its charter, or otherwise to the satisfaction of the Government, prohibited from consolidating or amalgamating with any other cable-telegraph line, or combining therewith for the purpose of regulating and maintaining the cost of telegraphing.

 **\*\*5** 'These views are understood to have met the approval of Congress and of the people of the United States, indicated by the tacit acquiescence of the Congress, and by the expressed approval of individual members of that body, and the general approval of the public press of the country. In the same message the President announced that the right to control the conditions for the laying of a cable within the jurisdictional waters of the United States, to connect our shores with those of any foreign State, pertains exclusively to the Government of the United States, under such limitations and conditions as Congress may impose. And he further stated that, unless Congress otherwise direct, he would feel it his duty to prevent the landing of any telegraphic cable which does not conform (among others) to the point above referred to.

'The President is of the opinion that the control of the United States over its jurisdictional waters extends to the right of discontinuing and preventing their use by a cable whose proprietors may violate any of the conditions on which the Government by acquiescence or silent permission

FOREIGN CABLES, 22 U.S. Op. Atty. Gen. 13 (1898)

Case 4:16-cv-00036   Document 42-3   Filed in TXSD on 04/01/16   Page 40 of 59

allowed its landing as well as to the resistance and prohibition of an original landing.' (Senate Doc. 122, pp. 11, 12.)

The so-called 'Second French Cable' was laid by La Compagnie Francaise du Telégraphe de Paris à New York in 1879 from Brest to St. Pierre, and thence to Cape Cod. The company applied, through the French minister, to your Department for permission to land the cable, and the privilege was granted upon substantially the conditions formulated in President Grant's message of 1875, Mr. Evarts, in his letter of November 10, 1879, to Mr. Outrey, saying:

'I have, without delay, brought the subject, together with the information conveyed by your note, to the attention **\*20** of the President, and he authorizes me to say that in view of the assurances thus received from the French Government that reciprocal privileges of landing will be granted by France to any company which may be formed by citizens of the United States upon the same terms that these privileges are granted to the present or any future company of French citizens that may apply for such landing privilege; and having also received the acceptance by the directors of the Compagnie Francaise du Telégraphe de Paris à New York of the conditions prescribed by this Government, the executive permission of the Government of the United States will be granted to that company to land its cable at Cape Cod, in the State of Massachusetts. It is proper for me to add, however, that this executive permission is to be accepted and understood by the company as being subject to any future action of Congress in relation to the whole subject of submarine telegraphy as explained in my note to you of the 27th ultimo.' (Senate Doc. 122, p. 76.)

The Mackey-Bennett commercial cable was laid in 1884 from the coast of Europe to the United States, by permission of the President, upon substantially the conditions outlined in President Grant's message to Congress in 1875. Mr. Frelinghuysen, in his letter of December 5, 1883, describes the attitude of the Government thus:

 **\*\*6** 'This Government regards with favorable consideration all efforts to extend the facilities for telegraphic communication between the United States and other nations, and in pursuance of this sentiment the President is desirous of extending every facility in his power to promote the laying of the cables. While there is no special statute authorizing the Executive to grant permission to land a cable on the coast of the United States, neither is there any statute prohibiting such action; and I find no examination of the records of this Department that in 1875 conditional authority was given to land a French cable at Rye Beach, New Hampshire, and that in 1879 permission was given to land a cable at Cape Cod.

'These precedents seem to justify a similar concession to the promoters of the present enterprise, which there is the **\*21** less hesitation in according as they are citizens of the United States.' (Senate Doc. 122, p. 84.)

FOREIGN CABLES, 22 U.S. Op. Atty. Gen. 13 (1898)

Case 4:16-cv-00036   Document 42-3   Filed in TXSD on 04/01/16   Page 41 of 59

On October 18, 1889, the Compagnie Francaise du Telégraphe de Paris à New York applied to your Department for permission to lay a cable from San Domingo to the United States. To this request Mr. Blaine replied, December 21, 1889:

'While the authority of the President to grant the permission you desire must be accepted, subject, of course, to the future ratification by Congress, yet there are certain conditions which he regards as absolutely essential before such provisional permission can be accorded.'

These conditions are as follows:

'(1) That neither the company, its successors or assigns, nor any cable with which it connects, shall receive from any foreign government exclusive privileges which would prevent the establishment and operation of a cable of an American company in the jurisdiction of such foreign government.

