# EXHIBIT 7

Diversion of Water from Niagara River,
30 Op. Att'y Gen. 217 (1913)

DIVERSION OF WATER FROM NIAGARA RIVER..., 30 U.S. Op. Atty. Gen. 217 (1913)

Case 4:16-cv-00036 Document 42-4 Filed in TXSD on 04/01/16 Page 2 of 39

30 U.S. Op. Atty. Gen. 217 (U.S.A.G.), 1913 WL 685

United States Attorney General

DIVERSION OF WATER FROM NIAGARA RIVER.

August 14, 1913.

Any diversion of water from the Niagara River on the American side in such quantity as substantially to interfere with the navigable capacity of that river or the connected lakes, or which in any substantial degree alters or modifies the course, location, or channel of either of those waterways, is prohibited by section 10 of the river and harbor act of March 3, 1899 (30 Stat. 1151), unless in advance recommended by the Chief of Engineers and authorized by the Secretary of War.Under the treaty proclaimed May 13, 1910 (36 Stat. 2448), between the United States and Great Britain relating to boundary waters between the United States and Canada, the authority of the President is not limited to the prevention of interference with navigation, but extends to the regulation or supervision of diversions for power purposes within a daily maximum, in the aggregate, of 20,000 cubic feet of water per second, and to the prevention of any diversion whatever for such purposes in excess of that maximum.In the absence of legislation by Congress, the President may not only prohibit the importation of electrical power to this country from Canada, but may also grant permission therefor subject to such conditions as to him may seem good.

**1** To THE PRESIDENT.

SIR:

I have the honor to reply to your letter of June 19, 1913, desiring my opinion on certain questions concerning the Niagara River.

You inquire as to your authority under any existing act of Congress or under Article V of the treaty proclaimed May 13, 1910 (36 Stat. 2448), between Great Britain and the United States to control the amount and manner of diversions of water for power purposes on the American side of the river; and whether under the treaty you may restrict the quantity to be diverted for such purposes to less than the maximum limit authorized therein.

Aside from the treaty, the only provision of existing law applicable to the case is section 10 of the river and habor act approved March 3, 1899 (30 Stat. 1121, 1151), which provides that—

> ‘* * * it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits **\*218** of any breakwater, or of the channel of any navigable water of the United States, unless

DIVERSION OF WATER FROM NIAGARA RIVER..., 30 U.S. Op. Atty. Gen. 217 (1915)

Case 4:16-cv-00036   Document 42-4   Filed in TXSD on 04/01/16   Page 3 of 39

the work has been recommended by the Chief of Engineers and authorized by the Secretary of War prior to beginning the same.'

I am of opinion that under this law any diversion of water from the Niagara River in such quantity as substantially to interfere with the navigable capacity of that river or the connected lakes, or which in any substantial degree alters or modifies the course, location, or channel of either of those waterways, is prohibited unless in advance recommended by the Chief of Engineers and authorized by the Secretary of War. Whether any particular diversion amounts to a substantial interference with navigation is a question of fact to be determined in the first instance by the officials named and while their conclusion is doubtless not final, yet it would certainly be very persuasive if appealed from.

**2** Any such prohibited diversions that may be discovered should be reported to this Department, whose duty it will be to stop and prevent them by injunction or by criminal prosecution under section 12 of the same act.

Under the treaty your authority is not limited to the prevention of interference with navigation, but extends to the regulation or supervision of diversions for power purposes within a daily maximum, in the aggregate, of 20,000 cubic feet of water per second, and to the prevention of any diversion whatever for such purposes in excess of that maximum.

The treaty provision is as follows:

'ARTICLE V.

'The High Contracting Parties agree that it is expedient to limit the diversion of waters from the Niagara River so that the level of Lake Erie and the flow of the stream shall not be appreciably affected. It is the desire of both Parties to accomplish this object with the least possible injury to investments which have already been made in the construction of power plants on the United States side of the river under grants of authority from the State of New York, and on the Canadian side of the river under **\*219** licenses authorized by the Dominion of Canada and the Province of Ontario.

'So long as this treaty shall remain in force, no diversion of the waters of the Niagara river above the Falls from the natural course and stream thereof shall be permitted except for the purposes and to the extent hereinafter provided.

'The United States may authorize and permit the diversion within the State of New York of the waters of said river above the Falls of Niagara, for power purposes, not exceeding in the aggregate a daily diversion at the rate of twenty thousand cubic feet of water per second.

DIVERSION OF WATER FROM NIAGARA RIVER..., 30 U.S. Op. Atty. Gen. 217 (1913)

Case 4:16-cv-00036 Document 42-4 Filed in TXSD on 04/01/16 Page 4 of 39

'The United Kingdom, by the Dominion of Canada, or the Province of Ontario, may authorize and permit the diversion within the Province of Ontario of the waters of said river above the Falls of Niagara, for power purposes, not exceeding in the aggregate a daily diversion at the rate of thirty-six thousand cubic feet of water per second.

'The prohibitions of this article shall not apply to the diversion of water for sanitary or domestic purposes, or for the service of canals for the purposes of navigation.'

That the subject matter of this treaty, namely, the regulation of the boundary waters between this country and Canada, being, by its very nature, beyond the competency either of Congress or the States, is one peculiarly within the treaty making power as always been understood, can not be doubted (22 Op. 214). Accordingly, the treaty is part of the 'supreme law of the land' and has the same force and effect and is to be carried out in the same manner as an act of Congress expressed in like terms. (*Ware* v. *Hylton*, 3 Dall. 199, 277, 281.) As said by Mr. Justice Miller in the *Head Money Cases*, 112 U. S. 580, 598, 599: '* * * A treaty, then, is a law of the land as an act of Congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined. And when such rights are of a nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decision for the case before it as it would to a statute.'

 **3** It is true that in some cases, owing to the fact that the treaty provides for or contemplates some further action by **\*220** the legislative department of the Government an act of Congress may be necessary before the provisions of the treaty can be effectively carried out (*Foster* v. *Neilson*, 2 Pet. 253; *Turner* v. *American Baptist Missionary Union*, 5 McLean, 344, 347), but in my judgment the provisions of this treaty relating to the diversion of water from the Niagara River were intended to operate presently and additional legislation is not necessary. An appropriate act of Congress might merely repeat the language of the treaty and certainly it would be your duty to enforce by all appropriate means an act of Congress drawn in these terms. I can see no valid distinction between the provision now in question and those provisions of other treaties which have been held by high authority to be self-executing. (*United States* v. *Percheman*, 7 Pet. 51, Marshall, C. J.; *United States* v. *43 Gallons of Whiskey*, 93 U. S. 188, 196; *The British Prisoners*, 1 Woodbury & Minot 66; 4 Op. 201, 209, 210; *Geofroy* v. *Riggs*, 133 U. S. 258.)

In thus executing the treaty you may use any of the agencies ordinarily adopted for the execution of the laws of the United States. You may invoke the aid of the courts, or you may employ directly the administrative officers of the United States, or the military forces thereof. As was said by Mr., afterwards Chief Justice, Marshall, in arguing the case of Jonathan Robbins in the House of Representatives, Annals of Congress, Sixth Congress, 614:

Case 4:16-cv-00036   Document 42-4   Filed in TXSD on 04/01/16   Page 5 of 39

'The treaty, which is a law, enjoins the performance of a particular object. The person who is to perform this object is marked out by the Constitution, since the person is named who conducts the foreign intercourse, and is to take care that the laws be faithfully executed. The means by which it is to be performed, the force of the nation, are in the hands of this person. Ought not this person to perform the object, although the particular mode of using the means has not been prescribed? Congress, unquestionably, may prescribe the mode, and Congress may devolve on others the whole execution of the contract; but, till this be done, it seems the duty of the executive department to execute the contract by any means it possesses.'

I am of the opinion, therefore, that it is your duty to interfere with any diversion within the State of New York **\*221** of the waters of the Niagara River above the Falls of Niagara, for power purposes, exceeding a daily maximum, in the aggregate, of 20,000 cubic feet of water per second. If that maximum be not exceeded, the terms of the treaty are, as between the high contracting parties, satisfied. The stipulation, however, that 'the United States may authorize and permit' the diversion of waters to that extent, clearly places the subject, in the absence of legislation by Congress to the contrary, under your supervision, to the end that the maximum may not be exceeded.

 **\*\*4**  You further inquire whether under existing law you have any authority to control the importation into this country from Canada of electric current generated by water power from the Niagara River.

In my opinion the lapse of the Burton Act (34 Stat. 626), which contained the only direct legislation regarding the transmission of electricity from Canada, has left you free to control the matter under your plenary power to prevent any physical connection (not authorized by Congress) between any foreign country and the United States.

The executive power (subject, of course, to affirmative control by Congress) has been recognized as controlling the laying of cables between the United States and foreign countries (22 Op. 13, 408, 514; 29 Op. 579, 583), and in the only case in court upon the subject *United States* v. *La Compagnie Francaise des Cables Telegraphiques*, 77 Fed. 496) Judge Lacombe expressed as follows the same opinion, though in that particular case he refused a *preliminary* injunction on the ground that the cable had already been laid.

