# EXHIBIT 11

2 John Bassett Moore, Digest of International Law 452-66 (1906)

# A DIGEST

OF

# INTERNATIONAL LAW

AS EMBODIED IN

DIPLOMATIC DISCUSSIONS, TREATIES AND
OTHER INTERNATIONAL AGREEMENTS, INTERNATIONAL
AWARDS, THE DECISIONS OF MUNICIPAL COURTS, AND
THE WRITINGS OF JURISTS,

AND ESPECIALLY IN

DOCUMENTS, PUBLISHED AND UNPUBLISHED,
ISSUED BY PRESIDENTS AND SECRETARIES OF STATE OF
THE UNITED STATES,
THE OPINIONS OF THE ATTORNEYS-GENERAL, AND THE
DECISIONS OF COURTS, FEDERAL
AND STATE.

BY

## JOHN BASSETT MOORE, LL. D.,

Hamilton Fish Professor of International Law and Diplomacy, Columbia University,
New York; Associate of the Institute of International Law; Sometime
Third Assistant Secretary of State and Assistant Secre-
tary of State of the United States;
Author of a Treatise on Extradition and Interstate Rendition, of American Notes on
the Conflict of Laws, of a History and Digest of International Arbitra-
tions, of an Exposition of the Spirit and Achievements
of American Diplomacy, etc.

IN EIGHT VOLUMES
(THE EIGHTH BEING INDEXICAL).

## VOLUME II.

WASHINGTON:
GOVERNMENT PRINTING OFFICE,
1906.

the dyke was stopped; but the company afterwards resumed operations, raising and strengthening the dyke. This condition of things was brought to the notice of the British embassy Aug. 10, 1897. The embassy, Oct. 1, 1897, stated that the authorities of British Columbia would be instructed to make full and proper inquiry into the complaint of the landowners, but that Her Majesty's Government were advised that the complainants had a right of action in the courts of British Columbia, and that they would be entitled to sue for damages and for an injunction against the continuance of the mischief. The settlers, it seems, engaged a lawyer, who found that " it was impossible to do anything for them individually, as the land damaged belonged to the United States; " and they therefore asked the United States Government to take up the matter for them in the British Columbian courts.

Mr. Sherman, Sec. of State, to Sec. of Interior, Jan. 31, 1898, 225 MS. Dom. Let. 77.

### VII. *LANDING OF SUBMARINE CABLES.*

### § 227.

" On May 4, 1897, the French ambassador submitted to your Department the application of the French Company of Telegraphic Cables (the successor of ' La Compagnie Française du Télégraphe de Paris à New-York ') for permission to land a cable supplementary to that which it has between Brest and Cape Cod, upon the same terms and conditions as those which were imposed by the President in 1879, when the original cable was landed.

**Regulation of landing.**

" On May 11, 1897, your Department replied to this request, saying:

" ' The present Executive does not regard himself as clothed, in the absence of legislative enactment, with the requisite authority to take any action upon the application which you present. A bill was introduced in the last Congress giving the President of the United States express authority to authorize the landing of submarine cables on the shore of the United States subject to conditions therein specified, but it failed to become a law. Until Congress shall see fit to clothe the President with power to act in matters of this kind, he will be compelled to refrain from doing so.'

" On June 4, 1897, your Department addressed a note to the French ambassador, calling his attention to the fact that it had been represented to the Department that a steamer from France had arrived at Cape Cod with the avowed purpose of laying the shore end of the new cable, and saying:

Case 4:16-cv-00036   Document 42-5   Filed in TXSD on 04/01/16   Page 4 of 48

" ' It is the expectation of the Federal Government that that company (the French Cable Company) will take no steps toward laying its proposed cable from Cape Cod without express authorization of the President or of Congress, before which, as I have observed to you, a bill was introduced at the last session, but which has not yet been enacted into law.  If that company should, however, take action in the manner proposed, it is proper to say that it would do so at its peril.'

" On June 5, 1897, another note was sent, informing the French ambassador of advices received to the effect that about 1,000 feet of the new French cable had been laid at Cape Cod the day before, and saying:

" ' Before taking any further action in the matter, I request that you will promptly instruct the proper authorities of the French Telegraph Company, in case the Department's information should be correct, to immediately desist from its work, pending the necessary authorization of the President or of Congress.

" The French ambassador's notes, two of the 5th and one each of the 6th and 8th of June, disclose the fact that, although the Department's notes of the 4th and 5th of June had been promptly forwarded to the company's agent, the work of landing the cable had been completed before their receipt.

" In view of the situation outlined, and the fact that Congress has not acted upon the matter, you request an official expression of my views as to the power of the President, in the absence of legislative enactment, to control the landing of foreign telegraphic cables.

" What the President can do and ought to do in the case of projected cables may possibly be ascertained from what he has done; at any rate, a recurrence to the history of the landing of certain existing cables may prove of service in considering the question you propound.

" The first cable from a foreign country landed upon the shores of the United States was one connecting the island of Cuba with the State of Florida, and was landed in 1867, under supposed authority of the act of Congress of May 5, 1866 (14 Stat., 44), granting to the International Ocean Telegraph Company, a New York corporation, the sole privilege, for fourteen years, of laying and operating telegraphic cables from the shores of Florida to Cuba, the Bahamas, and other West India islands, upon these conditions, namely, the United States to have the free use of the cable for military, naval, and diplomatic purposes; the company to keep all its lines open to the public for the daily publication of market and commercial reports and intelligence; all messages to be forwarded in the order received; no charge to exceed $3.50 for messages of ten words, and Congress to have the power to alter and determine the rates.  (Forty-ninth Congress, sec-

Case 4:16-cv-00036   Document 42-5   Filed in TXSD on 04/01/16   Page 5 of 48

ond session, Senate Doc. No. 122, p. 63; letter of Mr. Freylinghuysen to the President, January 27, 1885.)

"In 1869 a concession was granted by the French Government to a company which proposed to lay a cable from the shores of France to the United States. One of the provisions of this concession gave to the company for a long period the exclusive right of telegraphic communication by submarine cable between France and the United States. President Grant resisted the landing of the cable unless this offensive monopoly feature should be abandoned. The French company accordingly renounced the exclusive privilege, and the President's objection was withdrawn. The cable was laid in July, 1869; it ran from Brest, France, to St. Pierre, a French island off the southern coast of Newfoundland, thence to Duxbury, Mass., and was known as the 'First French Cable.' It soon passed, however, into the control of the Anglo-American Company, controlling the cables connecting Great Britain with this continent. (Senate Doc. No. 122, pp. 63, 71.)[a] .

"In a note respecting this cable, dated July 10, 1869, and addressed to the French and British ministers, Mr. Fish said:

"'It is not doubted by this Government that the complete control of the whole subject, both of the permission and the regulation of this mode of foreign intercourse, is with the Government of the United States, and that, however suitable certain legislation on the part of a State of the Union may become, in respect to its proprietary rights, in aid of such enterprises, the entire question of the allowance or prohibition of such means of foreign intercourse, commercial and political, and of the terms and conditions and its allowance, is under the control of the Government of the United States.' (Sen. Doc. No. 122, p. 65.)

"In his annual message of December, 1875, President Grant recounts his action respecting the French cable of 1869, and says:

"'The right to control the conditions for the laying of a cable within the jurisdictional waters of the United States, to connect our shores with those of any foreign state, pertains exclusively to the Government of the United States, under such limitations and conditions as Congress may impose. In the absence of legislation by Congress, I was unwilling, on the one hand, to yield to a foreign state the right to say that its grantees might land on our shores while it denied a similar right to our people to land on its shore; and, on the other hand, I was reluctant to deny to the great interests of the world and of civilization the facilities of such communication as were proposed. I therefore withheld any resistance to the landing of the cable, on condition that the offensive monopoly feature of

---

[a] See also H. Ex. Doc. 46, 47th Cong. 2 sess., parts 1 and 2; S. Ex. Doc. 51, 48th Cong. 2 sess; 22 Stat. 173, 371.

the concession be abandoned, and that the right of any cable which
may be established by authority of this Government to land upon
French territory and to connect with French land lines, and enjoy
all the necessary facilities or privileges incident to the use thereof
upon as favorable terms as any other company, be conceded.' (Senate
Doc. No. 122, p. 70.)

" After adverting to the need of new cables in order to provide com-
petition and reduce rates, President Grant continues:

" ' As these cable-telegraph lines connect separate states, there are
questions as to their organization and control which probably can be
best, if not solely, settled by conventions between the respective
states.   In the absence, however, of international conventions on
the subject, municipal legislation may secure many points which
appear to me important, if not indispensable, for the protection of
the public against the extortions which may result from a monopoly
of the right of operating cable telegrams, or from a combination
between several lines:

" ' I. No line should be allowed to land on the shores of the United
States under the concession from another power which does not ad-
mit the right of any other line or lines formed in the United States
to land and freely connect with and operate through its land lines.

" ' II. No line should be allowed to land on the shores of the
United States which is not, by treaty stipulation with the Govern-
ment from whose shores it proceeds, or by prohibition in its charter,
or otherwise to the satisfaction of this Government, prohibited from
consolidating or amalgamating with any other cable-telegraph line,
or combining therewith for the purpose of regulating and maintaining
the cost of telegraphing.

" ' III. All lines should be bound to give precedence in the trans-
mission of the official messages of the Governments of the two
countries between which it may be laid.

" ' IV. A power should be reserved to the two Governments, either
conjointly or to each, as regards the messages dispatched from its
shores, to fix a limit to the charges to be demanded for the trans-
mission of messages.

" ' I present this subject to the earnest consideration of Congress.

" ' In the meantime, and unless Congress otherwise direct, I shall
not oppose the landing of any telegraphic cable which complies with
and assents to the points above enumerated, but will feel it my duty to
prevent the landing of any which does not conform to the first and sec-
ond points as stated, and which will not stipulate to concede to this
Government the precedence in the transmission of its official messages,
and will not enter into a satisfactory arrangement with regard to its
charges.'   (Senate Doc. No. 122, pp. 71-72.)

"It will be observed that President Grant rested his authority to annex conditions to the landing of a foreign cable upon his power to prevent its landing altogether, if deemed by him inimical to the interests of this Government, its people, or their business. The right to prevent carried with it the right to control.

"The Direct United States Cable Company completed its line in 1875 from Ballinskellings Bay, Ireland, to Rye Beach, New Hampshire, by way of Torbay, Nova Scotia. This cable was laid under the act of March 29, 1867 (15 Stat. 10), conferring upon the American Atlantic Cable Telegraph Company the privilege for twenty years to land a submarine telegraph cable at any place on the Atlantic coast except the coast of Florida, and to operate the same, the Government to have the preference in its use, on terms to be agreed upon between the Postmaster-General and the company, Congress reserving the right to alter, amend, or repeal the act. Application was made to the Department of State for the privilege of landing, accompanied by the voluntary assurance of the company that no amalgamation should take place with any other company for the purpose of controlling rates.

"In view of these assurances, the landing of the cable was acquiesced in by the President, Mr. Fish, in his letter to Mr. Eckert of January 2, 1877, saying:

"'On receiving such assurances from the promoters of the company, the President decided to withold resistance to the landing of their cable.

"'The President adheres to the views which he expressed to Congress in December, 1875, that no line should be allowed to land on the shores of the United States which is not, by prohibition in its charter, or otherwise to the satisfaction of the Government, prohibited from consolidating or amalgamating with any other cable-telegraph line, or combining therewith for the purpose of regulating and maintaining the cost of telegraphing.

"'These views are understood to have met the approval of Congress and of the people of the United States, indicated by the tacit acquiescence of the Congress, and by the expressed approval of individual members of that body, and the general approval of the public press of the country. In the same message the President announced that the right to control the conditions for the laying of a cable within the jurisdictional waters of the United States, to connect our shores with those of any foreign state, pertains exclusively to the Government of the United States, under such limitations and conditions as Congress may impose. And he further stated that, unless Congress otherwise direct, he would feel it his duty to prevent the landing of any telegraphic cable which does not conform (among others) to the point above referred to.

Case 4:16-cv-00036   Document 42-5   Filed in TXSD on 04/01/16   Page 8 of 48

" ' The President is of the opinion that the control of the United States over its jurisdictional waters extends to the right of discontinuing and preventing their use by a cable whose proprietors may violate any of the conditions on which the Government by acquiescence or silent permission allowed its landing, as well as to the resistance and prohibition of an original landing.' (Senate Doc. No. 122, pp. 11, 12.)

" The so-called ' Second French Cable ' was laid by Compagnie Française du Télégraphe de Paris à New-York in 1879, from Brest to St. Pierre, and thence to Cape Cod. The company applied, through the French minister, to your Department for permission to land the cable, and the privilege was granted upon substantially the conditions formulated in President Grant's message of 1875, Mr. Evarts, in his letter of November 10, 1879, to Mr. Outrey, saying:

" ' I have, without delay, brought the subject, together with the information conveyed by your note, to the attention of the President, and he authorizes me to say that, in view of the assurances thus received from the French Government that reciprocal privileges of landing will be granted by France to any company which may be formed by citizens of the United States upon the same terms that these privileges are granted to the present or any future company of French citizens that may apply for such landing privilege; and landing will be granted by France to any company which may be formed by citizens of the United States upon the same terms that these privileges are granted to the present or any future company of French citizens that may apply for such landing privilege: and having also received the acceptance by the directors of the " Compagnie Française du Télégraphe de Paris à New-York " of the conditions prescribed by this Government, the Executive permission of the Government of the United States will be granted to that company to land its cable at Cape Cod, in the State of Massachusetts. It is proper for me to add, however, that this Executive permission is to be accepted and understood by the company as being subject to any future action of Congress in relation to the whole subject of submarine telegraphy as explained in my note to you of the 27th ultimo.' (Senate Doc. No. 122, p. 76.)

" The Mackay-Bennett commercial cable was laid in 1884 from the coast of Europe to the United States, by permission of the President, upon substantially the conditions outlined in President Grant's message to Congress in 1875. Mr. Frelinghuysen, in his letter of December 5, 1883, describes the attitude of the Government thus:

" ' This Government regards with favorable consideration all efforts to extend the facilities for telegraphic communication between the United States and other nations, and in pursuance of this sentiment the President is desirous of extending every facility in his power to

promote the laying of the cables. While there is no special statute authorizing the Executive to grant permission to land a cable on the coast of the United States, neither is there any statute prohibiting such action; and I find on examination of the records of this Department that in 1875 conditional authority was given to land a French cable at Rye Beach, N. H., and that in 1879 permission was given to land a cable at Cape Cod.

