# EXHIBIT 19

*Sisseton-Wahpeton Oyate v. Dep't of State*, 3:08-cv-3023,
ECF No. 28 (Feb. 1, 2009)

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH DAKOTA
## CENTRAL DIVISION

_____
                                 )

THE SISSETON-WAHPETON OYATE, *et al.*  )
        Plaintiffs                 )   Civil Action No. 08–3023
                                 )

        -v.-                       )
                                 )

UNITED STATES DEPARTMENT OF STATE,  )
*et al.*                              )
        Defendants             )
                                 )

TRANSCANADA KEYSTONE PIPELINE, LP,  )
        Intervenor              )
_____)

## BRIEF OF TRANSCANADA KEYSTONE PIPELINE, LP, IN SUPPORT OF MOTION TO DISMISS UNDER FEDERAL RULES OF CIVIL PROCEDURE 12(B)(1) & 12(B)(6)

# TABLE OF CONTENTS

STATEMENT OF FACTS ............................................................................................................1

ARGUMENT ...............................................................................................................................5

    I.    INTRODUCTION AND SUMMARY OF ARGUMENT. .....................................................................5

    II.    THE TREATIES CITED BY PLAINTIFFS DO NOT APPLY TO ANY LAND AT ISSUE IN THIS SUIT, SO NO RIGHT OF ACTION OR WAIVER OF SOVEREIGN IMMUNITY AUTHORIZES THE TRIBES' CLAIMS. ....................................................7

    III.    PLAINTIFFS' STATUTORY CLAIMS ARE EQUALLY DEFECTIVE BECAUSE FOUR OF THE STATUTORY CLAIMS CREATE NO GOVERNMENTAL DUTIES ON NON-FEDERAL LAND, AND BECAUSE THE APA DOES NOT PROVIDE PLAINTIFFS A CAUSE OF ACTION OR A WAIVER OF SOVEREIGN IMMUNITY. ...........................................................10

        *A.*    *Four of Plaintiffs' statutory claims can be dismissed because the statutes they rely on create no governmental duties or are expressly inapplicable to activities on private lands.*............................................10

        *B.*    *Plaintiffs' remaining claims under NEPA and the NHPA must be dismissed because the APA is inapplicable where the sole authority for government action is the President's constitutional authority.*........11

        *C.*    *In the alternative, Plaintiffs fail to allege any facts that plausibly suggest the Department violated any statute.*..................................................................................................................................20

CONCLUSION ...........................................................................................................................21

## STATEMENT OF FACTS

TransCanada Keystone Pipeline, LP (Keystone) is a Delaware limited partnership, jointly owned by TransCanada Corporation and ConocoPhillips Company.  Along with Canadian affiliates, Keystone was created to develop, construct, and operate a pipeline to transport crude oil and other hydrocarbons from an oil supply hub in Canada to oil refineries and oil distribution terminals in the United States.  On April 19, 2006, Keystone filed a detailed application for a Presidential Permit to construct, operate, and maintain the border-crossing section of its proposed pipeline project.

The President has delegated his constitutional authority to approve border-crossing energy facilities to the Secretary of State by Executive Order ("E.O.") 13337 of April 30, 2004. After receiving the Keystone application, the Department of State prepared an Environmental Impact Statement, following the procedures common under the National Environmental Policy Act, 42 U.S.C. § 4332(2)(c).  Accordingly, it first prepared a Draft Environmental Impact Statement on which it sought public comment, and followed that with a detailed Final Environmental Impact Statement, a copy of which has been provided to the Court.  Also, the Department of State engaged in consultation with the United States Fish & Wildlife Service to satisfy its obligations under the Endangered Species Act, 16 U.S.C. § 1536(a)(2), and pursuant to the National Historic Preservation Act, 16 U.S.C. § 470, the Department of State consulted with eighty-seven tribal historic preservation officials and state historic preservation officials from every state through which the pipeline will pass.  (Record of Decision and National Interest Determination ("ROD") at 20).[1]  Apart from regular contact by mail, phone, and email, the Department held in-person, government-to-government consultations with the Indian tribes in

---

[1]  The Department of State submitted a copy of the ROD to this Court on Jan. 30, 2009.  Docket # 17, Attach. 2 (Exh.1).

May, August, October, and December 2007. (*Id*.). As a result of this consultation process, the Department of State found that the pipeline had been routed to avoid cultural resources, (ROD 11), and that any inadvertent discoveries of new cultural resources would be handled through a comprehensive Programmatic Agreement, which provides for additional consultation with all concerned parties. (*Id*.).

In its February 28, 2008 Record of Decision and National Interest Determination, the Department found that the pipeline (1) would increase the diversity of United States crude sources, (2) would reduce the need for marine transport of oil, (3) would increase supplies from a stable and reliable trading partner using relatively safe transport, and (4) would make up for the decline in imports from other major United States suppliers. (ROD 22). Accordingly, it issued a Presidential Permit on March 11, 2008, allowing Keystone to construct, operate, and maintain the Keystone Pipeline at the international boundary between the United States and Canada.

The tribes' Complaint seeks to invalidate this Permit under a collection of treaties and statutes. Citing treaties with the United States, the tribes first assert that the Permit violates property interests they claim in their aboriginal lands. Specifically, the tribes allege that when they gave up these lands by treaty, they retained the "right of access to historic sites, religious sites and/or burial sites, and to funerary objects and cultural items" in their aboriginal lands. (Complaint ¶ 27). Even those tribes without aboriginal land at issue allegedly retain this right because their members have intermarried with tribes from those aboriginal lands. (Complaint ¶¶ 25, 31). Moreover, the tribes assert that the government has a trust obligation over all the aboriginal lands that the tribes have ceded. (Complaint ¶ 60). Second, the Complaint alleges that this Permit process violates seven federal statutes: the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, *et seq*., the National Historic Preservation Act, 16 U.S.C. § 470, *et*

*seq*., the Native American Graves Protection and Repatriation Act (NAGPRA), 25 U.S.C.

§ 3002(a), the American Indian Religious Freedom Act (AIRFA), 42 U.S.C. § 1996, the

Archeological and Historic Preservation Act (AHPA), 16 U.S.C. § 469, *et seq*., the

Archeological Resources Protection Act (ARPA), 16 U.S.C. § 470aa, *et seq*., and the

Administrative Procedure Act (APA), 5 U.S.C. § 551, *et seq*.  (Complaint ¶¶ 124–125).  In most

instances, Plaintiffs do not explain how the Defendants violated any specific provisions of these

statutes; their Complaint simply identifies a particular statute, briefly describes it, and asserts that

the federal defendants stand in violation of it.  But with respect to the National Historic

Preservation Act (NHPA), Plaintiffs assert that the Defendants did not comply with NHPA

regulations that demand an agency's "good faith effort" to identify possible historic properties.

*See* 36 C.F.R. § 800.4(b)(1).  Plaintiffs seek declaratory and injunctive relief, including an order

requiring the Defendants to revoke the Presidential Permit for the Keystone Pipeline, and to halt

further construction pending compliance with the various federal statutes.  (Complaint at 39).

Plaintiffs assert that this Court has jurisdiction over this suit on the basis of 28 U.S.C. § 1331

(federal question), 28 U.S.C. § 1361 (mandamus), 28 U.S.C. § 1362 (federal question for a tribal

plaintiff), and 28 U.S.C. §§ 2201–2202 (declaratory judgment).  (Complaint ¶ 13).

The President delegated the Secretary of State the authority to issue this permit by

Executive Order 13337 of April 30, 2004.  Presidents often use Executive Orders to delegate

power granted them by statute, but the power delegated here does not come from any statute.

Instead it comes from the President's inherent constitutional authority over national security and

foreign affairs.  This Executive Order, E.O. 13337, is the latest in a series managing this

constitutional authority over energy facilities that cross international borders.  *See* 69 Fed. Reg.

25,299 (May 5, 2004).  Presidents have exercised their authority over such facilities for nearly a

century, because proposed cross-border facilities can present important foreign relations and national security concerns.  As early as 1919, the President exercised his foreign relations and national security power by delegating to the Secretary of State the authority to issue permits for the landing of foreign telegraph and other cables in the United States.  *See* Landing Licenses, 4 Hackworth DIGEST § 350, at 247–56 (1942); *see also* Landing of Submarine Cables, 2 Moore DIGEST § 227, at 461–63 (1906) (describing the assertions by Presidents Grant, Hayes, Garfield, Arthur, Cleveland, and Harrison of the right of the executive branch to control the landing of cables on U.S. shores).  Thus, this Presidential Permit for the Keystone Pipeline is simply the latest decision in the lengthy history of the exercise of presidential powers involving foreign policy and national security.[2]

Executive Order 13337 was promulgated in part "to expedite reviews of permits as necessary to accelerate the completion of energy production and transmission projects."  *Id.*[3]  Accordingly, E.O. 13337 delegates many of the President's permitting duties for cross-border projects, while retaining his authority over the final decision.  Indeed, the Order *requires* the President to make the decision himself whenever any of the specified Cabinet officers disagree with the Secretary's determination.  *Id.*  Further, because E.O. 13337 is based on the President's constitutional power, and not an act of Congress, the President is free to approve or deny cross-border energy facilities

---

[2] President Johnson incorporated this area of presidential authority into a larger cross-border facility permit program by issuing E.O. 11423 on August 16, 1968.  There, the President delegated to the Secretary of State the authority to issue "Presidential permits for the construction, connection, operation, and maintenance at the borders of the United States of" a wide variety of "border crossing facilities" such as "water supply and oil pipelines, aerial tramways and cable cars, submarine cables, … lines for the transmission of electric energy[,] …  facilities for the transportation of persons or things, or both, to or from a foreign country" and, subject to a statutory carve-out, international bridges. 33 Fed. Reg. 11,741 (Aug. 20, 1968).  Congress has built additional statutory obligations that supplement this presidential authority with respect to some international facilities.  For example, in the International Bridge Act of 1972, Congress recognized presidential authority over bridges that cross international borders, requiring presidential approval for the construction, operation, or maintenance of such bridges.  *See* 33 U.S.C. § 535b; *see also* the Submarine Cable Landing and Licensing Act of 1921, codified at 47 U.S.C. §§ 34–35 (requiring presidential approval for the landing of submarine cables on United States shores).  But there is no federal legislation addressing the President's authority to approve oil pipelines.

[3] E.O. 13337 also contains provisions relating to construction of specified types of international border crossings for motor and rail land transportation.

himself, and is free to amend or revoke E.O. 13337 at any time. Finally, while E.O. 13337 requires the Secretary to seek input from other federal agencies and allows her to seek public comment, it (like its predecessors) expressly does not create "any right, benefit, or trust responsibility, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities, or entities, its officers or employees, or any other person." 69 Fed. Reg. at 25301.

The February 28, 2008, Record of Decision and the March 11, 2008, Presidential Permit authorizing the construction, operation, and maintenance of the Keystone Pipeline at the border between the United States and Canada were expressly and solely grounded in the powers in E.O. 13337. There is no other basis for this federal action over the Keystone pipeline.

## ARGUMENT

### I.      Introduction and Summary of Argument.

Under Federal Rule of Civil Procedure 12(b)(6), Plaintiffs' claims must be dismissed because they have not stated a claim upon which relief may be granted. Plaintiffs bear the burden of showing that Congress has provided them with a right of action. *N.Y. City Envtl. Justice Alliance v. Giuliani*, 214 F.3d 65, 73 (2d Cir. 2000) (citing *Suter v. Artist M.*, 503 U.S. 347, 363 (1992)). But Plaintiffs have only identified one statute that creates a private right of action in any circumstance—the Administrative Procedure Act—and that act does not provide review of presidential decisions like those at issue in this suit. *Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992). Challenges to presidential action are very rare, and are governed by a body of Supreme Court law that holds them to be unreviewable under the APA. *Dalton v. Specter*, 511 U.S. 462, 469 (1994); see *infra* at 11–18. Thus, Plaintiffs' Complaint must be dismissed under Rule 12(b)(6). *Four T's, Inc. v. Little Rock Mun. Airport Comm'n*, 108 F.3d 909, 911, 915–17 (8th Cir. 1997).

Plaintiffs' claims also must be dismissed under Rule 12(b)(1) for lack of jurisdiction. In their suit against the government, Plaintiffs bear "the burden of showing an unequivocal waiver of immunity." *Baker v. United States*, 817 F.2d 560, 562 (9th Cir. 1987); *United States v. Mitchell,* 463 U.S. 206, 212 (1983). "When the United States consents to be sued, the terms of its consent to be sued in any court define the court's jurisdiction to entertain the suit." *T.L. ex rel. Ingram v. United States*, 443 F.3d 956, 959 (8th Cir. 2006) (alterations and internal quotation marks omitted). Courts "presume that federal courts lack jurisdiction unless the contrary appears affirmatively from the record, and it is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Nat'l Right to Life Political Action Comm. v. Connor*, 323 F.3d 684, 689 (8th Cir. 2003) (alterations and internal quotation marks omitted). Again, the only statute Plaintiffs cite which ever provides a waiver of sovereign immunity is the APA, and it does not apply here because the sole basis for the Presidential Permit is the inherent constitutional authority of the President over national security and foreign affairs that he has delegated to the Department of State. Thus Plaintiffs' claims also must be dismissed under Rule 12(b)(1). *Brown v. United States*, 151 F. 3d 800, 803–04 (8th Cir. 1998).

Plaintiffs assert that this Court has jurisdiction over this case pursuant to familiar provisions in Title 28: the federal question provision of § 1331, the mandamus provision of § 1361, the provision for claims brought by Indian Tribes in § 1362, and the Court's authority to issue declaratory judgments found at §§ 2201–2202. Under § 1331, a civil action "aris[es] under the . . . laws . . . of the United States," if "federal law creates the cause of action." *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 27–28 (1983). Accordingly, the tribes must invoke a cause of action, which § 1331 itself does not provide: "§ 1331 does not, in and of itself,

create substantive rights in suits brought against the United States." *Sabhari v. Reno*, 197 F.3d 938, 943 (8th Cir. 1999).

Similarly, the mandamus statute, § 1361, does not provide an independent basis for federal court jurisdiction. *Starbuck v. City & County of S. F.*, 556 F.2d 450, 459 n.18 (9th Cir. 1977); *Clayton Brokerage Co. of St. Louis, Inc., v. Commodity Futures Trading Comm'n*, 548 F. Supp. 1015, 1016 n.1 (E.D. Mo. 1982). Section 1362, which uses the same "arising under" formulation as § 1331, merely exempts tribes from now defunct amount-in-controversy requirements for federal questions, and may, in very limited circumstances, allow tribal suits against states that would otherwise be barred by a statutory immunity. *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 783–86 (1991). The plaintiff must still invoke a separate cause of action. *W. Shoshone Bus. Council v. Babbitt*, 1 F.3d 1052, 1058–59 (10th Cir. 1993). The Declaratory Judgment statute, §§ 2201–2202, again, is not an independent source of federal jurisdiction; it simply grants an additional remedy where jurisdiction has already been established. *Schilling v. Rogers*, 363 U.S. 666, 677 (1960).

## II. The treaties cited by Plaintiffs do not apply to any land at issue in this suit, so no right of action or waiver of sovereign immunity authorizes the tribes' claims.

