# EXHIBIT 22

Department of State Report to Congress Under the
Temporary Payroll Tax Cut Continuation Act of 2011,
Section 501(b)(2)

REPORT TO CONGRESS

Under the Temporary Payroll Tax Cut Continuation Act of 2011
Section 501(b)(2)
Concerning the Presidential Permit Application of the
Proposed Keystone XL Pipeline

On December 23, 2011, the Temporary Payroll Tax Cut Continuation Act of 2011 ("the Act") was enacted. This report to Congress is submitted under section 501(b)(2) of the Act, which provides that if the President determines that the Keystone XL pipeline is not in the national interest he shall provide a report to Congress that provides a justification for that decision, including consideration of employment, economic, energy security, foreign policy, trade, and environmental factors.[1]

Executive Order (EO) 13337 delegates to the Department of State (the Department) the authority to receive applications for Presidential permits for cross-border facilities and outlines a process for the Department to determine whether granting such permits would be in the national interest. On November 10, 2011, the Department concluded that it required more information before a determination could be made regarding the Keystone XL pipeline application for a Presidential permit. The time period provided in the Temporary Payroll Tax Cut Continuation Act of 2011 is not adequate for the Department to conduct the necessary analysis to gain the additional information. The Department therefore recommended that the President determine that the permit application for the Keystone XL pipeline filed on September 19, 2008 (including amendments) be denied and that he determine the Keystone XL pipeline, as presented and analyzed at this time, does not serve the national interest. The President concurred with the Department's recommendation and made that determination on January 18, 2012.

Background

On September 19, 2008, TransCanada Keystone Pipeline, LP (the "Applicant") applied for a Presidential permit for the proposed Keystone XL pipeline, which would transport crude oil from Hardisty, Alberta, Canada to delivery points near Cushing, Oklahoma and Nederland, Texas. Pursuant to

---

[1] This report also serves as the Department of State's record of decision consistent with 22 CFR § 161.8(d)(5) and 40 CFR §1505.2.

Executive Order (EO) 13337, which delegates to the Department the authority to receive and grant applications for Presidential permits that are in the national interest, the Department conducted a review of the pipeline's potential impacts by preparing an Environmental Impact Statement (EIS) consistent with the National Environmental Policy Act (NEPA).

The Department released a final EIS on August 26, 2011.  After the final EIS was released, the Department held a public comment period under EO 13337 to obtain input for the national interest determination, which closed on October 9, 2011.

During this period, the public provided input on many issues, including job creation, negative environmental impacts from constructing the pipeline, pipeline safety issues, economic benefits of constructing the pipeline, and environmental impacts associated with oil sands extraction in Canada.  Among the more commonly raised issues by commenters, particularly those from the State of Nebraska, was concern about the proposed route through the Sand Hills area of Nebraska. [2]

On November 10, 2011, the Department determined, in light of additional information gleaned from consultations with Nebraska state and local officials as well as public comments, that under Section 1(f) of EO 13337, it was necessary to seek additional information regarding potential alternative routes around the Sand Hills in Nebraska to inform the determination regarding whether issuing a permit for the proposed Keystone XL pipeline is in the national interest.

---

[2]  As detailed in the final EIS, the Sand Hills area possesses a combination of characteristics that are not present together elsewhere along the proposed route.  These characteristics include a high concentration of wetlands identified as of "special concern or value"; increased susceptibility to wind erosion if vegetation is not maintained; increased threat of invasive plant species because of the difficulty of reestablishing native vegetation; presence of shallow groundwater throughout the area, including extensive areas of "wet meadows" where plants are irrigated from the shallow water table; and presence of considerable prime habitat for an endangered species.  In consultations with, and correspondence from, Nebraska's elected officials (including the Governor, both U.S. Senators, and members of the Legislature), there was nearly unanimous opposition to the proposed route through the uniquely sensitive terrain of the Nebraska Sand Hills.  Concerns about the route through the Sand Hills were expressed during the environmental review process and these concerns, as expressed by Nebraska officials and echoed by citizen commenters from all areas of Nebraska, have grown significantly during the course of the Department's review of the proposed Keystone XL pipeline.

On November 14, 2011, the Applicant announced that it had reached agreement with Nebraska officials to move the proposed route out of the Nebraska Sand Hills. On November 22, 2011, Nebraska enacted a law establishing a process to approve a new route within Nebraska and directing the Nebraska Department of Environmental Quality to cooperate with the Department in reviewing potential alternative routes.

On December 23, 2011, the Temporary Payroll Tax Cut Continuation Act of 2011 was signed, which provides, among other things, that:

- "not later than 60 days after the enactment of this Act, the President, acting through the Secretary of State, shall grant a permit under Executive Order 13337 . . . for the Keystone XL pipeline . . . .";

- "[t]he President shall not be required to grant the permit . . . if the President determines that the Keystone XL pipeline would not serve the national interest";

- if no action is taken, then "not later than 60 days after the date of enactment of this Act, the permit for the Keystone XL pipeline" that meets certain conditions outlined in the Act "shall be in effect by operation of law"; and,

- if the Keystone XL pipeline were approved pursuant to the Act, then the final EIS would be deemed to satisfy requirements of the National Environmental Policy Act (NEPA) and the National Historic Preservation Act (NHPA).

