# EXHIBIT 25

Report of the Veto of S. 1, the Keystone XL Pipeline Approval Act,
161 Cong. Rec. S1,073 (daily ed. Feb. 24, 2015)



114th Congress, 1st Session – – – – – – – – – – – – – Senate Document 114–2

VETO—S. 1
(PM 6)

———

## MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

RETURNING

WITHOUT MY APPROVAL S. 1, THE KEYSTONE XL PIPELINE
APPROVAL ACT



FEBRUARY 24, 2015.—Ordered to be printed

———

U.S. GOVERNMENT PUBLISHING OFFICE
49–011                          WASHINGTON : 2015

*To the Senate of the United States:*

    I am returning herewith without my approval S. 1, the "Keystone XL Pipeline Approval Act." Through this bill, the United States Congress attempts to circumvent longstanding and proven processes for determining whether or not building and operating a cross-border pipeline serves the national interest.

    The Presidential power to veto legislation is one I take seriously. But I also take seriously my responsibility to the American people. And because this act of Congress conflicts with established executive branch procedures and cuts short thorough consideration of issues that could bear on our national interest—including our security, safety, and environment—it has earned my veto.

BARACK OBAMA.

THE WHITE HOUSE, *February 24, 2015.*

○

# EXHIBIT 26

American Energy Renaissance Act of 2015,
S. 791 and H.R. 1487, 114th Cong. (2015)

I

114TH CONGRESS
1ST SESSION

# H. R. 1487

To free the private sector to harness domestic energy resources to create jobs and generate economic growth by removing statutory and administrative barriers.

––––––––––––––

## IN THE HOUSE OF REPRESENTATIVES

MARCH 19, 2015

Mr. BRIDENSTINE (for himself, Mr. DESJARLAIS, Mr. DUNCAN of South Carolina, and Mr. JORDAN) introduced the following bill; which was referred to the Committee on Natural Resources, and in addition to the Committees on Transportation and Infrastructure, Energy and Commerce, Agriculture, the Judiciary, and Foreign Affairs, for a period to be subsequently determined by the Speaker, in each case for consideration of such provisions as fall within the jurisdiction of the committee concerned

––––––––––––––

# A BILL

To free the private sector to harness domestic energy resources to create jobs and generate economic growth by removing statutory and administrative barriers.

1    *Be it enacted by the Senate and House of Representa-*

2   *tives of the United States of America in Congress assembled,*

3   **SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

4       (a) SHORT TITLE.—This Act may be cited as the

5   "American Energy Renaissance Act of 2015".

2

1        (b) TABLE OF CONTENTS.—The table of contents for

2    this Act is as follows:

Sec. 1. Short title; table of contents.

### TITLE I—EXPANDING AMERICAN ENERGY EXPORTS

Sec. 1001. Finding.
Sec. 1002. Natural gas exports.
Sec. 1003. Crude oil exports.
Sec. 1004. Coal exports.

### TITLE II—IMPROVING NORTH AMERICAN ENERGY INFRASTRUCTURE

#### Subtitle A—North American Energy Infrastructure

Sec. 2001. Finding.
Sec. 2002. Definitions.
Sec. 2003. Authorization of certain energy infrastructure projects at the national boundary of the United States.
Sec. 2004. Importation or exportation of natural gas to Canada and Mexico.
Sec. 2005. Transmission of electric energy to Canada and Mexico.
Sec. 2006. No Presidential permit required.
Sec. 2007. Modifications to existing projects.
Sec. 2008. Effective date; rulemaking deadlines.

#### Subtitle B—Keystone XL Permit Approval

Sec. 2011. Findings.
Sec. 2012. Keystone XL permit approval.

### TITLE III—OUTER CONTINENTAL SHELF LEASING

Sec. 3001. Finding.
Sec. 3002. Extension of leasing program.
Sec. 3003. Lease sales.
Sec. 3004. Applications for permits to drill.
Sec. 3005. Lease sales for certain areas.

### TITLE IV—UTILIZING AMERICA'S ONSHORE RESOURCES

Sec. 4001. Findings.
Sec. 4002. State option for energy development.

#### Subtitle A—Energy Development by States

Sec. 4011. Definitions.
Sec. 4012. State programs.
Sec. 4013. Leasing, permitting, and regulatory programs.
Sec. 4014. Judicial review.
Sec. 4015. Administrative Procedure Act.

#### Subtitle B—Onshore Oil and Gas Permit Streamlining

##### PART I—OIL AND GAS LEASING CERTAINTY

3

Sec. 4021.  Minimum acreage requirement for onshore lease sales.
Sec. 4022.  Leasing certainty.
Sec. 4023.  Leasing consistency.
Sec. 4024.  Reduce redundant policies.
Sec. 4025.  Streamlined congressional notification.

PART II—APPLICATION FOR PERMITS TO DRILL PROCESS REFORM

Sec. 4031.  Permit to drill application timeline.
Sec. 4032.  Administrative protest documentation reform.
Sec. 4033.  Improved Federal energy permit coordination.
Sec. 4034.  Administration.

PART III—OIL SHALE

Sec. 4041.  Effectiveness of oil shale regulations, amendments to resource man-
            agement plans, and record of decision.
Sec. 4042.  Oil shale leasing.

PART IV—NATIONAL PETROLEUM RESERVE IN ALASKA ACCESS

Sec. 4051.  Sense of Congress and reaffirming national policy for the National
            Petroleum Reserve in Alaska.
Sec. 4052.  National Petroleum Reserve in Alaska: lease sales.
Sec. 4053.  National Petroleum Reserve in Alaska: planning and permitting
            pipeline and road construction.
Sec. 4054.  Issuance of a new integrated activity plan and environmental impact
            statement.
Sec. 4055.  Departmental accountability for development.
Sec. 4056.  Deadlines under new proposed integrated activity plan.
Sec. 4057.  Updated resource assessment.

PART V—MISCELLANEOUS PROVISIONS

Sec. 4061.  Sanctions.
Sec. 4062.  Ensuring consideration of economic impacts of protections for en-
            dangered species and threatened species.

PART VI—JUDICIAL REVIEW

Sec. 4071.  Definitions.
Sec. 4072.  Exclusive venue for certain civil actions relating to covered energy
            projects.
Sec. 4073.  Timely filing.
Sec. 4074.  Expedition in hearing and determining the action.
Sec. 4075.  Limitation on injunction and prospective relief.
Sec. 4076.  Limitation on attorneys' fees and court costs.
Sec. 4077.  Legal standing.

TITLE V—ADDITIONAL ONSHORE RESOURCES

Subtitle A—Leasing Program for Land Within Coastal Plain

Sec. 5001.  Finding.
Sec. 5002.  Definitions.
Sec. 5003.  Leasing program for land on the Coastal Plain.
Sec. 5004.  Lease sales.
Sec. 5005.  Grant of leases by the Secretary.

4

Sec. 5006. Lease terms and conditions.
Sec. 5007. Coastal Plain environmental protection.
Sec. 5008. Expedited judicial review.
Sec. 5009. Rights-of-way across the Coastal Plain.
Sec. 5010. Conveyance.

### Subtitle B—Native American Energy

Sec. 5021. Findings.
Sec. 5022. Appraisals.
Sec. 5023. Standardization.
Sec. 5024. Environmental reviews of major Federal actions on Indian land.
Sec. 5025. Judicial review.
Sec. 5026. Tribal resource management plans.
Sec. 5027. Leases of restricted lands for the Navajo Nation.
Sec. 5028. Nonapplicability of certain rules.

### Subtitle C—Additional Regulatory Provisions

#### Part I—State Authority Over Hydraulic Fracturing

Sec. 5031. Finding.
Sec. 5032. State authority.

#### Part II—Miscellaneous Provisions

Sec. 5041. Environmental legal fees.
Sec. 5042. Master leasing plans.

## TITLE VI—IMPROVING AMERICA'S DOMESTIC REFINING CAPACITY

### Subtitle A—Refinery Permitting Reform

Sec. 6001. Finding.
Sec. 6002. Definitions.
Sec. 6003. Streamlining of refinery permitting process.

### Subtitle B—Repeal of Renewable Fuel Standard

Sec. 6011. Findings.
Sec. 6012. Phase out of renewable fuel standard.

## TITLE VII—STOPPING EPA OVERREACH

Sec. 7001. Findings.
Sec. 7002. Clarification of Federal regulatory authority to exclude greenhouse gases from regulation under the Clean Air Act.
Sec. 7003. Clarification of authority.
Sec. 7004. Jobs analysis for all EPA regulations.

## TITLE VIII—DEBT FREEDOM FUND

Sec. 8001. Findings.
Sec. 8002. Debt freedom fund.

5

# TITLE I—EXPANDING AMERICAN ENERGY EXPORTS

**SEC. 1001. FINDING.**

Congress finds that opening up energy exports will contribute to economic development, private sector job growth, and continued growth in American energy production.

**SEC. 1002. NATURAL GAS EXPORTS.**

(a) FINDING.—Congress finds that expanding natural gas exports will lead to increased investment and development of domestic supplies of natural gas that will contribute to job growth and economic development.

(b) NATURAL GAS EXPORTS.—Section 3(c) of the Natural Gas Act (15 U.S.C. 717b(c)) is amended—

(1) by inserting "or any other nation not excluded by this section" after "trade in natural gas";

(2) by striking "(c) For purposes" and inserting the following:

"(c) EXPEDITED APPLICATION AND APPROVAL PROCESS.—

"(1) IN GENERAL.—For purposes"; and

(3) by adding at the end the following:

"(2) EXCLUSIONS.—

"(A) IN GENERAL.—Any nation subject to sanctions or trade restrictions imposed by the

6

1    United States is excluded from expedited ap-

2    proval under paragraph (1).

3        "(B) DESIGNATION BY PRESIDENT OR

4    CONGRESS.—The President or Congress may

5    designate nations that may be excluded from

6    expedited approval under paragraph (1) for rea-

7    sons of national security.

8        "(3) ORDER NOT REQUIRED.—No order is re-

9    quired under subsection (a) to authorize the export

10   or import of any natural gas to or from Canada or

11   Mexico.".

12   **SEC. 1003. CRUDE OIL EXPORTS.**

13   (a) FINDINGS.—Congress finds that—

14       (1) the restrictions on crude oil exports from

15   the 1970s are no longer necessary due to the techno-

16   logical advances that have increased the domestic

17   supply of crude oil; and

18       (2) repealing restrictions on crude oil exports

19   will contribute to job growth and economic develop-

20   ment.

21   (b) REPEAL OF PRESIDENTIAL AUTHORITY TO RE-

22   STRICT OIL EXPORTS.—

23       (1) IN GENERAL.—Section 103 of the Energy

24   Policy and Conservation Act (42 U.S.C. 6212) is re-

25   pealed.

7

1       (2) CONFORMING AMENDMENTS.—

2          (A) Section 12 of the Alaska Natural Gas

3      Transportation Act of 1976 (15 U.S.C. 719j) is

4      amended—

5             (i) by striking "and section 103 of the

6          Energy Policy and Conservation Act"; and

7             (ii) by striking "such Acts" and in-

8          serting "that Act".

9          (B) The Energy Policy and Conservation

10     Act is amended—

11            (i) in section 251 (42 U.S.C. 6271)—

12              (I) by striking subsection (d);

13           and

14              (II) by redesignating subsection

15           (e) as subsection (d); and

16            (ii) in section 523(a)(1) (42 U.S.C.

17          6393(a)(1)), by striking "(other than sec-

18          tion 103 thereof)".

19    (c) REPEAL OF LIMITATIONS ON EXPORTS OF OIL.—

20      (1) IN GENERAL.—Section 28 of the Mineral

21    Leasing Act (30 U.S.C. 185) is amended—

22          (A) by striking subsection (u); and

23          (B) by redesignating subsections (v)

24      through (y) as subsections (u) through (x), re-

25      spectively.

8

1     (2) CONFORMING AMENDMENTS.—

2          (A) Section 1107(c) of the Alaska National

3     Interest Lands Conservation Act (16 U.S.C.

4     3167(c)) is amended by striking "(u) through

5     (y)" and inserting "(u) through (x)".

6          (B) Section 23 of the Deep Water Port

7     Act of 1974 (33 U.S.C. 1522) is repealed.

8          (C) Section 203(c) of the Trans-Alaska

9     Pipeline Authorization Act (43 U.S.C. 1652(c))

10    is amended in the first sentence by striking

11    "(w)(2), and (x))" and inserting "(v)(2), and

12    (w))".

13          (D) Section 509(c) of the Public Utility

14    Regulatory Policies Act of 1978 (43 U.S.C.

15    2009(c)) is amended by striking "subsection

16    (w)(2)" and inserting "subsection (v)(2)".

17    (d) REPEAL OF LIMITATIONS ON EXPORT OF OCS

18    OIL OR GAS.—Section 28 of the Outer Continental Shelf

19    Lands Act (43 U.S.C. 1354) is repealed.

20    (e) TERMINATION OF LIMITATION ON EXPORTATION

21    OF CRUDE OIL.—Section 7(d) of the Export Administra-

22    tion Act of 1979 (50 U.S.C. App. 2406(d)) (as in effect

23    pursuant to the International Emergency Economic Pow-

24    ers Act (50 U.S.C. 1701 et seq.)) shall have no force or

25    effect.

9

1    (f) CLARIFICATION OF CRUDE OIL REGULATION.—

2       (1) IN GENERAL.—Section 754.2 of title 15,

3    Code of Federal Regulations (relating to crude oil)

4    shall have no force or effect.

5       (2) CRUDE OIL LICENSE REQUIREMENTS.—The

6    Bureau of Industry and Security of the Department

7    of Commerce shall grant licenses to export to a

8    country crude oil (as the term is defined in sub-

9    section (a) of the regulation referred to in paragraph

10    (1)) (as in effect on the date that is 1 day before

11    the date of enactment of this Act) unless—

12       (A) the country is subject to sanctions or

13       trade restrictions imposed by the United States;

14       or

15       (B) the President or Congress has des-

16       ignated the country as subject to exclusion for

17       reasons of national security.

18    **SEC. 1004. COAL EXPORTS.**

19    (a) FINDINGS.—Congress finds that—

20       (1) increased international demand for coal is

21    an opportunity to support jobs and promote eco-

22    nomic growth in the United States; and

23       (2) exports of coal should not be unreasonably

24    restricted or delayed.

10

1 (b) NEPA REVIEW FOR COAL EXPORTS.—In com-

2 pleting an environmental impact statement or similar

3 analysis required under the National Environmental Pol-

4 icy Act of 1969 (42 U.S.C. 4321 et seq.) for an approval

5 or permit for coal export terminals, or transportation of

6 coal to coal export terminals, the Secretary of the Army,

7 acting through the Chief of Engineers—

8  (1) may only take into account domestic envi-

9  ronmental impacts; and

10  (2) may not take into account any impacts re-

11  sulting from the final use overseas of the exported

12  coal.

# TITLE II—IMPROVING NORTH AMERICAN ENERGY INFRA-STRUCTURE

## Subtitle A—North American Energy Infrastructure

18 **SEC. 2001. FINDING.**

19 Congress finds that the United States should estab-

20 lish a more uniform, transparent, and modern process for

21 the construction, connection, operation, and maintenance

22 of oil and natural gas pipelines and electric transmission

23 facilities for the import and export of oil and natural gas

24 and the transmission of electricity to and from Canada

1 and Mexico, in pursuit of a more secure and efficient

2 North American energy market.

**SEC. 2002. DEFINITIONS.**

4     In this subtitle:

5         (1) CROSS-BORDER SEGMENT.—The term

6     ''cross-border segment'' means the portion of an oil

7     or natural gas pipeline or electric transmission facil-

8     ity that is located at the national boundary of the

9     United States with either Canada or Mexico.

10         (2) ELECTRIC RELIABILITY ORGANIZATION.—

11     The term ''Electric Reliability Organization'' has the

12     meaning given the term in section 215 of the Fed-

13     eral Power Act (16 U.S.C. 824o).

14         (3) INDEPENDENT SYSTEM OPERATOR.—The

15     term ''Independent System Operator'' has the mean-

16     ing given the term in section 3 of the Federal Power

17     Act (16 U.S.C. 796).

18         (4) MODIFICATION.—The term ''modification''

19     includes a reversal of flow direction, change in own-

20     ership, volume expansion, downstream or upstream

21     interconnection, or adjustment to maintain flow

22     (such as a reduction or increase in the number of

23     pump or compressor stations).

12

1       (5) NATURAL GAS.—The term ''natural gas''

2   has the meaning given the term in section 2 of the

3   Natural Gas Act (15 U.S.C. 717a).

4       (6) OIL.—The term ''oil'' means petroleum or

5   a petroleum product.

6       (7) REGIONAL ENTITY.—The term ''regional

7   entity'' has the meaning given the term in section

8   215 of the Federal Power Act (16 U.S.C. 824o).

9       (8) REGIONAL TRANSMISSION ORGANIZATION.—

10   The term ''Regional Transmission Organization''

11   has the meaning given the term in section 3 of the

12   Federal Power Act (16 U.S.C. 796).

**13   SEC. 2003. AUTHORIZATION OF CERTAIN ENERGY INFRA-**

**14           STRUCTURE PROJECTS AT THE NATIONAL**

**15           BOUNDARY OF THE UNITED STATES.**

16   (a) AUTHORIZATION.—Except as provided in sub-

17   section (c) and section 2007, no person may construct,

18   connect, operate, or maintain a cross-border segment of

19   an oil pipeline or electric transmission facility for the im-

20   port or export of oil or the transmission of electricity to

21   or from Canada or Mexico without obtaining a certificate

22   of crossing for the construction, connection, operation, or

23   maintenance of the cross-border segment under this sec-

24   tion.