'(2) That the company shall not consolidate or amalgamate with any other line or combine therewith for the purpose of regulating rates.

'(3) That the charges to the Government of the United States shall not be greater than those to any other government, and the general charges shall be reasonable.

'(4) That the Government of the United States shall be entitled to the same or similar privileges as may be law, regulation, or agreement be granted to any other government.

'(5) That a citizen of the United States shall stand on the same footing as regards privileges with citizens of San Domingo.

'(6) That messages shall have precedence in the following order: (a) Government messages and official messages to the Government; (b) telegraphic business; (c) general business.

'(7) That the line shall be kept open for daily business, and all messages, in the above order, be transmitted according to the time of receipt.

'Conditions similar to these were required of your company in 1879 in reply to its application for authority to land one or more of its cables on the Atlantic coast of this country, and assented to by the company's order November 5, 1879.  **22**  And it would seem needless to add that similar conditions have been imposed upon all cable companies desiring to land their cables from foreign countries upon the shores of the United States. It will be observed, however, that the first condition has been modified to meet a case which did not arise in 1879, of the cable for which the privilege of landing is sought being used as a link in a longer line of communication. Such a case is believed now to exist in respect to the proposed cable between the United States and San Domingo, which

FOREIGN CABLES, 22 U.S. Op. Atty. Gen. 13 (1898)

Case 4:16-cv-00036   Document 42-3   Filed in TXSD on 04/01/16   Page 42 of 59

is understood to be only a link in a line between the United States and South America. The spirit and purpose of the first condition imposed in 1879 require that American cable companies should not now be excluded from operating and establishing lines between the United States and South America, either directly or by way of San Domingo.

 **7  'The President, therefore, directs me to say that if the foregoing conditions are satisfactory to your company, and it will first file in this Department a duly authenticated copy of the concessions granted by the Dominican Government to land its cable at Puerto Plata, together with a like certified copy of the conditions imposed by this Government, he will be willing to grant the necessary permission to your company to land its cable at Charleston, S. C., subject to the future action of Congress.' (House of Representatives, Fifty-second Congress, first session, Report No. 964.)

The cable company took no steps to comply with these requirements. Nearly two years later, on December 2, 1891, the French Cable Company, through its attorney, Mr. Jefferson Chandler, renewed its application for permission to land a cable. Meantime, on December 1, 1891, the company, through the same attorney, obtained from the legislature of South Carolina a joint resolution purporting to authorize it to land a cable on the coast of that State, and, in January, 1892, from the legislature of Virginia, an act purporting to authorize it to land a cable on shore of that State. On March 10, 1892, a joint resolution was introduced into Congress to confirm these grants. This resolution was referred to a committee, of which Mr. Wise was chairman, and to him was addressed the letter of Acting  *23  Secretary Wharton of March 22, 1892, published in House Report No. 964, Fifty-second Congress, first session. After receiving this communication the committee reported a substitute granting the landing privilege upon the conditions prescribed by Mr. Blaine. Thereupon, for the time being, the attempt of the company to obtain the consent of Congress ceased.

On June 21, 1893, the same company, through the same attorney, applied again to the Department of State, ostensibly for permission to land a cable on the shore of Virginia, but the application was accompanied by a written argument to show that the President had no power to act in the matter, the concluding paragraph of this argument and application being:

'I respectfully request, therefore, on behalf of the applicant that the honorable Secretary of State will decide this application on its merits, and will declare that under the law the States may freely land cables, and that the Executive has no jurisdiction or disposition to prevent the landing and operation of a submarine cable from the shores of Virginia to any point permitted by the State, and that the authority of the State of Virginia to so permit cable companies to land and establish themselves on its coast is complete; and, further, that no action is required or permitted by any of the executive officers of the Government as the law not is.' (Fifty-third Congress, second session, Senate Doc. No. 14; letter to Mr. Gresham.)

In response to this argument, Mr. Gresham, changing the attitude of the Government as established by the Presidents and their Secretaries of State from President Grant's time down, declined to act on the application, saying in his communication of August 15, 1893:

 **\*\*8** 'There is no Federal legislation conferring authority upon the President to grant such permission, and in the absence of such legislation, Executive action of the character desired would have no binding force.' (Fifty-third Congress, second session, Senate Doc. No. 14; letter of Mr. Gresham.)