'It is thought that the main proposition advanced by complainant's counsel is a sound one, and that, without the consent of the General Government, no one, alien or native, has any right to establish a physical connection between the shores of this country and that of any foreign nation. Such consent may be implied as well as expressed, and whether it shall be granted or refused is a political question, which, in the absence of congressional action, would seem to fall within the province of the Executive to decide. As was intimated upon the argument, it is further thought **\*222**  that the Executive may effectually enforce its decision without the aid of the courts. \* \* \*'

The principle has been acted upon frequently in our dealings with foreign nations (*Moore Dig. of International Law*, Vol. II, pp. 463, 466), and may now be regarded as firmly established.

These authorities are applicable to the present subject, and in the absence of legislation by Congress you may not only prohibit the importation of electrical power to this country from Canada, but may also grant permission therefor subject to such conditions as to you may seem good.
 Very respectfully,

J. C. McREYNOLDS.

30 U.S. Op. Atty. Gen. 217 (U.S.A.G.), 1913 WL 685

---

**End of Document**
© 2016 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 8

Granting of License for the Construction of a Gas Pipeline,
38 Op. Att'y Gen. 163 (1935)

GRANTING OF LICENSE FOR THE CONSTRUCTION OF ..., 38 U.S. Op. Atty. Gen....

Case 4:16-cv-00036   Document 42-4   Filed in TXSD on 04/01/16   Page 8 of 39

38 U.S. Op. Atty. Gen. 163 (U.S.A.G.), 1935 WL 1371

United States Attorney General

GRANTING OF LICENSE FOR THE CONSTRUCTION OF A GAS PIPE LINE

January 11, 1935.

The President may grant a license for the construction and maintenance of a pipe line under the Rio Grande for transportation of gas from gas fields in Texas to Monterey, Mexico.

**1**  To the PRESIDENT.

SIR:

I have your memorandum of January 4 inclosing a letter of January 3 from the Secretary of State which transmitted for your approval a form of license for the construction and maintenance of a pipe line under the Rio Grande between Roma and San Pedro for the purpose of transporting gas from the gas fields of Texas to the City of Monterey, Mexico.

In appears that the Secretary of State has handled the matter with the Secretary of War and that the latter reports that there is no objection insofar as concerns the public rights of navigation. Members of my staff have also conferred with the State Department and the War Department and have been informed that the granting of such licenses in the form submitted is common practice. I have found **164** no statute relating particularly to pipe lines, but the practice in such cases appears to be based upon the principle stated in the Attorney General's opinion of January 18, 1898 (22 Op. 13, 27), that in the absence of legislative enactment the President may control the landing of submarine cables, either preventing such landing or permitting it 'on conditions which will protect the interests of this Government and its citizens.' I do not doubt, particularly in view of the practice which has prevailed, that the principle is as much applicable to pipe lines as to cables.

It is therefore my opinion that there is no legal objection to the granting of the proposed license. The documents submitted by you are returned herewith.

 Respectfully,

HOMER CUMMINGS.

38 U.S. Op. Atty. Gen. 163 (U.S.A.G.), 1935 WL 1371

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 9

9 Marjorie M. Whiteman, Digest of International Law 917-32 (1968)

# DIGEST OF INTERNATIONAL LAW



*prepared by and under the direction of*

**Marjorie M. Whiteman,** B.A., LL.B., M.P.L., J.S.D., LL.D. (HON.)

*Assistant Legal Adviser, the Department of State*

VOLUME

*9*



MARITIME NA
  Nationalit
  Exercise c
    Penal
    Anch
  Seamen (§
  Arrival or
    Entra
    Form:
    Stowa
    Servic
    Cleara
  Maritime
    Safety
    Loadli
    Rules
    Ice Pa
    Gener:
    Salvag
  Maritime (
    Ocean
    Cabot:
    Limita
    Regula
    Shippi
    Cargo
  Nuclear-Po

AVIATION
  Airspace . .
    Soverei
    Right c
    Interna
    Airspac
    Airspac
    Certain
      and
  Public Air I
    Chicago
      Ba
      Int
      Cal
      Na
      Int
      Int

**DEPARTMENT OF STATE PUBLICATION 8419**

Released December 1968

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, D.C. 20402 - Price $6.75

"(b) Sharing with non-TAT correspondents should be equitable and non-discriminatory;

"(c) The proposal should be designed to enhance rather than hinder opportunities for the opening of circuits with the competing United States carriers; and

"(d) The costs to be shared should be easy to compute, easy to understand and adaptable to changing situations, or extension to new points.

"It is noted that the TAT countries do not propose to make uniform charges per teleprinter circuit but instead impose a premium for the first four circuits which they lease to each non-TAT country. Under these circumstances, it would appear that the higher charges made with respect to the first four circuits are designed to compensate for the risk of idle capacity. This then, one might fairly conclude is the evaluation made by the TAT countries of the differences in costs which should be borne by the non-TAT countries which do not undertake to devote a full voice channel to teleprinter services. . . .

.           .           .           .           .           .           .

"It is recognized that in some instances certain of the American carriers may be required to reach particular European countries through indirect routes because they do not operate circuits to the TAT country which has a cable terminal near the hinterland European country involved. Under such circumstances, it appears that what has been said herein before should be modified to permit the American carrier to absorb any additional transit charges applicable to the indirect route. However, in order to obviate any opportunity for claims of unfair competitive advantage, it would be expected that any such proposal will be submitted to the Commission for consideration and comment before it is reduced to a final agreed-upon contract."

Acting Secretary of the Federal Communications Commission (Ben Waple) to American Cable & Radio Corporation and the Western Union Telegraph Company, letter, July 15, 1960, MS. Federal Communications Commission files.

Except with respect to the issuance of permits regarding facilities at the borders of the United States for the transmission of electric energy, or for the importation and exportation of natural gas (see *post*, p. 923), and the issuance and revocation of licenses to land submarine cables in the United States (see *post*, p. 918), the Secretary of State is empowered under Executive Order No. 11423 of August 16, 1968, to receive all applications for permits for the construction, connection, operation, or maintenance of such other facilities at the borders of the United States as "(i) pipelines, conveyor belts, and similar facilities for the exportation or importation of petroleum,

*Permits for facilities on U.S. borders*

918                           COMMUNICATIONS, TRANSPORTATION AND TRAVEL

petroleum products, coal, minerals, or other products to or from a foreign country; (ii) facilities for the exportation or importation of water or sewage to or from a foreign country; (iii) monorails, aerial cable cars, aerial tramways and similar facilities for the transportation of persons or things, or both, to or from a foreign country; and (iv) bridges, to the extent that congressional authorization is not required".

The Secretary of State is authorized to issue or deny such permits after securing the views of the Federal officers specified in the order. In the event of disagreement among those officers, the application would be presented to the President of the United States for final action.

The Secretary of State may provide for the publication in the *Federal Register* of notice of receipt of applications, for receipt of public comments on applications, and for publication in the *Federal Register* of notice of issuance or denial of applications.

33 *Fed. Reg.* 11741.

**Transfer of cable landing license**

On October 4, 1961, the Federal Communications Commission, acting pursuant to Executive Order No. 10530, dated May 10, 1954 (delegating to the Federal Communications Commission certain Presidential functions relating to submarine cable landing licenses), approved the transfer to the British Columbia Telephone Company of the rights as set forth in the Cable Landing License issued to Point Roberts and Gulf Telephone Company on November 22, 1948, and issued a license to the British Columbia Telephone Company, a corporation organized under the laws of Canada, to land and operate the two submarine cables.

FCC 61–1168, MS. Federal Communications Commission file. For the text of Executive Order No. 10530, May 10, 1954, see 19 *Fed. Reg.* 2709. As to the granting on August 27, 1947, to All America Cables and Radio, Inc., of an application for the transfer of a license originally granted to a subsidiary, the Commercial Cable Company of Cuba (later known as the Cuban All America Cables, Inc.), see Vice Chairman, Federal Communications Commission (Walker), to President Truman, letter, Aug. 5, 1947, MS. Department of State, file 811.7337/8–547; Acting Secretary of State (Lovett) to Chairman, Federal Communications Commission (Denny), letter, Sept. 5, 1947, *ibid.*

The Point Roberts and Gulf Telephone Company by application filed with the Federal Communications Commission on June 4, 1948, requested that its Presidential license dated May 24, 1929, to land at Point Roberts, Whatcom County, Washington, and operate a submarine cable extending from Point Roberts, Washington, to the Interna-

TELECOMMUNICATIONS                                        919

tional Boundary Line in Georgia Strait, there connecting with a sub-  **Modification of cable landing license**
marine cable of the British Columbia Telephone Company, be modified
so as to permit the landing and operation of a second cable paral-
leling the existing cable.   The Commission, having been advised by
the Secretaries of State, Army, Navy, and Interior that there was
no objection to the proposed draft license which revoked the former
license and authorized the landing and operation of the existing
cable and the additional proposed cable, recommended to the Presi-
dent that the license be issued. The President after receiving the Secre-
tary of State's endorsement signed the license on November 22, 1948.