" ' These precedents seem to justify a similar concession to the promoters of the present enterprise, which there is the less hesitation in according as they are citizens of the United States.' (Senate Doc. No. 122, p. 84.)

" On October 18, 1889, the Compagnie Française du Télégraphe de Paris à New-York applied to your Department for permission to lay a cable from San Domingo to the United States. To this request Mr. Blaine replied, December 21, 1889:

" ' While the authority of the President to grant the permission you desire must be accepted subject, of course, to the future ratification by Congress, yet there are certain conditions which he regards as absolutely essential before such provisional permission can be accorded.'

" These conditions are as follows:

" ' (1) That neither the company, its successors or assigns, nor any cable with which it connects, shall receive from any foreign government exclusive privileges which would prevent the establishment and operation of a cable of an American company in the jurisdiction of such foreign government.

" ' (2) That the company shall not consolidate or amalgamate with any other line or combine therewith for the purpose of regulating rates.

" ' (3) That the charges to the Government of the United States shall not be greater than those to any other government, and the general charges shall be reasonable.

" ' (4) That the Government of the United States shall be entitled to the same or similar privileges as may by law, regulation, or agreement be granted to any other government.

" ' (5) That a citizen of the United States shall stand on the same footing as regards privileges with citizens of San Domingo.

" ' (6) That messages shall have precedence in the following order: (a) Government messages and official messages to the Government; (b) telegraphic business; (c) general business.

" ' (7) That the line shall be kept open for daily business, and all messages, in the above order, be transmitted according to the time of receipt.

" ' Conditions similar to these were required of your company in 1879 in reply to its application for authority to land one or more of its cables on the Atlantic coast of this country, and assented to by the

company's order November 5, 1879. And it would seem needless to add that similar conditions have been imposed upon all cable companies desiring to land their cables from foreign countries upon the shores of the United States. It will be observed, however, that the first condition has been modified to meet a case which did not arise in 1879, of the cable for which the privilege of landing is sought being used as a link in a longer line of communication. Such a case is believed now to exist in respect to the proposed cable between the United States and San Domingo, which is understood to be only a link in a line between the United States and South America. The spirit and purpose of the first condition imposed in 1879 require that American cable companies should not now be excluded from operating and establishing lines between the United States and South America, either directly or by way of San Domingo.

"'The President, therefore, directs me to say that if the foregoing conditions are satisfactory to your company, and it will first file in this Department a duly authenticated copy of the concession granted by the Dominican Government to land its cable at Puerto Plata, together with a like certified copy of the conditions imposed by this Government, he will be willing to grant the necessary permission to your company to land its cable at Charleston, S. C., subject to the future action of Congress.' (House of Representatives, Fifty-second Congress, first session, Report No. 964.)

"The cable company took no steps to comply with these requirements. Nearly two years later, on December 2, 1891, the French Cable Company, through its attorney, Mr. Jefferson Chandler, renewed its application for permission to land a cable. Meantime, on December 1, 1891, the company, through the same attorney, obtained from the legislature of South Carolina a joint resolution purporting to authorize it to land a cable on the coast of that State, and, in January, 1892, from the legislature of Virginia, an act purporting to authorize it to land a cable on the shore of that State. On March 10, 1892, a joint resolution was introduced into Congress to confirm these grants. This resolution was referred to a committee, of which Mr. Wise was chairman, and to him was addressed the letter of Acting Secretary Wharton of March 22, 1892, published in House Report No. 964, Fifty-second Congress, first session. After receiving this communication the committee reported a substitute granting the landing privilege upon the conditions prescribed by Mr. Blaine. Thereupon, for the time being, the attempt of the company to obtain the consent of Congress ceased.

"On June 21, 1893, the same company, through the same attorney, applied again to the Department of State, ostensibly for permission to land a cable on the shore of Virginia, but the application was accompanied by a written argument to show that the President had no

power to act in the matter, the concluding paragraph of this argument and application being:

" ' I respectfully request, therefore, on behalf of the applicant, that the honorable Secretary of State will decide this application on its merits, and will declare that under the law the States may freely land cables, and that the Executive has no jurisdiction nor dispostion to prevent the landing and operation of a submarine cable from the shores of Virginia to any point permitted by the State, and that the authority of the State of Virginia to so permit cable companies to land and establish themselves on its coast is complete; and, further, that no action is required or permitted by any of the executive officers of the Government as the law now is.' (Fifty-third Congress, second session, Senate Doc. No. 14; letter to Mr. Gresham.)

" In response to this argument, Mr. Gresham, changing the attitude of the Government as established by the Presidents and their Secretaries of State from President Grant's time down, declined to act on the application, saying in his communication of August 15, 1893 :

" ' There is no Federal legislation conferring authority upon the President to grant such permission, and in the absence of such legislation, Executive action of the character desired would have no binding force.' [a] (Fifty-third Congress, second session, Senate Doc. No. 14; letter of Mr. Gresham.)

" October 2, 1895, Mr. Olney addressed a letter to Mr. Scrymser, president of the Central and South American Telegraph Company, in which, in answer to his letter of September 25, 1895, he stated that La Compagnie Française des Cables Télégraphiques had not made application for permission to land its cables on the coast of the United States, and added :

" ' Furthermore, in the absence of Federal legislation conferring authority upon the Executive to grant such permission, this Department has no power to act in the matter.'

" On the 24th of October, 1895, Mr. Scrymser laid before your Department certain information concerning an agreement for laying and maintaining submarine cables between France, North America, and the Antilles, to which the Government of France was a party, and suggested that the French minister be officially informed as to the policy of the Government of the United States in the matter of cable-landing privileges on our shores. Replying to this communication, on October 28, 1895, Mr. Olney referred to his former letter, and said :

" ' There is no Federal statute conferring authority upon the Executive to grant or withhold permission to land cables on the shores of

[a] See, to the same effect, Mr. Gresham, Sec. of State, to Mr. Mackey, Nov. 2, 1894, 199 MS. Dom. Let. 310; Mr. Gresham, Sec. of State, to Mr. Ingersoll, April 13, 1895, 201 MS. Dom. Let. 493; Mr. Uhl, Acting Sec. of State, to Mr. Wilson, May 22, 1895, 202 MS. Dom. Let. 304.

the United States. This Department has, therefore, no power to act in the matter, and I am unable to comply with your request.'

" As a natural sequence of the attitude taken by your Department under Mr. Gresham and Mr. Olney, La Compagnie Française des Cables Télégraphiques, acting in connection with the United States and Haiti Telegraph and Cable Company and the United States and Haiti Cable Company, in 1896, landed a cable, extending from Haiti to this country, at Coney Island, New York, without permission of the Government. This Department, acting through the Attorney-General and the United States attorney, brought an injunction suit against the companies named to prevent the landing and operation of the cable, but in view of the fact that the cable had been landed, the motion for an injunction against its operation was refused. At the same time Judge Lacombe said (77 Fed. Rep. 496) :

" ' It is thought that the main proposition advanced by complainant's counsel is a sound one, and that, without the consent of the General Government, no one, alien or native, has any right to establish a physical connection between the shores of this country and that of any foreign nation. Such consent may be implied as well as expressed, and whether it shall be granted or refused is a political question, and in the absence of Congressional action would seem to fall within the province of the Executive to decide. As was intimated upon the argument, it is further thought that the Executive may effectually enforce its decision without the aid of the courts.'

" It thus appears that from 1869 to August, 1893, during the terms of Grant, Hayes, Garfield, Arthur, Cleveland (first term), and Harrison, it was held by the Presidents and their Secretaries of State that the Executive has the power, in the absence of legislation by Congress, to control the landing, and, incidentally, regulate the operation of foreign submarine cables in the protection of the interests of this Government and its citizens. Against this established rule, supported by the opinion of the only United States judge who has passed upon the question, stands opposed the refusal to act of Mr. Gresham, followed by the dictum of Mr. Olney. The attitude taken by your Department under Mr. Gresham has resulted in the landing of two foreign cables upon our shores without permission of this Government and subject to no limitations or restrictions whatever. Must this condition continue? Is the President powerless to act until Congress legislates?

" A foreign submarine cable which lands upon our shores in its location enjoys rights upon our territory, and in its operation provides a means of international communication, public and private, political and commercial.

" The jurisdiction of this nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself. (Mr. Chief Justice Marshall, The Exchange,

7 Cranch, 116, 136.)   No one has a right to land a foreign cable upon our shores and establish a physical connection between our territory and that of a foreign state without the consent of the Government of the United States.

" The preservation of our territorial integrity and the protection of our foreign interests is intrusted, in the first instance, to the President. The Constitution, established by the people of the United States as the fundamental law of the land, has conferred upon the President the executive power; has made him the commander in chief of the Army and Navy; has authorized him, by and with the consent of the Senate, to make treaties, and to appoint ambassadors, public ministers, and consuls; and has made it his duty to take care that the laws be faithfully executed.   In the protection of these fundamental rights, which are based upon the Constitution and grow out of the jurisdiction of this nation over its own territory and its international rights and obligations as a distinct sovereignty, the President is not limited to the enforcement of specific acts of Congress.   He takes a solemn oath to faithfully execute the office of President, and to preserve, protect, and defend the Constitution of the United States.   To do this, he must preserve, protect, and defend those fundamental rights which flow from the Constitution itself and belong to the sovereignty it created.   (Mr. Justice Miller, In re Neagle, 135 U. S. 1, 63, 64; Mr. Justice Field, The Chinese Exclusion Case, 130 U. S. 581, 606; Mr. Justice Gray, Fong Yue Ting v. United States, 149 U. S. 698, 711; Mr. Justice Brewer, In re Debs, 158 U. S. 564, 582.)

" The President has charge of our relations with foreign powers. It is his duty to see that, in the exchange of comities among nations, we get as much as we give.   He ought not to stand by and permit a cable to land on our shores under a concession from a foreign power which does not permit our cables to land on its shores and enjoy *their* facilities equal to those accorded its cable *here*.   For this reason President Grant insisted on the first point in his message of 1875.

" The President is not only the head of the diplomatic service, but commander in chief of the Army and Navy.   A submarine cable is of inestimable service to the Government in communicating with its officers in the diplomatic and consular service, and in the Army and Navy when abroad.   The President should, therefore, demand that the Government have precedence in the use of the line, and this was done by President Grant in the third point of his message.

" Treating a cable simply as an instrument of commerce, it is the duty of the President, pending legislation by Congress, to impose such restrictions as will forbid unjust discriminations, prevent monopolies, promote competition, and secure reasonable rates.   These were the objects of the second and fourth points in President Grant's message.

"The Executive permission to land a cable is, of course, subject to subsequent Congressional action.  The President's authority to control the landing of a foreign cable does not flow from his right to permit it in the sense of granting a franchise, but from his power to prohibit it should he deem it an encroachment on our rights or prejudicial to our interests.  The unconditional landing of a foreign cable might be both, and therefore to be prohibited, but a landing under judicious restrictions and conditions might be neither, and therefore to be permitted in the promotion of international intercourse.

"I am of the opinion, therefore, that the President has the power, in the absence of legislative enactment, to control the landing of foreign submarine cables.  He may either prevent the landing, if the rights intrusted to his care so demand, or permit it on conditions which will protect the interests of this Government and its citizens; and if a landing has been effected without the consent or against the protest of this Government, respect for its rights and compliance with its terms may be enforced by applying the prohibition to the operation of the line unless the necessary conditions are accepted and observed."

> Mr. Richards, Acting Attorney-General, to Mr. Sherman, Sec. of State, Jan. 18, 1898, 22 Op. 13;  For. Rel. 1897, 166.
>
> Affirmed by Griggs, At. Gen., March 25, 1899, 22 Op. 408.
>
> June 11, 1898, the United States and Haiti Telegraph and Cable Company, in order to secure the dismissal of the suit against it, referred to in the opinion of Acting Attorney-General Richards, supra, adopted, by its board of directors, a resolution accepting the condition to which the French company objected in 1889, viz, that neither the company, "nor any cable with which it connects," shall receive from any foreign government exclusive privileges which would prevent the establishment and operation of a cable of an American company in the jurisdiction of such foreign government.  (Mr. Day, Sec. of State, to the Attorney-General, June 13, 1898, 229 MS. Dom. Let. 311.  See, also, same to same, May 24, 1898, 227 MS. Dom. Let. 592.)
>
> See Mr. Foster, Sec. of State, to Mr. Conger, min. to Brazil, July 13, 1892, explaining the position of the United States in opposing the creation of a monopolistic line between the United States and Brazil.  (For. Rel. 1892, 16.)  See, also, Mr. Uhl, Act. Sec., to Mr. Thompson, April 24, 1894, MS. Inst. Brazil, XVIII. 47.
>
> See Mr. Partridge, min. to Venezuela, to Mr. Gresham, Sec. of State, March 10, 1893, as to a proposed line from Venezuela to the United States.  (For. Rel. 1893, 720.)
>
> "The President has the power to grant or withhold, in his discretion, permission to land a foreign cable on the shores of the United States, and to impose whatever conditions thereon he may deem proper in the public interest, subject to whatever action Congress may take thereon."  (Mr. Bayard, Sec. of State, to Mr. Scrymser, March 7, 1886, 159 MS. Dom. Let. 258.)
>
> See, to the same effect, Mr. Davis, Acting Sec. of State, to Mr. Thompson, Oct. 10, 1882, 144 MS. Dom. Let. 124,

As to international telegraph lines through Central America and along the northern Pacific shores, see circular of Mr. Seward, Sec. of State, August 18, 1864, MS. Inst. Am. States, XVI. 456.

September 14, 1897, Mr. Sherman, Secretary of State, informed the British embassy at Washington that the President gave his consent to the construction by the Canadian government of a telegraphic line from the head of winter navigation on the Lynn canal, for a distance of about eighty miles across the summit of the mountains, without prejudice to the boundary or other claims of either Government, and with the reservation that the right of the United States to revoke the license at any time should be admitted.

For. Rel. 1897, 327–329.

March 29, 1899, the German ambassador at Washington presented a petition of the German-Atlantic Telegraphic Company to land in the United States a submarine cable, in order to establish direct telegraphic communication between Germany and the United States, touching the Azores.[a]

April 10, 1899, the Department of State conveyed to the ambassador the consent of the President, which was to become operative when the company should file in the Department its formal written acceptance of certain terms and conditions.[b]

These terms and conditions, which the company accepted, its acceptance being filed under date of May 13, 1899, were as follows:

I. That neither the said company, its successors or assigns, nor any cable with which it connects shall receive from any foreign government exclusive privilege which would prevent the establishment and operation of a cable of an American company in the jurisdiction of such foreign government.