The tribes cannot show that the treaties they rely upon have created any continued legally protected interest in lands crossed by the Keystone Pipeline, and therefore their treaty-based claims must be dismissed. The tribes invoke the 1851 Treaty of Fort Laramie, 11 Stat. 749, and the 1867 Treaty with the Sisseton-Wahpeton Sioux, 15 Stat. 505, as grounds to invalidate Keystone's permit, but neither treaty granted the tribes any land at issue in this suit. (Complaint ¶¶ 26–31, 124–125). Thus, claims based on those treaties are simply inapposite. In the 1851 Treaty, other tribes recognized certain lands as Sioux territory. But all of this land was west of the Missouri River. *See* 11 Stat. 749 (roughly speaking, this is the striped area comprising

Western South Dakota in Plaintiffs' Ex. A). The pipeline remains east of the Missouri River throughout the Dakotas, far from any land covered by the 1851 Treaty. The 1867 Treaty with the Sisseton-Wahpeton Sioux, on the other hand, only created a reservation on lands east of the pipeline route, on the border with Minnesota. *See* Complaint ¶ 19; 15 Stat. 505. The pipeline's route does not cross this land, which formerly comprised the Lake Traverse Indian Reservation in northeast South Dakota.[4]

Thus, neither the 1851 treaty nor the 1867 treaty could possibly give rise to a cause of action regarding the pipeline. Plaintiffs note that the 1851 Treaty stated:

> [T]he aforesaid Indian nations do not hereby *abandon or prejudice* any rights or claims they *may* have to other lands; and further . . . they *do not surrender* the privilege of hunting, fishing, or passing over any of the tracts of country heretofore described.

11 Stat. 749 (emphasis added). But this, at most, shows that the 1851 Treaty did not *extinguish*—"abandon," "prejudice," or "surrender"—the tribes' *preexisting* claims to other land. It does not *grant* the tribes any rights that they did not have before the Treaty was signed. *Cf.* Treaty with the Chippewa, July 29, 1837, 7 Stat. 536 ("The privilege of hunting, fishing, and gathering the wild rice, upon the lands, the rivers and the lakes included in the territory ceded, is *guarantied* to the Indians." (emphasis added)). Accordingly, Plaintiffs' claim can only be that, although no treaty gave them title to the land at issue in this suit, they hold "aboriginal title based on use and occupation 'for a long time.'"[5] (Complaint ¶ 30.)

Consequently, Plaintiffs assert that the Rosebud and Yankton Sioux Tribes have "usufructuary rights" in the territories to which they claim aboriginal title, (Complaint ¶¶ 26–28),

---

[4] This reservation was terminated by an 1891 Act, 26 Stat. 1035, ratifying an 1889 agreement with the Sisseton-Wahpeton tribe. *DeCoteau v. Dist. County Court for the Tenth Judicial Dist.*, 420 U.S. 425 (1975); *Yankton Sioux Tribe v. Gaffey*, 188 F.3d 1010, 1020 (8th Cir. 1999) (the reservation has been "completely disestablished").

[5] The treaty language does not even imply that the Tribes have aboriginal rights outside the delimited territory, given the use of the qualifier "may."

including, in the case of the Rosebud Sioux Tribe, "legally protected rights . . . including trust title to all cultural items, human remains, and associated funerary objects imbedded in the land." (Complaint ¶ 29). Plaintiffs also assert that the Sisseton-Wahpeton Oyate has "underlying aboriginal title" to lands through which the Department of State has approved the Keystone pipeline, (Complaint ¶ 30), and that, due to intermarriage, the Santee Sioux Tribe shares whatever rights this alleged title confers. (Complaint ¶ 31). But all these claims are based on aboriginal title, and tribes cannot raise such a claim unless they are given specific congressional authorization: "Indian occupancy, not specifically recognized as ownership by action authorized by Congress, may be extinguished by the Government without compensation." *Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 288–89 (1955). And even if such claims once had merit, decades have passed since the land at issue passed out of the tribes' possession to generations of private landowners; thus the tribes' claims based on asserted aboriginal ownership were barred by the statute of limitations long ago and cannot serve to provide a cause of action in this litigation. 28 U.S.C. § 2401.[6]

The tribes also contend that the United States has a trust obligation with regard to protection of cultural items found on lands claimed as aboriginal by the tribes. The tribes cannot cite any statute that imposes any specific fiduciary duties upon the government, and the general guardian-ward relationship between the tribes and the government is simply not enough to create an actionable trust. *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003); *Ashley v. U.S. Dep't of Interior*, 408 F.3d 997, 1002 (8th Cir. 2005). Indeed, the tribes must show that the

---

[6] Congress *has* authorized some Indian claims otherwise barred by the statute of limitations through the Indian Claims Commission. Indian Claims Commission Act of 1946 ("ICCA") § 2, 60 Stat. 1049. The Act even authorized limited damages for claims, like Plaintiffs', based only on aboriginal title. *See Otoe & Missouria Tribe v. United States*, 131 F. Supp. 265, 276 (Ct. Cl. 1955). But all such claims had to be lodged before August 13, 1951. ICCA §12. And had to be lodged with the Commission. *Id.* And could seek only monetary relief. *Oglala Sioux Tribe v. United States*, 650 F.2d 140, 143–44 & n.11 (8th Cir. 1981). The suit here, lodged 57 years late, in district court, seeking injunctive relief, meets none of these prerequisites.

9

United States exercises plenary control over the alleged trust property, *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 474–75 (2003), and "must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." *Navajo Nation*, 537 U.S. at 506; *see also Ashley*, 408 F.3d at 1002. The tribes have not alleged that the United States exercises plenary control over the hypothesized cultural artifacts at issue because their claim does not involve any federal land, or even any tribal land. Also, there is no statute that establishes a fiduciary duty on the part of the government to manage these cultural artifacts; in fact, Plaintiffs have not even pointed to a statute regarding these artifacts that uses the word "trust." *Cf. White Mountain Apache Tribe*, 537 U.S. at 474–75 (statute dictated that the Fort at issue was to be "held by the United States in trust for the White Mountain Apache Tribe").[7]

### III. Plaintiffs' statutory claims are equally defective because four of the statutory claims create no governmental duties on non-federal land, and because the APA does not provide Plaintiffs a cause of action or a waiver of sovereign immunity.

A. Four of Plaintiffs' statutory claims can be dismissed because the statutes they rely on create no governmental duties or are expressly inapplicable to activities on private lands.

The Keystone Pipeline crosses no federal lands in the Dakotas, and four of the statutes cited by Plaintiffs are inapplicable to the consideration of Keystone's Presidential Permit application by the Department of State. Plaintiffs first cite the American Indian Religious Freedom Act (AIRFA), 42 U.S.C. § 1996. (Complaint ¶ 32). But that statute merely expresses the government's general policy to "protect and preserve for American Indians their" religious

---

[7] Again, though Plaintiffs' legal claims are meritless, Congress has attempted to protect the interests asserted by the tribes through separate legislation. The 1992 amendments to the NHPA (1) provided that a "tribal preservation officer" could, in some cases, assume "the functions of a State Historic Preservation Officer . . . with respect to tribal lands," (2) recognized that "[p]roperties of traditional religious and cultural importance to an Indian tribe or Native Hawaiian organization may be determined to be eligible for inclusion on the National Register," and (3) provided that agencies consult with any tribe that "attaches religious and cultural significance" to such properties. 16 U.S.C. § 470a(d)(2), (d)(6); 1992 National Historic Preservation Act Amendments, Pub. L. No. 102-575, Title XL, § 4006, 106 Stat. 4600, 4756–57.

freedom; it does not "create a cause of action or any judicially enforceable individual rights." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 454–55 (1988). Nor does it impose any duties on the government beyond those imposed by the First Amendment. *Crow v. Gullet*, 706 F.2d 856, 858–59 (8th Cir. 1983) (affirming *Crow v. Gullet*, 541 F. Supp. 785 (D.S.D. 1982)). Plaintiffs have failed to establish any jurisdictional basis for claims arising from this measure.

Plaintiffs next cite the Archeological and Historic Preservation Act (AHPA), 16 U.S.C. § 469c–2(2), a subsection of a statute focused on alterations of terrain caused by dams, § 469, which allows the government to charge permittees "reasonable costs for identification, surveys, evaluation and data recovery." Plaintiffs identify no mandatory duty within this measure, and provide no specific allegation of how it has been violated here.

The other two statutes mentioned by the Plaintiffs, the Native American Graves Protection and Repatriation Act (NAGPRA), 25 U.S.C. § 3002(a), and the Archeological Resources Protection Act (ARPA), 16 U.S.C. § 470cc, by their express terms apply only to federal and tribal lands. And, again, there is no federal, tribal, or Indian land at issue in this suit. Plaintiffs have not invoked any statute that provides them a waiver of sovereign immunity or a cause of action, so the Plaintiffs' claims must be dismissed for lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted.

**B.** **Plaintiffs' remaining claims under NEPA and the NHPA must be dismissed because the APA is inapplicable where the sole authority for government action is the President's constitutional authority.**

Plaintiffs assert that the APA governs judicial review of their statutory claims. (Complaint ¶ 58). Presumably this assertion is made because none of these statutes, including NEPA and the NHPA, provides a cause of action. *See supra* at 10–11; *Cent. S.D. Coop. Grazing Dist. v. Sec'y of the U.S. Dep't of Agric.*, 266 F.3d 889, 894 (8th Cir. 2001) ("NEPA does not

authorize a private right of action."); *Karst Envtl. Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291,

1295 (D.C. Cir. 2007) ("NHPA, like NEPA, contains no private right of action"); *San Carlos*

*Apache Tribe v. United States*, 417 F.3d 1091 (9th Cir. 2005) (explaining in detail why recent

Supreme Court precedent, as well as the NHPA's similarity to NEPA, dictates that the NHPA

does not create a cause of action). But the APA does not authorize Plaintiffs' claims either,

because the Secretary of State's issuance of a Presidential Permit is not "agency action." And

even if this presidential action was considered agency action, it would still be exempt from APA

review because the only authority that binds the Secretary is the Executive Order, which

precludes judicial review. 5 U.S.C. § 701(a)(1). Furthermore, that Order commits the decision

to her discretion. *Id*. at § 701(a)(2). Accordingly, the APA cannot provide the cause of action or

waiver of immunity necessary to adjudicate Plaintiffs' claims.

      1)     The Secretary's exercise of the presidential power to permit border crossings
is not reviewable "agency action."

Although the APA does not confer subject matter jurisdiction on federal courts, *see*

*Califano v. Sanders*, 430 U.S. 99, 107 (1977), Section 702 provides a cause of action to private

litigants and a waiver of sovereign immunity for "[a] person suffering legal wrong because of

agency action, or adversely affected or aggrieved by agency action within the meaning of a

relevant statute." 5 U.S.C. § 702. The APA dictates that "'agency' means each authority of the

Government of the United States, whether or not it is within or subject to review by another

agency," but specifically exempts Congress and the Courts, along with other entities. *Id*. at

§ 701(b)(1).

It may be that "[t]he President is not explicitly excluded from the APA," *Franklin v.*

*Massachusetts*, 505 U.S. 788, 800 (1992), and he certainly is an "authority of the Government of

the United States." 5 U.S.C. § 701(b)(1). But the "Court long has held that statutes which

employ broad terms to confer power of judicial review are not always to be read literally." *Chicago & Southern Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 106 (1948). Instead, "[o]ut of respect for the separation of powers and the unique constitutional position of the President," *Franklin*, 505 U.S. at 800, the Court has held that "the President's actions [are] not reviewable under the APA." *Dalton v. Specter*, 512 U.S. 462, 469 (1994). In essence, the courts have recognized that "the President is not an 'agency' within the meaning of the APA." *Id*.

The question in this suit is whether the Department of State's issuance of the permit is an "agency action" under *Franklin* when it exercises presidential powers delegated from the President. As the Second Circuit recognized in *Dreyfus v. Von Finck*, 534 F.2d 24, 29 (2d Cir. 1976), where it held that an Executive Order issued without statutory authority was not a "law" of the United States for purposes of § 1331 jurisdiction, "The fact that this executive authority is exercised by the President through others does not transmute it into judicially reviewable action." *Id*. (citing *Ludecke v. Watkins*, 335 U.S. 160, 165 (1948)); *see also Tulare County v. Bush*, 185 F. Supp. 2d 18 (D.D.C. 2001) ("The Forest Service is merely carrying out directives of the President, and the APA does not apply to presidential action. Any argument suggesting that this action is agency action would suggest the absurd notion that all presidential actions must be carried out by the President him or herself in order to receive the deference Congress has chosen to give to presidential action.") (citations omitted), *aff'd*, 306 F.3d 1138 (D.C. Cir. 2002); *Alaska v. Carter*, 462 F. Supp. 1155, 1160 (D. Alaska 1978) ("The argument that the President . . . must personally . . . [perform] the other details that are necessary to the issuance of a Presidential Proclamation in order to escape the procedural requirements of NEPA approaches the absurd.").

There are two types of delegation cases, one like this that involves delegated *executive* power, and the other type involving delegated *legislative* power. The administrative state is built

on delegated legislative authority, which happens when Congress passes a bill delegating certain decisions to the President or an executive agency. The APA provides review of those legislative decisions. In contrast, this case lies on the opposite end of the spectrum—here the delegated authority is purely *executive*.[8] The Secretary exercised the President's inherent constitutional authority over pipeline border crossings. The President has not been granted that power by any statute, and no statute has attempted to constrain it.

Presidential action is rarely challenged under the Administrative Procedure Act. And the Supreme Court has made clear that such cases cannot be analyzed under the usual, run-of-the-mill APA framework. Instead, such cases fall under the less extensive, but consistent body of Supreme Court decisions analyzing APA challenges to presidential action: *Dalton v. Spector*, 511 U.S. 462 (1994), *Franklin v. Massachusetts*, 505 U.S. 788 (1992), and their precursor, *Chicago & Southern Air Lines v. Waterman Steamship Corp.*, 333 U.S. 103, 106 (1948).[9]

*Dalton v. Specter* concerned the Defense Base Closure and Realignment Act of 1990 which specified a detailed procedure for base closing in which the Secretary of Defense would submit recommended closings to a special commission, which would submit them to the President, who was required to accept them or to reject them completely. 512 U.S. at 464–65. The plaintiffs sued the Secretary of Defense to enjoin him from closing a base pursuant to the statute, alleging that the Secretary and the commission had violated the procedure dictated by the Act in making their recommendations to the President. *Id*. at 466. Though, as in this case, the President was not a party to the suit, the decision turned on the reviewability of the President's

---

[8] The exclusively executive nature of such actions explains why the Second Circuit declared in *Dreyfus v. Von Finck*: "Even in peace time, Executive Orders issued without statutory authority providing for presidential implementation are generally held not to be 'laws' of the United States." 534 F.2d at 29 (citing cases, including *Crabb v. Welden Bros.*, 164 F.2d 797 (8th Cir. 1947)).

[9] The United States District Court for the District of Columbia is currently considering this question as it entertains motions to dismiss from Keystone and the government in the ongoing suit brought by the Natural Resources Defense Council (NRDC). *See NRDC v. Dep't of State*, No. 1:08-cv-01363-RJL (D.D.C. Oct. 19, 2008) (Motions to Dismiss filed by Keystone and the Department of State).

actions because the 1990 Act gave him the ultimate authority to approve or deny the recommendations of the Secretary and the commission.  The Court's characterization of this claim closely parallels the tribes' claim in this suit: "The President is said to have violated the terms of the 1990 Act by accepting procedurally flawed recommendations."  *Id*. at 474.  Such a claim was unreviewable because the "1990 Act does not at all limit the President's discretion in approving or disapproving the Commission's recommendations."  *Id*. at 476.  "The President's authority to act is not contingent on the Secretary's and Commission's fulfillment of all the procedural requirements imposed upon them by the 1990 Act."  *Id*.  Thus, the Court concluded: "How the President chooses to exercise the discretion Congress has granted him is not a matter for our review."  *Id*.

*Franklin v. Massachusetts* addressed two statutory requirements: the Secretary of Commerce's duty to conduct the "decennial census" and report it to the President, 505 U.S. at 792, and the President's duty to "transmit to the Congress a statement showing the whole number of persons in each State as ascertained under the decennial census of the population."  *Id*. (alterations omitted).  The plaintiffs challenged the Census Bureau's decision, delegated from the Secretary of Commerce, to allocate federal employees overseas to their homes of record.  The Supreme Court again analyzed this claim as one attacking the President's actions, because no statute prevented the President from instructing the Secretary to reform or amend the census.  *Id*. at 797–98.  And, again, it held that the presidential decision was unreviewable under the APA. *Id*. at 800–01.