Discussion

The Department determined on November 10, 2011, that it needed additional information about potential route alternatives that would avoid the Nebraska Sand Hills before it could make a determination as to whether issuing a permit for the proposed Keystone XL pipeline was in the national interest. Without such additional information about the potential impacts of those alternative routes, the Department lacks information about the precise environmental, socio-economic, cultural, and other impacts of a significant portion of the pipeline route in the United States. This lack of information does not allow for a meaningful comparison of the potential impacts of the Keystone XL pipeline to other crude oil transport options used in North America. Accordingly, without

such information the Department and the other agencies with which it consults on the national interest determination cannot responsibly move forward with granting the pipeline permit as directed by Section 501(a) of the Act.

When the Department announced its decision to seek additional information, it estimated, based on past projects of similar length and scope, it could complete the necessary review to make a decision by the first quarter of 2013. Consultations between the Department, the State of Nebraska, and the Applicant regarding the necessary steps in conducting a proper review continue to support that estimate. Thus, even if the Department were to operate pursuant to the provision in the Act that allows for a permit determination that circumvents the long-established NEPA process, the sixty days provided in the Act is not sufficient time to conduct the necessary analysis to gain the additional information to make an informed determination.

The final EIS contains information and analysis concerning the Keystone XL pipeline as described in the permit application regarding employment, economic, energy security, foreign policy, trade, and environmental factors. In light of the reroute of the pipeline, however, there is incomplete information regarding the potential environmental impacts of the pipeline (as well as, socioeconomic, environmental justice, and cultural impacts).[3]

Regarding employment, the construction of the Keystone XL pipeline would likely create several thousand temporary jobs associated with construction; however, the project would not have a significant impact on long-term employment in the United States. While some reports have suggested there could be over 100,000 direct and indirect jobs created by the pipeline, this inflated number appears to be a misinterpretation of one of the economic analyses prepared on the pipeline.[4] Based on the amount of money the applicant projects it would

---

[3] The final EIS includes an assessment of the potential environmental impacts associated with denying the pipeline permit.

[4] The economic study prepared under contract to the Applicant estimated 118,000 person-years of employment could be generated over a projected 100-year operational life of the pipeline. This number appears to have been misreported by others as 118,000 jobs created; in fact in addition to the long time-frame projected in the study, it appears the study treated crude oil that would be transported by the pipeline as an increase in crude oil imported into the United States. The study then attributed the economic activity (including employment) associated with increased crude oil imports and refining to the pipeline. The economic analysis conducted for the EIS under contract to the Department of Energy, however, indicates that Keystone XL is unlikely to have any impact on the amount of crude oil imported into, or refined in, the United

spend on labor in building the pipeline, and the number of construction crews likely to be used in constructing the pipeline, the final EIS estimated there would be approximately 5,000 to 6,000 direct construction jobs in the United States that would last for the two years that it would take to build the pipeline.

Regarding economic, energy security, and trade factors, the economic analysis in the final EIS indicates that, over the remainder of this decade, even if no new cross-border pipelines were constructed, there is likely to be little difference in the amount of crude oil refined at U.S. refineries, the amount of crude oil and refined products such as gasoline imported to (or exported from) the United States, the cost of crude oil or refined products in the United States, or the amount of crude oil imported from Canada. There is currently excess cross-border pipeline capacity, but limited connections to the U.S. Gulf Coast refineries. As noted in the Keystone XL Assessment – No Expansion Update (in Appendix V to the final EIS), there is significant activity in proposals for other new domestic pipelines, expansions or reversals of existing pipelines, and other modes of transport such as rail, that could play a role in increasing imports of crude oil from Canada to the United States, including to refineries in the U.S. Gulf Coast area.

With regard to foreign policy implications and U.S. relations with Canada, the U.S.-Canada alliance is a cornerstone of both countries' national security. We believe that Canada will remain committed to the bilateral alliance whether the permit is approved or denied at this time.[5] The United States will continue to work with Canada to ensure our shared interests in energy, environmental, and economic issues are not negatively affected by this decision.

The analysis from the final EIS, noted above, indicates that denying the permit at this time is unlikely to have a substantial impact on U.S. employment, economic activity, trade, energy security, or foreign policy over the longer term. The Department's recommendation, and the President's determination, is based on not having necessary information with respect to the Keystone XL permit application at this time. Thus, the determination does not preclude any subsequent permit application or applications for similar projects.

---

States. Therefore, it would not be reasonable to suggest the pipeline would cause an increase in employment or other economic activity by increasing crude oil imported into the United States.
[5] In a December 2, 2011 press conference with President Obama, Prime Minister Harper stated that the bilateral relationship was "a marvelous relationship, and a relationship that really is a shining example to the world."

# EXHIBIT 23

Notice of 30 Day Public Comment Period Regarding
National Interest Determination for TransCanada Keystone Pipeline,
LP's Presidential Permit Application,
79 Fed. Reg. 6,984 (Feb. 5, 2014)

DTAG members' responsibilities include:

• Service for a consecutive two-year term which may be renewed or terminated at the discretion of the Assistant Secretary of State for Political-Military Affairs (membership shall automatically terminate for members who fail to attend two consecutive DTAG plenary meetings).

• Making recommendations in accordance with the DTAG Charter and the FACA.

• Making policy and technical recommendations within the scope of the U.S. commercial export control regime as mandated in the AECA, the ITAR, and appropriate directives.

Please note that DTAG members may not be reimbursed for travel, per diem, and other expenses incurred in connection with their duties as DTAG members. A new applicant to the DTAG who is currently registered as a Federal lobbyist is not eligible to serve on the DTAG.

How to apply: Applications in response to this notice must contain the following information: (1) Name of applicant; (2) affirmation of U.S. citizenship; (3) organizational affiliation and title, as appropriate; (4) mailing address; (5) work telephone number; (6) email address; (7) resumé; (8) summary of qualifications for DTAG membership and (9) confirmation that you have not been registered as a Federal lobbyist at any time from January 1, 2010 to the present.