25   (b) CERTIFICATE OF CROSSING.—

13

1      (1) REQUIREMENT.—Not later than 120 days

2    after final action is taken under the National Envi-

3    ronmental Policy Act of 1969 (42 U.S.C. 4321 et

4    seq.) with respect to a cross-border segment for

5    which a request is received under this section, the

6    Secretary of Energy, in consultation with appro-

7    priate Federal agencies, shall issue a certificate of

8    crossing for the cross-border segment unless the rel-

9    evant official finds that the construction, connection,

10   operation, or maintenance of the cross-border seg-

11   ment is not in the national security interest of the

12   United States.

13      (2) ADDITIONAL REQUIREMENT FOR ELECTRIC

14   TRANSMISSION FACILITIES.—In the case of a request

15   for a certificate of crossing for the construction, con-

16   nection, operation, or maintenance of a cross-border

17   segment of an electric transmission facility, the Sec-

18   retary of Energy shall require, as a condition of

19   issuing the certificate of crossing for the request

20   under paragraph (1), that the cross-border segment

21   of the electric transmission facility be constructed,

22   connected, operated, or maintained consistent with

23   all applicable policies and standards of—

24        (A) the Electric Reliability Organization

25         and the applicable regional entity; and

14

1          (B) any Regional Transmission Organiza-

2     tion or Independent System Operator with

3     operational or functional control over the cross-

4     border segment of the electric transmission fa-

5     cility.

6     (c) EXCLUSIONS.—This section shall not apply to any

7 construction, connection, operation, or maintenance of a

8 cross-border segment of an oil pipeline or electric trans-

9 mission facility for the import or export of oil or the trans-

10 mission of electricity to or from Canada or Mexico—

11          (1) if the cross-border segment is operating for

12     that import, export, or transmission as of the date

13     of enactment of this Act;

14          (2) if a permit described in section 2006 for

15     that construction, connection, operation, or mainte-

16     nance has been issued;

17          (3) if a certificate of crossing for that construc-

18     tion, connection, operation, or maintenance has pre-

19     viously been issued under this section; or

20          (4) if an application for a permit described in

21     section 2006 for that construction, connection, oper-

22     ation, or maintenance is pending on the date of en-

23     actment of this Act, until the earlier of—

24          (A) the date on which the application is

25     denied; or

1        (B) July 1, 2016.

2    (d) EFFECT OF OTHER LAWS.—

3        (1) APPLICATION TO PROJECTS.—Nothing in

4    this section or section 2007 affects the application of

5    any other Federal law to a project for which a cer-

6    tificate of crossing for the construction, connection,

7    operation, or maintenance of a cross-border segment

8    is sought under this section.

9        (2) EFFECT ON NATURAL GAS ACT.—Nothing

10    in this section or section 2007 affects the require-

11    ment to obtain approval or authorization under sec-

12    tions 3 and 7 of the Natural Gas Act (15 U.S.C.

13    717b, 717f) for the siting, construction, or operation

14    of any facility to import or export natural gas.

## SEC. 2004. IMPORTATION OR EXPORTATION OF NATURAL
## GAS TO CANADA AND MEXICO.

17    Section 3(c) of the Natural Gas Act (15 U.S.C.

18    717b(c)) is amended—

19        (1) by striking ''(c) For purposes'' and insert-

20    ing the following:

21    ''(c) EXPEDITED APPROVAL.—

22        ''(1) IN GENERAL.—For purposes''; and

23        (2) by adding at the end the following:

24        ''(2) EXPEDITED EXPORTS TO CANADA OR MEX-

25    ICO.—No order is required under subsection (a) to

16

1    authorize the export or import of any natural gas to

2    or from Canada or Mexico.''.

**SEC. 2005. TRANSMISSION OF ELECTRIC ENERGY TO CAN-**

**ADA AND MEXICO.**

5    (a) REPEAL OF REQUIREMENT TO SECURE

6    ORDER.—Section 202 of the Federal Power Act (16

7    U.S.C. 824a) is amended by striking subsection (e).

8    (b) CONFORMING AMENDMENTS.—

9        (1) STATE REGULATIONS.—Section 202(f) of

10       the Federal Power Act (16 U.S.C. 824a(f)) is

11       amended in the last sentence by striking ''insofar as

12       such State regulation does not conflict with the exer-

13       cise of the Commission's powers under or relating to

14       subsection 202(e)''.

15       (2) SEASONAL DIVERSITY ELECTRICITY EX-

16       CHANGE.—Section 602(b) of the Public Utility Reg-

17       ulatory Policies Act of 1978 (16 U.S.C. 824a–4(b))

18       is amended in the first sentence by striking ''the

19       Commission has'' and all that follows through the

20       period at the end of the last sentence and inserting

21       ''the Secretary has conducted hearings and finds

22       that the proposed transmission facilities would not

23       impair the sufficiency of electric supply within the

24       United States or would not impede or tend to im-

17

1    pede the coordination in the public interest of facili-

2    ties subject to the jurisdiction of the Secretary.''.

**SEC. 2006. NO PRESIDENTIAL PERMIT REQUIRED.**

4    No Presidential permit (or similar permit) required

5    under Executive Order 13337 (3 U.S.C. 301 note; 69 Fed.

6    Reg. 25299 (April 30, 2004)), Executive Order 11423 (3

7    U.S.C. 301 note; 33 Fed. Reg. 11741 (August 16, 1968)),

8    section 301 of title 3, United States Code, Executive

9    Order 12038 (43 Fed. Reg. 3674 (January 26, 1978)),

10   Executive Order 10485 (18 Fed. Reg. 5397 (September

11   9, 1953)), or any other Executive order shall be necessary

12   for the construction, connection, operation, or mainte-

13   nance of an oil or natural gas pipeline or electric trans-

14   mission facility, or any cross-border segment thereof.

**SEC. 2007. MODIFICATIONS TO EXISTING PROJECTS.**

16   No certificate of crossing under section 2003, or per-

17   mit described in section 2006, shall be required for a

18   modification to the construction, connection, operation, or

19   maintenance of an oil or natural gas pipeline or electric

20   transmission facility—

21        (1) that is operating for the import or export

22        of oil or natural gas or the transmission of elec-

23        tricity to or from Canada or Mexico as of the date

24        of enactment of this Act;

18

1  (2) for which a permit described in section

2  2006 for such construction, connection, operation, or

3  maintenance has been issued; or

4  (3) for which a certificate of crossing for the

5  cross-border segment of the pipeline or facility has

6  previously been issued under section 2003.

7 **SEC. 2008. EFFECTIVE DATE; RULEMAKING DEADLINES.**

8  (a) EFFECTIVE DATE.—Sections 2003 through 2007,

9 and the amendments made by those sections, shall take

10 effect on January 1, 2016.

11  (b) RULEMAKING DEADLINES.—The Secretary of

12 Energy shall—

13  (1) not later than 180 days after the date of

14  enactment of this Act, publish in the Federal Reg-

15  ister notice of a proposed rulemaking to carry out

16  the applicable requirements of section 2003; and

17  (2) not later than 1 year after the date of en-

18  actment of this Act, publish in the Federal Register

19  a final rule to carry out the applicable requirements

20  of section 2003.

# Subtitle B—Keystone XL Permit Approval

23 **SEC. 2011. FINDINGS.**

24  Congress finds that—

19

1        (1) building the Keystone XL pipeline will pro-

2    vide jobs and economic growth to the United States;

3    and

4        (2) the Keystone XL pipeline should be ap-

5    proved immediately.

6  **SEC. 2012. KEYSTONE XL PERMIT APPROVAL.**

7    (a) IN GENERAL.—Notwithstanding Executive Order

8  13337 (3 U.S.C. 301 note; 69 Fed. Reg. 25299 (April 30,

9  2004)), Executive Order 11423 (3 U.S.C. 301 note; 33

10  Fed. Reg. 11741 (August 16, 1968)), section 301 of title

11  3, United States Code, and any other Executive order or

12  provision of law, no presidential permit shall be required

13  for the pipeline described in the application filed on May

14  4, 2012, by TransCanada Corporation to the Department

15  of State for the northern portion of the Keystone XL pipe-

16  line from the Canadian border to the border between the

17  States of South Dakota and Nebraska.

18    (b) ENVIRONMENTAL IMPACT STATEMENT.—The

19  final environmental impact statement issued by the Sec-

20  retary of State on January 31, 2014, regarding the pipe-

21  line referred to in subsection (a), shall be considered to

22  satisfy all requirements of the National Environmental

23  Policy Act of 1969 (42 U.S.C. 4321 et seq.).

24    (c) CRITICAL HABITAT.—No area necessary to con-

25  struct or maintain the Keystone XL pipeline shall be con-

20

1 sidered critical habitat under the Endangered Species Act
2 of 1973 (16 U.S.C. 1531 et seq.) or any other provision
3 of law.

4     (d) PERMITS.—Any Federal permit or authorization
5 issued before the date of enactment of this Act for the
6 pipeline and cross-border facilities described in subsection
7 (a), and the related facilities in the United States, shall
8 remain in effect.

9     (e) FEDERAL JUDICIAL REVIEW.—The pipeline and
10 cross-border facilities described in subsection (a), and the
11 related facilities in the United States, that are approved
12 by this section, and any permit, right-of-way, or other ac-
13 tion taken to construct or complete the project pursuant
14 to Federal law, shall only be subject to judicial review on
15 direct appeal to the United States Court of Appeals for
16 the District of Columbia Circuit.

## 17 TITLE III—OUTER CONTINENTAL
## 18 SHELF LEASING

19 **SEC. 3001. FINDING.**

20     Congress finds that the United States has enormous
21 potential for offshore energy development and that the
22 people of the United States should have access to the jobs
23 and economic benefits from developing those resources.

21

**SEC. 3002. EXTENSION OF LEASING PROGRAM.**

(a) IN GENERAL.—Subject to subsection (c), the Draft Proposed Outer Continental Shelf Oil and Gas Leasing Program 2015–2020 issued by the Secretary of the Interior (referred to in this title as the ''Secretary'') under section 18 of the Outer Continental Shelf Lands Act (43 U.S.C. 1344) shall be considered to be the final oil and gas leasing program under that section for the period of fiscal years 2015 through 2020.

(b) FINAL ENVIRONMENTAL IMPACT STATEMENT.— The Secretary is considered to have issued a final environmental impact statement for the program applicable to the period described in subsection (a) in accordance with all requirements under section 102(2)(C) of the National Environmental Policy Act of 1969 (42 U.S.C. 4332(2)(C)).

(c) EXCEPTIONS.—Lease Sales 214, 232, and 239 shall not be included in the final oil and gas leasing program for the period of fiscal years 2015 through 2020.

**SEC. 3003. LEASE SALES.**

(a) IN GENERAL.—Except as otherwise provided in this section, not later than 180 days after the date of enactment of this Act and every 270 days thereafter, the Secretary shall conduct a lease sale in each outer Continental Shelf planning area for which the Secretary determines that there is a commercial interest in purchasing

22

1 Federal oil and gas leases for production on the outer Con-

2 tinental Shelf.

3     (b) SUBSEQUENT DETERMINATIONS AND SALES.—If

4 the Secretary determines that there is not a commercial

5 interest in purchasing Federal oil and gas leases for pro-

6 duction on the outer Continental Shelf in a planning area

7 under this section, not later than 2 years after the date

8 of the determination and every 2 years thereafter, the Sec-

9 retary shall—

10     (1) make an additional determination on wheth-

11     er there is a commercial interest in purchasing Fed-

12     eral oil and gas leases for production on the outer

13     Continental Shelf in the planning area; and

14     (2) if the Secretary determines that there is a

15     commercial interest under paragraph (1), conduct a

16     lease sale in the planning area.

17     (c) PROTECTION OF STATE INTEREST.—In devel-

18 oping future leasing programs, the Secretary shall give

19 deference to affected coastal States (as the term is used

20 in the Outer Continental Shelf Lands Act (43 U.S.C. 1331

21 et seq.)) in determining leasing areas to be included in

22 the leasing program.

23     (d) PETITIONS.—If a person petitions the Secretary

24 to conduct a lease sale for an outer Continental Shelf plan-

25 ning area in which the person has a commercial interest,

23

1  the Secretary shall conduct a lease sale for the area in

2  accordance with subsection (a).

3  **SEC. 3004. APPLICATIONS FOR PERMITS TO DRILL.**

4     Section 5 of the Outer Continental Shelf Lands Act

5  (43 U.S.C. 1334) is amended by adding at the end the

6  following:

7     "(k) APPLICATIONS FOR PERMITS TO DRILL.—

8       "(1) IN GENERAL.—Subject to paragraph (2),

9     the Secretary shall approve or disapprove an applica-

10     tion for a permit to drill submitted under this Act

11     not later than 20 days after the date on which the

12     application is submitted to the Secretary.

13       "(2) DISAPPROVAL.—If the Secretary dis-

14     approves an application for a permit to drill under

15     paragraph (1), the Secretary shall—

16         "(A) provide to the applicant a description

17       of the reasons for the disapproval of the appli-

18       cation;

19         "(B) allow the applicant to resubmit an

20       application during the 10-day period beginning

21       on the date of the receipt of the description de-

22       scribed in subparagraph (A) by the applicant;

23       and

24         "(C) approve or disapprove any resub-

25       mitted application not later than 10 days after

24

1          the date on which the application is submitted

2          to the Secretary.''.

**SEC. 3005. LEASE SALES FOR CERTAIN AREAS.**

4     (a) IN GENERAL.—As soon as practicable but not

5 later than 1 year after the date of enactment of this Act,

6 the Secretary shall conduct Lease Sale 220 for areas off-

7 shore of the State of Virginia.

8     (b) COMPLIANCE WITH OTHER LAWS.—For pur-

9 poses of the lease sale described in subsection (a), the en-

10 vironmental impact statement prepared under section

11 3001 shall satisfy the requirements of the National Envi-

12 ronmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

13     (c) ENERGY PROJECTS IN GULF OF MEXICO.—

14          (1) JURISDICTION.—The United States Court

15          of Appeals for the Fifth Circuit shall have exclusive

16          jurisdiction over challenges to offshore energy

17          projects and permits to drill carried out in the Gulf

18          of Mexico.

19          (2) FILING DEADLINE.—Any civil action to

20          challenge a project or permit described in paragraph

21          (1) shall be filed not later than 60 days after the

22          date of approval of the project or the issuance of the

23          permit.

25

# TITLE IV—UTILIZING AMERICA'S ONSHORE RESOURCES

**SEC. 4001. FINDINGS.**

Congress finds that—

(1) current policy has failed to take full advantage of the natural resources on Federal land;

(2) the States should be given the option to lead energy development on all available Federal land in a State; and

(3) the Federal Government should not inhibit energy development on Federal land.

**SEC. 4002. STATE OPTION FOR ENERGY DEVELOPMENT.**

Notwithstanding any other provision of this title, a State may elect to control energy development and production on available Federal land in accordance with the terms and conditions of subtitle A and the amendments made by subtitle A in lieu of being subject to the Federal system established under subtitle B and the amendments made by subtitle B.

# Subtitle A—Energy Development by States

**SEC. 4011. DEFINITIONS.**

In this subtitle:

26

(1) AVAILABLE FEDERAL LAND.—The term "available Federal land" means any Federal land that, as of the date of enactment of this Act—

(A) is located within the boundaries of a State;

(B) is not held by the United States in trust for the benefit of a federally recognized Indian tribe;

(C) is not a unit of the National Park System;

(D) is not a unit of the National Wildlife Refuge System; and

(E) is not a congressionally designated wilderness area.

(2) SECRETARY.—The term "Secretary" means the Secretary of the Interior.

(3) STATE.—The term "State" means—

(A) a State; and

(B) the District of Columbia.

**SEC. 4012. STATE PROGRAMS.**

(a) IN GENERAL.—A State—

(1) may establish a program covering the leasing and permitting processes, regulatory requirements, and any other provisions by which the State would exercise the rights of the State to develop all

27

1    forms of energy resources on available Federal land

2    in the State; and

3       (2) as a condition of certification under section

4       4013(b) shall submit a declaration to the Depart-

5       ments of the Interior, Agriculture, and Energy that

6       a program under paragraph (1) has been established

7       or amended.

8    (b) AMENDMENT OF PROGRAMS.—A State may

9 amend a program developed and certified under this sub-

10 title at any time.

11    (c) CERTIFICATION OF AMENDED PROGRAMS.—Any

12 program amended under subsection (b) shall be certified

13 under section 4013(b).

14 **SEC. 4013. LEASING, PERMITTING, AND REGULATORY PRO-**

15        **GRAMS.**

16    (a) SATISFACTION OF FEDERAL REQUIREMENTS.—

17 Each program certified under this section shall be consid-

18 ered to satisfy all applicable requirements of Federal law

19 (including regulations), including—

20       (1) the National Environmental Policy Act of

21       1969 (42 U.S.C. 4321 et seq.);

22       (2) the Endangered Species Act of 1973 (16

23       U.S.C. 1531 et seq.); and

24       (3) the National Historic Preservation Act (16

25       U.S.C. 470 et seq.).

28

1    (b) FEDERAL CERTIFICATION AND TRANSFER OF

2 DEVELOPMENT RIGHTS.—Upon submission of a declara-

3 tion by a State under section 4012(a)(2)—

4        (1) the program under section 4012(a)(1) shall

5        be certified; and

6        (2) the State shall receive all rights from the

7        Federal Government to develop all forms of energy

8        resources covered by the program.

9    (c) ISSUANCE OF PERMITS AND LEASES.—If a State

10 elects to issue a permit or lease for the development of

11 any form of energy resource on any available Federal land

12 within the borders of the State in accordance with a pro-

13 gram certified under subsection (b), the permit or lease

14 shall be considered to meet all applicable requirements of

15 Federal law (including regulations).

**16 SEC. 4014. JUDICIAL REVIEW.**

17    Activities carried out in accordance with this subtitle

18 shall not be subject to Federal judicial review.