October 2, 1895, Mr. Olney addressed a letter to Mr. Scrymser, president of the Central and South American Telegraph Company, in which, in answer to his letter of **\*24** September 25, 1895, he stated that La Compagnie Francaise des Cables Telégraphiques had not made application for permission to land its cables on the coast of the United States, and added:

'Furthermore, in the absence of Federal legislation conferring authority upon the Executive to grant such permission, this Department has no power to act in the matter.'

On the 24th of October, 1895, Mr. Scrymser laid before your Department certain information concerning an agreement for laying and maintaining submarine cables between France, North America, and the Antilles, to which the Government of France was a party, and suggested that the French minister be officially informed as to the policy of the Government of the United States in the matter of cablelanding privileges on our shores. Replying to this communication on October 28, 1895, Mr. Olney referred to his former letter, and said:

'There is no Federal statute conferring authority upon the Executive to grant or withhold permission to land cables on the shores of the United States. This Department has, therefore, no power to act in the matter, and I am unable to comply with your request.'

As a natural sequence of the attitude taken by your Department under Mr. Gresham and Mr. Olney, La Compagnie Francaise des Cables Telégraphiques, acting in connection with the United States and Haiti Telegraph and Cable Company and the United States and Haiti Cable Company, in 1896, landed a cable, extending from Haiti to this country, at Coney Island, New York, without permission of the Government. This Department, acting through the Attorney-General and the United States attorney, brought an injunction suit against the companies named to prevent the landing and operation of the cable, but in view of the fact that the cable had been landed, the motion for an injunction against its operation was refused. At the same time Judge Lacombe said (77 Fed. Rep., 496):

FOREIGN CABLES, 22 U.S. Op. Atty. Gen. 13 (1898)

Case 4:16-cv-00036  Document 42-3  Filed in TXSD on 04/01/16  Page 44 of 59

'It is thought that the main proposition advanced by complainant's counsel is a sound one, and that without the consent of the General Government, no one, alien or native, has any right to establish a physical connection between the  *25  shores of this country and that of any foreign nation. Such consent may be implied as well as expressed, and whether it shall be granted or refused is a political question, and in the absence of Congressional action would seem to fall within the province of the Executive to decide. As was intimated upon the argument, it is further thought that the Executive may effectually enforce its decision without the aid of the courts.'

 **9  It thus appears that from 1869 to August, 1893, during the terms of Grant, Hayes, Garfield, Arthur, Cleveland (first term), and Harrison, it was held by the Presidents and their Secretaries of State that the Executive has the power, in the absence of legislation by Congress, to control the landing, and, incidentally, regulate the operation of foreign submarine cables in the protection of the interests of this Government and its citizens. Against this established rule, supported by the opinion of the only United States judge who has passed upon the question, stands opposed the refusal to act of Mr. Gresham, followed by the dictum of Mr. Olney. The attitude taken by your Department under Mr. Gresham has resulted in the landing of two foreign cables upon our shores without permission of this Government and subject to no limitations or restrictions whatever. Must this condition continue? Is the President powerless to act until Congress legislates?

A foreign submarine cable which lands upon our shores, in its location enjoys rights upon our territory and in its operation provides a means of international communication, public and private, political and commercial.

The jurisdiction of this nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself. (Mr. Chief Justice Marshall, *The Exchange*, 7 Cranch, 116, 136.) No one has a right to land a foreign cable upon our shores and establish a physical connection between our territory and that of a foreign state without the consent of the Government of the United States.