> The Chairman, Federal Communications Commission (Coy) to Presi-
> dent Truman, letter, Oct. 21, 1948, MS. Department of State, file 811.7342/
> 10–2148; the Acting Chairman, Federal Communications Commission
> (Walker), to the Secretary of State (Marshall), Dec. 20, 1948, *ibid.*/12–
> 2048.  For a similar modification of license granted Cuban American Tele-
> phone and Telegraph Company on October 25, 1949, see the Acting Chairman,
> Federal Communications Commission (Walker), to President Truman,
> letter, Sept. 21, 1949, MS. Department of State, file 811.7337 P 84/9–2149;
> the Chairman, Federal Communications Commission (Coy) to the Secretary
> of State (Acheson), letter, Nov. 16, 1949, *ibid.*/11–1649.

The Commercial Cable Company and All America Cables and  **Joint cable license**
Radio, Inc., by application dated July 24, 1945, and amended Janu-
ary 8, 1947, requested the issuance of a joint Presidential license
authorizing Commercial to land, and AACR to operate, the portion
of cable connecting New York with Habana, Cuba, at that time
owned by Commercial and leased to AACR. The cable had been laid
under authority of a license issued to the Postal Telegraph-Cable
Company, dated February 21, 1923, and transferred to Commercial
with Presidential consent dated March 11, 1939.  It extended from
Far Rockaway, N.Y., to a point 151 knots off the coast of Habana,
Cuba, where it connected with a submarine cable owned and oper-
ated by AACR extending to Habana.

The Federal Communications Commission, in its letter of Decem-
ber 22, 1948, to the President recommending his approval of the
license, commented:

> "The request for a new license issued jointly to the above
> companies was made by them for the purpose of complying
> with the opinion of the Department of State expressed in its
> letter of June 29, 1945, addressed to the Chairman of the Fed-
> eral Communications Commission in reply to an inquiry from
> this Commission, to the effect that AACR should apply for a
> license also if it is to continue operation of the cable under
> lease from Commercial."

The Commission informed the President that there was no objection to the issuance of the license on the part of the Secretaries of State, Army, Navy, and Interior. Following endorsement of the proposed license by the Secretary of State, the President issued the license February 1, 1949, which authorized the Commercial Cable Company to land and the All America Cables and Radio, Inc., to operate a submarine cable at Far Rockaway, N.Y.

> The Acting Chairman, Federal Communications Commission (Walker) to President Truman, letter, Dec. 22, 1948, MS. Department of State, file 811.7337 P 84/12–2248; the Chairman, Federal Communications Commission (Coy) to the Secretary of State (Acheson), letter, Apr. 15, 1949, *ibid.*/4–1549.

Other physical connections—

"Specific examples of Presidential Permits for other than submarine cables are:

"1. Electric power line across the St. Lawrence River issued July 7, 1941.

"2. Aerial railway across the Niagara River issued July 22, 1915.

"3. Oil pipeline under the Saint Clair River issued June 10, 1918.

"4. Pipeline under the Detroit River issued February 5, 1919.

"5. Telephone and telegraph line between Key West, Florida, and Habana, Cuba, issued December 11, 1920.

"6. Electric power line across the Rio Grande issued May 26, 1931.

"7. Oil pipeline under the Saint Clair River issued April 28, 1953.

"8. Oil pipeline under the Rio Grande issued July 30, 1953.

"9. Water supply intake tunnel under Detroit River issued July 3, 1957.

"10. Aerial tramway across the United States-Mexican border (Tijuana to San Ysidro), May 5, 1960.

"11. Over-land oil pipeline from Antler, North Dakota, to Cromer, Manitoba, issued December 4, 1961 [amended July 13, 1962].

"12. Crude oil pipeline under the Niagara River issued October 18, 1962.

"13. Crude condensate pipeline from Cut Bank, Montana, to Alberta, Canada, issued October 18, 1962.

"14. Crude oil pipeline from a point near North Troy, Vermont, to a point in Quebec, Canada, issued January 13, 1965.

"15. Aerial Cable car across the Detroit River (Detroit, Michigan, to Windsor, Ontario, Canada), issued January 13, 1965 [amended October 19, 1965, to reflect change in location of facilities in Detroit].

"[16. Sawmill pipeline from International Falls, Minnesota, to a point near Fort Frances, Ontario, Canada, issued January 10, 1966.

"[17. Crude oil pipeline from a point in Toole County, Montana, to a point in Alberta, Canada, issued April 10, 1966. (31 *Fed. Reg.* 6204.)]"

.     .     .     .     .     .

"The right of the President to issue permits or licenses regulating physical connections between the United States and a foreign country was raised by President Grant in 1869, when the French Cable Company sought to land a cable at Duxbury, Massachusetts. The President took the position that in the absence of Congressional authorization for the landing of the cable, it was his duty to prevent the landing of such cable except upon the terms and conditions which he deemed it necessary and advisable to impose.

"The matter arose again in 1897. The Attorney General in an opinion dated January 18, 1898 (22 Ops. Atty. Gen. 13), held that the President has the power, in the absence of legislative enactment, to control the landing of foreign submarine cables. A similar opinion was rendered on June 15, 1899 (22 O.A.G. 514) and on August 18, 1902 (24 O.A.G. 100).

"From the time when President Grant raised the question to the present time, except during the second term of President Cleveland, the President has issued permits or licenses regulating physical connections between the United States and foreign countries. Hackworth's 'Digest of International Law', Vol. IV, pp. 247 to 266.

"Pursuant to a request dated September 29, 1922, for a formal statement for the guidance of the Department of State in dealing with questions concerning the construction of telegraph and telephone lines, power transmission lines, pipe lines and other agencies connecting the United States with foreign countries, the Attorney General in his reply of November 15, 1922, supported the views of prior Attorneys General that the President has the authority to issue permits for such connections. MS. Department of State, File 811.73 W 52/112. The Department of State in its letter of September 29, 1922 had made reference to the Attorney General's opinion of August 14, 1913, in which it was stated that the President's authority in this matter was based on his '. . . plenary power to prevent any physical connection (not authorized by Congress) between any foreign country and the United States' (30 OAG 217, 221).

"The Attorney General rendered an opinion on January 11, 1935, holding that the President might issue a permit for the construction of a gas pipe line under the Rio Grande between Roma, Texas, and San Pedro, Mexico. (38 O.A.G. 163)"

"Presidential Authority to Regulate Physical Connections Between the United States and a Foreign Country and Delegations thereof to FPC and FCC", memorandum prepared in the Office of the Legal Adviser

(originally prepared Dec. 2, 1953, by Assistant Legal Adviser Frederick M. Diven, brought up to date Oct. 22, 1957, by Attorney Adviser Benjamin H. Read, and subsequently on Jan. 15, 1965, by Assistant Legal Adviser for European Affairs (Reis) (MS. Department of State, file POL 33 CAN–US/RA corrected as to fourth paragraph Aug. 30, 1961, and revised again as of June 1967 by Attorney Adviser Julia W. Willis)), MS. Department of State, file 611.00321/10–2257.

In connection with the Boise Cascade Corporation's application for a sawmill pipeline connection across the United States-Canadian border (item 16 above), the Office of the Legal Adviser of the Department of State in a memorandum of December 23, 1965, to Lee C. White, Special Counsel to the President, stated in part as follows:

"Boise Cascade's request for a permit to construct and operate a sawmill pipeline between the U.S. and Canada in the Fort Frances area is routine.

"2. *Presidential Discretion.* The President is not required to grant a request for a permit. He may withhold a permit or impose appropriate terms and conditions. There is no legislation nor are there any judicial decisions which inhibit his freedom of action.

"The State Department processes a request for a permit by (1) publishing a notice of the request in the Federal Register [Publication in the Federal Register is a new practice which we intend to follow in the future. We did not publish Boise Cascade's request.], (2) seeking the views of the Governor of the particular state and interested international bodies (e.g., the U.S.-Canada International Joint Commission), (3) obtaining approval of the Executive agencies involved and (4) forwarding the request to the President for action. Presidents appear to have granted cleared requests as a matter of routine. The only exceptions to State Department handling relate to electric and natural gas interconnections and submarine cables. President Eisenhower delegated authority to issue permits for electric and natural gas interconnections to the Federal Power Commission, subject to approval by State and Defense. President Eisenhower also delegated authority to issue permits for submarine cables to the Federal Communications Commission, subject to approval by State. [*Ante*, p. 917.]

.          .          .          .          .          .

"3. *Canadian Requirements.* The effectiveness of a U.S. Presidential permit is by its terms conditioned upon receipt by the applicant of the Canadian Government's approval.

"Canada requires a license for trans-border interconnections relating to oil, gas and electric power. In the case of oil or gas lines, the Provincial authorities must initially approve the export of the resource, after which the National Energy Board may recommend to the Governor in Council (the Canadian executive) the licensing of the interconnection. The Governor in Council may then authorize the Board to approve the request. In the case of

electric power interconnections, a license must be obtained from the National Energy Board."

The Assistant Legal Adviser for European Affairs (Reis) to Special Counsel to the President (White), memorandum, Dec. 23, 1965, MS. Department of State, file POL 33 CAN–US/RA.

Section 202(e) of the Public Utility Holding Company Act of 1935, amending the Federal Water Power Act of June 10, 1920 (41 Stat. 1063), requires that any person who shall transmit any electric energy from the United States to a foreign country first secure an order of the Federal Power Commission authorizing it to do so, and that the Commission shall issue such order unless "it finds that the proposed transmission would impair the sufficiency of electric supply within the United States or would impede or tend to impede the coordination in the public interest of facilities subject to the jurisdiction of the Commission".   (49 Stat. 847, 849; 16 U.S.C. § 824a (e).)   *Electric energy*

By the terms of section 3 of the Natural Gas Act of June 21, 1938, any person who "shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country" is required to first secure an order of the Federal Power Commission authorizing it to do so.  Such application shall   *Natural gas*   be issued unless the Commission finds that the proposed exportation or importation will not be consistent with the public interest. (52 Stat. 821, 822; 15 U.S.C. § 717b.)