II. That the company has received no exclusive concession from any government which would exclude any other company or association which may be formed in the United States of America from obtaining a like privilege for landing its cable or cables on the shores of Germany, and connecting such cable or cables with the inland telegraphic systems of said country.

III. That the said company shall not consolidate or amalgamate with any other line or combine therewith for the purpose of regulating rates.

IV. That the company will, in the transmission of official messages, give precedence to messages from and to the Government of the United States of America and of other governments.

V. That the rates charged to the Government of the United States shall not be greater than those to any other Government, and the said rates and those charged to the general public shall never exceed the present telegraphic rates between the said countries, and shall be reasonable.

VI. That the Government of the United States shall be entitled to the same or similar privileges as may by law, regulation, or agreement be granted by said company or its successors or assigns to any other government.

[a] For. Rel. 1899, 310.

[b] For. Rel. 1899, 311 ; MS. Notes to German Leg. XII. 288.

VII. That the citizens of the United States shall stand on an equal footing as regards the transmission of messages over said company's lines with citizens or subjects of Germany or any other country with which the said cable may connect.

VIII. That messages shall have precedence in the following order:

(a) Government messages and official messages to the Government.

(b) Service messages.

(c) General telegraphic messages.

IX. The said line shall be kept open for daily business, and all messages, in the order above, be transmitted according to the time of receipt.

X. That no liability shall be assumed by the Government of the United States by virtue of any censorship which it may exercise over said line in the event of war or civil disturbance.

XI. That the consent hereby granted shall be subject to any future action by the Congress or by the President, affirming, revoking, or modifying, wholly or in part, the said conditions and terms on which said permission is given.

The undersigned company at the same time most respectfully begs to express its best thanks for the granting of said consent, and awaits with pleasure the final document from the Department of State.

We have, etc.,

DEUTSCH ATLANTISCHE TELEGRAPHENGESELLSCHAFT.
C. W. GUILLEAUME, No. 36764, Rep.

The undersigned, a notary public for the district of the royal oberlande court at Colonge, residing at Colonge-on-the-Rhine, counselor of justice, Franz Friedrich Wilhelm Goecke, hereby attests under his official seal the genuineness of the above signature, written in his presence by Carl Wilhelm Guilleaume, whose name, occupation, and place of residence are known to him. The said Carl Wilhelm Guilleaume being a merchant, residing at Cologne, and a member of the board of directors of the stock company known as the German Atlantic Telegraph Company (Deutsch Atlantische Telegraphengesellschaft), located at Cologne.

Cologne, May 15, 1899.

[L. S.]

GOECKE,
Royal Notary and Counselor of Justice.

The foregoing signature of the royal notary. counselor of justice, Goecke, of Cologne, is hereby authenticated. It is further certified that the notary was authorized to give the above certificate, and that the said certificate is in conformity with the legal provisions enforced here.

Cologne, May 15, 1899.

[SEAL.]

LUTZELER,
Chief Justice of the Provincial Court,
Superior Privy Counselor of Justice.

CONSULATE OF THE UNITED STATES OF AMERICA AT COLOGNE, GERMANY, ss:

I, John A. Barnes, consul of the United States of America at Cologne, Germany, do hereby certify that Lutzeler, whose name is subscribed to the annexed instrument of writing, was, at the time of subscribing the same, Royal Prussian president of the land court of justice, duly commissioned, and that full faith and credit are due to his acts as such.

Given under my hand and seal of office this 15th day of May, A. D. 1899.

[SEAL.]

JOHN A. BARNES,
Consul of the United States of America.

No. 138.

This is to certify that the foregoing document is executed and properly legal-ized according to the requirements of the German law.

Washington, D. C., May 26, 1899.

[SEAL.] .                                        HOLLEBEN,

                                          *Imperial German Ambassador.*

August 30, 1900, telegrams were exchanged between the German Emperor and the President of the United States on the opening of the cable.

> · For. Rel. 1899, 314–315

. September 19, 1899, the minister of the United States at Tokyo, acting under instructions of his Government, drew attention to the desirability of direct telegraphic communication between Japan and the United States under American auspices, and stated that it would be agreeable to the United States if the Pacific Cable Company of New York should be authorized to establish cable communications between the two countries.

The Japanese Government exhibited a favorable attitude toward the project, and a draft of proposed conditions for the laying and working of the cable was informally handed to the American min-ister. These conditions provided that the cable should be laid within five years after the date of the Japanese concession; that the Japa-nese Government should grant an annual subsidy of 150,000 yen, during a term of twenty years after the opening of the cable; that the rate for private telegrams should not exceed two yen per word, and that the rate per word for Japanese Government telegrams should be half the amount collected from the general public for ordi-nary telegrams; that during the term of twenty years the Japanese Government should not authorize the laying of another cable between America and Japan, either with or without intermediate stations, with the reservation, however, of the right to grant a concession for another cable if it should be important to do so, and if the company, after having had an offer of the first chance to lay it, should decline to accept such offer.

> . For. Rel. 1899, 481–483.

### VIII. *INTERNATIONAL COOPERATION.*

#### 1. PREVENTION OF THE SLAVE TRADE.

### § 228.

As each nation's sphere of action is circumscribed by jurisdictional limits, it is obvious that there are interests common to all for the preservation of which international cooperation is essential. Such

# EXHIBIT 12

Presidential Permit Authorizing US-Canada Oil Pipeline
Cross-Border Facilities signed by President John F. Kennedy,
dated October 18, 1962

PRESIDENTIAL PERMIT

----------------

AUTHORIZING LAKEHEAD PIPE LINE COMPANY, INC.
TO CONNECT, CONSTRUCT, OPERATE, AND MAINTAIN A PIPELINE
AT THE INTERNATIONAL BOUNDARY LINE BETWEEN
THE UNITED STATES AND CANADA

By virtue of the authority vested in me as President of the
United States of America, and subject to the acceptance of the
conditions, provisions and requirements hereinafter set forth,
permission is hereby granted to Lakehead Pipe Line Company, Inc.,
a Delaware corporation having its main office at 2206 East 5th
Street, Superior, Wisconsin (hereinafter referred to as "permittee")
to construct, operate, and maintain a pipeline for crude oil or
other fluid hydrocarbons from the international boundary line
between the United States and Canada to the Buffalo, New York area,
and to connect such facilities with like facilities in Canada.

The term "facilities" as used in this permit means the pipeline
and all land, structures, installations, and equipment appurtenant
thereto.

The term "United States facilities" as used herein means that
part of the facilities in the United States.

The facilities, of which the United States facilities covered
by and subject to this permit are a part, are described as follows:

A pipeline with an American Petroleum Institute
specification of 5LX42, an outside diameter of 12 and
3/4 inches and a wall thickness of 0.5 inches, with
internal pressure at minimum yield strength of 1,650
pounds per square inch, said pipeline to be buried in
a trench to a depth of 10 feet beneath the floor of the
West Branch of the Niagara River, said trench to be
backfilled above the pipeline with 3 feet of gravel or
gravel-filled sacks and 6 feet of one man stone, the
balance left to silt up; said pipeline to contain motor-
operated emergency river valves at the Canadian and
American shore lines adjacent to the river crossing.

The above-described facilities shall be situated
in the West Branch of the Niagara River, opposite a
portion of Lot 39 of the Town of Grand Island, Erie
County, State of New York, owned in fee simple by per-
mittee, and the connection between the United States

facilities

- 2 -

facilities and the facilities located in Canada shall lie,
measured from the International Boundary Commission's
Concrete Reference Monument No. 26, Latitude 43 degrees
no minutes 56.748 seconds Longitude 79 degrees, no minutes,
54.279 seconds as a base point, East a distance of 2169
feet on a bearing of North 85 degrees 25 minutes 50 seconds
East and from that point South 5326.13 feet on a bearing of
North 6 degrees 23 minutes West.

In addition to the above, permittee shall furnish,
install, and maintain in the above-described pipeline, at
a point in the United States as near to the international
boundary line as is practicable, a positive displacement
meter, or meters, provided with an adequate proving system,
to be installed and operated in accordance with American
Petroleum Institute Code No. 1101, and a suitable sampling
device; the installation and operation of said meter, proving
system, and sampling device to be subject to the approval of
the Commissioner of Customs. The conditions and times of
meter reading, meter proving, and sampling shall be as
directed by the Commissioner of Customs.

The effectiveness of this permit to authorize connection of the
United States facilities at the international boundary line with the
facilities located in Canada is subject to the issuance by the appropriate
authorities in Canada to the Interprovincial Pipe Line Company
a Federal corporation incorporated by Special Act of the Parliament
of Canada, 13 George VI, Chapter 34, having its head office at 1004
Jasper Avenue, Edmonton, Alberta, Canada, of which permittee is a
wholly owned subsidiary, of the necessary authorization for the construction,
operation, and maintenance of the facilities located in
Canada and for their connection with the United States facilities at
the international boundary line.

This permit is subject to such conditions as the President of
the United States may see fit, expedient or necessary hereafter to
impose; is subject to the acquisition by permittee of a servitude
of passage or right-of-way, valid under the laws of the State of New
York, from any and all persons owning or asserting an interest of
any nature or kind whatsoever in and to the land in the United States
in the vicinity of the point at which the connection between the
United States facilities and the facilities located in Canada occurs
and is subject to the following further conditions:

Article 1.  It is expressly agreed by the permittee that the
United States facilities and operations herein described shall be
subject to all the conditions, provisions and requirements of this
permit or any amendment thereof, further that this permit may be

termin

- 3 -

terminated at the will of the President of the United States or may
be amended by the President of the United States at will or upon
proper application therefor, further that permittee shall make no
substantial change in the location of the United States facilities
or in the operation authorized by this permit until such changes
shall have been approved by the Government of the United States.

Article 2. The construction, operation, maintenance and con-
nection of the United States facilities shall be subject to inspec-
tion and approval by representatives of any Federal or State agency
concerned and the International Joint Commission, United States and
Canada. The permittee shall allow duly authorized officers and
employees of such agencies or the International Joint Commission
free and unrestricted access to said facilities in the performance
of their official duties.

: Article 3. Upon the termination, revocation, or surrender of
this permit, the United States facilities in the immediate vicinity
of the international boundary line shall be removed by and at the
expense of the permittee within such time as the Government of the
United States may specify, and upon failure of the permittee to
remove this portion of the United States facilities as ordered, the
Government of the United States may direct that possession of such
facilities be taken and that they be removed at the expense of the
permittee; and the permittee shall have no claim for damages by
reason of such possession or removal.

Article 4. The transportation of crude oil or other fluid hydro
carbons through the United States facilities shall be in all respect
subject to the power of Congress under its authority to regulate com
merce as applied to the business of this permittee.

Article 5. This permit is subject to the limitations, terms an
conditions contained in any orders issued by (1) the Department of
the Treasury, (2) the Department of Defense, (3) the Department of
Commerce, (4) the International Joint Commission, or (5) the Inter-
state Commerce Commission with respect to the United States facilit
or the crude oil or other fluid hydrocarbons transported thereby, an
shall continue in force and effect only so long as permittee shall
continue the operations thereby authorized in exact accordance with
such limitations, terms and conditions.

Article 6. The permittee agrees that when, in the opinion of
the President of the United States, the safety of the United States
demands it, due notice being given, the United States shall have th
right to enter upon and take possession of any of the United States
facilities or parts thereof and to take such measures as it deems
necessary with respect to all contracts of the permittee covering

. the

- 4 -

the transportation or sale of crude oil or other fluid hydrocarbons by means of said United States facilities; to retain possession, management and control thereof for such length of time as may appear to the President to be necessary to accomplish said purposes; and thereafter to restore possession and control to the permittee. In the event that the United States shall exercise such right, it shall pay to permittee just and fair compensation for the use of such United States facilities upon the basis of a reasonable profit in time of peace, and the cost of restoring said facilities to as good condition as existed at the time of entering and taking over the same, less the reasonable value of any improvements that may have been made by the United States.

Article 7.  Neither this permit nor the United States facilities nor any part thereof covered by this permit shall be voluntarily transferred in any manner otherwise than to The Chase Manhattan Bank, as Trustee under the mortgage and deed of trust dated as of October 1 1949.  In the event of the involuntary transfer of the United States facilities or any part thereof by operation of law the permit shall continue in effect temporarily for a reasonable time pending the making of an application by the transferee for a permanent permit and decision thereon, provided that notice of such involuntary transfer is given promptly in writing to the Department of State of the United States accompanied by a statement by the transferee under oath that the United States facilities and the operation and maintenance thereof authorized by this permit will remain substantially the same as before the involuntary transfer.

Article 8.

(1)  The permittee shall maintain the United States facilities and every part thereof in a condition of good repair for their safe operation in the transportation of crude oil or other fluid hydro-carbons.

(2)  Permittee shall take reasonable precautions to prevent and suppress fires, explosions or leakage and to avert any conditions on the land traversed or waters crossed by the United States facilities which might endanger the safety of these facilities.

(3)  Permittee shall save harmless the United States from any claimed or adjudged liability arising out of the construction, opera-tion, or maintenance of the facilities.

Article 9.  Permittee agrees to file with the appropriate agency of the Government of the United States such statement or reports under oath with respect to the United States facilities, the crude oil or other fluid hydrocarbons transported thereby, and/or permittee's

activiti

- 5 -

activities and operations in connection therewith, as are now or
as may hereafter be required under any laws or regulations of the
Government of the United States or its agencies, or the Inter-
national Joint Commission.

Article 10.  The permittee shall send notice to the Department
of State of the United States at such time when the connection
authorized by this permit is made at the international boundary
line between the United States facilities and the facilities
located in Canada.