This unbroken line of cases finds its source in an earlier case that parallels the tribes' challenge to this border permit.  In *Chicago & Southern Air Lines v. Waterman Steamship Corp.*, 333 U.S. 103 (1948), Waterman challenged the Civil Aeronautics Board's denial of a certificate

of convenience and necessity for overseas air transportation. Under the Civil Aeronautics Act (CAA), such orders were subject to presidential approval. *Id*. at 104. The CAA, like the APA, broadly authorized review of "any order, affirmative or negative, issued by the Board under this Act." *Id*. at 106. The Court "conceded that a literal reading of [the Act] subjects this order to re-examination by the courts." *Id*. at 110. But, as in *Dalton* and *Franklin*, the Court held that the claim necessarily challenged presidential action, because the President was not constrained by the Board's ruling. *Id*. at 113. Thus, even if the court forced the Board to alter its ruling, the President might ignore that alteration. *Id*. The Court concluded that if the President "may completely disregard the judgment of the court," then it must be "one the courts were not authorized to render." *Id*. And the Court held that the presidential decision was unreviewable because it drew vitality from pooled legislative and executive powers—powers flowing from the CAA and the President's constitutional role as "Commander-in-Chief and as the Nation's organ in foreign affairs," respectively. *Id*. at 109–10. Such "executive decisions as to foreign policy" are not reviewable because they are "political, not judicial." *Id*. at 111. "[T]he Judiciary has neither aptitude, facilities nor responsibility" to answer such questions. *Id*.

In a crucial sense, the Department's action in issuing this Presidential Permit was *more* purely executive than the actions held unreviewable in *Dalton*, *Franklin*, and *Waterman*. Waterman challenged an order partially grounded in constitutional executive authority and partially grounded in legislative delegation, and the presidential actions in *Dalton* and *Franklin* were both taken pursuant to statutes. In each case Congress had delegated legislative discretion to the President, but had not constrained it sufficiently to make his decision reviewable. In contrast, the tribes challenge a permit *solely* grounded in executive authority. *A fortiori*, *Dalton*, *Franklin*, and *Waterman* teach that the APA does not provide review of Plaintiffs' challenge.

In the environmental context, there is further guidance on this subject. The D.C. Circuit has addressed the same type of challenge in a NEPA case that could be analogized to the tribes' Complaint. In *Public Citizen v. United States Trade Representative*, 5 F.3d 549 (D.C. Cir. 1993), the court held it could not review the plaintiffs' claim that the United States Trade Representative violated NEPA by its failure to conduct an Environmental Impact Statement ("EIS") before negotiating the North American Free Trade Agreement ("NAFTA"). The district court had distinguished *Franklin* on the basis that NAFTA would not be changed by the President before submission to Congress, and therefore the President's final role was a mere formality. *Id*. at 552. But the D.C. Circuit rejected this reasoning because the President retained discretion over the agency action, whether he exercised it or not. *Id*. The D.C. Circuit also rejected the argument that NEPA's requirement to prepare an EIS "is an independent statutory obligation" that triggers APA Section 702 review. *Id*. (*citing Foundation on Economic Trends v. Lyng*, 943 F.2d 79, 85 (D.C. Cir. 1991)).

Plaintiffs may argue that they only seek to review the Department of State's compliance with NEPA, and assert that APA review should be available because the Department of State is an agency. But, again, this is precisely the position rejected in *Dalton* and *Franklin*. In *Dalton*, plaintiffs challenged *the Secretary of Defense*'s failure to follow statutory procedures, but the Court held that such a suit was an impermissible challenge to *the President*'s ultimate discretionary decision. Similarly, in *Franklin*, plaintiffs challenged the Secretary of Commerce's method of apportionment, and Justice Stevens argued that such a challenge did not implicate the President, 505 U.S. at 816 (Stevens, J., concurring in the judgment), but the Court held that the President's residual discretion made that challenge unreviewable. *Id*. at 797–98 & n.1.

The key to this case is Justice Jackson's warning from *Waterman*: "if the President may completely disregard the judgment of the court, it would only be because it is one the courts were not authorized to render." 333 U.S. at 113. No one doubts that regardless of the outcome of this case, if the President himself re-issued this Permit, that decision would be unreviewable. Thus, this case fits squarely under *Waterman*: the Plaintiffs request a judgment that this Court is not authorized to render.

> 2)    Even if issuing the Presidential Permit counted as agency action, E.O. 13337 precludes judicial review under APA § 701(a)(1).

Even where otherwise applicable, APA Section 702's private right of judicial review is not available where there is either an expressed or implied intent to preclude judicial review in the statute authorizing the underlying agency action. 5 U.S.C. § 702; *see also* 5 U.S.C. § 701(a)(1). "The APA confers a general cause of action upon persons 'adversely affected or aggrieved by agency action within the meaning of a relevant statute,' 5 U.S.C. § 702, but withdraws that cause of action to the extent the relevant statute 'preclude[s] judicial review,' 5 U.S.C § 701(a)(1)." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984); *Dravo Corp. v. Zuber*, 13 F.3d 1222, 1227 (8th Cir. 1994).

Of course, the Presidential Permit is authorized by an executive order, not by any statute, so Section 701(a)(1)'s preclusion provision applies awkwardly here, demonstrating the unsuitability of APA review. But in the absence of any governing statutory authority, this Court must look to the Executive Order, which clearly expresses the President's intent to preclude judicial review. The President dictated that E.O. 13337 does not create "any right, benefit, or trust responsibility, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities, or entities, its officers or employees, or any other

person." 69 Fed. Reg. at 25,301. The President's intent to preclude judicial review of Presidential Permit decisions could not be clearer.

>    3)   The Department of State's decision is also unreviewable under APA § 701(a)(2) because it is committed to its discretion by law.

Even if issuing a Presidential Permit could count as "agency action," APA § 701(a)(2) precludes judicial review of agency action when it "is committed to agency discretion by law." "Even when Congress has not affirmatively precluded judicial oversight, 'review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Webster v. Doe*, 486 U.S. 592, 599–600 (1988). Executive Order 13337 instructs that if the Secretary "finds that issuance of a permit to the applicant would serve *the national interest*," she "shall prepare a permit, in such form and with such terms and conditions as the national interest may in [her] judgment require," and if she "finds that issuance of a permit to the applicant would *not* serve *the national interest*," she shall deny the permit application. 69 Fed. Reg. at 25,300 (emphasis added). This order dictates the broadest possible policy inquiry. There are no statutory criteria to apply—there is not even an underlying statute. Thus, there is no way for a court to assess the reasonableness of such a broad determination, and there is no law to apply.

As in *Waterman* and subsequent cases, this Court is being asked to review an executive branch agency's determinations relating to foreign relations and the "national interest"—a determination which can be ignored or reversed by the President. The essence of the Presidential Permit decision is "a judgment call . . . [t]hus, unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Dep't of Navy v. Egan*, 484 U.S. 518, 529–30 (1988). Simply put, Plaintiffs are attacking a procedure "leading to an ultimate decision not otherwise

judicially reviewable." *Rural Electrification Admin. v. Northern States Power Co.*, 373 F.2d 686, 698–99 (8th Cir. 1967). They "cannot succeed in doing indirectly that which they concede they cannot do directly." *Id*. at 699–700.

C.  In the alternative, Plaintiffs fail to allege any facts that plausibly suggest the Department violated any statute.

As described above, Plaintiffs' claims must be dismissed under Rules 12(b)(1) and 12(b)(6) because they have not identified a waiver of sovereign immunity or a cause of action that authorizes their claims. But even if Plaintiffs had a right to judicial review of their claims, their claims are still subject to dismissal under Rule 12(b)(6) because they have not pled any facts "that affirmatively and plausibly suggest" that the Defendants have violated any of the statutes they cite. *Stalley ex rel. United States v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007). This analysis is hampered by Plaintiffs' failure to identify how their factual allegations *could* be relevant to most of the statutes they cite. For instance, Plaintiffs simply do not make any allegations suggestive of a NEPA violation or relevant to a NEPA inquiry. And their allegations respecting private land have no relevance to statutes regulating public land like NAGPRA and ARPA.

Even Plaintiffs' more extensive allegations regarding the Department of State's NHPA process do not "plausibly" suggest that they have an NHPA claim. *Id*. Plaintiffs acknowledge that the Department of State held four face-to-face meetings with them, (Complaint ¶ 108), in addition to two teleconferences. (Complaint ¶ 111). Nor can they deny the extensive, and expensive, cultural assessment performed by the Department of State. *See* Final Environmental Impact Statement at 3.11-1–3.11-98.[10]  These allegations simply do not suggest that the

---

[10]  The Department of State is currently preparing a hard copy of the EIS to submit to this Court. Docket # 17, Response to the Court's Memorandum Letter, at 2 (Jan. 30, 2009). In the meantime, the EIS is available at http://www.keystonepipeline.state.gov/.

Department of State utterly failed to "make a reasonable and good faith effort" to identify historical properties on the pipeline route. 36 C.F.R. § 800.4(b)(1); *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 804–07 (9th Cir. 1999) (per curiam).  Thus, Plaintiffs' NHPA claims should also be dismissed for this reason.  *Stalley*, 509 F.3d at 521.

## **CONCLUSION**

For the foregoing reasons, Keystone respectfully requests that this Court dismiss Plaintiffs' Complaint with prejudice.

February 18, 2009

Peter R. Steenland
James Coleman
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Telephone:  (202) 736-8000
Fax:  (202) 736-8711

Respectfully submitted,

  /s/ James E. Moore
William Taylor
James E. Moore
PO Box 5027
300 S. Phillips Avenue, Suite 300
Sioux Falls, SD 57117-5027
Telephone:  (605) 336-3890
Fax:  (605) 339-3357
Email:  bill.taylor@woodsfuller.com
Email:  james.moore@woodsfuller.com

*Attorneys for TransCanada Keystone Pipeline, LP*

# EXHIBIT 20

*Sisseton-Wahpeton Oyate v. Dep't of State*, 3:08-cv-3023,
ECF No. 48 (Apr. 13, 2009)

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH DAKOTA

|  |  |  |
|---|---|---|
| _____ | ) | |
| THE SISSETON-WAHPETON OYATE, _et al._ | ) | |
| Plaintiffs | ) | Civil Action No. 08–3023 |
|  | ) | |
| -v.- | ) | |
|  | ) | |
| UNITED STATES DEPARTMENT OF STATE, | ) | |
| _et al._ | ) | |
| Defendants | ) | |
|  | ) | |
| TRANSCANADA KEYSTONE PIPELINE, LP, | ) | |
| Intervenor | ) | |
| _____ | ) | |

## REPLY BRIEF OF TRANSCANADA KEYSTONE PIPELINE, LP, IN SUPPORT OF MOTION TO DISMISS

**<u>Introduction and Summary of Reply</u>**   In its Motion to Dismiss the Complaint, TransCanada Keystone Pipeline, LP (Keystone) argued that this Court cannot adjudicate the Tribes' case because the Administrative Procedure Act (APA) does not provide either the requisite waiver of sovereign immunity or a cause of action.  Keystone demonstrated that the only authority empowering the Department of State to issue a trans-boundary Presidential Permit to Keystone was Executive Order 13337, a delegation of the President's constitutional authority to manage our nation's foreign affairs.  For this reason, the waiver of sovereign immunity contained in the APA is inapplicable here, because that waiver only applies to agency action—action taken by an agency pursuant to a statutory mandate.  Thus, the APA's waiver of sovereign immunity does not apply to an executive official exercising presidential constitutional authority. Keystone also showed that even if this Court held that the issuance of this Presidential Permit

was not presidential action, the exercise of that delegated authority is still unreviewable under the APA, because it is committed to the Department of State's discretion. Finally, Keystone showed that the pipeline does not pass through land protected by treaty, and that the Tribes' aboriginal claims do not give them authority over the private land at issue in this lawsuit.

The Plaintiffs object to Keystone's motion, disclaiming any intent to enforce E.O. 13337. Objections Memo at 13. However, they fail to identify any authority beyond E.O. 13337 that authorizes their claim. Plaintiffs have dropped their claims to relief under NAGPRA, the AHPA, ARPA, and AIRFA. *Compare* First Amended Complaint at 39 *with* Complaint at 39. Plaintiffs also do not reply to Keystone's demonstration that no treaty applies to land at issue in this suit. Thus, their only remaining statutory claims are under the National Environmental Policy Act (NEPA) and the National Historic Preservation Act (NHPA), pursuant to the APA. They assert that an Environmental Impact Statement (EIS), standing alone, is a final agency action subject to review under the APA. They also assert that issuance of the Presidential Permit was not presidential action. Because permitting and licensing is routine federal agency action, the Plaintiffs argue that the Presidential Permit is subject to the APA. Objections Memo at 13. Finally, the Plaintiffs maintain that the United States owes them a trust duty to manage hypothetical cultural artifacts on the private land along the pipeline route. After clarifying that Plaintiffs' claims may only be brought under the APA, Keystone responds, briefly, to each of the Plaintiffs' arguments in turn.

### 1. Plaintiffs' NEPA and NHPA claims are governed by the APA.

As the Plaintiffs have consistently recognized, their claims can only be brought under the APA. In their Complaint, Plaintiffs state: "The APA governs judicial review of an agency's compliance with NEPA, NHPA, NGPRA." Complaint at ¶58. Similarly, in their Objections to the Motions to Dismiss, the Plaintiffs state: "The Tribes bring their NEPA and NHPA claims

under the APA, 5 U.S.C. §§ 701-706."  Objections Memo at 16.  This accords with unanimous

circuit authority.  *Central S.D. Coop. Grazing Dist. v. Sec'y of the United States Dep't of Agric.*,

266 F.3d 889, 894 (8th Cir. 2001) ("Although NEPA does not authorize a private right of action,

the Administrative Procedure Act (APA) provides for judicial review of agency action."); *Karst*

*Envtl. Educ. and Prot. v. EPA*, 475 F.3d 1291, 1295 (D.C. Cir. 2007) ("NHPA, like NEPA,

contains no private right of action"); *San Carlos Apache Tribe v. United States*, 417 F.3d 1091

(9th Cir. 2005) (explaining why recent Supreme Court precedent, as well as the NHPA's

similarity to NEPA, dictates that the NHPA does not create a cause of action).

      Given the Plaintiffs' consistency in designating their claims as APA claims, it is puzzling

when their brief asserts that "[t]he Tribes are provided with a private right of action under

NHPA."  Objections Memo at 21.  Given the clarity of their "under the APA" statements,

Plaintiffs almost certainly mean that the NHPA *together with the APA* provides them with a right

of action.  Presumably they are not suggesting that the NHPA alone, independent of the APA,

provides them with a private right of action; such a contention would contradict their own

Complaint, ¶ 58, and their own statement, just five pages earlier, that they "bring their NEPA and

NHPA claims under the APA."  Objections Memo at 16.  More importantly, it would contradict

circuit and Supreme Court precedent.  Although Keystone assumes that Plaintiffs are not making

an argument that they have explicitly disavowed, given the confusing nature of the Plaintiffs'

brief, Keystone will explain briefly why the NHPA alone, independent of the APA, cannot create

a private right of action.

      Plaintiffs assert that "it is the clear intent of the Eighth Circuit to recognize a private right

of action under the NHPA," citing *Ringsred v. City of Duluth*, 828 F.2d 1305, 1309 (8th Cir.

1987).  Again, Plaintiffs are probably saying that the NHPA provides review in combination with

the APA, and that is true—final agency action made reviewable under the APA may be tested for its compliance with the NHPA.  But if, for the sake of argument, we take Plaintiffs to be arguing that the NHPA provides review apart from the APA, then their argument is exactly wrong—such review may only be had under the APA, as *Ringsred* itself suggests.  *Ringsred* treats the NHPA exactly like NEPA, *Ringsred*, 828 F.2d at 1309, and binding circuit precedent holds that "NEPA does not authorize a private right of action," *Central S.D. Coop.*, 266 F.3d at 894, and thus review is only available under the APA.  *Id*.