This information may be provided via two methods:

• Emailed to the following address: *DTAG@state.gov*. In the subject field, please write, ''DTAG Application.''

• Send in hardcopy to the following address: Lisa Aguirre, PM/DDTC, SA–1, 12th Floor, Directorate of Defense Trade Controls, Bureau of Political Military Affairs, U.S. Department of State, Washington, DC 20522–0112.

All applications must be postmarked by March 1, 2014

**Kenneth B. Handelman,**

*Designated Federal Official, Defense Trade Advisory Group, Department of State.*

[FR Doc. 2014–02414 Filed 2–4–14; 8:45 am]

**BILLING CODE 4710–25–P**

## DEPARTMENT OF STATE

[Public Notice 8622; Docket ID: DOS–2014–0003]

**Notice of 30 Day Public Comment Period Regarding the National Interest Determination for TransCanada Keystone Pipeline, L.P.'s Presidential Permit Application**

**AGENCY:** Department of State.

**ACTION:** Notice; Solicitation of Comments.

**SUMMARY:** TransCanada Keystone Pipeline, L.P. applied on May 4, 2012, to the U.S. Department of State (''State Department'') for a Presidential Permit that would authorize construction, connection, operation, and maintenance of pipeline facilities on the U.S./Canadian border in Phillips County, Montana for the importation of crude oil. The border facilities would be part of a proposed 875-mile pipeline and related facilities (the Keystone XL project) that is designed to transport up to 830,000 barrels per day of crude oil from Alberta, Canada and the Bakken shale formation in North Dakota and Montana. The pipeline would cross the U.S. border near Morgan, Montana and continue through Montana, South Dakota, and Nebraska, where it would connect to existing pipeline facilities near Steele City, Nebraska for onward delivery to Cushing, Oklahoma and the U.S. Gulf Coast region.

Background information related to the application may be found at *http://www.keystonepipeline-xl.state.gov/*. On January 31, 2014, the State Department released the Final Supplemental Environmental Impact Statement (''Final SEIS'') for the proposed Keystone XL project. The application and the Final SEIS, along with other documents, are available through the State Department's web address for the project shown above.

Executive Order 13337 (69 FR 25299) calls on the Secretary of State, or his designee, to determine if issuance of a Presidential Permit would serve the national interest. This decision will take into account a wide range of factors, including energy security; environmental, cultural, and economic impacts; foreign policy; and compliance with relevant federal regulations and issues.

The State Department invites members of the public to comment on any factor they deem relevant to the national interest determination that will be made for this permit application. Along with other factors such as those listed above, these comments will be considered in the final national interest determination. The public comment period will end 30 days from the publication of this notice.

Comments are not private. They will be posted on the site *http://www.regulations.gov*. The comments will not be edited to remove identifying or contact information, and the State Department cautions against including any information that one does not want publicly disclosed. The State Department requests that any party soliciting or aggregating comments received from other persons for submission to the State Department inform those persons that the State Department will not edit their comments to remove identifying or contact information, and that they should not include any information in their comments that they do not want publicly disclosed.

**DATES:** Comments must be submitted by no later than March 7, 2014, at 11:59 p.m. (EST).

**ADDRESSES:** For reasons of efficiency, the State Department encourages the electronic submission of comments through the federal government's eRulemaking Portal. To submit comments electronically, go to the Federal eRulemaking Portal (*http://www.regulations.gov*), enter the Docket No. DOS–2014–0003, and follow the prompts to submit a comment.

The State Department also will accept comments submitted in hard copy by mail and postmarked no later than March 7, 2014. Please note that standard mail delivery to the State Department can be delayed due to security screening. To submit comments by mail, use the following address: Bureau of Energy Resources, Room 4843, Attn: Keystone XL Public Comments, U.S. Department of State, 2201 C St. NW., Washington, DC 20520.

Dated: January 31, 2014.

**Robin L. Dunnigan,**

*Director, Office of Europe, the Western Hemisphere and Africa, Bureau of Energy Resources, U.S. Department of State.*

[FR Doc. 2014–02420 Filed 2–4–14; 8:45 am]

**BILLING CODE 4710–02–P**

## TENNESSEE VALLEY AUTHORITY

**Meeting of the Regional Resource Stewardship Council**

**AGENCY:** Tennessee Valley Authority (TVA).

**ACTION:** Notice of meeting.

**SUMMARY:** The TVA Regional Resource Stewardship Council (RRSC) will hold a meeting on Tuesday, February 25, and

# EXHIBIT 24

Keystone XL Pipeline Approval Act, S. 1, 114th Cong. (2015)



S. 1

# One Hundred Fourteenth Congress
## of the
# United States of America

**AT THE FIRST SESSION**

*Begun and held at the City of Washington on Tuesday,*
*the sixth day of January, two thousand and fifteen*

## An Act

To approve the Keystone XL Pipeline.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Keystone XL Pipeline Approval Act".

**SEC. 2. KEYSTONE XL APPROVAL.**

(a) IN GENERAL.—TransCanada Keystone Pipeline, L.P. may construct, connect, operate, and maintain the pipeline and cross-border facilities described in the application filed on May 4, 2012, by TransCanada Corporation to the Department of State (including any subsequent revision to the pipeline route within the State of Nebraska required or authorized by the State of Nebraska).