**19 SEC. 4015. ADMINISTRATIVE PROCEDURE ACT.**

20    Activities carried out in accordance with this subtitle

21 shall not be subject to subchapter II of chapter 5, and

22 chapter 7, of title 5, United States Code (commonly known

23 as the ''Administrative Procedure Act'').

29

# Subtitle B—Onshore Oil and Gas Permit Streamlining

## PART I—OIL AND GAS LEASING CERTAINTY

**SEC. 4021. MINIMUM ACREAGE REQUIREMENT FOR ON-SHORE LEASE SALES.**

Section 17 of the Mineral Leasing Act (30 U.S.C. 226) is amended—

(1) by striking "SEC. 17. (a) All lands" and inserting the following:

**"SEC. 17. LEASE OF OIL AND GAS LAND.**

"(a) AUTHORITY OF SECRETARY.—

"(1) IN GENERAL.—All land"; and

(2) in subsection (a), by adding at the end the following:

"(2) MINIMUM ACREAGE REQUIREMENT FOR ONSHORE LEASE SALES.—

"(A) IN GENERAL.—In conducting lease sales under paragraph (1)—

"(i) there shall be a presumption that nominated land should be leased; and

"(ii) the Secretary of the Interior shall offer for sale all of the nominated acreage not previously made available for lease, unless the Secretary demonstrates by

30

1         clear and convincing evidence that an indi-

2         vidual lease should not be granted.

3         ''(B) ADMINISTRATION.—Acreage offered

4         for lease pursuant to this paragraph—

5           ''(i) shall not be subject to protest;

6         and

7           ''(ii) shall be eligible for categorical

8         exclusions under section 390 of the Energy

9         Policy Act of 2005 (42 U.S.C. 15942), ex-

10        cept that the categorical exclusions shall

11        not be subject to the test of extraordinary

12        circumstances or any other similar regula-

13        tion or policy guidance.

14        ''(C) AVAILABILITY.—In administering this

15        paragraph, the Secretary shall only consider

16        leasing of Federal land that is available for

17        leasing at the time the lease sale occurs.''.

**18 SEC. 4022. LEASING CERTAINTY.**

19     Section 17(a) of the Mineral Leasing Act (30 U.S.C.

20 226(a)) (as amended by section 4061) is amended by add-

21 ing at the end the following:

22         ''(3) LEASING CERTAINTY.—

23         ''(A) IN GENERAL.—The Secretary of the

24        Interior shall not withdraw any covered energy

25        project (as defined in section 4051 of the Amer-

1    ican Energy Renaissance Act of 2015) issued

2    under this Act without finding a violation of the

3    terms of the lease by the lessee.

4          ''(B) DELAY.—The Secretary shall not in-

5    fringe on lease rights under leases issued under

6    this Act by indefinitely delaying issuance of

7    project approvals, drilling and seismic permits,

8    and rights-of-way for activities under the lease.

9          ''(C) AVAILABILITY FOR LEASE.—Not later

10   than 18 months after an area is designated as

11   open under the applicable land use plan, the

12   Secretary shall make available nominated areas

13   for lease using the criteria established under

14   section 2.

15         ''(D) LAST PAYMENT.—

16             ''(i) IN GENERAL.—Notwithstanding

17         any other provision of law, the Secretary

18         shall issue all leases sold not later than 60

19         days after the last payment is made.

20             ''(ii) CANCELLATION.—The Secretary

21         shall not cancel or withdraw any lease par-

22         cel after a competitive lease sale has oc-

23         curred and a winning bidder has submitted

24         the last payment for the parcel.

25         ''(E) PROTESTS.—

32

1                    ''(i) IN GENERAL.—Not later than the

2                  end of the 60-day period beginning on the

3                  date a lease sale is held under this Act, the

4                  Secretary shall adjudicate any lease pro-

5                  tests filed following a lease sale.

6                    ''(ii) UNSETTLED PROTEST.—If, after

7                  the 60-day period described in clause (i)

8                  any protest is left unsettled—

9                      ''(I) the protest shall be consid-

10                 ered automatically denied; and

11                     ''(II) the appeal rights of the

12                 protestor shall begin.

13            ''(F) ADDITIONAL LEASE STIPULATIONS.—

14        No additional lease stipulation may be added

15        after the parcel is sold without consultation and

16        agreement of the lessee, unless the Secretary

17        considers the stipulation as an emergency ac-

18        tion to conserve the resources of the United

19        States.''.

20  **SEC. 4023. LEASING CONSISTENCY.**

21        A Federal land manager shall follow existing resource

22 management plans and continue to actively lease in areas

23 designated as open when resource management plans are

24 being amended or revised, until such time as a new record

25 of decision is signed.

33

**SEC. 4024. REDUCE REDUNDANT POLICIES.**

Bureau of Land Management Instruction Memorandum 2010–117 shall have no force or effect.

**SEC. 4025. STREAMLINED CONGRESSIONAL NOTIFICATION.**

Section 31(e) of the Mineral Leasing Act (30 U.S.C. 188(e)) is amended in the first sentence of the matter following paragraph (4) by striking "at least thirty days in advance of the reinstatement" and inserting "in an annual report".

## PART II—APPLICATION FOR PERMITS TO DRILL PROCESS REFORM

**SEC. 4031. PERMIT TO DRILL APPLICATION TIMELINE.**

Section 17(p) of the Mineral Leasing Act (30 U.S.C. 226(p)) is amended by striking paragraph (2) and inserting the following:

"(2) APPLICATIONS FOR PERMITS TO DRILL REFORM AND PROCESS.—

"(A) IN GENERAL.—Not later than the end of the 30-day period beginning on the date an application for a permit to drill is received by the Secretary, the Secretary shall decide whether to issue the permit.

"(B) EXTENSION.—

"(i) IN GENERAL.—The Secretary may extend the period described in subparagraph (A) for up to 2 periods of 15

34

1         days each, if the Secretary has given writ-

2         ten notice of the delay to the applicant.

3                "(ii) NOTICE.—The notice shall—

4                    "(I) be in the form of a letter

5                  from the Secretary or a designee of

6                  the Secretary; and

7                    "(II) include—

8                      "(aa) the names and titles

9                    of the persons processing the ap-

10                    plication;

11                      "(bb) the specific reasons

12                    for the delay; and

13                      "(cc) a specific date a final

14                    decision on the application is ex-

15                    pected.

16        "(C) NOTICE OF REASONS FOR DENIAL.—

17        If the application is denied, the Secretary shall

18        provide the applicant—

19                "(i) a written statement that provides

20                clear and comprehensive reasons why the

21                application was not accepted and detailed

22                information concerning any deficiencies;

23                and

24                "(ii) an opportunity to remedy any de-

25                ficiencies.

35

1     "(D) APPLICATION DEEMED APPROVED.—

2       "(i) IN GENERAL.—Except as pro-

3      vided in clause (ii), if the Secretary has

4      not made a decision on the application by

5      the end of the 60-day period beginning on

6      the date the application is received by the

7      Secretary, the application shall be consid-

8      ered approved.

9       "(ii) EXCEPTIONS.—Clause (i) shall

10      not apply in cases in which existing reviews

11      under the National Environmental Policy

12      Act of 1969 (42 U.S.C. 4321 et seq.) or

13      Endangered Species Act of 1973 (16

14      U.S.C. 1531 et seq.) are incomplete.

15     "(E) DENIAL OF PERMIT.—If the Sec-

16    retary decides not to issue a permit to drill

17    under this paragraph, the Secretary shall—

18      "(i) provide to the applicant a descrip-

19      tion of the reasons for the denial of the

20      permit;

21      "(ii) allow the applicant to resubmit

22      an application for a permit to drill during

23      the 10-day period beginning on the date

24      the applicant receives the description of

25      the denial from the Secretary; and

1       "(iii) issue or deny any resubmitted
2       application not later than 10 days after the
3       date the application is submitted to the
4       Secretary.
5       "(F) Fee.—
6           "(i) In general.—Notwithstanding
7       any other provision of law, the Secretary
8       shall collect a single $6,500 permit proc-
9       essing fee per application from each appli-
10      cant at the time the final decision is made
11      whether to issue a permit under subpara-
12      graph (A).
13          "(ii) Resubmitted application.—
14      The fee required under clause (i) shall not
15      apply to any resubmitted application.
16          "(iii) Treatment of permit proc-
17      essing fee.—Subject to appropriation, of
18      all fees collected under this paragraph for
19      each fiscal year, 50 percent shall be—
20              "(I) transferred to the field office
21          at which the fees are collected; and
22              "(II) used to process protests,
23          leases, and permits under this Act.".

37

1 SEC. 4032. ADMINISTRATIVE PROTEST DOCUMENTATION

2            REFORM.

3       Section 17(p) of the Mineral Leasing Act (30 U.S.C.

4 226(p)) (as amended by section 4031) is amended by add-

5 ing at the end the following:

6       "(4) PROTEST FEE.—

7            "(A) IN GENERAL.—The Secretary shall

8            collect a $5,000 documentation fee to accom-

9            pany each administrative protest for a lease,

10           right-of-way, or application for a permit to drill.

11           "(B) TREATMENT OF FEES.—Subject to

12           appropriation, of all fees collected under this

13           paragraph for each fiscal year, 50 percent

14           shall—

15                "(i) remain in the field office at which

16                the fees are collected; and

17                "(ii) be used to process protests.".

18 SEC. 4033. IMPROVED FEDERAL ENERGY PERMIT COORDI-

19           NATION.

20      (a) DEFINITIONS.—In this section:

21      (1) ENERGY PROJECT.—The term "energy

22      project" includes any oil, natural gas, coal, or other

23      energy project, as defined by the Secretary.

24      (2) PROJECT.—The term "Project" means the

25      Federal Permit Streamlining Project established

26      under subsection (b).

38

1       (3) SECRETARY.—The term ''Secretary'' means

2     the Secretary of the Interior.

3     (b) ESTABLISHMENT.—The Secretary shall establish

4 a Federal Permit Streamlining Project in each Bureau of

5 Land Management field office with responsibility for per-

6 mitting energy projects on Federal land.

7     (c) MEMORANDUM OF UNDERSTANDING.—

8       (1) IN GENERAL.—Not later than 90 days after

9       the date of enactment of this Act, the Secretary

10       shall enter into a memorandum of understanding for

11       purposes of carrying out this section with—

12           (A) the Secretary of Agriculture;

13           (B) the Administrator of the Environ-

14           mental Protection Agency; and

15           (C) the Chief of Engineers.

16       (2) STATE PARTICIPATION.—The Secretary

17       may request that the Governor of any State with en-

18       ergy projects on Federal land to be a signatory to

19       the memorandum of understanding.

20     (d) DESIGNATION OF QUALIFIED STAFF.—

21       (1) IN GENERAL.—Not later than 30 days after

22       the date of the signing of the memorandum of un-

23       derstanding under subsection (c), each Federal sig-

24       natory party shall, if appropriate, assign to each Bu-

25       reau of Land Management field office an employee

39

1  who has expertise in the regulatory issues relating to
2  the office in which the employee is employed, includ-
3  ing, as applicable, particular expertise in—

4      (A) the consultations and the preparation
5      of biological opinions under section 7 of the En-
6      dangered Species Act of 1973 (16 U.S.C.
7      1536);

8      (B) permits under section 404 of the Fed-
9      eral Water Pollution Control Act (33 U.S.C.
10     1344);

11     (C) regulatory matters under the Clean Air
12     Act (42 U.S.C. 7401 et seq.);

13     (D) planning under the National Forest
14     Management Act of 1976 (16 U.S.C. 1600 et
15     seq.); and

16     (E) the preparation of analyses under the
17     National Environmental Policy Act of 1969 (42
18     U.S.C. 4321 et seq.).

19  (2) DUTIES.—Each employee assigned under
20  paragraph (1) shall—

21     (A) not later than 90 days after the date
22     of assignment, report to the Bureau of Land
23     Management Field Managers in the office to
24     which the employee is assigned;

40

(B) be responsible for all issues relating to
the energy projects that arise under the au-
thorities of the home agency of the employee;
and

(C) participate as part of the team of per-
sonnel working on proposed energy projects,
planning, and environmental analyses on Fed-
eral land.

(e) ADDITIONAL PERSONNEL.—The Secretary shall
assign to each Bureau of Land Management field office
described in subsection (b) any additional personnel that
are necessary to ensure the effective approval and imple-
mentation of energy projects administered by the Bureau
of Land Management field office, including inspection and
enforcement relating to energy development on Federal
land, in accordance with the multiple use mandate of the
Federal Land Policy and Management Act of 1976 (43
U.S.C. 1701 et seq.).

(f) FUNDING.—Funding for the additional personnel
shall come from the Department of the Interior reforms
under paragraph (2) of section 17(p) of the Mineral Leas-
ing Act (30 U.S.C. 226(p)) (as amended by section 4031
and section 4032).

(g) SAVINGS PROVISION.—Nothing in this section af-
fects—

41

1        (1) the operation of any Federal or State law;

2     or

3        (2) any delegation of authority made by the

4     head of a Federal agency any employee of which is

5     participating in the Project.

**SEC. 4034. ADMINISTRATION.**

7     Notwithstanding any other provision of law, the Sec-

8  retary of the Interior shall not require a finding of extraor-

9  dinary circumstances in administering section 390 of the

10  Energy Policy Act of 2005 (42 U.S.C. 15942).

11              **PART III—OIL SHALE**

12  **SEC. 4041. EFFECTIVENESS OF OIL SHALE REGULATIONS,**

13             **AMENDMENTS TO RESOURCE MANAGEMENT**

14             **PLANS, AND RECORD OF DECISION.**

15  (a) REGULATIONS.—

16        (1) IN GENERAL.—Notwithstanding any other

17     provision of law (including regulations), the final

18     regulations regarding oil shale management pub-

19     lished by the Bureau of Land Management on No-

20     vember 18, 2008 (73 Fed. Reg. 69414), shall be

21     considered to satisfy all legal and procedural re-

22     quirements under any law, including—

23        (A) the Federal Land Policy and Manage-

24     ment Act of 1976 (43 U.S.C. 1701 et seq.);

42

1         (B) the Endangered Species Act of 1973

2       (16 U.S.C. 1531 et seq.); and

3         (C) the National Environmental Policy Act

4       of 1969 (42 U.S.C. 4321 et seq.).

5       (2) IMPLEMENTATION.—The Secretary of the

6   Interior shall implement the regulations described in

7   paragraph (1) (including the oil shale leasing pro-

8   gram authorized by the regulations) without any

9   other administrative action necessary.

10  (b) AMENDMENTS TO RESOURCE MANAGEMENT

11 PLANS AND RECORD OF DECISION.—

12      (1) IN GENERAL.—Notwithstanding any other

13   provision of law (including regulations) to the con-

14   trary, the Approved Resource Management Plan

15   Amendments/Record of Decision for Oil Shale and

16   Tar Sands Resources to Address Land Use Alloca-

17   tions in Colorado, Utah, and Wyoming and the Final

18   Programmatic Environmental Impact Statement of

19   the Bureau of Land Management, as in effect on

20   November 17, 2008, shall be considered to satisfy all

21   legal and procedural requirements under any law, in-

22   cluding—

23      (A) the Federal Land Policy and Manage-

24     ment Act of 1976 (43 U.S.C. 1701 et seq.);

43

1          (B) the Endangered Species Act of 1973

2      (16 U.S.C. 1531 et seq.); and

3          (C) the National Environmental Policy Act

4      of 1969 (42 U.S.C. 4321 et seq.).

5      (2) IMPLEMENTATION.—The Secretary of the

6  Interior shall implement the oil shale leasing pro-

7  gram authorized by the regulations described in

8  paragraph (1) in those areas covered by the resource

9  management plans covered by the amendments, and

10  covered by the record of decision, described in para-

11  graph (1) without any other administrative action

12  necessary.

13  **SEC. 4042. OIL SHALE LEASING.**

14  (a) ADDITIONAL RESEARCH AND DEVELOPMENT

15  LEASE SALES.—Not later than 180 days after the date

16  of enactment of this Act, the Secretary of the Interior

17  shall hold a lease sale offering an additional 10 parcels

18  for lease for research, development, and demonstration of

19  oil shale resources, under the terms offered in the solicita-

20  tion of bids for such leases published on January 15, 2009

21  (74 Fed. Reg. 2611).

22  (b) COMMERCIAL LEASE SALES.—

23      (1) IN GENERAL.—Not later than January 1,

24      2017, the Secretary of the Interior shall hold not

25      less than 5 separate commercial lease sales in areas

44

1    considered to have the most potential for oil shale

2    development, as determined by the Secretary, in

3    areas nominated through public comment.

4         (2) ADMINISTRATION.—Each lease sale shall

5    be—

6              (A) for an area of not less than 25,000

7         acres; and

8              (B) in multiple lease blocs.

9    **PART IV—NATIONAL PETROLEUM RESERVE IN**

10        **ALASKA ACCESS**

11   **SEC. 4051. SENSE OF CONGRESS AND REAFFIRMING NA-**

12        **TIONAL POLICY FOR THE NATIONAL PETRO-**

13        **LEUM RESERVE IN ALASKA.**

14   It is the sense of Congress that—

15        (1) the National Petroleum Reserve in Alaska

16   remains explicitly designated, both in name and legal

17   status, for purposes of providing oil and natural gas

18   resources to the United States; and

19        (2) accordingly, the national policy is to actively

20   advance oil and gas development within the Reserve

21   by facilitating the expeditious exploration, produc-

22   tion, and transportation of oil and natural gas from

23   and through the Reserve.