The preservation of our territorial integrity and the protection of our foreign interests is intrusted, in the first instance, to the President. The Constitution, established  *26  by the people of the United States as the fundamental law of the land, has conferred upon the President the executive power; has made him the commander in chief of the Army and Navy; has authorized him, by and with the consent of the Senate, to make treaties, and to appoint ambassadors, public ministers, and consuls; and has made it his duty to take care that the laws be faithfully executed. In the protection of these fundamental rights, which are based upon the Constitution and grow out of the jurisdiction of this nation over its own territory and its international rights and obligations as a distinct sovereignty, the President is not limited to the enforcement of specific acts of Congress. He takes a solemn oath to faithfully execute the office of President, and to preserve, protect, and defend the Constitution of the United States. To do this he must preserve, protect, and defend those fundamental rights which

FOREIGN CABLES, 22 U.S. Op. Atty. Gen. 13 (1898)

Case 4:16-cv-00036 Document 42-3 Filed in TXSD on 04/01/16 Page 45 of 59

flow from the Constitution itself and belong to the sovereignty it created. (Mr. Justice Miller, *In re Neagle*, 135 U. S., 1, 63, 64; Mr. Justice Field, *The Chinese Exclusion Case*, 130 U. S., 581, 606; Mr. Justice Gray, *Fong Yue Ting* v. *United States*, 149 U. S., 698, 711; Mr. Justice Brewer, *In re Debs*, 158 U. S., 564, 582.)

**\*\*10** The President has charge of our relations with foreign powers. It is his duty to see that in the exchange of comities among nations we get as much as we give. He ought not to stand by and permit a cable to land on our shores under a concession from a foreign power which does not permit our cables to land on its shores and enjoy *there* facilities equal to those accorded its cable *here*. For this reason President Grant insisted on the first point in his message of 1875.

The President is not only the head of the diplomatic service, but commander in chief of the Army and Navy. A submarine cable is of inestimable service to the Government in communicating with its officers in the diplomatic and consular service, and in the Army and Navy when abroad. The President should, therefore, demand that the Government have precedence in the use of the line, and this was done by President Grant in the third point of his message.

Treating a cable simply as an instrument of commerce, it **\*27** is the duty of the President, pending legislation by Congress, to impose such restrictions as will forbid unjust discriminations, prevent monopolies, promote competition, and secure reasonable rates. These were the objects of the second and fourth points in President Grant's message.

The Executive permission to land a cable is, of course, subject to subsequent Congressional action. The President's authority to control the landing of a foreign cable does not flow from his right to permit it in the sense of granting a franchise, but from his power to prohibit it should he deem it an encroachment on our rights or prejudicial to our interests. The unconditional landing of a foreign cable might be both, and therefore to be prohibited, but a landing under judicious restrictions and conditions might be neither, and therefore to be permitted in the promotion of international intercourse.

I am of the opinion, therefore, that the President has the power, in the absence of legislative enactment, to control the landing of foreign submarine cables. He may either prevent the landing, if the rights intrusted to his care so demand, or permit it on conditions which will protect the interests of this Government and its citizens; and if a landing has been effected without the consent or against the protest of this Government, respect for its rights and compliance with its terms may be enforced by applying the prohibition to the operation of the line unless the necessary conditions are accepted and observed.

Very respectfully,

JOHN K. RICHARDS,

*Acting Attorney-General.*

22 U.S. Op. Atty. Gen. 13 (U.S.A.G.), 1898 WL 427

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 4

Cuba-Cables, 22 Op. Att'y Gen. 408 (1899)

CUBA-CABLES, 22 U.S. Op. Atty. Gen. 408 (1899)

Case 4:16-cv-00036   Document 42-3   Filed in TXSD on 04/01/16   Page 48 of 59

22 U.S. Op. Atty. Gen. 408 (U.S.A.G.), 1899 WL 536

United States Attorney General

CUBA—CABLES.

March 25, 1899

The grounding of a cable upon the soil of the United States, with the intention of connecting our territory with foreign territory by that means, is a matter which is under the soverign control of the Government.The application of the Commercial Cable Company for leave to land its cable in the United States is within the jurisdiction and control of the Department of State, acting for the President.So far as the landing of a cable in the island of Cuba is concerned, the subject is under the control of the War Department, by reason of the fact that its occupation is that of a military nature.Owing to the temporary nature of the occupation of the island of Cuba by the United States, it is inexpedient to grant permission to the Commercial Cable Company to land a cable upon the soil of Cuba.

 **1  The SECRETARY OF WAR.

SIR:

I have the honor to acknowledge receipt of a communication from you, under date of February 27, 1899, with which you inclose to me an application made by the Commercial Cable Company of the United States for permission to land a submarine cable in Cuba and Puerto Rico, for the purpose of effecting cable communication between those islands and the United States, as to which you request my opinion in respect to the power of the Secretary of War in the premises.