By Executive Order No. 10485, dated September 3, 1953, the Federal Power Commission was empowered to receive all applications for permits for the construction, operation, maintenance, or connection, at the borders of the United States, of facilities for the transmission of electric energy between the United States and a foreign country and of facilities for the exportation or importation of natural gas to or from a foreign country.  After specifying that favorable recommendations of the Secretaries of State and Defense must be obtained, the order provides that in any case wherein the Federal Power Commission, the Secretary of State, and the Secretary of Defense cannot agree as to whether or not to issue a permit, the President shall make the final decision.  (18 *Fed. Reg.* 5397.)

For regulations regarding application for authorization as well as the construction, operation, maintenance, or connection at an international boundary of facilities for the exportation or importation of natural gas, see 18 CFR 153 :1–12 (1968).  For the same regarding facilities for the transmission of electric energy, see 18 CFR 32 : 30–52 (1968).

Albo Rios y Capitanachi, a partnership composed of two Mexican citizens, filed an application on June 24, 1948, with the Federal Com-

License for
construction
of telephone
line

munications Commission requesting a Presidential license for the construction of a telephone line across the Rio Grande River near Presidio, Texas, and connecting in Texas with a line of the Southwestern Bell Telephone Company, for exchange service.

The Federal Communications Commission, in a letter of December 22, 1948, requesting the Department of State's views, discussed the question of the necessity of a Presidential license as follows:

"At the outset a question is presented as to whether the President should entertain the application. It does not appear that the telephone line would constitute a 'submarine cable' for which a license may be granted or denied by the President under the act entitled, 'An Act relating to the landing and operation of submarine cables in the United States,' 47 USCA, Section 34–39. However, the project involves a physical connection with a foreign country and would appear to be subject to the consent of the Government of the United States although not regulated by specific legislation. The Acting Attorney General in advising the Secretary of State with respect to the President's power to control the landing of foreign submarine cables prior to the passage of the cable landing license act in 1921, stated in an opinion, dated January 18, 1898, that the President might, in the absence of legislative enactment to control the landing of foreign submarine cables, 'prevent the landing, if the rights intrusted to his care so demand, or permit it on conditions which will protect the interests of this Government and its citizens.' *22 Opinions of Attorneys General 13, 27.* In reply to an inquiry in connection with a case similar to that under consideration here, the Department of State by letter, dated April 22, 1926, advised the American Telephone and Telegraph Company that a Presidential permit would appear to be necessary for the laying of cables to be attached to the high level fixed bridge across the Niagara River since the project involved a physical connection with a foreign country. Subsequently, an application was filed and a license granted to the New York Telephone Company for the landing, operation, and maintenance of such cables, dated August 16, 1926. On the other hand, an examination of information in the Commission's files discloses that numerous telephone and telegraph lines have been constructed across the Canadian and Mexican borders for which it appears no Presidential permit has ever been obtained; and, in the absence of some specific cause, we see no reason to insist that permits now be secured for those lines.

"With respect to the instant application, it would appear from the above that the President has authority, even in the absence of specific legislation, to entertain the application and to grant or deny authority to lay the cable as requested. Accordingly, it is our present opinion that the Commission with the approval of the Department of State should make a recommendation to

the President for a grant or denial of the application upon
its merits. . . ."

The Federal Communications Commission informed the President
in its letter of July 20, 1949, recommending approval of the license,
that the State, Army, and Interior Departments had advised by
letters dated May 9, March 11, and January 3, 1949, respectively,
that they had no objections to the granting of an appropriate
license; that the Department of Justice, by letter dated June 16,
1949, had advised that nothing was revealed in the details of the
proposal to indicate that considerations of national security require
a denial of the application at the present time but that a reconsidera-
tion of the use being made of any license granted would, of course,
be desirable in the event of a national emergency; and that the
Navy Department, by letter dated January 12, 1949, stated that it
perceived no objection to granting the license, but that it believed
that the license should provide that the private line not be used by
anyone other than the applicant company.  Reporting its refusal to
accept the Navy Department's suggestion, the Commission explained:

> ". . . In view of the fact that the licensees may not operate
> the line as common carriers, the use of the line will be restricted
> to them and such persons as they may permit to use it without
> compensation.  It is not believed that the limited use made of
> the line under these circumstances would impair national se-
> curity, particularly since the line will always be operated
> through the Southwestern Bell Telephone Company exchange
> and will be subject to closure or control by the President under
> Section 606 (d) of the Communications Act of 1934, as amended,
> upon proclamation that there exists a state or threat of war
> involving the United States."

Following endorsement of the proposed license by the Secretary
of State, the President signed the license on September 9, 1949, au-
thorizing Alfredo Albo Rios and Severo Santiago Capitanachi,
doing business as a partnership under the name of Albo Rios y
Capitanachi, to construct and operate a private telephone line at
Presidio, Texas, extending across the Rio Grande River to Ojinaga,
Chihuahua, Mexico.

The Acting Chairman, Federal Communications Commission (Walker)
to the Secretary of State (Marshall), letter, Dec. 22, 1948, MS. Depart-
ment of State, file 811.7512/12–2248; the Acting Chairman, Federal Com-
munications Commission (Walker) to President Truman, letter, July 20,
1949, *ibid.*/7–2049; the Chairman, Federal Communications Commission
(Coy) to the Secretary of State (Acheson), letter, Sept. 26, 1949, *ibid.*/
9–2649.

926                    COMMUNICATIONS, TRANSPORTATION AND TRAVEL

International skyride

With respect to the question of what agreement or permit would be required for the construction of an international skyride, a type of aerial tramway which as proposed would cross the United States-Mexican Boundary from the State of California into Tijuana, Mexico, the Department of State in a letter of July 22, 1959, informed the President of the International Skyride Corporation as follows:

"The question of whether an international agreement with Mexico would be required for you to construct the proposed skyride has been under study since your visit to my office in May. The Department has reached the conclusion that, so far as this Government is concerned, it would not be required.

"It will be necessary, however, for you to apply for and obtain a Presidential Permit authorizing the construction of the skyride. The necessity for such a permit is based on the consideration that the President customarily issues such permits in order to regulate physical connections between this country and other countries. Several opinions of the Attorney General have upheld the President's power in this respect as based upon his general constitutional powers, particularly his powers regarding the conduct of relations with foreign countries.

". . . It may be stated at this time, however, that approval of the project by the Mexican Government will be required as well as approval by such United States agencies as may have an interest in the proposed construction, including the Department of the Army, the Department of the Treasury (Bureau of Customs), the Department of Justice (Immigration and Naturalization Service), the Department of Health, Education, and Welfare (Public Health Service), the Department of Agriculture, possibly the Interstate Commerce Commission, and, as you recognized in your letter of June 5, 1959, the International Boundary and Water Commission, United States and Mexico.

"It is suggested that before you proceed much further with your plans you should obtain general approval of the project by the Government of Mexico. At the same time you ought to inform the Bureau of Customs and the Immigration and Naturalization Service of what you have in mind in order to be sure that they will be able to provide the inspection facilities you will require and that they will have no objection to the project. It might also be helpful to you if, at an early stage, you consult the other Federal agencies to determine whether any of them will have objection. When you have indications of the approval of the interested Federal agencies and at least the tentative approval of the Federal authorities of Mexico, you might appropriately apply to the Department of State for the Presidential Permit. The Department of State would undertake to consult with these agencies to learn formally whether any of them perceive reasons for withholding approval of the application and issuance of the permit. While I cannot now state all the conditions that the permit may contain, it would undoubtedly be issued subject to the approval of the

appropriate Mexican authorities and the International Boundary and Water Commission."

Director of Office of Mexican and Caribbean Affairs (Wieland) to President of International Skyride Corporation (Parkinson), letter, July 22, 1959, MS. Department of State, file 611.12321/7–2259.

The International Boundary and Water Commission, United States and Mexico, in its letter to the Department of State on June 1, 1959, stated:

"It is the view of this Section that an agreement between the two Governments would not be necessary for construction of the proposed 'skyride' and we know of no reason why such an agreement would be desirable. Although unique, an international 'skyride' would seem to be generally comparable to an international bridge. The Department has taken the position, we believe properly, that an agreement between the two Governments for construction of bridges across the international portion of the Rio Grande is neither necessary nor desirable."

Commissioner, International Boundary and Water Commission, United States and Mexico (Hewitt) to Officer in Charge, Mexican Affairs (Osborne), letter, June 1, 1959, *ibid.*/6–159.

Formal application for a Presidential permit to construct, operate, and maintain an aerial tramway for the transportation of passengers from San Ysidro, California, to the international boundary line between the United States and Mexico to connect with like facilities in Mexico was made on October 29, 1959. Permit was granted by the President on May 5, 1960, subject to issuance by the Government of Mexico of the necessary authorization to a Mexican corporation for the construction, operation, and maintenance of that part of the facilities in or over Mexico and the approval of the construction plans by the International Boundary and Water Commission, United States and Mexico, as well as by the District Engineer, Los Angeles, of the Corps of Engineers, United States Army, the city of San Diego, and the State of California.