IN WITNESS WHEREOF, I, JOHN F. KENNEDY, President of the
United States of America, have hereunto set my hand this eighteenth
day of October, 1962, in the City of Washington, District of Colu

# EXHIBIT 13

Presidential Permit Signed by President Lyndon B. Johnson,
dated January 22, 1968

PRESIDENTIAL PERMIT

--------------------

## AUTHORIZING LAKEHEAD PIPE LINE COMPANY TO CONNECT, CONSTRUCT, OPERATE AND MAINTAIN A PIPELINE AT THE INTERNATIONAL BOUNDARY LINE BETWEEN THE UNITED STATES AND CANADA

By virtue of the authority vested in me as President of the United States of America, and subject to the acceptance of the conditions, provisions and requirements hereinafter set forth, permission is hereby granted to Lakehead Pipe Line Company, Incorporated, a Delaware corporation having its main office at 3025 Tower Avenue, Superior, Wisconsin (hereinafter referred to as "permittee"), to construct, operate, and maintain a pipeline system for crude oil and other liquid hydrocarbons at the international boundary line between the United States and Canada in Pembina County, North Dakota, and to connect such facilities with like facilities in the Province of Manitoba, Canada.

The term "facilities" as used in this permit means the pipeline system and all land, structures, installations, and equipment appurtenant thereto.

The term "United States facilities" as used herein means that part of the facilities in the United States.

The facilities, of which the United States facilities covered by and subject to this permit are a part, are described as follows:

a. A 34-inch pipeline for crude oil and other liquid hydrocarbons manufactured and installed substantially as described in th attached application dated August 31, 1967, which application together with the exhibits attached thereto is made a part of this permit. Said pipeline shall connect at the international boundary line with a liquid hydrocarbon pipeline system to be constructed in the Province of Manitoba, Canada.

The permittee shall furnish, install, and maintain or cause to be furnished, installed, and maintained, such metering facilities as are required by the Commissioner of Customs, provided with an adequate proving system or systems, to be installed and operated in accordance with American Petroleum Institute Code No. 1101, and a suitable sampling device or devices; the installation and operation of said facilities to be subject to the approval of the Commissioner of Customs. The conditions and times of meter reading, meter proving, and sampling shall be as directed by the Commissioner of Customs.

- 2 -

The above-described facilities shall be situated at such location or locations as will be acceptable to the Commissioner of Customs and to permittee.

b. An existing pipeline for crude oil and other liquid hydrocarbons, located in Pembina County, North Dakota, manufactured to American Petroleum Institute specification 5LX, with an outside diameter of 18 inches, a wall thickness of .281 inches, minimum yield strength of 46,000 pounds per square inch, a coating of coal tar enamel, tested to 1,000 pounds per square inch after installation, the said pipeline continuing for at least forty feet on each side of the international boundary and buried to a depth of 3 feet below ground level, said pipeline connected at the international boundary line with like facilities in the Province of Manitoba, Canada.

c. An existing pipeline for crude oil and other liquid hydrocarbons, located in Pembina County, North Dakota, manufactured to American Petroleum Institute specification 5LX, with an outside diameter of 26 inches, a wall thickness of .281 inches, minimum yield strength of 52,000 pounds per square inch, a coating of coal tar enamel, tested to 1,010 pounds per square inch after installation, the said pipeline continuing for at least forty feet on each side of the international boundary and buried to a depth of 3 feet below ground level, said pipeline connected at the international boundary line with like facilities in the Province of Manitoba, Canada

The effectiveness of this permit to authorize connection of the United States facilities at the international boundary line with the facilities located in Canada is subject to the issuance by the appropriate authorities in Canada to a company or companies, operating in Canada, of the necessary authorization for the construction, operation, and maintenance of the facilities located in Canada and for their connection with the United States facilities at the international boundary line.

This permit is subject to such conditions as the President of the United States may see fit, expedient or necessary hereafter to impose; is subject to the acquisition by the permittee of a servitude of passage or right-of-way, valid under the laws of the State of North Dakota from any and all persons owning or asserting an interest of any nature or kind whatsoever in and to the land in the United States in the vicinity of the point of connection between the United States facilities and the facilities located in Canada; and is subject to the following further con

Article 1. It is expressly agreed by the permittee that the United States facilities and operations herein described shall be subject to all the conditions, provisions and requirements of this permit or any amendment thereof, further that this permit may be terminated at the will of the President of the United States or may be amended by the President of the United States at will or upon proper application therefor, further that the permittee shall make no substantial change in the location of the United States facilities or in the operation authorized by this perm until such changes shall have been approved by the President of the United States.

- 3 -

Article 2.  The construction, connection, operation, and maintenance of the United States facilities shall be subject to inspection and approval by the representatives of any Federal or State agency concerned. The permittee shall allow duly authorized officers and employees of such agencies free and unrestricted access to said facilities in the performance of their official duties.

Article 3.  Upon the termination, revocation, or surrender of this permit, the United States facilities in the immediate vicinity of the international boundary line shall be removed by and at the expense of the permittee within such time as the President of the United States may specify, and upon failure of the permittee to remove this portion of the United States facilities as ordered, the President of the United States may direct that possession of such facilities be taken and that they be removed at the expense of the permittee; and the permittee shall have no claim for damages by reason of such possession or removal.

Article 4.  The transportation of crude oil and other liquid hydrocarbons through the United States facilities shall be in all respects subject to the power of Congress under its authority to regulate commerce as applied to the business of this permittee.

Article 5.  This permit is subject to the limitations, terms and conditions contained in any orders issued by any competent agency of the United States Government with respect to the United States facilities or the crude oil and other liquid hydrocarbons transported thereby, and shall continue in force and effect only so long as the permittee shall continue the operations hereby authorized in exact accordance with such limitations, terms and conditions.

Article 6.  The permittee agrees that when, in the opinion of the President of the United States, the national security of the United States demands it, due notice being given, the United States shall have the right to enter upon and take possession of any of the United States facilities or parts thereof and to take such measures as it deems necessary with respect to all contracts of the permittee covering the transportation or sale of crude oil and other liquid hydrocarbons by means of said United States facilities; to retain possession, management and control thereof for such length of time as may appear to the President to be necessary to accomplish said purposes; and thereafter to restore possession and control to the permittee.  In the event that the United States shall exercise such right, it shall pay to the permittee just and fair compensation for the use of such United States facilities

- 4 -

upon the basis of a reasonable profit in normal conditions, and the cost of restoring said facilities to as good condition as existed at the time of entering and taking over the same, less the reasonable value of any improvements that may have been made by the United States.

Article 7.  Neither this permit nor the United States facilities nor any part thereof covered by this permit shall be voluntarily transferred in any manner.  In the event of an involuntary transfer of the United States facilities or any part thereof by operation of law (including transfers to receivers, trustees, or purchasers under foreclosure or judicial sale) the permit shall continue in effect temporarily for a reasonable time pending the making of an application by the transferee for a permanent permit and decision thereon, provided that notice of such involuntary transfer is given promptly in writing to the Department of State of the United States accompanied by a statement by the transferee under oath that the United States facilities and the operation and maintenance thereof authorized by this permit will remain substantially the same as before the involuntary transfer.  Notwithstanding the foregoing, the United States facilities or any part thereof covered by this permit may be transferred to the Chase Manhattan Bank, as Trustee under the Mortgage and Deed of Trust dated as of October 1, 1949. In this case this permit shall continue in effect subject to all the limitations, terms and conditions herein stated.

Article 8.

(1)  The permittee shall maintain the United States facilities and every part thereof in a condition of good repair for their safe operation in the transportation of crude oil and other liquid hydrocarbons.

(2)  The permittee shall take reasonable precautions to prevent and suppress fires, explosions or leakage and to avert any conditions on the land traversed or waters affected by the United States facilities which might endanger the safety of these facilities.

(3)  The permittee shall save harmless the United States from any claimed or adjudged liability arising out of the construction, operation, or maintenance of the facilities.

Article 9.  The permittee agrees to file with the appropriate agencies of the Government of the United States such statement or reports under oath with respect to the United States facilities, the crude oil and other liquid hydrocarbons transported thereby, and/or permittee's activities and operations in connection therewith, as are now or as may hereafter be required under any laws or regulations of the Government of the United States or its agencies.

- 5 -

**Article 10.**  The permittee shall send notice to the Department of State of the United States at such time as the connection authorized by this permit is made at the international boundary line between the United States facilities and the facilities located in Canada.

IN WITNESS WHEREOF, I, LYNDON B. JOHNSON, President of the United States of America, have hereunto set my hand this 22nd     day of January   , 1968, in the City of Washington, District of Columbia.

# EXHIBIT 14

Executive Order No. 10530, 19 Fed. Reg. 2,709
(May 12, 1954)

# FEDERAL REGISTER

**THE NATIONAL ARCHIVES**

LITTERA SCRIPTA MANET

1934

OF THE UNITED STATES

VOLUME 19 · NUMBER 92

*Washington, Wednesday, May 12, 1954*

## TITLE 3—THE PRESIDENT

### EXECUTIVE ORDER 10530

PROVIDING FOR THE PERFORMANCE OF CERTAIN FUNCTIONS VESTED IN OR SUBJECT TO THE APPROVAL OF THE PRESIDENT

By virtue of the authority vested in me by section 301 of title 3 of the United States Code (65 Stat. 713), and as President of the United States, it is hereby ordered as follows:

PART I. DIRECTOR OF THE BUREAU OF THE BUDGET

SECTION 1. The Director of the Bureau of the Budget is hereby designated and empowered to perform the following-described functions without the approval, ratification, or other action of the President:

(a) The authority vested in the President by section 10 of the act of March 3, 1933, ch. 212, 47 Stat. 1516, as amended by section 6 of the act of August 2, 1946, ch. 744, 60 Stat. 808 (5 U. S. C. 73b), to prescribe regulations with respect to the certification required in connection with allowances for transportation exceeding the lowest first-class rate by the transportation facility used in such transportation.

(b) The authority vested in the President by sections 1 (a) and 1 (b) of the act of August 2, 1946, ch. 744, 60 Stat. 806, 807 (5 U. S. C. 73b–1 (a), 73b–1 (b)), to prescribe regulations (1) with respect to the allowance and payment from Government funds of the expenses of travel of any civilian officer or employee of the Government transferred from one official station to another for permanent duty, the expenses of transportation of his immediate family (or commutation thereof), and the expenses of transportation, packing, crating, temporary storage, drayage, and unpacking of his household goods and personal effects; and (2) with respect to reimbursement to such officer or employee on a commuted basis in lieu of the payment of actual expenses of transportation, packing, crating, temporary storage, drayage, and unpacking of his household goods and personal effects in the case of such transfers between points in continental United States.

(c) The authority vested in the President by section 7 of the act of August 2, 1946, ch. 744, 60 Stat. 808 (5 U. S. C.

73b–3), to prescribe regulations with respect to the availability of appropriations for the departments for expenses of travel of new appointees, expenses of transportation of their immediate families and expenses of transportation of their household goods and personal effects from places of actual residence at time of appointment to places of employment outside the continental United States, and for such expenses on return of employees from their posts of duty outside the continental United States to the places of their actual residence at time of assignment to duty outside the United States.

(d) The authority vested in the President by section 1 of the act of July 8, 1940, ch. 551, 54 Stat. 743 (5 U. S. C. 103a), to prescribe regulations with respect to the payment on the death of a civilian officer or employee of the United States (1) of the expenses of preparing and transporting the remains when the death of the officer or employee occurs while in travel status in the United States or while performing official duties in a territory or possession of the United States or in a foreign country or in transit thereto or therefrom, and (2) of the transportation expenses of his dependents, including expenses incurred in packing, crating, drayage, and transportation of household effects and other personal property, to his former home or such other place as the head of the department shall determine when the death of the officer or employee occurs while in travel status or while performing official duties as set forth in item (1) of this paragraph.

(e) The authority vested in the President by section 407 of the National Security Act of 1947, as added by the act of August 10, 1949, ch. 412, sec. 11, 63 Stat. 585 (5 U. S. C. 172f (a)), to approve the transfers of balances of appropriations provided for in the said section 407.

(f) The authority vested in the President by the last sentence of paragraph (c) of section 32 of Title III of the act of July 22, 1937, ch. 517, 50 Stat. 525, as amended (7 U. S. C. 1011c), to transfer to other Federal, State, or Territorial agencies lands acquired by the Secretary of Agriculture under section 32 (a) of the said act.

(g) The authority vested in the President by section 45 of Title IV of the act

(Continued on p. 2711)

## CONTENTS

### THE PRESIDENT

| | Page |
|---|---|
| **Executive Order** | |
| Providing for the performance of certain functions vested in or subject to the approval of the President | 2709 |

### EXECUTIVE AGENCIES

**Agricultural Marketing Service**
Proposed rule making:
Milk handling in Sioux City, Iowa — 2722

**Agriculture Department**
See Agricultural Marketing Service; Commodity Credit Corporation.

**Civil Aeronautics Board**
Rules and regulations:
Charter trips and special services; temporary authorization for national defense transportation — 2717

**Civil Service Commission**
Rules and regulations:
Competitive service, exceptions from; Department of Labor — 2712

**Coast Guard**
Notices:
Equipment:
Approval — 2739
Termination of approvals — 2739

**Commodity Credit Corporation**
Rules and regulations:
Corn; 1953-crop reseal loan program — 2712
Flaxseed; 1954 crop loan and purchase agreement program; warehouse charges — 2714
Oilseeds; 1954 cottonseed loan program — 2714

**Customs Bureau**
Notices:
Hats and beaded bag plates; tariff classification — 2739
Rules and regulations:
Air commerce regulations; Detroit-Wayne Major Airport — 2717

**Federal Communications Commission**
Notices:
Hearings, etc.:
Arkansas Television Co. and Arkansas Telecasters, Inc. — 2746
Atlas Towing Co — 2747

2709

Case 4:16-cv-00036   Document 42-5   Filed in TXSD on 04/01/16   Page 32 of 48



# FEDERAL REGISTER

Published daily, except Sundays, Mondays, and days following official Federal holidays, by the Federal Register Division, National Archives and Records Service, General Services Administration, pursuant to the authority contained in the Federal Register Act, approved July 26, 1935 (49 Stat. 500, as amended; 44 U. S. C., ch. 8B), under regulations prescribed by the Administrative Committee of the Federal Register, approved by the President. Distribution is made only by the Superintendent of Documents, Government Printing Office, Washington 25, D. C.

The regulatory material appearing herein is keyed to the Code of Federal Regulations, which is published, under 50 titles, pursuant to section 11 of the Federal Register Act, as amended August 5, 1953.

The FEDERAL REGISTER will be furnished by mail to subscribers, free of postage, for $1.50 per month or $15.00 per year, payable in advance. The charge for individual copies (minimum 15¢) varies in proportion to the size of the issue. Remit check or money order, made payable to the Superintendent of Documents, Washington 25, D. C.