The Tribes also quote dicta from *Yankton Sioux Tribe v. Army Corps of Eng'rs*, 194 F. Supp. 2d 977, 989–90 (D.S.D. 2002), stating that "a private right of action exists under the NHPA."  *Id*. at 990.  Again, if we read this quotation to support the Tribes' avowed argument that NHPA violations may often be pursued under the APA, it is correct.  But if *Yankton* is read to argue that the NHPA alone provides review, then *Yankton* is incorrect on its own terms and discredited by all subsequent authority.

The *Yankton* court did not offer independent reasoning for the quoted statement.  Instead it sided with what it felt to be the "more persuasive" authority.  *Id*. at 990.  That authority was a decision from this circuit, *Ringsred*, as well as decisions from five other circuits.  *Id*. at 989 (citing *WATCH v. Harris*, 603 F.2d 310 (2d Cir. 1979); *Boarhead Corp v. Erickson*, 923 F.2d 1011, 1017 (3d Cir. 1991); *Nat'l Ctr. for Pres. Law v. Landrieu*, 635 F.2d 324 (4th Cir. 1980) (per curiam); *Vieux-Carre Prop. Owners, Residents & Assoc. v. Brown*, 875 F.2d 453 (5th Cir. 1989); *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153 (9th Cir. 1998)).  As shown below, none of these cases supports the proposition that the NHPA alone creates a cause of action, and each implies that an NHPA claim should be reviewed under the APA.  Thus, *Yankton* should not be read to support the conclusion that the NHPA creates a private right of action independent of

the APA, because, under that reading, its conclusion would rest wholly on authority that stands for exactly the opposite proposition.

*Ringsred*, as noted above, strongly suggests that in this circuit, NHPA claims should be treated like NEPA claims, and consequently should rely upon the APA to establish a private right of action. Three of the other circuit decisions cited by *Yankton* similarly lump NHPA claims in with NEPA claims, implying that they, too, require the APA to provide judicial review. *WATCH*, 603 F.2d 310, *National Center*, 635 F.2d at 325-26, *Presidio*, 155 F.3d at 1157–60. Indeed, the Ninth Circuit now has made explicit what had been implicit in *Presidio*, the case cited by *Yankton*: "§ 106 does not give rise to a 'private' right of action against the federal government." *San Carlos Apache*, 417 F.3d at 1099; *see also San Carlos Apache Tribe v. United States*, 272 F. Supp. 2d 860, 885 (D. Ariz. 2003) (reading *Yankton* to rely upon *Presidio* for the proposition that the NHPA itself creates a cause of action, and noting that this would be mistaken because *Presidio* stands for the exact opposite proposition).

The other two decisions cited by *Yankton* also suggest that any NHPA action must be brought through the APA. The Third Circuit's decision in *Boarhead* is actually careful to note that the NHPA only authorizes a claim "insofar as the APA gives Boarhead a right to judicial review." 923 F.2d at 1017–18 n.11. And *Boarhead* ultimately concluded that the plaintiff had no right to judicial review. *Id*. at 1024. The Fifth Circuit's 1989 decision in *Vieux Carre* also does not say that the NHPA alone creates a cause of action. It does however, contain a puzzling assertion: "Rather than through APA review, a private right of action against an agency arises under 16 U.S.C. § 470w-4, which provides for the NHPA to be enforced 'in any civil action brought in any U.S. District Court by any interested person.'" *Vieux Carre*, 875 F.2d at 458. Section 470w-4 actually says: "In any civil action brought in any United States district court by

any interested person to enforce the provisions of this subchapter, if such person substantially prevails in such action, the court may award attorneys' fees." As later courts have noted, by its plain terms this section only waives sovereign immunity for attorneys' fees, and *some other statute* must create a private right of action and waive sovereign immunity generally. *San Carlos Apache*, 417 F.3d at 1098–99; *Boarhead*, 923 F.2d at 1017–18 n.11. So the Fifth Circuit's statement is puzzling.[1] But whatever it meant by its statement, the Fifth Circuit *did not* mean that the NHPA *alone* creates a cause of action against the government, because on the very same reporter page the Circuit goes on to analyze whether the NHPA is a "relevant statute" under the APA, 5 U.S.C. § 702, such that the APA grants review. *Vieux-Carre*, 875 F.2d at 458.

Furthermore, if these older decisions could be read to support the view that the NHPA creates a private right of action independent of the APA, then they would not survive the Supreme Court's recent decision in *Alexander v. Sandoval*, 532 U.S. 275 (2001), which makes plain that the NHPA alone cannot create a cause of action. There, the Supreme Court stated: "Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." *Id.* at 289 (internal quotation omitted). NHPA's provisions, like NEPA's, plainly focus on the duties of federal agencies. *San Carlos Apache*, 417 F.3d at 1095. Accordingly, recent circuit decisions confirm the implication of the older decisions cited in *Yankton*: plaintiffs cannot rely on the NHPA alone. *Karst Envtl. Educ.*, 475 F.3d at 1295; *San Carlos Apache*, 417 F.3d at 1097. Instead, they must point to another statute that grants them a cause of action, generally the APA. *Id.*

---

[1] The statement is actually part of the *Vieux-Carre* court's explanation that the NHPA did not give plaintiffs a cause of action against non-federal defendants. 875 F.2d at 458. The court seems to be saying that if any statute gave plaintiffs a right of action against non-federal defendants, it would be 16 U.S.C. § 470w-4, but that it does not. *Id.*

Thankfully, this Court need not decide the admittedly difficult question of whether *Yankton* can be read consistently with the authority it cites or whether it must be rejected in light of the contrary circuit and Supreme Court authority. This is because Plaintiffs have not asserted that the NHPA *alone* provides them with review; they correctly rely on the APA. Complaint ¶ 58; Objections Memo at 16.

### 2. The Presidential Permit, and not the Environmental Impact Statement, is the only final action here within the meaning of the APA.

As the Supreme Court stated in *Bennett v. Spear,* 520 U.S. 154, 175 (1997):

> The APA, by its terms, provides a right to judicial review of all "final agency action for which there is no other adequate remedy in a court," § 704, and applies universally "except to the extent that – (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law," § 701(a).

Plaintiffs assert that not only the Presidential Permit, *but also the Keystone EIS itself*, is final agency action subject to judicial review under the APA. They attempt to distinguish two cases which held that a freestanding NEPA violation cannot be final agency action: *Foundation on Economic Trends v. Lyng*, 943 F.2d 79 (D.C. Cir. 1991) and *Public Citizen v. United States Trade Representative*, 5 F.3d 549 (D.C. Cir. 1993).

Plaintiffs' analysis of *Foundation on Economic Trends* is inaccurate. While acknowledging that it held that preparation of an EIS is not final agency action, they assert that the court "implied the actions of the agency would trigger an APA review where they were substantive, 'putting the parties at risk'." Objections Memo at 17. But the phrase quoted by Plaintiffs, and cited to 943 F.2d at 85, does not appear in the opinion. And rather than imply anything, the court was clear about the meaning of "final agency action": "plaintiffs in NEPA cases must point to 'action' at least arguably triggering the agency's obligation to prepare an

impact statement." *Found. on Econ. Trends*, 943 F.2d at 85.[2]  That is, the EIS itself is not an agency action triggering review; instead plaintiffs "must show the particular agency action—in addition to the agency's refusal to prepare an impact statement—that allegedly triggered the violation and thereby caused the injury." *Id*. at 87.

The Tribes' analysis of *Public Citizen* is also unpersuasive.  They assert that *Public Citizen* addressed "whether the agency should have prepared an[] environmental impact statement, not whether the statement itself was considered final agency action."  Objections Memo at 17.  But this distinction does not favor the Tribes.  It is true that the plaintiff in *Public Citizen* asserted that "the agency's failure to prepare an EIS is reviewable final agency action."  5 F.3d at 552.  And the court rejected that argument, holding that "an agency's failure to prepare an EIS, by itself, is not sufficient to trigger APA review in the absence of identifiable *substantive* agency action."  *Id*. (emphasis added).  But if refusing to issue an EIS altogether is not reviewable final agency action, then issuing an EIS surely cannot be.  Refusing to issue an EIS ends the NEPA process entirely, allowing the challenged agency to continue its operations without any further environmental analysis.  In contrast, an EIS, like the Final EIS in this case, often allows further comments that may lead to modifications or supplementation of the EIS. *See* Final EIS cover letter.  Thus, the distinction drawn by the Tribes cuts against them: a decision not to issue an EIS at all is not final agency action, *Public Citizen*, 5 F.3d at 552, so *a fortiori* issuing an EIS can not be final agency action either.

---

[2]        See also *Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808 (8th Cir. 2006), where the court quoted this passage from *Foundation on Economic Trends*, *id*. at 816, and held that Sierra Club which had demonstrated a "final FEMA determination to approve a specific levee proposal," *id*. at 814, had met its obligation under *Foundation on Economic Trends*.  There was no such determination in this case until the Permit issued.

Plaintiffs also rely on dicta from the Supreme Court's decision in *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998), which reads, "Hence a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper." *Id.* at 737. But, as the quote clearly indicates, the Court was only addressing when a claim was ripe, not the separate issue of whether a freestanding NEPA violation can constitute final agency action. The Court has addressed this question elsewhere. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990); *Found. on Econ. Trends*, 943 F.2d at 85–86 (analyzing *National Wildlife Federation*). And the Court does not state or imply that *issuing an EIS* makes a claim ripe. Instead, it discusses "a person with *standing* who is *injured by* a failure to comply with the NEPA procedure." The Tribes' claim that the EIS, standing alone, is defective does not give them standing, because without the Presidential Permit the EIS was simply a government document that could not injure them.

A plaintiff cannot be injured by a freestanding violation of NEPA. Admittedly, there is little case law on this subject. The *Foundations on Economic Trends* court, and the Supreme Court in *Lujan v. National Wildlife Federation*, 497 U.S. 871, both assumed *arguendo* that the plaintiffs had been injured. *See Found. on Econ. Trends*, 943 F.2d at 85–86 (citing *Nat'l Wildlife Fed'n*, 497 U.S. at 898–99). Those decisions could make this assumption because they concluded that failure to prepare an EIS was not reviewable, because it was not "agency action." *See id.* And those decisions are sufficient to resolve this case: the Plaintiffs do not complain of final agency action, so their claim is not reviewable under the APA. But, should the Court reach the issue, it is also clear that Plaintiffs were not injured by the EIS, standing alone.

Before the Presidential Permit issued on March 11, 2008, Plaintiffs had no injury. At that time, the Keystone Presidential Permit application was still pending at the Department of State.

Until the Permit issued, the EIS prepared by the Department of State pursuant to NEPA, along

with the Programmatic Agreement (PA) adopted under the NHPA, were simply two government

documents on a shelf.  Whether those documents represented the epitome of excellence or a

model of mediocrity, they could not have injured anyone.  Indeed, with respect to the PA that

Plaintiffs declined to sign, that document would have had no consequence in the absence of a

Presidential Permit authorizing the activity that Plaintiffs claim causes them injury.  Thus, if the

President had denied the permit, or simply put off a decision indefinitely, even Plaintiffs must

admit that they would have had no claim.  But, once the Presidential Permit issued, those and

other documents became part of an administrative record in support of a decision authorizing the

construction, operation, and maintenance of the Keystone Pipeline at the international border.

This case is like *Nuclear Energy Institute Inc. v. EPA*, 373 F.3d 1251 (D.C. Cir. 2004) where the

court said: "Nevada's substantive claims against the FEIS will not be fit for judicial review until

the FEIS is used to support a concrete and final decision.  . . .  We do not yet know whether or to

what extent NRC will adopt DOE's FEIS in support of any decision to authorize construction or

license the operation of a repository at Yucca."  *Id.* at 1313.  The only final action in this case,

the only action "from which legal consequences will flow," *Bennett v. Spear,* 520 U.S. 154, 177–

78 (1997), is the Presidential Permit that Keystone received, allowing its pipeline to cross the

border with Canada.

Plaintiffs' theory that, somehow, the issuance of a Final EIS itself can constitute final

agency action reviewable under the APA cannot be squared with the host of NEPA cases

recognizing that the right to judicial review is based on the underlying agency action rather than

on NEPA.  As noted earlier, the APA provides for judicial review of all "final agency action for

which there is no other adequate remedy in a court."  5 U.S.C. § 704.  Accordingly, when parties

challenge an agency action for compliance with NEPA, the statutory authority for the underlying agency action determines whether and where judicial review can be had. In *National Committee for the New River v. FERC*, 373 F.3d 1323 (D.C. Cir. 2004), the Natural Gas Act dictated that Federal Energy Regulatory Commission (FERC) NEPA compliance was reviewable in the Court of Appeals on petition for review. In *NRDC v. Nuclear Regulatory Commission,* 647 F.2d 1345 (D.C. Cir 1981), Nuclear Regulatory Commission (NRC) compliance with NEPA in issuing an export license was handled on petition for review pursuant to the Hobbs Act, 28 U.S.C. § 2341 *et seq.*, as called for in the Atomic Energy Act. NEPA decisions made by the Federal Aviation Administration (FAA) are often subject to review in the Courts of Appeals pursuant to the judicial review provisions of the Federal Aviation Act. *See Suburban O'Hare Comm'n v. Dole,* 787 F.2d 186 (7th Cir. 1986). In contrast, NEPA compliance questions involving agencies without express judicial review provisions in their organic acts are raised as federal questions under 28 U.S.C. § 1331 and are judicially reviewable under the APA in district court because "there is no other adequate remedy in a court." *See*, *e.g.*, *Border Power Plant Working Group v. Dep't of Energy,* 467 F. Supp. 2d 1040 (S.D. Cal. 2006). But if Plaintiffs are correct in asserting that the release of an EIS itself is reviewable federal agency action, then none of these special judicial review statutes would ever come into play. All NEPA complaints would be brought in federal district courts, because each would arise under NEPA rather than the statute authorizing the substantive agency action that necessitated NEPA's procedures. Thus, under Plaintiffs' theory the extensive NEPA jurisprudence resting on petitions for review of decisions by FERC, NRC, FAA, and other similar agencies would have no reason for existence.

### 3. The Presidential Permit is presidential action, not agency action.

The Supreme Court has stated that "the President is not an 'agency' within the meaning of the APA." *Dalton v. Specter*, 511 U.S. 462, 469 (1994). Thus, Plaintiffs face a seemingly

insuperable obstacle to their suit—they must prove a paradox, that the Presidential Permit is not presidential action.  They gamely offer two arguments.  Their first argument requires two steps.  They assert that the Department of State, not the President, issued the Permit, and they argue that the President's authority to overturn or ignore that ruling is irrelevant.  Objections Memo at 9–11.  Their second argument is less complicated, but totally unrelated to the law.  They argue, as a policy matter, that this permit should be reviewable because permits are generally reviewable.  *Id.* at 12.  But the correct answer is the simple one suggested by the text of the APA and the decisions of the Supreme Court: the Presidential Permit is not agency action, so it is not reviewable under the APA.