(b) ENVIRONMENTAL IMPACT STATEMENT.—The Final Supplemental Environmental Impact Statement issued by the Secretary of State in January 2014, regarding the pipeline referred to in subsection (a), and the environmental analysis, consultation, and review described in that document (including appendices) shall be considered to fully satisfy—

(1) all requirements of the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.); and

(2) any other provision of law that requires Federal agency consultation or review (including the consultation or review required under section 7(a) of the Endangered Species Act of 1973 (16 U.S.C. 1536(a))) with respect to the pipeline and facilities referred to in subsection (a).

(c) PERMITS.—Any Federal permit or authorization issued before the date of enactment of this Act for the pipeline and cross-border facilities referred to in subsection (a) shall remain in effect.

(d) JUDICIAL REVIEW.—Except for review in the Supreme Court of the United States, the United States Court of Appeals for the District of Columbia Circuit shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency regarding the pipeline and cross-border facilities described in subsection (a), and the related facilities in the United States, that are approved by this Act (including any order granting a permit or right-of-way, or any other agency action taken to construct or complete the project pursuant to Federal law).

(e) PRIVATE PROPERTY SAVINGS CLAUSE.—Nothing in this Act alters any Federal, State, or local process or condition in effect on the date of enactment of this Act that is necessary to secure

access from an owner of private property to construct the pipeline and cross-border facilities described in subsection (a).

(f) PRIVATE PROPERTY PROTECTION.—Land or an interest in land for the pipeline and cross-border facilities described in subsection (a) may only be acquired consistently with the Constitution.

**SEC. 3. COORDINATION OF ENERGY RETROFITTING ASSISTANCE FOR SCHOOLS.**

(a) DEFINITIONS.—In this section:

(1) SCHOOL.—The term "school" means—

(A) an elementary school or secondary school (as defined in section 9101 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7801));

(B) an institution of higher education (as defined in section 102(a) of the Higher Education Act of 1965 (20 U.S.C. 1002(a));

(C) a school of the defense dependents' education system under the Defense Dependents' Education Act of 1978 (20 U.S.C. 921 et seq.) or established under section 2164 of title 10, United States Code;

(D) a school operated by the Bureau of Indian Affairs;

(E) a tribally controlled school (as defined in section 5212 of the Tribally Controlled Schools Act of 1988 (25 U.S.C. 2511)); and

(F) a Tribal College or University (as defined in section 316(b) of the Higher Education Act of 1965 (20 U.S.C. 1059c(b))).

(2) SECRETARY.—The term "Secretary" means the Secretary of Energy.

(b) DESIGNATION OF LEAD AGENCY.—The Secretary, acting through the Office of Energy Efficiency and Renewable Energy, shall act as the lead Federal agency for coordinating and disseminating information on existing Federal programs and assistance that may be used to help initiate, develop, and finance energy efficiency, renewable energy, and energy retrofitting projects for schools.

(c) REQUIREMENTS.—In carrying out coordination and outreach under subsection (b), the Secretary shall—

(1) in consultation and coordination with the appropriate Federal agencies, carry out a review of existing programs and financing mechanisms (including revolving loan funds and loan guarantees) available in or from the Department of Agriculture, the Department of Energy, the Department of Education, the Department of the Treasury, the Internal Revenue Service, the Environmental Protection Agency, and other appropriate Federal agencies with jurisdiction over energy financing and facilitation that are currently used or may be used to help initiate, develop, and finance energy efficiency, renewable energy, and energy retrofitting projects for schools;

(2) establish a Federal cross-departmental collaborative coordination, education, and outreach effort to streamline communication and promote available Federal opportunities and assistance described in paragraph (1) for energy efficiency, renewable energy, and energy retrofitting projects that enables States, local educational agencies, and schools—

(A) to use existing Federal opportunities more effectively; and

S. 1—3

(B) to form partnerships with Governors, State energy programs, local educational, financial, and energy officials, State and local government officials, nonprofit organizations, and other appropriate entities to support the initiation of the projects;

(3) provide technical assistance for States, local educational agencies, and schools to help develop and finance energy efficiency, renewable energy, and energy retrofitting projects—

(A) to increase the energy efficiency of buildings or facilities;

(B) to install systems that individually generate energy from renewable energy resources;

(C) to establish partnerships to leverage economies of scale and additional financing mechanisms available to larger clean energy initiatives; or

(D) to promote—

(i) the maintenance of health, environmental quality, and safety in schools, including the ambient air quality, through energy efficiency, renewable energy, and energy retrofit projects; and

(ii) the achievement of expected energy savings and renewable energy production through proper operations and maintenance practices;

(4) develop and maintain a single online resource website with contact information for relevant technical assistance and support staff in the Office of Energy Efficiency and Renewable Energy for States, local educational agencies, and schools to effectively access and use Federal opportunities and assistance described in paragraph (1) to develop energy efficiency, renewable energy, and energy retrofitting projects; and

(5) establish a process for recognition of schools that—

(A) have successfully implemented energy efficiency, renewable energy, and energy retrofitting projects; and

(B) are willing to serve as resources for other local educational agencies and schools to assist initiation of similar efforts.

(d) REPORT.—Not later than 180 days after the date of enactment of this Act, the Secretary shall submit to Congress a report describing the implementation of this section.

**SEC. 4. CONSULTATION WITH INDIAN TRIBES.**

Nothing in this Act relieves the United States of its responsibility to consult with Indian nations as required under executive order 13175 (67 Fed. Reg. 67249) (November 6, 2000).

**SEC. 5. SENSE OF THE SENATE REGARDING CLIMATE CHANGE.**

It is the sense of the Senate that climate change is real and not a hoax.