1  **SEC. 4052. NATIONAL PETROLEUM RESERVE IN ALASKA:**

2  **LEASE SALES.**

3      Section 107 of the Naval Petroleum Reserves Produc-

4  tion Act of 1976 (42 U.S.C. 6506a) is amended by strik-

5  ing subsection (a) and inserting the following:

6      "(a) IN GENERAL.—The Secretary shall conduct an

7  expeditious program of competitive leasing of oil and gas

8  in the Reserve—

9          "(1) in accordance with this Act; and

10          "(2) that shall include at least 1 lease sale an-

11      nually in the areas of the Reserve most likely to

12      produce commercial quantities of oil and natural gas

13      for each of calendar years 2015 through 2024.".

14  **SEC. 4053. NATIONAL PETROLEUM RESERVE IN ALASKA:**

15      **PLANNING AND PERMITTING PIPELINE AND**

16      **ROAD CONSTRUCTION.**

17      (a) IN GENERAL.—Notwithstanding any other provi-

18  sion of law, the Secretary of the Interior, in consultation

19  with other appropriate Federal agencies, shall facilitate

20  and ensure permits, in a timely and environmentally re-

21  sponsible manner, for all surface development activities,

22  including for the construction of pipelines and roads, nec-

23  essary—

24          (1) to develop and bring into production any

25      areas within the National Petroleum Reserve in

26      Alaska that are subject to oil and gas leases; and

46

1      (2) to transport oil and gas from and through

2      the National Petroleum Reserve in Alaska in the

3      most direct manner possible to existing transpor-

4      tation or processing infrastructure on the North

5      Slope of Alaska.

6    (b) TIMELINE.—The Secretary shall ensure that any

7  Federal permitting agency shall issue permits in accord-

8  ance with the following timeline:

9      (1) Permits for the construction described in

10      subsection (a) for transportation of oil and natural

11      gas produced under existing Federal oil and gas

12      leases with respect to which the Secretary has issued

13      a permit to drill shall be approved not later than 60

14      days after the date of enactment of this Act.

15      (2) Permits for the construction described in

16      subsection (a) for transportation of oil and natural

17      gas produced under Federal oil and gas leases shall

18      be approved not later than 180 days after the date

19      on which a request for a permit to drill is submitted

20      to the Secretary.

21    (c) PLAN.—To ensure timely future development of

22  the National Petroleum Reserve in Alaska, not later than

23  270 days after the date of enactment of this Act, the Sec-

24  retary of the Interior shall submit to Congress a plan for

25  approved rights-of-way for a plan for pipeline, road, and

47

1 any other surface infrastructure that may be necessary in-
2 frastructure that will ensure that all leasable tracts in the
3 Reserve are within 25 miles of an approved road and pipe-
4 line right-of-way that can serve future development of the
5 Reserve.

6 **SEC. 4054. ISSUANCE OF A NEW INTEGRATED ACTIVITY**
7 **PLAN AND ENVIRONMENTAL IMPACT STATE-**
8 **MENT.**

9 (a) ISSUANCE OF NEW INTEGRATED ACTIVITY
10 PLAN.—Not later than 180 days after the date of enact-
11 ment of this Act, the Secretary of the Interior shall
12 issue—

13 (1) a new proposed integrated activity plan
14 from among the nonadopted alternatives in the Na-
15 tional Petroleum Reserve Alaska-Integrated Activity
16 Plan Record of Decision issued by the Secretary of
17 the Interior and dated February 21, 2013; and

18 (2) an environmental impact statement under
19 section 102(2)(C) of the National Environmental
20 Policy Act of 1969 (42 U.S.C. 4332(2)(C)) for
21 issuance of oil and gas leases in the National Petro-
22 leum Reserve-Alaska to promote efficient and max-
23 imum development of oil and natural gas resources
24 of the Reserve.

48

1    (b) NULLIFICATION OF EXISTING RECORD OF DECI-
2  SION, IAP, AND EIS.—Except as provided in subsection
3  (a), the National Petroleum Reserve-Alaska Integrated
4  Activity Plan Record of Decision issued by the Secretary
5  of the Interior and dated February 21, 2013, including
6  the integrated activity plan and environmental impact
7  statement referred to in that record of decision, shall have
8  no force or effect.

9  **SEC. 4055. DEPARTMENTAL ACCOUNTABILITY FOR DEVEL-**
10              **OPMENT.**

11   The Secretary of the Interior shall promulgate regu-
12  lations not later than 180 days after the date of enactment
13  of this Act that establish clear requirements to ensure that
14  the Department of the Interior is supporting development
15  of oil and gas leases in the National Petroleum Reserve-
16  Alaska.

17  **SEC. 4056. DEADLINES UNDER NEW PROPOSED INTE-**
18              **GRATED ACTIVITY PLAN.**

19   At a minimum, the new proposed integrated activity
20  plan issued under section 4054(a)(1) shall—

21       (1) require the Department of the Interior to
22       respond within 5 business days to a person who sub-
23       mits an application for a permit for development of
24       oil and natural gas leases in the National Petroleum

49

1    Reserve-Alaska acknowledging receipt of the applica-

2    tion; and

3        (2) establish a timeline for the processing of

4    each application that—

5            (A) specifies deadlines for decisions and

6        actions on permit applications; and

7            (B) provides that the period for issuing a

8        permit after the date on which the application

9        is submitted shall not exceed 60 days without

10        the concurrence of the applicant.

11   **SEC. 4057. UPDATED RESOURCE ASSESSMENT.**

12       (a) IN GENERAL.—The Secretary of the Interior shall

13   complete a comprehensive assessment of all technically re-

14   coverable fossil fuel resources within the National Petro-

15   leum Reserve in Alaska, including all conventional and un-

16   conventional oil and natural gas.

17       (b) COOPERATION AND CONSULTATION.—The as-

18   sessment required by subsection (a) shall be carried out

19   by the United States Geological Survey in cooperation and

20   consultation with the State of Alaska and the American

21   Association of Petroleum Geologists.

22       (c) TIMING.—The assessment required by subsection

23   (a) shall be completed not later than 2 years after the

24   date of enactment of this Act.

50

1    (d) FUNDING.—In carrying out this section, the

2  United States Geological Survey may cooperatively use re-

3  sources and funds provided by the State of Alaska.

4          **PART V—MISCELLANEOUS PROVISIONS**

5  **SEC. 4061. SANCTIONS.**

6    Nothing in this title authorizes the issuance of a lease

7  under the Mineral Leasing Act (30 U.S.C. 181 et seq.)

8  to any person designated for the imposition of sanctions

9  pursuant to—

10       (1) the Syria Accountability and Lebanese Sov-

11      ereignty Restoration Act of 2003 (22 U.S.C. 2151

12      note; Public Law 108–175);

13       (2) the Comprehensive Iran Sanctions, Account-

14      ability, and Divestiture Act of 2010 (22 U.S.C. 8501

15      et seq.);

16       (3) section 1245 of the National Defense Au-

17      thorization Act for Fiscal Year 2012 (22 U.S.C.

18      8513a);

19       (4) the Iran Threat Reduction and Syria

20      Human Rights Act of 2012 (22 U.S.C. 8701 et

21      seq.);

22       (5) the Iran Freedom and Counter-Proliferation

23      Act of 2012 (22 U.S.C. 8801 et seq.);

24       (6) the Iran Sanctions Act of 1996 (50 U.S.C.

25      1701 note; Public Law 104–172);

51

1     (7) Executive Order 13224 (50 U.S.C. 1701

2     note; relating to blocking property and prohibiting

3     transactions with persons who commit, threaten to

4     commit, or support terrorism);

5     (8) Executive Order 13338 (50 U.S.C. 1701

6     note; relating to blocking property of certain persons

7     and prohibiting the export of certain goods to

8     Syria);

9     (9) Executive Order 13622 (50 U.S.C. 1701

10     note; relating to authorizing additional sanctions

11     with respect to Iran);

12     (10) Executive Order 13628 (50 U.S.C. 1701

13     note; relating to authorizing additional sanctions

14     with respect to Iran); or

15     (11) Executive Order 13645 (50 U.S.C. 1701

16     note; relating to authorizing additional sanctions

17     with respect to Iran).

18 **SEC. 4062. ENSURING CONSIDERATION OF ECONOMIC IM-**

19         **PACTS OF PROTECTIONS FOR ENDANGERED**

20         **SPECIES AND THREATENED SPECIES.**

21     (a) IN GENERAL.—Section 13 of the Endangered

22 Species Act of 1973 (87 Stat. 902; relating to conforming

23 amendments to other laws, which have been executed) is

24 amended to read as follows:

52

1 **"SEC. 13. ENSURING THE CONSIDERATION OF THE ECO-**
2 **NOMIC IMPACTS OF PROTECTIONS.**

3 "(a) CONSIDERATION OF ECONOMIC COSTS AND

4 BENEFITS.—Notwithstanding any other provision of this

5 Act, any authorization, requirement, or prohibition of, or

6 other restriction on, any action by a Federal agency or

7 other person under this Act shall not apply with respect

8 to a species determined by the Secretary to be an endan-

9 gered species or threatened species, unless—

10     "(1) the Secretary has published and submitted

11     to Congress a report that—

12         "(A) describes the application;

13         "(B) sets forth the data considered by the

14         Secretary regarding the economic costs and

15         benefits of the application; and

16         "(C) determines that the economic benefits

17         of the application exceed the economic costs of

18         the application; and

19     "(2) the application is authorized expressly with

20     respect to that species in a law enacted by Congress

21     after the date of enactment of the American Energy

22     Renaissance Act of 2015.

23 "(b) LIMITATIONS.—Subsection (a)—

24     "(1) does not affect any authority of the Sec-

25     retary under this Act—

53

1          ''(A) to determine that a species is an en-

2     dangered species or threatened species and des-

3     ignate the critical habitat of that species;

4          ''(B) to conduct research regarding a spe-

5     cies or the critical habitat of that species; or

6          ''(C) to prepare, publish, or revise lists, or

7     conduct reviews, under section 4(c);

8     ''(2) does not apply with respect to a species

9 if—

10          ''(A) the Secretary—

11               ''(i) determines that prompt applica-

12          tion of an authorization, requirement, or

13          prohibition under this Act is necessary to

14          prevent the extinction of the species; and

15               ''(ii) convenes a meeting of the En-

16          dangered Species Committee to consider

17          that determination, except that for pur-

18          poses of this paragraph each member of

19          the Committee from an affected State

20          under section 4(e)(3)(G) shall be appointed

21          by the Governor of that State; and

22          ''(B) the Committee—

23               ''(i) concurs in that determination by

24          not later than 30 days after the date the

25          Secretary convenes the Committee; and

54

1          ''(ii) the vote to concur in that deter-

2          mination is unanimous, with all 7 votes in

3          favor; and

4     ''(3) does not affect the application of this Act

5 with respect to a species that is included in the list

6 in effect under section 4(c) on the date of enactment

7 of the American Energy Renaissance Act of 2015,

8 during the 15-year period beginning on that date of

9 enactment.

10 ''(c) CHANGE IN STATUS OF SPECIES.—

11     ''(1) IN GENERAL.—A species shall not be

12 treated under this Act as an endangered species or

13 threatened species after the end of the 15-year pe-

14 riod beginning on the date the Secretary determines

15 under this Act that the species is an endangered

16 species or a threatened species, unless the Secretary

17 determines under section 4(c)(2), after the end of

18 the 10-year period beginning on that date, that the

19 species should not be changed in status.

20     ''(2) APPLICATION WITH RESPECT TO PRE-

21 VIOUSLY LISTED SPECIES.—In the case of a species

22 included in a list under section 4(c) in effect on the

23 date of enactment of the American Energy Renais-

24 sance Act of 2015, paragraph (1) shall be applied by

25 substituting that date of enactment for the date 'the

55

1    Secretary determines under this Act that the species

2    is an endangered species or a threatened species'.''.

3    (b) CONFORMING AMENDMENT.—The table of con-

4    tents for the Endangered Species Act of 1973 (15 U.S.C.

5    1531 note) is amended by striking the item relating to

6    section 13 and inserting the following:

"Sec. 13. Ensuring the consideration of the economic impacts of protections.''.

7    **PART VI—JUDICIAL REVIEW**

8    **SEC. 4071. DEFINITIONS.**

9    In this part:

10    (1) COVERED CIVIL ACTION.—The term ''cov-

11    ered civil action'' means a civil action containing a

12    claim under section 702 of title 5, United States

13    Code, regarding agency action (as defined for the

14    purposes of that section) affecting a covered energy

15    project on Federal land.

16    (2) COVERED ENERGY PROJECT.—

17    (A) IN GENERAL.—The term ''covered en-

18    ergy project'' means—

19    (i) the leasing of Federal land for the

20    exploration, development, production, proc-

21    essing, or transmission of oil, natural gas,

22    wind, or any other source of energy; and

23    (ii) any action under the lease.

24    (B) EXCLUSION.—The term ''covered en-

25    ergy project'' does not include any dispute be-

56

1  tween the parties to a lease regarding the obli-
2  gations under the lease, including any alleged
3  breach of the lease.

4  **SEC. 4072. EXCLUSIVE VENUE FOR CERTAIN CIVIL ACTIONS**
5  **RELATING TO COVERED ENERGY PROJECTS.**

6  Venue for any covered civil action shall lie in the
7  United States district court in which the covered energy
8  project or lease exists or is proposed.

9  **SEC. 4073. TIMELY FILING.**

10  To ensure timely redress by the courts, a covered civil
11  action shall be filed not later than the end of the 90-day
12  period beginning on the date of the final Federal agency
13  action to which the covered civil action relates.

14  **SEC. 4074. EXPEDITION IN HEARING AND DETERMINING**
15  **THE ACTION.**

16  The court shall endeavor to hear and determine any
17  covered civil action as expeditiously as practicable.

18  **SEC. 4075. LIMITATION ON INJUNCTION AND PROSPECTIVE**
19  **RELIEF.**

20  (a) IN GENERAL.—In a covered civil action, a court
21  shall not grant or approve any prospective relief unless
22  the court finds that the relief—

23  (1) is narrowly drawn;

24  (2) extends no further than necessary to correct

25  the violation of a legal requirement; and

57

1     (3) is the least intrusive means necessary to

2    correct the violation.

3    (b) DURATION.—

4     (1) IN GENERAL.—A court shall limit the dura-

5    tion of preliminary injunctions to halt covered en-

6    ergy projects to not more than 60 days, unless the

7    court finds clear reasons to extend the injunction.

8     (2) ADMINISTRATION.—In the case of an exten-

9    sion, the extension shall—

10      (A) only be in 30-day increments; and

11      (B) require action by the court to renew

12     the injunction.

**SEC. 4076. LIMITATION ON ATTORNEYS' FEES AND COURT**

13

14        **COSTS.**

15    (a) IN GENERAL.—Sections 504 of title 5 and 2412

16 of title 28, United States Code (commonly known as the

17 "Equal Access to Justice Act"), shall not apply to a cov-

18 ered civil action.

19    (b) COURT COSTS.—A party to a covered civil action

20 shall not receive payment from the Federal Government

21 for the attorneys' fees, expenses, or other court costs in-

22 curred by the party.

**SEC. 4077. LEGAL STANDING.**

23

24    A challenger that files an appeal with the Department

25 of the Interior Board of Land Appeals shall meet the same

58

1  standing requirements as a challenger before a United

2  States district court.

# TITLE V—ADDITIONAL ONSHORE RESOURCES

## Subtitle A—Leasing Program for Land Within Coastal Plain

**SEC. 5001. FINDING.**

8  Congress finds that development of energy reserves

9  under the Coastal Plain of Alaska, performed in an envi-

10  ronmentally responsible manner, will contribute to job

11  growth and economic development.

**SEC. 5002. DEFINITIONS.**

13  In this subtitle:

14  (1) COASTAL PLAIN.—The term "Coastal

15  Plain" means the area described in appendix I to

16  part 37 of title 50, Code of Federal Regulations.

17  (2) PEER REVIEWED.—The term "peer re-

18  viewed" means reviewed—

19  (A) by individuals chosen by the National

20  Academy of Sciences with no contractual rela-

21  tionship with, or those who have no application

22  for a grant or other funding pending with, the

23  Federal agency with leasing jurisdiction; or

24  (B) if individuals described in subpara-

25  graph (A) are not available, by the top individ-

59

1 uals in the specified biological fields, as deter-

2 mined by the National Academy of Sciences.

3 (3) SECRETARY.—The term "Secretary" means

4 the Secretary of the Interior.

5 **SEC. 5003. LEASING PROGRAM FOR LAND ON THE COASTAL**

6 **PLAIN.**

7 (a) IN GENERAL.—The Secretary shall—

8 (1) establish and implement, in accordance with

9 this subtitle and acting through the Director of the

10 Bureau of Land Management in consultation with

11 the Director of the United States Fish and Wildlife

12 Service, a competitive oil and gas leasing program

13 that will result in the exploration, development, and

14 production of the oil and gas resources of the Coast-

15 al Plain; and

16 (2) administer the provisions of this subtitle

17 through regulations, lease terms, conditions, restric-

18 tions, prohibitions, stipulations, and other provisions

19 that ensure the oil and gas exploration, development,

20 and production activities on the Coastal Plain do not

21 result in any significant adverse effect on fish and

22 wildlife, the habitat of fish and wildlife, subsistence

23 resources, or the environment, including, in further-

24 ance of this goal, by requiring the application of the

25 best commercially available technology for oil and

60

1    gas exploration, development, and production to all

2    exploration, development, and production operations

3    under this subtitle in a manner that ensures the re-

4    ceipt of fair market value by the public for the min-

5    eral resources to be leased.