The views of this Department upon the subject of landing foreign submarine cables upon the territory of the United States are fully expressed in the opinion of the Solicitor-General, acting as Attorney-General, under date of January 18, 1898, to which you are respectfully referred. The substance of the opinion is that the grounding of a cable upon the soil of the United States, with the intention of connecting our territory with foreign territory by that means, is a *409 matter which is under the sovereign control of this Government, such control to be exercised by Congress, provided it legislates upon the subject, and, in the absence of such legislation, to be regulated and controlled by the executive department of the Government.

Congress having failed to take jurisdiction and pass any statutes governing the subject, the matter has heretofore been regulated by Executive permission, revocable either at the will of the President or by subsequent legislation by Congress.

So far as the application of the Commercial Cable Company for leave to land its cable in the United States is concerned, the matter is properly, under the practice heretofore established, within the jurisdiction and control of the Department of State, acting for the President. So far as the landing of a cable in the island of Cuba is concerned, the subject is under the control of the War Department, by reason of the fact that the United States is exercising in the island of Cuba administration under the law of belligerent right, its occupancy being of a military nature and merely temporary.

In all instances heretofore where application has been made of this Government, exercising the temporary control and government of the Island of Cuba, for grants or concessions which usually flow from the depositary of sovereign power, the Executive Departments have taken the ground that under the circumstances by which the United States came into temporary administration of affairs in Cuba, and in view of the fact that it is the declared purpose of the United States, when a stable government shall have been there established, to retire from the island and leave the government thereof to the inhabitants, it would be inexpedient to grant such applications, except in case of absolute necessity.

 **2  In an opinion rendered to you on January 19, 1899, relative to the claim of Michael J. Dady & Co. as to certain contractual relations between them and the city of Havana, relative to sewering and paving the said city, I said:

'The importance of the matter involved and the difficulty of understanding the rights and interests of the people of Havana with reference thereto are sufficient and conclusive **\*410**  reasons for such a course. The administration of the United States in Cuba is of a military nature, and merely temporary. No action binding the island or any of its municipalities to large expenditures and continuing debt ought to be made except upon grounds of immediate necessity, which in this case do not appear to be present.

'Whether the claims of Dady & Co. are well founded, whether they are sufficiently complete to constitute a contractual relation, and whether the authorities of Havana ought ultimately to recognize and confirm them are questions which ought to be left to the decision of the authorities of Havana, not while that city is in the disturbed and partially disorganized condition consequent upon a recent war and a change of national sovereignty, but when it shall hereafter have resumed its normal functions under such conditions of order and tranquillity as will permit its authorities to deal intelligently and justly with the subject.'

By Executive order, promulgated by the general commanding the United States forces in Cuba, all grants and concessions of franchises and similar rights have been for-bidden to be made by any authority in the islands except upon the approval of the Secretary of War.

CUBA-CABLES., 22 U.S. Op. Atty. Gen. 408 (1899)

Case 4:16-cv-00036   Document 42-3   Filed in TXSD on 04/01/16   Page 50 of 59

This cautious and conservative policy is sustained by considerations of prudence, and by a proper regard for the reversionary rights of the future government of the island of Cuba. In affirmation of the Executive policy so declared and followed, Congress, by act approved March 3, 1899, directed that no property, franchises, or concessions of any kind whatever shall be granted by the United States, or by any military or other authority whatever, in the island of Cuba during the occupation thereof by the United States. (See act making appropriation for support of the Regular and Volunteer Army for the fiscal year ending June 30, 1900, section 2.)

While not meaning to concede that Congress, by legislative act, has power to restrain or control the proper exercise of the powers of the Commander in Chief of the Army and Navy of the United States, occupying, under the law of belligerent right, foreign territory—a question that may well be open to doubt—yet the expressed will and desire of **\*411** the Congress, conforming as it does to the previously established policy and practice of the Executive Departments, is entitled to the respect of the Executive Departments, and ought to be followed, unless some high necessity requires otherwise.

You are therefore advised that it would be inexpedient, under all the circumstances, to grant permission to the applicant in this case to land its cable upon the soil of Cuba.

 **\*\*3**  Inasmuch as the permission to land its cable upon the soil of Puerto Rico seems to depend upon the grant of a similar right as to the island of Cuba, the same order should be made with reference to that part of the application, although the circumstances under which the United States retains control and government of the two islands are materially different.