Presidental Permit, Authorizing the International Skyride Corporation to Construct, Operate, and Maintain an Aerial Tramway from San Ysidro, California, to the International Boundary Line Between the United States and Mexico, MS. Department of State, file 611.12321/5–560. Certification of Board of Directors of the International Skyride Corporation, May 13, 1960, MS. Department of State, file FW 611.12321/5–1360.  For the current procedure regarding such permits, see *antc*, p. 917.

The international skyride was never constructed for the reason as given by the President of the International Skyride Corporation in a letter of October 26, 1960, to the Department of State, that—

". . . just as we were getting ready to begin construction, we were informed by the California State Highway Department that they

928                              COMMUNICATIONS, TRANSPORTATION AND TRAVEL

needed practically all of our property that we were going to use for the terminal and parking lot for a proposed freeway. This, of course, came as quite a surprise to us, especially in view of the fact that we had checked with them several months ago and asked if they would have need of this property and they said 'no, to proceed with our plans' . . . . After lengthy negotiations they decided there was no other place they could put the freeway, so because of this we have been forced to abandon the project." President of International Skyride Corporation (Parkinson) to Director of Office of Mexican and Caribbean Affairs (Wieland), letter, Oct. 26, 1960, MS. Department of State, file 611.12-321/10–2660.

Monorail across Rio Grande

With reference to the International Monorail Corporation's proposal to construct, maintain, and operate a monorail service from El Paso, Texas, across the Rio Grande to Ciudad Juárez, Mexico, the United States Commissioner on the International Boundary and Water Commission (Friedkin) informed the President of the Monorail Corporation in a letter of February 23, 1966:

"... crossings of the international river or land boundary are authorized through issuance of a Presidential Permit processed through a United States agency appropriate for the particular type of crossing desired, with the exception noted later herein. Processing of such a Permit includes consideration of the views and requirements of all the governmental agencies and other interests concerned. Thus, the interests of the International Boundary and Water Commission would be automatically provided for in the normal processing sequence of the Presidential Permit as a matter of course.

"Our records indicate that one important exception to the Presidential Permit procedures exists in the cases of crossings of the international river boundary by structures classifiable as bridges. In these cases the Congress has reserved for itself by law (33 U.S.C.A. Secs. 491 & 531 [34 Stat. 84 and 60 Stat. 849]) the right of consent to the construction of any bridge that will connect the United States with any foreign country."

Adverting to that part of the Commissioner's letter which indicated that the consent of Congress may be necessary in the case of a monorail service across the Rio Grande, the Department of State stated in a letter of April 28, 1966, to Congressman White:

"... The Department concurs. ... If Congress should decide, pursuant to these provisions, that Congressional authorization is necessary for the construction, operation and maintenance of a monorail service across the Rio Grande between El Paso and Cuidad Juarez, we can see no need for the issuance of a Presidential Permit on the same application since the views and technical requirements of interested government agencies would be secured prior to the passage of the legislation and the signing into law by the President."

United States Commissioner on the International Boundary and Water Commission (Friedkin) to the President of the International Monorail

TELECOMMUNICATIONS                                           929

Corporation (Stephen Kent), letter, Feb. 23, 1966, MS. Department of State, file IT 8–19 MEX–U.S. Assistant Secretary MacArthur to Congressman White, letter, Apr. 28, 1966, *ibid.*

On April 9, 1968, President Johnson signed a permit authorizing the International Monorail Corporation to construct, operate, and maintain an aerial transport ferry service from El Paso, Texas, to the international boundary line between the United States and Mexico. The aerial transport ferry facilities would there connect with like facilities in Mexico. 33 *Fed. Reg.* 6555, Apr. 30, 1968. Regarding such permits, see *ante*, p. 917.

In a legal memorandum endorsing the procedure of obtaining an agreement between Canada and the United States to effectuate a joint undertaking for the improvement of the Great Lakes–St. Lawrence Basin so as to make these waters available to seagoing vessels, and the development of hydroelectric power, the Legal Adviser of the Department of State, Green H. Hackworth, stated:

**Bridges**

"Of interest in this connection is action by Congress with respect to the construction of bridges across the international boundary—United States and Canada, subject to similar authorization by Canada. For example, Public Resolution No. 117, 75th Congress, 3d session, created the Niagara Falls Bridge Commission and authorized it to construct and operate bridges across the Niagara River, subject to 'the approval of the proper authorities in the Dominion of Canada'. (52 Stat. 767.)

"On November 11, 1927, President Coolidge issued a presidential license to the Detroit-Ontario Subway, Inc., authorizing the company to construct, operate, and maintain a tunnel from a point in or near Brush or Randolph Street in the City of Detroit to a point on the international boundary line under the Detroit River. It is understood that corresponding authorization was given on the part of Canada by an Order in Council.

"The improvement of the Great Lakes—St. Lawrence Basin for navigation and other purposes would seem clearly to fall within the commerce clause of the Constitution, giving the Congress the authority to regulate interstate and foreign commerce. Where the undertaking with respect to interstate and foreign commerce involves boundary waters over which this country does not have exclusive jurisdiction, there would seem to be no reason why the Congress should not within its Constitutional power enact legislation, contingent upon a like legislative enactment in the other country, signifying its approval of a joint undertaking signed by both Governments. The signing of an agreement by the two Governments would be but a convenient way of bringing about in advance of legislative enactments a joint understanding by the two Governments on a complicated question which could hardly be handled without such advance understanding. . . ."

IV *Bulletin*, Department of State, No. 92, Mar. 29, 1941, pp. 364, 365. See further vol. 3, this *Digest of International Law* (1964), pp. 910–912.

930                     COMMUNICATIONS, TRANSPORTATION AND TRAVEL

In article V of the Boundary Convention of March 1, 1889, between the United States and Mexico, the International Boundary Commission (changed to the International Boundary and Water Commission, under article 2 of the U.S.-Mexican Water Treaty, Feb. 3, 1944, U.S. TS 994; 59 Stat. 1219; 3 UNTS 313) was given certain jurisdiction as to the construction of such works in that part of the Rio Grande or Colorado Rivers which form the boundary, as are prohibited by article III of the Convention of November 12, 1884, or by article VII of the Treaty of Guadalupe Hidalgo of February 2, 1848.

Article III of the 1884 Treaty prohibits an "artificial change in the navigable course of the river, by building jetties, piers, or obstructions which may tend to deflect the current or produce deposits of alluvium, or by dredging to deepen another than the original channel under the Treaty when there is more than one channel, or by cutting waterways to shorten the navigable distance," from affecting or altering the dividing line as determined by the International Boundary Commission of 1852.

Article VII of the 1848 Treaty between the United States and Mexico prohibits the construction, without the consent of the other, of any work that might impede or interrupt, in whole or in part, the exercise of the right that navigation of the Gila and of the Bravo Rivers below the boundary as described be free and common to the vessels and citizens of both countries.

> For the Boundary Convention of 1889, see I Malloy, Treaties, etc. (1910) 1167, 1168.  For the 1884 Treaty, see *ibid.*  1159, 1160.  For the 1848 Treaty, see *ibid.* 1107, 1111.

U.S. laws

The "Act to regulate the construction of bridges over navigable waters" of March 23, 1906, requires that before a bridge authorized by Congress after March 23, 1906, to be constructed over any of the navigable waters of the United States, may be built or commenced, the plans and specifications for its construction, together with such drawings of the proposed construction and such map of the proposed location as may be required for a full understanding of the subject, must be approved by the Secretary of the Army and Chief of Engineers, as well as any subsequent modification of such plans.

> 34 Stat. 84; 33 U.S.C. § 491.

Under the General Bridge Act of 1946, Congress granted its consent for the construction, maintenance, and operation of bridges and approaches thereto over the navigable waters of the United States, specifying that such construction and operation of bridges accord with provisions of the Act such as that requiring the approval of the location and plans for bridges by the Chief of Engineers and the

TELECOMMUNICATIONS                                931

Secretary of the Army, and that requiring that any tolls charged be reasonable. The Act expressly excludes from its authorization and provisions, the construction of any international bridge, i.e., "any bridge which will connect the United States, or any Territory or possession of the United States, with any foreign country".

60 Stat. 847, 849; 33 U.S.C. §§ 525, 526, 531.

For examples of Congressional authorizations for the construction of bridges between the U.S. and Canada, see volume 3 of this *Digest of International Law* (1964) 738–740.

A bill (S. 623) to amend the General Bridge Act of 1946 by which Congress would give its consent, subject to certain conditions, to the construction of certain international bridges, was reported on favorably by the Senate Foreign Relations Committee in March 1967. The proposed amendment would make separate Congressional authorizations for individual international bridges unnecessary on the following conditions: (1) the approval of the proper authorities in the foreign country concerned; (2) a commitment by the State or States having jurisdiction over the bridge location to review the detailed plans and specifications for structural soundness and to inspect the bridge on completion and from time to time thereafter; and (3) fulfillment of the provisions of the 1906 Act. The bill would also require the prior approval of the President to the construction, maintenance, and operation of bridges. In recommending the passage of this bill, the Senate Committee on Foreign Relations concluded its report with the following comments:

". . . there are no great departures from precedent involved. Nothing in this bill gives advance consent to compacts or agreements between States and foreign countries or subdivisions thereof for the construction of international bridges. Bridges built under such agreements would continue to be considered ad hoc by the Congress. Nor does the bill deal with toll policy for international bridge authorities or commissions because it is felt that appropriate toll provisions could best be worked out in the context of negotiating compacts or agreements to set up such authorities. The bill is naturally limited in its effect to the territory over which the United States has jurisdiction.