There are no restrictions on the republication of material appearing in the FEDERAL REGISTER.

## CFR SUPPLEMENTS

### (For use during 1954)

The following Supplement is now available:

### Titles 4–5 ($0.60)

Previously announced: Title 3, 1953 Supp. ($1.50); Title .8 ($0.35); Title 9 ($0.50); Titles 10–13 ($0.50); Title 16 ($1.00); Title 17 ($0.50); Title 18 ($0.45); Title 20 ($0.70); Titles 22–23 ($1.00); Title 24 ($0.75); Title 25 ($0.45); Title 26: Parts 183–299, Revised 1953 ($5.50); Titles 30–31 ($1.00); Title 33 ($1.25); Titles 40–42 ($0.50); Titles 44–45 ($0.75); Title 49: Parts 1–70 ($0.60); Parts 71–90 ($0.65); Parts 91–164 ($0.45); Parts 165 to end ($0.60)

Order from
Superintendent of Documents, Government Printing Office, Washington 25, D. C.

## CONTENTS—Continued

**Federal Communications Commission—Continued**                               Page
Notices—Continued
  Hearings, etc.—Continued
    Kullman, Charlie_____          2746
    Southwestern Publishing Co., Inc., and Boulder City Broadcasting Co_____          2747
    Texas Telecasting Inc., and Big Spring Broadcasting Co_____          2747
    Trawler Batavia, Inc_____          2747
    Wright & Hawkins Ltd_____          2747
  Renewal of exemption of certain U. S. passenger vessels from radio provisions when navigated in specified waters_          2748

## CONTENTS—Continued

**Federal Communications Commission—Continued**                               Page
Proposed rule making:
  Radio broadcast services_____          2734
  Stations on land and shipboard in Maritime Services_____          2738
Rules and regulations:
  Television broadcast stations; table of assignments (3 documents) _____          2721

**Federal Power Commission**
Notices:
  Hearings, etc.:
    Baltic Operating Co_____          2750
    Commonwealth Natural Gas Corp_____          2749
    El Paso Natural Gas Co_____          2750
    Tennessee Gas Transmission Co. et al_____          2749
    United Gas Pipe Line Co_____          2750

**Federal Reserve System**
Rules and regulations:
  Payment of interest on deposits; payroll deduction savings plan_____          2716

**Geological Survey**
Notices:
  California, Louisiana, Montana, New Mexico, and Wyoming; definitions of known geologic structures of producing oil and gas fields_____          2745

**Housing and Home Finance Agency**
Notices:
  Certain officials; organization description, including delegations of final authority; designation of Acting Administrator_____          2750

**Interior Department**
See Geological Survey.

**Interstate Commerce Commission**
Notices:
  Applications for relief:
    Iron and steel pipe from Texas to Mississippi River crossings_____          2756
    Lumber, net transit rates on, from Virginia to Memphis, Tenn_____          2756
  Applications of motor carriers of property_____          2751
  Applications of motor carriers under sections 5 and 210a (b) _____          2756
Rules and regulations:
  Carriers by motor vehicle; applications for certificates and permits_____          2722

**Labor Department**
See Wage and Hour Division.

**Post Office Department**
Rules and regulations:
  International postal service: Postage rates, service available and instructions for mailing; miscellaneous amendments (2 documents) _____          2720, 2721

## CONTENTS—Continued

**Securities and Exchange Commission**                               Page
Notices:
  Hearings, etc.:
    Magnavox Co_____          2750
    Worthington Corp. et al_____          2751

**Treasury Department**
See Coast Guard; Customs Bureau.

**Veterans' Administration**
Rules and regulations:
  Vocational rehabilitation and education:
    Considerations respecting training under other laws administered by the Veterans' Administration_____          2720
    Miscellaneous amendments___          2718
    Special considerations concerning pursuit of education and training after statutory delimiting date__          2717

**Wage and Hour Division**
Notices:
  Learner employment certificates; issuance to various industries_____          2745

## CODIFICATION GUIDE

A numerical list of the parts of the Code of Federal Regulations affected by documents published in this issue. Proposed rules, as opposed to final actions, are identified as such.

**Title 3**                                         Page
Chapter II (Executive orders):
  3513 (revoked by EO 10530)__          2709
  6779 (see EO 10530)_____          2709
  7732 (see EO 10530)_____          2709
  10530_____          2709
Chapter III (Presidential documents other than proclamations and Executive orders):
  Reorganization Plan 3, 1947 (see EO 10530) _____          2709

**Title 5**
Chapter I:
  Part 6_____          2712

**Title 6**
Chapter IV:
  Part 421 (2 documents) ___ 2712, 2714
  Part 443 _____          2714

**Title 7**
Chapter IX:
  Part 948 (proposed) _____          2722

**Title 12**
Chapter II:
  Part 217_____          2716

**Title 14**
Chapter I:
  Part 207_____          2717

**Title 19**
Chapter I:
  Part 6_____          2717

**Title 38**
Chapter I:
  Part 21 (3 documents) _____ 2717, 2718, 2720

**Title 39**
Chapter I:
  Part 127 (2 documents) ___ 2720, 2721

## CODIFICATION GUIDE—Con.

| Title 47 | Page |
|---|---|
| Chapter I: | |
| Part 3 (3 documents) | 2721 |
| Proposed rules | 2734 |
| Part 7 (proposed) | 2738 |
| Part 8 (proposed) | 2738 |
| Title 49 | |
| Chapter I: | |
| Part 168 | 2712 |

of July 22, 1937, ch. 517, 50 Stat. 530, as amended by the act of August 14, 1946, ch. 964. 60 Stat. 1064 and 1069 (7 U. S. C. 1019), and as limited with respect to Title III of the act of July 22, 1937, to transfer any right, interest or title held by the United States in any lands acquired in the program of national defense and no longer needed therefor, and to determine the suitability of the lands to be transferred, for the purposes referred to in said section 45; and to transfer for the purposes of Title III of the said act, any right, interest or title held by the United States in any lands under the supervision of the Secretary of Agriculture, as provided by section 45 of the said act of July 22, 1937.

(h) The authority vested in the President by section 4 (k) of the Tennessee Valley Authority Act of May 18, 1933, as amended, 55 Stat. 599 (16 U. S. C. 831c (k)), to approve transfers under paragraphs (a) and (c) thereof, other than leases for terms of less than 20 years and conveyances of property having a value not in excess of $500.

(i) The authority vested in the President by section 7 (b) of the Tennessee Valley Authority Act of May 18, 1933, ch. 32, 48 Stat. 63 (16 U. S. C. 831f (b)), to provide for the transfer to the Tennessee Valley Authority of the use, possession, and control of real or personal property of the United States deemed by the Director of the Bureau of the Budget to be necessary and proper for the purposes of the Corporation as stated in the said act.

(j) The authority vested in the President by section 1 of the act of March 4, 1927, ch. 505, 44 Stat. 1422 (20 U. S. C. 191), to transfer to the jurisdiction of the Secretary of Agriculture for the purposes of said act any land belonging to the United States within or adjacent to the District of Columbia located along the Anacostia River north of Benning Bridge.

(k) The authority vested in the President by section 202 of the Budget and Accounting Procedures Act of September 12, 1950, ch. 946, 64 Stat. 838 (31 U. S. C. 581c), to approve the transfers of balances of appropriations provided for in subsections (a) and (b) of the said section 202.

(l) So much of the authority vested in the President by the last sentence of section 11 of the act of June 6, 1924, ch. 270, 43 Stat. 463 (as renumbered by sec. 2 of and as amended by, the act of July 19, 1952, ch. 949, 66 Stat. 781, et seq.), as consists of authority to approve the designation of lands to be acquired by condemnation and of authority to approve contracts for purchase of lands.

(m) The authority vested in the President by section 1 of the act of December 22, 1928, ch. 48, 45 Stat. 1070 (40 U. S. C. 72a), to approve contracts for acquisition of land subject to limited rights reserved to the grantor and for the acquisition of limited permanent rights in land adjoining park property.

(n) The authority vested in the President by section 108 of the Housing Act of July 15, 1949, ch. 338, 63 Stat. 419 (42 U. S. C. 1458), to transfer, or cause to be transferred, to the Housing and Home Finance Administrator any right, title or interest held by the Federal Government or any department or agency thereof in any land (including buildings thereon) which is surplus to the needs of the Government and which a local public agency certifies will be within the area of a project being planned by it.

### PART II. THE UNITED STATES CIVIL SERVICE COMMISSION

SEC. 2. The United States Civil Service Commission is hereby designated and empowered to perform the following-described functions without the approval, ratification, or other action of the President:

(a) So much of the authority vested in the President by section 1753 of the Revised Statutes of the United States (5 U. S. C. 631) as relates to establishing regulations for the conduct of persons in the civil service.

(b) The authority vested in the President by section 3 (b) of the Civil Service Retirement Act of May 29, 1930, as amended by section 3 of the act of January 24, 1942, ch. 16, 56 Stat. 15 (5 U. S. C. 693 (b)), to exclude from the operation of the said Civil Service Retirement Act any officer or employee or group of officers or employees in the executive branch of the service whose tenure of office or employment is intermittent or of uncertain duration.

(c) So much of the authority vested in the President by section 204 of the act of June 30, 1932, ch. 314, 47 Stat. 404 (5 U. S. C. 715a), to exempt from automatic separation from the service persons who are reaching the prescribed retirement age when the public interest so requires as relates to persons other than Presidential appointees.

(d) The authority vested in the United States Civil Service Commission by section 605 of the act of June 30, 1945, ch. 212, 59 Stat. 304 (5 U. S. C. 945), to issue regulations necessary for the administration of that act insofar as it affects officers and employees in or under the executive branch of the Government.

SEC. 3. The Chairman of the United States Civil Service Commission is hereby designated and empowered, without the approval, ratification, or other action of the President, to exercise the authority vested in the President by section 505 (b) of the Classification Act of October 28, 1949, ch. 782, 63 Stat. 959, as amended (5 U. S. C. 1105 (b)), to place positions in, and to remove positions from, Grade 18 of the General Schedule established by that act, exclusive of positions in the Commission's own organization.

### PART III. THE HOUSING AND HOME FINANCE ADMINISTRATOR

SEC. 4. The Housing and Home Finance Administrator is hereby designated and empowered to perform the following-described functions without the approval, ratification, or other action of the President:

(a) The authority vested in the said Administrator by section 102 (e) of the Housing Act of July 15, 1949, ch. 338, 63 Stat. 415 (42 U. S. C. 1452 (e)), to issue and have outstanding obligations for purchase by the Secretary of the Treasury.

(b) The authority vested in the said Administrator by section 103 (b) of the said act (42 U. S. C. 1453 (b)) to contract to make capital grants with respect to projects assisted under Title I of the said act.

(c) The authority vested in the President by sections 6 (d) and 10 (e) of the act of September 1, 1937, ch. 896, 50 Stat. 888, as affected by Reorganization Plan No. 3 of 1947 (61 Stat. 954) and as amended (42 U. S. C. 1406 (d) and 1410 (e)), to approve the undertaking by the Public Housing Administration of any annual contribution, grant, or loan or any contract for any annual contribution, grant, or loan, under said act.

(d) The authority vested in the President by section 14 of the said act, as affected by said Reorganization Plan and as amended (42 U. S. C. 1414), to approve the amending or superseding of any contract for annual contributions or loans, or both, so that the going Federal rate on the basis of which such annual contributions or the interest rate on the loans, or both, respectively, are fixed shall mean the going Federal rate on the date of approval of the amending or superseding contract entered into by the Public Housing Administration.

(e) The authority vested in the President by section 5 of the act of June 29, 1936, ch. 860, 49 Stat. 2026, as affected by Executive Order No. 7732 of October 27, 1937, and by the said Reorganization Plan, to approve the dedication by the Public Housing Commissioner of streets, alleys, and parks for public use, and the granting by the said Commissioner of easements, in connection with any low-cost housing or slum-clearance project described in that act.

### PART IV. THE FEDERAL COMMUNICATIONS COMMISSION

SEC. 5. (a) The Federal Communications Commission is hereby designated and empowered to exercise, without the approval, ratification, or other action of the President, all authority vested in the President by the act of May 27, 1921, ch. 12, 42 Stat. 8 (47 U. S. C. 34 to 39, inclusive), including the authority to issue, withhold, or revoke licenses to land or operate submarine cables in the United States: *Provided*, That no such license shall be granted or revoked by the Commission except after obtaining approval of the Secretary of State and such advice from any executive department or establishment of the Government as the Commission may deem necessary. The Commission is authorized and directed to

2712                    THE PRESIDENT

receive all applications for the said licenses.

(b) Executive Order No. 3513 of July 9, 1921, as amended by Executive Order No. 6779 of June 30, 1934, is hereby revoked.

PART V. THE ATTORNEY GENERAL AND THE ADMINISTRATOR OF GENERAL SERVICES

SEC. 6. The Attorney General and the Administrator of General Services are hereby designated and empowered jointly to perform the following-described functions without the approval, ratification, or other action of the President:

(a) The authority vested in the President by section 5 (a) of the act of July 26, 1935, ch. 417, 49 Stat. 501, as amended (44 U. S. C. 305 (a)), to determine from time to time the documents or classes of documents having general applicability and legal effect.

(b) The authority vested in the President by sections 6, 11 (a), and 11 (f) of said act, as amended (44 U. S. C. 306; 311 (a); and 311 (f)), to approve (or disapprove), respectively, (1) regulations, prescribed by the Administrative Committee of the Federal Register, for carrying out the provisions of that act (including the regulations referred to in section 5 (b) of the act, authorizing publication in the FEDERAL REGISTER of certain documents or classes of documents), (2) actions of the Administrative Committee of the Federal Register requiring, from time to time, the preparation and publication in special or supplemental editions of the FEDERAL REGISTER of complete codifications of the documents, described in the said section 11 (a), of each agency of the Government, and (3) regulations, prescribed by the Administrative Committee of the Federal Register, for carrying out the provisions of section 11 of the said act, as amended.

PART VI. GENERAL PROVISIONS

SEC. 7. All actions heretofore taken by the President in respect of the matters affected by this order and in force at the time of the issuance of this order, including any regulations prescribed or approved by the President in respect of such matters, shall, except as they may be inconsistent with the provisions of this order, remain in effect until amended, modified, or revoked pursuant to the authority conferred by this order.