The Plaintiffs repeatedly emphasize that the Department of State took many of the actions leading to the permit.  It "took full responsibility for evaluating and approving the application for the Presidential Permit."  *Id.* at 10.  It "took steps where 'rights and obligation[s] have been determined' and from which 'legal consequences flow'."  *Id.*  It "undertook an environmental impact statement that included a cultural resource survey."  *Id.* at 11.  Some of these steps were actually performed by the Under Secretary of State, rather than the Department of State, but even assuming that these assertions were true, their relevance is unclear.  The Plaintiffs are probably asserting that when the Department of State acts, it must be agency action within the meaning of the APA, not presidential action.  But it is well settled that if the President delegates authority to his executive officers, and that authority is unconstrained by statute,[3] then those officers' actions are presidential actions.  *Ludecke v. Watkins*, 335 U.S. 160, 165–66 (1948) ("The power with which Congress vested the President had to be executed by him through

---

[3]    It is important to remember, as Keystone noted in its motion to dismiss, that this case concerns delegated *presidential* authority, not the delegated *legislative* authority that is the basis for the administrative state and is routinely subject to APA review.  Keystone Mot. to Dismiss at 13.

others. . . . [T]he Attorney General was the President's voice and conscience. A war power of

the President not subject to judicial review is not transmuted into a judicially reviewable action

because the President chooses to have that power exercised within narrower limits than Congress

authorized."); *Dreyfus v. Von Finck*, 534 F.2d 24, 29 (2d Cir. 1976) ("The fact that this executive

authority is exercised by the President through others does not transmute it into judicially

reviewable action."); *Jensen v. Nat'l Marine Fisheries Serv. (NOAA)*, 512 F.2d 1189, 1191 (9th

Cir. 1975) (where treaty gave President power to approve regulations, and he delegated that

power to the Secretary of State "the Secretary's actions are those of the President," and because

"presidential action in the field of foreign affairs is committed to presidential discretion by law it

follows that the APA does not apply to the action of the Secretary in approving the regulation

here challenged" (internal citation omitted)); *Alaska v. Carter*, 462 F. Supp. 1155 (D. Alaska

1978) ("The argument that the President . . . must personally . . . [perform] the details that are

necessary to the issuance of a Presidential Proclamation in order to escape the procedural

requirements of NEPA approaches the absurd."). And the Supreme Court has made clear that if

an action is presidential action, it is not agency action within the meaning of the APA. *Dalton*,

511 U.S. at 469; *see also Jensen*, 512 F.2d at 1191. Accordingly, none of the actions cited by

Plaintiffs are reviewable under the APA.

Moreover, even if the Department of State was not exercising authority specifically

delegated from the President, the Plaintiffs would still have to show that the President's

unconstrained authority to overturn that decision does not transform the Department's actions

into presidential action. Here the Plaintiffs must contend with the Supreme Court's decisions in

*Dalton v. Specter*, 511 U.S. 462 (1994), *Franklin v. Massachusetts*, 505 U.S. 788 (1992), and

*Chicago & Southern Air Lines v. Waterman Steamship Corp.*, 333 U.S. 103 (1948). Plaintiffs

assert that *Dalton* and *Waterman* are distinguishable "because the final action in those cases taken was that of the President." Objections Memo at 10. But these cases were not so limited. The Fifth Circuit's judgment that was reversed in *Waterman* took the Plaintiffs' position. It reasoned that it could review the decision of the Civil Aeronautics Board, because doing so would not conflict with the President's authority—the President could simply disapprove the decision as modified by the circuit court. *Waterman*, 333 U.S. 103, 105, 113 (1948). The Supreme Court rejected this view emphatically:

> [I]f the President may completely disregard the judgment of the
> court, it would be only because it is one the courts were not
> authorized to render. Judgments, within the powers vested in
> courts by the Judiciary Article of the Constitution, may not
> lawfully be revised, overturned or refused faith and credit by
> another Department of Government.

*Id*. at 113. Here, there can be no dispute that if this Court were to rescind the Presidential Permit issued by the Department of State, the President retains the inherent sovereign authority to simply reissue the permit himself the next day, and that this Presidential deed would be obviously unreviewable presidential action. Thus, *Waterman* resolves this case. The Plaintiffs seek a judgment that "the President may completely disregard." *Id*. Therefore, it is a judgment this court is "not authorized to render." *Id*.

Plaintiffs' second argument is that the Presidential Permit should be judged to be non-presidential because "[p]ermitting and licensing is common federal agency action." Objections Memo at 12. Of course, this argument has nothing to do with the law, which is established by the APA's text and the Supreme Court's controlling decisions. But even on its own terms, this argument is unavailing. Nearly all permitting and licensing *is* reviewable under the APA, because generally that permitting is done by an agency pursuant to a *statutory* delegation of *legislative* authority. Indeed, the cases the Plaintiffs rely upon for this assertion involved agency

action taken pursuant to statute. Thus, *Presidio Bridge Co. v. Secretary of State*, 486 F. Supp. 288 (W.D. Tex. 1978) involved the exercise of statutory authority contained in section 535(b) of the International Bridge Act. Similarly, in *Border Power Plant Working Group v. Department of Energy,* 467 F. Supp. 2d 1040 (S.D. Cal 2006), the Bureau of Land Management took action under the Federal Land Policy and Management Act to issue a right of way for an electric transmission line. But, in this case, the question presented is whether the APA provides review of a Presidential Permit for an oil pipeline border crossing made pursuant to the President's inherent constitutional authority. This question concerns a tiny subset of permitting decisions: those that solely rely upon the President's constitutional authority to control the nation's borders, and are unconstrained by any act of Congress.

Plaintiffs also vaguely assert that the government's argument asks "the Court to ignore applicable laws and hold that the President's authority to be greater than that of Congress." Objections Memo at 5. They also state that the government's argument "shakes the foundation the Constitutional law principle of separation of powers." Objections Memo at 4. Keystone respectfully disagrees. Plaintiffs cannot dispute that the President has the sole authority to permit oil pipeline border crossings. Without this authority, Keystone would not even need a permit to cross the border and the Plaintiffs would have no claim. Congress has chosen not to regulate oil pipeline border crossings.[4] Thus, if anyone can regulate such a crossing, it is the President. If Plaintiffs succeeded in proving that the President had no inherent constitutional authority to permit the Keystone crossing, they would have only proved that they have no case.

---

[4]     Unlike the construction of natural gas pipelines, which must be approved by the Federal Energy Regulatory Commission under the Natural Gas Act, 15 U.S.C. § 717, *et seq.*, Congress has declined to create any federal regulatory scheme for the construction of oil pipelines, leaving any regulation to the states.

Plaintiffs also may be expressing frustration that presidential compliance with NEPA is not reviewable under the APA. But that is the holding of *Dalton v. Specter*, 511 U.S. at 469. *Cf. Weinberger v. Catholic Action of Hawaii*, 454 U.S. 139, 146 (1981) (even though "[t]he Navy must consider environmental consequences in its decisionmaking process" the ultimate decision "whether or not the Navy has complied with NEPA 'to the fullest extent possible' is beyond judicial scrutiny"). It also is important to remember that "the President's acts may still be reviewed for constitutionality." *Franklin*, 505 U.S. at 801. Plaintiffs do not assert any constitutional claims, so their claims are unreviewable. This conclusion does not threaten the separation of powers. Instead, it

> follows from [the Court's] interpretation of an act of Congress, by which . . . all federal courts are bound. The judicial power of the United States conferred by Article III of the Constitution is upheld just as surely by withholding judicial relief where Congress has permissibly foreclosed it, as it is by granting such relief where authorized by the Constitution or by statute.

*Dalton*, 511 U.S. at 477. This Court should uphold that judicial power, and the decisions rendered by the Supreme Court, and dismiss Plaintiffs' Complaint.

### 4. **The United States does not have a trust duty to manage the hypothetical cultural resources that form the basis for this suit.**

The Tribes assert that the United States owes the Tribes a trust duty to manage lands owned by private landowners to conserve any possible cultural resources that might exist on those properties. But as Keystone demonstrated in its opening memorandum, *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003), forecloses this argument, because it dictates that the general guardian-ward relationship between the Tribes and the government is not enough to create an actionable trust. And the Tribes have not asserted another basis for an actionable trust duty. In response, the Tribes assert that *Navajo Nation* only governs claims under the Indian Tucker Act. Objections Memo at 28. But this is not true:

> There is a general trust relationship between the United States and the Indian People.  But that relationship alone does not suffice to impose an actionable fiduciary duty on the United States.  Instead, to determine whether such a duty exists, we must look to specific rights-creating or duty-imposing statutory or regulatory prescriptions.

*Ashley v. U.S. Dep't of Interior*, 408 F.3d 997, 1002 (8th Cir. 2005) (internal quotations and citations omitted) (citing *Navajo Nation*, 537 U.S. at 506).  Thus, Plaintiffs' trust claim is foreclosed by binding precedent.

## CONCLUSION

For the foregoing reasons, Keystone respectfully requests that this Court dismiss Plaintiffs' Complaint with prejudice.

April 13, 2009                            Respectfully submitted,

                                          /s/ James E. Moore

Peter R. Steenland                        William Taylor
James Coleman                             James E. Moore
SIDLEY AUSTIN LLP                         PO Box 5027
1501 K Street, NW                         300 S. Phillips Avenue, Suite 300
Washington, DC 20005                      Sioux Falls, SD 57117-5027
Telephone:  (202) 736-8000                Telephone:  (605) 336-3890
Fax:  (202) 736-8711                      Fax:  (605) 339-3357
                                          Email:  bill.taylor@woodsfuller.com
                                          Email:  james.moore@woodsfuller.com

*Attorneys for TransCanada Keystone Pipeline, LP*

# EXHIBIT 21

*NRDC v. Dep't of State*, 1:08-cv-01363,
ECF No. 25 (Oct. 20, 2008)

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATURAL RESOURCES DEFENSE COUNCIL,   )
INC.,   )
  )
      Plaintiff,   )
  )
v.   )      Case No. 1:08-cv-01363-RJL
  )
  )
UNITED STATES DEPARTMENT OF STATE;   )
CONDOLEEZZA RICE, in her official capacity as   )
Secretary of State; and REUBEN JEFFREY III, in   )
his official capacity as Under Secretary of State for   )
Economic, Energy, and Agricultural Affairs,   )
Defendants,   )
  )
and   )
  )
TRANSCANADA KEYSTONE PIPELINE, LP,   )
  )
Defendant-Intervenor.   )

## MOTION BY TRANSCANADA KEYSTONE PIPELINE, LP, TO DISMISS COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1), OR 12(b)(6), AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

Defendant-Intervenor TransCanada Keystone Pipeline, LP (hereinafter, "Keystone"),

hereby moves and respectfully seeks an order dismissing with prejudice the Complaint filed by

Plaintiff Natural Resources Defense Council ("Plaintiff") against Defendants United States

Department of State, Condoleezza Rice, and Reuben Jeffrey III, in this matter pursuant to Rule

12(b)(1) for lack of subject matter jurisdiction. Alternatively, this matter should be dismissed

with prejudice pursuant to Rule 12(b)(6), for failure to state a claim upon which relief can be

granted. Keystone believes that oral argument would be helpful and appropriate, and therefore

requests the same.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... ii

STATEMENT OF FACTS ........................................................................... 1

ARGUMENT ............................................................................................... 8

    I.   THE UNITED STATES HAS NEITHER WAIVED ITS SOVEREIGN IMMUNITY NOR GRANTED A PRIVATE RIGHT OF JUDICIAL REVIEW FOR PLAINTIFF'S CLAIMS, WHICH SHOULD BE DISMISSED PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(1). .................................................... 9

        *A.   Neither NEPA nor the Executive Order authorizing the State Department's actions provide a private right of judicial review or a waiver of sovereign immunity.* .................... 11

        *B.   The APA's Section 702 waiver of immunity and grant of a private right of action does not apply in circumstances where the President retains a significant degree of final discretion.* ........................................................................................................... 15

        *C.   In the alternative, any private right of review is precluded by contrary Presidential intent thereby demonstrating that the limitations of Section 701(a)(1) are applicable here.* 18

        *D.   The unsuitability of review under the APA, as provided in Section 701(a)(2), is confirmed by the absence of standards to guide judicial review or application of a remedy and by the lack of judicial expertise in matters determining the "national interest."* ........ 20

    II.   IN THE ALTERNATIVE, PLAINTIFF'S COMPLAINT FAILS TO STATE ANY CLAIM FOR WHICH RELIEF CAN BE GRANTED AND THUS SHOULD BE DISMISSED PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6). ................................................... 24

CONCLUSION ......................................................................... 25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Abbott Laboratories v. Gardner,*
  387 U.S. 136 (1967)............................................................................................19

*\*Air Trans. Ass'n of America v. Fed. Aviation Admin.,*
  169 F.3d 1 (D.C. Cir. 1999)...............................................................................13

*\*Arbaugh v. Y&H Corporation,*
  546 U.S. 500 (2006)............................................................................................25

*Baltimore Gas & Elec. Co. v. NRDC,*
  462 U.S. 87 (1983)..............................................................................................5

*Barnes v. Kline,*
  759 F.2d 21 (D.C. Cir. 1985)..............................................................................12

*Beneficial Nat'l Bank v. Anderson,*
  539 U.S. 1 (2003)................................................................................................9

*\*Benvenuti v. Department of Defense,*
  587 F. Supp. 348 (D.D.C. 1984)........................................................................11

*Biodiversity Conservation v. U.S. Bureau of Land,*
  404 F. Supp. 2d 212 (D.D.C. 2005)....................................................................12

*\*Block v. Cmty. Nutrition Inst.,*
  467 U.S. 340 (1984)......................................................................................18, 19

*\*C&S Air Lines v. Waterman Corp.,*
  333 U.S. 103 (1948)......................................................................................22, 23

*Califano v. Sanders,*
  430 U.S. 99 (1977)........................................................................................15, 20

*\*Commodity Futures Trading Com'n v. Nahas,*
  738 F.2d 487 (D.C. Cir. 1984)............................................................................8

*Corus Group PLC v. International Trade Commission,*
  352 F.3d 1351 (Fed. Cir. 2003)..........................................................................23

*\*Dalton v. Specter,*
  511 U.S. 462 (1994)............................................................................................16

*Davis v. Passman*,
442 U.S. 228 (1979)................................................................................24

*\*Department of Navy v. Egan*,
484 U.S. 518 (1988)............................................................................. 24

*DeVilbiss v. Small Bus. Admin.*,
661 F.2d 716 (8th Cir. 1981) ..............................................................10

*El-Shifa Pharms. Indus. Co. v. United States*,
402 F. Supp. 2d 267 (D.D.C. 2005)......................................................15

*Foundation on Economic Trends v. Lyng*,
943 F.2d 79 (D.C. Cir1991 ..................................................................17

*F.D.I.C. v. Meyer*,
510 U.S. 471 (1994)..............................................................................11

*\*Franchise Tax Bd. v. Construction Laborers Vacation Trust*,
463 U.S. 1 (1983)...................................................................................9

*\*Franklin v. Massachusetts*,
505 U.S. 788 (1992)..........................................................................15, 16

*Grand Lodge of the Fraternal Order of Police v. Ashcroft*,
185 F. Supp. 2d 9 (D.D.C. 2001) ..........................................................9

*Independent Meat Packers Association v. Butz*,
526 F.2d 228 (8th Cir. 1975) ...............................................................14

*Jones v. Exec. Office of the President*,
167 F. Supp. 2d 10 (D.D.C. 2001) .........................................................8

*Kokkonen v. Guardian Life Ins. Co. of America*,
511 U.S. 375 (1994)................................................................................8

*Kowal v. MCI Communications Corp.*,
16 F.3d 1271 (D.C. Cir. 1994) ...............................................................9

*Lane v. Pena*,
518 U.S. 187 (1996)..............................................................................11

*Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*,
507 U.S. 163 (1993)................................................................................9

*Lehman v. Nakshian,*
  453 U.S. 156 (1981)........................................................................... 11

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992)...........................................................................22

*Manhattan-Bronx Postal Union v. Gronouski,*
  350 F.2d 451 (D.C. Cir. 1965), *cert. denied,* 382 U.S. 978 (1966) ...........................13

*Marbury v. Madison,*
  5 U.S. (1 Cranch) 137 (1803).............................................................. 23

*Marsh v. Oregon Natural Resources Council,*
  490 U.S. 360 (1989)............................................................................6

*Maryland Dept. of Human Resources v. Department of Health and Human Svcs.,*
  763 F.2d 1441 (D.C. Cir. 1985) ..........................................................19