**SEC. 6. SENSE OF SENATE REGARDING THE OIL SPILL LIABILITY TRUST FUND.**

It is the sense of the Senate that—

(1) Congress should approve a bill to ensure that all forms of bitumen or synthetic crude oil derived from bitumen are subject to the per-barrel excise tax associated with the Oil Spill Liability Trust Fund established by section 9509 of the Internal Revenue Code of 1986;

S. 1—4

(2) it is necessary for Congress to approve a bill described in paragraph (1) because the Internal Revenue Service determined in 2011 that certain forms of petroleum are not subject to the per-barrel excise tax;

(3) under article I, section 7, clause 1 of the Constitution, the Senate may not originate a bill to raise new revenue, and thus may not originate a bill to close the legitimate and unintended loophole described in paragraph (2);

(4) if the Senate attempts to originate a bill described in paragraph (1), it would provide a substantive basis for a "blue slip" from the House of Representatives, which would prevent advancement of the bill; and

(5) the House of Representatives, consistent with article I, section 7, clause 1 of the Constitution, should consider and refer to the Senate a bill to ensure that all forms of bitumen or synthetic crude oil derived from bitumen are subject to the per-barrel excise tax associated with the Oil Spill Liability Trust Fund established by section 9509 of the Internal Revenue Code of 1986.

# DIVISION B—ENERGY EFFICIENCY IMPROVEMENT

**SECTION 1. SHORT TITLE.**

This division may be cited as the "Energy Efficiency Improvement Act of 2015".

# TITLE I—BETTER BUILDINGS

**SEC. 101. SHORT TITLE.**

This title may be cited as the "Better Buildings Act of 2015".

**SEC. 102. ENERGY EFFICIENCY IN FEDERAL AND OTHER BUILDINGS.**

(a) DEFINITIONS.—In this section:

(1) ADMINISTRATOR.—The term "Administrator" means the Administrator of General Services.

(2) COST-EFFECTIVE ENERGY EFFICIENCY MEASURE.—The term "cost-effective energy efficiency measure" means any building product, material, equipment, or service, and the installing, implementing, or operating thereof, that provides energy savings in an amount that is not less than the cost of such installing, implementing, or operating.

(3) COST-EFFECTIVE WATER EFFICIENCY MEASURE.—The term "cost-effective water efficiency measure" means any building product, material, equipment, or service, and the installing, implementing, or operating thereof, that provides water savings in an amount that is not less than the cost of such installing, implementing, or operating.

(b) MODEL PROVISIONS, POLICIES, AND BEST PRACTICES.—

(1) IN GENERAL.—Not later than 180 days after the date of enactment of this Act, the Administrator, in consultation with the Secretary of Energy and after providing the public with an opportunity for notice and comment, shall develop model commercial leasing provisions and best practices in accordance with this subsection.

S. 1—5

(2) COMMERCIAL LEASING.—

(A) IN GENERAL.—The model commercial leasing provisions developed under this subsection shall, at a minimum, align the interests of building owners and tenants with regard to investments in cost-effective energy efficiency measures and cost-effective water efficiency measures to encourage building owners and tenants to collaborate to invest in such measures.

(B) USE OF MODEL PROVISIONS.—The Administrator may use the model commercial leasing provisions developed under this subsection in any standard leasing document that designates a Federal agency (or other client of the Administrator) as a landlord or tenant.

(C) PUBLICATION.—The Administrator shall periodically publish the model commercial leasing provisions developed under this subsection, along with explanatory materials, to encourage building owners and tenants in the private sector to use such provisions and materials.

(3) REALTY SERVICES.—The Administrator shall develop policies and practices to implement cost-effective energy efficiency measures and cost-effective water efficiency measures for the realty services provided by the Administrator to Federal agencies (or other clients of the Administrator), including periodic training of appropriate Federal employees and contractors on how to identify and evaluate those measures.

(4) STATE AND LOCAL ASSISTANCE.—The Administrator, in consultation with the Secretary of Energy, shall make available model commercial leasing provisions and best practices developed under this subsection to State, county, and municipal governments for use in managing owned and leased building space in accordance with the goal of encouraging investment in all cost-effective energy efficiency measures and cost-effective water efficiency measures.

**SEC. 103. SEPARATE SPACES WITH HIGH-PERFORMANCE ENERGY EFFICIENCY MEASURES.**

(a) IN GENERAL.—Subtitle B of title IV of the Energy Independence and Security Act of 2007 (42 U.S.C. 17081 et seq.) is amended by adding at the end the following:

**"SEC. 424. SEPARATE SPACES WITH HIGH-PERFORMANCE ENERGY EFFICIENCY MEASURES.**

"(a) DEFINITIONS.—In this section:

"(1) HIGH-PERFORMANCE ENERGY EFFICIENCY MEASURE.— The term 'high-performance energy efficiency measure' means a technology, product, or practice that will result in substantial operational cost savings by reducing energy consumption and utility costs.

"(2) SEPARATE SPACES.—The term 'separate spaces' means areas within a commercial building that are leased or otherwise occupied by a tenant or other occupant for a period of time pursuant to the terms of a written agreement.

"(b) STUDY.—

"(1) IN GENERAL.—Not later than 1 year after the date of enactment of this section, the Secretary, acting through the Assistant Secretary of Energy Efficiency and Renewable Energy, shall complete a study on the feasibility of—

"(A) significantly improving energy efficiency in commercial buildings through the design and construction, by owners and tenants, of separate spaces with high-performance energy efficiency measures; and

"(B) encouraging owners and tenants to implement high-performance energy efficiency measures in separate spaces.