6    (b) REPEAL OF EXISTING RESTRICTION.—

7        (1) REPEAL.—Section 1003 of the Alaska Na-

8    tional Interest Lands Conservation Act (16 U.S.C.

9    3143) is repealed.

10       (2) CONFORMING AMENDMENT.—The table of

11   contents contained in section 1 of that Act (16

12   U.S.C. 3101 note) is amended by striking the item

13   relating to section 1003.

14   (c) COMPLIANCE WITH REQUIREMENTS UNDER CER-

15   TAIN OTHER LAWS.—

16       (1) COMPATIBILITY.—For purposes of the Na-

17   tional Wildlife Refuge System Administration Act of

18   1966 (16 U.S.C. 668dd et seq.), the oil and gas

19   leasing program and activities authorized by this

20   section on the Coastal Plain are deemed to be com-

21   patible with the purposes for which the Arctic Na-

22   tional Wildlife Refuge was established, and no fur-

23   ther findings or decisions are required to implement

24   this determination.

1    (2) ADEQUACY OF THE DEPARTMENT OF THE

2    INTERIOR'S LEGISLATIVE ENVIRONMENTAL IMPACT

3    STATEMENT.—The document of the Department of

4    the Interior entitled "Final Legislative Environ-

5    mental Impact Statement" and dated April 1987 re-

6    lating to the Coastal Plain prepared pursuant to sec-

7    tion 1002 of the Alaska National Interest Lands

8    Conservation Act (16 U.S.C. 3142) and section

9    102(2)(C) of the National Environmental Policy Act

10    of 1969 (42 U.S.C. 4332(2)(C)) is deemed to satisfy

11    the requirements under the National Environmental

12    Policy Act of 1969 (42 U.S.C. 4321 et seq.) that

13    apply with respect to prelease activities under this

14    subtitle, including actions authorized to be taken by

15    the Secretary to develop and promulgate regulations

16    for the establishment of a leasing program author-

17    ized by this subtitle before the conduct of the first

18    lease sale.

19    (3) COMPLIANCE WITH NEPA FOR OTHER AC-

20    TIONS.—

21        (A) IN GENERAL.—Prior to conducting the

22        first lease sale under this subtitle, the Secretary

23        shall prepare an environmental impact state-

24        ment under the National Environmental Policy

25        Act of 1969 (42 U.S.C. 4321 et seq.) with re-

62

1  spect to the actions authorized by this subtitle
2  not covered by paragraph (2).
3      (B) NONLEASING ALTERNATIVES NOT RE-
4  QUIRED.—Notwithstanding any other provision
5  of law, in preparing the environmental impact
6  statement under subparagraph (A), the Sec-
7  retary—
8          (i) shall—
9              (I) only identify a preferred ac-
10         tion for leasing and a single leasing
11         alternative; and
12             (II) analyze the environmental ef-
13         fects and potential mitigation meas-
14         ures for those 2 alternatives; and
15         (ii) is not required—
16             (I) to identify nonleasing alter-
17         native courses of action; or
18             (II) to analyze the environmental
19         effects of nonleasing alternative
20         courses of action.
21      (C) DEADLINE.—The identification under
22  subparagraph (B)(i)(I) for the first lease sale
23  conducted under this subtitle shall be completed
24  not later than 18 months after the date of en-
25  actment of this Act.

(D) PUBLIC COMMENT.—The Secretary
shall only consider public comments that—

(i) specifically address the preferred
action of the Secretary; and

(ii) are filed not later than 20 days
after the date on which the environmental
analysis is published.

(E) COMPLIANCE.—Notwithstanding any
other provision of law, compliance with this
paragraph is deemed to satisfy all requirements
for the analysis and consideration of the envi-
ronmental effects of proposed leasing under this
subtitle.

(d) RELATIONSHIP TO STATE AND LOCAL AUTHOR-
ITY.—Nothing in this subtitle expands or limits State or
local regulatory authority.

(e) SPECIAL AREAS.—

(1) IN GENERAL.—The Secretary, after con-
sultation with the State of Alaska, the city of
Kaktovik and the North Slope Borough of the State
of Alaska, may designate not more than 45,000
acres of the Coastal Plain as a ''Special Area'' if the
Secretary determines that the area is of such unique
character and interest so as to require special man-
agement and regulatory protection.

64

1    (2) SADLEROCHIT SPRING AREA.—The Sec-

2 retary shall designate the Sadlerochit Spring area,

3 consisting of approximately 4,000 acres, as a Special

4 Area.

5    (3) MANAGEMENT.—Each Special Area shall be

6 managed To protect and preserve the unique and di-

7 verse character of the area, including the fish, wild-

8 life, and subsistence resource values of the area.

9    (4) EXCLUSION FROM LEASING OR SURFACE

10 OCCUPANCY.—

11    (A) IN GENERAL.—The Secretary may ex-

12 clude any Special Area from leasing.

13    (B) NO SURFACE OCCUPANCY.—If the Sec-

14 retary leases a Special Area, or any part of a

15 Special Area, for oil and gas exploration, devel-

16 opment, production, or related activities, there

17 shall be no surface occupancy of the land com-

18 prising the Special Area.

19    (5) DIRECTIONAL DRILLING.—Notwithstanding

20 the other provisions of this subsection, the Secretary

21 may lease all or a portion of a Special Area under

22 terms that permit the use of horizontal drilling tech-

23 nology from sites on leases tracts located outside the

24 Special Area.

65

1     (f) LIMITATION ON CLOSED AREAS.—The authority

2 of the Secretary to close land on the Coastal Plain to oil

3 and gas leasing, exploration, development, or production

4 shall be limited to the authority provided under this sub-

5 title.

6     (g) REGULATIONS.—

7         (1) IN GENERAL.—Not later than 15 months

8         after the date of enactment of this Act, the Sec-

9         retary shall promulgate regulations necessary to

10        carry out this subtitle, including regulations relating

11        to protection of fish and wildlife, the habitat of fish

12        and wildlife, subsistence resources, and environment

13        of the Coastal Plain.

14        (2) REVISION OF REGULATIONS.—The Sec-

15        retary shall, through a rulemaking conducted in ac-

16        cordance with section 553 of title 5, United States

17        Code, periodically review and, if appropriate, revise

18        the regulations promulgated under paragraph (1) to

19        reflect a preponderance of the best available sci-

20        entific evidence that has been peer reviewed and ob-

21        tained by following appropriate, documented sci-

22        entific procedures, the results of which can be re-

23        peated using those same procedures.

1 **SEC. 5004. LEASE SALES.**

2   (a) IN GENERAL.—In accordance with the require-

3 ments of this subtitle, the Secretary may lease land under

4 this subtitle to any person qualified to obtain a lease for

5 deposits of oil and gas under the Mineral Leasing Act (30

6 U.S.C. 181 et seq.).

7   (b) PROCEDURES.—The Secretary shall, by regula-

8 tion and not later than 180 days after the date of enact-

9 ment of this Act, establish procedures for—

10     (1) receipt and consideration of sealed nomina-

11   tions for any area of the Coastal Plain for inclusion

12   in, or exclusion from, a lease sale;

13     (2) the holding of lease sales after the nomina-

14   tion process; and

15     (3) public notice of and comment on designa-

16   tion of areas to be included in, or excluded from, a

17   lease sale.

18   (c) LEASE SALE BIDS.—Lease sales under this sub-

19 title may be conducted through an Internet leasing pro-

20 gram, if the Secretary determines that the Internet leasing

21 program will result in savings to the taxpayer, an increase

22 in the number of bidders participating, and higher returns

23 than oral bidding or a sealed bidding system.

24   (d) SALE ACREAGES AND SCHEDULE.—The Sec-

25 retary shall—

26     (1) offer for lease under this subtitle—

67

1          (A) those tracts the Secretary considers to

2     have the greatest potential for the discovery of

3     hydrocarbons, taking into consideration nomi-

4     nations received under subsection (b)(1); and

5          (B)(i) not fewer than 50,000 acres by not

6     later than 22 months after the date of the en-

7     actment of this Act; and

8          (ii) not fewer than an additional 50,000

9     acres at 6-, 12-, and 18-month intervals fol-

10     lowing the initial offering under subclause (i);

11     (2) conduct 4 additional lease sales under the

12     same terms and schedule as the last lease sale under

13     paragraph (1)(B)(ii) not later than 2 years after the

14     date of that sale, if sufficient interest in leasing ex-

15     ists to warrant, in the judgment of the Secretary,

16     the conduct of the sales; and

17     (3) evaluate the bids in each lease sale under

18     this subsection and issue leases resulting from the

19     sales not later than 90 days after the date on which

20     the sale is completed.

21  **SEC. 5005. GRANT OF LEASES BY THE SECRETARY.**

22     (a) IN GENERAL.—The Secretary may grant to the

23  highest responsible qualified bidder in a lease sale con-

24  ducted under section 5004 any land to be leased on the

68

1 Coastal Plain upon payment by the bidder of any bonus

2 as may be accepted by the Secretary.

3 (b) SUBSEQUENT TRANSFERS.—No lease issued

4 under this subtitle may be sold, exchanged, assigned, sub-

5 let, or otherwise transferred except with the approval of

6 the Secretary after the Secretary consults with, and gives

7 due consideration to the views of, the Attorney General.

**8 SEC. 5006. LEASE TERMS AND CONDITIONS.**

9 An oil or gas lease issued under this subtitle shall—

10 (1) provide for the payment of a royalty of not

11 less than 12.5 percent in amount or value of the

12 production removed or sold under the lease, as de-

13 termined by the Secretary under the regulations ap-

14 plicable to other Federal oil and gas leases;

15 (2) provide that the Secretary may close, on a

16 seasonal basis, portions of the Coastal Plain to ex-

17 ploratory drilling activities as necessary to protect

18 caribou calving areas and other species of fish and

19 wildlife based on a preponderance of the best avail-

20 able scientific evidence that has been peer reviewed

21 and obtained by following appropriate, documented

22 scientific procedures, the results of which can be re-

23 peated using those same procedures;

24 (3) require that the lessee of land on the Coast-

25 al Plain shall be fully responsible and liable for the

69

1    reclamation of land on the Coastal Plain and any

2    other Federal land that is adversely affected in con-

3    nection with exploration, development, production, or

4    transportation activities conducted under the lease

5    and on the Coastal Plain by the lessee or by any of

6    the subcontractors or agents of the lessee;

7    (4) provide that the lessee may not delegate or

8    convey, by contract or otherwise, the reclamation re-

9    sponsibility and liability to another person without

10    the express written approval of the Secretary;

11    (5) provide that the standard of reclamation for

12    land required to be reclaimed under this subtitle

13    shall be, as nearly as practicable, a condition capable

14    of supporting the uses which the land was capable

15    of supporting prior to any exploration, development,

16    or production activities, or upon application by the

17    lessee, to a higher or better use as certified by the

18    Secretary;

19    (6) contain terms and conditions relating to

20    protection of fish and wildlife, the habitat of fish

21    and wildlife, subsistence resources, and the environ-

22    ment as required under section 5003(a)(2);

23    (7) provide that the lessee, agents of the lessee,

24    and contractors of the lessee use best efforts to pro-

25    vide a fair share, as determined by the level of obli-

70

1    gation previously agreed to in the 1974 agreement

2    implementing section 29 of the Federal Agreement

3    and Grant of Right of Way for the Operation of the

4    Trans-Alaska Pipeline, of employment and con-

5    tracting for Alaska Natives and Alaska Native cor-

6    porations from throughout the State; and

7        (8) contain such other provisions as the Sec-

8    retary determines necessary to ensure compliance

9    with this subtitle and the regulations issued pursu-

10    ant to this subtitle.

11    **SEC. 5007. COASTAL PLAIN ENVIRONMENTAL PROTECTION.**

12    (a) NO SIGNIFICANT ADVERSE EFFECT STANDARD

13    TO GOVERN AUTHORIZED COASTAL PLAIN ACTIVITIES.—

14    The Secretary shall, consistent with the requirements of

15    section 5003, administer this subtitle through regulations,

16    lease terms, conditions, restrictions, prohibitions, stipula-

17    tions, and other provisions that—

18        (1) ensure the oil and gas exploration, develop-

19    ment, and production activities on the Coastal Plain

20    shall not result in any significant adverse effect on

21    fish and wildlife, the habitat of fish and wildlife, or

22    the environment;

23        (2) require the application of the best commer-

24    cially available technology for oil and gas explo-

25    ration, development, and production on all new ex-

71

1  ploration, development, and production operations;

2  and

3      (3) ensure that the maximum amount of sur-

4  face acreage covered by production and support fa-

5  cilities, including airstrips and any areas covered by

6  gravel berms or piers for support of pipelines, does

7  not exceed 10,000 acres on the Coastal Plain for

8  each 100,000 acres of area leased.

9  (b) SITE-SPECIFIC ASSESSMENT AND MITIGATION.—

10  With respect to any proposed drilling and related activi-

11  ties, the Secretary shall require that—

12      (1) a site-specific analysis be made of the prob-

13  able effects, if any, that the drilling or related activi-

14  ties will have on fish and wildlife, the habitat of fish

15  and wildlife, subsistence resources, and the environ-

16  ment;

17      (2) a plan be implemented to avoid, minimize,

18  and mitigate (in that order and to the extent prac-

19  ticable) any significant adverse effect identified

20  under paragraph (1); and

21      (3) the development of the plan shall occur

22  after consultation with the agency or agencies hav-

23  ing jurisdiction over matters mitigated by the plan.

24  (c) REGULATIONS TO PROTECT COASTAL PLAIN

25  FISH AND WILDLIFE RESOURCES, SUBSISTENCE USERS,

72

1 AND THE ENVIRONMENT.—Prior to implementing the

2 leasing program authorized by this subtitle, the Secretary

3 shall prepare and promulgate regulations, lease terms,

4 conditions, restrictions, prohibitions, stipulations, and

5 other measures designed to ensure that the activities un-

6 dertaken on the Coastal Plain under this subtitle are con-

7 ducted in a manner consistent with the purposes and envi-

8 ronmental requirements of this subtitle.

9 (d) COMPLIANCE WITH FEDERAL AND STATE ENVI-

10 RONMENTAL LAWS AND OTHER REQUIREMENTS.—The

11 proposed regulations, lease terms, conditions, restrictions,

12 prohibitions, and stipulations for the leasing program

13 under this subtitle shall require compliance with all appli-

14 cable provisions of Federal and State environmental law

15 and compliance with the following:

16 (1) Standards at least as effective as the safety

17 and environmental mitigation measures set forth in

18 items 1 through 29 at pages 167 through 169 of the

19 document of the Department of the Interior entitled

20 "Final Legislative Environmental Impact State-

21 ment" and dated April 1987 relating to the Coastal

22 Plain.

23 (2) Seasonal limitations on exploration, develop-

24 ment, and related activities, where necessary, to

25 avoid significant adverse effects during periods of

73

1    concentrated fish and wildlife breeding, denning,

2    nesting, spawning, and migration based on a prepon-

3    derance of the best available scientific evidence that

4    has been peer reviewed and obtained by following

5    appropriate, documented scientific procedures, the

6    results of which can be repeated using those same

7    procedures.

8    (3) That exploration activities, except for sur-

9    face geological studies—

10    (A) be limited to the period between ap-

11    proximately November 1 and May 1 each year;

12    and

13    (B) be supported, if necessary, by ice

14    roads, winter trails with adequate snow cover,

15    ice pads, ice airstrips, and air transport meth-

16    ods, except that exploration activities may occur

17    at other times if the Secretary finds that the

18    exploration will have no significant adverse ef-

19    fect on the fish and wildlife, the habitat of fish

20    and wildlife, and the environment of the Coastal

21    Plain.

22    (4) Design safety and construction standards

23    for all pipelines and any access and service roads,

24    that minimize, to the maximum extent practicable,

25    adverse effects on—

74

1            (A) the passage of migratory species such

2        as caribou; and

3            (B) the flow of surface water by requiring

4        the use of culverts, bridges, and other struc-

5        tural devices.

6        (5) Prohibitions on general public access and

7    use on all pipeline access and service roads.

8        (6) Stringent reclamation and rehabilitation re-

9    quirements, consistent with the standards set forth

10    in this subtitle, requiring the removal from the

11    Coastal Plain of all oil and gas development and

12    production facilities, structures, and equipment upon

13    completion of oil and gas production operations, ex-

14    cept that the Secretary may exempt from the re-

15    quirements of this paragraph those facilities, struc-

16    tures, or equipment that the Secretary determines

17    would assist in the management of the Arctic Na-

18    tional Wildlife Refuge and that are donated to the

19    United States for that purpose.

20        (7) Appropriate prohibitions or restrictions on

21    access by all modes of transportation.

22        (8) Appropriate prohibitions or restrictions on

23    sand and gravel extraction.

24        (9) Consolidation of facility siting.

1       (10) Appropriate prohibitions or restrictions on

2 the use of explosives.

3       (11) Avoidance, to the extent practicable, of

4 springs, streams, and river systems, the protection

5 of natural surface drainage patterns, wetlands, and

6 riparian habitats, and the regulation of methods or

7 techniques for developing or transporting adequate

8 supplies of water for exploratory drilling.

9       (12) Avoidance or minimization of air traffic-re-

10 lated disturbance to fish and wildlife.

11       (13) Treatment and disposal of hazardous and

12 toxic wastes, solid wastes, reserve pit fluids, drilling

13 muds and cuttings, and domestic wastewater, includ-

14 ing an annual waste management report, a haz-

15 ardous materials tracking system, and a prohibition

16 on chlorinated solvents, in accordance with applica-

17 ble Federal and State environmental law (including

18 regulations).

19       (14) Fuel storage and oil spill contingency plan-

20 ning.