The conclusion which I have arrived at renders it unnecessary for me to discuss or decide the objections raised on behalf of the Western Union Telegraph Company, lessee of the International Cable Company of New York, which companies claim an exclusive grant under a concession from Spain made in 1867, which exclusive grant, it is claimed, has not yet expired.
 Very respectfully,

JOHN W. GRIGGS.

22 U.S. Op. Atty. Gen. 408 (U.S.A.G.), 1899 WL 536

---

**End of Document**                                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 5

Cuba-Cables, 22 Op. Att'y Gen. 514 (1899)

CUBA-CABLES, 22 U.S. Op. Atty. Gen. 514 (1899)

Case 4:16-cv-00036   Document 42-3   Filed in TXSD on 04/01/16   Page 52 of 59

22 U.S. Op. Atty. Gen. 514 (U.S.A.G.), 1899 WL 562

United States Attorney General

CUBA—CABLES.

June 15, 1899

The grounding of a cable upon the soil of the United States, with the intention of connecting our territory with foreign territory by that means, is a matter which is under the sovereign control of the Government, to be exercised by Congress, but in the absence of Congressional action to be regulated and controlled by the executive department of the Government.The grounding of a cable upon the island of Cuba to connect it with a foreign country can not be done and maintained in opposition to the law of the Government which exercises sovereign power in the island.The authorities of the United States have full power, in their discretion, to prevent by all necessary means the grounding of a cable intended to connect the island of Cuba with the United States or any other country, or to remove or disrupt any cable which may be laid in disregard of its instructions and against its will.

**1  The SECRETARY OF WAR.

SIR:

I am in receipt, by reference from you, of a letter from Mr. Mackay, president of the Commercial Cable Company of Cuba, dated May 31, 1899, asking for a reconsideration of the order made by the War Department to General Brooke on May 27, 1899, directing him to prevent the landing, by the Commercial Cable Company of Cuba, of a proposed cable in Cuba, to connect that island with the United States. You request my opinion as to the power of the War Department in the premises.

*515  On February 27, 1899, application was made by the Commercial Cable Company of the United States for permission to land a submarine cable in Cuba and Porto Rico, for the purpose of effecting cable communication between those islands and the United States. This application was by you referred to me for an opinion in respect to the power of the Secretary of War in the premises. Under date of March 25, 1899, I advised you fully upon the subject, and you are respectfully referred to that opinion and to what is said therein with reference to this subject. Among other things, I said in that communication that the opinion of this Department is and has been that the grounding of a cable upon the soil of the United States, with the intention of connecting our territory with foreign territory by that means, is a matter which is under the sovereign control of this Government, such control to be exercised by Congress, but in the absence of Congressional action to be regulated and controlled by the executive department of the Government.

The same principle is applicable to the island of Cuba, and the grounding of a cable upon the soil of that island, to connect it with a foreign country, can not be done and maintained in opposition to the will of the government which exercises sovereign power in the island. That power at the present time is the United States, and therefore the authorities of the United States have full power, in their discretion, to prevent by all necessary means the grounding of a cable intended to connect the island of Cuba with the United States or any other country. If the Commercial Cable Company of Cuba, in disregard of the instructions of the War Department and against its will, carries out its proclaimed purpose of landing its cable upon the island of Cuba to connect that island with the United States, you would be justified in using such force as is necessary to remove and disrupt it.

 **2  The foregoing sufficiently answers your request for my legal opinion as to your power in the premises. There are, however, some observations in the letter of Mr. Mackay which indicate on his part such a misunderstanding of private rights and public duties in connection with this subject that I think it may be useful to refer to some of them.

As tending to justify his intention of creating, either with  *516  or without permission, a new line of cable communication between Cuba and the United States, he adverts to the fact that the Western Union Telegraph Company has now and for years has had a monopoly of the cable communication between these countries.