"The authorization contained in the bill is specific and limited and, the committee stresses, largely drawn from existing law and precedent. The committee believes that it represents a more orderly and better method for dealing with requests for permission to build international bridges than has been available heretofore. Its principal advantage is to relieve Congress of the burden of passing on a multiplicity of individual bridges."

The International Bridge Act of 1967, S. Rept. 80, May 23, 1967, 90th Cong., 1st sess., p. 4. The bill, having passed by voice vote in the Senate

932          COMMUNICATIONS, TRANSPORTATION AND TRAVEL

on April 3, 1967, was then referred on April 4 to the House Foreign Affairs Committee where it is pending at the time of publication of this volume.

During the Hearings on September 4, 1959, before the Senate Committee on Foreign Relations, concerning three separate bills for the construction of international bridges, Melville Osborne, Officer in Charge of Mexican Affairs at the Department of State, commented on the interest of the Department of State and the International Boundary Commission, United States and Mexico, in the matter of international bridges as follows:

". . . The Department of State and the International Boundary Commission have limited interest in international bridges.

"The Commission is authorized by convention, based on treaty with Mexico, to prevent artificial obstructions in the stream from changing the course of the stream and therefore the boundary.

"Therefore, the International Boundary and Water Commission's interest in bridges is primarily to see that the works placed in the channel do not deflect the course of the stream.

"The Commission does not have jurisdiction over questions of tolls, which is, of course, the Defense Department's jurisdiction.

"Similarly, the Department of State would not normally enter into a toll question of this sort unless some agreement were required of Mexico, or desired of Mexico, to make treatment of both sides of the bridge equal."

International Bridges, Hearings before the Committee on Foreign Relations, United States Senate, 86th Cong., 1st sess., on S. 2531, S. 2590, and H.R. 3180, Sept. 1 and 4, 1959, p. 52.

With respect to such transportation facilities as bridges, tunnels, pipelines, and power cables, see further Reiff, *The United States and The Treaty Law of the Sea* (1959) 21 ff.

### Postwar Disposition of Submarine Cables

### §16

German-owned

Prior to World War II, the German-Atlantic Cable Company, identified by the initials, D.A.T., owned and operated three submarine telegraph cables: Emden–Dumpton Gap (England), Emden–Vigo (Spain), and the Emden–Horta (Azores) cables. After the outbreak of the Second World War, the British and/or French Forces severed the cables to make them inoperable and useless for German wartime communications. Following the United States entry into the war, the Combined Chiefs of Staff (United States–United Kingdom) decided, late in 1943 in connection with projected military operations for an Allied landing on the northern coast of France, to assign to the Signal Corps of the United States Army the responsibility of repairing the cables and establishing a northern

terminal at
a cable at
terminal w
Azores link
use, the Br
time in 194
tinued its cc

In a Dep
connection
cable, inter
viewed and
follows:

"The
of subm
in Arti
of 1907

"
neu
of
dem

This ap
territor
such ter

"
Sub
Art
[II

"It is
ment in
enemy-c
territor

"The
the Pea
meeting
followir

"
nati
gra
nav

"
nati
or 1
ener
*Rel*
The

# EXHIBIT 10

IV G.H. Hackworth, Digest of International Law 247-56 (1942)

# DIGEST

OF

# INTERNATIONAL LAW

BY

GREEN HAYWOOD HACKWORTH

*Legal Adviser of the Department of State*

VOLUME IV

CHAPTERS XII–XV



UNITED STATES

GOVERNMENT PRINTING OFFICE

WASHINGTON : 1942

In denying the right of the United States to recover for damages to a cable allegedly caused by a steamship in the harbor of Valdez, the District Court of the District of Alaska said:

"Under the treaty of 1884 between the United States and various other countries relating to submarine cables, it is provided that the owner of the cable will compensate the owner of any vessel which loses its anchor or other equipment in avoiding injury to the cable.

"Counsel for libelant lays particular stress on the case of Davidson S.S. Co. v. United States, 205 U.S. 193, 27 Sup. Ct. 482, 51 L. Ed. 764, citing from the opinion in this case:

. . . . . .

"It . . . appears [in the above-cited case] that the obstruction to navigation was generally known to mariners, that the knowledge thereof could easily have been obtained by the captain, and further that official circulars were mailed to him giving notice thereof, which is quite a different state of affairs from that in the case at bar, where it is not even shown that any information could have been obtained by the captain of the Alameda, had he sought it, that the location of such cable was not generally known, and that all the other sea captains mentioned had no notice thereof, and did not consider that they were lacking in care and prudence in not knowing such location."

*United States* v. *The Alameda et al.*, 5 Alaska 663, 667–668 (1917).

For the award of the tribunal established under the special agreement of Aug. 18, 1910 in the case of the *Great Northwestern Telegraph Company* (Great Britain *v.* United States) for injury to a telegraph cable caused by the American gunboat *Essex* in dropping her anchor in a reserved space in Quebec harbor and fouling the cable, see Nielsen's Report (1926) 436. The United States admitted liability in this case.

## LANDING LICENSES

### §350

In an instruction to the Ambassador to Great Britain in 1919 the Department of State described the procedure at that time regarding the granting of permits to land cables in the United States as follows:

As there is no legislation of Congress at the present time governing the subject, permits to land cables in the United States are granted by the President, by virtue of his power as director of the relations of the Government with foreign powers, and as Commander in Chief of the Army and Navy. The permit for license is granted by the President through the Department of State, after negotiations conducted by the Department of State with the diplomatic agents of the country of the cable company desiring the permit to land; or in case the cable company is an American company, with the officers of the company directly. The approval of the War Department in the form of a license governing the conditions of the physical laying of the cable must also be obtained.

The Third Assistant Secretary of State (Long) to the Ambassador in London (Davis), no. 324, July 31, 1919, MS. Department of State, file 841.73/10.

**Landing of Western Union Telegraph Co. cable at Miami**

In July 1919 the Western Telegraph Company, a British corporation, entered into a contract with the Western Union Telegraph Company, an American corporation, by the terms of which the former agreed to lay a submarine cable from Brazil to Barbados and the latter agreed to lay and maintain a cable from Miami, Florida, to Barbados. The two parties agreed to equip and maintain a joint station at Barbados and respectively to transmit messages over the resulting "through line" to South America and Europe.

The Department of State declined to recommend to the President that a permit be issued for the landing of the cable at Miami because of the proposed connection between the Western Union Telegraph Company's lines and those of the Western Telegraph Company, which, by grant of the Brazilian Government, enjoyed a monopoly of interportal connections in Brazil. The Western Union Telegraph Company nevertheless attempted to lay a cable from Miami to Barbados without a permit. On July 30, 1920, the Secretary of State informed the British Ambassador in Washington that the British cable-ship *Colonia* was on its way to Miami to land the cable although a permit had been withheld, and that measures had been taken by the Government of the United States physically to prevent such landing. It was suggested that the Ambassador convey a timely warning to the master of the *Colonia*. The cable was subsequently laid by the *Colonia* from a point just outside of the three-mile limit off Miami Beach. The Western Union Telegraph Company, having failed to land the cable, planned to splice into it a branch cable to connect at Cojimar, Cuba, with three cables which had been theretofore maintained and operated by it from that point to Key West, Florida.

Secretary Colby to Sir Auckland Geddes, July 30, 1920, MS. Department of State, file 811.73/235a. See also 1920 For. Rel., vol. II, p. 687.

**Cancelation of Western Union concession in Cuba**

The Western Union Telegraph Company obtained from the Government of Cuba in 1920 a concession allowing it to land at Cojimar a direct cable from Barbados. On December 24, 1920 the company's permit to land at Cojimar was suspended by the President of Cuba. On January 14, 1921 the Department of State instructed the Minister to Cuba to communicate orally and informally to the President a statement—

that the Government of the United States had not felt at liberty to request the Cuban Government to suspend the landing permit because of the fact that the granting or the refusal of this landing permit was, of course, a matter within the sovereign rights

of the Cuban Government; that although it would be objectionable and detrimental to the interests of the United States if such cable in violation of the policy of the United States and of the landing permit granted on November 20, 1920 by the United States to the Western Union Company, regulating the operation of its cables between Key West and Cojimar, were used for transmitting through messages from the United States to Barbados and from thence to Brazil, in which latter country the connecting company enjoys monopolistic privileges, the Department had not felt justified in requesting the Cuban Government to assist in a controversy between the United States and an American corporation.