SEC. 8. As used in this order, the term "functions" embraces duties, powers, responsibilities, authority, or discretion, and the term "perform" may be construed to mean 'exercise."

DWIGHT D. EISENHOWER

THE WHITE HOUSE,
    May 10, 1954.

[F. R. Doc. 54-3595; Filed, May 11, 1954; 10:33 a. m.]

---

# RULES AND REGULATIONS

## TITLE 5—ADMINISTRATIVE PERSONNEL

### Chapter I—Civil Service Commission

PART 6—EXCEPTIONS FROM THE COMPETITIVE SERVICE

DEPARTMENT OF LABOR

Effective upon publication in the FEDERAL REGISTER, § 6.313 (a) (1) is amended to read as follows:

§ 6.313 *Department of Labor*—(a) *Office of the Secretary.* (1) Four special assistants, two confidential assistants, and one confidential assistant (private secretary) to the Secretray of Labor.

(R. S. 1753, sec. 2, 22 Stat. 403; 5 U. S. C. 631, 633; E. O. 10440, 3 CFR, 1953 Supp., 18 F. R. 1823)

UNITED STATES CIVIL SERVICE COMMISSION,
[SEAL]      WM. C. HULL,
        *Executive Assistant.*

[F. R. Doc. 54-3500; Filed, May 11, 1954; 8:48 a. m.]

## TITLE 6—AGRICULTURAL CREDIT

### Chapter IV—Commodity Stabilization Service and Commodity Credit Corporation, Department of Agriculture

Subchapter B—Loans, Purchases, and Other Operations

[1953 C. C. C. Grain Price Support Bulletin 1, Supp. 3, Corn]

PART 421—GRAINS AND RELATED COMMODITIES

SUBPART—1953-CROP CORN RESEAL LOAN PROGRAM

A reseal loan program has been announced for 1953-crop Corn. The 1953-CCC Grain Price Support Bulletin 1 (18 F. R. 1960, 3705, and 19 F. R. 1149) issued by the Commodity Credit Corporation and containing the general requirements with respect to price support operations for grains and related commodities produced in 1953, supplemented by Supplements 1 and 2, Corn (18 F. R. 5359, 6983 and 19 F. R. 1595), containing the specific requirements for the 1953-crop corn price support program, is hereby further supplemented as follows:

Sec.
421.62  Applicable sections of 1953 CCC Grain Price Support Bulletin 1, and Supplements 1 and 2, Corn.
421.63  Availability.
421.64  Eligible producer.
421.65  Eligible corn.
421.66  Approved storage.
421.67  Approved forms.
421.68  Quantity eligible for resealing.
421.69  Additional service charges.
421.70  Interest rate.
421.71  Transfer of producer's equity.
421.72  Storage and track-loading payments.
421.73  Maturity and satisfaction.
421.74  Support rates.
421.75  CSS commodity offices.

AUTHORITY: §§ 421.62 to 421.75 issued under sec. 4, 62 Stat. 1070, as amended; 15 U. S. C. Sup. 714b. Interpret or apply sec. 5, 62 Stat. 1072, secs. 101, 401, 63 Stat. 1051; 15 U. S. C. Sup. 714c, 7 U. S. C. Sup. 1441, 1421.

§ 421.62  *Applicable sections of 1953 CCC Grain Price Support Bulletin 1, and Supplements 1 and 2, Corn.* The following sections of the 1953 CCC Grain Price Support Bulletin 1, and Supplements 1 and 2, Corn, published in 18 F. R. 1960, 3705, 5359, 6983, and 19 F. R. 1149 and 1595, shall be applicable to the 1953 Corn Reseal Loan Program: § 421.1 *Administration;* § 421.5 *Approved lending agencies;* § 421.8 *Liens;* § 421.10 *Set-offs;* § 421.13 *Safeguarding the commodity;* § 421.14 *Insurance on farm-storage loans;* § 421.15 *Less or damage to the commodity;* § 421.16 *Personal liability of the producer;* § 421.17 *Release of the commodity under loan;* § 421.19 *Fore-* *closure;* § 421.20 *Purchase of notes;* § 421.55 *Determination of quantity;* § 421.56 *Determination of quality.* Other sections of the 1953 Corn Price Support Program shall be applicable to the extent indicated in this subpart.

§ 421.63  *Availability*—(a) *Area.* The reseal program will be available (1) anywhere in the 1954 commercial corn area, except in designated angoumois moth areas, and (2) in the following counties in South Dakota outside the 1954 commercial corn area: Brown, Edmunds, Faulk, Hughes, Hyde, Marshall, Potter, Sully and Walworth. Under this program, 1953-crop farm-storage loans will be extended and farm-storage loans will be made on 1953-crop corn covered by purchase agreements. Neither warehouse-storage loans nor purchase agreements will be available to producers under this program.

(b) *Time.* (1) The producer who desires to participate in the reseal loan program must file an application for a farm-storage reseal loan with the county committee. In the case of a farm-storage loan, the producer will be required to apply for extension of his loan before the final date for delivery specified in the delivery instructions issued to him by the county committee.

(2) The producer who signed a purchase agreement on farm-stored corn is required, under the 1953 Corn Price Support Program, to notify the county committee not later than July 31, 1954, if he intends to deliver the corn to CCC. If the producer has notified the county committee, on or before July 31, 1954, of his intention to deliver the corn or to participate in this program, he may obtain a farm-storage loan on the corn. The loan documents must be executed by the producer on or before the final date for delivery specified in the delivery instructions, or on or before September 30, 1954, if the producer has not requested delivery instructions. The loan

# EXHIBIT 15

Executive Order No. 10485, 18 Fed. Reg. 5,397
(Sept. 3, 1953)

# FEDERAL REGISTER

THE NATIONAL ARCHIVES

LITTERA SCRIPTA MANET

1934

OF THE UNITED STATES

**VOLUME 18**     **NUMBER 176**

## Washington, Wednesday, September 9, 1953

---

## TITLE 3—THE PRESIDENT

### EXECUTIVE ORDER 10484

PROVIDING FOR THE ADMINISTRATION OF THE PRESIDENT'S MANAGEMENT IMPROVEMENT FUND

By virtue of the authority vested in me by the Constitution and statutes, including section 301 of title 3 of the United States Code, and as President of the United States, it is hereby ordered as follows:

SECTION 1. The Director of the Bureau of the Budget is hereby authorized and empowered to exercise the authority vested in the President by the paragraph appearing under the heading "Funds Appropriated to the President—Expenses of Management Improvement" in Chapter VII of the Supplemental Appropriation Act, 1954, to allocate to any agency or office in the executive branch (including the Bureau of the Budget) funds appropriated by the said paragraph.

SEC. 2. The Director of the Bureau of the Budget shall from time to time report to the President concerning activities carried on by executive agencies and offices with funds allocated hereunder and shall, consonant with law, exercise such direction and control with respect to the said activities as he shall deem appropriate.

DWIGHT D. EISENHOWER

THE WHITE HOUSE,
*September 3, 1953.*

[F. R. Doc. 53-7905; Filed, Sept. 8, 1953; 10:29 a. m.]

---

### EXECUTIVE ORDER 10485

PROVIDING FOR THE PERFORMANCE OF CERTAIN FUNCTIONS HERETOFORE PERFORMED BY THE PRESIDENT WITH RESPECT TO ELECTRIC POWER AND NATURAL GAS FACILITIES LOCATED ON THE BORDERS OF THE UNITED STATES

WHEREAS section 202 (e) of the Federal Power Act, as amended, 49 Stat. 847 (16 U. S. C. 824a (e)) requires any person desiring to transmit any electric energy from the United States to a foreign country to obtain an order of the Federal Power Commission authorizing it to do so; and

WHEREAS section 3 of the Natural Gas Act, 52 Stat. 822 (15 U. S. C. 717b), requires any person desiring to export any natural gas from the United States to a foreign country or to import any natural gas from a foreign country to the United States to obtain an order from the Federal Power Commission authorizing it to do so; and

WHEREAS the proper conduct of the foreign relations of the United States requires that executive permission be obtained for the construction and maintenance at the borders of the United States of facilities for the exportation or importation of electric energy and natural gas; and

WHEREAS it is desirable to provide a systematic method in connection with the issuance and signing of permits for such purposes:

NOW, THEREFORE, by virtue of the authority vested in me as President of the United States and Commander in Chief of the armed forces of the United States, it is hereby ordered as follows:

SECTION 1. (a) The Federal Power Commission is hereby designated and empowered to perform the following-described functions:

(1) To receive all applications for permits for the construction, operation, maintenance, or connection, at the borders of the United States, of facilities for the transmission of electric energy between the United States and a foreign country.

(2) To receive all applications for permits for the construction, operation, maintenance, or connection, at the borders of the United States, of facilities for the exportation or importation of natural gas to or from a foreign country.

(3) Upon finding the issuance of the permit to be consistent with the public interest, and, after obtaining the favorable recommendations of the Secretary of State and the Secretary of Defense thereon, to issue to the applicant, as appropriate, a permit for such construction, operation, maintenance, or connection. The Commission shall have the power to attach to the issuance of the permit and to the exercise of the rights granted thereunder such conditions as

(Continued on p. 5399)

## CONTENTS

### THE PRESIDENT

| | Page |
|---|---|
| Executive Orders | |
| Providing for the administration of the President's Management Improvement Fund | 5397 |
| Providing for the performance of certain functions heretofore performed by the President with respect to electric power and natural gas facilities located on the borders of the United States | 5397 |

### EXECUTIVE AGENCIES

**Agriculture Department**
*See* Commodity Credit Corporation; Production and Marketing Administration; Rural Electrification Administration.

**Alien Property Office**
Notices:
| | |
|---|---|
| Vested property, intention to return: | |
| Brunato, Fortunato et al | 5442 |
| Christensen, Henry Marinus | 5442 |
| Dammann, Irene | 5442 |
| Hertz, Jorgen | 5442 |
| Kahn, Dr. Isidore | 5442 |
| Mutzenmacher, Tola | 5442 |

**Army Department**
Rules and regulations:
| | |
|---|---|
| Competition with civilian bands; revision | 5426 |

**Census Bureau**
Notices:
| | |
|---|---|
| Combined Census Operations Division; abolishment | 5438 |

**Civil Aeronautics Board**
Notices:
| | |
|---|---|
| Hearings, etc.. | |
| Frontier Airlines, Inc., et al | 5433 |
| Northern Consolidated Airlines, Inc., mail rates | 5438 |
| Proposed rule making: | |
| Check airmen and flight check of flight engineers | 5436 |
| Smoke and fire detectors; proposed special civil air regulation | 5435 |

**Civil Service Commission**
Rules and regulations:
| | |
|---|---|
| Competitive service, exceptions from; Department of Agriculture | 5399 |

5397



# FEDERAL REGISTER

Published daily, except Sundays, Mondays, and days following official Federal holidays, by the Federal Register Division, National Archives and Records Service, General Services Administration, pursuant to the authority contained in the Federal Register Act, approved July 26, 1935 (49 Stat. 500, as amended; 44 U. S. C., ch. 8B), under regulations prescribed by the Administrative Committee of the Federal Register, approved by the President. Distribution is made only by the Superintendent of Documents, Government Printing Office, Washington 25, D. C.

The regulatory material appearing herein is keyed to the Code of Federal Regulations, which is published, under 50 titles, pursuant to section 11 of the Federal Register Act, as amended June 19, 1937.

The FEDERAL REGISTER will be furnished by mail to subscribers, free of postage, for $1.50 per month or $15.00 per year, payable in advance. The charge for individual copies (minimum 15¢) varies in proportion to the size of the issue. Remit check or money order, made payable to the Superintendent of Documents, directly to the Government Printing Office, Washington 25, D. C.

There are no restrictions on the republication of material appearing in the FEDERAL REGISTER.

## CFR SUPPLEMENTS

(For use during 1953)

The following Supplement is now available:

### Title 14: Parts 1-399 (Revised Book) ($6.00)

Previously announced: Title 3 ($1.75); Titles 4-5 ($0.55); Title 6 ($1.50); Title 7: Parts 1-209 ($1.75), Parts 210-899 ($2.25), Part 900-end (Revised Book) ($6.00); Title 8 (Revised Book) ($1.75); Title 9 ($0.40); Titles 10-13 ($0.40); Title 14: Part 400-end (Revised Book) ($3.75); Title 15 ($0.75); Title 16 ($0.65); Title 17 ($0.35); Title 18 ($0.35); Title 19 ($0.45); Title 20 ($0.60); Title 21 ($1.25); Titles 22-23 ($0.65); Title 24 ($0.65); Title 25 ($0.40); Title 26: Parts 80-169 ($0.40), Parts 170-182 ($0.65), Parts 183-299 ($1.75); Title 26: Part 300-end, Title 27 ($0.60); Titles 28-29 ($1.00); Titles 30-31 ($0.65); Title 32: Parts 1-699 ($0.75), Part 700-end ($0.75); Title 33 ($0.70); Titles 35-37 ($0.55); Title 38 ($1.50); Title 39 ($1.00); Titles 40-42 ($0.45); Title 43 ($1.50); Titles 44-45 ($0.60); Title 46: Parts 1-145 (Revised Book) ($5.00), Part 146-end ($2.00); Titles 47-48 ($2.00); Title 49: Parts 1-70 ($0.50), Parts 71-90 ($0.45), Parts 91-164 ($0.40), Part 165-end ($0.55); Title 50 ($0.45)

Order from
Superintendent of Documents, Government Printing Office, Washington 25, D. C.