*\*Merrell Dow Pharmaceuticals Inc. v. Thompson,*
  478 U.S. 804 (1986).............................................................................9

*Meyer v. Bush,*
  981 F.2d 1288 (D.C. Cir. 1993) ..........................................................14

*Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Svcs.,*
  545 U.S. 967 (2005)...........................................................................23

*Natural Resources Defense Council v. Kempthorne,*
  525 F. Supp. 2d 115 (D.D.C. 2007) .....................................................15

*Neighbors For Rational Development, Inc., v. Norton,*
  379 F.3d 956 (10th Cir. 2004) ............................................................18

*No Oilport v. Carter,*
  520 F. Supp. 334 (W.D. Wa, 1981) .................................................21, 23

*Papasan v. Allain,*
  478 U.S. 265 (1986)............................................................................9

*\*Public Citizen v. U.S. Trade Representative,*
  5 F.3d 549 (D.C. Cir. 1993), *cert. denied* 510 U.S. 1041 (1994) ...............5, 11, 15, 17

*Richardson v. United States,*
  943 F.2d 1107 (9th Cir.1991) .............................................................12

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989)...................................................................................6

*Schilling v. Rogers*,
   363 U.S. 666 (1960).................................................................................10

*Sierra Club v. EPA*,
   292 F.3d 895 (D.C. Cir., 2002) ...............................................................22

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998)...................................................................................12

*Suburban O'Hare Comm'n v. Dole*,
   787 F.2d 186 (7th Cir. 1986) ..................................................................12

*\*In re Surface Min. Regulation Litigation*,
   627 F.2d 1346 (D.C. Cir. 1980) ..............................................................13

*In re Swine Flu Immunization Products Liability Litigation*,
   880 F.2d 1439 (D.C. Cir. 1989) ................................................................8

*\*Trudeau v. Federal Trade. Commission*,
   456 F.3d 178 (D.C. Cir. 2006) ................................................................ 24

*Tulare County v. Bush*,
   185 F. Supp. 2d 18 (D.D.C. 2001), *aff'd,* 306 F.3d 1138 (D.C. Cir. 2002), *cert.
   denied,* 540 U.S. 813 (2003) ...................................................................16

*United States v. Curtis-Wright Corp.*,
   299 U.S. 304 (1936) ................................................................................ 23

*\*United States v. Mitchell*,
   463 U.S. 206 (1983)...................................................................................10

*Webster v. Doe*,
   486 U.S. 592 (1988).................................................................................21

*\*Weinberger v. Catholic Action of Hawaii*,
   454 U.S. 139 (1981)...................................................................................6

*West 14th Street Commercial Corp. v. 5 West 14th Owners Corp.*,
   815 F.2d 188 (2d Cir. 1987).......................................................................9

*Wilderness Society v. Norton*,
   434 F.3d 584 (D.C. Cir. 2006) .................................................................22

*Women's Equity Action League v. Cavazos*,
   906 F.2d 742 (D.C. Cir. 1990) .................................................................13

*Zhang v. Slattery*,
   55 F.3d 732 (2d Cir. 1995) ....................................................................13

## STATUTES AND OTHER AUTHORITIES

5 U.S.C. § 551, *et seq* .............................................................................15

5 U.S.C. § 701 .........................................................................................18

5 U.S.C. § 702 ..............................................................................15, 18, 19

16 U.S.C. § 470(f) ......................................................................................7

16 U.S.C § 1536 .........................................................................................7

28 U.S.C. § 1331 ..................................................................................8, 9, 12

28 U.S.C. §§ 2201-2202 ........................................................................8, 10

30 U.S.C. § 185 .........................................................................................21

33 U.S.C. § 535 ...........................................................................................4

42 U.S.C. § 4321, et *seq* ............................................................................2

42 U.S.C. §§ 4321 - 4370 ......................................................................5, 11

42 U.S.C. § 4332 .........................................................................................6

43 U.S.C. § 1701, *et seq* ...........................................................................12

47 U.S.C. § 34 .............................................................................................4

47 U.S.C. § 35 .............................................................................................4

40 C.F.R. § 1500, *et seq* ............................................................................6

33 Fed. Reg. 11,741 (Aug. 20, 1968) .........................................................3

66 Fed. Reg. 28,357 (May 22, 2001) ........................................................14

68 Fed. Reg. 27,429 (May 20, 2003) ........................................................14

69 Fed. Reg. 25,229 (May 5, 2004) .......................................................................... *passim*

Federal Rule of Civil Procedure 12(b)(1) ........................................................................8, 9

Federal Rule of Civil Procedure 12(b)(6).. .................................................................9, 24

## STATEMENT OF FACTS

Introduction and Summary.  Acting on behalf of the President of the United States, the Department of State (or alternatively, "State Department") has determined that the issuance of a Presidential Permit for the Keystone crude oil pipeline to cross the border between the United States and Canada serves the national interest of the United States.  In its February 28, 2008, Record of Decision and National Interest Determination ("ROD/NID"), the State Department found "that the Keystone Pipeline Project serves the national interest by providing additional access to a proximate and newly available supply of crude oil with minimum transportation requirements from a reliable trading partner of the United States."  ROD/NID at 2.[1]  The State Department gave four reasons for this finding.  First, it found that an oil pipeline transporting crude oil from Alberta, Canada, to refineries and oil distribution terminals in the United States would increase the diversity of available supplies among crude oil sources.  Second, it recognized that Canadian crude oil is the largest and closest supply source to U.S. refineries that does not require marine transport.  Third, it stated that Canada is a stable and reliable trading partner, and a Canadian pipeline is safer and more environmentally responsible than marine or railway transport.  Fourth, the State Department found that this pipeline provides additional crude oil to make up for the continued decline in imports from other major U.S. suppliers.  ROD/NID at 22.  Accordingly, the Department of State issued a Presidential Permit on March 11, 2008, allowing Keystone to construct, operate, and maintain the Keystone Pipeline at the international boundary between the United States and Canada.

Plaintiff Natural Resources Defense Council ("NRDC") brought this suit to invalidate that Presidential Permit, claiming that the Department of State violated the National

---

[1] The Record of Decision issued in this matter by the Department of State is appended to this Motion as Attachment A.

Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, e*t seq.*, by producing an Environmental

Impact Statement ("EIS") to accompany the Presidential Permit that NRDC has deemed

deficient.  However, unlike other, more common NEPA cases that have been resolved on their

merits, this litigation falls into that small category of NEPA cases that cannot and should not be

litigated because the underlying action giving rise to the EIS is not judicially reviewable.  As a

result, any EIS produced and any Permit granted under these particular circumstances falls

beyond the reach of the judiciary.

     I.     <u>The Keystone Pipeline Application to the Department of State.</u>  TransCanada

Keystone Pipeline, LP ( "Keystone") is a Delaware limited partnership, jointly owned by

TransCanada Corporation, a Canadian public company organized under the laws of Canada, and

by ConocoPhillips Company, a Delaware corporation, a wholly owned subsidiary of

ConocoPhillips, a Delaware Corporation.  The Keystone limited partnership was created for the

purpose of transporting crude oil and other hydrocarbons by pipeline from the international

border between the United States and Canada to facilities in the United States.  Consistent with

that purpose, Keystone filed on April 19, 2006, with the State Department a detailed application

for a permit to construct, operate, and maintain a cross-border energy facility within the scope of

Executive Order 13337.  This permit allows Keystone to cross the international border and

construct an international crude oil pipeline from a crude oil supply hub in Canada to oil

refineries and oil distribution terminals in the United States.

     Executive Order ("E.O.") 13337 of April 30, 2004, provides the sole basis for the action

by the State Department that provoked the NRDC lawsuit.  Unlike some Executive Orders that

find their basis in specific legislation, the President promulgated this Order pursuant to his

constitutional authority over national security and foreign affairs.  This Executive Order,

E.O.13337, is simply one in a series of Presidential directives for managing this constitutional authority over energy facilities that cross international borders, *see* 69 Fed. Reg. 25,299 (May 5, 2004). In fact, because proposed cross-border facilities can present important foreign relations and national security concerns, such facilities have been subject to Presidential authority for nearly a century. For example, at least as early as 1919, the President exercised his foreign relations and national security power by delegating to the Secretary of State and Department of State the authority to issue permits for the landing of foreign telegraph and other cables in the United States. *See* A. Hackworth, *Digest of International Law*, Vol. IV, section 350, at pp. 247-266 (1942); *see also* John Bassett Moore, *A Digest of International Law*, Vol. II, section 227, at pp. 461-463 (1906) (describing the assertions by Presidents Grant, Hayes, Garfield, Arthur, Cleveland, and Harrison of the right of the executive branch to control the landing of cables on U.S. shores). Thus, the issuance of the Presidential Permit for the Keystone Pipeline is simply one more example in the lengthy history of the exercise of Presidential powers involving foreign policy and national security.

In exercising this constitutional authority, President Johnson incorporated this area of Presidential authority into a larger cross-border facility permit program with his issuance of E.O. 11423 on August 16, 1968. There, the President delegated to the Secretary of State and the State Department the authority to issue "Presidential permits for the construction, connection, operation, and maintenance at the borders of the United States of" a wide variety of "border crossing facilities" such as water supply and oil pipelines, aerial tramways and cable cars, submarine cables, … lines for the transmission of electric energy[,] … facilities for the transportation of persons or things, or both, to or from a foreign country" and, subject to a statutory carve-out, international bridges. 33 Fed. Reg. 11,741 (Aug. 20, 1968). With respect to

some international facilities, Congress has built additional statutory obligations that supplement this Presidential authority.  For example, in the International Bridge Act of 1972, Congress recognized Presidential authority over bridges that cross international borders, requiring Presidential approval for the construction, operation, or maintenance of such bridges.  *See* 33 U.S.C. § 535(b); *see also* the Submarine Cable Landing and Licensing Act of 1921, codified at 47 U.S.C. §§ 34-35 (requiring Presidential approval for the landing of submarine cables on U.S. shores).  With regard to oil pipelines, however, there is no federal legislation addressing this Presidential authority – and as stated in E.O. 13337, the basis for its promulgation rests upon Presidential constitutional authority.

Consistent with this long-established practice, E.O. 13337 – which amends E.O. 11423 – creates a formal process through which the State Department, in the person of the Secretary of State, exercises the President's delegated authority to make all national interest determinations for the construction, connection, operation or maintenance of any facility for the exportation or importation of petroleum and other fuels at the border of the United States.  69 Fed. Reg. 25,229 (May 5, 2004).  Promulgated in part "to expedite reviews of permits as necessary to accelerate the completion of energy production and transmission projects," *id.*[2], E.O. 13337 shifts much of the burden of permitting such cross-border projects from the President, while retaining the Chief Executive's ultimate authority over permitting decisions.  Specifically, the President has retained exclusive final decisionmaking in the permitting process whenever any of the listed Cabinet officers consulted during the permitting process disagrees with the State Department's determination of the national interest and the State Department's announced decision to approve or deny the permit.  *Id.*  At that point, the permit application is referred to the President for his

---

[2] E.O. 13337 also contains provisions relating to construction of specified types of international border crossings for motor and rail land transportation.

final decision.  *Id*.  Further, because E.O. 13337 derives its authority from the President's constitutional power, and not an act of Congress, the President is free to approve or deny cross-border energy facilities without recourse to that Executive Order, and is free to amend or revoke E.O. 13337 at any time.  Thus, this Executive Order is simply a management tool for the exercise of the President's constitutional authority over our borders with other nations, and the concomitant foreign policy and national security issues presented in that context.

Finally, while E.O. 13337 makes provision for input from other federal agencies and for public input, it (like its predecessors) expressly rejects the intent to or effect of creating

> any right, benefit, or trust responsibility, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities, or entities, its officers or employees, or any other person.

69 Fed. Reg. 25,299 (May 5, 2004).

Both the February 28, 2008, State Department ROD/NID containing the national interest findings for the Keystone Pipeline and the March 11, 2008, Presidential Permit authorizing the construction, operation, and maintenance of the Keystone Pipeline at the border between the United States and Canada were expressly and solely grounded in the powers contained in this Executive Order.

The National Environmental Policy Act of 1969 ("NEPA") is a procedural statute intended to foster "consider[ation of] environmental concerns" as part of the "decision-making process" of federal agencies.  *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983).  Although several of NEPA's provisions purport to impose mandates upon federal agencies, NEPA does not address whether or how its requirements are to be judicially reviewed or enforced.  *See generally* 42 U.S.C. §§ 4321 – 4370; *see also Public Citizen v. U.S. Trade Representative*, 5 F.3d 549, 551 (D.C. Cir. 1993), *cert. denied* 510 U.S. 1041 (1994).  Of course,

there is the familiar Section 102(2)(C) of NEPA, which requires all federal agencies, "to the fullest extent possible," to include an Environmental Impact Statement ("EIS") in proposals for "major federal actions significantly affecting the environment." 42 U.S.C. § 4332(2)(C). Notwithstanding NEPA's silence as to judicial review, courts have found that Section 102(2)(C) imposes procedural requirements on agencies – but does not mandate any particular substantive outcome – and that the procedural requirements are judicially reviewable in some circumstances. *See, e.g., Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989); *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371 (1989).

However, judicial review of agency compliance with Section 102(2)(C) is not always available. The Supreme Court has declared that while Section 102(2)(C) and its implementing regulations, 40 C.F.R. § 1500, *et seq.,* may impose requirements on agencies, those obligations nevertheless may not be subject to private suits for judicial review. *See, e.g., Weinberger v. Catholic Action of Hawaii,* 454 U.S. 139 (1981) (rejecting the Court of Appeals' ruling that the Navy prepare a "hypothetical EIS" for nuclear weapon storage in Hawaii, and noting that although the Navy might be required to perform an internal EIS for such an action, Navy's NEPA compliance "is beyond judicial scrutiny" and not subject to public release).

II.     The State Department's review of the application for a Presidential Permit.  The Department of State reviewed the application pursuant to the requirements of E.O. 13337, and assessed the project with respect to the national interest, a process summarized in the Department's ROD/NID of February 28, 2008.  As a corollary to its national interest determination, the State Department also completed a Draft and then a Final EIS to inform it, other federal, state and local agencies, and the public of the reasonably foreseeable environmental, social, and economic impacts of the proposed pipeline.  *See* ROD/NID at 8-19.

The State Department also undertook consultations and additional assessments pursuant to Section 106 of the National Historic Preservation Act, 16 U.S.C. § 470(f), and it engaged in consultation with the U.S. Fish & Wildlife Service pursuant to Section 7 of the Endangered Species Act, 16 U.S.C. § 1536. *See* ROD/NID at 20-21. The ROD/NID summarizes the results of these processes, describing the environmental impacts, alternatives considered, possible environmental consequences and mitigation for potential adverse impacts. In the end, the ROD/NID finds that the construction, maintenance, and operation of the Keystone Pipeline "would have limited adverse impact to the environment." *Id*. at 3.

The State Department concluded its examination of the application by determining "that the Keystone Pipeline Project serves the national interest by providing additional access to a proximate and newly available supply of crude oil with minimum transportation requirements from a reliable trading partner of the United States." *Id*. at 22-24. The State Department therefore issued a Presidential Permit to Keystone, authorizing the company to construct, operate, and maintain the portion of the Keystone Pipeline facility located at the international border between the United States and Canada.

III. <u>Plaintiff's Complaint.</u> NRDC filed a complaint on August 6, 2008 (amended September 23, 2008), alleging that the issuance of the Presidential Permit to Keystone violated NEPA and its implementing regulations. In particular, NRDC asserts that the EIS is deficient because it fails to discuss in meaningful detail "the predictable increases in pollution from the refining of oil transported through the Pipeline…." Plaintiff's First Amended Complaint For Declaratory and Injunctive Relief ("Complaint") at ¶ 2. NRDC charges that the State Department "failed to consider adequately the Pipeline's indirect effects at Wood River [Refinery], and failed to consider at all its indirect effects at any other refinery." *Id.* at ¶ 62.