"(2) SCOPE.—The study shall, at a minimum, include—

"(A) descriptions of—

"(i) high-performance energy efficiency measures that should be considered as part of the initial design and construction of separate spaces;

"(ii) processes that owners, tenants, architects, and engineers may replicate when designing and constructing separate spaces with high-performance energy efficiency measures;

"(iii) policies and best practices to achieve reductions in energy intensities for lighting, plug loads, heating, cooling, cooking, laundry, and other systems to satisfy the needs of the commercial building tenant;

"(iv) return on investment and payback analyses of the incremental cost and projected energy savings of the proposed set of high-performance energy efficiency measures, including consideration of available incentives;

"(v) models and simulation methods that predict the quantity of energy used by separate spaces with high-performance energy efficiency measures and that compare that predicted quantity to the quantity of energy used by separate spaces without high-performance energy efficiency measures but that otherwise comply with applicable building code requirements;

"(vi) measurement and verification platforms demonstrating actual energy use of high-performance energy efficiency measures installed in separate spaces, and whether such measures generate the savings intended in the initial design and construction of the separate spaces;

"(vii) best practices that encourage an integrated approach to designing and constructing separate spaces to perform at optimum energy efficiency in conjunction with the central systems of a commercial building; and

"(viii) any impact on employment resulting from the design and construction of separate spaces with high-performance energy efficiency measures; and

"(B) case studies reporting economic and energy savings returns in the design and construction of separate spaces with high-performance energy efficiency measures.

"(3) PUBLIC PARTICIPATION.—Not later than 90 days after the date of the enactment of this section, the Secretary shall publish a notice in the Federal Register requesting public comments regarding effective methods, measures, and practices for the design and construction of separate spaces with high-performance energy efficiency measures.

"(4) PUBLICATION.—The Secretary shall publish the study on the website of the Department of Energy.".

(b) CLERICAL AMENDMENT.—The table of contents in section 1(b) of the Energy Independence and Security Act of 2007 is amended by inserting after the item relating to section 423 the following new item:

"Sec. 424. Separate spaces with high-performance energy efficiency measures.".

**SEC. 104. TENANT STAR PROGRAM.**

(a) IN GENERAL.—Subtitle B of title IV of the Energy Independence and Security Act of 2007 (42 U.S.C. 17081 et seq.) (as amended by section 103) is amended by adding at the end the following:

**"SEC. 425. TENANT STAR PROGRAM.**

"(a) DEFINITIONS.—In this section:

"(1) HIGH-PERFORMANCE ENERGY EFFICIENCY MEASURE.— The term 'high-performance energy efficiency measure' has the meaning given the term in section 424.

"(2) SEPARATE SPACES.—The term 'separate spaces' has the meaning given the term in section 424.

"(b) TENANT STAR.—The Administrator of the Environmental Protection Agency, in consultation with the Secretary of Energy, shall develop a voluntary program within the Energy Star program established by section 324A of the Energy Policy and Conservation Act (42 U.S.C. 6294a), which may be known as 'Tenant Star', to promote energy efficiency in separate spaces leased by tenants or otherwise occupied within commercial buildings.

"(c) EXPANDING SURVEY DATA.—The Secretary of Energy, acting through the Administrator of the Energy Information Administration, shall—

"(1) collect, through each Commercial Buildings Energy Consumption Survey of the Energy Information Administration that is conducted after the date of enactment of this section, data on—

"(A) categories of building occupancy that are known to consume significant quantities of energy, such as occupancy by data centers, trading floors, and restaurants; and

"(B) other aspects of the property, building operation, or building occupancy determined by the Administrator of the Energy Information Administration, in consultation with the Administrator of the Environmental Protection Agency, to be relevant in lowering energy consumption;

"(2) with respect to the first Commercial Buildings Energy Consumption Survey conducted after the date of enactment of this section, to the extent full compliance with the requirements of paragraph (1) is not feasible, conduct activities to develop the capability to collect such data and begin to collect such data; and

"(3) make data collected under paragraphs (1) and (2) available to the public in aggregated form and provide such data, and any associated results, to the Administrator of the Environmental Protection Agency for use in accordance with subsection (d).

"(d) RECOGNITION OF OWNERS AND TENANTS.—

"(1) OCCUPANCY-BASED RECOGNITION.—Not later than 1 year after the date on which sufficient data is received pursuant to subsection (c), the Administrator of the Environmental

S. 1—8

Protection Agency shall, following an opportunity for public notice and comment—

"(A) in a manner similar to the Energy Star rating system for commercial buildings, develop policies and procedures to recognize tenants in commercial buildings that voluntarily achieve high levels of energy efficiency in separate spaces;

"(B) establish building occupancy categories eligible for Tenant Star recognition based on the data collected under subsection (c) and any other appropriate data sources; and

"(C) consider other forms of recognition for commercial building tenants or other occupants that lower energy consumption in separate spaces.

"(2) DESIGN- AND CONSTRUCTION-BASED RECOGNITION.—After the study required by section 424(b) is completed, the Administrator of the Environmental Protection Agency, in consultation with the Secretary and following an opportunity for public notice and comment, may develop a voluntary program to recognize commercial building owners and tenants that use high-performance energy efficiency measures in the design and construction of separate spaces.".

(b) CLERICAL AMENDMENT.—The table of contents in section 1(b) of the Energy Independence and Security Act of 2007 is amended by inserting after the item relating to section 424 (as added by section 103(b)) the following new item:

"Sec. 425. Tenant Star program.".