21       (15) Research, monitoring, and reporting re-

22 quirements.

23       (16) Field crew environmental briefings.

76

1        (17) Avoidance of significant adverse effects
2    upon subsistence hunting, fishing, and trapping by
3    subsistence users.

4        (18) Compliance with applicable air and water
5    quality standards.

6        (19) Appropriate seasonal and safety zone des-
7    ignations around well sites, within which subsistence
8    hunting and trapping shall be limited.

9        (20) Reasonable stipulations for protection of
10   cultural and archeological resources.

11       (21) All other protective environmental stipula-
12   tions, restrictions, terms, and conditions determined
13   necessary by the Secretary.

14   (e) CONSIDERATIONS.—In preparing and promul-
15   gating regulations, lease terms, conditions, restrictions,
16   prohibitions, and stipulations under this section, the Sec-
17   retary shall consider—

18       (1) the stipulations and conditions that govern
19   the National Petroleum Reserve-Alaska leasing pro-
20   gram, as set forth in the 1999 Northeast National
21   Petroleum Reserve-Alaska Final Integrated Activity
22   Plan/Environmental Impact Statement;

23       (2) the environmental protection standards that
24   governed the initial Coastal Plain seismic exploration

77

1    program under parts 37.31 to 37.33 of title 50,
2    Code of Federal Regulations; and

3        (3) the land use stipulations for exploratory
4    drilling on the KIC–ASRC private land that are set
5    forth in appendix 2 of the August 9, 1983, agree-
6    ment between Arctic Slope Regional Corporation and
7    the United States.

8    (f) FACILITY CONSOLIDATION PLANNING.—

9        (1) IN GENERAL.—The Secretary shall, after
10   providing for public notice and comment, prepare
11   and update periodically a plan to govern, guide, and
12   direct the siting and construction of facilities for the
13   exploration, development, production, and transpor-
14   tation of Coastal Plain oil and gas resources.

15       (2) OBJECTIVES.—The plan shall have the fol-
16   lowing objectives:

17           (A) Avoiding unnecessary duplication of fa-
18       cilities and activities.

19           (B) Encouraging consolidation of common
20       facilities and activities.

21           (C) Locating or confining facilities and ac-
22       tivities to areas that will minimize impact on
23       fish and wildlife, the habitat of fish and wildlife,
24       and the environment.

78

1          (D) Using existing facilities wherever prac-

2     ticable.

3          (E) Enhancing compatibility between wild-

4     life values and development activities.

5     (g) ACCESS TO PUBLIC LAND.—The Secretary

6 shall—

7          (1) manage public land in the Coastal Plain

8     subject to section 811 of the Alaska National Inter-

9     est Lands Conservation Act (16 U.S.C. 3121); and

10          (2) ensure that local residents shall have rea-

11     sonable access to public land in the Coastal Plain for

12     traditional uses.

13 **SEC. 5008. EXPEDITED JUDICIAL REVIEW.**

14     (a) FILING OF COMPLAINT.—

15          (1) DEADLINE.—Subject to paragraph (2), any

16     complaint seeking judicial review of—

17          (A) any provision of this subtitle shall be

18     filed by not later than 1 year after the date of

19     enactment of this Act; or

20          (B) any action of the Secretary under this

21     subtitle shall be filed—

22               (i) except as provided in clause (ii),

23          during the 90-day period beginning on the

24          date on which the action is challenged; or

79

1             (ii) in the case of a complaint based

2             solely on grounds arising after the period

3             described in clause (i), not later than 90

4             days after the date on which the complain-

5             ant knew or reasonably should have known

6             of the grounds for the complaint.

7     (2) VENUE.—Any complaint seeking judicial re-

8 view of any provision of this subtitle or any action

9 of the Secretary under this subtitle may be filed only

10 in the United States Court of Appeals for the Dis-

11 trict of Columbia.

12     (3) LIMITATION ON SCOPE OF CERTAIN RE-

13 VIEW.—

14         (A) IN GENERAL.—Judicial review of a de-

15         cision by the Secretary to conduct a lease sale

16         under this subtitle, including an environmental

17         analysis, shall be—

18             (i) limited to whether the Secretary

19             has complied with this subtitle; and

20             (ii) based on the administrative record

21             of that decision.

22         (B) PRESUMPTION.—The identification by

23         the Secretary of a preferred course of action to

24         enable leasing to proceed and the analysis by

25         the Secretary of environmental effects under

80

1          this subtitle is presumed to be correct unless
2          shown otherwise by clear and convincing evi-
3          dence.

4     (b) LIMITATION ON OTHER REVIEW.—Actions of the
5 Secretary with respect to which review could have been
6 obtained under this section shall not be subject to judicial
7 review in any civil or criminal proceeding for enforcement.

8     (c) LIMITATION ON ATTORNEYS' FEES AND COURT
9 COSTS.—

10         (1) IN GENERAL.—Sections 504 of title 5 and
11         2412 of title 28, United States Code (commonly
12         known as the ''Equal Access to Justice Act''), shall
13         not apply to any action under this subtitle.

14         (2) COURT COSTS.—A party to any action
15         under this subtitle shall not receive payment from
16         the Federal Government for the attorneys' fees, ex-
17         penses, or other court costs incurred by the party.

18 **SEC. 5009. RIGHTS-OF-WAY ACROSS THE COASTAL PLAIN.**

19     (a) IN GENERAL.—The Secretary shall issue rights-
20 of-way and easements across the Coastal Plain for the
21 transportation of oil and gas produced under leases under
22 this subtitle—

23         (1) except as provided in paragraph (2), under
24         section 28 of the Mineral Leasing Act (30 U.S.C.
25         185), without regard to title XI of the Alaska Na-

81

1    tional Interest Lands Conservation Act (16 U.S.C.

2    3161 et seq.); and

3        (2) under title XI of the Alaska National Inter-

4    est Lands Conservation Act (30 U.S.C. 3161 et

5    seq.), for access authorized by sections 1110 and

6    1111 of that Act (16 U.S.C. 3170, 3171).

7    (b) TERMS AND CONDITIONS.—The Secretary shall

8 include in any right-of-way or easement issued under sub-

9 section (a) such terms and conditions as may be necessary

10 to ensure that transportation of oil and gas does not result

11 in a significant adverse effect on the fish and wildlife, the

12 habitat of fish and wildlife, subsistence resources, or the

13 environment of the Coastal Plain, including requirements

14 that facilities be sited or designed so as to avoid unneces-

15 sary duplication of roads and pipelines.

16    (c) REGULATIONS.—The Secretary shall include in

17 regulations promulgated under section 5003(g) provisions

18 granting rights-of-way and easements described in sub-

19 section (a).

20 **SEC. 5010. CONVEYANCE.**

21    In order to maximize Federal revenues by removing

22 clouds on titles to land and clarifying land ownership pat-

23 terns on the Coastal Plain, and notwithstanding section

24 1302(h)(2) of the Alaska National Interest Lands Con-

82

1 servation Act (16 U.S.C. 3192(h)(2)), the Secretary shall

2 convey—

3    (1) to the Kaktovik Inupiat Corporation, the

4    surface estate of the land described in paragraph 1

5    of Public Land Order 6959, to the extent necessary

6    to fulfill the entitlement of the Kaktovik Inupiat

7    Corporation under sections 12 and 14 of the Alaska

8    Native Claims Settlement Act (43 U.S.C. 1611,

9    1613) in accordance with the terms and conditions

10    of the Agreement between the Department of the In-

11    terior, the United States Fish and Wildlife Service,

12    the Bureau of Land Management, and the Kaktovik

13    Inupiat Corporation dated January 22, 1993; and

14    (2) to the Arctic Slope Regional Corporation

15    the remaining subsurface estate to which the Arctic

16    Slope Regional Corporation is entitled pursuant to

17    the August 9, 1983, agreement between the Arctic

18    Slope Regional Corporation and the United States of

19    America.

## 20 Subtitle B—Native American
## 21 Energy

22 **SEC. 5021. FINDINGS.**

23    Congress finds that—

83

1    (1) the Federal Government has unreasonably

2    interfered with the efforts of Indian tribes to develop

3    energy resources on tribal land; and

4    (2) Indian tribes should have the opportunity to

5    gain the benefits of the jobs, investment, and eco-

6    nomic development to be gained from energy devel-

7    opment.

**SEC. 5022. APPRAISALS.**

9    (a) AMENDMENT.—Title XXVI of the Energy Policy

10   Act of 1992 (25 U.S.C. 3501 et seq.) is amended by add-

11   ing at the end the following:

**"SEC. 2607. APPRAISAL REFORMS.**

13   "(a) OPTIONS TO INDIAN TRIBES.—With respect to

14   a transaction involving Indian land or the trust assets of

15   an Indian tribe that requires the approval of the Sec-

16   retary, any appraisal or other estimates of value relating

17   to fair market value required to be conducted under appli-

18   cable law, regulation, or policy may be completed by—

19   "(1) the Secretary;

20   "(2) the affected Indian tribe; or

21   "(3) a certified, third-party appraiser pursuant

22   to a contract with the Indian tribe.

23   "(b) TIME LIMIT ON SECRETARIAL REVIEW AND AC-

24   TION.—Not later than 30 days after the date on which

25   the Secretary receives an appraisal conducted by or for

84

1  an Indian tribe pursuant to paragraphs (2) or (3) of sub-

2  section (a), the Secretary shall—

3         ''(1) review the appraisal; and

4         ''(2) provide to the Indian tribe a written notice

5    of approval or disapproval of the appraisal.

6    ''(c) FAILURE OF SECRETARY TO APPROVE OR DIS-

7  APPROVE.—If the Secretary has failed to approve or dis-

8  approve any appraisal by the date that is 60 days after

9  the date on which the appraisal is received, the appraisal

10 shall be deemed approved.

11   ''(d) OPTION OF INDIAN TRIBES TO WAIVE AP-

12 PRAISAL.—An Indian tribe may waive the requirements of

13 subsection (a) if the Indian tribe provides to the Secretary

14 a written resolution, statement, or other unambiguous in-

15 dication of tribal intent to waive the requirements that—

16        ''(1) is duly approved by the governing body of

17    the Indian tribe; and

18        ''(2) includes an express waiver by the Indian

19    tribe of any claims for damages the Indian tribe

20    might have against the United States as a result of

21    the waiver.

22   ''(e) REGULATIONS.—The Secretary shall promulgate

23 regulations to implement this section, including standards

24 the Secretary shall use for approving or disapproving an

25 appraisal under subsection (b).''.

85

1    (b) CONFORMING AMENDMENT.—The table of con-

2  tents of the Energy Policy Act of 1992 (42 U.S.C. 13201

3  note) is amended by adding at the end of the items relat-

4  ing to title XXVI the following:

"Sec. 2607. Appraisal reforms.".

5  **SEC. 5023. STANDARDIZATION.**

6    As soon as practicable after the date of enactment

7  of this Act, the Secretary of the Interior shall implement

8  procedures to ensure that each agency within the Depart-

9  ment of the Interior that is involved in the review, ap-

10 proval, and oversight of oil and gas activities on Indian

11 land shall use a uniform system of reference numbers and

12 tracking systems for oil and gas wells.

13 **SEC. 5024. ENVIRONMENTAL REVIEWS OF MAJOR FEDERAL**

14            **ACTIONS ON INDIAN LAND.**

15   Section 102 of the National Environmental Policy

16 Act of 1969 (42 U.S.C. 4332) is amended—

17      (1) in the matter preceding paragraph (1) by

18    inserting "(a) IN GENERAL.—" before "The Con-

19    gress authorizes"; and

20      (2) by adding at the end the following:

21   "(b) REVIEW OF MAJOR FEDERAL ACTIONS ON IN-

22 DIAN LAND.—

23      "(1) DEFINITIONS OF INDIAN LAND AND IN-

24    DIAN TRIBE.—In this subsection, the terms 'Indian

25    land' and 'Indian tribe' have the meaning given

86

1    those terms in section 2601 of the Energy Policy
2    Act of 1992 (25 U.S.C. 3501).

3        ''(2) IN GENERAL.—For any major Federal ac-
4    tion on Indian land of an Indian tribe requiring the
5    preparation of a statement under subsection
6    (a)(2)(C), the statement shall only be available for
7    review and comment by—

8            ''(A) the members of the Indian tribe; and
9            ''(B) any other individual residing within
10           the affected area.

11       ''(3) REGULATIONS.—The Chairman of the
12   Council on Environmental Quality, in consultation
13   with Indian tribes, shall develop regulations to im-
14   plement this section, including descriptions of af-
15   fected areas for specific major Federal actions.''.

**16   SEC. 5025. JUDICIAL REVIEW.**

17       (a) DEFINITIONS.—In this section:

18       (1) AGENCY ACTION.—The term ''agency ac-
19   tion'' has the meaning given the term in section 551
20   of title 5, United States Code.

21       (2) ENERGY-RELATED ACTION.—The term ''en-
22   ergy-related action'' means a civil action that—

23           (A) is filed on or after the date of enact-
24           ment of this Act; and

87

1 (B) seeks judicial review of a final agency

2 action relating to the issuance of a permit, li-

3 cense, or other form of agency permission allow-

4 ing—

5  (i) any person or entity to conduct on

6  Indian land activities involving the explo-

7  ration, development, production, or trans-

8  portation of oil, gas, coal, shale gas, oil

9  shale, geothermal resources, wind or solar

10  resources, underground coal gasification,

11  biomass, or the generation of electricity; or

12  (ii) any Indian tribe, or any organiza-

13  tion of 2 or more entities, not less than 1

14  of which is an Indian tribe, to conduct ac-

15  tivities involving the exploration, develop-

16  ment, production, or transportation of oil,

17  gas, coal, shale gas, oil shale, geothermal

18  resources, wind or solar resources, under-

19  ground coal gasification, biomass, or the

20  generation of electricity, regardless of

21  where such activities are undertaken.

22 (3) INDIAN LAND.—

23 (A) IN GENERAL.—The term "Indian

24 land" has the meaning given the term in sec-

88

1    tion 2601 of the Energy Policy Act of 1992 (25

2    U.S.C. 3501).

3        (B) INCLUSION.—The term ''Indian land''

4    includes land owned by a Native Corporation

5    (as that term is defined in section 3 of the

6    Alaska Native Claims Settlement Act (43

7    U.S.C. 1602)) under that Act (43 U.S.C. 1601

8    et seq.).

9    (4) ULTIMATELY PREVAIL.—

10        (A) IN GENERAL.—The term ''ultimately

11    prevail'' means, in a final enforceable judgment

12    that the court rules in the party's favor on at

13    least 1 civil claim that is an underlying ration-

14    ale for the preliminary injunction, administra-

15    tive stay, or other relief requested by the party.

16        (B) EXCLUSION.—The term ''ultimately

17    prevail'' does not include circumstances in

18    which the final agency action is modified or

19    amended by the issuing agency unless the modi-

20    fication or amendment is required pursuant to

21    a final enforceable judgment of the court or a

22    court-ordered consent decree.

23    (b) TIME FOR FILING COMPLAINT.—

24    (1) IN GENERAL.—Any energy related action

25    shall be filed not later than the end of the 60-day

89

1    period beginning on the date of the action or deci-

2    sion by a Federal official that constitutes the cov-

3    ered energy project concerned.

4        (2) PROHIBITION.—Any energy related action

5    that is not filed within the time period described in

6    paragraph (1) shall be barred.

7    (c) DISTRICT COURT VENUE AND DEADLINE.—An

8  energy related action—

9        (1) may only be brought in the United States

10    District Court for the District of Columbia; and

11        (2) shall be resolved as expeditiously as pos-

12    sible, and in any event not more than 180 days after

13    the energy related action is filed.

14    (d) APPELLATE REVIEW.—An interlocutory order or

15  final judgment, decree or order of the district court in an

16  energy related action—

17        (1) may be appealed to the United States Court

18    of Appeals for the District of Columbia Circuit; and

19        (2) if the court described in paragraph (1) un-

20    dertakes the review, the court shall resolve the re-

21    view as expeditiously as possible, and in any event

22    by not later than 180 days after the interlocutory

23    order or final judgment, decree or order of the dis-

24    trict court was issued.

90

1    (e) LIMITATION ON CERTAIN PAYMENTS.—Notwith-
2 standing section 1304 of title 31, United States Code, no
3 award may be made under section 504 of title 5, United
4 States Code, or under section 2412 of title 28, United
5 States Code, and no amounts may be obligated or ex-
6 pended from the Claims and Judgment Fund of the
7 United States Treasury to pay any fees or other expenses
8 under such sections, to any person or party in an energy
9 related action.

10    (f) LIMITATION ON ATTORNEYS' FEES AND COURT
11 COSTS.—

12        (1) IN GENERAL.—Sections 504 of title 5 and
13        2412 of title 28, United States Code (commonly
14        known as the "Equal Access to Justice Act"), shall
15        not apply to an energy related action.

16        (2) COURT COSTS.—A party to a covered civil
17        action shall not receive payment from the Federal
18        Government for the attorneys' fees, expenses, or
19        other court costs incurred by the party.

20 **SEC. 5026. TRIBAL RESOURCE MANAGEMENT PLANS.**

21    Unless otherwise explicitly exempted by Federal law
22 enacted after the date of enactment of this Act, any activ-
23 ity conducted or resources harvested or produced pursuant
24 to a tribal resource management plan or an integrated re-
25 source management plan approved by the Secretary of the

91

1 Interior under the National Indian Forest Resources Man-

2 agement Act (25 U.S.C. 3101 et seq.) or the American

3 Indian Agricultural Resource Management Act (25 U.S.C.

4 3701 et seq.), shall be considered a sustainable manage-

5 ment practice for purposes of any Federal standard, ben-

6 efit, or requirement that requires a demonstration of such

7 sustainability.