This Department has not assumed to pass upon the validity of the exclusive right which the Western Union Telegraph Company and its leased companies claim. They have formally notified the authorities of the United States of their claim under a concession granted by Spain, alleged to continue for forty years and not yet expired. The mere fact that the Western Union Telegraph Company is enjoying, under a grant of exclusive right, what amounts to a monopoly is no reason of itself why it should be deprived of its concession. It is easy to say that monopolies are odious, but there are concessions which amount to monopolies which are lawful, and can not be disturbed except by a violation of public faith. The laying and operation of cables, especially a quarter of a century ago, were attended with great expense and risk, and it was a very common thing for different nations, including the United States, to grant exclusive concessions for a term of years to companies that would undertake to invest the necessary capital and carry on such enterprises. With the chances of success the concessionaries took also the hazard of failure and loss. If loss ensued, they bore it; if success and profit, it was deemed proper to secure for a limited period to those who had risked the venture the enjoyment of the fruits of their enterprise, and not to allow other competitors who had not shared the risk to come in and take a share of the benefits. With the wisdom of such arrangements for exclusive franchises the Executive Departments are not concerned. The grants are made in this country by Congress, and in other countries by the constituted sovereign authority. It is the duty of those who administer the Government to deal with the conditions as they find them, and to see that legal rights of every nature are respected.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

CUBA-CABLES, 22 U.S. Op. Atty. Gen. 514 (1899)

Case 4:16-cv-00036   Document 42-3   Filed in TXSD on 04/01/16   Page 54 of 59

The granting of such concessions and their operation have, in many instances, been of great advantage to commerce and to the countries from which the concessions were derived. **\*517** To show the prevalence of this policy among different nations, I quote the following list of exclusive cable rights granted by different sovereignties:

*England*.—Exclusive rights have been granted or approved for the establishment of cables between Great Britain, France, Belgium, Holland, Germany, Norway, Sweden, Denmark, Spain, and Portugal.

**\*\*3** *Newfoundland*.—An exclusive right for landing English cables was granted by Newfoundland and ratified by the British Government.

*France*.—An exclusive right for the establishment of an Atlantic cable connecting with the island of St. Pierre, off the coast of Nova Scotia. Preferential guaranties and subsidies for French telegraphic traffic to the French cables connecting with the United States, Haiti, and French West India Islands.

*Spain*.—Exclusive rights for the establishment of cables to the Canary Islands, Africa, and Brazil; also connecting Cuba with the United States, and Cuba with other West India Islands.

*Portugal*.—Exclusive rights for the cables connecting with Great Britain; also Brazil and the Azores.

*Brazil*.—Exclusive rights for connecting Brazil with the United States; also with Africa, Spain, and Portugal. Exclusive rights covering the whole coast of Brazil.

*Peru*.—Exclusive rights for cables northward from Peru.

*Ecuador*.—Exclusive rights covering the whole shore of Ecuador.

*United States of Colombia*.—Exclusive rights for the establishment of cables southward from the Isthmus of Panama.

*Mexico*.—Exclusive rights for the establishment of cables on the coast of the Gulf of Mexico and Pacific coast of Mexico.

*Japan*.—Exclusive rights for cables connecting Japan with China and Russia.

*The United States*.—The exclusive right for connecting the United States (coast of Florida) with Cuba and other West India Islands, by act of Congress approved May 5, 1866.

**\*518**  Concessions of this kind, which carry with them exclusive rights for a period of years, constitute property of which the concessionary can no more be deprived arbitrarily and without lawful reason than it can be deprived of its personal tangible assets. In a case in the Supreme Court of the United States (1 Wall., 352) Mr. Justice Field said:

'The United States have desired to act as a great nation, not seeking, in extending their authority over the ceded country, to enforce forfeitures, but to afford protection and security to all just rights which could have been claimed from the Government they superseded.'

If, therefore, the Western Union Telegraph Company has an exclusive grant applicable to Cuba for cable rights, which grant has not expired, it would be violative of all principles of justice to destroy its exclusive right by granting competing privileges to another company.

It is suggested, however, in Mr. Mackay's letter, that the grant which the Western Union Telegraph Company now holds, by lease or assignment, was obtained by fraud practiced on the Government of Spain, and that for that reason its grant is void.

Such an allegation can not be fairly and justly tried upon a proceeding like this. Neither the War Department nor the Department of Justice has power to summon witnesses or to give a judgment upon this question. It is essentially a question for judicial examination and decision, and to determine such a matter in a proceeding of this kind would not only be irregular, but contrary to the ordinary rules and procedure practiced in such cases. Vested rights which are property ought not to be taken from anyone, even upon charges of fraud, except by due process of law. Executive action by the War Department applied to subjects like this is not due process of law.