The Minister was authorized to say that the United States reserved the right to protest to the Cuban Government later if the Cuban landing permit should be again granted to the Western Union and if it should be ascertained later that the landing of that cable in Cuba had been used by the company as a subterfuge and as a means of violating the conditions under which messages were permitted to pass between Key West and Cuba. The Minister was also informed, on January 29, 1921, that the United States would not support any claim of the Western Union for indemnity based on the suspension of its landing permit in Cuba since article III thereof expressly provided for its suspension when it was deemed proper for the protection of the public interest and since the United States believed that the landing license in Cuba had been obtained to circumvent any action it might take to prevent the landing of the cable at Miami Beach.

The Chargé d'Affaires in Cuba (White) to the Secretary of State (Colby), no. 253, July 10, 1920, MS. Department of State, file 837.73/6; Minister Long to Acting Secretary Davis, telegram 360, Dec. 24, 1920, *ibid.* /27; Mr. Davis to Mr. Long, telegram 16, Jan. 14, 1921, and Mr. Colby to Mr. Long, telegram of Jan. 29, 1921, *ibid.* /32. See also 1920 For. Rel., vol. I, pp. 60, 69; 1921 For. Rel., vol. I, pp. 816, 822. For the text of the license of Nov. 20, 1920, see MS. Department of State, file 811.73/461.

Suit was instituted by the Western Union Telegraph Company against the Secretaries of State, War, and the Navy to enjoin them from interfering with its acts. A suit in equity was thereupon brought by the United States against the company to prevent it from making the allegedly unauthorized cable connection between the shores of the United States and a foreign country. A motion by the Government for a preliminary injunction was denied by the District Court of the United States for the Southern District of New York on February 25, 1921. Judge A. N. Hand, in the course of the opinion, stated : *U. S. v. Western Union Telegraph Co.*

... The government ... contends that the Executive has the power to prevent the landing of cables and other physical connection of foreign countries with this country, because Congress has long acquiesced in executive regulation of such matters in cases

where Congress has not acted.  From the time of the administration of President Grant there has been frequent and growing insistence by the Executive upon the right to regulate the landing of cables connecting with foreign countries, and this alleged prerogative has been recently extended to grant permits to light lines, oil lines, telephone lines, äerial railways, and pipes for the disposal of waste from the manufacture of soda ash.  The exercise of this executive power has been acquiesced in by various corporations, who perhaps found it easier to accept a permit than to attempt to resist the Executive.  President Grant, in a message to Congress in December, 1875, referred to a French company which proposed to lay a cable from the shores of France to the United States.  President Grant stated in his message that he could not concede that any power should claim the right to land a cable on the shores of the United States and at the same time deny to the United States or to its citizens or grantees an equal right to land a cable on its shores.

President Grant  . . .  set forth conditions which he thought should be exacted before allowing foreign cables to land, and said:
"I present this subject to the earnest consideration of Congress. In the meantime, and unless Congress otherwise direct, I shall not oppose the landing of any telegraphic cable which complies with and assents to the points above enumerated, but will feel it my duty to prevent the landing of any which does not conform to the first and second points as stated, and which will not stipulate to concede to this government the precedence in the transmission of its official messages and will not enter into a satisfactory arrangement with regard to its charges."
There is attached to the moving papers letters from Secretaries of State Fish, Evarts, Blaine, and Day (now Mr. Justice Day) requiring executive permits, as well as from Secretary Bayard and Secretary Root, and Attorneys General Griggs, Knox, Wickersham, and McReynolds (now Mr. Justice McReynolds).  The only break in this continuous position taken by the Executive Branch of the Government for the last 50 years was during the administration of President Cleveland.  Secretaries Gresham and Olney declined to exercise the power upon the ground that presidential action would not be binding upon Congress, and that the President was without power.
In 1898 Acting Attorney General Richards (22 Op. Attys. Gen. 25–27) rendered an elaborate opinion in regard to this matter in which he summarized the position of the government by saying:
"I am of the opinion, therefore, that the President has the power, in the absence of legislative enactment, to control the landing of foreign submarine cables.  . . ."

. . .  While the original power of the President in such matters is questionable, the long-continued practice of the Executive, after a formal message to Congress by President Grant regarding foreign cable connections, may indicate their willingness to have the Executive take the kind of action that is here insisted upon in

cases where there is no appropriate legislation covering the subject-matter.

Judge Lacombe, in the case of United States v. La Compagnie Francaise, etc. (C.C.) 77 Fed. 495, where a cable company having no franchise under the Post Roads Act was involved, said that—

"Without the consent of the general government, no one, alien or native, has any right to establish a physical connection between the shores of this country and that of any foreign nation. Such consent may be implied as well as expressed, and whether it shall be granted or refused is a political question, which, in the absence of congressional action, would seem to fall within the province of the Executive to decide."

.   .   .   .   .   .

. . . It may be that the President, before Congress has acted, may exercise this power in respect to a foreign cable company having no congressional franchise.   This is claimed to have been substantially the situation in the case of the French Cable Company, decided by Judge Lacombe.   But in respect to the Western Union, which by the Act of July 24, 1866 (supra [14 Stat. 44]) possesses a federal franchise covering a business with foreign countries and regulated as to rates by an agency of the government created by Congress, it seems unreasonable to hold that Congress has not occupied the field and legislated so generally in regard to this defendant that it has withdrawn it from the exercise of executive power in respect to foreign cable connections.

*United States* v. *Western Union Telegraph Co.,* 272 Fed. 311, 316-322 (S.D.N.Y., 1921).   The Circuit Court of Appeals, on Mar. 10, 1921, affirmed the order denying the preliminary injunction.  272 Fed. 893 (C.C.A. 2d, 1921).

On May 27, 1921 an act was approved (the so-called "Kellogg act") forbidding the landing or operation in the United States of any submarine cable directly or indirectly connecting the United States with any foreign country without a written license from the President.   Section 2 provides:

. . . That the President may withhold or revoke such license when he shall be satisfied after due notice and hearing that such action will assist in securing rights for the landing or operation of cables in foreign countries, or in maintaining the rights or interests of the United States or of its citizens in foreign countries, or will promote the security of the United States, or may grant such license upon such terms as shall be necessary to assure just and reasonable rates and service in the operation and use of cables so licensed: *Provided,* That the license shall not contain terms or conditions granting to the licensee exclusive rights of landing or of operation in the United States  . . .

Section 3 empowers the President to prevent the landing of any cable about to be landed in violation of the act and confers jurisdiction on District Courts of the United States to enjoin the landing or opera-

tion of such a cable or to compel by injunction the removal thereof. 42 Stat. 8.

By Executive order issued July 9, 1921 the President directed that the Secretary of State should receive all applications for licenses for the landing or operation of cables and, after obtaining from any department of the Government such assistance as he might require, should inform the President with regard to the granting or revocation of such licenses.

> Ex. Or. 3513, July 9, 1921, MS. Department of State, file 811.73/709. See G. G. Wilson, "Landing and Operation of Submarine Cables in the United States", in 16 A.J.I.L. (1922) 68–70.
>
> Executive Order 3513 of July 9, 1921 was amended in 1934 to read:
>
> ". . . the Federal Communications Commission is hereby authorized and directed to receive all applications for licenses to land or operate submarine cables in the United States, and, after obtaining approval of the Secretary of State and such assistance from any executive department or establishment of the Government as it may require, it shall advise the President with respect to the granting or revocation of such licenses." Ex. Or. 6779, June 30, 1934.

On May 1, 1922 a license was issued to the Western Union Telegraph Company to land its cable from Barbados at Miami Beach, Florida, upon the condition that the cable would be sealed and would not be operated or connected with the company's land lines until a license "to land and operate" the cable had been granted. On August 12, 1922 a license for 30 days was issued to it to land and operate its cable at Miami Beach for the purpose of carrying messages between the United States and Europe. The granting of a final license to the company was conditioned on the waiver by the Western Telegraph Company and by the All America Cables Company, Inc. (an American corporation), of their exclusive privileges in South America. The Department of State insisted that not only should such waivers be executed by the above-mentioned companies but also that satisfactory expressions of acquiescence should be obtained from such governments of South America as were concerned. The waivers having been executed and satisfactory expressions having been received from the Governments of Brazil, Argentina, and Uruguay, in which the Western Telegraph Company had held exclusive privileges, and from the Governments of Ecuador, Colombia, and Peru, in which the All America Cables Company had held exclusive privileges, a license to land and operate a cable from Miami Beach to Barbados to the Western Union Telegraph Company on August 24, 1922.

> MS. Department of State, file 811.73W52/77, /80, /92. See also 1922 For. Rel., vol. I, pp. 518–538.
>
> On Oct. 13, 1922, the Government having appealed from the decision of the Circuit Court of Appeals (*ante*, p. 251), a joint suggestion and stipulation was filed by the parties to the case of the *United States* v. *Western Union*

*Telegraph Company* suggesting that, in view of the enactment of the act approved May 27, 1921 and the issuance to the Western Union Company of a license thereunder in respect to the cable in controversy, the case was moot.  An order was entered by the Supreme Court on Oct. 23, 1922 remanding the case to the District Court with directions to enter a decree dismissing the bill without prejudice and without costs to either party.  260 U.S. 754 (1922).  For a copy of the joint suggestion and stipulation, see MS. Department of State, file 811.73W52/109.