## CONTENTS—Continued

**Coast Guard**     Page
Proposed rule making:
Pilot rules, navigation and vessel inspection regulations; hearing on proposed changes___ 5431

**Commerce Department**
See Census Bureau.

**Commodity Credit Corporation**
Rules and regulations:
Oilseeds; 1953 cottonseed products program; miscellaneous amendments_____ 5399

**Customs Bureau**
Rules and regulations:
Amendments and redesignations of Customs Regulations_____ 5403

**Defense Department**
See Army Department.

**Defense Mobilization Office**
See Defense Rental Areas Division.

**Defense Rental Areas Division**
Rules and regulations:
Defense-rental areas in:
Maine and South Carolina:
Hotels _____ 5427
Housing _____ 5426
Motor courts_____ 5427
Rooms _____ 5426
Tennessee:
Hotels _____ 5428
Housing _____ 5427
Motor courts_____ 5428
Rooms _____ 5427
Specific provisions relating to individual defense-rental areas or portions thereof; Oak Ridge, Tenn..
Hotels _____ 5427
Housing _____ 5427
Motor courts_____ 5427
Rooms _____ 5427

**Federal Power Commission**
Notices:
Panhandle Eastern Pipe Line Co., extension of time for filing exceptions_____ 5439

**Federal Trade Commission**
Rules and regulations:
Cease and desist orders:
American Biltrite Rubber Co., Inc._____ 5401
B. F. Goodrich Co._____ 5401
Goodyear Tire and Rubber Co., Inc._____ 5402
O'Sullivan Rubber Corp___ 5402

**Interior Department**
See Land Management Bureau.

**Interstate Commerce Commission**
Notices:
Applications for relief:
Asphalt from St. Louis, Mo., Lawrenceville and Robinson, Ill., to Kentucky_____ 5440
Commodity rates to and from Coronet, Va._____ 5441
Crude sulphur from points in Louisiana and Texas to southern territory_____ 5441

## CONTENTS—Continued

**Interstate Commerce Commission—Continued**     Page
Notices—Continued
Applications for relief—Con.
Petroleum products to points in southern territory from:
Centralia, Ill._____ 5440
Crossville and Marfak, Ill._ 5440
Rayon tire fabric from points in Ohio to Natchez, Miss._ 5440
Rubber tires from Conshohocken, Pa., to Columbus and Greenville, Miss., and Spartansburg, S. C._____ 5440
Sand from Vincennes, Ind., to Huey, Ill._____ 5441
Mississippi Valley Motor Freight Bureau; application for approval of agreement_____ 5441

**Justice Department**
See Alien Property Office.

**Land Management Bureau**
Notices:
Alaska; correction of shore-space restoration _____ 5437

**Production and Marketing Administration**
Rules and regulations:
Limitations of shipments:
Lemons grown in California and Arizona_____ 5400
Tokay grapes grown in San Joaquin and Sacramento Counties in California____ 5400

**Rural Electrification Administration**
Notices:
Allocation of funds for loans (2 documents) _____ 5437
Loan announcements (13 documents) _____ 5437, 5438

**Securities and Exchange Commission**
Notices:
Hearings, etc.:
Arkansas Louisiana Gas Co.__ 5439
Flour Mills Of America, Inc._ 5439
International Hydro-Electric System._____ 5439

**Treasury Department**
See Coast Guard; Customs Bureau.

**Veterans' Administration**
Rules and regulations:
Vocational rehabilitation and education; counseling; miscellaneous amendments_____ 5428

## CODIFICATION GUIDE

A numerical list of the parts of the Code of Federal Regulations affected by documents published in this issue. Proposed rules, as opposed to final actions, are identified as such.

**Title 3**     Page
Chapter II (Executive orders)
8202 (revoked by EO 10485)_____ 5397
10484_____ 5397
10485_____ 5397

**Title 5**
Chapter I.
Part 6_____ 5399

Case 4:16-cv-00036 Document 12-5 Filed in TXSD on 04/01/16 Page 38 of 48

## CODIFICATION GUIDE—Con.

| | Page |
|---|---|
| **Title 6** | |
| Chapter IV: | |
| Part 643 | 5399 |
| **Title 7** | |
| Chapter IX: | |
| Part 951 | 5400 |
| Part 953 | 5400 |
| **Title 14** | |
| Chapter I: | |
| Part 4b (proposed) | 5435 |
| Part 40 (proposed) (2 documents) | 5435, 5436 |
| Part 41 (proposed) | 5435 |
| Part 42 (proposed) | 5435 |
| **Title 16** | |
| Chapter I: | |
| Part 3 (4 documents) | 5401, 5402 |
| **Title 19** | |
| Chapter I | 5403 |
| **Title 32** | |
| Chapter V: | |
| Part 508 | 5426 |
| Chapter VII: | |
| Part 808 (see Part 508). | |
| **Title 32A** | |
| Chapter XXI (DRAD): | |
| RR 1 (3 documents) | 5426, 5427 |
| RR 2 (3 documents) | 5426, 5427 |
| RR 3 (3 documents) | 5427, 5428 |
| RR 4 (3 documents) | 5427, 5428 |
| **Title 33** | |
| Chapter I: | |
| Part 80 (proposed) | 5431 |

## CODIFICATION GUIDE—Con.

| | Page |
|---|---|
| **Title 33—Continued** | |
| Chapter I—Continued | |
| Part 90 (proposed) | 5431 |
| Part 95 (proposed) | 5431 |
| **Title 38** | |
| Chapter I: | |
| Part 21 | 5428 |
| **Title 46** | |
| Chapter I: | |
| Part 5 (proposed) | 5431 |
| Part 10 (proposed) | 5431 |
| Part 25 (proposed) | 5431 |
| Part 33 (proposed) | 5431 |
| Part 34 (proposed) | 5431 |
| Part 51 (proposed) | 5431 |
| Part 52 (proposed) | 5431 |
| Part 54 (proposed) | 5431 |
| Part 55 (proposed) | 5431 |
| Part 61 (proposed) | 5431 |
| Part 71 (proposed) | 5431 |
| Part 76 (proposed) | 5431 |
| Part 95 (proposed) | 5431 |
| Part 111 (proposed) | 5431 |
| Part 113 (proposed) | 5431 |
| Part 137 (proposed) | 5431 |
| Part 146 (proposed) | 5431 |
| Part 157 (proposed) | 5431 |
| Part 160 (proposed) | 5431 |

the public interest may in its judgment require.

(b) In any case wherein the Federal Power Commission, the Secretary of State, and the Secretary of Defense cannot agree as to whether or not a permit should be issued, the Commission shall submit to the President for approval or disapproval the application for a permit with the respective views of the Commission, the Secretary of State and the Secretary of Defense.

Sec. 2. The Chairman or Acting Chairman of the Federal Power Commission is hereby designated and empowered to sign any permits issued by the Federal Power Commission pursuant to section 1 (a) (3) hereof.

Sec. 3. The Federal Power Commission is authorized to issue such rules and regulations, and to prescribe such procedures, as it may from time to time deem necessary or desirable for the exercise of the authority delegated to it by this order.

Sec. 4. All Presidential Permits heretofore issued pursuant to Executive Order No. 8202 of July 13, 1939, and in force at the time of the issuance of this order, and all permits issued hereunder, shall remain in full force and effect until modified or revoked by the President or by the Federal Power Commission.

Sec. 5. Executive Order No. 8202 of July 13, 1939, is hereby revoked.

Dwight D. Eisenhower

The White House,
*September 3, 1953.*

[F. R. Doc. 53–7906; Filed, Sept. 8, 1953; 10:29 a. m.]

---

# RULES AND REGULATIONS

## TITLE 6—AGRICULTURAL CREDIT

### Chapter IV—Production and Marketing Administration and Commodity Credit Corporation, Department of Agriculture

**Subchapter C—Loans, Purchases and Other Operations**

[1953 CCC Cottonseed Bulletin 3, Revision 1, Amdt. 1]

Part 643—Oilseeds

Subpart—1953 Cottonseed Products Purchase Program

MISCELLANEOUS AMENDMENTS

The regulations of Commodity Credit Corporation with respect to the purchase of cottonseed products as a means of supporting the price of 1953-crop cottonseed (1953 CCC Cottonseed Bulletin 3, (18 F. R. 3988, 4875)), are hereby amended by additions to § 643.912 (b), § 643.913 (a) and (d) and by changing paragraph (b) of § 643.914 thereof as follows:

1. Section 643.912 (b) *Source* is amended by adding the words "Revision 1 as amended" to "1953 Cottonseed Bulletin 3" wherever it appears in that paragraph.

2. Section 643.913 (a) *Price* and (d) *Receipts from gins owned by or under same legal entity as the crusher* are amended by adding the words "as amended" to "1953 Cottonseed Bulletin 2" where it appears in paragraphs (a) and (d) of this section.

3. Section 643.914 (b) is amended to read as follows:

§ 643.914 *Purchase of cottonseed products by CCC.* * * *

(b) *Conditional tenders.* (1) The crusher may condition any tender of cottonseed products under paragraph (a) of this section upon an immediate repurchase by the crusher from CCC of a specified quantity of cake or meal included in such tender, at the current market price of cake or meal as determined by the PMA commodity office. CCC reserves the right to reject any or all such conditional tenders and any acceptance by CCC shall be made within 24 hours after receipt of the tender in the PMA commodity office. CCC may announce from time to time its policy for acceptance or rejection of conditional tenders.

(2) In submitting any tender the crusher may incorporate in the tender an offer to repurchase a specified quantity and quality of liters included in such tender at the applicable price for liters listed in such tender, and CCC shall accept such offer to purchase upon its determination that the price contained in the offer to purchase is the applicable price.

(Sec. 4, 62 Stat. 1070, as amended; 15 U. S. C. Sup. 714b. Interpret or apply sec. 5, 62 Stat. 1072, secs. 301, 401, 63 Stat. 1053, 1054; 15 U. S. C. Sup., 714c, 7 U. S. C. Sup., 1447, 1421)

Issued this 2d day of September 1953.

[SEAL] Howard H. Gordon,
*Executive Vice President,*
*Commodity Credit Corporation.*

Approved:
John H. Davis,
*President,*
*Commodity Credit Corporation.*

[F. R. Doc. 53–7825; Filed, Sept. 8, 1953; 8:50 a. m.]

---

## TITLE 5—ADMINISTRATIVE PERSONNEL

### Chapter I—Civil Service Commission

Part 6—Exceptions From the Competitive Service

DEPARTMENT OF AGRICULTURE

Effective upon publication in the Federal Register, § 6.111 (i) (1) of Schedule A is amended to read as follows:

§ 6.111 *Department of Agriculture.* * * *

(i) *Production and Marketing Administration.* (1) Six Area Directors at a salary equivalent to GS–15.

# EXHIBIT 16

Executive Order No. 12038, 43 Fed. Reg. 4,957
(Feb. 3, 1978)

# presidential documents

[3195–01]

## Title 3—The President

**Executive Order 12038** • **February 3, 1978**

### Relating to Certain Functions Transferred to the Secretary of Energy by the Department of Energy Organization Act

By virtue of the authority vested in me as President of the United States of America, in order to reflect the responsibilities of the Secretary of Energy for the performance of certain functions previously vested in other officers of the United States by direction of the President and subsequently transferred to the Secretary of Energy pursuant to the Department of Energy Organization Act (91 Stat. 565; 42 U.S.C. 7101 *et seq.*), it is hereby ordered as follows:

SECTION 1. *Functions of the Federal Energy Administration.* In accordance with the transfer of all functions vested by law in the Federal Energy Administration, or the Administrator thereof, to the Secretary of Energy pursuant to Section 301(a) of the Department of Energy Organization Act, hereinafter referred to as the Act, the Executive Orders and Proclamations referred to in this Section, which conferred authority or responsibility upon the Administrator of the Federal Energy Administration, are amended as follows:

(a) Executive Order No. 11647, as amended, relating to Federal Regional Councils, is further amended by deleting "The Federal Energy Administration" in Section 1(a)(10) and substituting "The Department of Energy", and by deleting "The Deputy Administrator of the Federal Energy Administration" in Section 3(a)(10) and substituting "The Deputy Secretary of Energy".

(b) Executive Order No. 11790 of June 25, 1974, relating to the Federal Energy Administration Act of 1974, is amended by deleting "Administrator of the Federal Energy Administration" and "Administrator" wherever they appear in Sections 1 through 6 and substituting "Secretary of Energy" and "Secretary", respectively, and by deleting Section 7 through 10.

(c) Executive Order No. 11912, as amended, relating to energy policy and conservation, and Proclamation No. 3279, as amended, relating to imports of petroleum and petroleum products, are further amended by deleting "Administrator of the Federal Energy Administration", "Federal Energy Administration", and "Administrator" (when used in reference to the Federal Energy Administration) wherever those terms appear and by substituting "Secretary of Energy", "Department of Energy", and "Secretary", respectively, and by deleting "and the Administrator of Energy Research and Development" in Section 1(b) of Executive Order No. 11912, as amended.

SEC. 2. *Functions of the Federal Power Commission.* In accordance with the transfer of functions vested in the Federal Power Commission to the Secretary of Energy pursuant to Section 301(b) of the Act, the Executive Orders referred to in this Section, which conferred authority or responsibility upon the Federal Power Commission, or Chairman thereof, are amended or modified as follows:

(a) Executive Order No. 10485 of September 3, 1953, relating to certain facilities at the borders of the United States is amended by deleting Section 2 thereof, and by deleting "Federal Power Commission" and "Commission"

wherever those terms appear in Sections 1, 3 and 4 of such Order and substituting for each "Secretary of Energy".

(b) Executive Order No. 11969 of February 2, 1977, relating to the administration of the Emergency Natural Gas Act of 1977, is hereby amended by deleting the second sentence in Section 1, by deleting "the Secretary of the Interior, the Administrator of the Federal Energy Administration, other members of the Federal Power Commission and" in Section 2, and by deleting "Chairman of the Federal Power Commission" and "Chairman" wherever those terms appear and substituting therefor "Secretary of Energy" and "Secretary", respectively.

(c) Paragraph (2) of Section 3 of Executive Order No. 11331, as amended, relating to the Pacific Northwest River Basins Commission, is hereby amended by deleting "from each of the following Federal departments and agencies" and substituting therefor "to be appointed by the head of each of the following Executive agencies", by deleting "Federal Power Commission" and substituting therefor "Department of Energy", and by deleting "such member to be appointed by the head of each department or independent agency he represents.".

SEC. 3. *Functions of the Secretary of the Interior.* In accordance with the transfer of certain functions vested in the Secretary of the Interior to the Secretary of Energy pursuant to Section 302 of the Act, the Executive Orders referred to in this Section, which conferred authority or responsibility on the Secretary of the Interior, are amended or modified as follows:

(a) Sections 1 and 4 of Executive Order No. 8526 of August 27, 1940, relating to functions of the Bonneville Power Administration, are hereby amended by substituting "Secretary of Energy" for "Secretary of the Interior", by adding "of the Interior" after "Secretary" in Sections 2 and 3, and by adding "and the Secretary of Energy," after "the Secretary of the Interior" wherever the latter term appears in Section 5.

(b) Executive Order No. 11177 of September 16, 1964, relating to the Columbia River Treaty, is amended by deleting "Secretary of the Interior" and "Department of the Interior" wherever those terms appear and substituting therefor "Secretary of Energy" and "Department of Energy", respectively.