7

Further, the Complaint alleges a failure to assess the Pipeline's cumulative impacts, and to recognize the broader and longer-range problems that global-warming inducing effects may pose. NRDC claims that the State Department's EIS fails to deal adequately with incomplete or unavailable information concerning reasonably foreseeable and significant adverse project-related impacts and does not consider or propose appropriate mitigation measures. *Id.* at ¶ 63. NRDC seeks declaratory and injunctive relief, including an order requiring the State Department to revoke the Presidential Permit for the Keystone Pipeline, and to ensure that no further construction takes place pending compliance with NEPA. *Id.*

NRDC asserts that this Court has jurisdiction over this suit on the basis of "28 U.S.C. § 1331 (federal question), 28 U.S.C. §§ 2201-2202 (declaratory judgment), and 5 U.S.C. §§ 701-706 (Administrative Procedure Act)." *Id.* at ¶ 6.

## ARGUMENT

A motion to dismiss pursuant to the Federal Rule of Civil Procedure 12(b)(1) challenges the jurisdictional basis for a court to consider a party's claims. For those claims to survive a motion to dismiss pursuant to Rule 12(b)(1), a plaintiff must establish that the court has subject matter jurisdiction to hear the case. *See, e.g., In re Swine Flu Immunization Prods. Liab. Litig*., 880 F.2d 1439, 1442-43 (D.C. Cir. 1989); *Jones v. Exec. Office of the President*, 167 F. Supp. 2d 10, 13 (D.D.C. 2001). "Federal courts are courts of limited jurisdiction" and "possess only that power authorized by Constitution and statute," *Kokkonen v. Guardian Life Ins. Co. of America,* 511 U.S. 375, 377 (1994) (citations omitted). Consequently, "[a] federal court *presumptively* lacks jurisdiction in a proceeding until a party demonstrates that jurisdiction exists," *Commodity Futures Trading Com'n v. Nahas*, 738 F.2d 487, 492 n. 9 (D.C. Cir. 1984) (citations omitted; emphasis added). Thus, NRDC must demonstrate that this Court has jurisdiction over its claims against the State Department.

8

In ruling upon a motion to dismiss, the court must accept as true all factual allegations contained in the complaint. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993). This requirement similarly applies to a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). However, in ruling on a motion to dismiss, a court is "not bound to accept as true a legal conclusion couched as a factual allegation," *Papasan v. Allain,* 478 U.S. 265, 286 (1986), or to "accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint," *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C. Cir. 1994). Moreover, given the threshold nature of subject matter jurisdiction, a "plaintiff's factual allegations in the complaint ... will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Grand Lodge of the Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13-14 (D.D.C. 2001) (internal quotation marks omitted). Finally, "[j]urisdiction may not be sustained on a theory that the plaintiff has not advanced." *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804, 810 n. 6 (1986) (citations omitted).

I.      **The United States has neither waived its sovereign immunity nor granted a private right of judicial review for Plaintiff's claims, which should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1).**

NRDC relies upon Title 28, Section 1331 of the United States Code, which grants to federal district courts original subject matter jurisdiction over "civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. A civil action "aris[es] under the … laws … of the United States," if "federal law creates the cause of action," *Franchise Tax Bd. v. Constr. Laborers Vacation Trust,* 463 U.S. 1, 27-28 (1983), or alleges a state law cause of action subject with certain federal features, *Beneficial Nat'l Bank v. Anderson,* 539 U.S. 1 (2003); *see also West 14th Street Commercial Corp. v. 5 West 14th Owners Corp.*, 815 F.2d 188, 192 (2d Cir. 1987) ("There are two tests under which an action may present a federal

question ... [first,] whether federal law creates the cause of action" and second, "[i]f state law creates the cause of action [,]… whether that cause of action poses a substantial federal question…").  In this case, where NRDC alleges violations of federal law, it must demonstrate an applicable private right of judicial review granted by federal law in order to establish this Court's subject matter jurisdiction.[3]  Section 1331, by itself, does not provide that cause of action.  *See, e.g., DeVilbiss v. Small Bus. Admin.,* 661 F.2d 716, 718 (8th Cir. 1981) (section 1331 is "merely jurisdictional" and does "not create any substantive right enforceable against the United States…") (*citing United States v. Testan*, 424 U.S. 392, 400-02 (1976)) (remaining citations omitted).

Similarly, the Declaratory Judgment statute, 28 U.S.C. §§ 2201-2202, also invoked by NRDC, "is not an independent source of federal jurisdiction" but rather a grant of an additional remedy "the availability of [which] presupposes the existence of a judicially remediable right." *Schilling v. Rogers*, 363 U.S. 666, 677 (1960) (citation omitted).  As discussed in detail below, NEPA, the Administrative Procedure Act ("APA"), and E.O. 13337 similarly fail to provide Plaintiff with a private right of judicial review.  Because Plaintiff's Complaint fails on its face to articulate an applicable private right of action, and therefore a basis for subject matter jurisdiction, this Court should dismiss with prejudice Plaintiff's claims.

In addition, because the Complaint raises claims against the United States and federal officials acting in their official capacity, NRDC must demonstrate that the United States, as sovereign, has consented to being sued.  *See, e.g., United States v. Mitchell,* 463 U.S. 206, 212 (1983) ("the United States may not be sued without its consent and ... the existence of consent is

---

[3] Additionally, or in the alternative, the failure to demonstrate an applicable private right to judicial review can be challenged as a failure to state a claim upon which relief can be granted.  For that reason, Keystone also raises these arguments in the alternative as subject to dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), *see* Section II, *infra*.

a prerequisite for jurisdiction."); *Lehman v. Nakshian,* 453 U.S. 156, 160 (1981); *F.D.I.C. v. Meyer,* 510 U.S. 471 (1994). As with the statutory grant of subject matter jurisdiction, a waiver of sovereign immunity must be explicit, and is to be construed strictly and narrowly. *See, e.g., Lane v. Pena,* 518 U.S. 187, 192 (1996) (a waiver of "sovereign immunity must be unequivocally expressed in statutory text" and will be "strictly construed, in terms of its scope, in favor of the sovereign.").

This requirement is independent from establishing subject matter jurisdiction, as Section 1331 does not provide a waiver of sovereign immunity. *See, e.g., Benvenuti v. Department of Defense*, 587 F.Supp. 348, 352 (D.D.C. 1984) (citations omitted). Nor does the Declaratory Judgment statute provide such a waiver. *See, e.g., id.* (citations omitted). Indeed, as discussed below, no waiver applicable to Plaintiff's claims is contained in NEPA, the APA, or E.O. 13337. Thus, NRDC's failure to articulate a relevant waiver of sovereign immunity acts as an additional, independent barrier to establishing subject matter jurisdiction in this Court.

It is possible that NRDC will disclaim any interest in enforcing or litigating the terms of the Executive Order, and assert instead that it merely seeks vanilla-judicial review of the State Department EIS. But, as we now show, the Department of State's issuance of the Presidential Permit rested solely on E.O. 13337, and therefore any challenge to this EIS has to be grounded in the underlying authority that empowered the decision challenged by the plaintiff.

A. Neither NEPA nor the Executive Order authorizing the State Department's actions provide a private right of judicial review or a waiver of sovereign immunity.

NRDC's Complaint primarily alleges violations of NEPA, *see Complaint* at ¶¶ 65-73, but NRDC does not and cannot invoke NEPA as a basis for jurisdiction, *see id.* at ¶ 6. This is because NEPA itself makes no provision for judicial review. Similarly, NEPA does not contain a waiver of sovereign immunity. *See generally* 42 U.S.C. §§ 4321 – 4370; *see also Public*

*Citizen,* 5 F.3d at 551.[4]  As a matter of basic federal court jurisdiction, anyone alleging a violation of NEPA must identify both a private cause of action and a waiver of sovereign immunity, because NEPA contains neither.  Normally, a court's jurisdiction to hear NEPA challenges is found in the statute authorizing the underlying agency action that provoked the allegation of a NEPA violation.  *See, e.g., Suburban O'Hare Comm'n v. Dole,* 787 F.2d 186, 191-94 (7th Cir. 1986) (Federal Aviation Act, which authorized the orders at issue in the case, provided the jurisdictional basis of claims of, *inter alia*, NEPA violations by FAA in issuing those orders).  *See also Biodiversity Conservation v. U.S. Bureau of Land,* 404 F. Supp. 2d 212 (D.D.C. 2005) (Plaintiff's challenge to approval of seismic testing technique on federal land by Bureau of Land Management grounded upon agency's authority under the Federal Land Policy Management Act, 43 U.S.C. § 1701, *et seq.,* thereby allowing judicial review of claimed NEPA violations under the Administrative Procedure Act and 28 U.S.C. § 1331).

Here, however, the actions at issue were taken not under the authority of any statute, but instead were authorized solely pursuant to E.O. 13337 – which provides neither a private cause of action nor a waiver of immunity.  What is more, Section 6 of E.O. 13337 expresses the President's clear intent that the E.O. "not[] create any right … substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities, or entities, its officers or employees, or any other persons."  69 Fed. Reg.

---

[4] Nor does the fact that the State Department prepared an EIS as part of its permitting process here generate a cause of action under NEPA.  Since parties cannot by stipulation between them confer subject matter jurisdiction upon a federal court, *see, e.g., Barnes v. Kline,* 759 F.2d 21, 29 n.16 (D.C. Cir. 1985) ("parties may not create jurisdiction by mere stipulation") (*vacated on other grounds,* 479 U.S. 361 (1987)), the State Department's unilateral action surely cannot confer jurisdiction upon a federal court to review an EIS that is the product of non-reviewable Presidential authority.  *See also Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 95 (1998) ("[E]very federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review, even though the parties are prepared to concede it") (internal quotation marks and citations omitted); *Richardson v. United States,* 943 F.2d 1107, 1113 (9th Cir. 1991) ("Subject matter jurisdiction cannot be conferred upon the courts by the actions of the parties… ").

25,299 (May 5, 2004).  This disclaimer is consistent with settled judicial treatment of executive

orders – *i.e.*, that "[g]enerally, there is no private right of action to enforce obligations imposed

on executive branch officials by executive orders."  *Zhang v. Slattery,* 55 F.3d 732, 747 (2d Cir.

1995) (quotations and citations removed).

      The limited instances in which this Circuit and others discern an implicit, judicially

enforceable private right of action in an executive order are premised upon two factors that are

entirely absent here.  First, those executive orders are issued pursuant to a statutory mandate

from Congress – a statutory mandate which expressly or implicitly evinces a legislative intent to

provide for judicial review.  Absent that, this Circuit "has [] declared that executive orders

without specific foundation in congressional action are not judicially enforceable in private civil

suits."  *In re Surface Min. Regulation Litigation*, 627 F.2d 1346, 1357 (D.C. Cir. 1980) (citation

omitted); *see also Women's Equity Action League v. Cavazos,* 906 F.2d 742, 750 (D.C. Cir.

1990) (citation omitted).  This Circuit will not involve the federal judiciary in second-guessing

the actions of executive agencies pursuant to such executive orders because, at least in part, those

orders can be "withdrawn at any time for any or no reason," solely on the discretion of the

President.  *See Manhattan-Bronx Postal Union v. Gronouski,* 350 F.2d 451, 456 (D.C. Cir.

1965), *cert. denied,* 382 U.S. 978 (1966).

      Second, some courts have discerned a private right of action in an executive order when

the order's terms and purpose conveyed an intent on the part of the President to create a private

right of action.  Conversely, this Circuit and others have rejected an implied private right of

judicial review in executive orders containing clear expressions of *contrary* intent.  *See, e.g., Air

Trans. Ass'n of America v. Fed. Aviation Admin*., 169 F.3d 1, 8-9 (D.C. Cir. 1999) (citing *Meyer*

*v. Bush,* 981 F.2d 1288, 1296 n. 8 (D.C. Cir. 1993)); *see also Indep. Meat Packers Ass'n v. Butz,* 526 F. 2d 228, 234-35 (8th Cir. 1975).

Here, each factor operates to preclude the creation of a right of judicial review under E.O. 13337, which is premised upon an exercise of the Executive's constitutional authority rather than a statutory provision. As with the executive order at issue in *Gronouski*, 350 F.2d at 456-57, E.O. 13337 can be withdrawn, revised, or replaced purely at the President's discretion. This similarity counsels against construing E.O. 13337 to contain any private right of judicial review.

Another basis for rejecting any implied right of review in E.O. 13337 is its clear articulation of contrary intent. It expressly declares that it is not intended to create any such private right of action. 69 Fed. Reg. 25,299 (May 5, 2004). Furthermore, that Order is expressly intended, *see id.*, to implement the provisions of E.O. 13212, "Actions to Expedite Energy-Related Projects," which creates a task force to "monitor and assist the agencies in their efforts to expedite their reviews of permits or similar actions, as necessary, to accelerate the completion of energy-related projects…." 66 Fed. Reg. 28,357 (May 22, 2001) (as amended by E.O. 13302, at 68 Fed. Reg. 27,429 (May 20, 2003)). In light of these repeated declarations by the President regarding the need to expedite the permitting process for energy related projects, it is highly doubtful that the President intended E.O. 13337 to be subject to a private right of action, including the exercise of a federal court's equitable jurisdiction to review and possibly enjoin a project that a Presidential Permit process concluded was in the "national interest."

Absent this Executive Order, the Department of State would have had no authority to issue a Presidential Permit for the Keystone Pipeline. Absent this Executive Order, a EIS performed by the Department of State on the Keystone Pipeline proposal would have been nothing more than another government report, because without the authority to issue a

14

Presidential Permit, the EIS report would have no legally cognizable impact upon Plaintiffs or any other party. Thus, while NRDC undoubtedly seeks to shine this Court's spotlight on the Keystone EIS, it needs to identify a source of power beyond NEPA to authorize judicial illumination.

> B. <u>The APA's Section 702 waiver of immunity and grant of a private right of action does not apply in circumstances where the President retains a significant degree of final discretion.</u>

Where the underlying legal framework provides no grant of a private right to judicial review, NEPA litigants' remaining recourse is to the Administrative Procedure Act ("APA"), 5 U.S.C. § 551, *et seq. See, e.g., Public Citizen,* 5 F.3d at 551; *Natural Resources Defense Council v. Kempthorne,* 525 F. Supp. 2d 115 (D.D.C. 2007). Although the APA does not confer subject matter jurisdiction on federal courts, *see Califano v. Sanders*, 430 U.S. 99, 107 (1977), APA Section 702 provides a cause of action to private litigants and a waiver of sovereign immunity for "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.

However, the APA does not create a right of judicial review of the State Department's exercise of delegated, purely discretionary Presidential authority in making a national interest determination and approving Keystone's permit application. APA Section 702's grant of judicial review and immunity waiver for "agency actions" do not apply to decisions where (i) the President exercises his inherent Constitutional authority over matters of foreign relations *or* (ii) he delegates his authority to an administrative agency yet retains final discretion over the agency's exercise of those delegated powers.

It is well settled that the President is not an "agency" within the meaning of the APA, *see, e.g., Franklin v. Massachusetts,* 505 U.S. 788, 801 (1992); *see also El-Shifa Pharms. Indus. Co. v. United States*, 402 F. Supp. 2d 267, 272-73 (D.D.C. 2005). As a result, "presidential actions

are not subject to review pursuant to the APA." *Tulare County v. Bush,* 185 F. Supp. 2d 18, 28 (D.D.C. 2001), *aff'd,* 306 F.3d 1138 (D.C. Cir. 2002), *cert. denied,* 540 U.S. 813 (2003); s*ee also Dalton v. Specter,* 511 U.S. 462, 470 (1994).  Thus, for example, APA Section 702 would not authorize judicial review in this matter if the President himself, rather than the Department of State, had determined that the construction of this cross-border crude oil pipeline is in the national interest and approved a Presidential Permit for that purpose.