# TITLE II—GRID-ENABLED WATER HEATERS

### SEC. 201. GRID-ENABLED WATER HEATERS.

Part B of title III of the Energy Policy and Conservation Act is amended—

(1) in section 325(e) (42 U.S.C. 6295(e)), by adding at the end the following:

"(6) ADDITIONAL STANDARDS FOR GRID-ENABLED WATER HEATERS.—

"(A) DEFINITIONS.—In this paragraph:

"(i) ACTIVATION LOCK.—The term 'activation lock' means a control mechanism (either a physical device directly on the water heater or a control system integrated into the water heater) that is locked by default and contains a physical, software, or digital communication that must be activated with an activation key to enable the product to operate at its designed specifications and capabilities and without which activation the product will provide not greater than 50 percent of the rated first hour delivery of hot water certified by the manufacturer.

"(ii) GRID-ENABLED WATER HEATER.—The term 'grid-enabled water heater' means an electric resistance water heater that—

"(I) has a rated storage tank volume of more than 75 gallons;

S. 1—9

"(II) is manufactured on or after April 16, 2015;

"(III) has—

"(aa) an energy factor of not less than 1.061 minus the product obtained by multiplying—

"(AA) the rated storage volume of the tank, expressed in gallons; and

"(BB) 0.00168; or

"(bb) an equivalent alternative standard prescribed by the Secretary and developed pursuant to paragraph (5)(E);

"(IV) is equipped at the point of manufacture with an activation lock; and

"(V) bears a permanent label applied by the manufacturer that—

"(aa) is made of material not adversely affected by water;

"(bb) is attached by means of non-water-soluble adhesive; and

"(cc) advises purchasers and end-users of the intended and appropriate use of the product with the following notice printed in 16.5 point Arial Narrow Bold font:

"'IMPORTANT INFORMATION: This water heater is intended only for use as part of an electric thermal storage or demand response program. It will not provide adequate hot water unless enrolled in such a program and activated by your utility company or another program operator. Confirm the availability of a program in your local area before purchasing or installing this product.'.

"(B) REQUIREMENT.—The manufacturer or private labeler shall provide the activation key for a grid-enabled water heater only to a utility or other company that operates an electric thermal storage or demand response program that uses such a grid-enabled water heater.

"(C) REPORTS.—

"(i) MANUFACTURERS.—The Secretary shall require each manufacturer of grid-enabled water heaters to report to the Secretary annually the quantity of grid-enabled water heaters that the manufacturer ships each year.

"(ii) OPERATORS.—The Secretary shall require utilities and other demand response and thermal storage program operators to report annually the quantity of grid-enabled water heaters activated for their programs using forms of the Energy Information Agency or using such other mechanism that the Secretary determines appropriate after an opportunity for notice and comment.

"(iii) CONFIDENTIALITY REQUIREMENTS.—The Secretary shall treat shipment data reported by manufacturers as confidential business information.

"(D) PUBLICATION OF INFORMATION.—

"(i) IN GENERAL.—In 2017 and 2019, the Secretary shall publish an analysis of the data collected under subparagraph (C) to assess the extent to which shipped

S. 1—10

products are put into use in demand response and thermal storage programs.

"(ii) PREVENTION OF PRODUCT DIVERSION.—If the Secretary determines that sales of grid-enabled water heaters exceed by 15 percent or greater the quantity of such products activated for use in demand response and thermal storage programs annually, the Secretary shall, after opportunity for notice and comment, establish procedures to prevent product diversion for non-program purposes.

"(E) COMPLIANCE.—

"(i) IN GENERAL.—Subparagraphs (A) through (D) shall remain in effect until the Secretary determines under this section that—

"(I) grid-enabled water heaters do not require a separate efficiency requirement; or

"(II) sales of grid-enabled water heaters exceed by 15 percent or greater the quantity of such products activated for use in demand response and thermal storage programs annually and procedures to prevent product diversion for non-program purposes would not be adequate to prevent such product diversion.

"(ii) EFFECTIVE DATE.—If the Secretary exercises the authority described in clause (i) or amends the efficiency requirement for grid-enabled water heaters, that action will take effect on the date described in subsection (m)(4)(A)(ii).

"(iii) CONSIDERATION.—In carrying out this section with respect to electric water heaters, the Secretary shall consider the impact on thermal storage and demand response programs, including any impact on energy savings, electric bills, peak load reduction, electric reliability, integration of renewable resources, and the environment.

"(iv) REQUIREMENTS.—In carrying out this paragraph, the Secretary shall require that grid-enabled water heaters be equipped with communication capability to enable the grid-enabled water heaters to participate in ancillary services programs if the Secretary determines that the technology is available, practical, and cost-effective.";

(2) in section 332(a) (42 U.S.C. 6302(a))—

(A) in paragraph (5), by striking "or" at the end;

(B) in the first paragraph (6), by striking the period at the end and inserting a semicolon;

(C) by redesignating the second paragraph (6) as paragraph (7);

(D) in subparagraph (B) of paragraph (7) (as so redesignated), by striking the period at the end and inserting "; or"; and

(E) by adding at the end the following:

"(8) for any person—

"(A) to activate an activation lock for a grid-enabled water heater with knowledge that such water heater is not used as part of an electric thermal storage or demand response program;

S. 1—11

"(B) to distribute an activation key for a grid-enabled water heater with knowledge that such activation key will be used to activate a grid-enabled water heater that is not used as part of an electric thermal storage or demand response program;