**SEC. 5027. LEASES OF RESTRICTED LANDS FOR THE NAV-**

**AJO NATION.**

10 Subsection (e)(1) of the first section of the Act of

11 August 9, 1955 (25 U.S.C. 415) (commonly known as the

12 "Long-Term Leasing Act"), is amended—

13 (1) by striking ", except a lease for" and insert-

14 ing ", including leases for";

15 (2) in subparagraph (A), by striking "25 years,

16 except" and all that follows through "; and" and in-

17 serting "99 years;";

18 (3) in subparagraph (B), by striking the period

19 and inserting "; and"; and

20 (4) by adding at the end the following:

21 "(C) in the case of a lease for the exploration,

22 development, or extraction of mineral resources, in-

23 cluding geothermal resources, 25 years, except that

24 the lease may include an option to renew for 1 addi-

25 tional term not to exceed 25 years.".

92

**SEC. 5028. NONAPPLICABILITY OF CERTAIN RULES.**

No rule promulgated by the Secretary of the Interior regarding hydraulic fracturing used in the development or production of oil or gas resources shall affect any land held in trust or restricted status for the benefit of Indians except with the express consent of the beneficiary on behalf of which the land is held in trust or restricted status.

# Subtitle C—Additional Regulatory Provisions

## PART I—STATE AUTHORITY OVER HYDRAULIC FRACTURING

**SEC. 5031. FINDING.**

Congress finds that given variations in geology, land use, and population, the States are best placed to regulate the process of hydraulic fracturing occurring on any land within the boundaries of the individual State.

**SEC. 5032. STATE AUTHORITY.**

(a) DEFINITION OF FEDERAL LAND.—In this section, the term ''Federal land'' means—

(1) public lands (as defined in section 103 of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1702));

(2) National Forest System land;

(3) land under the jurisdiction of the Bureau of Reclamation; and

93

1    (4) land under the jurisdiction of the Corps of

2    Engineers.

3    (b) STATE AUTHORITY.—

4        (1) IN GENERAL.—Notwithstanding any other

5    provision of law, a State shall have the sole author-

6    ity to promulgate or enforce any regulation, guid-

7    ance, or permit requirement regarding the treatment

8    of a well by the application of fluids under pressure

9    to which propping agents may be added for the ex-

10   pressly designed purpose of initiating or propagating

11   fractures in a target geologic formation in order to

12   enhance production of oil, natural gas, or geothermal

13   production activities on or under any land within the

14   boundaries of the State.

15       (2) FEDERAL LAND.—Notwithstanding any

16   other provision of law, the treatment of a well by the

17   application of fluids under pressure to which prop-

18   ping agents may be added for the expressly designed

19   purpose of initiating or propagating fractures in a

20   target geologic formation in order to enhance pro-

21   duction of oil, natural gas, or geothermal production

22   activities on Federal land shall be subject to the law

23   of the State in which the land is located.

94

1     **PART II—MISCELLANEOUS PROVISIONS**

2  **SEC. 5041. ENVIRONMENTAL LEGAL FEES.**

3      Section 504 of title 5, United States Code, is amend-

4  ed by adding at the end the following:

5      "(g) ENVIRONMENTAL LEGAL FEES.—Notwith-

6  standing section 1304 of title 31, no award may be made

7  under this section and no amounts may be obligated or

8  expended from the Claims and Judgment Fund of the

9  Treasury to pay any legal fees of a nongovernmental orga-

10  nization related to an action that (with respect to the

11  United States)—

12          "(1) prevents, terminates, or reduces access to

13      or the production of—

14              "(A) energy;

15              "(B) a mineral resource;

16              "(C) water by agricultural producers;

17              "(D) a resource by commercial or rec-

18          reational fishermen; or

19              "(E) grazing or timber production on Fed-

20          eral land;

21          "(2) diminishes the private property value of a

22      property owner; or

23          "(3) eliminates or prevents 1 or more jobs.".

24  **SEC. 5042. MASTER LEASING PLANS.**

25      (a) IN GENERAL.—Notwithstanding any other provi-

26  sion of law, the Secretary of the Interior, acting through

95

1  the Bureau of Land Management, shall not establish a

2  master leasing plan as part of any guidance issued by the

3  Secretary.

4      (b) EXISTING MASTER LEASING PLANS.—Instruc-

5  tion Memorandum No. 2010–117 and any other master

6  leasing plan described in subsection (a) issued on or before

7  the date of enactment of this Act shall have no force or

8  effect.

# TITLE VI—IMPROVING AMER-ICA'S DOMESTIC REFINING CAPACITY

## Subtitle A—Refinery Permitting Reform

**SEC. 6001. FINDING.**

15      Congress finds that the domestic refining industry is

16  an important source of jobs and economic growth and

17  whose growth should not be limited by an excessively

18  drawn out permitting and approval process.

**SEC. 6002. DEFINITIONS.**

20      In this subtitle:

21      (1) ADMINISTRATOR.—The term "Adminis-

22      trator" means the Administrator of the Environ-

23      mental Protection Agency.

1    (2) EXPANSION.—The term "expansion" means

2  a physical change that results in an increase in the

3  capacity of a refinery.

4    (3) INDIAN TRIBE.—The term "Indian tribe"

5  has the meaning given the term in section 4 of the

6  Indian Self-Determination and Education Assistance

7  Act (25 U.S.C. 450b).

8    (4) PERMIT.—The term "permit" means any

9  permit, license, approval, variance, or other form of

10  authorization that a refiner is required to obtain—

11       (A) under any Federal law; or

12       (B) from a State or tribal government

13       agency delegated authority by the Federal Gov-

14       ernment, or authorized under Federal law, to

15       issue permits.

16    (5) REFINER.—The term "refiner" means a

17  person that—

18       (A) owns or operates a refinery; or

19       (B) seeks to become an owner or operator

20       of a refinery.

21    (6) REFINERY.—

22       (A) IN GENERAL.—The term "refinery"

23       means—

97

1             (i) a facility at which crude oil is re-

2         fined into transportation fuel or other pe-

3         troleum products; and

4             (ii) a coal liquification or coal-to-liquid

5         facility at which coal is processed into syn-

6         thetic crude oil or any other fuel.

7         (B) INCLUSION.—The term "refinery" in-

8     cludes an expansion of a refinery.

9         (7) REFINERY PERMITTING AGREEMENT.—The

10    term "refinery permitting agreement" means an

11    agreement entered into between the Administrator

12    and a State or Indian tribe under subsection (c).

13        (8) STATE.—The term "State" means—

14        (A) a State; and

15        (B) the District of Columbia.

**SEC. 6003. STREAMLINING OF REFINERY PERMITTING**

16

17                **PROCESS.**

18    (a) IN GENERAL.—At the request of the Governor

19 of a State or the governing body of an Indian tribe, the

20 Administrator shall enter into a refinery permitting agree-

21 ment with the State or Indian tribe under which the proc-

22 ess for obtaining all permits necessary for the construction

23 and operation of a refinery shall be streamlined using a

24 systematic, interdisciplinary multimedia approach, as pro-

25 vided in this section.

98

1    (b) AUTHORITY OF ADMINISTRATOR.—Under a refin-

2 ery permitting agreement, the Administrator shall have

3 the authority, as applicable and necessary—

4    (1) to accept from a refiner a consolidated ap-

5    plication for all permits that the refiner is required

6    to obtain to construct and operate a refinery;

7    (2) in consultation and cooperation with each

8    Federal, State, or tribal government agency that is

9    required to make any determination to authorize the

10    issuance of a permit, to establish a schedule under

11    which each agency shall—

12    (A) concurrently consider, to the maximum

13    extent practicable, each determination to be

14    made; and

15    (B) complete each step in the permitting

16    process; and

17    (3) to issue a consolidated permit that combines

18    all permits issued under the schedule established

19    under paragraph (2).

20    (c) REFINERY PERMITTING AGREEMENTS.—Under a

21 refinery permitting agreement, a State or governing body

22 of an Indian tribe shall agree that—

23    (1) the Administrator shall have each of the au-

24    thorities described in subsection (b); and

1     (2) the State or tribal government agency

2 shall—

3         (A) in accordance with State law, make

4         such structural and operational changes in the

5         agencies as are necessary to enable the agencies

6         to carry out consolidated, project-wide permit

7         reviews concurrently and in coordination with

8         the Environmental Protection Agency and other

9         Federal agencies; and

10         (B) comply, to the maximum extent prac-

11         ticable, with the applicable schedule established

12         under subsection (b)(2).

13 (d) DEADLINES.—

14     (1) NEW REFINERIES.—In the case of a con-

15 solidated permit for the construction of a new refin-

16 ery, the Administrator and the State or governing

17 body of an Indian tribe shall approve or disapprove

18 the consolidated permit not later than—

19         (A) 365 days after the date of receipt of

20         an administratively complete application for the

21         consolidated permit; or

22         (B) on agreement of the applicant, the Ad-

23         ministrator, and the State or governing body of

24         the Indian tribe, 90 days after the expiration of

25         the deadline described in subparagraph (A).

1     (2) EXPANSION OF EXISTING REFINERIES.—In

2     the case of a consolidated permit for the expansion

3     of an existing refinery, the Administrator and the

4     State or governing body of an Indian tribe shall ap-

5     prove or disapprove the consolidated permit not later

6     than—

7         (A) 120 days after the date of receipt of

8         an administratively complete application for the

9         consolidated permit; or

10         (B) on agreement of the applicant, the Ad-

11         ministrator, and the State or governing body of

12         the Indian tribe, 30 days after the expiration of

13         the deadline described in subparagraph (A).

14     (e) FEDERAL AGENCIES.—Each Federal agency that

15 is required to make any determination to authorize the

16 issuance of a permit shall comply with the applicable

17 schedule established under subsection (b)(2).

18     (f) JUDICIAL REVIEW.—Any civil action for review

19 of a permit determination under a refinery permitting

20 agreement shall be brought exclusively in the United

21 States district court for the district in which the refinery

22 is located or proposed to be located.

23     (g) EFFICIENT PERMIT REVIEW.—In order to reduce

24 the duplication of procedures, the Administrator shall use

25 State permitting and monitoring procedures to satisfy

101

1 substantially equivalent Federal requirements under this
2 subtitle.

3     (h) SEVERABILITY.—If 1 or more permits that are
4 required for the construction or operation of a refinery are
5 not approved on or before an applicable deadline under
6 subsection (d), the Administrator may issue a consolidated
7 permit that combines all other permits that the refiner is
8 required to obtain, other than any permits that are not
9 approved.

10     (i) CONSULTATION WITH LOCAL GOVERNMENTS.—
11 The Administrator, States, and tribal governments shall
12 consult, to the maximum extent practicable, with local gov-
13 ernments in carrying out this section.

14     (j) EFFECT OF SECTION.—Nothing in this section af-
15 fects—

16         (1) the operation or implementation of any oth-
17     erwise applicable law regarding permits necessary
18     for the construction and operation of a refinery;

19         (2) the authority of any unit of local govern-
20     ment with respect to the issuance of permits; or

21         (3) any requirement or ordinance of a local gov-
22     ernment (such as a zoning regulation).

# Subtitle B—Repeal of Renewable Fuel Standard

**SEC. 6011. FINDINGS.**

Congress finds that the mandates under the renewable fuel standard contained in section 211(o) of the Clean Air Act (42 U.S.C. 7545(o))—

(1) impose significant costs on American citizens and the American economy, without offering any benefit; and

(2) should be repealed.

**SEC. 6012. PHASE OUT OF RENEWABLE FUEL STANDARD.**

(a) IN GENERAL.—Section 211(o) of the Clean Air Act (42 U.S.C. 7545(o)) is amended—

(1) in paragraph (2)—

(A) in subparagraph (A)—

(i) by striking clause (ii); and

(ii) by redesignating clauses (iii) and (iv) as clauses (ii) and (iii), respectively; and

(B) in subparagraph (B), by striking clauses (ii) through (v) and inserting the following:

"(ii) CALENDAR YEARS 2014 THROUGH 2019.—Notwithstanding clause (i), for purposes of subparagraph (A), the applicable

103

volumes of renewable fuel for each of calendar years 2014 through 2019 shall be determined as follows:

"(I) For calendar years 2014 and 2015, in accordance with the table entitled 'I–2—Proposed 2014 Volume Requirements' of the proposed rule published at pages 71732 through 71784 of volume 78 of the Federal Register (November 29, 2013).

"(II) For calendar year 2016, the applicable volumes established under subclause (I), reduced by 20 percent.

"(III) For calendar year 2017, the applicable volumes established under subclause (I), reduced by 40 percent.

"(IV) For calendar year 2018, the applicable volumes established under subclause (I), reduced by 60 percent.

"(V) For calendar year 2019, the applicable volumes established under

104

1          subclause (I), reduced by 80 per-

2          cent.'';

3     (2) in paragraph (3)—

4          (A) by striking ''2021'' and inserting

5          ''2018'' each place it appears; and

6          (B) in subparagraph (B)(i), by inserting '',

7          subject to the condition that the renewable fuel

8          obligation determined for a calendar year is not

9          more than the applicable volumes established

10         under paragraph (2)(B)(ii)'' before the period;

11         and

12    (3) by adding at the end the following:

13    ''(13) SUNSET.—The program established

14    under this subsection shall terminate on December

15    31, 2019.''.

16    (b) REGULATIONS.—Effective beginning on January

17  1, 2020, the regulations contained in subparts K and M

18  of part 80 of title 40, Code of Federal Regulations (as

19  in effect on that date of enactment), shall have no force

20  or effect.

# TITLE VII—STOPPING EPA OVERREACH

**SEC. 7001. FINDINGS.**

24    Congress finds that—

105

1        (1) the Environmental Protection Agency has

2    exceeded its statutory authority by promulgating

3    regulations that were not contemplated by Congress

4    in the authorizing language of the statutes enacted

5    by Congress;

6        (2) no Federal agency has the authority to reg-

7    ulate greenhouse gases under current law; and

8        (3) no attempt to regulate greenhouse gases

9    should be undertaken without further Congressional

10   action.

11   **SEC. 7002. CLARIFICATION OF FEDERAL REGULATORY AU-**

12   **THORITY TO EXCLUDE GREENHOUSE GASES**

13   **FROM REGULATION UNDER THE CLEAN AIR**

14   **ACT.**

15   (a) Repeal of Federal Climate Change Regu-

16   lation.—

17       (1) Greenhouse gas regulation under

18   clean air act.—Section 302(g) of the Clean Air

19   Act (42 U.S.C. 7602(g)) is amended—

20           (A) by striking "(g) The term" and insert-

21       ing the following:

22   "(g) Air Pollutant.—

23       "(1) In general.—The term"; and

24           (B) by adding at the end the following:

106

1    &ldquo;(2)  EXCLUSION.—The  term  &lsquo;air  pollutant&rsquo;

2        does not include carbon dioxide, water vapor, meth-

3        ane,      nitrous      oxide,      hydrofluorocarbons,

4        perfluorocarbons, or sulfur hexafluoride.&rdquo;.

5        (2) NO REGULATION OF CLIMATE CHANGE.—

6        Notwithstanding any other provision of law, nothing

7        in any of the following Acts or any other law author-

8        izes or requires the regulation of climate change or

9        global warming:

10            (A) The Clean Air Act (42 U.S.C. 7401 et

11        seq.).

12            (B) The Federal Water Pollution Control

13        Act (33 U.S.C. 1251 et seq.).

14            (C)  The  National  Environmental  Policy

15        Act of 1969 (42 U.S.C. 4321 et seq.).

16            (D) The Endangered Species Act of 1973

17        (16 U.S.C. 1531 et seq.).

18            (E)  The  Solid  Waste  Disposal  Act  (42

19        U.S.C. 6901 et seq.).

20    (b) EFFECT ON PROPOSED RULES OF THE EPA.—

21    In accordance with this section, the following proposed or

22    contemplated rules (or any similar or successor rules) of

23    the Environmental Protection Agency shall be void and

24    have no force or effect:

107

1       (1) The proposed rule entitled "Standards of

2  Performance for Greenhouse Gas Emissions From

3  New Stationary Sources: Electric Utility Generating

4  Units" (published at 79 Fed. Reg. 1430 (January 8,

5  2014)).

6       (2) The proposed rule entitled "Carbon Pollu-

7  tion Emission Guidelines for Existing Stationary

8  Sources: Electric Utility Generating Units" (pub-

9  lished at 79 Fed. Reg. 34829 (June 18, 2014)).

10      (3) Any other contemplated or proposed rules

11  proposed to be issued pursuant to the purported au-

12  thority described in subsection (a)(2).

**13  SEC. 7003. CLARIFICATION OF AUTHORITY.**

14  (a) IN GENERAL.—Neither the Secretary of the

15  Army, acting through the Chief of Engineers, nor the Ad-

16  ministrator of the Environmental Protection Agency

17  shall—

18      (1) finalize the proposed rule entitled "Defini-

19  tion of Waters of the United States Under the Clean

20  Water Act" (79 Fed. Reg. 22188 (April 21, 2014)); 

21  or

22      (2) use the proposed rule described in para-

23  graph (1), or any substantially similar proposed rule

24  or guidance, as the basis for any rulemaking or any

25  decision regarding the scope or enforcement of the

108

1 Federal Water Pollution Control Act (33 U.S.C.

2 1251 et seq.).

3 (b) RULES.—The use of the proposed rule described

4 in subsection (a)(1), or any substantially similar proposed

5 rule or guidance, as the basis for any rulemaking or any

6 decision regarding the scope or enforcement of the Federal

7 Water Pollution Control Act (33 U.S.C. 1251 et seq.) shall

8 be grounds for vacation of the final rule, decision, or en-

9 forcement action.