**\*\*4**  Mr. Mackay further submits that 'the tremendous power of the Government should not be exercised against us.' It is the function of the Government to prevent, so far as possible, all infringement of the vested rights of others. Mr. Mackay, through his company, proposes to set up a competitive cable line, which he concedes will greatly injure the business of the Western Union Company, and although  **\*519**  the latter company produces a grant which, on its face, gives it an exclusive right for a period which has not expired, he requests this Government to stand idly by while he does, with the acquiescence of the United States, the very thing which the Government of Spain, our predecessor in the sovereignty of Cuba, solemnly agreed not to do or permit to be done.

I do not think that controversies as to grants and franchises derived from Spain, but exercisable within the island of Cuba or other islands derived by the United States from Spain, ought to be precipitated to a decision in the present unsettled condition that prevails in those islands. It is better to preserve, in all cases of doubt and difficulty, the present status until the full restoration of the

civil régime and the establishment of permanent governments under which the rights of all can be duly and deliberately determined.

Very respectfully,

JOHN W. GRIGGS.

22 U.S. Op. Atty. Gen. 514 (U.S.A.G.), 1899 WL 562

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 6

Wireless Telegraphy-International Agreement,
24 Op. Att'y Gen. 100 (1902)

WIRELESS TELEGRAPHY—INTERNATIONAL AGREEMENT., 24 U.S. Op. Atty Gen....

Case 4:16-cv-00036   Document 42-2   Filed in TXSD on 04/01/16   Page 58 of 59

24 U.S. Op. Atty. Gen. 100 (U.S.A.G.), 1902 WL 789

United States Attorney General

WIRELESS TELEGRAPHY—INTERNATIONAL AGREEMENT.

August 18, 1902

The United States have power, either alone or in cooperation with other countries, to impose conditions upon the operation of any wireless telegraph system which conveys messages to or from the United States.Such transmission is commerce, and the power of the United States to regulate commerce and to preserve the territorial integrity of this country does not depend upon the means employed but upon the end attained.

 **1  The SECRETARY OF STATE.

SIR:

I have the honor to acknowledge the receipt of your letter of the 18th ultimo, transmitting 'copy of a confidential memorandum from the general embassy suggesting an international arrangement to prevent the English Marconi **101  Company from obtaining a monopoly of wireless telegraphy,' and also a copy of your reply, summarizing the answer of the Treasury, War, and Navy Departments to the proposal.

You ask for my opinion 'on the legal questions involved, so far as this Government is concerned,' and for 'legal suggestions as to the regulations proposed to be submitted to a preliminary conference.'

The power of the United States, either alone or in cooperation with other countries, to impose conditions upon the operation of any wireless telegraph system which conveys messages to or from the United States is perfectly clear. Such transmission has been repeatedly held by the Supreme Court to be commerce, and, therefore, within the plenary and paramount authority of the Federal Government to regulate, whether such commerce be foreign or interstate.

Apart from this specific clause of the Constitution, I may refer you to the carefully considered opinion of this Department (22 Opin., 13), in which the inherent authority of the President to control the landing of foreign submarine cables on the shores of the United States was set forth. The conclusions therein reached are not affected by the means employed to transmit messages, for whether transmitted by the ordinary telegraph wires, by submarine cables, or by any of the wireless systems, the power of the Government to regulate commerce and to preserve the territorial integrity of this country depends not upon the means employed but upon the end attained.

Case 4:16-cv-00036 Document 42-2 Filed in TXSD on 04/01/16 Page 59 of 59

Whether the United States should participate in an international conference to regulate wireless telegraphy is an administrative question upon which I am not called to express an opinion. If your Department should reach the conclusion to participate in such a conference, and desires to formulate propositions for its consideration in behalf of the United States, I am willing, if desired, to express an opinion, upon their submission to me, as to their legal sufficiency.

Respectfully,

JAMES M. BECK,
*Acting Attorney-General.*

24 U.S. Op. Atty. Gen. 100 (U.S.A.G.), 1902 WL 789

---

**End of Document**    © 2016 Thomson Reuters. No claim to original U.S. Government Works.