The Secretary of State, on Sept. 29, 1922, requested a formal statement from the Attorney General for the guidance of the Department of State in dealing with cases where telegraph or telephone lines, power-transmission lines, pipe lines, or other agencies had been constructed or were to be constructed connecting the United States with a foreign country.  The Attorney General replied that—

"the disposal of the Western Union Telegraph Company case by stipulation, on the ground that the question at issue was moot, could not affect prejudicially, or otherwise, any right that the President may have in the matter above indicated.  In the Western Union Telegraph Company case the Government contended that even when not specifically authorized by Congress, the President had an inherent right to prevent such connections between this and foreign countries.  The District Court for the Southern District of New York decided against this contention, and that was the subject of the appeal in the Supreme Court of the United States.  In that case the question of power became moot by reason of the passage of an Act of Congress which conferred upon the President the disputed authority.  The decision of the District Court was, therefore, reversed and the case remanded to dismiss the Government's bill 'without prejudice.'  Therefore the power of the President, in the absence of Congressional authority, is, so far as that case is concerned, exactly where it was before; for while the decision of the District Court remains, the dismissal of the suit without prejudice clearly indicates a right of the Government at any time to assert the inherent power of the President above referred to.  This would be true even in the case of a cable sought to be laid by the Western Union Telegraph Company; for the dismissal without prejudice prevents the case from being *res adjudicata* as between the Government and the Western Union Telegraph Company.  *A fortiori* this disposition of the case cannot affect the Government as to other companies and as to other possible conflicts in cases arising under different circumstances."  Attorney General Daugherty to Secretary Hughes, Nov. 15, 1922, MS. Department of State, file 811.73W52/112.

On April 22, 1930 the Department of State said in a letter to the President of the Western Union Telegraph Company that, since the issuance of the license to the Western Union Company on August 24, 1922, the All America Cables Company, Inc., had been attempting to procure in Brazil rights of interportal operation and that such rights had not been obtained because of the opposition of the Western Telegraph Company, which, it was alleged, still asserted the possession of monopolistic rights in Brazil and, in particular, exclusive right to the interportal operation of cables on the Brazilian coast.  The Department quoted from a memorandum filed by the Western Telegraph

Company with the Director General of Telegraphs in Brazil, which stated that the waiver of special rights signed by it in 1922 referred to international communications only, without including its Brazilian intercoastal monopoly, and which objected to the granting by the Brazilian Minister of Foreign Affairs to the All America Cables Company, Inc., of any concession that permitted it to handle intercoastal traffic.  The Department observed in its letter that the landing license of August 24, 1922 required that neither the Western Union Telegraph Company nor any company with which it was associated should oppose in any way the landing, connection, or operation by any American company of cables in South America on terms of equality.

On May 9, 1930 the Department of State instructed the Ambassador in Brazil to inform the Brazilian Foreign Office that the Government of the United States hoped that, in accordance with the spirit of the compromise for the waiver of special rights in South American countries by British and American cable companies, reached in 1922 and assented to by the Brazilian Government, the Government of Brazil would accord to the All America Cables Company, Inc., the same rights for the carriage of local interportal traffic as were enjoyed by the British Western Telegraph Company.

On January 11, 1935 the *Jornal do commercio* announced that a decree had been signed by the President of Brazil authorizing the All America Cables Company, Inc., to lay a submarine cable between Rio de Janeiro and Santos and to handle internal and international messages on land telegraph lines connected with its stations.

> The Acting Secretary of State (Cotton) to Mr. Carlton, Apr. 22, 1930, MS. Department of State, file 832.73A15/51 ; Secretary Stimson to the Embassy in Brazil, telegram 24, May 9, 1930, *ibid.* /36 ; the Consul General at Rio de Janeiro to Secretary Hull, Jan. 11, 1935, *ibid.* /65.

Cables landed without license prior to May 27, 1921

In 1922 the Compagnie Française des Câbles Télégraphiques addressed a letter to the Secretary of State relating to the four cables which it was operating in the United States.  Three of the cables had been landed in the United States prior to 1899 without a presidential license therefor, although one of these, extending from Cape Cod to St. Pierre-Miquelon, had been landed in 1879 pursuant to permission contained in a letter addressed by the Secretary of State to the French Minister on November 10, 1879.  See II Moore's Dig. 457.  Inquiry was made whether under the circumstances it was necessary for it to comply with the requirements of the act approved May 27, 1921 (the Kellogg act, *ante*, p. 251).  The Department of State replied that in its view application should be made for permission to land and operate the cables in the United States.

> Compagnie Française des Câbles Télégraphiques to Secretary Hughes, Aug. 15, 1922, and Assistant Secretary Harrison to the Compagnie Française

des Câbles Télégraphiques, July 21, 1923, MS. Department of State, file 811.7351C731/2.

The letter of the Office of the Chief of Engineers raises the question whether the Act approved May 27, 1921, entitled "An Act Relating to the Landing and Operation of Submarine Cables in the United States" requires a Presidential license to authorize the laying of a cable between two points in one of the states of the United States which are separated by a portion of the high seas. This question was considered in relation to the desire of the Pacific Telephone and Telegraph Company to lay and maintain two cables between San Pedro, California, and the Santa Catalina Island. The Department adopted the view that a license need not be obtained for a cable connecting two points in the same state. It would seem that the application of the Western Union Telegraph Company for a permit to lay a cable between Key West and Punta Rassa [in Florida] raises the same question  . . .  It is the view of the Department that a Presidential license need not be obtained to authorize the Western Union Telegraph Company to lay a cable between Key West and Punta Rassa. *Intrastate*

The Secretary of State (Hughes) to the Secretary of War (Weeks), Jan. 28, 1924, MS. Department of State, file 811.73/713. The War Department accepted the view of the Department of State. Mr. Weeks to Mr. Hughes, Feb. 4, 1924, *ibid.* /714.

For a statement indicating that it is the general policy of the United States (1) not to grant monopolistic or exclusive rights for the landing of submarine cables or the erection of radio stations, (2) not to support, diplomatically or otherwise, nationals seeking exclusive cable or radio concessions, and (3) not to prevent the granting of exclusive or privileged concessions for a reasonable term of years in cases where the probable traffic would not be sufficient to yield a fair return upon the capital invested in more than one system for the operation of the service in question, see the Assistant Secretary of State (Johnson) to the Minister in China (MacMurray), no. 1337, Sept. 4, 1929, MS. Department of State, file 893.73/57, referring to the Report of Subcommittee on International Cable and Radio Law and on Cable Landing Rights, *ibid.* 574.D1/411a; 1920 For. Rel., vol. I, p. 159.

In view of the statement contained in your Commission's letter of May 16, 1939 that "the power to revoke a cable license, even though issued at the outset on a permanent basis, is provided for by law as well as by the terms of the proposed license itself," this Department is inclined to agree with your Commission that "it would appear that the Government's control would be thereby adequately safeguarded without the necessity of issuing it on a temporary basis for one year only". *Revocation*

The Assistant Secretary of State (Messersmith) to the Chairman of the Federal Communications Commission (McNinch), June 16, 1939, MS. Department of State, file 811.73W521/28.

The license under discussion as finally issued and signed by the President was for an indefinite period, revocable at the will of the Government. The chairman of the Federal Communications Commission (Fly) to Presi-

dent Roosevelt, Sept. 7, 1939, *ibid.* 811.73W521/32; Mr. Messersmith to Mr. Fly, Sept. 27, 1939, *ibid.* /30.

For the text of Executive Order 3360–A, issued Nov. 29, 1920 by President Wilson, canceling a cable permit issued to the Deutsch-Atlantische Telegraphengesellschaft in 1899, see 1920 For. Rel., vol. I, pp. 141–142.

**Transfer**

This is to advise that the President of the United States has given his consent, subject to certain conditions, for the rights and privileges conferred by the four presidential licenses dated February 21, 1923, authorizing the landing of six cables at Far Rockaway, New York, to be transferred from the Postal Telegraph-Cable Company to the Commercial Cable Company. There is enclosed herewith a document executed by the President on March 11, 1939 containing such consent and setting forth the conditions upon which the same is given.

Your attention is invited particularly to condition number (2), which provides that the terms and conditions upon which the licenses were given, and upon which consent is given to the transfer therof, shall be accepted by a duly authorized officer of the Commercial Cable Company, and evidence of said acceptance shall be filed with the Federal Communications Commission.

The Federal Communications Commission to the Postal Telegraph-Cable Company, Mar. 15, 1939, MS. Department of State, file 811.73P84/25.

After consideration of the court order dated January 20, 1940 and the statements set forth in your letter, you are advised that on the understanding that The Commercial Cable Company is an American-owned corporation, this Department consents to the sale of this property by the Postal Telegraph-Cable Company (New York) to The Commercial Cable Company, in accordance with the ninth condition contained in the four cable landing licenses issued by the President of the United States on February 21, 1923 permitting the landing of six cables on the shores of the United States. The Department desires to receive a statement concerning the nationality of the owners of the stock of The Commercial Cable Company.

The Counselor of the Department of State (Moore) to Chadbourne, Wallace, Parke & Whiteside, Jan. 25, 1940, MS. Department of State, file 811.73P84/26.

## CABLE CONCESSIONS ABROAD

### §351

On December 31, 1925 the Department of State wrote to the President of the Western Union Telegraph Company that it was "not within the province of the Department to make applications to foreign governments for concessions on behalf of American companies, its action in such matters being limited to supporting American citizens or concerns in appropriate cases in their efforts to obtain concessions or modifications of existing concessions".