SEC. 4. *Functions of the Atomic Energy Commission and the Energy Research and Development Administration.*

(a) In accordance with the transfer of all functions vested by law in the Administrator of Energy Research and Development to the Secretary of Energy pursuant to Section 301(a) of the Act, the Executive Orders referred to in this Section are amended or modified as follows:

(1) All current Executive Orders which refer to functions of the Atomic Energy Commission, including Executive Order No. 10127, as amended; Executive Order No. 10865, as amended; Executive Order No. 10899 of December 9, 1960; Executive Order No. 11057 of December 18, 1962; Executive Order No. 11477 of August 7, 1969; Executive Order No. 11752 of December 17, 1973; and Executive Order No. 11761 of January 17, 1974 are modified to provide that all such functions shall be exercised by (1) the Secretary of Energy to the extent consistent with the functions of the Atomic Energy Commission that were transferred to the Administrator of Energy Research and Development pursuant to the Energy Organization Act of 1974 (Public Law 93–438; 88 Stat. 1233), and (2) the Nuclear Regulatory Commission to the extent consistent with the functions of the Atomic Energy Commission that were transferred to the Commission by the Energy Reorganization Act of 1974.

(2) Executive Order No. 11652, as amended, relating to the classification of national security matters, is further amended by substituting "Department

of Energy" for "Energy Research and Development Administration" in Sections 2(A), 7(A) and 8 and by deleting "Federal Power Commission" in Section 2(B)(3).

(3) Executive Order No. 11902 of February 2, 1976, relating to export licensing policy for nuclear materials and equipment, is amended by substituting "the Secretary of Energy" for "the Administrator of the United States Energy Research and Development Administration, hereinafter referred to as the Administrator" in Section 1(b) and for the "Administrator" in Sections 2 and 3.

(4) Executive Order No. 11905, as amended, relating to foreign intelligence activities, is further amended by deleting "Energy Research and Development Administration", "Administrator of the Energy Research and Development Administration", and "ERDA" wherever those terms appear and substituting "Department of Energy", "Secretary of Energy", and "DOE" respectively.

(5) Section 3(2) of each of the following Executive Orders is amended by substituting "Department of Energy" for "Energy Research and Development Administration":

(i) Executive Order No. 11345, as amended, establishing the Great Lakes River Basin Commission.

(ii) Executive Order No. 11371, as amended, establishing the New England River Basin Commission.

(iii) Executive Order No. 11578, as amended, establishing the Ohio River Basin Commission.

(iv) Executive Order No. 11658, as amended, establishing the Missouri River Basin Commission.

(v) Executive Order No. 11659, as amended, establishing the Mississippi River Basin Commission.

SEC. 5. *Special Provisions Relating to Emergency Preparedness and Mobilization Functions.*

(a) Executive Order No. 10480, as amended, is further amended by adding thereto the following new Sections:

"Sec. 609. Effective October 1, 1977, the Secretary of Energy shall exercise all authority and discharge all responsibility herein delegated to or conferred upon (a) the Atomic Energy Commission, and (b) with respect to petroleum, gas, solid fuels and electric power, upon the Secretary of the Interior.

"Sec. 610. Whenever the Administrator of General Services believes that the functions of an Executive agency have been modified pursuant to law in such manner as to require the amendment of any Executive order which relates to the assignment of emergency preparedness functions or the administration of mobilization programs, he shall promptly submit any proposals for the amendment of such Executive orders to the Director of the Office of Management and Budget in accordance with the provisions of Executive Order No. 11030, as amended.".

(b) Executive Order No. 11490, as amended, is further amended by adding thereto the following new section:

"Sec. 3016. Effective October 1, 1977, the Secretary of Energy shall exercise all authority and discharge all responsibility herein delegated to or conferred upon (a) the Federal Power Commission, (b) the Energy Research and Development Administration, and (c) with respect to electric power, petroleum, gas and solid fuels, upon the Department of the Interior.".

SEC. 6. This Order shall be effective as of October 1, 1977, the effective date of the Department of Energy Organization Act pursuant to the provisions of Section 901 thereof and Executive Order No. 12009 of September 13,

4960                                    **THE PRESIDENT**

1977, and all actions taken by the Secretary of Energy on or after October 1, 1977, which are consistent with the foregoing provisions are entitled to full force and effect.

*Jimmy Carter*

THE WHITE HOUSE,
*February 3, 1978.*

[FR Doc. 78-3444 Filed 2-3-78; 3:16 pm]

# EXHIBIT 17

Executive Order No. 8202, 4 Fed. Reg. 3,243
(July 15, 1939)

# FEDERAL REGISTER

LITTERA
SCRIPTA
MANET

THE NATIONAL ARCHIVES
OF THE UNITED STATES
1934

VOLUME 4                    NUMBER 135

## *Washington, Saturday, July 15, 1939*

### *The President*

#### EXECUTIVE ORDER

AUTHORIZING AND REQUESTING THE FEDERAL POWER COMMISSION TO PERFORM CERTAIN FUNCTIONS RELATING TO THE TRANSMISSION OF ELECTRIC ENERGY BETWEEN THE UNITED STATES AND FOREIGN COUNTRIES AND TO THE EXPORTATION AND IMPORTATION OF NATURAL GAS FROM AND INTO THE UNITED STATES

By virtue of the authority vested in me as President of the United States, and as an aid in effectuating the provisions of the Federal Power Act, approved August 26, 1935 (49 Stat. 838), and the Natural Gas Act, approved June 21, 1938 (52 Stat. 821), I hereby authorize and request the Federal Power Commission (1) to receive all applications for permits for the construction, operation, maintenance, or connection, at the borders of the United States, of facilities for the transmission of electric energy between the United States and foreign countries, and for the exportation and importation of natural gas to or from foreign countries, and (2), after obtaining the recommendations of the Secretary of State and the Secretary of War thereon, to submit each such application to the President with a recommendation as to whether the permit applied for should be granted, and if so, upon what terms and conditions.

The Federal Power Commission may prescribe such regulations not inconsistent herewith as it may deem necessary or desirable for carrying out the provisions of this order.

FRANKLIN D ROOSEVELT
THE WHITE HOUSE,
*July 13, 1939.*

[No. 8202]

[F. R. Doc. 39-2568; Filed, July 14, 1939; 12:56 p. m.]

#### EXECUTIVE ORDER

TRANSFER OF JURISDICTION OVER CERTAIN LANDS FROM THE SECRETARY OF AGRICULTURE TO THE SECRETARY OF WAR

WISCONSIN

WHEREAS certain lands within the hereinafter-described areas have been acquired, or are in process of acquisition, under the authority of the Emergency Relief Appropriation Act of 1935, approved April 8, 1935 (49 Stat. 115), in connection with the Camp McCoy, LO–WI 16, Land-Utilization and Land-Conservation Project of the Department of Agriculture, in Wisconsin; and

WHEREAS by Executive Order No. 7908, dated June 9, 1938,[1] all the right, title, and interest of the United States in such lands, acquired or in process of acquisition, was transferred to the Secretary of Agriculture for use, administration, and disposition in accordance with the provisions of Title III of the Bankhead-Jones Farm Tenant Act, approved July 22, 1937 (50 Stat. 522, 525), and the related provisions of Title IV thereof; and immediately upon the acquisition of legal title to those lands now in process of acquisition the said order, by the terms thereof, will become applicable to all the additional right, title, and interest thereby acquired by the United States; and

WHEREAS it appears that the use of such lands as a military reservation would be in the public interest:

NOW, THEREFORE, by virtue of and pursuant to the authority vested in me by section 32 of Title III of the said Bankhead-Jones Farm Tenant Act, and upon recommendation of the Secretary of Agriculture, it is ordered that all lands within the hereinafter-described areas acquired or in process of acquisition by the United States, together with the improvements thereon, be, and they are hereby, transferred from the Secretary of Agriculture to the Secretary of War for use as a military reservation:

[1] 3 F.R. 1389 DI.

## CONTENTS

THE PRESIDENT

Executive Orders:                                                      Page
  Federal Power Commission authorized and requested to perform certain functions relating to transmission of electric energy between United States and foreign countries; exportation and importation of natural gas _____ 3243
  Wisconsin, transfer of land jurisdiction from Secretary of Agriculture to Secretary of War _____ 3243

RULES, REGULATIONS, ORDERS

TITLE 7—AGRICULTURE:
  Agricultural Adjustment Administration:
    Agricultural conservation program bulletin, 1938, Supplement No. 25 _____ 3244
TITLE 10—ARMY: WAR DEPARTMENT:
  Personnel, appointment of second lieutenants _____ 3244
TITLE 18—CONSERVATION OF POWER:
  Federal Power Commission:
    Accounting prescribed, electric plant acquisition adjustments accounts _____ 3248
TITLE 24—HOUSING CREDIT:
  Federal Home Loan Bank Board:
    Crediting voluntary retirements of investments in savings and loan associations by:
      Home Owners' Loan Corporation _____ 3249
      Secretary of the Treasury and Home Owners' Loan Corporation _____ 3249
TITLE 33—NAVIGATION AND NAVIGABLE WATERS:
  War Department:
    California, bridge regulations _ 3250

(Continued on next page)

3243

# EXHIBIT 18

Executive Order No. 11423, 33 Fed. Reg. 11,741
(Aug. 16, 1968)

THE PRESIDENT

## Executive Order 11423

### PROVIDING FOR THE PERFORMANCE OF CERTAIN FUNCTIONS HERE-TOFORE PERFORMED BY THE PRESIDENT WITH RESPECT TO CERTAIN FACILITIES CONSTRUCTED AND MAINTAINED ON THE BORDERS OF THE UNITED STATES

WHEREAS the proper conduct of the foreign relations of the United States requires that executive permission be obtained for the construction and maintenance at the borders of the United States of facilities connecting the United States with a foreign country; and

WHEREAS such executive permission has from time to time been sought and granted in the form of Presidential permits for the construction, connection, operation, and maintenance at the borders of the United States of such border crossing facilities as water supply and oil pipelines, aerial tramways and cable cars, submarine cables, and lines for the transmission of electric energy; and

WHEREAS Executive Order No. 10485 of September 3, 1953, empowers the Federal Power Commission to issue permits for the construction, operation, maintenance, or connection, at the borders of the United States, of facilities for the transmission of electric energy between the United States and a foreign country and for the importation or exportation of natural gas to or from a foreign country; and

WHEREAS Executive Order No. 10530 of May 10, 1954, empowers the Federal Communications Commission to issue and revoke licenses to land submarine cables in the United States; and

WHEREAS it is desirable to provide a systematic method in connection with the issuance of permits for the construction and maintenance of other such facilities connecting the United States with a foreign country:

NOW, THEREFORE, by virtue of the authority vested in me as President of the United States and Commander in Chief of the Armed Forces of the United States and in conformity with the provisions of Section 301 of Title 3, United States Code, it is ordered as follows:

SECTION 1. (a) Except with respect to facilities covered by Executive Orders No. 10485 and No. 10530, the Secretary of State is hereby designated and empowered to receive all applications for permits for the construction, connection, operation, or maintenance, at the borders of the United States, of: (i) pipelines, conveyor belts, and similar facilities for the exportation or importation of petroleum, petroleum products, coal, minerals, or other products to or from a foreign country; (ii) facilities for the exportation or importation of water or sewage to or from a foreign country; (iii) monorails, aerial cable cars, aerial tramways and similar facilities for the transportation of persons or things, or both, to or from a foreign country; and (iv) bridges, to the extent that congressional authorization is not required.

(b) With respect to applications received pursuant to subsection (a)(i) above, the Secretary of State shall request the views of the Secretary of the Treasury, the Secretary of Defense, the Attorney General, the Secretary of the Interior, the Secretary of Commerce, the Secretary of Transportation, the Interstate Commerce Commission, and the Director of the Office of Emergency Planning. With respect to applications received pursuant to subsection (a)(ii) above, the Secretary of State shall request the views of the Secretary of Defense and the Secretary of the Interior. With respect to applications received pursuant to subsection (a)(iii) or (iv) above, the Secretary of State shall request the views of the Secretary of the Treasury, the Secretary of Defense, the Attorney General, and the Secretary of Transportation.

(c) The Secretary of State may also consult with such other department and agency heads and with such state and local government officials as he deems appropriate with respect to each application. All federal government officials consulted by the Secretary of State pursuant to this section shall provide such information and render such assistance as he may request, consistent with their competence and authority.

(d) If the Secretary of State finds, after consideration of the views obtained pursuant to subsections (b) and (c), that issuance of a permit to the applicant would serve the national interest, he shall prepare a permit, in such form and with such terms and conditions as the national interest may in his judgment require, and shall notify the officials required to be consulted under subsection (b) above of his proposed determination that the permit be issued.

(e) If the Secretary of State finds, after consideration of the views obtained pursuant to subsections (b) and (c), that issuance of a permit to the applicant would not serve the national interest, he shall notify the officials required to be consulted under subsection (b) above of his proposed determination that the application be denied.

(f) The Secretary of State shall issue or deny the permit in accordance with his proposed determination unless, within fifteen days after notification pursuant to subsection (d) or (e) above, an official required to be consulted under subsection (b) above shall notify the Secretary of State that he disagrees with the Secretary's proposed determination and requests the Secretary to refer the application to the President. In the event of such a request, the Secretary of State shall refer the application, together with statements of the views of the several officials involved, to the President for his consideration and final decision.

Sec. 2. (a) The Secretary of State may provide for the publication in the FEDERAL REGISTER of notice of receipt of applications, for the receipt of public comments on applications, and for publication in the FEDERAL REGISTER of notice of issuance or denial of applications.

(b) The Secretary of State is authorized to issue such further rules and regulations, and to prescribe such further procedures, as he may from time to time deem necessary or desirable for the exercise of the authority conferred upon him by this order.

Sec. 3. The authority of the Secretary of State hereunder is supplemental to, and does not supersede, existing authorities or delegations relating to importation, exportation, transmission, or transportation to or from a foreign country. All permits heretofore issued with respect to matters described in Section 1 of this order, and in force at the time of issuance of this order, and all permits issued hereunder, shall remain in effect in accordance with their terms unless and until modified, amended, suspended, or revoked by the President or, upon compliance with the procedures provided for in this order, by the Secretary of State.

Lyndon B Johnson

THE WHITE HOUSE,
*August 16, 1968.*

[F.R. Doc. 68–10056; Filed, Aug. 16, 1968; 3:57 p.m.]