Critically, this conclusion is not altered where the President, rather than acting himself, has delegated to an administrative agency those functions, but retained final discretion over their exercise.  For example, in *Franklin v. Massachusetts*, the Supreme Court held that a party could not obtain judicial review under the APA for a suit challenging agency actions regarding the preparation of a census report used to apportion Congressional seats among the states.  505 U.S. 788 (1992).  The Court held that the President's act of transmitting the final census report to Congress could not be challenged under the APA, because the President's actions are not subject to the APA.  *Id*. at 801.  It also held that the agency's preparation of the census report could not be challenged under the APA, because the President possessed final discretion to revise the report before it was transmitted to Congress, and therefore that agency preparation was not "final agency action" subject to APA review.  *Id*. at 798.

The Supreme Court applied similar reasoning in a subsequent case, *Dalton v. Specter*, where individuals, organizations, members of Congress, and several states sought to enjoin the Secretary of Defense from implementing the President's decision, pursuant to the recommendations of an administrative commission, to close a naval shipyard.  511 U.S. 462 (1994).  A statute authorized the commission to develop a report with recommendations regarding the closure of military bases, which were submitted to the President – but authorized

16

the President only to approve or reject the report and recommendations in their entirety. *Id.* at 464-65. Nevertheless, the Court found that this degree of Presidential discretion was sufficient to defeat the application of the APA's right of judicial review. *Id.* at 470-71.

This Circuit used similar reasoning to reject environmental organizations' invocation of APA Section 702 as a basis for judicial review of their allegation that the U.S. Trade Representative's failure to conduct an EIS as part of its preparation of the North American Free Trade Agreement ("NAFTA") amounted to violations of NEPA. *Public Citizen v. U.S. Trade Representative*, 5 F.3d 549 (D.C. Cir. 1993). The district court's assertion that *Franklin* was distinguishable – on the basis that NAFTA would not be changed by the President before submission to Congress, and therefore the President's final role was mere formality – was rejected by the D.C. Circuit, which noted that the President retained discretion over the agency action, whether he exercised it or not. *Id.* at 552. The D.C. Circuit also rejected the argument that NEPA's requirement to prepare an EIS "is an independent statutory obligation" and thus triggers APA Section 702 review. *Id.* (*citing Foundation on Economic Trends v. Lyng,* 943 F.2d 79, 85 (D.C. Cir. 1991)).

Like NAFTA, the State Department's national interest determination and permitting decisions under E.O. 13337 are subject to a substantial degree of residual Presidential discretion in two aspects. First, the President's reservation of residual authority in E.O. 13337 means that although he need not act in *all* cases for the State Department to issue a Presidential permit, Section 1(i) of the Order imposes exclusive decision making authority by the President himself if another listed Cabinet official takes issue with the Secretary of State's proposed disposition of the permit application. 69 Fed. Reg. 25,229 (May 5, 2004). Second, the President is entirely unconstrained by statute with respect to border crossings for oil pipelines, and retains full

17

discretion to approve or deny cross-border energy facilities without recourse to that Order, or amend or revoke it at any time. Indeed, because this Executive Order is based upon inherent constitutional authority over foreign policy and national security, NRDC would be hard pressed to deny that even *if* this Court were to exercise jurisdiction over this matter, and even *if* this Court were to rule against Defendants, the President would possess the power to nevertheless issue a Permit to Keystone. Consequently, the State Department's decision here presents a strong indication of final Presidential discretion, and demonstrates the inapplicability of Section 702 of the APA.

      C.   <u>In the alternative, any private right of review is precluded by contrary Presidential intent thereby demonstrating that the limitations of Section 701(a)(1) are applicable here.</u>

Even where otherwise applicable, APA Section 702's private right of judicial review is inapplicable where there is either an expressed *or implied* intent to preclude judicial review in the statute authorizing the underlying agency action. 5 U.S.C. § 702; *see also* 5 U.S.C. § 701(a)(1). "The APA confers a general cause of action upon persons 'adversely affected or aggrieved by agency action within the meaning of a relevant statute,' 5 U.S.C. § 702, but withdraws that cause of action to the extent the relevant statute 'preclude[s] judicial review,' 5 U.S.C § 701(a)(1)." *Block v. Cmty. Nutrition Inst.,* 467 U.S. 340, 345 (1984); s*ee also Neighbors For Rational Development, Inc., v. Norton*, 379 F.3d 956, 961 (10th Cir. 2004). In other words, Congressional intent "fairly discernable" in a statutory scheme, even if not explicit, overcomes any statutory, regulatory, or judicial presumption of reviewability of agency action. This jurisprudence strongly suggests that, in the absence of any governing statutory authority, the President's intent to preclude judicial review, clearly expressed in E.O. 13337, should also foreclose the reviewability under APA Section 702 of State Department's actions pursuant to

that Executive Order – particularly in light of the exclusively executive authority underlying the

Order.

APA Section 702 expressly limits its grant of a waiver and private cause of action,

explaining that

> Nothing herein (1) affects other limitations on judicial review or the power
> or duty of the court to dismiss any action or deny relief on any other
> appropriate legal or equitable ground; or (2) confers authority to grant relief
> if any other statute that grants consent to suit expressly or impliedly forbids
> the relief which is sought.

5 U.S.C. § 702; *see also Maryland Dept. of Human Resources v. Department of Health and

Human Svcs.*, 763 F.2d 1441, 1448 (D.C. Cir. 1985).  Where the underlying legal authority for

the agency action is a statute, courts have looked to its text and structure to discern

Congressional intent regarding reviewability – whether express or implied.

For example, in *Block v. Community Nutrition Institute*, the Supreme Court discerned an

implicit preclusion of APA Section 702 judicial review where milk consumers sought to

challenge agency action pursuant to the Agricultural Marketing Agreement Act ("AMAA").  467

U.S. 340 (1984).  The Court noted that the AMAA expressly permitted judicial review by milk

handlers and thereby evinced Congressional intent to exclude suits by other groups, also noting

that allowing such suits would "severely disrupt" the regulatory scheme Congress intended to

create.  *Id*. at 345-48.  The Supreme Court rejected the appellate court's reliance on a

presumption favoring judicial review, noting that such presumption is overcome "whenever the

congressional intent to preclude judicial review is fairly discernible in the statutory scheme."  *Id*.

at 348-51 (citation, internal quotations omitted); *cf. Abbott Laboratories v. Gardner*, 387 U.S.

136, 139-48 (1967) (finding no implied preclusion of judicial review in the Food and Drug Act

where legislative history evinced a Congressional intent of broad judicial reviewability and the

Act included a savings clause expressly preserving other remedies at law) (*overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 104-105 (1977).

Here, there is no statute either creating or limiting judicial review for oil pipeline border crossings. Instead, as demonstrated throughout this Motion, the State Department has acted solely pursuant to delegation of constitutional executive authority, and the relevant intent with respect to available judicial review, *vel non,* is established by the President. As noted above, the E.O. 13337 is clear on its face that it is not intended to create any right of judicial review. Because federal courts have limited jurisdiction, restricted to that conveyed by Congress, APA Section 701(a)(1) should apply in this context so as to not frustrate the President's intent to preclude reviewability of actions taken pursuant to E.O. 13337.

   D.  The unsuitability of review under the APA, as provided in Section 701(a)(2), is confirmed by the absence of standards to guide judicial review or application of a remedy and by the lack of judicial expertise in matters determining the "national interest."

A necessary corollary to the essential executive character of the State Department's determinations here is that the guiding considerations are unsuited for judicial review. Indeed, Sections 1(g)-(h) of E.O. 13337 instruct that if the State Department "finds that issuance of a permit to the applicant would serve *the national interest*," it "shall prepare a permit, in such form and with such terms and conditions as the national interest may in [its] judgment require…," and if it "finds that issuance of a permit to the applicant would *not* serve *the national interest*," it shall deny the permit application." 69 Fed. Reg. 25,299 (May 5, 2004) (emphasis added). In short, the President has delegated a question of foreign relations and "the national interest," broadly framed, to a subordinate executive agency with expertise in this area. Absent any statutory criteria by which this Court could judge the reasonableness of such a State Department determination, it must be concluded that this process is one in which, as provided by Section 701(a)(2) of the APA, there is no law to apply.

Such determinations require executive branch consideration of factors that are often beyond the scope of judicial cognizance and are particularly ill-suited for judicial review. Thus, "[e]ven when Congress has not affirmatively precluded judicial oversight, 'review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Webster v. Doe,* 486 U.S. 592, 599-600 (1988). With respect to the State Department's "national interest" decision regarding the Keystone Pipeline, the absence of legislation in this area is again instructive. *Compare* 30 U.S.C. § 185(s) (mandating a Presidential "national interest determination" as to exports of Alaskan North Slope oil, and specifying minimum considerations for that determination). In such a statutory environment, if there are criteria provided by Congress for the executive to apply in making such a finding, it may be possible for courts to determine if an agency's national interest finding is consistent with those criteria, is supported by the administrative record, or is arbitrary or capricious under the APA.[5] Here, of course, there is no legislative guidance on how a reviewing court could possibly test State Department's determination that the Keystone oil pipeline is in the national interest.

Nor is judicial review made more palatable on the basis that NEPA's mandates are only procedural, rather than substantive. Any such a procedural review will necessarily be intertwined with an examination of the substance of the Presidential Permit and national interest determination. Indeed, the Complaint confirms this problem, as NRDC asserts in support of its arguments regarding the necessity of review of the indirect effects of refining that "[w]ithout downstream refining, there is no purpose to the Pipeline, and no national interest in its construction." Complaint at ¶ 62.

---

[5] Indeed, in one particular case, Congress directed the President to make a public interest determination, and created an expedited judicial review process for that unique circumstance. *See No Oilport v. Carter,* 520 F. Supp. 334 (D.C. Wash. 1981).

Furthermore, the unsuitability of judicial review over the State Department's determinations is evident from an examination of the available remedies – assuming, for the sake of argument, that Plaintiff's claims had merit. Aside from declaratory relief and an award of attorneys' fees and costs, NRDC asks the Court to

> direct[] [the State Department] to revoke the Presidential Permit, to require Keystone to remove the portion of the Pipeline subject to the Presidential Permit, and to ensure that no further activity in furtherance of Pipeline construction or operation is undertaken unless and until [the State Department] complies fully with the requirements of NEPA and the APA.

*See* Complaint at p. 19. Yet, such relief puts this Court in the position of ordering the State Department to act contrary to the President's direction in E.O. 13337 – to determine whether the cross-border energy facility is in the national interest, and if so, to issue the permit. Moreover, the President is free to ignore such a remedy, if he wishes to approve the facility himself.[6]

Both of these factors underpin the Supreme Court's refusal to review the actions of the Civil Aeronautics Board ("CAB") in *C&S Air Lines v. Waterman Corp.,* 333 U.S. 103 (1948). In that case, the Waterman Corporation sought judicial review of the determination by the CAB, pursuant to statute, as to whether the corporation would be awarded approval for an international air route. Unlike domestic routes, the CAB's international route determinations had to be submitted to the President for approval. The Court rejected Waterman Corporation's invitation to read into the statute a right to judicial review of the CAB's determinations, observing that

> the dilemma faced by those who demand judicial review of the Board's order is that before Presidential approval it is not a final determination even of the Board's ultimate action, and after Presidential approval the whole

---

[6] Again, the residual authority of the nation's Chief Executive turns an otherwise routine NEPA case into this jurisprudential thicket. The ability of the President to issue a permit to Keystone, even if this Court were to exercise jurisdiction and deem the EIS inadequate, means that any order this Court might issue cannot redress Plaintiffs' injuries. As a result, NRDC lacks Article III standing because it cannot show that there is a "substantial probability" that their injuries would be redressed by the relief sought. *Sierra Club v. EPA,* 292 F.3d 895 (D.C. Cir., 2002); *Wilderness Society v. Norton,* 434 F.3d 584, 589 (D.C. Cir. 2006)(*citing Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992). Here, there is no basis for concluding that a judicial order invalidating the Presidential Permit issued by the State Department also would preclude the President from authorizing the border crossing activity the next day.

order, both in what is approved without change as well as in amendments which he directs, derives vitality from the exercise of unreviewable Presidential discretion.

*Id.* at 113; *see also Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Svcs*., 545 U.S. 967, 1017 (2005) (Scalia, J., dissenting) ("Article III courts do not sit to render decisions that can be reversed or ignored by executive officers.") (*citing Waterman*); *No Oilport v. Carter*, 520 F. Supp. 334, 352 (D.C. Wash. 1981). Further, the Court balked at second-guessing the CAB ruling based on "certain factors relating to our broad national welfare and other matters for which the Chief Executive has special responsibility" which were "decisions of a kind for which the Judiciary has neither aptitude, facilities, nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry." *Waterman,* 333 U.S. at 111.

This principle has been repeatedly affirmed in federal jurisprudence – and was articulated first in *Marbury v. Madison,* where the Court observed that when the President exercises the political power of the office, this is a matter of discretion in which he "is accountable to his country only in his political character and to his conscience." 5 U.S. (1 Cranch) 137, 166 (1803); *see also United States v. Curtis-Wright Corp.* 299 U. S. 304 (1936). In areas where the President has complete discretion whether to take action in the first place, courts are without authority to review the validity of that action, or of an agency recommendation to the President regarding such action. *See, e.g., Corus Group PLC v. International Trade Commission,* 352 F.3d 1351, 1358 (Fed. Cir. 2003).

As in *Waterman* and subsequent cases, this Court is being asked to review an executive branch agency's determinations relating to foreign relations and the "national interest" – a determination which can be ignored or reversed by the President. Moreover, the essence of the

State Department decision is "a judgment call… [t]hus, unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Department of Navy v. Egan,* 484 U.S. 518, 529-30 (1988). These considerations buttress the conclusion that APA Section 702 should not be read to confer a private right of judicial review of State Department's determinations pursuant to E.O. 13337.

We conclude this presentation where we began. NEPA does not unlock the courthouse door; it has neither a private right of action nor a waiver of sovereign immunity. As a result, a NEPA plaintiff must find another key. Where, as here, the sole basis for federal agency decisionmaking is an Executive Order grounded in the President's inherent authority over foreign affairs and national security, that Executive Order does not operate to establish this Court's jurisdiction to hear any claim, NEPA or otherwise, arising from the Presidential Permitting process.

## II.    In the alternative, Plaintiff's Complaint fails to state any claim for which relief can be granted and thus should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

As described above, Plaintiff's allegations that the State Department's national interest determination and approval of Keystone's permit application violate NEPA, its implementing regulations, and the APA, are not judicially cognizable because no applicable private right of judicial review exists for such claims. Whether a plaintiff's claims are those upon which relief can be granted depends upon "whether there is a cause of action that permits [plaintiff] to invoke the power of the court to redress the violations of law" alleged and the legal sufficiency of the allegations in a plaintiff's complaint. *Trudeau v. Fed. Trade. Commission*, 456 F.3d 178, 188 (D.C. Cir. 2006) (citing *Davis v. Passman,* 442 U.S. 228, 239-40 & n.18 (1979)). Consequently, and even if Plaintiff could establish subject matter jurisdiction over its allegations in this Court,

24

those allegations fail to state a claim upon which relief can be granted. Plaintiff's Complaint therefore is also, or alternatively, subject to dismissal with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6). *See also Arbaugh v. Y&H Corporation,* 546 U.S. 500 (2006).

## CONCLUSION

For the foregoing reasons, Keystone respectfully requests that this Court dismiss Plaintiff's Complaint with prejudice.


Dated: October 20, 2008

Respectfully submitted,

/s/ Peter R. Steenland
Peter R. Steenland (D.C. Bar # 79236)
Timothy K. Webster (D.C. Bar # 441297)
William E. Gerard (D.C. Bar # 495960)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
(202) 736-8711 (fax)
psteenland@sidley.com
twebster@sidley.com
wgerard@sidley.com
*Counsel for TransCanada Keystone*
*Pipeline, LP*