"(C) to otherwise enable a grid-enabled water heater to operate at its designed specification and capabilities with knowledge that such water heater is not used as part of an electric thermal storage or demand response program; or

"(D) to knowingly remove or render illegible the label of a grid-enabled water heater described in section 325(e)(6)(A)(ii)(V).";

(3) in section 333(a) (42 U.S.C. 6303(a))—

(A) by striking "section 332(a)(5)" and inserting "paragraph (5), (6), (7), or (8) of section 332(a)"; and

(B) by striking "paragraph (1), (2), or (5) of section 332(a)" and inserting "paragraph (1), (2), (5), (6), (7), or (8) of section 332(a)"; and

(4) in section 334 (42 U.S.C. 6304)—

(A) by striking "section 332(a)(5)" and inserting "paragraph (5), (6), (7), or (8) of section 332(a)"; and

(B) by striking "section 332(a)(6)" and inserting "section 332(a)(7)".

# TITLE III—ENERGY INFORMATION FOR COMMERCIAL BUILDINGS

### SEC. 301. ENERGY INFORMATION FOR COMMERCIAL BUILDINGS.

(a) REQUIREMENT OF BENCHMARKING AND DISCLOSURE FOR LEASING BUILDINGS WITHOUT ENERGY STAR LABELS.—Section 435(b)(2) of the Energy Independence and Security Act of 2007 (42 U.S.C. 17091(b)(2)) is amended—

(1) by striking "paragraph (2)" and inserting "paragraph (1)"; and

(2) by striking "signing the contract," and all that follows through the period at the end and inserting the following: "signing the contract, the following requirements are met:

"(A) The space is renovated for all energy efficiency and conservation improvements that would be cost effective over the life of the lease, including improvements in lighting, windows, and heating, ventilation, and air conditioning systems.

"(B)(i) Subject to clause (ii), the space is benchmarked under a nationally recognized, online, free benchmarking program, with public disclosure, unless the space is a space for which owners cannot access whole building utility consumption data, including spaces—

"(I) that are located in States with privacy laws that provide that utilities shall not provide such aggregated information to multitenant building owners; and

"(II) for which tenants do not provide energy consumption information to the commercial building owner in response to a request from the building owner.

"(ii) A Federal agency that is a tenant of the space shall provide to the building owner, or authorize the owner

S. 1—12

to obtain from the utility, the energy consumption information of the space for the benchmarking and disclosure required by this subparagraph.".

(b) STUDY.—

(1) IN GENERAL.—Not later than 2 years after the date of enactment of this Act, the Secretary of Energy, in collaboration with the Administrator of the Environmental Protection Agency, shall complete a study—

(A) on the impact of—

(i) State and local performance benchmarking and disclosure policies, and any associated building efficiency policies, for commercial and multifamily buildings; and

(ii) programs and systems in which utilities provide aggregated information regarding whole building energy consumption and usage information to owners of multitenant commercial, residential, and mixed-use buildings;

(B) that identifies best practice policy approaches studied under subparagraph (A) that have resulted in the greatest improvements in building energy efficiency; and

(C) that considers—

(i) compliance rates and the benefits and costs of the policies and programs on building owners, utilities, tenants, and other parties;

(ii) utility practices, programs, and systems that provide aggregated energy consumption information to multitenant building owners, and the impact of public utility commissions and State privacy laws on those practices, programs, and systems;

(iii) exceptions to compliance in existing laws where building owners are not able to gather or access whole building energy information from tenants or utilities;

(iv) the treatment of buildings with—

(I) multiple uses;

(II) uses for which baseline information is not available; and

(III) uses that require high levels of energy intensities, such as data centers, trading floors, and televisions studios;

(v) implementation practices, including disclosure methods and phase-in of compliance;

(vi) the safety and security of benchmarking tools offered by government agencies, and the resiliency of those tools against cyber attacks; and

(vii) international experiences with regard to building benchmarking and disclosure laws and data aggregation for multitenant buildings.

(2) SUBMISSION TO CONGRESS.—At the conclusion of the study, the Secretary shall submit to the Committee on Energy and Commerce of the House of Representatives and Committee on Energy and Natural Resources of the Senate a report on the results of the study.

(c) CREATION AND MAINTENANCE OF DATABASE.—

(1) IN GENERAL.—Not later than 18 months after the date of enactment of this Act and following opportunity for public

S. 1—13

notice and comment, the Secretary of Energy, in coordination with other relevant agencies, shall maintain, and if necessary create, a database for the purpose of storing and making available public energy-related information on commercial and multifamily buildings, including—

    (A) data provided under Federal, State, local, and other laws or programs regarding building benchmarking and energy information disclosure;

    (B) information on buildings that have disclosed energy ratings and certifications; and

    (C) energy-related information on buildings provided voluntarily by the owners of the buildings, only in an anonymous form unless the owner provides otherwise.

(2) COMPLEMENTARY PROGRAMS.—The database maintained pursuant to paragraph (1) shall complement and not duplicate the functions of the Environmental Protection Agency's Energy Star Portfolio Manager tool.

(d) INPUT FROM STAKEHOLDERS.—The Secretary of Energy shall seek input from stakeholders to maximize the effectiveness of the actions taken under this section.

(e) REPORT.—Not later than 2 years after the date of enactment of this Act, and every 2 years thereafter, the Secretary of Energy shall submit to the Committee on Energy and Commerce of the House of Representatives and Committee on Energy and Natural Resources of the Senate a report on the progress made in complying with this section.


*Speaker of the House of Representatives.*


*Vice President of the United States and*
*President of the Senate.*