**SEC. 7004. JOBS ANALYSIS FOR ALL EPA REGULATIONS.**

11 (a) IN GENERAL.—Before proposing or finalizing any

12 regulation, rule, or policy, the Administrator of the Envi-

13 ronmental Protection Agency shall provide an analysis of

14 the regulation, rule, or policy and describe the direct and

15 indirect net and gross impact of the regulation, rule, or

16 policy on employment in the United States.

17 (b) LIMITATION.—No regulation, rule, or policy de-

18 scribed in subsection (a) shall take effect if the regulation,

19 rule, or policy has a negative impact on employment in

20 the United States unless the regulation, rule, or policy is

21 approved by Congress and signed by the President.

# TITLE VIII—DEBT FREEDOM FUND

**SEC. 8001. FINDINGS.**

25 Congress finds that—

109

1        (1) the national debt being over

2    $17,000,000,000,000 in 2014—

3           (A) threatens the current and future pros-

4          perity of the United States;

5           (B) undermines the national security inter-

6          ests of the United States; and

7           (C) imposes a burden on future genera-

8          tions of United States citizens; and

9        (2) revenue generated from the development of

10   the natural resources in the United States should be

11   used to reduce the national debt.

12 **SEC. 8002. DEBT FREEDOM FUND.**

13        Notwithstanding any other provision of law, in ac-

14 cordance with all revenue sharing arrangement with

15 States in effect on the date of enactment of this Act, an

16 amount equal to the additional amount of Federal funds

17 generated by the programs and activities under this Act

18 (and the amendments made by this Act)—

19        (1) shall be deposited in a special trust fund ac-

20       count in the Treasury, to be known as the "Debt

21       Freedom Fund"; and

22        (2) shall not be withdrawn for any purpose

23       other than to pay down the national debt of the

110

1     United States, for which purpose payments shall be

2     made expeditiously.

○

# EXHIBIT 27

Keystone for a Secure Tomorrow Act, H.R. 28, 114th Cong. (2015)

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

I

114TH CONGRESS
1ST SESSION

# H. R. 28

To approve the Keystone XL pipeline project permit.

_____

## IN THE HOUSE OF REPRESENTATIVES

JANUARY 6, 2015

Mr. POE of Texas introduced the following bill; which was referred to the Committee on Transportation and Infrastructure, and in addition to the Committees on Energy and Commerce and Natural Resources, for a period to be subsequently determined by the Speaker, in each case for consideration of such provisions as fall within the jurisdiction of the committee concerned

_____

# A BILL

To approve the Keystone XL pipeline project permit.

1  *Be it enacted by the Senate and House of Representa-*

2  *tives of the United States of America in Congress assembled,*

3  **SECTION 1. SHORT TITLE.**

4  This Act may be cited as the "Keystone For a Secure

5  Tomorrow Act".

6  **SEC. 2. FINDING.**

7  The Congress finds that the delivery of oil from Al-

8  berta, Canada, to domestic markets in the United States

9  is in the national interest of the United States, and the

2

1 earliest possible completion of the Keystone XL pipeline

2 will best serve the national interest.

3 **SEC. 3. KEYSTONE XL PIPELINE PERMIT APPROVAL.**

4     (a) PERMIT APPROVAL.—The permit described in

5 subsection (b) is hereby approved.

6     (b) DESCRIPTION OF PERMIT.—The permit approved

7 under subsection (a) is the permit with respect to certain

8 energy-related facilities and land transportation crossings

9 on the international boundaries of the United States for

10 the Keystone XL pipeline project, an application for which

11 was filed on September 19, 2008 (including amendments).

12 Such permit shall also include the Nebraska reroute evalu-

13 ated in the Final Evaluation Report issued the Nebraska

14 Department of Environmental Quality in January 2013.

15     (c) REQUIREMENTS.—The permit granted under sub-

16 section (a) shall require the following:

17         (1) The permittee shall comply with all applica-

18     ble Federal and State laws (including regulations)

19     and all applicable industrial codes regarding the con-

20     struction, connection, operation, and maintenance of

21     the United States facilities.

22         (2) The permittee shall take all appropriate

23     measures to prevent or mitigate any adverse envi-

24     ronmental impact or disruption of historic properties

3

1 in connection with the construction, operation, and

2 maintenance of the United States facilities.

3  (3) For the purpose of the permit approved

4 under subsection (a)—

5    (A) the final environmental impact state-

6    ment issued by the Secretary of State on Au-

7    gust 26, 2011, and the Final Evaluation Report

8    described in subsection (b) satisfy all require-

9    ments of the National Environmental Policy

10    Act of 1969 (42 U.S.C. 4321 et seq.) and sec-

11    tion 106 of the National Historic Preservation

12    Act (16 U.S.C. 470f);

13    (B) any modification required by the Sec-

14    retary of State to the Plan described in para-

15    graph (4)(A) shall not require supplementation

16    of the final environmental impact statement de-

17    scribed in that paragraph; and

18    (C) no further Federal environmental re-

19    view shall be required.

20  (4) The construction, operation, and mainte-

21 nance of the facilities shall be in all material re-

22 spects similar to that described in the application

23 and the Final Evaluation Report described in sub-

24 section (b) and in accordance with—

4

1    (A) the construction, mitigation, and rec-

2   lamation measures agreed to by the permittee

3   in the Construction Mitigation and Reclamation

4   Plan found in appendix B of the final environ-

5   mental impact statement issued by the Sec-

6   retary of State on August 26, 2011;

7    (B) the special conditions agreed to be-

8   tween the permittee and the Administrator of

9   the Pipeline Hazardous Materials Safety Ad-

10   ministration of the Department of Transpor-

11   tation found in appendix U of the final environ-

12   mental impact statement described in subpara-

13   graph (A); and

14    (C) the stipulations identified in appendix

15   S of the final environmental impact statement

16   described in subparagraph (A).

17  (5) Other requirements that are standard in-

18  dustry practice or commonly included in Federal

19  permits that are similar to a permit approved under

20  subsection (a).

21  (d) PRIVATE PROPERTY SAVINGS CLAUSE.—Nothing

22 in this section alters the Federal, State, or local processes

23 or conditions in effect on the date of enactment of this

5

1  Act that are necessary to secure access from private prop-

2  erty owners to construct the Keystone XL pipeline.

○

# EXHIBIT 28

North American Energy Infrastructure Act,
S. 1228, 114th Cong. (2015)

II

114TH CONGRESS
1ST SESSION
# S. 1228

To require approval for the construction, connection, operation, or mainte-
nance of oil or natural gas pipelines or electric transmission facilities
at the national boundary of the United States for the import or export
of oil, natural gas, or electricity to or from Canada or Mexico, and
for other purposes.

––––––––––––––––

## IN THE SENATE OF THE UNITED STATES

MAY 6, 2015

Mr. HOEVEN (for himself and Mr. DONNELLY) introduced the following bill;
which was read twice and referred to the Committee on Energy and Nat-
ural Resources

––––––––––––––––

# A BILL

To require approval for the construction, connection, oper-
ation, or maintenance of oil or natural gas pipelines
or electric transmission facilities at the national bound-
ary of the United States for the import or export of
oil, natural gas, or electricity to or from Canada or
Mexico, and for other purposes.

1    *Be it enacted by the Senate and House of Representa-*

2  *tives of the United States of America in Congress assembled,*

3  **SECTION 1. SHORT TITLE.**

4       This Act may be cited as the ''North American En-

5  ergy Infrastructure Act''.

2

1  **SEC. 2. FINDING.**

2    Congress finds that the United States should estab-

3  lish a more uniform, transparent, and modern process for

4  the construction, connection, operation, and maintenance

5  of oil and natural gas pipelines and electric transmission

6  facilities for the import and export of oil and natural gas

7  and the transmission of electricity to and from Canada

8  and Mexico, in pursuit of a more secure and efficient

9  North American energy market.

10  **SEC. 3. DEFINITIONS.**

11    In this Act:

12    (1) CROSS-BORDER SEGMENT.—The term

13    ''cross-border segment'' means the portion of an oil

14    or natural gas pipeline or electric transmission facil-

15    ity that is located at the national boundary of the

16    United States with Canada or Mexico.

17    (2) ELECTRIC RELIABILITY ORGANIZATION.—

18    The term ''Electric Reliability Organization'' has the

19    meaning given the term in section 215(a) of the

20    Federal Power Act (16 U.S.C. 824o(a)).

21    (3) INDEPENDENT SYSTEM OPERATOR.—The

22    term ''Independent System Operator'' has the mean-

23    ing given the term in section 3 of the Federal Power

24    Act (16 U.S.C. 796).

25    (4) MODIFICATION.—The term ''modification''

26    includes—

3

1          (A) a change in ownership;

2          (B) a volume expansion;

3          (C) a downstream or upstream inter-

4     connection; or

5          (D) an adjustment to maintain flow (such

6     as a reduction or increase in the number of

7     pump or compressor stations).

8     (5) NATURAL GAS.—The term "natural gas"

9     has the meaning given the term in section 2 of the

10    Natural Gas Act (15 U.S.C. 717a).

11    (6) OIL.—The term "oil" means petroleum or

12    a petroleum product.

13    (7) REGIONAL ENTITY.—The term "regional

14    entity" has the meaning given the term in section

15    215(a) of the Federal Power Act (16 U.S.C.

16    824o(a)).

17    (8) REGIONAL TRANSMISSION ORGANIZATION.—

18    The term "Regional Transmission Organization"

19    has the meaning given the term in section 3 of the

20    Federal Power Act (16 U.S.C. 796).

21  **SEC. 4. AUTHORIZATION OF CERTAIN ENERGY INFRA-**

22  **STRUCTURE PROJECTS AT THE NATIONAL**

23  **BOUNDARY OF THE UNITED STATES.**

24    (a) AUTHORIZATION.—Except as provided in sub-

25  section (c) and section 8, no person may construct, con-

4

1 nect, operate, or maintain a cross-border segment of an

2 oil pipeline or electric transmission facility for the import

3 or export of oil or the transmission of electricity to or from

4 Canada or Mexico without obtaining a certificate of cross-

5 ing for the construction, connection, operation, or mainte-

6 nance of the cross-border segment under this section.

7    (b) CERTIFICATE OF CROSSING.—

8        (1) REQUIREMENT.—Not later than 120 days

9        after final action is taken under the National Envi-

10       ronmental Policy Act of 1969 (42 U.S.C. 4321 et

11       seq.) with respect to a cross-border segment for

12       which a request is received under this section, the

13       relevant official identified under paragraph (2), in

14       consultation with appropriate Federal agencies, shall

15       issue a certificate of crossing for the cross-border

16       segment unless the relevant official finds that the

17       construction, connection, operation, or maintenance

18       of the cross-border segment is not in the public in-

19       terest of the United States.

20       (2) RELEVANT OFFICIAL.—The relevant official

21       referred to in paragraph (1) is—

22            (A) the Secretary of State with respect to

23            oil pipelines; and

24            (B) the Secretary of Energy with respect

25            to electric transmission facilities.

5

1        (3) ADDITIONAL REQUIREMENT FOR ELECTRIC

2     TRANSMISSION FACILITIES.—In the case of a request

3     for a certificate of crossing for the construction, con-

4     nection, operation, or maintenance of a cross-border

5     segment of an electric transmission facility, the Sec-

6     retary of Energy shall require, as a condition of

7     issuing the certificate of crossing for the request

8     under paragraph (1), that the cross-border segment

9     of the electric transmission facility be constructed,

10    connected, operated, or maintained consistent with

11    all applicable policies and standards of—

12         (A) the Electric Reliability Organization

13          and the applicable regional entity; and

14         (B) any Regional Transmission Organiza-

15          tion or Independent System Operator with

16          operational or functional control over the cross-

17          border segment of the electric transmission fa-

18          cility.

19    (c) EXCLUSIONS.—This section shall not apply to any

20  construction, connection, operation, or maintenance of a

21  cross-border segment of an oil pipeline or electric trans-

22  mission facility for the import or export of oil or the trans-

23  mission of electricity to or from Canada or Mexico—

6

1     (1) if the cross-border segment is operating for

2 the import, export, or transmission as of the date of

3 enactment of this Act;

4     (2) if a permit described in section 7 for the

5 construction, connection, operation, or maintenance

6 has been issued;

7     (3) if a certificate of crossing for the construc-

8 tion, connection, operation, or maintenance has pre-

9 viously been issued under this section; or

10     (4) if an application for a permit described in

11 section 7 for the construction, connection, operation,

12 or maintenance is pending on the date of enactment

13 of this Act, until the earlier of—

14     (A) the date on which the application is

15 denied; or

16     (B) July 1, 2016.

17 (d) EFFECT OF OTHER LAWS.—

18     (1) APPLICATION TO PROJECTS.—Nothing in

19 this section or section 8 affects the application of

20 any other Federal law to a project for which a cer-

21 tificate of crossing for the construction, connection,

22 operation, or maintenance of a cross-border segment

23 is sought under this section.

24     (2) ENERGY POLICY AND CONSERVATION

25 ACT.—Nothing in this section or section 8 shall af-

7

1  fect the authority of the President under section

2  103(a) of the Energy Policy and Conservation Act

3  (42 U.S.C. 6212(a)).

**SEC. 5. IMPORTATION OR EXPORTATION OF NATURAL GAS**

**TO CANADA AND MEXICO.**

6  Section 3(c) of the Natural Gas Act (15 U.S.C.

7  717b(c)) is amended—

8  (1) by striking "(c) For purposes" and insert-

9  ing the following:

10  "(c) EXPEDITED APPLICATION AND APPROVAL

11  PROCESS.—

12  "(1) IN GENERAL.—For purposes"; and

13  (2) by adding at the end the following:

14  "(2) DEADLINE FOR APPROVAL OF APPLICA-

15  TIONS RELATING TO CANADA AND MEXICO.—In the

16  case of an application for the importation or expor-

17  tation of natural gas to or from Canada or Mexico,

18  the Commission shall approve the application not

19  later than 30 days after the date of receipt of the

20  application.".

**SEC. 6. TRANSMISSION OF ELECTRIC ENERGY TO CANADA**

**AND MEXICO.**

23  (a) REPEAL OF REQUIREMENT TO SECURE

24  ORDER.—Section 202 of the Federal Power Act (16

25  U.S.C. 824a) is amended—

8

1     (1) by striking subsection (e); and

2     (2) by redesignating subsections (f) and (g) as

3   subsections (e) and (f), respectively.

4   (b) CONFORMING AMENDMENTS.—

5     (1) STATE REGULATIONS.—Subsection (e) of

6   section 202 of the Federal Power Act (16 U.S.C.

7   824a) (as redesignated by subsection (a)(2)) is

8   amended in the second sentence by striking "insofar

9   as such State regulation does not conflict with the

10  exercise of the Commission's powers under or relat-

11  ing to subsection 202(e)".

12    (2) SEASONAL DIVERSITY ELECTRICITY EX-

13  CHANGE.—Section 602(b) of the Public Utility Reg-

14  ulatory Policies Act of 1978 (16 U.S.C. 824a–4(b))

15  is amended by striking "the Commission has con-

16  ducted hearings and made the findings required

17  under section 202(e) of the Federal Power Act" and

18  all that follows through the period at the end of the

19  second sentence and inserting "the Secretary has

20  conducted hearings and finds that the proposed

21  transmission facilities would not impair the suffi-

22  ciency of electric supply within the United States or

23  would not impede or tend to impede the coordination

24  in the public interest of facilities subject to the juris-

25  diction of the Secretary.".

9

1 **SEC. 7. NO PRESIDENTIAL PERMIT REQUIRED.**

2     (a) IN GENERAL.—No Presidential permit (or similar

3 permit) required under an applicable provision described

4 in subsection (b) shall be necessary for the construction,

5 connection, operation, or maintenance of an oil or natural

6 gas pipeline or electric transmission facility, or any cross-

7 border segment of the pipeline or facility.

8     (b) APPLICABLE PROVISIONS.—Subsection (a) ap-

9 plies to—

10         (1) section 301 of title 3, United States Code;

11         (2) Executive Order 11423 (3 U.S.C. 301

12     note);

13         (3) Executive Order 13337 (3 U.S.C. 301

14     note);

15         (4) Executive Order 10485 (15 U.S.C. 717b

16     note);

17         (5) Executive Order 12038 (42 U.S.C. 7151

18     note); and

19         (6) any other Executive order.

20 **SEC. 8. MODIFICATIONS TO EXISTING PROJECTS.**

21     No certificate of crossing under section 4, or permit

22 described in section 7, shall be required for a modification

23 to the construction, connection, operation, or maintenance

24 of an oil or natural gas pipeline or electric transmission

25 facility—

10

1   (1) that is operating for the import or export

2  of oil or natural gas or the transmission of elec-

3  tricity to or from Canada or Mexico as of the date

4  of enactment of the Act;

5   (2) for which a permit described in section 7 for

6  the construction, connection, operation, or mainte-

7  nance has been issued; or

8   (3) for which a certificate of crossing for the

9  cross-border segment of the pipeline or facility has

10  previously been issued under section 4.

11 **SEC. 9. EFFECTIVE DATE; RULEMAKING DEADLINES.**

12  (a) EFFECTIVE DATE.—Sections 4 through 8, and

13 the amendments made by those sections, take effect on

14 July 1, 2016.

15  (b) RULEMAKING DEADLINES.—Each relevant offi-

16 cial described in section 4(b)(2) shall—

17   (1) not later than 180 days after the date of

18  enactment of this Act, publish in the Federal Reg-

19  ister notice of a proposed rulemaking to carry out

20  the applicable requirements of section 4; and

21   (2) not later than 1 year after the date of en-

22  actment of this Act, publish in the Federal Register

23  a final rule to carry out the applicable requirements

24  of section 4.

○