# EXHIBIT 29

Press Release, the White House, *U.S. Leadership and the Historic Paris Agreement to Combat Climate Change* (Dec. 12, 2015)

*the* WHITE HOUSE   *PRESIDENT BARACK OBAMA*



# Briefing Room

Your Weekly Address

Speeches & Remarks

Press Briefings

**Statements & Releases**

White House Schedule

Presidential Actions

Executive Orders

Presidential Memoranda

Proclamations

Legislation

Pending Legislation

Signed Legislation

Vetoed Legislation

Nominations & Appointments

Disclosures

**The White House**
Office of the Press Secretary

For Immediate Release                                    December 12, 2015

SHARE THIS:


TWITTER


FACEBOOK

# U.S. Leadership and the Historic Paris Agreement to Combat Climate Change

EMAIL

U.S. LEADERSHIP AND THE HISTORIC PARIS AGREEMENT TO COMBAT CLIMATE CHANGE

Today, more than 190 countries came together to adopt the most ambitious climate change agreement in history. The Paris Agreement establishes a long term, durable global framework to reduce global greenhouse gas emissions. For the first time, all countries commit to putting forward successive and ambitious, nationally determined climate targets and reporting on their progress towards them using a rigorous, standardized process of review.

The Agreement provides strong assurance to developing countries that they will be supported as they pursue clean and climate resilient growth.  The deal builds on the unprecedented participation of 187 countries that submitted post-2020 climate action targets in advance of the meeting, and establishes a framework to ratchet up ambition by driving down global emissions in the decades to come.

This new global framework lays the foundation for countries to work together to put the world on a path to keeping global temperature rise well below 2 degrees Celsius and sets an ambitious vision to go even farther than that. This Agreement sends a strong signal to the private sector that the global economy is moving towards clean energy, and that through innovation and ingenuity, we can achieve our climate objectives while creating new jobs, raising standards of living and lifting millions out of poverty.

The Paris Agreement is also the culmination of a broader effort by nations, businesses, cities, and citizens to reorient the global economy to a path of low-carbon growth – progress that will accelerate as a result of the Agreement's provisions on mitigation ambition, transparency, and climate finance.

***An Ambitious Agreement***

The Paris Agreement sets forward an ambitious vision for tackling climate change globally. This includes:

- **Strengthening long-term ambition:** The Agreement sets a goal of keeping warming well below 2 degrees Celsius and for the first time agrees to pursue efforts to limit the increase in temperatures to 1.5 degrees Celsius. It also acknowledges that in order to meet that target, countries should aim to peak greenhouse gas emissions as soon as possible.
- **Establishing a universal approach for all countries:** The Agreement moves beyond dividing the world into outdated categories of developed and developing countries and instead directs all parties to prepare, communicate and maintain successive and ambitious nationally determined climate targets. This approach – where countries set non-binding targets for themselves – paved the way for 187 mitigation contributions this year and will form the basis for a long-term, durable system to ratchet down emissions.
- **Locking in five year target cycles:** Under the Agreement, all countries will communicate their climate targets every five years, starting in 2020. Targets must be submitted 9-12 months before they are finalized, creating time for other countries and civil society to seek clarity about the targets submitted.

- **Ratcheting up ambition over time:** Each target should reflect progress from the prior one, reflecting the highest possible ambition that each country can achieve. This durable, long term framework will drive greater climate ambition as technologies improve and circumstances change.
- **Rigorous assessment of global climate action:** To help inform further domestic and global efforts, the Agreement puts in place a mechanism to assess collective progress on global mitigation action using the best available science. This process will begin in 2018 and occur every five years to help inform countries' future targets and strategies.
- **Sending a market signal on innovation and technology:** The mitigation components of the Agreement, combined with a broad push on innovation and technology, will help significantly scale up energy investments over the coming years – investments that will accelerate cost reductions for renewable energy and other low-carbon solutions.  This set of actions will create a mutually reinforcing cycle in which enhanced mitigation increases

investment and enhanced investment allows additional mitigation by driving down costs.

### A Transparent and Accountable Agreement

The Paris Agreement establishes a robust transparency system to help make sure that all countries are living up to their commitments. This will send a market signal to the private sector and investors that countries are serious about meeting the targets they have set.  These steps include:

- **Putting in place an enhanced transparency system for all countries:** A critical component of the Agreement, the transparency framework agreed to by parties ensures that all countries are on a level playing field with the United States with flexibility for those developing countries with less capacity.
- **Requiring countries to report on greenhouse gas inventories**: For the first time, the Agreement requires all countries to report on national inventories of emissions by source. This breakthrough will give unprecedented clarity to the public's understanding of emissions and pollution in countries throughout the world.
- **Requiring countries to report on mitigation progress:** Also for the first time, countries are required to report on information necessary to track progress made in implementing and achieving the targets and strategies countries have put forward.
- **Establishing a technical review process with agreed upon standards:** To help ensure countries are meeting transparency requirements, countries are subject to a comprehensive technical expert review process that analyzes whether reporting is in line with the standards adopted. Countries will also engage in a multilateral review with their peers to share their experiences and lessons learned.

### An Agreement for a Low-Carbon Future

Tackling climate change will require shifting global investment flows towards clean energy, forest protection, and climate-resilient infrastructure.  Developing countries, particularly the most vulnerable, will need support from the global

community as they pursue clean and resilient growth. The Paris Agreement makes real progress on this front by:

- **Providing a strong, long-term market signal that the world is locking in a low-carbon future:** The submission of ambitious national targets in five-year cycles gives investors and technology innovators a clear signal that the world will demand clean power plants, energy efficient factories and buildings, and low-carbon transportation not just in the short-term but in the decades to come. This will make it far easier to draw in the largest pools of capital that need long-term certainty in order to invest in clean technologies.
- **Giving confidence that existing financial commitments will be met:** Many developing countries, particularly the poorest and most vulnerable, came to Paris seeking reassurance that a global climate deal is not just about the big emitters but also supports their transition to a low-carbon growth path. In this regard, we are already making strong progress towards meeting the existing goal to mobilize $100 billion from a wide variety of sources, including both public and private, by 2020. The Paris outcome provides further confidence that this goal will be met and that climate finance will continue to flow. For the first time, the Agreement recognizes the reality that countries like China are already joining the base of donor countries contributing to climate finance and encourages developing countries to contribute to climate finance, while reaffirming that the United States and other developed economies should continue to take the lead.

These components of the Agreement build on steps the United States took in Paris to demonstrate its commitment to mobilizing finance from public and private sources for both mitigation and adaptation activities in developing countries. These steps include:

- **Launching Mission Innovation:** On the first day of the conference, President Obama joined other world leaders to launch Mission Innovation, a landmark commitment to accelerate public and private global clean energy innovation, and dramatically expand the new technologies that will define a clean, affordable, and reliable global power mix. Twenty countries representing around 80% of global clean energy research and development (R&D) funding base committed to double their R&D investments over five years. In addition, a coalition of 28 global investors led by Bill Gates

committed to support early-stage breakthrough energy technologies in countries that have joined Mission Innovation.

- **Doubling U.S. grant-based public finance for adaptation by 2020:** Secretary of State John Kerry announced that the United States will double its grant-based, public climate finance for adaptation by 2020. As of 2014, the United States invested more than $400 million per year of grant-based resources for climate adaptation in developing countries. These investments provide vulnerable countries with support – through both bilateral and multilateral channels – to reduce climate risks in key areas, including infrastructure, agriculture, health and water services.

### An Agreement Complemented by Subnational, Private Sector and Citizen Action

Because the Agreement should serve as a floor for future ambitious climate action, complementary actions outside of the Agreement by sub-national governments, enterprising businesses, investors and entrepreneurs, and an enlightened global public are important complements to the Paris Agreement. As part of these global efforts, Americans have demonstrated their dedication to climate action through a wide variety of commitments.

- **Compact of Mayors:** 117 United States mayors have signed onto the Compact of Mayors pledge. The Compact establishes a common platform to capture the impact of cities' collective actions through standardized measurement of emissions and climate risk, and consistent, public reporting of their efforts.
- **Under-2 MOU:** States including California, Oregon, Vermont, Washington, Minnesota, New Hampshire, and New York have signed onto the Under-2 MOU.   The MOU commits signatories to cut greenhouse gas emissions 80-95% below 1990 levels, share technology and scientific research, expand zero-emission vehicles, improve air quality by reducing short-lived climate pollutants and assess projected impacts of climate change on communities.
- **American Business Act on Climate Pledge:** 154 companies have signed the White House's **American Business Act on Climate** Pledge.  These companies have operations in all 50 states, employ nearly 11 million people, represent more than $4.2 trillion in annual revenue and have a combined market capitalization of over $7 trillion. As part of this initiative,

Case 4:16-cv-00036   Document 42-9   Filed in TXSD on 04/01/16   Page 8 of 103

each company expressed support for an ambitious Paris Agreement and announced significant pledges to reduce their emissions, increase low-carbon investments, deploy more clean energy and take other actions to build more sustainable businesses and tackle climate change.

- **American Campuses Act on Climate Pledge:** 311 colleges and universities representing over 4 million students have demonstrated their commitment to climate action by joining the **American Campuses Act on Climate** Pledge.

# EXHIBIT 30

Unauthorized Landing of Submarine Cables in the United States,
H. Rep. 67-71 (1921)

| 67TH CONGRESS,<br>1st Session. | HOUSE OF REPRESENTATIVES. | REPORT<br>No. 71. |
|---|---|---|

# UNAUTHORIZED LANDING OF SUBMARINE CABLES IN THE UNITED STATES.

MAY 16, 1921.—Referred to the House Calendar and ordered to be printed.

Mr. WEBSTER, from the Committee on Interstate and Foreign Commerce, submitted the following

# REPORT.

[To accompany S. 535.]

The Committee on Interstate and Foreign Commerce, to whom was referred the bill (S. 535) entitled "An act to prevent the unauthorized landing of submarine cables in the United States," having considered the same, report thereon with amendments and as so amended recommend that it pass.

Amend the bill as follows:

Page 1, line 8, strike out the word "however" and the following comma.

Page 1, line 9, after the word "any" insert the word "such."

Page 1, line 12, strike out the words "of the approval of"; strike out the period after the word "act" and insert the words "takes effect."

Page 1, line 12, after the word "act," strike out the comma, insert a colon and the following words: "*And provided further,* That the conditions of this act shall not apply to cables, all of which, including both terminals, lie wholly within continental United States."

Page 1, line 14, after the word "satisfied," insert the words "after due notice and hearing."

Page 1, amend the title by striking out the words "To prevent the unauthorized landing" and insert in lieu thereof the words "Relating to the landing and operation."

Speaking broadly, the purpose of the bill is to grant to the President of the United States the power to prevent the unauthorized landing of high seas submarine cables on the shores of the United States, to issue written licenses to land or operate such cables, to withhold or revoke such licenses, and to cause the removal of any such cables which are being operated in violation of the provisions of the bill.

The authority of the President to control the landing and operation of cables connecting the shores of this country with a foreign country has been asserted and exercised by the Chief Executive for a period of more than half a century.

The first instance of the exercise of this power arose during the administration of President Grant in 1869. In that year a cable company enjoying monopolistic concessions from the French Government for telegraph communication between France and the United States sought to lay a cable from a point in France to Duxbury, Mass. President Grant resisted the landing of the cable until the monopolistic feature of the French concession should be waived or abandoned and American cable concerns should be accorded the same privileges in France as the French company was seeking in the United States. Later, the French company renounced its monopoly and the landing of the cable was permitted. In his message to Congress on December 18, 1875, President Grant, discussing his action in the premises, said:

In the absence of legislation by Congress I was unwilling, on the one hand, to yield to a foreign State the right to say that its grantees might land on our shores, while it denied a similar right to our people to land on its shores, and, on the other hand, I was reluctant to deny to the great interests of the world and of civilization the facilities of such communication as were proposed. I therefore withheld any resistance to the landing of the cable on condition that the offensive monopoly feature of the concession be abandoned and that the right of any cable which may be established by authority of this Government to land upon French territory and to connect with French land lines and enjoy all the necessary facilities or privileges incident to the use thereof upon as favorable terms as any other company be conceded.

I. No line should be allowed to land on the shores of the United States under the concession from any other power which does not admit the right of any other line or lines formed in the United States to land and freely connect with and operate through its land lines.

II. No line should be allowed to land on the shores of the United States which is not by treaty stipulation with the Government from whose shores it proceeds or by prohibition in its charter or otherwise to the satisfaction of this Government prohibited from consolidating or amalgamating with any other cable-telegraph line or combining therewith for the purpose of regulating and maintaining the cost of telegraph.

In the meantime, and unless Congress otherwise directs, I shall not oppose the landing of any telegraphic cable which complies with and assents to the points above enumerated, but will feel it my duty to prevent the landing of any which does not conform to the first and second points as stated, and which will not stipulate to concede to this Government the precedence in the transmission of its official messages, and will not enter into a satisfactory arrangement with regard to its charges.

Since that time distinguished Secretaries of State and Attorneys General, among them Fish, Evarts, Frelinghuysen, Bayard, Blaine, Day, Hay, Root, Richards, Griggs, Wickersham, and McReynolds, have upheld the right of the Chief Executive to deal with submarine cable landings.

The only departure from this position occurred during the administration of President Cleveland, when Secretaries Gresham and Olney held to the opposite view. The exercise of this authority, however, has recently been challenged in the courts, the salient facts giving rise to the litigation being, briefly, these:

The Western Telegraph Co., a British corporation, has a monopoly of interport cable communication in Brazil, the effect of which is to prevent any American company from connecting by submarine cable any ports in Brazil which are touched by the cable lines of the British corporation. This company in July, 1919, entered into a written contract with the Western Union Telegraph Co. of this country, by

the terms of which the British company agreed to extend its cable from a point in Brazil to the island of Barbados, and the Western Union Co. agreed to construct a cable from Miami Beach, Fla., to Barbados, at which point connection was to be made, thereby establishing a through line of cable communication from the shores of the United States to the shores of Brazil.

In an effort to carry out its part of the contract, the Western Union Co. applied to Secretary of State Colby for executive permission to lay the cable; which permission it did not receive. Subsequently, the Western Union Co., without the permission sought, undertook to lay its line of cable from Miami to Barbados. Acting under orders from the President, the Secretary of the Navy dispatched a warship to the point where the Western Union Co. was engaged in laying its cable and compelled the company to cease its operations. The Western Union Co. already has constructed its line of cable from Barbados to a point immediately outside the 3-mile limit off the coast of Miami, where it is now fastened to a buoy. It involves a matter of but a few hours to extend the Miami portion of the cable under the territorial waters of the United States and to connect with the end of the line already laid from Barbados.

Immediately after work in laying the cable had been interrupted by the Navy Department, the Western Union Co. instituted an action in the courts of the District of Columbia, praying for an injunction against Josephus Daniels, as Secretary of the Navy, enjoining him from interfering with the company in the laying of its cable. This application is now held under advisement by the district court. Thereafter the United States of America made application to the United States District Court for the Southern District of New York for an injunction against the Western Union Telegraph Co. restraining that company from further attempting to lay the cable to Barbados.

On February 25, 1921, Judge Augustus N. Hand, of the Federal court for the southern district of New York, appears to have decided that the President does not possess the power to regulate or control the landing of submarine cables on the shores of the United States by an American company, which has accepted the provisions of the so-called post roads act of July 24, 1866 (14 Stat., 221).

On appeal to the Circuit Court of Appeals for the Second Circuit the decision of the district court was affirmed and the cause dismissed. Thereafter the case was appealed to the Supreme Court of the United States, in which it is now pending, having been finally submitted for decision. This litigation marks the only instance wherein the question of the Executive power involved has been specifically passed upon and determined by any court.

Should the decision of the circuit court of appeals be affirmed by the Supreme Court of the United States and Executive authority in the premises thus be nullified, this Government would be in the very deplorable situation, unique among civilized nations, of having no power of control over the landing of submarine cables, palpably a matter of world-wide interest and far-reaching importance. This condition would come about in this way:

The Executive will be shorn of any power upon the ground that the sole authority to regulate submarine cables is under the commerce clause of the Constitution vested in the Congress. Unless,

therefore, the Congress shall exercise its power and establish some machinery to deal with the problem, there will be no authority anywhere to cope with the situation or to protect our territory against invasion by cable companies, either domestic or foreign.

Your committee deems it proper to say that the last as well as the present administration, speaking through the Department of State, has expressed approval of the underlying principle of the bill, namely, that the power to deal with the matter of submarine cable landings and operations shall be vested in the President. It is also thought by the present Secretary of State that in view of the litigation heretofore referred to, an emergency of unusual importance exists and that Congress should take appropriate action in the premises at the earliest convenient moment. He has so advised the committee.

American cable companies have been, and are now, obliged to submit to various terms and conditions imposed by foreign governments. If this Nation is to be saved from humiliation and its interests and welfare are to be protected, similar concerns desiring to establish cable connections with our shores should be required to submit to such conditions as will protect our national rights.

It is thought by your committee that this bill will accomplish that purpose in a broad and comprehensive way.

### AMENDMENTS.

Amendment No. 1. Page 1, line 8, strike out the word "*however.*" This amendment is made in the interest of good draftsmanship.

Amendment No. 2. Page 1, line 9, after the word "any," insert the word "such." The purpose of this amendment is to narrow the scope of the broad expression used in the bill "any cable" and to confine the bill to high seas submarine cables.

Amendments Nos. 3 and 4. Page 1, line 12, strike out the words "of the approval of." Strike out the period after the word "act" and insert the words "takes effect." This amendment is in the interest of good draftsmanship intended to cover all the means by which the bill may become effective. The proviso immediately following, "*And provided further*, That the conditions of this act shall not apply to cables, all of which, including both terminals, lie wholly within continental United States," was inserted for the purpose of making it plain that the provisions of the bill do not extend to cables wholly within continental United States, but relate to high seas submarine cables.

Amendment No. 5. Page 1, line 14, after the word "satisfy," insert the words "after due notice and hearing." This was inserted for the obvious purpose of requiring such notice and hearing prior to the revocation of any license contemplated by the bill.

Amendment No. 6. Page 1, amend the title by striking out the words "To prevent the unauthorized landing" and insert in lieu thereof the words "Relating to the landing and operation." This was inserted for the purpose of correcting the somewhat misleading title of the bill as it passed the Senate and to make the title conform to the provisions of the bill.

○

# EXHIBIT 31

*American Jobs Now: A Legislative Hearing on H.R. 3548, the North American Energy Access Act*: *hearing before the Subcommittee on Energy and Power of the Committee on Energy and Commerce*, 112th Cong. (Jan. 25, 2012)
(statement of Dr. Kerri-Ann Jones, Assistant Sec'y of State)

**TESTIMONY OF
DR. KERRI-ANN JONES
ASSISTANT SECRETARY OF STATE
BUREAU OF OCEANS AND INTERNATIONAL ENVIRONMENTAL AND
SCIENTIFIC AFFAIRS
U.S. DEPARTMENT OF STATE**

**BEFORE THE SUBCOMMITTEE ON ENERGY AND POWER OF THE COMMITTEE
ON ENERGY AND COMMERCE
UNITED STATES HOUSE OF REPRESENTATIVES**

**JANUARY 25, 2012**

Good morning Chairman Whitfield, Ranking Member Rush and other Members of the

Subcommittee on Energy and Power; I appreciate the opportunity to appear before you today.

The Keystone XL project is a proposed seven billion dollar, 1,700-mile pipeline that

TransCanada Keystone Pipeline LP applied to build and operate.  It would transport up to

830,000 barrels per day of crude oil from Alberta, Canada to refineries in the U.S. Gulf Coast

Region.  Most of the oil would originate from the oil sands of Alberta, although as much as

100,000 barrels per day might have come from the Bakken formation in Montana and North

Dakota and up to 150,000 barrels per day could have been transported from Cushing, Oklahoma

to the Gulf Coast.  The U.S. Department of State received the application for this project in

September 2008.  We began a thorough, rigorous and transparent process to determine whether

issuance of a Presidential Permit for this pipeline was in the national interest.  Congress passed

the Temporary Payroll Tax Cut Continuation Act of 2011, which required a determination by the

President, within 60 days, of whether the Keystone XL pipeline project would serve the national

interest.  On January 18, 2012 the Department of State recommended to the President that the

application for a Presidential Permit be denied, due to insufficient time to conduct the necessary

1

analysis, and the President accepted our recommendation and determined that the Keystone XL pipeline project, as presented and analyzed at that time, would not serve the national interest.

I would now like to fill in some further details about our authority to conduct such a process, about the way in which we did so, and about the events that led to our final recommendation. I will also comment briefly on the Administration's view of H.R. 3548, the bill that Congressman Terry and others have introduced seeking to provide an expedited approval of the pipeline by the Federal Energy Regulatory Commission, or FERC.

On April 30, 2004, President George W. Bush issued Executive Order 13337, which amended Executive Order 11423, originally issued in 1968. Executive Order 13337 designated and empowered the Department of State to receive the applications for Presidential Permits for all oil infrastructure projects that cross a U.S. border. The Executive Order indicates that the permit should be granted based on whether it is in the national interest. The Executive Order also states that the Secretary shall consult with eight other agencies: the Departments of Commerce, Defense, Energy, Homeland Security, Interior, Justice, and Transportation, and the Environmental Protection Agency. Executive Order 13337 also envisions broader consultations to include state, tribal and local government officials and foreign governments. The Department's national interest determination factors in a  full range of issues, including energy security, foreign policy, economic effects, health, safety, and environmental considerations, including climate change, as well as any other factor the Department believes is relevant to the national interest. To make an informed decision, the Department is directed in the Executive Order to request additional information as needed from the applicant.

In order to analyze the potential environmental impacts of the project, as required by Executive Order 13337, the Department of State determined that it would prepare an Environmental Impact Statement, or EIS, consistent with the National Environmental Policy Act of 1969.

Preparation of an EIS requires significant technical expertise.  In a project of this complexity, it requires a great deal of scientific input, including from geologists, hydrologists, ecologists and botanists, to name a few.  It requires engineers that understand fluid dynamics and material strength and pipe-welding specifications.  It requires statisticians and economists; it requires experts in oil spills and emergency oil spill response.  In preparing the EIS for the Keystone pipeline, we consulted extensively with other federal agencies that have substantial direct expertise in these areas.

We followed the provisions of the NEPA regulations, and the example of other federal agencies in engaging a technical contractor to assist in developing the EIS.  ENTRIX (now Cardno ENTRIX) was selected. The applicant paid the costs of preparing the EIS. We directed the work of ENTRIX and ensured the quality of all information and analysis in the EIS.

At the same time, we conducted two parallel processes mandated by law.  Section 106 of the National Historic Preservation Act of 1966 requires agencies to consider the effects of their actions on properties that may have religious or cultural importance and to engage the Advisory Council on Historic Preservation.  In addition, Section 7 of the Endangered Species Act requires

Federal agencies to consult with the Fish and Wildlife Service to ensure that the proposed action

will not jeopardize the continued existence of any federally listed endangered or threatened

species.

Following NEPA requirements, we engaged in a robust public outreach effort.  We

carried out our consultation on many different levels, including Government-to-Government

consultations with over 95 Indian tribes.  In 2009, we conducted 20 scoping meetings in

communities along the pipeline route.  In April of 2010 we issued a Draft EIS and held 21 public

comment meetings during a 45-day period including meetings in Kansas, Montana, Nebraska,

Oklahoma, South Dakota, Texas, and Washington, DC.  As a result of these comments and

consultations, we issued a Supplemental Draft EIS in April 2011.  In the subsequent 45-day

period, we received over 280,000 comments.  On August 26, 2011, we issued the Final EIS.

Following its issuance we began an interagency review period for the national interest

determination required by Executive Order 13337 and conducted an additional public comment

period that closed on October 9, 2011.  During this period we again held public meetings in

Washington, DC and along the pipeline route, including in the Sand Hills of Nebraska.

These meetings were passionate.  We heard voices urging diametrically opposite actions

and providing solid rationales on both sides.  In Nebraska particularly, we again heard concerns,

clearly and repeatedly, about the fragile and unique Sand Hills of Nebraska and their importance

to the nation and to the people of Nebraska.  We listened to these views, many actually

supportive of the pipeline, but stressing that the route needed to be moved.   Indeed, the people

of Nebraska felt so strongly about this issue that their legislators met in special session to draft a

law to ensure the Sand Hills would be protected.  That is why we paused the process in

November 2011, and based on experience with pipelines of similar length we estimated that it

would take until early 2013 to complete our assessment.

In December 2011, as we were cooperating with Nebraska's Department of

Environmental Quality to develop a process to evaluate any potential new route, the Temporary

Payroll Tax Cut Continuation Act (H.R. 3765) was enacted into law imposing a 60-day clock on

a decision about the Keystone XL pipeline permit; at that time, the requested permit lacked

critical information, including the exact route of the pipeline.  We knew that 60 days was not

enough time to complete the work and the analysis needed relevant to the national interest

determination, especially given that the route had not been finalized.  We have been committed

to carrying out a thorough, rigorous, inclusive and transparent review of this application and this

was not possible within the timeline imposed.  We decided – based not on the merits but on the

inadequate time period and incomplete review – to recommend that the President deny the

permit.

This brings us to H.R. 3548.  Last week the President concurred with our

recommendation that the Keystone XL project would not serve the national interest at this time.

That decision was based on the fact that the exact route of the pipeline has yet to be identified in

critical areas.  As a result, there are unresolved concerns for a full range of issues, including

energy security, foreign policy, economic effects, health, safety, and environmental impacts,

among other considerations.  This new legislation would not resolve any of these concerns; it just

imposes narrow time constraints and creates automatic mandates that prevent an informed

decision.  The legislation raises serious questions about existing legal authorities, questions the continuing force of much of the federal and all of the state and local environmental and land use management authority over the pipeline, and overrides foreign policy and national security considerations implicated by a cross border permit, which are properly assessed by the State Department.

I know that each and every Member of this Committee is concerned about our nation's energy security, and I can assure you that Secretary Clinton and the Department of State share that concern.  Internationally, we remain fully engaged with all our key suppliers, including Canada, as we work on issues of energy diplomacy while at the same time transitioning to cleaner sources of energy.  As we do so, the Department of State remains committed to carrying out its responsibilities under Executive Order 13337 with diligence and fairness to the applicants but with ultimate concern for the best interests of the American people.

Thank you again for this opportunity to testify before this Subcommittee and I would be pleased to answer any questions the subcommittee might have.

# EXHIBIT 32

Record of Decision and National Interest Determination
Regarding the Alberta Clipper Pipeline,
(Aug. 3, 2007)

# DEPARTMENT OF STATE
# RECORD OF DECISION AND NATIONAL INTEREST DETERMINATION

## Enbridge Energy, Limited Partnership – Alberta Clipper Pipeline Application for Presidential Permit

**Contents**

**1.0 Summary**

**2.0 Introduction**

**3.0 Statutory Authority and Requirements**

**4.0 Purpose and Need for the Alberta Clipper Project**

**5.0 Description of Environmental Impacts and Alternatives Considered**

**6.0 Public Review and Comment**

**7.0 Decision and Basis for Decision**

**8.0 National Interest Determination**

**Appendix A - Responses to Comments on Final EIS**

## 1.0 Summary

On May 15, 2007, Enbridge Energy, Limited Partnership (Enbridge) submitted an application to the U.S. Department of State (DOS) for construction, connection, operation, and maintenance of an oil pipeline and associated facilities at the U.S./Canada border to enable Enbridge to import heavy crude oil from Canada (the Alberta Clipper Project). Enbridge is a limited partnership duly organized under the laws of the State of Delaware. Enbridge is a wholly owned subsidiary of Enbridge Energy Partners, L.P. ("Enbridge Partners") which is a Delaware master limited partnership headquartered at 1100 Louisiana, Suite 3300, Houston, Texas 77002. Enbridge Partners provides pipeline transportation of petroleum and natural gas in the Mid-Continent and Gulf Coast regions of the United States, in addition to gathering, processing, and other related operations. Enbridge Partners' two primary business segments are liquids transportation and natural gas. The liquids transportation segment involves the transportation by pipeline of crude petroleum and natural gas liquids via three main interstate pipeline systems (Lakehead, North Dakota and Ozark). The natural gas business segment involves the interstate and intrastate transportation by pipeline of natural gas as well as related gathering, midstream, and marketing operations. Enbridge Partners operates over 5,000 miles of liquids pipeline facilities in sixteen different states.

Executive Order 13337, as amended, delegates to the Secretary of State the President's authority to receive applications for permits for the construction, connection, operation, or maintenance of facilities for the exportation or importation of petroleum, petroleum products, coal, or other fuels at the border of the United States and to issue or deny such Presidential permits upon a national interest determination. On February 13, 2009, Secretary Clinton delegated to the Deputy Secretary of State and to the Deputy Secretary of State for Management and Resources, to the extent authorized by law, all authorities and functions vested in the Secretary of State or the head of agency by any act, order, determination, delegation of authority, regulation, or executive order, now or hereafter issued. Department of State Delegation of Authority No. 245-1.

The United States portion of the Alberta Clipper pipeline would consist of approximately 326.9 miles of new 36-inch-diameter pipeline and associated facilities that would be installed primarily within or adjacent to the existing Enbridge pipeline corridor from the U.S./Canada border to the existing Enbridge terminal in Superior, Wisconsin. The Project also would require new construction at existing pump stations and construction of delivery facilities and mainline valves. To meet anticipated demand, the proposed Alberta Clipper Project would provide approximately 450,000 bpd of heavy crude oil capacity. The capacity provided by the Project would provide independent utility to Enbridge and its customers for the transport of crude oil to the existing Enbridge terminal in Superior, Wisconsin. From there, crude oil can be delivered to refineries throughout U.S. Petroleum Administration for Defense District II (PADD II) and eastern Canada, as well as to other regions in the United States through interconnected existing pipeline systems. Enbridge proposes to begin construction activities for the Project in summer 2009, with a planned in-service date of early 2010, subject to receipt of all necessary permits, approvals, and authorizations pursuant to DOS regulations (40 CFR 1500-1508 and 22 CFR 161) and other relevant laws and regulations. The Canadian portion of the pipeline system has been approved by the Canadian National Energy Board (CNEB) and other reviewing entities in Canada and is under construction.

DOS has determined, through review of the Alberta Clipper Project application, that the Alberta Clipper Project would serve the national interest, in a time of considerable political tension in other major oil producing regions and countries, by providing additional access to a proximate, stable, secure supply of crude oil with minimum transportation requirements from a reliable ally

and trading partner of the United States with which we have free trade agreements that further augments the security of this energy supply. Additionally, through bilateral diplomacy and a Clean Energy Dialogue process that is underway, the United States and Canada are working cooperatively across our respective energy sectors to cooperate on best practices and technology, including in carbon sequestration and storage, so as to lower the overall environmental footprint of our energy sectors.

Concerns have been raised about higher-than-average levels of greenhouse gas (GHG) emissions associated with oil sands crude. The Administration has considered these concerns and considers that on balance they do not outweigh the benefits to the national interests identified above. The United States will continue to reduce reliance on oil through conservation and energy efficiency measures, such as recently increased Corporate Average Fuel Economy (CAFÉ) standards, as well as through the pursuit of comprehensive climate legislation and a global agreement on climate change. In addition, the United States will cooperate with the Canadian government through the Clean Energy Dialogue and other processes to promote the deployment of technologies that reduce our respective GHG emissions.

Consistent with the National Environmental Policy Act of 1969 (NEPA), DOS conducted an environmental analysis of the project and prepared and submitted a Final Environmental Impact Statement (FEIS) to the EPA on June 5, 2009. The Deputy Secretary of State, acting under delegated authority, has reviewed Enbridge's amended application, the FEIS, and the suitability of Enbridge to hold a Presidential permit for the Alberta Clipper Project. Based upon that review, the Deputy Secretary of State finds that construction, maintenance and operation of the Project in accordance with the DOS preferred alternative would have limited adverse impact to the environment.

Consistent with Section 106 of the National Historic Preservation Act of 1966 (NHPA), as amended, DOS, as the lead federal agency of a federal undertaking (issuance of a Presidential Permit), conducted consultation with consulting parties, including Indian tribes, to consider potential impacts to historic properties that would result from construction of the Alberta Clipper Project. DOS has determined that, after review of the information provided by Enbridge, consultation with the consulting parties, and the conclusion of a Programmatic Agreement (PA) to address the continuing roles and obligations of the consulting parties during the construction of the Alberta Clipper Project, the requirements of Section 106 are satisfied. Among other things, DOS intends to address the pending request from the Fond du Lac band that the 1854 Ceded Territory be recognized as a traditional cultural property pursuant to the terms of the PA.

Consistent with Section 7 of the Endangered Species Act (ESA), DOS consulted with and obtained the concurrence of the U.S. Fish and Wildlife Service (USFWS) with a final Biological Assessment (BA) on the Alberta Clipper Project. The BA concludes that the construction of the Alberta Clipper Project may affect, but is not likely to adversely affect, species protected under the ESA.

In light of these findings, the Deputy Secretary of State has decided to issue a Presidential Permit to Enbridge Energy, Limited Partnership, to construct, connect, operate, and maintain at the border of the United States pipeline facilities for the transport of crude oil between the United States and Canada as described in the Presidential Permit application received from Enbridge by DOS on May 15, 2007, as amended by the subsequent filings of Enbridge with the DOS, and in accordance with the measures described in the Environmental Mitigation Plan (EMP) and other mitigation and control plans contained in the FEIS.

## 2.0 Introduction

### 2.1 Action

On May 15, 2007 Enbridge Energy, Limited Partnership (Enbridge) applied to DOS for a Presidential Permit for construction, connection, operation, and maintenance of facilities at the border of the United States for the importation of petroleum from a foreign country. Executive Order 13337, as amended, delegates to the Secretary of State the President's authority to receive applications for permits for the construction, connection, operation, or maintenance of facilities for the exportation or importation of petroleum, petroleum products, coal, or other fuels at the border of the United States and to issue or deny such Presidential permits upon a national interest determination. As noted above, the functions assigned to the Secretary have been further delegated within the Department of State to the Deputy Secretary of State, the Under Secretary of State for Political Affairs and the Under Secretary of State for Economic, Energy and Agricultural Affairs. Further, on February 13, 2009, Secretary Clinton delegated to the Deputy Secretary of State and to the Deputy Secretary of State for Management and Resources, to the extent authorized by law, all authorities and functions vested in the Secretary of State or the head of agency by any act, order, determination, delegation of authority, regulation, or executive order, now or hereafter issued. Department of State Delegation of Authority No. 245-1.

The DOS engaged in an environmental review of the project consistent with NEPA and prepared and issued a Final Environmental Impact Statement (FEIS) on June 5, 2009. This FEIS addresses the portion of the Alberta Clipper pipeline within the United States to inform the Department's decision on issuance of a Presidential Permit in response to Enbridge's application and to support the decisions of other federal agencies whose actions are necessary to allow the project to proceed.

Issuance of a Presidential Permit to Enbridge would allow it to construct, connect, operate and maintain pipeline facilities at the border between the United States and Canada within a right-of-way adjacent to the point at which Enbridge's existing pipeline facilities cross the border.

### 2.2 Alberta Clipper Pipeline

The proposed Alberta Clipper pipeline would be a new pipeline that would transport crude oil from Enbridge's existing facilities in Hardisty, Alberta, Canada to its existing terminal in Superior, Wisconsin. From there, the liquid hydrocarbons would be transported to Midwestern markets, the eastern United States and Canada, and the Midcontinent and U.S. Gulf markets. Crude oil would be transported to markets in the Midwest and beyond via Enbridge's Lakehead System, non-Enbridge pipelines, and potentially through pipelines that may be constructed in the future. The proposed pipeline would be designed to transport an average crude oil volume of approximately 450,000 bpd.

Overall, the Alberta Clipper pipeline would consist of a new pipeline and associated facilities in both Canada and the United States. This Record of Decision and National Interest Determination, only address the United States portion of the Alberta Clipper pipeline in accordance with CEQ guidance on NEPA, implementing regulations, and EO 12114 and 13337. The primary components of the U.S. portion of the pipeline would be the new pipeline, new mainline valves, and additional pumping capacity at three existing pump stations. The U.S. portion of the pipeline would extend approximately 326.9 miles from the U.S./Canada border near Neche, North Dakota through Minnesota and Wisconsin to the existing Enbridge terminal in Superior, Wisconsin. A

total of 32 mainline valves would be installed at key locations along the alignment. The Canadian portion of the pipeline system has been approved by the Canadian National Energy Board (CNEB) and other reviewing entities in Canada and is under construction.

The U.S. portion of the pipeline system was evaluated in the DOS FEIS issued on June 5, 2009. It traverses either all or portions of the States of North Dakota, Minnesota, and Wisconsin. The project will be located primarily in rural areas, but will be routed through or near populated areas occurring around Bemidji, Minnesota, the Leech Lake Reservation in Minnesota, the Fond du Lac Reservation in Minnesota, and Superior, Wisconsin. The U.S. counties that will be affected by the pipeline are:

- Pembina County in North Dakota
- Kittson, Marshall, Pennington, Red Lake, Polk, Clearwater, Beltrami, Hubbard, Cass, Itasca, Aitkin, St. Louis, and Carlton Counties in Minnesota and
- Douglas County in Wisconsin

The Alberta Clipper pipeline would be installed within or adjacent to the existing Enbridge right-of-way along the majority of its route. Enbridge has identified 42 locations where the construction right-of-way would be 85 feet or more from the existing right-of-way due to the need to avoid conflicts with existing land uses. The total distance of those 42 sections of the route would be approximately 40 miles, or about 12 percent of the total route.

Along most of the route, construction activities would require a 140-foot-wide construction right-of-way. In wetland areas, the total width of the construction right-of-way would be reduced to 125 feet, except where construction through wetlands is conducted during winter. In those areas, the construction right-of-way would be 140 feet.

From Neche to Clearbrook, the pipe would be generally installed approximately 25 feet from the Southern Lights LSr Project pipeline. Along that portion of the proposed route, the spoil side (the area used to store topsoil and excavated material) typically would be approximately 35 to 50 feet wide and within Enbridge's existing maintained right-of-way. The working side (equipment work area and travel lane) typically would be 90 feet wide and generally outside of Enbridge's existing maintained right-of-way.

Between Clearbrook and Superior, the Alberta Clipper would be constructed within the same corridor at approximately the same time. The spoil side of the construction right-of-way typically would be approximately 50 feet wide and within Enbridge's existing maintained right-of-way. The working side of the construction right-of-way typically would be 90 feet wide and outside of Enbridge's existing maintained right-of-way.

Aboveground facilities would include mainline valves installed within the same construction right-of-way as that of the pipeline. The new pumps and associated facilities required at the three existing pump stations would require the following area: 3.2 acres at the Viking Pump Station, 2.1 acres at the Deer River Pump Station, and 1.8 acres at the Clearbrook Pump Station (which is located within the boundaries of the Clearbrook Terminal). At the Viking Pump Station, all facilities would be constructed on Enbridge's existing property but would be outside of and adjacent to the existing fenced area. At the Deer River Pump Station, all new facilities except the electrical switchgear building would be within the existing fence line; the area required outside of and adjacent to the existing station would cover about 0.06 acre and would be on existing Enbridge property. The fenced area would be expanded to include the new facilities at the Viking

and Deer Park locations. All of the new facilities required for the Project at the Clearbrook Pump Station would be installed within the fenced area of the Clearbrook Terminal.

Construction of the U.S. portion of the pipeline route would involve a total of three perennial and 24 intermittent waterbody crossings in North Dakota; 76 perennial and 86 intermittent waterbody crossings in Minnesota (15 additional crossings have not yet been surveyed), and one perennial and 13 intermittent waterbody crossings in Wisconsin. Approximately 1,346.16 acres of wetlands would be impacted during construction of the proposed Project, 820.64 acres of which would be permanently maintained in an herbaceous state during operations. The predominant wetland types that would be crossed by the proposed Project are forested and scrub-shrub communities.

Extra construction workspace areas would be needed where the proposed route crosses features such as waterbodies, some wetland crossings, steep slopes, roads, railroads, and existing pipelines and utilities. These extra workspaces, which would be outside of the typical construction right-of-way, would be used to stage equipment and stockpile excavated material. It is expected that refinement of extra workspace areas would continue during the pre-construction phase of the proposed Project. Additional extra workspace areas may be needed as determined by site conditions at the time of construction. If additional extra workspace is needed beyond the areas identified in the FEIS, Enbridge would seek approval from the appropriate agencies for establishing each workspace prior to use of an area.

## 3.0 Statutory Authority and Requirements

The Secretary of State has the authority under Executive Order 13337, as amended, to approve or deny applications for Presidential Permits and to issue such permits on such terms and conditions that the Secretary determines are appropriate, if the Secretary finds that issuance of the permit would serve the national interest. The President has delegated this authority to the Secretary based on his authority under the Constitution and laws of the United States, including Section 301 of Title 3 of the United States Code. The functions assigned to the Secretary have been further delegated within the Department of State to the Deputy Secretary of State, the Under Secretary of State for Political Affairs and the Under Secretary of State for Economic, Energy and Agricultural Affairs. Further, on February 13, 2009, Secretary Clinton delegated to the Deputy Secretary of State and to the Deputy Secretary of State for Management and Resources, to the extent authorized by law, all authorities and functions vested in the Secretary of State or the head of agency by any act, order, determination, delegation of authority, regulation, or executive order, now or hereafter issued. Department of State Delegation of Authority No. 245-1.

Executive Order 13337 specifically authorizes the issuance of Presidential Permits for the "construction, connection, operation, or maintenance at the borders of the United States of facilities for the exportation or importation of petroleum, petroleum products, coal or other fuels to or from a foreign country." Because the Alberta Clipper Project seeks to transport crude oil between Canada and the United States across the international border, the Alberta Clipper Project is within the scope of Executive Order 13337 and within the authority of the Secretary of State (or her delegate) under that Executive Order. Once the Secretary's decision has been made, selected agency officials may indicate their disagreement with the decision and request that the Secretary refer the application to the President under Executive Order 13337. In the event no such request is made within 15 days of notification of the Secretary's decision, the Secretary's decision is final and the Presidential Permit is issued.

As noted above, when reviewing an application for a Presidential Permit, the Secretary is required to determine if issuance of the permit is in the national interest. The Secretary also considers the environmental impacts of the proposed action consistent with NEPA and considers any other relevant statutory provisions. These have been determined to include:

a) Section 404 of the Clean Water Act - The Alberta Clipper Project will affect jurisdictional wetlands and require crossing of navigable waters of the United States. These actions will require Enbridge to obtain permits from the U.S. Army Corps of Engineers (COE).

b) Section 7 of the Endangered Species Act (ESA) - The Alberta Clipper Project will be constructed and operated in areas where federally listed species or their critical habitat are known to occur. DOS has prepared a Biological Assessment, in consultation with the U.S. Fish and Wildlife Service (USFWS) and state agencies, concerning effects of the Alberta Clipper Project on species listed for protection.

c) Section 106 of the National Historic Preservation Act of 1966 (NHPA), as amended - The DOS, as the lead federal agency on a federal undertaking (issuance of a Presidential Permit), is required to consider the impacts to historic properties before that undertaking occurs and take appropriate actions.

The purpose of preparing a project-specific EIS consistent with NEPA is to provide a public document that informs decision makers about the potential environmental impacts of a project if it is undertaken in accordance with existing laws and regulations The purpose is not to speculate on potential changes to laws or policies that may occur at some undetermined time in the future. Therefore, the EIS for the proposed Alberta Clipper Project does not consider such speculative changes to laws or policies. DOS recognizes that the proposed Project, if approved, would need to adhere to all applicable laws that exist at the time of construction and operation.

## 4.0 Purpose and Need for the Alberta Clipper Project

The overall purpose of the Alberta Clipper Project is to enable the transport of additional crude oil into the United States from existing Enbridge facilities in western Canada to meet the demands of refineries and markets in those areas. Enbridge has proposed the Project to (1) meet the increased demand for heavy crude oil by refiners in the United States and offset the decreasing domestic crude oil supply from some regions of the United States that have traditionally served refineries in U.S. Petroleum Administration for Defense District II (PADD II – the U.S. Midwest); (2) reduce U.S. dependence on oil obtained from outside of North America by increasing access to more stable and secure Canadian crude oil supplies; and (3) meet demonstrated shipper interest in an overall Enbridge system expansion.

The U.S. Energy Information Agency (EIA) projects that the balance between domestic supply and demand will require the "unconventional" oil supply from Canada, which is predominately heavy crude from reserves in western Canada, to grow from approximately 1.5 million bpd in 2008 to over 4.3 million bpd by 2030. This increase in heavy crude imports is consistent with the observation that many U.S. refineries have been, or are in the process of being, retrofitted to accommodate heavy crude in order to remain cost-competitive with overseas suppliers of refined petroleum products.

Nearly all heavy and light crude oil imported from Canada in 2006 came from the Western Canadian Sedimentary Basin, and nearly all of it was transported through three major pipeline systems: Enbridge, Kinder Morgan Express, and Kinder Morgan TransMountain. These three pipelines have a maximum transport capacity of about 2.4 million bpd, with about 1.9 million bpd transported from the basin to several U.S. markets, including the Midwest. However, the majority of that volume continues to be sold into PADD II, where a large proportion of U.S. refining capacity is located. In recent years, the amount forwarded on to refiners in PADD III (the U.S. Gulf Coast) increased to meet refinery needs in that area as capacity grew and to slightly offset declines in offshore production or waterborne imports. These two districts are directly and indirectly served by the Enbridge system and Kinder Morgan Express, which together have a crude oil capacity—including both heavy and light crudes—of 2.0 million bpd.

With the Canadian National Energy Board's 2006 projections of an additional 1.5 million bpd of production from the basin by 2015 and assuming that Canada continues to export more than 70 percent of its production to the United States (the current export amount), an additional 1.1 million bpd of heavy crude oil will be flowing from the basin to the United States by 2015. This is approximately consistent with the Canadian Association of Petroleum Producer's projection of a pipeline capacity shortfall of 1.9 million bpd by 2015.

U.S. refiners have upgraded their refineries to process heavy crude oil, much of which is obtained from relatively unstable and insecure foreign sources. The crude oil that the Alberta Clipper Project would assist in delivering to U.S. refiners would replace or supplement a portion of that existing supply of heavy crude oil.

To meet the anticipated demand, the proposed Alberta Clipper Project would enable the cross-border transport of approximately 450,000 bpd of heavy crude oil . The transportation capacity provided by the Project would provide independent utility to Enbridge and its customers for the transport of crude oil to the existing Enbridge terminal in Superior, Wisconsin. From there, crude oil can be delivered to refineries throughout PADD II and eastern Canada, as well as to other

regions in the United States through interconnected existing pipeline systems. Enbridge would not own the oil and would not determine its destination.

Some of the capacity shortfall will be met by the 450,000-bpd capacity of the Keystone Pipeline Project (upgradeable to 590,000 bpd), which is currently being constructed by TransCanada. However, the refinery market served by the Keystone Project is largely different from the markets that would be served by the Alberta Clipper pipeline. The Alberta Clipper pipeline would tie into existing pipeline infrastructure in Superior, Wisconsin and primarily provide crude oil to refineries in the Midwest United States (e.g., Wisconsin, Michigan, Indiana) and Canada. The Keystone Project would primarily provide crude oil to southern Illinois, Oklahoma, and potentially refineries along the Gulf Coast. An additional portion of the capacity shortfall could be met by the Alberta Clipper pipeline's proposed pipeline capacity of 450,000 bpd. The remaining shortfall of 60,000 to 860,000 bpd would necessitate additional pipeline construction and/or expansion, which could include the proposed Keystone XL pipeline from Alberta to the U.S. Gulf Coast. This proposed pipeline would have an initial capacity of 700,000 bpd and an ultimate capacity of 900,000 bpd.

## 5.0 Description of Environmental Impacts, Alternatives Considered, and Environmental Commitments and Mitigation

Consistent with NEPA, DOS staff prepared a FEIS to inform the DOS, and allow the DOS to consider, the potential environmental, social, and economic impacts of the U.S. portion of Enbridge's proposed pipeline when making the decision to approve or deny Enbridge's Application for a Presidential Permit. The EIS was prepared consistent with the Council for Environmental Quality (CEQ) implementing regulations on NEPA's Procedural requirements (40 CFR Parts 1500-1508, as amended), Executive Order 11514 on Protection and Enhancement of Environmental Quality (35 Fed. Reg. 4247, as amended (March 5, 1970), and the Department of State's own regulations, 22 C.F.R. Part 161, as amended. The EIS for the U.S. portion of the pipeline was prepared by Entrix, Inc., on behalf of the Department of State. The EIS examined the impacts of the United States portion of the Alberta Clipper pipeline, including connected actions. The scope of the EIS was determined after consideration of input from the public, Indian tribes, and federal, state and local agencies. Short-term and long-term construction and operations impacts were analyzed as were the cumulative impacts of construction and operation of the U.S. portion of the Alberta Clipper pipeline as well as other past, present, and reasonably foreseeable future projects.

The EIS included an analysis of reasonable project alternatives to determine whether any would be preferable to Enbridge's proposed action. Alternatives considered included: system alternatives (use of other existing or proposed pipelines), major route alternatives, route variations, and alternative sites for aboveground facilities. The No Action alternative was also evaluated.

The EIS analysis found that none of the system alternatives could meet the project objectives presented by Enbridge. Enbridge's proposed pipeline route was found to be preferred to the other route alternatives considered, either because the other route alternatives did not meet project objectives or because the other route alternatives had greater impacts as a result of greater length or increased effects on sensitive resources.

A summary of the potential direct, indirect and cumulative impacts of construction and operation of the U.S. portion of the Alberta Clipper pipeline is provided below. A summary of the mitigation measures presently included in the EMP and those to be included as a result of consultation with federal and state agencies during the EIS process is also provided below.

### 5.1 Geology

The U.S. portion of the proposed Alberta Clipper pipeline would not involve substantial topographical alteration and would not disturb any geological features protected by federal or state laws. Less than 1 percent of the proposed pipeline route may require blasting. The Enbridge Blasting Plan (Appendix L of the EIS) identifies requirements for developing a site-specific blasting plan for any area where blasting is deemed necessary. These site-specific plans would account for protection of aboveground and below ground structures (such as water mains), resources (such as threatened and endangered species), and water resources (surface water and groundwater). Pleistocene-age mammal fossils may be unearthed during excavation activities in the area of the proposed pipeline; however, it is unlikely that any scientifically significant fossils are present in the area of the proposed pipeline.

Proposed construction techniques, along with erosion control and slope stabilization, and measures identified in the Enbridge EMP (Appendix C of the EIS) and other plans would reduce potential impacts related to geologic hazards.

Overall, geologic impacts associated with routine operations and maintenance of the proposed pipeline would be minimal. Routine pipeline operation and maintenance are not expected to affect physiography or bedrock geology, paleontological resources, mineral resources, or flooding.

### 5.2 Soils

Construction of the U.S. portion of the proposed Alberta Clipper pipeline would disturb soils, resulting in increased potential for erosion, compaction, and mixing of topsoil; damage to agricultural drainage tiles; and introduction of rock to the surface soil. Agricultural production on approximately 2,528.8 acres would be temporarily lost from production for the construction season. Enbridge has proposed construction procedures, including state-specific EMPs (Appendix C of the EIS) and an Agricultural Mitigation Plan (Appendix F of the EIS), designed to minimize the likelihood and severity of these impacts, and to mitigate where impacts are unavoidable.

In the event that previously contaminated soils were discovered during construction, Enbridge would stop work immediately, contact the appropriate state or tribal agency, and consult with the agency with respect to an acceptable plan of action in accordance with Enbridge's Petroleum-Contaminated Soil Management Plan (Appendix J of the EIS).

Should a spill occur that causes damage to soil productivity, Enbridge's easement agreements with landowners would require Enbridge to restore the productivity of the right-of-way and compensate landowners or tenants for demonstrated losses associated with decreased productivity resulting from pipeline construction and operation. Impacts would be mitigated in compliance with applicable federal, state, tribal, and local cleanup standards.

Enbridge has also developed an Anthrax Mitigation Plan (Appendix I of the EIS) to address the potential exposure of animals to anthrax spores resulting from construction activities.

Overall, construction and operation of the U.S. portion of the proposed pipeline are expected to cause minor impacts to soil resources with implementation of the existing Enbridge plans and compliance with applicable regulations and permits.

### 5.3 Water Resources

Only short-term fluctuations of groundwater levels are expected during construction, and recharge is expected to occur in a short period after construction. Implementation of Enbridge's procedures for minimizing the likelihood of a spill and controlling the impacts if a spill were to occur would reduce potential impacts during construction or operation, as described in the Spill Prevention, Containment, and Control Plan (SPCC) (Appendix E of the EIS) and Emergency Response Plan (Appendix Q of the EIS).

The U.S. portion of the proposed Alberta Clipper pipeline route would involve a total of three perennial and 24 intermittent waterbody crossings in North Dakota; 76 perennial and 86 intermittent crossings in Minnesota (15 additional crossings have not yet been surveyed), and one perennial and 13 intermittent waterbody crossings in Wisconsin.

Construction of the pipeline could result in temporary or short-term impacts due to increased sedimentation, degradation of aquatic habitat from instream construction activities, increased runoff and erosion, changes in channel morphology and stability, temporary reductions in flow during hydrostatic testing activities, alteration of aquatic habitat, and temporary to short-term surface water quality degradation during or after construction from disposal of materials and equipment or from vehicle spills and leaks. Various mitigation measures are proposed to avoid and minimize these potential impacts, including locating extra workspace areas at least 50 feet from the edge of a waterbody, providing temporary erosion control for certain waterbody crossing methods, and restoring waterbodies as soon as practical after construction. Implementation of measures described in the state-specific EMPs (Appendix C) would reduce erosion of soil or sediment and control surface water runoff during construction activities near waterbodies.

Overall, it is not anticipated that groundwater or surface water quality would be significantly affected during pipeline construction or operation.

Subsequent to the issuance of FEIS, EPA raised concerns that construction of the proposed Project could exacerbate groundwater contamination problems in the vicinity of the St. Regis Superfund site that could pose a threat to worker safety. As stated in the FEIS, previous investigations found no evidence of soil contamination along the proposed Project route. EPA is currently working with Enbridge to develop work plans to investigate groundwater contamination in the vicinity of the St. Regis Superfund Site. DOS urges Enbridge to finalize a work plan to investigate potential groundwater contamination and coordinate with EPA on any appropriate measures to protect worker safety and minimize potential environmental impacts in the event that there is groundwater contamination along the proposed route.

## 5.4 Wetlands

Approximately 1,346.16 acres of wetlands would be impacted during construction and operation of the U.S. portion of the proposed pipeline, 820.64 acres of which would be permanently maintained in an herbaceous state during operations. The proposed pipeline would cross one known and five potential wetlands listed in the Minnesota Department of Natural Resources (MDNR) Protected Waters Inventory as public water wetlands. Two Wetlands Reserve Program (WRP) wetlands, the Pokegama Carnegie Wetlands, and the Superior Airport/Hill Avenue Wetlands/South Superior Triangle Wetlands, also would be crossed by the proposed Alberta Clipper pipeline. Enbridge is currently consulting with Wisconsin Department of Natural Resources (WDNR) and the Army Corps of Engineers (COE) to conduct an alternatives analysis in this area and has developed the Pokegama Plan (Appendix T of the EIS) that would minimize impacts to the resource. Enbridge minimized impacts to the Superior Airport/Hill Avenue Wetlands/South Superior Triangle Wetlands during initial routing and does not propose additional mitigation.

To minimize potential construction and operation impacts, Enbridge would implement procedures outlined in the state-specific EMPs (Appendix C of the EIS) for wetland crossings. Enbridge would minimize impacts and restore wetlands affected by construction activities, to the extent practical. In addition to standard construction efforts, winter construction has been proposed for up to approximately 25 miles of expansive wetlands. Enbridge has prepared a Winter Construction Plan (Appendix O of the EIS) that identifies several mitigation measures to reduce impacts to wetlands associated with winter construction activities.

To further minimize impacts to this habitat, and in accordance with current or expected COE, MDNR, and Minnesota Public Utilities Commission (MPUC) permitting requirements, DOS has

recommended that Enbridge develop a construction management plan for approval by the COE at least 1 week prior to construction to include: an endangered resource plan; identification and inventory of existing plant communities; a preliminary wetland restoration plan; a replanting and reseeding plan; and a preliminary 5-year, site-specific post-construction monitoring plan for the wetland complex located between MP 853 and MP 854, or as otherwise directed by the COE for the U.S. portion of the Alberta Clipper pipeline; and that Enbridge take all necessary and reasonable measures to protect the wetland complex between MP 853 and MP 854, and submit proposed site plans to MDNR and MPUC 14 days prior to construction through the area, or as otherwise directed by MDNR and MPUC for the Alberta Clipper pipeline. Impacts to the sensitive vegetation at this location would further be minimized by construction of the pipeline on the north side of the right-of-way where the habitat is less sensitive.

Compensatory wetland mitigation is being developed in consultation with the COE and appropriate state resource agencies to offset unavoidable impacts to wetlands, which would result in no net loss of wetland function due to the proposed pipeline.

Overall, temporary and permanent impacts to wetlands, mitigated according to Enbridge plans and agency requirements would result in minor impacts to wetland resources.

## 5.5 Terrestrial Vegetation

Vegetation classes potentially affected by the U.S. portion of the proposed Alberta Clipper pipeline during construction include upland forested lands (1,254.5 acres), agricultural lands (2,528.8 acres), developed lands (617.2 acres), open lands (655.4 acres), and wetlands (1,346.2 acres). The primary impacts to vegetation from construction would be cutting, clearing, or removing the existing vegetation within the construction work area, along with the potential introduction of noxious weeds.

The same vegetation communities would be affected by the pipeline during operations since the permanent right-of-way would be maintained in an herbaceous condition. The permanent right-of-way would consist of previously forested uplands (622.2 acres), agricultural lands (569.4 acres), developed lands (36.7 acres), open lands (195.2 acres), and wetlands (820.7 acres). Permanent impacts would occur within the permanent right-of-way, where trees and shrubland would be removed and prevented from reestablishing through the periodic mowing and brush clearing required for pipeline operation and inspections.

Impacts to forested lands would be incurred in the areas within the permanent right-of-way that would not be allowed to revert to pre-construction cover. Even in construction areas that would be able to revert to forested land, complete recovery of these areas would require decades. Therefore, pipeline construction in forested areas would cause a long-term to permanent, localized impact on forested land.

Enbridge has identified measures to limit impacts to vegetation in its Agricultural Mitigation Plan (Appendix F of the EIS), state-specific EMPs (Appendix C of the EIS), Noxious Weed Plans (Appendix H of the EIS), and Revegetation and Restoration Monitoring Plans (Appendix K of the EIS). To further minimize potential impacts, DOS has identified mitigation measures to address potential impacts to vegetation communities of conservation concern and noxious weeds. In accordance with federal and/or state permitting requirements, DOS has recommended that Enbridge should:

- Take care to avoid damage between April 1 and July 1 to any live, standing residual oak trees adjacent to the right-of-way in counties where oak wilt occurs, and when construction occurs through forested areas containing oak trees. If any such damage does occur, the damaged areas on the trees should be immediately covered with pruning or latex paint.

- Develop a Construction Mitigation Plan (CMP) for the wetland complex located between MP 853 and MP 854, for approval by the COE at least 1 week prior to construction, that provides, among other things, an endangered resource plan; identification and inventory of existing plant communities; a preliminary wetland restoration plan; a replanting and reseeding plan; and a preliminary 5-year, site-specific post-construction monitoring plan—or as otherwise directed by the COE for the U.S. portion of the Alberta Clipper pipeline.

- Take all necessary and reasonable measures to protect the wetland complex between MP 853 and MP 854, and submit proposed site plans to MDNR and MPUC 14 days prior to construction through the area, or as otherwise directed by MDNR and MPUC for the U.S. portion of the Alberta Clipper pipeline.

In addition, DOS has recommended that revegetation in non-agricultural areas be considered successful if upon visual survey the density and cover of non-nuisance vegetation are similar in density (i.e., greater than 70 percent) and cover to adjacent undisturbed lands. With implementation of Enbridge's proposed mitigation and the additional mitigation measures identified by DOS, impacts to terrestrial vegetation for the proposed Project would be minor.

## 5.6 Wildlife

Construction and operation of the U.S. portion of the proposed Alberta Clipper pipeline would result in both short-term disturbance and long-term modification to wildlife habitats, including increased habitat fragmentation and widening of the existing right-of-way. Total habitat loss and alteration due to pipeline construction would be small in the context of available habitat because of the linear nature of the pipeline and the extent of collocation proposed. Operation of the pipeline would be expected to have little, if any, additional effects on wildlife.

To limit potential construction and operation impacts to wildlife, Enbridge has identified mitigation procedures in its state-specific EMPs (Appendix C of the EIS), Revegetation and Restoration Monitoring Plans (Appendix K of the EIS), and Noxious Weed Plans (Appendix H of the EIS), as well as in the Agricultural Mitigation Plan (Appendix F of the EIS) and Migratory Bird Plan (Appendix V of the EIS). Pipeline construction would also be conducted in accordance with required permits.

In addition, DOS has recommended that Enbridge, in accordance with USFWS requirements, should finalize plans to survey for migratory bird nests during the nesting season; finalize measures to avoid impacts to migratory bird nests, such as avoidance of land clearing during the primary nesting season (May 1 through July 15 within the Project area); and continue to consult with FWS to develop compensatory mitigation for the loss of quality upland nesting habitats for migratory birds.

Implementation of measures in the Enbridge plans, along with the mitigation measures recommended by the COE, USFWS, and DOS, would reduce impacts to wildlife. Consequently, overall impacts to wildlife resulting from the U.S. portion of the Alberta Clipper pipeline are expected to be minor.

## 5.7 Fisheries

The U.S. portion of the proposed Alberta Clipper pipeline could affect fisheries resources by loss or alteration of habitat; reduced spawning success; direct and indirect mortality; adverse health effects; and loss of individuals and habitats due to hydrostatic testing and exposure to toxic materials. Enbridge would adhere to agency recommendations on timing windows for instream work. All stream crossing methods would require review and approval by the COE and other relevant agencies prior to construction. In addition, Enbridge would need to demonstrate to the COE that each waterbody crossing method is the Least Environmentally Damaging Preferred Alternative (LEDPA) in accordance with EPA's 401(b)(1) Guidelines and COE's regulations.

Enbridge proposes to modify crossing methods based on flow conditions at the time of construction. Consequently, the open-cut method would be used for waterbodies planned as a dry crossing, if the waterbody is dry or has no perceptible flow at the time of construction. Alternatively, a dry crossing method would be used for waterbodies planned as an open cut, but with perceptible flow at the time of construction.

Potential impacts would be avoided and minimized to the degree practical by implementing Best Management Plans (BMPs). The state-specific EMPs (Appendix C of the EIS) describe the BMPs that would be used for each type of waterbody crossing to reduce potential effects on fish and aquatic/streambank habitat. To minimize the impacts of construction activities on fish and their habitats, Enbridge generally would complete all open-cut instream activity for minor waterbody crossings (less than 10 feet wide) within 24 hours and all activity for intermediate (10 to 99 feet wide) and major (100 feet wide or greater) waterbodies would be crossed in less than 48 hours, not including those crossed using the horizontal directional drill (subsurface) construction method.

DOS has recommended that Enbridge develop a Construction Management Plan for the Lost River—for approval by the COE at least 1 week prior to construction—that includes confirmation of the crossing method, site-specific mitigation to minimize impacts, a list of all sediment and erosion control equipment that would be on-site, and an endangered resource plan, as directed by the COE.

Implementation of the Enbridge plans and DOS-recommended mitigation would result in overall minor impacts to aquatic habitat and organisms.

## 5.8 Threatened, Endangered, and Sensitive Animals and Plants

Federally-listed threatened, endangered, or candidate species identified by the USFWS as potentially being affected by the U.S. portion of the Alberta Clipper pipeline include Kirtland's warbler, piping plover, Canada lynx, gray wolf (delisted by USFWS in a final rule dated April 2, 2009; effective May 4, 2009), Dakota skipper, and western prairie fringed orchid. In addition to the federally-protected species identified, several state- and tribal-designated threatened, endangered, and sensitive species were identified as potentially being affected by the U.S. portion of the proposed pipeline.

Construction of the U.S. portion of the Alberta Clipper pipeline would result in a small reduction in available habitats for some sensitive bird species, mammals, aquatic animals, and plants. Enbridge has identified mitigation procedures in its state-specific EMPs (Appendix C of the EIS), Revegetation and Restoration Monitoring Plans (Appendix K of the EIS), and Noxious Weed Plans (Appendix H of the EIS), as well as in the Agricultural Mitigation Plan (Appendix F of the

EIS) and Migratory Bird Plan (Appendix V of the EIS) that would reduce impacts on special-status species. Pipeline construction would be conducted in accordance with required permits. Impacts to sensitive mammals, plants, and aquatic animals would be minimized by implementation of measures described in these plans and measures recommended by the COE, USFWS, state resource agencies, and tribes.

Further, DOS has recommended that Enbridge, in accordance with USFWS requirements, finalize plans to survey for migratory bird nests during the nesting season; continue to develop measures to avoid impacts to migratory bird nests, such as avoidance of land clearing during the primary nesting season (May 1 through July 15 within the U.S. portion of the Alberta Clipper pipeline area); and continue to consult with USFWS to develop compensatory mitigation for migratory bird nesting habitat loss. Enbridge should relocate the creek heelsplitter mussels encountered in the Swan River (MP 1024.2) prior to instream construction and/or in accordance with COE requirements associated with these waterbody crossings.

With these measures, DOS concludes that the U.S. portion of the Alberta Clipper pipeline either would have no effect or may affect, but would not be likely to adversely affect, federally-listed or candidate species. Section 7 informal consultation with USFWS has been completed, and USFWS has concurred with the determinations presented in the EIS for federally-listed threatened, endangered and candidate species.

## 5.9 Land Use

Land uses that would be affected by the U.S. portion of the Alberta Clipper pipeline include agriculture, open land, wetlands, waterbodies, residential land, and recreational and other special interest areas. In general, lands required for construction would be temporarily impacted, while lands required for operation of the pipeline would be permanently impacted. Construction of the proposed pipeline would affect the following land use categories: forested lands (1,254.5 acres), agricultural lands (2,528.8 acres), developed lands (617.2 acres), open lands (655.4 acres), and wetland/open water (1,346.2 acres). Total land use acres that would be affected by construction of the proposed pipeline are 6,402.1 acres.

To address potential impacts to agricultural lands, Enbridge has proposed a number of mitigation measures that are detailed in the Agricultural Mitigation Plan (Appendix F of the EIS). Further, Enbridge would compensate all landowners for lost crops during construction and any documented damage caused by construction activities. After construction, Enbridge would repair or restore drain tiles, fences, and land productivity as these may be damaged during the construction process; agricultural land would be allowed to revert to its previous uses, except for land that would be set aside for permanent access roads; Enbridge would directly purchase such land from individual landowners. Construction impacts to general agricultural activities are expected to be minor and temporary; operations impacts would be minor but permanent.

On open lands, construction would require clearing of herbaceous plants and shrubs on the existing right-of-way and in construction work areas. Clearing of these shrubs and plants would result in some minor impacts. Enbridge would reseed and mulch upland open land areas after construction is completed.

Impacts to forested lands would be incurred in the areas within the permanent right-of-way that would not be allowed to revert to pre-construction cover. Even in construction areas that would be able to revert to forested land, complete recovery of these areas would require decades.

Therefore, pipeline construction in forested areas would cause a long-term to permanent, localized impact on forested land.

Enbridge has developed site-specific construction and mitigation plans for construction activities near residential and commercial structures. Operation of the pipeline has the potential to impact residential properties and landowners. Structures would not be permitted on the permanent right-of-way, and trees would not be allowed to re-grow within the pipeline right-of-way. This permanent easement on residential properties would be considered a permanent impact in that it restricts the use of that portion of the property. This limited use would be accounted for in the easement negotiations between individual landowners and Enbridge.

The U.S. portion of the Alberta Clipper pipeline would cross various recreation and special interest areas, resulting in temporary construction impacts and potential permanent impacts. Enbridge has developed mitigation measures for these areas in the state-specific EMPs (Appendix C of the EIS). The area of the Chippewa National Forest (CNF) crossed by the proposed pipeline is completely within the Leech Lake Reservation. A detailed description of impacts and mitigation measures within these areas is provided in Appendix U of the EIS.

The proposed pipeline would cross approximately 12.9 miles of the Fond du Lac Reservation; the entire length of the pipeline through the reservation would be collocated with the existing Enbridge pipeline right-of-way. Enbridge is working closely with the Fond du Lac Band to develop site-specific mitigation and minimization measures for reservation lands.

Implementation of measures in the Enbridge state-specific EMPs (Appendix C of the EIS), Agricultural Mitigation Plan (Appendix F of the EIS), Noxious Weed Plans (Appendix H of the EIS), Revegetation and Restoration Monitoring Plans (Appendix K of the EIS), and Construction Environmental Control Plan (Appendix M of the EIS) would reduce potential land use impacts. Enbridge has committed to implementing a comprehensive inspection, monitoring, and compliance control plan to ensure that multiple contractors comply with the conditions of all permits. Enbridge has developed a Complaint Handling Procedures Plan (Appendix X of the EIS) to ensure that all landowner concerns are handled appropriately. This plan was designed to provide landowners with the necessary contact information in the event that the details of the individual easement negotiations or details of the mitigation plans referenced throughout this document are not being upheld. Implementation of the Enbridge proposed plans and mitigation would result in overall minor impacts to land use.

*5.10   Socioeconomics*

Construction and operation of the U.S. portion of the Alberta Clipper pipeline could result in several types of socioeconomic impacts. Impacts could be temporary due to construction and more long-term or permanent due to operation of the pipeline. Possible temporary impacts include changes to local population levels and demographics, increased demands for housing and public services, changes in transportation needs, increased traffic, and increased employment opportunities or needs for local goods. Long-term impacts due to operation would include employment, income benefits, and increased tax revenue due to property taxes paid by Enbridge.

Overall, impacts related to socioeconomic resources are expected to be minor but mostly positive for the U.S. portion of the Alberta Clipper pipeline.

*5.11   Cultural Resources*

Field studies were conducted to identify archaeological and historic resources for the Alberta Clipper Project. The Fond du Lac Band of Lake Superior Chippewa, Leech Lake Band of Ojibwe, and Mille Lacs Band of Ojibwe have prepared Traditional Cultural Property studies within sections of the U.S. portion of the Alberta Clipper pipeline's Area of Potential Effect (APE). The DOS will take into account the Project's potential effects to archaeological and historic resources as well as TCPs through the Programmatic Agreement (PA), which will continue through construction of the Alberta Clipper Project.

Enbridge's main method of mitigation for potential impacts to cultural resources is avoidance. Types of avoidance identified by Enbridge include abandonment (or non-use of the location), narrowing of the construction corridor, limiting impacts (no change to the existing structure), and use of alternative crossing methods (such as horizontal directional drill). Based on the available information, Enbridge's proposed route, construction methods, and implementation of the PA, no impacts to cultural resources would be expected.

### 5.12   Air Quality and Noise

Air quality impacts associated with construction of the U.S. portion of the Alberta Clipper pipeline include emissions from fugitive dust, fossil-fueled construction equipment, open burning, and temporary fuel transfer systems and associated storage tanks. Air emissions during construction would be localized, intermittent, and short term. Emissions from construction-related activities would be conducted in compliance with applicable regulations and would not significantly affect local or regional air quality. Pipeline operations would not produce significant air quality impacts, and only minor emissions from fugitive emissions would occur from valves and pumping equipment. Enbridge has proposed measures in the state-specific EMPs (Appendix C of the EIS) and SPCC Plan (Appendix E of the EIS) that would reduce impacts related to air quality.

Noise impacts for a pipeline project generally fall into two categories: temporary impacts resulting from construction equipment and long-term or permanent impacts resulting from operation of the facility. Construction of the proposed pipeline would be similar to other pipeline projects in terms of schedule, equipment used, and types of activities. Construction would increase noise levels in the vicinity of pipeline activities, and the noise levels would vary during the construction period. In general, residential, agricultural, and commercial areas within 500 feet of the proposed pipeline right-of-way could experience short-term inconvenience from construction equipment noise. For horizontal directional drill crossings, drilling rig, pumps, generators, and mobile equipment produce noise that may impact nearby noise-sensitive areas. If noise from operations cannot be mitigated to the required level, other measures—such as providing temporary lodging at a local motel for affected residents—would be used to avoid exposing residents to objectionable noise. The temporary noise impacts from construction are expected to be minor with implantation of mitigation measures. Long-term noise impacts from operation of the pipeline would originate from the pump stations. Enbridge has proposed several mitigation measures at pump stations to reduce noise associated with the operation of pump stations for the U.S. portion of the Alberta Clipper pipeline. Material traveling through the buried pipeline would not be expected to emit audible noise above the surface or produce a perceptible level of vibration.

Overall, the impacts to air quality and noise during construction of the proposed pipeline are expected to be short term and minor. Air and noise impacts during operations would be minor but long term.

### 5.13   Reliability and Safety

Crude oil released into the environment (spills) may affect natural resources, human uses and services, and aesthetics to varying degrees, depending on the cause, size, type, volume, rate, temperature of the oil, location, environmental conditions, and associated response actions. To minimize the potential for releases from the U.S. portion of the Alberta Clipper pipeline, Enbridge would design and construct the proposed pipeline in accordance with applicable design, engineering, and safety standards. To ensure the integrity of the pipeline and associated facilities during operation, Enbridge would incorporate the U.S. portion of the Alberta Clipper pipeline into its existing programs that (1) ensure that the integrity of its existing pipeline systems is maintained, including inspection of the pipelines and pipeline alignments; and (2) detect and respond to releases of oil that may occur. Enbridge would expand its existing emergency response plan to incorporate the Alberta Clipper Project. The existing plan has been approved by DOT's PHMSA; PHMSA approval of the revised plan would be required for pipeline operation. The emergency response plan identifies specific measures to prevent a release and to implement the appropriate emergency response if a release were to occur. A summary of the procedures included in the emergency response plan is presented in Appendix Q of the EIS.

With implementation of the Enbridge plans and procedures, the reliability and safety of the proposed Alberta Clipper Project is expected to meet or exceed industry standards.

### 5.14   Cumulative Impacts

The cumulative impacts analysis was conducted on both a Project-wide (the entire U.S. portion of the Alberta Clipper pipeline) and watershed-specific level. In general, the primary impacts of concern for the U.S. portion of the Alberta Clipper pipeline and other pipelines in the region of influence include short-term construction impacts and long-term land conversion and air emissions. The Project-wide cumulative impacts assessment concluded that the Alberta Clipper Project would not result in significant cumulative construction or operation impacts when considered in conjunction with other large-scale projects in the area of the U.S. portion of the Alberta Clipper pipeline , such as other pipelines.

Due to the localized and temporary nature of pipeline construction, the primary emissions of concern during construction of the U.S. portion of the Alberta Clipper pipeline would be greenhouse gas (GHG) emissions, including direct impacts from construction equipment and indirect emissions from land disturbance. Emissions during operation of the pipeline would primarily be associated with electrical generation to operate the pump stations (estimated at 0.3 million metric tons of $CO_2$ annually).

The cumulative analysis for refineries focused on air emissions, including GHG emissions, for recently upgraded refineries and potential new refineries. Based on the cumulative emissions from recent refinery upgrades, it is estimated that the emissions associated with the 450,000 bpd transported via the Alberta Clipper Project could increase CO emissions by about 1,000 tons per year (tpy), increase VOC emissions by approximately 400 tpy, and decrease emissions of other pollutants relative to currently permitted refinery emissions.

The watershed-level assessment considered large-scale projects and smaller-scale projects on a watershed-by-watershed basis along the route of the U.S. portion of the Alberta Clipper pipeline. Smaller-scale projects included road construction, commercial and residential development, flood control projects, energy projects, timber harvesting, mining, and conservation programs. The watershed-by-watershed assessment concluded that the Alberta Clipper Project would not result

in significant construction or operation impacts when considered in conjunction with other large-scale and small-scale projects in individual watersheds along the Alberta Clipper Project route.

## 6.0 Public and Agency Review and Comment

During its consideration of Enbridge's application for a Presidential Permit and consistent with federal requirements for informing and involving the public, Indian tribes and other public agencies (both federal and state) with jurisdiction concerning aspects of this project, DOS conducted extensive public outreach and consultation programs. The purpose of these programs was to solicit public and agency input on issues and alternatives to be considered during preparation of the EIS and to receive comments on the completeness of the EIS. These programs also served to provide government-to-government consultation with Indian tribes relative to historic properties consistent with the NHPA and to consult with relevant natural resource management agencies consistent with the Clean Water Act (CWA) and the ESA. The actions and programs conducted during consideration of Enbridge's application included:

a) Publication in the Federal Register of a Notice of Receipt of an Application for a Presidential permit;

b) Publication in the Federal Register of a Notice of Intent to Prepare an Environmental Assessment;

c) Publication in the Federal Register of a Notice of Intent to Prepare an EIS and to Conduct Supplemental Scoping;

d) Conduct of a series of public meetings in North Dakota, Minnesota and Wisconsin to receive input on the U.S. portion of the Alberta Clipper pipeline from the public, federal and state agencies and Indian tribes;

e) Public Review and Comment on a Draft and Final EIS;

f) Consultation with Indian tribes; and

g) Consultation with other Federal and State Agencies (USEPA, USFWS, COE, BIA, MDNR, WDNR, State Historic Preservation Officers, etc.)

The result of these outreach and consultation programs is summarized below.

DOS published in the Federal Register a Notification of Receipt of the Enbridge Application for a permit on May 25, 2007 (72 FR 29360). That notification solicited public comment on the application for a 30-day period. Thereafter, the Department published in the Federal Register a Notification of Intent to Prepare an Environmental Assessment on July 27, 2007 (72 FR 41381). On March 31, 2008, the DOS issued a second NOI to announce its intention to prepare an Environmental Impact Statement (EIS) in order to address reasonably foreseeable impacts from the proposed action and alternatives (73 FR 16920). The Department's Notice of Availability of the Draft EIS and request for public comment was published in the Federal Register on December 5, 2008(73 FR 74221), seeking comments by January 30, 2009. The Department received over 900 public comments in response to its notice and has taken them into account in making its determination on the Enbridge application. The Department's Notice of Availability of the Final EIS and request for public comments was published in the Federal Register on June 8, 2009 (74 FR 108), seeking comments by July 3, 2009. The Department received four comments in response to this notice; none contained any new substantial or substantive arguments regarding the proposed project.

As required by Executive Order 13337, the Enbridge pipeline application and a Draft Environmental Impact Statement were transmitted to federal agencies for their review and comment on December 5, 2008. The Department of State received no objections from federal agencies regarding the issuance of a permit. The Department published a notice of the availability of the Final Environmental Impact Statement in the Federal Register on June 8, 2009 (74 FR 27229).

Concurrently, the Department took steps to act consistently with Section 106 of the National Historic Preservation Act. On ~~July~~ AUG 3, 2009, I signed a Programmatic Agreement with the Advisory Council on Historic Preservation (ACHP), the applicant, all three state historic preservation officials, and consulting federal and tribal agencies. Native American tribes were also invited to sign as concurring parties under the ACHP's guidelines. The purpose of the Programmatic Agreement is to take into account the effect of the proposed Alberta Clipper Project on historic properties and to satisfy all responsibilities under Section 106 of the National Historic Preservation Act. In this connection, the Department has a pending request from the Fond du Lac band that the 1854 Ceded Territory be recognized as a Traditional Cultural Property. The Department plans to evaluate the request pursuant to the terms of the PA.

Consistent with Section 7 of the Endangered Species Act (ESA), DOS consulted with and obtained the concurrence of the U.S. Fish and Wildlife Service (USFWS) with a final Biological Assessment (BA) on the Alberta Clipper Project. The BA concludes that the construction of the Alberta Clipper Project may affect, but is not likely to adversely affect, species protected under the ESA.

Consistent with its authority under Executive Order 13337, the Department reviewed all of the available information and documentation, including comments submitted by federal, tribal, and state agencies and the public. Executive Order 13337 requires that Secretaries or Heads of certain agencies be notified of the Department's proposed determination concerning issuance of the Presidential Permit. Any agency required to be consulted under Section 1(g) of the Order that disagrees with the proposed determination may notify the Secretary of State within 15 days of this notice that it disagrees with the determination and request that the Secretary refer the application to the President.

## 7.0 Decision and Basis for Decision

The Deputy Secretary of State has determined that a Presidential Permit will be issued to Enbridge Energy, Limited Partnership to construct, connect, operate, and maintain facilities at the border for the transport of crude oil between the United States and Canada across the international boundary, as described in the Application for a Presidential Permit dated May 15, 2007 and as further amended by the subsequent filings of Enbridge with the DOS and by information incorporated into the Final EIS issued June 5, 2009. The Deputy Secretary also finds that:

Construction and Operation of the Alberta Clipper Project Serves the National Interest - The addition of crude oil pipeline capacity between the Western Canada Sedimentary Basin (WCSB) and the United States serves the strategic interests of the United States for the following reasons:

- It increases the diversity of available supplies among the United States' worldwide crude oil sources in a time of considerable political tension in other major oil producing countries and regions. Increased output from the WCSB can be utilized by a growing number of refineries in the United States that have access and means of transport for these increased supplies.

- It shortens the transportation pathway for a sizeable portion of United States crude oil imports. Crude oil supplies in Western Canada represent the largest and closest foreign supply source to domestic refineries that do not require, in contrast to other suppliers, many days or weeks of marine transportation.

- It increases crude oil supplies from a major non-Organization of Petroleum Exporting Countries producer which is a stable and reliable ally and trading partner of the United States, with which we have free trade agreements which augment the security of this energy supply.

- Moreover, the United States and Canada, through bilateral diplomacy and a Clean Energy Dialogue process that is now underway, are working across our respective energy sectors to cooperate on best practices and technology, including carbon sequestration and storage, so as to lower the overall environmental footprint of our energy sectors. The Government of Canada and the Province of Alberta have also set greenhouse gas reduction targets and implementation programs to help them achieve them.

- Approval of this permit will also send a positive economic signal, in a difficult economic period, about the future reliability and availability of a portion of United State's energy imports, and in the immediate term, will provide construction jobs.

- It provides additional supplies of crude oil to make up for the continued decline in imports from several other major U.S. suppliers.

Page 25 of 28

- Construction and Operation of the Alberta Clipper Project Meets Environmental Protection Policies – The DOS concludes that the proposed Alberta Clipper Project, if designed, constructed, and operated in accordance with the Project Description in Section 2.0 of the FEIS, as amended by additional approaches and mitigation measures agreed to by Enbridge as a result of the DOS environmental analyses and as further amended by specific permit conditions contained in the permit and those to be assigned by the state and federal agencies with jurisdiction over aspects of the project along the pipeline corridor, would result in limited adverse environmental impacts.

Concerns have been raised about higher-than-average levels of greenhouse gas (GHG) emissions associated with oil sands crude. The Department has considered these concerns, and considers that they are best addressed in the context of the overall set of domestic policies that Canada and the United States will take to address their respective greenhouse gas emissions. The United States will continue to reduce reliance on oil through conservation and energy efficiency measures, such as recently increased Corporate Average Fuel Economy (CAFÉ) standards, as well as through the pursuit of comprehensive climate legislation and an ambitious global agreement on climate change that includes substantial emission reductions for both the United States and Canada. The Department, on behalf of the Administration, will urge ambitious action by Canada, and will cooperate with the Canadian government through the U.S.-Canada Clean Energy Dialogue and other processes to promote the deployment of technologies that reduce our respective GHG emissions.

The Scope of the Permit Issued to Enbridge shall extend only up to and including the first mainline shut-off value or pumping station in the United States. Executive Order 11423, initially delegating the President's authority to the DOS, specifically notes that "the proper conduct of the foreign relations of the United States requires that Executive permission be obtained for the construction and maintenance at the borders of the United States of facilities connecting the United States with a foreign country." Similarly, Section 1 of Executive Order 13337, further delegating the President's authority, states that DOS has authority for issuance of Presidential permits for the "construction, connection, operation, and maintenance at the borders of the United States of facilities... to or from a foreign country." Hence, in reviewing an application for a Presidential permit, the DOS, takes into account the impact the proposed cross-border facility (i.e., pipeline, bridge, road, etc.) will have upon U.S. relations with the country in question, whether Canada or Mexico, and also on the impact it will have on U.S. foreign relations generally. While the DOS also takes into account the various environmental and other domestic issues mentioned above, DOS does not have, and has never had, authority over facilities, including pipeline, bridges, roads, etc., located entirely within the United States that do not cross the international border with either Canada or Mexico. For these reasons, the Department does not believe that the scope of the permit it issues in this case should extend any further than necessary to protect that foreign relations interest. The permits the DOS issues under Executive Orders 11423 and 13337 routinely include provisions permitting DOS to take possession of the facilities at the border for national security reasons or to direct the permittee to remove the facilities in the immediate vicinity of the international border if so directed by the DOS. Since that is the case, the DOS has concluded that a limitation of the scope of the permit in this case to those pipeline facilities within the United States up to and including the first mainline shut-off valve or pumping station would adequately protect the DOS' foreign relations interest in implementing Executive Orders 11423 and 13337.

## 8.0 National Interest Determination

Pursuant to the authority vested in me under Executive Order 13337 of April 30, 2004, as amended, Department of State Delegation of Authority No. 118-2 of January 23, 2006, and Department of State Delegation No. 245-1 of February 13, 2009, and subject to satisfaction of the requirements of sections 1(g) and 1(i) of Executive Order 13337, I hereby determine that issuance of a permit to Enbridge Energy, Limited Partnership, a limited partnership organized under the laws of the State of Delaware, which is a wholly owned subsidiary of Enbridge Energy Partners, L.P. ("Enbridge Partners") which is a Delaware master limited partnership headquartered at 1100 Louisiana, Suite 3300, Houston, Texas 77002, to construct, connect, operate and maintain facilities at the border of the United States and Canada for the transport of crude oil between the United States and Canada across the international boundary at Cavalier County, North Dakota, would serve the national interest.

The Presidential Permit issued to Enbridge shall include authorization to construct, connect, operate, and maintain at the border of the United States facilities for the transport of crude oil between the United States and Canada across the international boundary as described in the Presidential Permit application received from Enbridge by DOS on May 15, 2007, as amended, and in accordance with the mitigation measures described in the Environmental Mitigation Plan (and other similar mitigation plans) contained in the FEIS, as amended. No construction or other actions shall be taken by Enbridge prior to Enbridge's acquisition of all other necessary federal, state, and local permits and approvals from agencies of competent jurisdiction. Enbridge shall provide written notice to the Department at such time as the construction authorized by this permit is begun, and again at such time as construction is completed, interrupted or discontinued.

This determination shall become final fifteen days after the Secretaries of Defense, Interior, Commerce, Energy, Homeland Security and Transportation, the Attorney General, and the Administrator of the Environmental Protection Agency have been notified of this determination, unless the matter must be referred to the President for consideration and final decision pursuant to section 1(i) of said Executive Order.

03- Augst 2007

Date

James B. Steinberg

Deputy Secretary of State

# EXHIBIT 33

Excerpt of National Security Strategy, White House
(Feb. 2015)



# NATIONAL SECURITY STRATEGY

## FEBRUARY 2015





# THE WHITE HOUSE

### WASHINGTON

Today, the United States is stronger and better positioned to seize the opportunities of a still new century and safeguard our interests against the risks of an insecure world.

America's growing economic strength is the foundation of our national security and a critical source of our influence abroad. Since the Great Recession, we have created nearly 11 million new jobs during the longest private sector job growth in our history. Unemployment has fallen to its lowest level in 6 years. We are now the world leader in oil and gas production. We continue to set the pace for science, technology, and innovation in the global economy.

We also benefit from a young and growing workforce, and a resilient and diversified economy. The entrepreneurial spirit of our workers and businesses undergirds our economic edge. Our higher education system is the finest in the world, drawing more of the best students globally every year. We continue to attract immigrants from every corner of the world who renew our country with their energy and entrepreneurial talents.

Globally, we have moved beyond the large ground wars in Iraq and Afghanistan that defined so much of American foreign policy over the past decade. Compared to the nearly 180,000 troops we had in Iraq and Afghanistan when I took office, we now have fewer than 15,000 deployed in those countries. We possess a military whose might, technology, and geostrategic reach is unrivaled in human history. We have renewed our alliances from Europe to Asia.

Now, at this pivotal moment, we continue to face serious challenges to our national security, even as we are working to shape the opportunities of tomorrow. Violent extremism and an evolving terrorist threat raise a persistent risk of attacks on America and our allies. Escalating challenges to cybersecurity, aggression by Russia, the accelerating impacts of climate change, and the outbreak of infectious diseases all give rise to anxieties about global security. We must be clear-eyed about these and other challenges and recognize the United States has a unique capability to mobilize and lead the international community to meet them.

Any successful strategy to ensure the safety of the American people and advance our national security interests must begin with an undeniable truth—America must lead. Strong and sustained American leadership is essential to a rules-based international order that promotes global security and prosperity as well as the dignity and human rights of all peoples. The question is never whether America should lead, but how we lead.

Abroad, we are demonstrating that while we will act unilaterally against threats to our core interests, we are stronger when we mobilize collective action. That is why we are leading international coalitions to confront the acute challenges posed by aggression, terrorism, and disease. We are leading over 60 partners in a global campaign to degrade and ultimately defeat the Islamic State of Iraq and the Levant (ISIL) in Iraq and Syria, including by working to disrupt the flow of foreign fighters to those countries, while keeping pressure on al-Qa'ida. We are leading a global effort to stop the deadly spread of the Ebola virus at its source. In lockstep with our European allies, we are enforcing tough sanctions on Russia to impose costs and deter future aggression.

Even as we meet these pressing challenges, we are pursuing historic opportunities. Our rebalance to Asia and the Pacific is yielding deeper ties with a more diverse set of allies and partners. When complete, the Trans-Pacific Partnership will generate trade and investment opportunities—and create high-quality jobs at home—across a region that represents more than 40 percent of global trade. We are primed to unlock the potential of our relationship with India. The scope of our cooperation with China is unprecedented, even as we remain alert to China's military modernization and reject any role for intimidation in resolving

territorial disputes. We are deepening our investment in Africa, accelerating access to energy, health, and food security in a rapidly rising region. Our opening to Cuba will enhance our engagement in our own hemisphere, where there are enormous opportunities to consolidate gains in pursuit of peace, prosperity, democracy, and energy security.

Globally, we are committed to advancing the Prague Agenda, including by stopping the spread of nuclear weapons and securing nuclear materials. We are currently testing whether it is possible to achieve a comprehensive resolution to assure the international community that Iran's nuclear program is peaceful, while the Joint Plan of Action has halted the progress of Iran's program. We are building on our own energy security—and the ground-breaking commitment we made with China to reduce greenhouse gas emissions—to cement an international consensus on arresting climate change. We are shaping global standards for cybersecurity and building international capacity to disrupt and investigate cyber threats. We are playing a leading role in defining the international community's post-2015 agenda for eliminating extreme poverty and promoting sustainable development while prioritizing women and youth.

Underpinning it all, we are upholding our enduring commitment to the advancement of democracy and human rights and building new coalitions to combat corruption and to support open governments and open societies. In doing so, we are working to support democratic transitions, while also reaching out to the drivers of change in this century: young people and entrepreneurs.

Finally, I believe that America leads best when we draw upon our hopes rather than our fears. To succeed, we must draw upon the power of our example—that means viewing our commitment to our values and the rule of law as a strength, and not an inconvenience. That is why I have worked to ensure that America has the capabilities we need to respond to threats abroad, while acting in line with our values—prohibiting the use of torture; embracing constraints on our use of new technologies like drones; and upholding our commitment to privacy and civil liberties. These actions are a part of our resilience at home and a source of our influence abroad.

On all these fronts, America leads from a position of strength. But, this does not mean we can or should attempt to dictate the trajectory of all unfolding events around the world. As powerful as we are and will remain, our resources and influence are not infinite. And in a complex world, many of the security problems we face do not lend themselves to quick and easy fixes. The United States will always defend our interests and uphold our commitments to allies and partners. But, we have to make hard choices among many competing priorities, and we must always resist the over-reach that comes when we make decisions based upon fear. Moreover, we must recognize that a smart national security strategy does not rely solely on military power. Indeed, in the long-term, our efforts to work with other countries to counter the ideology and root causes of violent extremism will be more important than our capacity to remove terrorists from the battlefield.

The challenges we face require strategic patience and persistence. They require us to take our responsibilities seriously and make the smart investments in the foundations of our national power. Therefore, I will continue to pursue a comprehensive agenda that draws on all elements of our national strength, that is attuned to the strategic risks and opportunities we face, and that is guided by the principles and priorities set out in this strategy. Moreover, I will continue to insist on budgets that safeguard our strength and work with the Congress to end sequestration, which undercuts our national security.

This is an ambitious agenda, and not everything will be completed during my Presidency. But I believe this is an achievable agenda, especially if we proceed with confidence and if we restore the bipartisan center that has been a pillar of strength for American foreign policy in decades past. As Americans, we will always have our differences, but what unites us is the national consensus that American global leadership remains indispensable. We embrace our exceptional role and responsibilities at a time when our unique contributions and capabilities are needed most, and when the choices we make today can mean greater security and prosperity for our Nation for decades to come.



# Table of Contents

I. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. Security . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    Strengthen Our National Defense . . . . . . . . . . . . . . . . . . . . . . . . . 7

    Reinforce Homeland Security . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    Combat the Persistent Threat of Terrorism . . . . . . . . . . . . . . . . . . . . 9

    Build Capacity to Prevent Conflict . . . . . . . . . . . . . . . . . . . . . . . 10

    Prevent the Spread and Use of Weapons of Mass Destruction . . . . . . . . . . . 11

    Confront Climate Change . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    Assure Access to Shared Spaces . . . . . . . . . . . . . . . . . . . . . . . . . 12

    Increase Global Health Security . . . . . . . . . . . . . . . . . . . . . . . . 13

III. Prosperity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    Put Our Economy to Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    Advance Our Energy Security . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    Lead in Science, Technology, and Innovation . . . . . . . . . . . . . . . . . . 16

    Shape the Global Economic Order . . . . . . . . . . . . . . . . . . . . . . . . 16

    End Extreme Poverty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

IV. Values . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    Live Our Values . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    Advance Equality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    Support Emerging Democracies . . . . . . . . . . . . . . . . . . . . . . . . . 20

    Empower Civil Society and Young Leaders . . . . . . . . . . . . . . . . . . . . 21

    Prevent Mass Atrocities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

V. International Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    Advance Our Rebalance to Asia and the Pacific . . . . . . . . . . . . . . . . . 24

    Strengthen Our Enduring Alliance with Europe . . . . . . . . . . . . . . . . . 25

    Seek Stability and Peace in the Middle East and North Africa . . . . . . . . . 26

    Invest in Africa's Future . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    Deepen Economic and Security Cooperation in the Americas . . . . . . . . . . . 27

VI. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29



# I. Introduction

In a young century, opportunities for America abound, but risks to our security remain. This new *National Security Strategy* positions the United States to safeguard our national interests through strong and sustainable leadership. It sets out the principles and priorities to guide the use of American power and influence in the world. It advances a model of American leadership rooted in the foundation of America's economic and technological strength and the values of the American people. It redoubles our commitment to allies and partners and welcomes the constructive contributions of responsible rising powers. It signals our resolve and readiness to deter and, if necessary, defeat potential adversaries. It affirms America's leadership role within a rules-based international order that works best through empowered citizens, responsible states, and effective regional and international organizations. And it serves as a compass for how this Administration, in partnership with the Congress, will lead the world through a shifting security landscape toward a more durable peace and a new prosperity.

This strategy builds on the progress of the last 6 years, in which our active leadership has helped the world recover from a global economic crisis and respond to an array of emerging challenges. Our progress includes strengthening an unrivaled alliance system, underpinned by our enduring partnership with Europe, while investing in nascent multilateral forums like the G-20 and East Asia Summit. We brought most of our troops home after more than a decade of honorable service in two wars while adapting our counterterrorism strategy for an evolving terrorist threat. We led a multinational coalition to support the Afghan government to take responsibility for the security of their country, while supporting Afghanistan's first peaceful, democratic transition of power. The United States led the international response to natural disasters, including the earthquake in Haiti, the earthquake and tsunami in Japan, and the typhoon in the Philippines to save lives, prevent greater damage, and support efforts to rebuild. We led international efforts to stop the proliferation of nuclear weapons, including by building an unprecedented international sanctions regime to hold Iran responsible for failing to meet its international obligations, while pursuing a diplomatic effort that has already stopped the progress of Iran's nuclear program and rolled it back in key respects. We are rebalancing toward Asia and the Pacific while seeking new opportunities for partnership and investment in Africa and the Americas, where we have spurred greater agriculture and energy-related investments than ever before. And at home and abroad, we are taking concerted action to confront the dangers posed by climate change and to strengthen our energy security.

Still, there is no shortage of challenges that demand continued American leadership. The potential proliferation of weapons of mass destruction, particularly nuclear weapons, poses a grave risk. Even as we have decimated al-Qa'ida's core leadership, more diffuse networks of al-Qa'ida, ISIL, and affiliated groups threaten U.S. citizens, interests, allies, and partners. Violent extremists exploit upheaval across the Middle East and North Africa. Fragile and conflict-affected states incubate and spawn infectious disease, illicit weapons and drug smugglers, and destabilizing refugee flows. Too often, failures in governance and endemic corruption hold back the potential of rising regions. The danger of disruptive and even destructive cyber-attack is growing, and the risk of another global economic slowdown remains. The international community's ability to respond effectively to these and other risks is helped or hindered by

the behaviors of major powers. Where progress has been most profound, it is due to the steadfastness of our allies and the cooperation of other emerging powers.

These complex times have made clear the power and centrality of America's indispensable leadership in the world. We mobilized and are leading global efforts to impose costs to counter Russian aggression, to degrade and ultimately defeat ISIL, to squelch the Ebola virus at its source, to stop the spread of nuclear weapons materials, and to turn the corner on global carbon emissions. A strong consensus endures across our political spectrum that the question is not *whether* America will lead, but *how* we will lead into the future.

First and foremost, we will **lead with purpose.** American leadership is a global force for good, but it is grounded in our enduring national interests as outlined in the 2010 *National Security Strategy*:

- The security of the United States, its citizens, and U.S. allies and partners;

- A strong, innovative, and growing U.S. economy in an open international economic system that promotes opportunity and prosperity;

- Respect for universal values at home and around the world; and

- A rules-based international order advanced by U.S. leadership that promotes peace, security, and opportunity through stronger cooperation to meet global challenges.

Especially in a changing global environment, these national interests will continue to guide all we do in the world. To advance these interests most effectively, we must pursue a comprehensive national security agenda, allocate resources accordingly, and work with the Congress to end sequestration. Even so, our resources will never be limitless. Policy tradeoffs and hard choices will need to be made. In such instances, we will prioritize efforts that address the top strategic risks to our interests:

- Catastrophic attack on the U.S. homeland or critical infrastructure;

- Threats or attacks against  U.S. citizens abroad and our allies;

- Global economic crisis or widespread economic slowdown;

- Proliferation and/or use of weapons of mass destruction;

- Severe global infectious disease outbreaks;

- Climate change;

- Major energy market disruptions; and

- Significant security consequences associated with weak or failing states (including mass atrocities, regional spillover, and transnational organized crime).

We will seize strategic opportunities to shape the economic order and cultivate new relationships with emerging economic powers and countries newly committed to peaceful democratic change. We will also capitalize on the potential to end extreme poverty and build upon our comparative advantages in innovation, science and technology, entrepreneurship, and greater energy security.

## I. INTRODUCTION

We will **lead with strength.** After a difficult decade, America is growing stronger every day. The U.S. economy remains the most dynamic and resilient on Earth. We have rebounded from a global recession by creating more jobs in the United States than in all other advanced economies combined. Our military might is unrivaled. Yet, American exceptionalism is not rooted solely in the strength of our arms or economy. Above all, it is the product of our founding values, including the rule of law and universal rights, as well as the grit, talent, and diversity of the American people.

In the last 6 years alone, we arrested the worst financial crisis since the Great Depression and catalyzed a new era of economic growth. We increased our competitive edge and leadership in education, energy, science and technology, research and development, and healthcare. We achieved an energy transformation in North America. We are fortifying our critical infrastructure against all hazards, especially cyber espionage and attack. And we are working hard to safeguard our civil liberties while advancing our security.

America's strategic fundamentals are strong but should not be taken for granted. We must be innovative and judicious in how we use our resources to build up our national power. Going forward, we will strengthen our foundation by growing our economy, modernizing our defense, upholding our values, enhancing the resilience of our homeland, and promoting talent and diversity in our national security workforce.

We will **lead by example.** The strength of our institutions and our respect for the rule of law sets an example for democratic governance. When we uphold our values at home, we are better able to promote them in the world. This means safeguarding the civil rights and liberties of our citizens while increasing transparency and accountability. It also means holding ourselves to international norms and standards that we expect other nations to uphold, and admitting when we do not. We must also demonstrate our ability to forge diverse partnerships across our political spectrum. Many achievements of recent years were made possible by Democrats and Republicans; Federal, state and local governments; and the public and private sectors working together. But, we face continued challenges, including political dysfunction in Washington that undermines national unity, stifles bipartisan cooperation, and ultimately erodes the perception and strength of our leadership abroad. American leadership is always most powerful when we are able to forge common ground at home around key national priorities.

We will **lead with capable partners.** In an interconnected world, there are no global problems that can be solved without the United States, and few that can be solved by the United States alone. American leadership remains essential for mobilizing collective action to address global risks and seize strategic opportunities. Our closest partners and allies will remain the cornerstone of our international engagement. Yet, we will continuously expand the scope of cooperation to encompass other state partners, non-state and private actors, and international institutions—particularly the United Nations (U.N.), international financial institutions, and key regional organizations. These partnerships can deliver essential capacity to share the burdens of maintaining global security and prosperity and to uphold the norms that govern responsible international behavior. At the same time, we and our partners must make the reforms and investments needed to make sure we can work more effectively with each other while growing the ranks of responsible, capable states. The United States is safer and stronger when fewer people face destitution, when our trading partners are flourishing, and when societies are freer.

We will **lead with all the instruments of U.S. power.** Our influence is greatest when we combine all our strategic advantages. Our military will remain ready to defend our enduring national interests while providing essential leverage for our diplomacy. The use of force is not, however, the only tool at our disposal, and it is not the principal means of U.S. engagement abroad, nor always the most effective for the challenges we face. Rather, our first line of action is principled and clear-eyed diplomacy, combined with the central role of development in the forward defense and promotion of America's interests. We will continue pursuing measures to enhance the security of our diplomats and development professionals to ensure they can fulfill their responsibilities safely in high-risk environments. We will also leverage a strong and well-regulated economy to promote trade and investment while protecting the international financial system from abuse. Targeted economic sanctions will remain an effective tool for imposing costs on irresponsible actors and helping to dismantle criminal and terrorist networks. All our tools are made more effective by the skill of our intelligence professionals and the quality of intelligence they collect, analyze, and produce. Finally, we will apply our distinct advantages in law enforcement, science and technology, and people-to-people relationships to maximize the strategic effects of our national power.

We will **lead with a long-term perspective.** Around the world, there are historic transitions underway that will unfold over decades. This strategy positions America to influence their trajectories, seize the opportunities they create, and manage the risks they present. Five recent transitions, in particular, have significantly changed the security landscape, including since our last strategy in 2010.

First, power among states is more dynamic. The increasing use of the G-20 on global economic matters reflects an evolution in economic power, as does the rise of Asia, Latin America, and Africa. As the balance of economic power changes, so do expectations about influence over international affairs. Shifting power dynamics create both opportunities and risks for cooperation, as some states have been more willing than others to assume responsibilities commensurate with their greater economic capacity. In particular, India's potential, China's rise, and Russia's aggression all significantly impact the future of major power relations.

Second, power is shifting below and beyond the nation-state. Governments once able to operate with few checks and balances are increasingly expected to be more accountable to sub-state and non-state actors—from mayors of mega-cities and leaders in private industry to a more empowered civil society. They are also contending with citizens enabled by technology, youth as a majority in many societies, and a growing global middle class with higher expectations for governance and economic opportunity. While largely positive, these trends can foster violent non-state actors and foment instability—especially in fragile states where governance is weak or has broken down—or invite backlash by authoritarian regimes determined to preserve the power of the state.

Third, the increasing interdependence of the global economy and rapid pace of technological change are linking individuals, groups, and governments in unprecedented ways. This enables and incentivizes new forms of cooperation to establish dynamic security networks, expand international trade and investment, and transform global communications. It also creates shared vulnerabilities, as interconnected systems and sectors are susceptible to the threats of climate change, malicious cyber activity, pandemic diseases, and transnational terrorism and crime.

Fourth, a struggle for power is underway among and within many states of the Middle East and North Africa. This is a generational struggle in the aftermath of the 2003 Iraq war and 2011 Arab uprisings, which will redefine the region as well as relationships among communities and between citizens and their governments. This process will continue to be combustible, especially in societies where religious extremists take root, or rulers reject democratic reforms, exploit their economies, and crush civil society.

Fifth, the global energy market has changed dramatically. The United States is now the world's largest natural gas and oil producer. Our dependence on foreign oil is at a 20-year low—and declining—and we are leading a new clean energy economy. While production in the Middle East and elsewhere remains vitally important for the global market, increased U.S. production is helping keep markets well-supplied and prices conducive to economic growth. On the other hand, energy security concerns have been exacerbated by European dependence on Russian natural gas and the willingness of Russia to use energy for political ends. At the same time, developing countries now consume more energy than developed ones, which is altering energy flows and changing consumer relationships.

Today's strategic environment is fluid. Just as the United States helped shape the course of events in the last century, so must we influence their trajectory today by evolving the way we exercise American leadership. This strategy outlines priorities based on a realistic assessment of the risks to our enduring national interests and the opportunities for advancing them. This strategy eschews orienting our entire foreign policy around a single threat or region. It establishes instead a diversified and balanced set of priorities appropriate for the world's leading global power with interests in every part of an increasingly interconnected world.

## Confront Climate Change

Climate change is an urgent and growing threat to our national security, contributing to increased natural disasters, refugee flows, and conflicts over basic resources like food and water. The present day effects of climate change are being felt from the Arctic to the Midwest. Increased sea levels and storm surges threaten coastal regions, infrastructure, and property. In turn, the global economy suffers, compounding the growing costs of preparing and restoring infrastructure.

America is leading efforts at home and with the international community to confront this challenge. Over the last 6 years, U.S. emissions have declined by a larger total magnitude than those of any other country. Through our Climate Action Plan and related executive actions, we will go further with a goal of reducing greenhouse gas emissions by 26 to 28 percent of 2005 levels by 2025. Working with U.S. states and private utilities, we will set the first-ever standards to cut the amount of carbon pollution our power plants emit into the air. We are also working to strengthen resilience and address vulnerabilities to climate impacts.

These domestic efforts contribute to our international leadership. Building on the progress made in Copenhagen and in ensuing negotiations, we are working toward an ambitious new global climate change agreement to shape standards for prevention, preparedness, and response over the next decade. As the world's two largest emitters, the United States and China reached a landmark agreement to take significant action to reduce carbon pollution. The substantial contribution we have pledged to the Green Climate Fund will help the most vulnerable developing nations deal with climate change, reduce their carbon pollution, and invest in clean energy. More than 100 countries have also joined with us to reduce greenhouse gases under the Montreal Protocol—the same agreement the world used successfully to phase out ozone-depleting chemicals. We are partnering with African entrepreneurs to launch clean energy projects and helping farmers practice climate-smart agriculture and plant more durable crops. We are also driving collective action to reduce methane emissions from pipelines and to launch a free trade agreement for environmental goods.

## Assure Access to Shared Spaces

The world is connected by shared spaces—cyber, space, air, and oceans—that enable the free flow of people, goods, services, and ideas. They are the arteries of the global economy and civil society, and access is at risk due to increased competition and provocative behaviors. Therefore, we will continue to promote rules for responsible behavior while making sure we have the capabilities to assure access to these shared spaces.

### Cybersecurity

As the birthplace of the Internet, the United States has a special responsibility to lead a networked world. Prosperity and security increasingly depend on an open, interoperable, secure, and reliable Internet. Our economy, safety, and health are linked through a networked infrastructure that is targeted by malicious government, criminal, and individual actors who try to avoid attribution. Drawing on the voluntary cybersecurity framework, we are securing Federal networks and working with the private sector, civil society, and other stakeholders to strengthen the security and resilience of U.S. critical infrastructure. We

# EXHIBIT 34

Excerpt of Quadrennial Defense Review 2014,
Department of Defense













# QUADRENNIAL

# DEFENSE

# REVIEW

# 2014





QUADRENNIAL

DEFENSE

REVIEW

2014

# T A B L E    O F    C O N T E N T S

I        SECRETARY'S LETTER

III      EXECUTIVE SUMMARY

1        INTRODUCTION

3        CHAPTER I:  FUTURE SECURITY ENVIRONMENT

11       CHAPTER II:  THE DEFENSE STRATEGY

27       CHAPTER III:  REBALANCING THE JOINT FORCE

43       CHAPTER IV:  REBALANCING THE DEFENSE INSTITUTION

53       CHAPTER V:   IMPLICATIONS AND RISKS OF SEQUESTRATION-LEVEL CUTS

59       CHAIRMAN'S ASSESSMENT OF THE QUADRENNIAL DEFENSE REVIEW



**SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

March 4, 2014

The 2014 Quadrennial Defense Review (QDR) seeks to adapt, reshape, and rebalance our military to prepare for the strategic challenges and opportunities we face in the years ahead.

Building on the 2012 Defense Strategic Guidance, the QDR prioritizes three strategic pillars: defending the homeland; building security globally by projecting U.S. influence and deterring aggression; and remaining prepared to win decisively against any adversary should deterrence fail. Guided by this updated defense strategy, we will rebalance the military over the next decade and put it on a sustainable path to protect and advance U.S. interests and sustain U.S. global leadership.

The QDR describes the tough choices we are making in a period of fiscal austerity to maintain the world's finest fighting forces. These include reducing force structure in order to protect and expand critical capabilities, modernizing the forces, and investing in readiness. Although the future force will be smaller, it will be ready, capable, and able to project power over great distances. Investment decisions will ensure that we maintain our technological edge over potential adversaries, and that we advance U.S. interests across all domains. Staying ahead of security challenges requires that we continue to innovate, not only in the technologies we develop, but in the way U.S. forces operate. Innovation – within the Department and working with other U.S. departments and agencies and with international partners – will be center stage as we adapt to meet future challenges.

To ensure U.S. Armed Forces remain ready and capable requires that we make much-needed reforms across the defense enterprise. We will prioritize combat power by reducing unnecessary overhead and streamlining activities. In addition, military and civilian leaders across the Department agree that we must reform military compensation in a responsible way that protects the ability to modernize the force over the long-term. The All-Volunteer Force is one of the greatest strengths of the United States, and we owe it to future Soldiers, Sailors, Airmen, and Marines to ensure that they are prepared for tomorrow's threats.

The Department stands ready to work in partnership with Congress and the American people to implement these difficult choices. It is only through an active and robust bipartisan dialogue that the Department can hope to make the transition necessary to ensure that the U.S. Armed Forces remain the preeminent global force of the future.

*[signature]*



The United States faces a rapidly changing security environment.  We are repositioning to focus on the strategic challenges and opportunities that will define our future: new technologies, new centers of power, and a world that is growing more volatile, more unpredictable, and in some instances more threatening to the United States.  Challenges to our many allies and partners around the globe remain dynamic and unpredictable, particularly from regimes in North Korea and Iran.  Unrest and violence persist elsewhere, creating a fertile environment for violent extremism and sectarian conflict, especially in fragile states, stretching from the Sahel to South Asia, and threatening U.S. citizens abroad.  Meanwhile, modern warfare is evolving rapidly, leading to increasingly contested battlespace in the air, sea, and space domains – as well as cyberspace – in which our forces enjoyed dominance in our most recent conflicts.

Our sustained attention and engagement will be important in shaping emerging global trends, both positive and negative.  Unprecedented levels of global connectedness provide common incentives for international cooperation and shared norms of behavior, and the growing capacity of some regional partners provides an opportunity for countries to play greater and even leading roles in advancing mutual security interests in their respective regions.  In addressing the changing strategic environment, the United States will rely on our many comparative advantages, including the strength of our economy, our strong network of alliances and partnerships, and our military's human capital and technological edge.  Doing so will require exceptional agility in how we shape, prepare, and posture the Joint Force.

The Department of Defense is also facing a changing and equally uncertain fiscal environment. Beginning with the Fiscal Year (FY) 2012 appropriations, the Department began absorbing significant impacts from the $487 billion, ten-year cut in spending due to caps instituted by the Budget Control Act (BCA) of 2011.  The BCA also instituted a sequestration mechanism requiring cuts of about $50 billion annually.  The Bipartisan Budget Act of 2013 provided modest immediate relief from sequestration, but unless Congress acts, annual sequestration cuts are set to resume in FY2016.  To protect the security interests of the United States most effectively while recognizing the fiscal imperative of deficit reduction, the President's FY2015 Budget reduces projected defense budgets by about $113 billion over five years compared to levels requested in the FY2014 Budget.  The President's Budget provides a balanced and responsible path forward given continuing fiscal uncertainty.  It reflects the strict constraints on discretionary funding required by the Bipartisan Budget Act in FY2015, but it does not accept sequestration levels thereafter, funding the Department at about $115 billion more than projected sequestration levels through 2019.

Given this dynamic environment, the 2014 Quadrennial Defense Review (QDR) is principally focused on preparing for the future by rebalancing our defense efforts in a period of increasing fiscal constraint.  The 2014 QDR advances three important initiatives.  First, it builds on the Defense Strategic Guidance, published in 2012, by outlining an updated defense strategy that protects and advances U.S. interests and sustains U.S. leadership.  Second, the QDR describes how the Department is responsibly and realistically taking steps to rebalance major elements of the Joint Force given the changing environment.  Third, the QDR demonstrates our intent to rebalance the Department itself as part of our effort to control internal cost growth that is threatening to erode our combat power in this period of fiscal austerity.  We will protect the health of the All-Volunteer Force as we undertake these reforms.

The QDR makes clear that this updated national defense strategy is right for the Nation, sustaining the global leadership role of the United States and providing the basis for decisions that will help bring our military into balance over the next decade and responsibly position us for an era of both strategic and fiscal uncertainty.  The FY2015 funding levels requested by the President will allow the military to protect and advance U.S. interests and execute the updated defense strategy – but with increased levels of risk for some missions.  We will continue to experience gaps in training and maintenance over the near term and will have a reduced margin of error in dealing with risks of uncertainty in a dynamic and shifting security environment over the long term.  The President's "Opportunity, Growth, and Security" Initiative would add $26 billion in FY2015 defense investments, allowing the Department to continue restoring and sustaining readiness, investing in weapons modernization, and making needed facilities

improvements – significantly mitigating these risks.  Overall, the Department can manage these risks under the President's FY2015 Budget plan, but the risks would grow significantly if sequester-level cuts return in FY2016, if proposed reforms are not accepted, or if uncertainty over budget levels continues.  It is essential that we work closely with Congress to ensure that, as we put our Nation's fiscal house in order, we provide sufficient resources to preserve our national security.

## BUILDING ON THE DEFENSE STRATEGIC GUIDANCE

The United States exercises global leadership in support of our interests: U.S. security and that of our allies and partners; a strong economy in an open economic system; respect for universal values; and an international order that promotes peace, security, and opportunity through cooperation.  Protecting and advancing these interests, consistent with the National Security Strategy, the 2014 QDR embodies the 21st century defense priorities outlined in the 2012 Defense Strategic Guidance.  These priorities include rebalancing to the Asia-Pacific region to preserve peace and stability in the region; maintaining a strong commitment to security and stability in Europe and the Middle East; sustaining a global approach to countering violent extremists and terrorist threats, with an emphasis on the Middle East and Africa; continuing to protect and prioritize key investments in technology while our forces overall grow smaller and leaner; and invigorating efforts to build innovative partnerships and strengthen key alliances and partnerships.  The 2014 QDR builds on these priorities and incorporates them into a broader strategic framework.  The Department's defense strategy emphasizes three pillars:

- *Protect the homeland*, to deter and defeat attacks on the United States and to support civil authorities in mitigating the effects of potential attacks and natural disasters.

- *Build security globally*, in order to preserve regional stability, deter adversaries, support allies and partners, and cooperate with others to address common security challenges.

- *Project power and win decisively*, to defeat aggression, disrupt and destroy terrorist networks, and provide humanitarian assistance and disaster relief.

These pillars are mutually reinforcing and interdependent, and all of the military Services play important roles in each.  Our nuclear deterrent is the ultimate protection against a nuclear attack on the United States, and through extended deterrence, it also serves to reassure our distant allies of their security against regional aggression.  It also supports our ability to project power by communicating to potential nuclear-armed adversaries that they cannot escalate their way out of failed conventional aggression.  Building security globally not only assures allies and

partners and builds their capacity but also helps protect the homeland by deterring conflict and increasing stability in regions like the Middle East and North Africa. Our ability to project forces to combat terrorism in places as far away as Yemen, Afghanistan, and Mali – and to build capacity to help partners counter terrorism and counter the proliferation of weapons of mass destruction (WMD) – reduces the likelihood that these threats could find their way to U.S. shores.

Across each of the three pillars of the updated defense strategy, the Department is committed to finding creative, effective, and efficient ways to achieve our goals and assist in making strategic choices. Innovation – within our own Department and in our interagency and international partnerships – is a central line of effort. We are identifying new presence paradigms, including potentially positioning additional forward deployed naval forces in critical areas, and deploying new combinations of ships, aviation assets, regionally aligned or rotational ground forces, and crisis response forces, all with the intention of maximizing effects while minimizing costs. With our allies and partners, we will make greater efforts to coordinate our planning to optimize their contributions to their own security and to our many combined activities. The impacts of climate change may increase the frequency, scale, and complexity of future missions, including defense support to civil authorities, while at the same time undermining the capacity of our domestic installations to support training activities. Our actions to increase energy and water security, including investments in energy efficiency, new technologies, and renewable energy sources, will increase the resiliency of our installations and help mitigate these effects.

Reflecting the requirements of this updated defense strategy, the U.S. Armed Forces will be capable of simultaneously defending the homeland; conducting sustained, distributed counterterrorist operations; and in multiple regions, deterring aggression and assuring allies through forward presence and engagement. If deterrence fails at any given time, U.S. forces will be capable of defeating a regional adversary in a large-scale multi-phased campaign, and denying the objectives of – or imposing unacceptable costs on – a second aggressor in another region.

The President's Budget provides the resources to build and sustain the capabilities to conduct these operations, although at increased levels of risk for some missions. With the President's Budget, our military will be able to defeat or deny any aggressor. Budget reductions inevitably reduce the military's margin of error in dealing with risks, and a smaller force strains our ability to simultaneously respond to more than one major contingency at a time. The Department can manage these risks under the President's FY2015 Budget plan, but the risks would grow significantly if sequester-level cuts return in FY2016, if proposed reforms are not accepted, or if uncertainty over budget levels continues.

# REBALANCING FOR THE 21ST CENTURY

Given major changes in our nation's security environment – including geopolitical changes, changes in modern warfare, and changes in the fiscal environment – our updated defense strategy requires that the Department rebalance the Joint Force in several key areas to prepare most effectively for the future.

*Rebalancing for a broad spectrum of conflict.* Future conflicts could range from hybrid contingencies against proxy groups using asymmetric approaches, to a high-end conflict against a state power armed with WMD or technologically advanced anti-access and area-denial (A2/AD) capabilities.  Reflecting this diverse range of challenges, the U.S. military will shift focus in terms of what kinds of conflicts it prepares for in the future, moving toward greater emphasis on the full spectrum of possible operations.  Although our forces will no longer be sized to conduct large-scale prolonged stability operations, we will preserve the expertise gained during the past ten years of counterinsurgency and stability operations in Iraq and Afghanistan.  We will also protect the ability to regenerate capabilities that might be needed to meet future demands.

The Joint Force must also be prepared to battle increasingly sophisticated adversaries who could employ advanced warfighting capabilities while simultaneously attempting to deny U.S. forces the advantages they currently enjoy in space and cyberspace.  We will sustain priority investments in science, technology, research, and development both within the defense sector and beyond.  The Department is taking steps to ensure that progress continues in areas most critical to meeting future challenges such as full-spectrum cyberspace capabilities and where the potential for game-changing breakthroughs appears most promising.  We will actively seek innovative approaches to how we fight, how we posture our force, and how we leverage our asymmetric strengths and technological advantages.  Innovation is paramount given the increasingly complex warfighting environment we expect to encounter.

The United States will maintain a worldwide approach to countering violent extremists and terrorist threats using a combination of economic, diplomatic, intelligence, law enforcement, development, and military tools.  The Department of Defense will rebalance our counterterrorism efforts toward greater emphasis on building partnership capacity, especially in fragile states, while retaining robust capability for direct action, including intelligence, persistent surveillance, precision strike, and Special Operations Forces.  We will remain focused on countering WMD, which undermine global security.  We will sustain efforts to strengthen key alliances and partnerships, placing more focus on deepening existing cooperation as well as

building new and innovative partnerships.  Finally, Combatant Commanders will invigorate their efforts to adjust contingency planning to reflect more closely the changing strategic environment.

*Rebalancing and sustaining our presence and posture abroad to better protect U.S. national security interests.*  In striving to achieve our three strategic objectives, the Department will also continue to rebalance and sustain our global posture.  We will continue our contributions to the U.S. rebalance to the Asia-Pacific region, seeking to preserve peace and stability in a region that is increasingly central to U.S. political, economic, and security interests.  Faced with North Korea's long-range missiles and WMD programs – particularly its pursuit of nuclear weapons – the United States is committed to maintaining peace and security on the Korean Peninsula.  As part of our broader efforts for stability in the Asia-Pacific region, the United States will maintain a robust footprint in Northeast Asia while enhancing our presence in Oceania and Southeast Asia.  As we end combat operations in Afghanistan, we are prepared to transition to a limited mission focused on counterterrorism and training, advising, and assisting Afghan security forces.

The United States also has enduring interests in the Middle East, and we will remain fully committed to the security of our partners in the region.  We will continue to maintain a strong military posture in the Gulf region – one that can respond swiftly to crisis, deter aggression, and assure our allies and partners – while making sure that our military capabilities evolve to meet new threats.  Given our deep and abiding interests in maintaining and expanding European security and prosperity, we will continue our work with allies and partners to promote regional stability and Euro-Atlantic integration, as well as to improve capacity, interoperability, and strategic access for coalition operations.  Across the globe, we will ensure the access needed to surge forces rapidly in the event of a crisis.

*Rebalancing capability, capacity, and readiness within the Joint Force.*  After more than twelve years of conflict and amid ongoing budget reductions, the Joint Force is currently out of balance.  Readiness further suffered due to the implementation of sequestration in FY2013, and the force has not kept pace with the need to modernize.  We will need time and funding to reset and reconstitute the Joint Force as we transition from operations in Afghanistan.  The President's FY2015 Budget proposal outlines a range of realistic and responsible adjustments in specific areas the Department believes must be made in the near term to restore balance in the Joint Force.  The force will become smaller in the next five years but will gradually become more modern as well, with readiness improving over time.  Taking the prudent steps outlined in this QDR in the near term will improve the Department's ability to meet our national security needs should the fiscal outlook not improve.  The longer critical decisions are delayed in the

hope that budget caps will be raised, the more difficult and painful those decisions will be to implement, and the more damaging they will be to our ability to execute the strategy if no additional resources are made available.  Key end strength and force structure decisions in this QDR include:

- Maintaining an Air Force with global power projection capabilities crucial for this updated defense strategy.  We will modernize next-generation Air Force combat equipment – including fighters and bombers – particularly against advancing modern air defense systems.  To free resources for these programs as well as to preserve investments in critical capabilities, the Air Force will reduce or eliminate capacity in some single-mission aviation platforms.  If sequestration-level cuts are imposed in FY2016 and beyond, the Air Force would have to retire 80 more aircraft, slow down purchases of the Joint Strike Fighter, and make other difficult adjustments.

- Sustaining a world-class Army capable of conducting the full range of operations on land, including prompt and sustained land combat as part of large, multi-phase joint and multinational operations by maintaining a force structure that we can man, train, equip, and keep ready.  To sustain this force, the Department will rebalance within the Army, across the Active, Guard, and Reserves.  The active Army will reduce from its war-time high force of 570,000 to 440,000-450,000 Soldiers.  The Army National Guard will continue its downsizing from a war-time high of 358,000 to 335,000 Soldiers, and the U.S. Army Reserve will reduce from 205,000 to 195,000 Soldiers.  If sequestration-level cuts are imposed in FY2016 and beyond, all components of the Army would be further reduced, with active duty end strength decreasing to 420,000, the Army National Guard drawing down to 315,000, and the Army Reserves reducing to 185,000.

- Preserving Naval capacity to build security globally and respond to crises.  Through an aggressive effort to reduce acquisition costs and temporary ship lay-ups, the Navy will modernize its fleets of surface ships, aircraft, and submarines to meet 21st century threats.  We must ensure that the fleet is capable of operating in every region and across the full spectrum of conflict.  No new negotiations beyond 32 Littoral Combat Ships (LCS) will go forward, and the Navy will submit alternative proposals to procure a capable and lethal small surface combatant.  If sequestration-level cuts are imposed in FY2016 and beyond, the USS George Washington aircraft carrier would need to be retired before scheduled refueling and overhaul.  The Department will have to make this decision, which would leave the Navy with ten carrier strike groups, in the 2016 budget submission.

- Maintaining the role of the Marine Corps as a vital crisis response force, protecting its most important modernization priorities and ensuring readiness, but planning for an end strength of 182,000 active Marines. This end strength includes almost 900 more Marines for the Embassy Security Guard program, which will protect U.S. interests and installations abroad. If sequestration-level cuts are imposed in FY2016 and beyond, the Marines would continue their drawdown to an end strength of 175,000.

As the Joint Force rebalances so that it remains modern, capable, and ready, the Department will take the following additional steps that are consistent with the President's FY2015 Budget submission to protect key capability areas in support of our strategy:

- *Cyber*. We will invest in new and expanded cyber capabilities and forces to enhance our ability to conduct cyberspace operations and support military operations worldwide, to support Combatant Commanders as they plan and execute military missions, and to counter cyberattacks against the United States.

- *Missile Defense*. We are increasing the number of Ground-Based Interceptors and deploying a second radar in Japan to provide early warning and tracking. We will make targeted investments in defensive interceptors, discrimination capabilities, and sensors; and we are studying the best location for an additional missile defense interceptor site in the United States if additional interceptors are needed.

- *Nuclear Deterrence*. We will continue to invest in modernizing our essential nuclear delivery systems; warning, command and control; and, in collaboration with the Department of Energy, nuclear weapons and supporting infrastructure.

- *Space*. We will move toward less complex, more affordable, more resilient systems and system architectures and pursue a multi-layered approach to deter attacks on space systems while retaining the capabilities to respond should deterrence fail.

- *Air/Sea*. We will continue to invest in combat aircraft, including fighters and long-range strike, survivable persistent surveillance, resilient architectures, and undersea warfare to increase the Joint Force's ability to counter A2/AD challenges.

- *Precision Strike*. We will procure advanced air-to-surface missiles that will allow fighters and bombers to engage a wide range of targets and a long-range anti-ship cruise missile that will improve the joint ability of U.S. air forces to engage surface combatants in defended airspace.

- ▪ *Intelligence, Surveillance, and Reconnaissance (ISR)*. We will rebalance investments toward systems that are operationally responsive and effective in highly contested environments, while sustaining capabilities appropriate for more permissive environments in order to support global situational awareness, counterterrorism, and other operations.

- ▪ *Counter Terror and Special Operations*. We will grow overall Special Operations Forces end strength to 69,700 personnel, protecting our ability to sustain persistent, networked, distributed operations to defeat al Qa'ida, counter other emerging transnational threats, counter WMD, build the capacity of our partners, and support conventional operations.

*Rebalancing tooth and tail.*  Finally, the Department itself will rebalance internally to control cost growth and generate greater efficiencies in order to prioritize spending on combat power. The Department has previously submitted three packages of budget proposals aimed at achieving efficiencies and now plans to implement additional overhead reduction efforts.  Key ongoing activities include reducing the Department's major headquarters budgets by 20 percent and decreasing the number of direct reports to the Secretary of Defense.  These will lower the Department's operating costs by $5 billion over the next five years and by more than twice that amount over the next decade.  The Department is making selected cutbacks in civilian personnel and contractors to hold down costs and is seeking to harness lower growth in private-sector health care costs in order to slow growth in military health care expenses.  In addition, the Department is also improving its financial management, in part to achieve auditable financial statements.

We are also continuing to implement acquisition reform efforts, most notably through the Better Buying Power initiative that seeks to achieve affordable programs by controlling costs, incentivizing productivity and innovation in industry and government, eliminating unproductive processes and bureaucracy, promoting effective competition, improving tradecraft in contracted acquisition of services, and improving the professionalism of the total acquisition workforce.  The Department will remain committed to continuously increasing productivity in defense acquisition.

Substantial long-term savings will be realized if the Department is permitted to eliminate unneeded infrastructure.  We estimate that we already have more infrastructure than we need, and this will grow as we reduce end strength.  The only effective way to eliminate unneeded infrastructure in the United States is through the Base Realignment and Closure (BRAC)

process.  Congress has denied the Department's request for another BRAC in each of the past two years.  If the Department is to make more effective use of taxpayer dollars, it is imperative that Congress authorize another BRAC round in 2017.

## MAINTAINING THE STRENGTH OF THE ALL-VOLUNTEER FORCE AND IMPLEMENTING NEW REFORMS

As we restore balance to the Joint Force and the Department, the United States will maintain its two-fold sacred contract with U.S. Service members: to properly compensate and care for our men and women in uniform and their families both during and after their service, and to provide our Service members the best training and equipment possible so they can safely accomplish their missions.

Service members will be treated fairly and equally, on and off the battlefield.  The Department last year expanded opportunities for women to serve in the U.S. Armed Forces and is seeking to integrate women successfully into the few remaining restricted occupational fields.  Eliminating sexual assault is one of the Department of Defense's highest priorities, requiring an absolute and sustained commitment to improving the Department's prevention and response programs – ensuring that we provide a safe environment free from threats to our military personnel.  The Department will continue to implement changes needed to realize fully its decision to allow gay men and women to serve openly in the military.  For those returning from combat ill or wounded, and for those who require hospitalization or rehabilitation, we will continue to provide the best possible care.  And the Department of Defense will continue working with the Departments of Veterans Affairs and Labor to provide the best possible assistance to Service members transitioning into private life.

In a constrained fiscal environment, the Department cannot afford to sustain the rate of growth in military pay and benefits that we experienced over the last decade.  The Department and the American people have rightfully been very supportive of our men and women in uniform for more than a decade of war, providing increases in military pay and benefits that have more than closed compensation gaps and have appropriately recognized the sacrifices of those who are serving and have served and their families.  The Department is proposing changes that will ensure we can continue to offer a competitive compensation package to recruit and retain our Joint Force of the future.  These changes include: restrained annual military pay raises over the next five years; slowing the rate of growth in tax-free housing allowances; simplifying and modernizing the TRICARE programs, including modestly increasing co-pays and deductibles in

ways that encourage members to use the most affordable means of care, adjusting pharmacy co-pay structure, and establishing a modest fee for the TRICARE-for-Life coverage for Medicare-eligible retirees; and decreasing commissary subsidies.  If implemented fully, these proposals would save approximately $12 billion over the next five years and considerably more by the end of ten years.

Without support from Congress and the American people for reforms to slow the rate of growth in military compensation, the Department will be left with no choice but to take resources away from its ability to field the future Joint Force we need.  The Secretary of Defense, the Secretaries of the Military Departments and Service Chiefs, the Senior Enlisted Advisers, and the Department's senior leadership team support this comprehensive approach to reform and will work in partnership with Congress and the American public to continue to sustain the world's finest military.

## IMPLICATIONS OF SEQUESTRATION-LEVEL CUTS

The FY2015 funding levels requested by the President will allow the military to protect and advance U.S. interests and fulfill the updated defense strategy – but with increased levels of risk for some missions.  In the near term, U.S. forces will remain actively engaged in building partnerships and enhancing stability in key regions, but our engagement will be even more tailored and selective.  We will continue to sustain a heightened alert posture in regions like the Middle East and North Africa.  At requested budget levels, we can sustain adequate readiness and modernization that is most relevant to strategic priorities over the near term.  Moreover, the President's "Opportunity, Growth, and Security" Initiative would fund an additional $26 billion in FY2015 defense investments, helping the Department to make faster progress toward restoring readiness, investing in weapons modernization, and making needed facilities improvements.  The development of advanced capabilities and sophisticated weapons systems by global rivals and potential adversaries will inevitably pose more risks to our forces and our security.  The Department can manage these risks under the President's FY2015 Budget plan, but the risks would grow significantly if sequester-level cuts return in FY2016, if proposed reforms are not accepted, or if uncertainty over budget levels continues.

If the modest, immediate relief that the Bipartisan Budget Act provides from sequestration – more so in FY2014 and less so in FY2015 – is followed by the return of annual reductions to the sequestration level, the Department would be unable to adjust the size and shape of the Joint Force in the more balanced way envisioned in the President's Budget submission.  Our

ability to implement the defense strategy would be significantly reduced over the entire BCA period. The Department's readiness challenges, particularly in the near term, would greatly reduce both our ability to conduct steady state activities and to respond quickly in a crisis. Critical modernization programs would be slowed or truncated, creating deficiencies in the technological capability of our forces. The United States would likely need to count more on allied and partner contributions in future confrontations and conflicts, assuming they would be willing and able to act in support of shared interests. Reductions in capacity and capability would significantly challenge our ability to respond to strategic surprise, particularly those requiring large numbers of modern forces.

Left unaddressed, continuing sequestration-level cuts would greatly affect what the U.S. military can and cannot do over the next ten years. The American people would have to accept that the level of risk in conducting military operations would rise substantially. Our military would be unbalanced and eventually too small to meet the needs of our strategy fully, leading to greater risk of longer wars with potentially higher casualties for the United States and for our allies and partners in the event of a conflict. Ultimately, continued resourcing at sequestration level would likely embolden our adversaries and undermine the confidence of our allies and partners, which in turn could lead to an even more challenging security environment than we already face.

## CONCLUSION

The United States remains committed to protecting its interests, sustaining U.S. leadership, and preserving global stability, security, and peace. Recognizing current fiscal realities, the Department has made a number of decisions to ensure the Joint Force remains as balanced as possible over time, even as it must begin force structure reductions due to fiscal constraints. We will prepare the Department of Defense for the future and preserve the health of the All-Volunteer Force as we implement reforms.

The President's FY2015 Budget provides a realistic alternative to sequester-level cuts, supporting the Department's ability to achieve our updated defense strategy and beginning an efficient transition to a smaller force over time. Resumption of sequestration-level cuts would lead to more immediate and severe risks to the strategy. Ultimately, with sequestration-level cuts, by 2021 the Joint Force would be too small and too outdated to fully implement our defense strategy. As a global leader, the United States requires a robust national defense strategy to protect and advance its interests and to ensure the security of its allies and partners with a

military and civilian workforce that can implement that strategy effectively.  This can only be achieved by the strategic balance of reforms and reductions that the Department is presenting to Congress and will require Congress to partner with the Department of Defense in making politically difficult choices.



I N T R O D U C T I O N

The 2014 QDR was a strategy-driven and resource-informed process focused on preparing the Department of Defense for the future and prioritizing our efforts in a period of fiscal austerity.  The QDR advances three important initiatives. First, it builds on the Defense Strategic Guidance, published in 2012, to continue protecting and advancing U.S. interests and sustaining American leadership.  Second, the QDR describes how the Department is responsibly and realistically taking steps to rebalance major elements of the Joint Force given the changing fiscal environment.   Third, the QDR demonstrates our intent to rebalance the Department itself as part of our effort to control internal cost growth that is threatening to erode our combat power in this period of fiscal austerity.  We will preserve and enhance the health of the All-Volunteer Force as we undertake these reforms.

In conducting the 2014 QDR, the Department first assessed the challenging international security environment.  Senior leaders sought to identify plausible strategic and operational futures that we could face over the near-, mid-, and long-term – paying particular attention to threats, challenges, and opportunities emerging since the release of the 2012 Defense Strategic Guidance.  Informed by this assessment, senior leadership identified objectives the Department will likely need to be capable of accomplishing in support of U.S. national security interests and assessed the sufficiency and proficiency of the Joint Force to meet these demands.  The results of these assessments guided development of the Department's force planning construct and informed the President's FY2015 Budget request.  Throughout the QDR process, senior leaders also considered the impact of lower budget levels – including sequestration-level cuts – on the Department's ability to protect U.S. interests.  The foundation of this QDR is a steadfast commitment to protect spending on combat power, while identifying new ways of achieving our goals and new approaches to reforming the Defense enterprise.



# CHAPTER 1: FUTURE SECURITY ENVIRONMENT

CHAPTER I: FUTURE SECURITY ENVIRONMENT

As the United States completes its transition in Afghanistan and looks to the future, the international security environment remains uncertain and complicated. The United States will likely face a broad array of threats and opportunities and must prepare to address both effectively in the coming years.

Powerful global forces are emerging. Shifting centers of gravity are empowering smaller countries and non-state actors on the international stage. Global connections are multiplying and deepening, resulting in greater interaction between states, non-state entities, and private citizens. In a fundamentally globalized world, economic growth in Asia; aging populations in the United States, Europe, China, and Japan; continued instability in the Middle East and Africa; and many other trends interact dynamically. The operating environment is increasingly enabled by technology, which provides the types of capabilities once largely limited to major powers to a broad range of actors. The rapidly accelerating spread of information is challenging the ability of some governments to control their populations and maintain civil order, while at the same time changing how wars are fought and aiding groups in mobilizing and organizing.



A U.S. Air Force MQ-9 Reaper unmanned aerial vehicle taxis at Kandahar Airfield, Afghanistan. (U.S. Air Force photo by Tech. Sgt. Efren Lopez)

Regional and global trends in the security environment, coupled with increasing fiscal austerity, will make it imperative that the United States adapt more quickly than it has in the past and pursue more innovative approaches and partnerships in order to sustain its global leadership role.

## *Regional Trends*

The United States has been a Pacific power for more than a century, with deep and enduring economic and security ties to the region.  Particularly in the past six decades, the United States has helped ensure peace and prosperity in the Asia-Pacific region through our commitment to free and open commerce, promotion of a just international order, and maintenance of open access to shared domains.  U.S. economic, security, and people-to-people ties with the region are strong and growing.

The Asia-Pacific region is increasingly central to global commerce, politics, and security. Defense spending in this region continues to rise.  As nations in the region continue to develop their military and security capabilities, there is greater risk that tensions over long-standing sovereignty disputes or claims to natural resources will spur disruptive competition or erupt into conflict, reversing the trends of rising regional peace, stability, and prosperity.  In particular, the rapid pace and comprehensive scope of China's military modernization continues, combined with a relative lack of transparency and openness from China's leaders regarding both military capabilities and intentions.

A multilateral security architecture – composed of groups such as the Association of South East Asian Nations (ASEAN) and regional actors collaborating on issues ranging from humanitarian assistance to maritime security to counterterrorism – is emerging to help manage tensions and prevent conflict.  Traditional anchors of regional security such as Australia, Japan, and the Republic of Korea (ROK), and growing powers such as India and Indonesia, are taking on additional leadership roles to foster increased communication and shared understanding.



U.S. Marines with the 2nd Fleet Anti-Terrorism Security Team and Australian soldiers with the 5th Battalion, Royal Australian Regiment conduct training at a live-fire range at Robertson Barracks in Darwin, Australia. (U.S. Marine Corps photo by Sgt. Pete Thibodeau)

As many Asia-Pacific countries seek to achieve greater prosperity, establish regional norms, and strive for a stable military balance, North Korea remains closed and authoritarian.  North Korea's long-range missile and weapons of mass destruction (WMD) programs – particularly its pursuit of nuclear weapons in contravention of its international obligations – constitutes a significant threat to peace and stability on the Korean Peninsula and in Northeast Asia and is a growing, direct threat to the United States.

Friction points also endure in the Middle East.  Religious differences, particularly a widening Sunni-Shi'a divide, are among the sources of trans-national division in the region.  Competition for resources, including energy and water, will worsen tensions in the coming years and could escalate regional confrontations into broader conflicts – particularly in fragile states.  In the region, Iran remains a destabilizing actor that threatens security by defying international law and pursuing capabilities that would allow it to develop nuclear weapons.  Even as Iran pledges not to pursue nuclear weapons, Iran's other destabilizing activities will continue to pose a threat to the Middle East, especially to the security of our allies and partners in the region and around the world.

Many countries in the Middle East and Africa are undergoing significant political and social change.  People in countries including Tunisia, Libya, Yemen, and Egypt are seeking a greater voice in their governance, upending traditional power centers in the process.  Terrorist groups seek to exploit transitional governments and expand their influence.  Internal strife in Syria continues amid sectarian friction, at great cost to human life.  Syria has become a magnet for global jihad – a situation that is likely to persist as long as the current leadership remains in power.  Ongoing, severe spillover effects include an influx of foreign fighters and a flood of refugees into neighboring countries.  These difficult political transitions are a reminder that events in the region will take years – perhaps decades – to develop fully.

In Africa, terrorists, criminal organizations, militias, corrupt officials, and pirates continue to exploit ungoverned and under-governed territory on the continent and its surrounding waters. The potential for rapidly developing threats, particularly in fragile states, including violent public protests and terrorist attacks, could pose acute challenges to U.S. interests.  At the same time, there is also significant opportunity to develop stronger governance institutions and to help build professional, capable military forces that can partner with the United States to address the full spectrum of regional security challenges.  Multilateral peace operations under the aegis of the United Nations, African Union, and sub-regional organizations are playing an increasingly prominent role in maintaining and restoring international security, including through prevention and mitigation of mass atrocities in threat environments that previously would have deterred multilateral action.

Europe remains our principal partner in promoting global security.  As unrest and violence persist, particularly in the Middle East and North Africa, Europe will be critical in addressing these challenges.  Europe is home to our most stalwart and capable allies and partners, and the strategic access and support these countries provide is essential to ensuring that the U.S. Armed Forces are more agile, expeditionary, and responsive to global challenges.  While most European countries today are producers of security, continued instability in the Balkans and on the

European periphery will continue to pose a security challenge.  The United States is willing to undertake security cooperation with Russia, both in the bilateral context and in seeking solutions to regional challenges, when our interests align, including Syria, Iran, and post-2014 Afghanistan.  At the same time, Russia's multi-dimensional defense modernization and actions that violate the sovereignty of its neighbors present risks.  We will engage Russia to increase transparency and reduce the risk of military miscalculation.

In the Western Hemisphere, predominant security challenges no longer stem principally from state-on-state conflict, right-wing paramilitaries, or left-wing insurgents.  Today's threats stem from the spread of narcotics and other forms of transnational organized crime, the effects of which can be exacerbated by natural disasters and uneven economic opportunity.  These challenges are shared and do not respect sovereign boundaries.  It is in the mutual interest of all the nations of the Western Hemisphere to unite to develop regional capacity to disrupt, dismantle, and defeat these threats from non-state actors.

## Global Trends

The global trends that will define the future security environment are characterized by a rapid rate of change and a complexity born of the multiple ways in which they intersect and influence one another.  As a result, despite the growing availability and flow of information around the world, it is increasingly challenging to predict how global threats and opportunities will evolve.

The United States' sustained attention and engagement will be important in shaping emerging global trends, both positive and negative.  In many regions we are witnessing the emergence of international partners with the capacity to play productive and even leading security roles in their respective regions.  Unprecedented levels of global interconnectedness through technology, travel, trade, and social media provide common incentives for, and more effective means of, fostering international cooperation and shared norms of behavior.  The forces of globalization are contributing to important macroeconomic changes in some of the world's most destitute areas.  And the pace of technological and scientific innovation in the private sector, particularly in energy markets, has the potential not only to revolutionize entire industries but also to enable new ways of providing for U.S. security in the future.

At the same time, the technology-enabled 21st century operational environment offers new tools for state and non-state adversaries such as terrorists to pursue asymmetric approaches, exploiting where we are weakest.  In the coming years, countries such as China will continue seeking to counter U.S. strengths using anti-access and area-denial (A2/AD) approaches and by employing other new cyber and space control technologies.  Additionally, these and other states

continue to develop sophisticated integrated air defenses that can restrict access and freedom of maneuver in waters and airspace beyond territorial limits.  Growing numbers of accurate conventional ballistic and cruise missile threats represent an additional, cost-imposing challenge to U.S. and partner naval forces and land installations.

The United States has come to depend on cyberspace to communicate in new ways, to make and store wealth, to deliver essential services, and to perform national security functions.  The importance of cyberspace to the American way of life – and to the Nation's security – makes cyberspace an attractive target for those seeking to challenge our security and economic order.  Cyberspace will continue to feature increasing opportunities but also constant conflict and competition – with vulnerabilities continually being created with changes in hardware, software, network configurations, and patterns of human use.  Cyber threats come from a diverse range of countries, organizations, and individuals whose activities are posing increasingly significant risks to U.S. national interests.  Some threats seek to undercut the Department's near- and long-term military effectiveness by gaining unauthorized access to Department of Defense and industry networks and infrastructure on a routine basis.  Further, potential adversaries are actively probing critical infrastructure throughout the United States and in partner countries, which could inflict significant damage to the global economy and create or exacerbate instability in the security environment.

Space also remains vital to U.S. security as well as to the global economy.  Congestion in space is growing, due both to routine space activities and to irresponsible behavior.  Threats to U.S. space capabilities, as well as to the space environment itself, are steadily increasing.  Some nations are developing a range of counter-space capabilities – with both reversible and permanent effects – designed to deny or degrade our ability to conduct military operations and to project power globally.  Additionally, many states are integrating space-enabled precision effects in their own systems to allow them to hold U.S. assets at risk.

The spread of other sophisticated technologies poses a range of new challenges.  Counter-stealth technology is just one example of how highly advanced weapons systems – previously available only to those with significant research and development capabilities and large acquisition budgets – could proliferate and change warfighting equations.  Automated and autonomous systems as well as robotics already have a wide range of commercial, industrial, and military applications – a trend that will likely continue.  The availability of low-cost three-dimensional printers could revolutionize manufacturing and logistics related to warfare.  New ways of developing WMD – such as biotechnology breakthroughs – could make dangerous agents more widely available, potentially presenting fast-moving threats that are very difficult to detect and

even more difficult to counter.  How these and other technologies will ultimately manifest on the battlefield remains unclear.

Whether employing high-technology tools or less-advanced weapons, the terrorist threat to our Nation's interests persists and has evolved greatly since 2001.  Many of the leading al Qa'ida elements who were responsible for planning and prosecuting attacks on U.S. soil have been captured or killed.  Although core al Qa'ida has been severely degraded, instability in the Middle East and civil war in Syria have enabled al Qa'ida to expand its global



A Soldier assigned to 1st Battalion, 72nd Armor Regiment, 1st Armored Brigade Combat Team, 2nd Infantry Division provides security during an anti-terrorism force protection exercise at Camp Casey, ROK. (U.S. Army photo by Sgt. Michael Dator)

reach and operate in new areas.  Terrorists remain willing and able to threaten the United States, our citizens, and our interests – from conducting major and well-coordinated attacks to executing attacks that are smaller and less complex.  Terrorist networks continue to demonstrate interest in obtaining WMD.  Foreign terrorist groups affiliated with al Qa'ida, as well as individual terrorist leaders, may seek to recruit or inspire Westerners to carry out attacks against our homeland with little or no warning.  Homegrown violent extremists, for instance, have attacked DoD personnel and installations.  Even groups that are unable to cause harm on U.S. soil may still threaten U.S. interests and personnel overseas.  The possibility that rapidly-developing threats, including violent protests and terrorist attacks, could escalate quickly and directly threaten U.S. interests at home and abroad is a significant challenge for the United States.

Climate change poses another significant challenge for the United States and the world at large.  As greenhouse gas emissions increase, sea levels are rising, average global temperatures are increasing, and severe weather patterns are accelerating.  These changes, coupled with other global dynamics, including growing, urbanizing, more affluent populations, and substantial economic growth in India, China, Brazil, and other nations, will devastate homes, land, and infrastructure.  Climate change may exacerbate water scarcity and lead to sharp increases in food costs.  The pressures caused by climate change will influence resource competition while placing additional burdens on economies, societies, and governance institutions around the world.  These effects are threat multipliers that will aggravate stressors abroad such as poverty, environmental degradation, political instability, and social tensions – conditions that can enable terrorist activity and other forms of violence.

# EXHIBIT 35

*Hearing on 2015 Paris International Climate Negotiations before the Subcommittee on Multilateral International Development, Multilateral Institutions, and International Economic, Energy, and Environmental Policy*, 114th Cong. (Oct. 20, 2015) (Testimony of Todd D. Stern, Special Envoy for Climate Change)

**Testimony of**
**Special Envoy for Climate Change Todd D. Stern**
**October 20, 2015**

**Senate Foreign Relation Committee**
**Subcommittee on Multilateral International Development, Multilateral Institutions, and**
**International Economic, Energy, and Environmental Policy**

Mr. Chairman, I am pleased to be here and appreciate the opportunity to testify before your subcommittee.

I look forward to discussing the issues on today's agenda with you and your colleagues on the subcommittee. I thought it might be useful at the outset for me to explain the approach we have taken to the international climate change negotiations over the last number of years and to explain what we hope to accomplish in the Paris conference in December.

The Obama Administration came into office convinced that we had to take bold, concerted action to tackle the very real threat of climate change. But we also saw that we needed a new approach. We took a hard look at the lessons of Kyoto and listened to what both sides of the aisle had been saying for years about what an international climate agreement ought to look like. Targets should be set by countries themselves bottom-up, not imposed top-down. Developing countries need to act just as we do, recognizing that they face unique challenges. Strong transparency provisions are needed with the same basic terms for the U.S. and emerging markets like China. And that's exactly the deal we've been fighting for.

If we secure a deal with these features, it's because we took to heart bipartisan feedback on earlier attempts to forge international climate agreements. And that's also why the President and Secretary Kerry have worked hard on building international support for this new approach, working with leaders from China to Brazil to India; from African countries and small island states that are facing clear and present threats from a changing climate. To demonstrate that we're committed to act, together with others. We now live in a new reality where China has pledged to peak its emissions, to bring online an average of a gigawatt of clean energy every week through 2030, to implement a national cap-and-trade plan, and to provide $3.1 billion in climate finance. And where nearly 150 countries have announced their own targets. We still have a considerable way to go to land a strong, viable climate agreement in Paris, but we are closer than we ever have been, and U.S. leadership has been at the heart of this progress.

Because the agreement we wanted was radically different from the one the UN process had produced in Kyoto, we knew that a fundamental reframing of the developed versus developing country paradigm would be needed. And we decided to go to the heart of that problem by engaging directly with China. For almost 20 years, the U.S. and China had been seen almost as captains of opposing teams in the negotiations. It was an unproductive situation that helped produce deadlock.

We started engaging with China on climate change in a concerted manner from the start of this Administration, building relationships, working with them.  Secretary Clinton highlighted climate change on her first trip there in February, 2009.  We intensified this effort in 2013 with Secretary Kerry's visit in April of that year, establishing the U.S.-China Climate Change Working Group, and with President Obama's first meeting with President Xi, in Sunnylands.  Then, last year, we sought to move our interaction to a whole new level. We found that their leadership was ready to work with us, genuinely concerned about the impacts of climate change as well as air pollution, and open to a cooperative approach based on mutual confidence that each side was serious about curbing emissions.  This led, of course, to the historic Joint Announcement last year between President Obama and President Xi, in which the U.S. and China set forth ambitious climate targets and marked the beginning of a new era of climate diplomacy.

We followed that up just a few weeks ago during President Xi's State Visit with a Joint Presidential Statement on Climate Change that laid out a common vision for the Paris Agreement, and also showed how serious both countries are about taking concrete action here and now.

These steps have given the global climate talks a jolt of momentum and have led Parties around the world to believe that these negotiations could and should succeed.

Most fundamentally, we have levelled the playing field by leading on a structure and process for the agreement in which more than 150 countries, including over 100 developing countries, have put forward their targets, known as INDCs ("intended nationally determined contributions").  This, by itself, is an extraordinary fact.  It is testament to the buy-in of countries around the world, and a demonstration that the old fire-wall between developed and developing countries is coming down.  In particular:

We proposed the structure of nationally determined mitigation contributions, around which Parties have largely converged.  Our rationale was simple: if all Parties are to be genuinely part of the new agreement, you can't negotiate top-down targets as was done in Kyoto.  To ensure maximum participation, we needed a structure that would allow countries to make their own choices about what target to adopt, reassuring them that they could join the agreement without disrupting their economic and development priorities.

We proposed that Parties submit their INDCs early rather than at the end in Paris, because we thought this exposure to scrutiny would push countries to do their best.  And the result has been a momentum-building drumbeat of submissions.

We have pushed for the idea of successive rounds of targets, coupled with longer-term goals for greater ambition.

We have pressed for an approach recognizing that developing countries continue to have unique challenges, but asks all countries to put forward actions to address this global challenge.

We are leading proponents of a robust transparency system of reporting and review for all, with a single set of guidelines, but flexibility in terms of the frequency and content of reporting, for those developing countries that need it based on their capacity.

We have strongly backed the notion of non-legally binding targets as the best way to ensure broad participation in the agreement. We concluded early on that many countries would be unwilling to put forward legally binding targets and, as noted, we are not willing to accept the Kyoto approach of binding targets for developed countries only. Also – contrary to much conventional wisdom – we think that non-binding targets will produce greater ambition because many countries would low-ball legally binding commitments out of fear for the consequences of missing their targets.

We have strongly supported the broad-based effort to elevate the importance of building resilience against the impacts of climate change, world-wide.

And we have advocated for a system of post-2020 support based on a shared effort among all countries to drive larger flows of climate friendly finance to those in need through the use of public and private finance, domestic resources, enhanced investment environments in recipient countries, and improved transparency regarding the provision, mobilization and use of funds.

We are seeking an agreement, in brief, that is universal, ambitious, transparent, durable and effective; one that will elevate adaptation and resilience; be differentiated in a manner suitable for the 2020s and beyond; and promote shared efforts to generate increasing flows of climate-friendly capital from all sources to countries around the world that need it. It is exactly the kind of accord that voices from both sides of the aisle have said we need.

An agreement like this in Paris wouldn't solve climate change by itself, but it would be an important step forward.  Of course, a great deal of the effort to combat climate change will be driven by national governments, subnational actors, enterprising businesses, innovative scientists and engineers, and an enlightened global public demanding that its leaders take heed and take action.  But we need a strong international agreement to supply the essential confidence countries need that, if they act, their partners and competitors will do so as well; and to send a clear signal to governments, civil society, and the private sector that the world's leaders have finally decided to take action and are not turning back.

A strong Paris Agreement of this kind is in the economic, diplomatic and national security interests of the United States and the American people.

It is in our economic interests because the costs of inaction, properly accounted for, will dwarf the costs of acting, and because no one is better positioned to win big in the multi-trillion dollar 21st century market for low-carbon energy innovation than the United States.

It is in our diplomatic interest because climate change is a high and rising priority in countries and regions all over the world, and it is untenable for the United States to stand apart.

It would be in our national security interests because threats of rising sea levels, droughts, floods and other extreme events have become all too real, and will get worse.   However, if we act now and act globally we can limit the extent and severity of the impacts.    This is not a matter of ideology; it is a matter of sober risk management.  Our military and intelligence leaders have been sounding the alarm now for years.  In March 2013, Admiral Samuel Locklear, then Commander of the Pacific Command, said that upheaval related to climate change "is probably the most likely thing that is going to happen . . . that will cripple the security environment, probably more likely than the other scenarios we all often talk about.''

So the time has come to act.  The stars are more aligned for an ambitious climate agreement this year than they ever have been.  The deal is far from done, but we will strive during the next seven and a half weeks to produce a strong outcome that will constitute a major step in combatting climate change.

I'll be happy to take your questions.

# EXHIBIT 36

Keystone XL Pipeline, S. Rep. No. 114-1 (2015)

# Calendar No. 2

| 114TH CONGRESS<br>*1st Session* | SENATE | REPORT<br>114–1 |
| --- | --- | --- |

## KEYSTONE XL PIPELINE

---

JANUARY 12, 2015.—Ordered to be printed

---

Ms. MURKOWSKI, from the Committee on Energy and Natural
Resources, submitted the following

# R E P O R T

together with

## MINORITY VIEWS

[To accompany S. 147]

The Committee on Energy and Natural Resources, having considered the same, reports favorably an original bill (S. 147) to approve the Keystone XL Pipeline, and recommends that the bill do pass.

### PURPOSE

The purpose of this measure is to approve the Keystone XL pipeline.

### BACKGROUND AND NEED

Although the Federal Government does not regulate the siting of oil pipelines within the United States, the President has, for more than a century, asserted authority to approve energy and tele-communication facilities that cross international borders pursuant to the President's constitutional authority over foreign affairs. *See Sierra Club* v. *Clinton,* 689 F. Supp. 2d 1147, 1163 (D. Minn. 2010). In 1968, President Johnson delegated his authority to issue or deny applications for Presidential permits for cross-border oil pipelines to the Secretary of State, based upon the Secretary's determination of whether issuance of the permit would serve the national interest. Executive Order 11423, 33 Fed. Reg. 11741 (Aug. 16, 1968). President George W. Bush affirmed President Johnson's delegation to the Secretary of State in 2004. Executive Order 13337, 69 Fed. Reg. 25299 (May 5, 2004).

49–010

2

TransCanada Keystone Pipeline, LP, ("TransCanada"), a Canadian company, proposes to build and operate an oil pipeline, known as the "Keystone XL pipeline," to transport heavy crude oil across the border between Saskatchewan, Canada, and Montana. This proposed pipeline would connect with a recently-completed pipeline that currently ends in Nebraska. In addition, the project will also provide transportation of light crude oil from the Bakken formation in North Dakota and Montana. TransCanada already operates another cross-border pipeline, known simply as the "Keystone pipeline," which runs from Hardisty, Alberta, crosses the border in North Dakota, and ends in Patoka, Illinois. It received a Presidential permit in March 2008 and began operating in June 2010. In the case of the original Keystone pipeline, the Department of State determined that the pipeline was in the national interest because it increased market access to crude oil supplies from "a stable and reliable trading partner, Canada, that is in close proximity to the United States."

In September 2008, TransCanada applied for a Presidential permit for the Keystone XL pipeline. This second pipeline would have the capacity to transport 830,000 barrels of oil per day, including 730,000 barrels per day from Canada, and 100,000 barrels per day from the Bakken formation of North Dakota and Montana. It would provide both Canadian and American oil producers greater access to the large refining center in the U.S. Gulf Coast.

The Department of State published a final environmental impact statement on the proposed project in August 2011. In November 2011, however, the Department determined that additional information was needed to act on the application.

In December 2011, Congress passed and the President signed into law the Temporary Payroll Tax Cut Continuation Act. Section 501 of that Act required the President, acting through the Secretary of State, to grant the Presidential permit for the Keystone XL pipeline "not later than 60 days" after December 23, 2011. Public Law 112–78, 501(a), 125 Stat. 1289. On January 18, 2012, the Secretary of State recommended that the President deny the permit, "based on the fact that the Department does not have sufficient time to obtain the information necessary to assess whether the project, in its current state, is in the national interest." The President accepted the Secretary of State's recommendation, stating that it was "not a judgment on the merits of the pipeline, but the arbitrary nature of a deadline that prevented the State Department from gathering the information necessary to approve the project. . . ."

In February 2012, TransCanada announced that it would proceed with the construction of the pipeline from Cushing, Oklahoma, to the Gulf Coast, for which a Presidential permit was not required (since it did not cross the border with Canada). Construction of that portion of the pipeline is now complete. It began operating in January 2014.

In May 2012, TransCanada filed a new application for a Presidential permit for the project. The new application proposed a modified route, which avoids the environmentally sensitive Sand Hills region in Nebraska and terminates near Steele City, Nebraska. From Steele City, oil would be transported through the so-called "Cushing Extension," from Steele City, Nebraska, to Cush-

3

ing, Oklahoma, which began operating in February 2011, and the "Gulf Coast Project," from Cushing, Oklahoma, to Nederland, Texas, which began operating in January 2014.

On January 31, 2014, the Department of State released a final supplemental environmental impact statement on the modified Keystone XL project. Pursuant to Executive Order 13337, the Department is required to solicit the views of the Departments of Energy, Defense, Transportation, Homeland Security, Justice, the Interior, and Commerce, and the Environmental Protection Agency. On April 18, 2014, the Department of State notified the eight agencies that it would provide more time for them to submit their views on the project. It cited both "the uncertainty created by the ongoing litigation in the Nebraska Supreme Court which could ultimately affect the pipeline route in that state," and the "unprecedented number of new public comments, approximately 2.5 million, received during the public comment period that closed on March 7, 2014," for giving the agencies more time. The State Department stated that it was "actively continuing" its work on the permit application, but offered no target date for bringing its review to a close and making a final decision on TransCanada's permit application.

The environmental community has expressed concern that construction of the Keystone XL pipeline would result in increased oil sands production, which would in turn increase greenhouse gas emissions in Canada. The State Department found in its Environmental Impact Statement that approval of the pipeline would be "unlikely to significantly impact the rate of extraction," concluding: "Oil sands production and investment could slow or accelerate depending on oil price trends, regulations, and technological developments. . . ."

LEGISLATIVE HISTORY

The Committee ordered S. 2554, legislation to approve the Keystone XL pipeline, favorably reported as an original bill on June 18, 2014. Similar legislation (S. 582 and S. 2280) was introduced by Senator Hoeven on March 18, 2013 (S. 582) and on May 5, 2014 (S. 2280). S. 582 was cosponsored by 27 Senators, and S. 2280 was cosponsored by 55 Senators. Both bills were placed directly on the Calendar pursuant to rule XIV. S. 2280 was considered by the full Senate on November 18, 2014 by a vote of 59–41 but, having failed to achieve 60 votes in the affirmative, did not pass.

In addition, similar measures have been incorporated as part of more comprehensive bills that have been referred to the Committee on Energy and Natural Resources. *See* S. 17, § 309 (Mr. Vitter); S. 2170, § 2012 (Mr. Cruz). *See* also S. Con. Res. 21 (Ms. Landrieu) (expressing the sense of the Senate that "completion of the Keystone XL pipeline is in the national interest of the United States"). Similar legislation (H.R. 3) was also passed by the House of Representatives on May 22, 2013, by a vote of 241–175, and was placed on the Senate Legislative Calendar under rule XIV.

COMMITTEE RECOMMENDATION AND TABULATION OF VOTES

The Committee on Energy and Natural Resources, in open business session on January 8, 2015, by a majority voice vote of a

4

quorum present, recommends that the Senate pass an original bill, as described herein.

The roll call vote on reporting the measure was 13 yeas, 9 nays, as follows:

| YEAS | NAYS |
|---|---|
| Ms. Murkowski | Ms. Cantwell |
| Mr. Barrasso | Mr. Wyden |
| Mr. Risch | Mr. Sanders |
| Mr. Lee | Ms. Stabenow |
| Mr. Flake | Mr. Franken |
| Mr. Daines | Mr. Heinrich |
| Mr. Manchin | Ms. Hirono |
| Mr. Cassidy | Mr. King |
| Mr. Gardner | Ms. Warren |
| Mr. Portman | |
| Mr. Hoeven | |
| Mr. Alexander | |
| Mrs. Capito * | |

\* Indicates vote by proxy.

### SECTION-BY-SECTION ANALYSIS

*Section 1* provides a short title for the measure.

*Section 2(a)* authorizes TransCanada to construct, connect, operate and maintain the Keystone XL pipeline and cross-border facilities described in the application TransCanada filed on May 4, 2012, including any subsequent revision to the pipeline route within the State of Nebraska required or authorized by the State of Nebraska.

Subsection (b) provides that the Final Supplemental Environmental Impact Statement on the Keystone XL Project issued by the Secretary of State in January 2014 shall be considered to satisfy the National Environmental Policy Act and any other provision of law that requires Federal agency consultation or review, including section 7(a) of the Endangered Species Act of 1973, with respect to the Keystone XL pipeline and cross-border facilities.

Subsection (c) provides that any Federal permit or authorization for the Keystone XL pipeline and cross-border facilities issued before the date of enactment of the measure shall remain in effect.

Subsection (d) gives the United States Court of Appeals for the District of Columbia Circuit original and exclusive jurisdiction, except for review in the Supreme Court of the United States, for the review of any order or action of a Federal agency regarding the Keystone XL pipeline and cross-border facilities and related facilities in the United States that are approved by the measure (including any order granting a permit or right-of-way, or any other agency action taken to construct or complete the project pursuant to Federal law).

Subsection (e) states that nothing in the measure alters any Federal, State, or local process or condition in effect on the date of enactment that is necessary to secure access from an owner of private property to construct the Keystone XL pipeline and cross-border facilities.

5

COST AND BUDGETARY CONSIDERATIONS

The following estimate of the costs of this measure has been provided by the Congressional Budget Office:

*Keystone XL Pipeline Approval Act*

In May 2012, a private firm submitted an application for a Presidential permit to construct the proposed Keystone XL pipeline, which would carry crude oil from Alberta, Canada, to Steel City, Nebraska. Under current law, the proposed pipeline requires a Presidential permit because it would cross international borders. That application is still under review by the Department of State, which is responsible for issuing such permits.

This legislation would specify various procedures pertaining to federal review and permitting of the proposed Keystone XL pipeline. In particular, the legislation would specifically authorize the private entity to construct, connect, operate, and maintain the proposed pipeline and related cross-border facilities described in the existing application.

Based on information from affected agencies, CBO estimates that enacting this legislation would have no significant effect on federal spending for regulatory activities related to the proposed pipeline. (Any such regulatory activities are subject to the availability of appropriated funds.) Enacting the legislation would not affect direct spending or revenues; therefore, pay-as-you-go procedures do not apply.

The Keystone XL Pipeline Approval Act contains no intergovernmental or private-sector mandates as defined in the Unfunded Mandates Reform Act and would impose no costs on state, local, or tribal governments.

The CBO staff contact for this estimate is Megan Carroll. The estimate was approved by Theresa Gullo, Deputy Assistant Director for Budget Analysis.

REGULATORY IMPACT EVALUATION

In compliance with paragraph 11(b) of rule XXVI of the Standing Rules of the Senate, the Committee makes the following evaluation of the regulatory impact which would be incurred in carrying out the bill.

The bill is not a regulatory measure in the sense of imposing Government-established standards or significant economic responsibilities on private individuals and businesses.

No personal information would be collected in administering the program. Therefore, there would be no impact on personal privacy.

Little, if any, additional paperwork would result from the enactment of the bill, as ordered reported.

CONGRESSIONALLY DIRECTED SPENDING

The bill, as reported, does not contain any congressionally directed spending items, limited tax benefits, or limited tariff benefits as defined in rule XLIV of the Standing Rules of the Senate.

EXECUTIVE COMMUNICATIONS

The Committee did not request the views of the Administration on the measure.

## MINORITY VIEWS

Under law existing for more than a century, any company that wishes to build an oil pipeline across our border with Canada must first obtain a permit from the President of the United States. In 1968, President Johnson delegated the President's authority to issue cross-border permits to the Secretary of State. In 2004, President George W. Bush established the current process that the Secretary must follow in issuing cross-border permits. In the executive order setting up this process, President Bush explained that it would "provide a systematic method for evaluating and permitting" cross-border pipelines, which would "expedite review" and "accelerate the completion" of cross-border projects, "while maintaining safety, public health, and environmental protections." President Bush's executive order requires the Secretary to find that the issuance of a permit "would serve the national interest," and it requires the Secretary to impose "such terms and conditions as the national interest may in the Secretary's judgment require." The State Department has previously approved presidential permits for other oil pipelines that cross the Canadian border using this process, without the need for legislative intervention.

The purpose of the Keystone XL Pipeline Approval Act is to exempt a single company, TransCanada Keystone Pipeline, L.P., a U.S. subsidiary of TransCanada Corporation, a Canadian business corporation, from the President's permitting authority, with respect to the proposed Keystone XL pipeline. The pipeline would transport oil produced from tar sands in Alberta, Canada, across the border, through Montana, South Dakota, and Nebraska. In Nebraska, the Keystone XL pipeline would connect with an existing pipeline that would then transport the oil to Port Arthur, Texas.

The Committee's bill would circumvent the President's long-standing permitting authority and bypass the need for the Secretary of State to determine if the pipeline is in the national interest. It would do so by simply authorizing TransCanada to build the pipeline, as a matter of law, without a presidential permit, without a national interest determination, and without national interest terms and conditions. The bill would also foreclose further environmental review of significant new circumstances or information and it would limit the ability of citizens directly affected by the pipeline's course through Montana, South Dakota, and Nebraska from obtaining judicial review.

The majority contends that the bill is needed because the review process established by President Bush to "expedite" and "accelerate" such projects, but still protect public health, safety, and the environment, is taking too long. They point to the fact that an earlier application for the Keystone XL pipeline was filed on September 19, 2008, and argue that the review has now taken over 6 years. In fact, more than half of that time was spent on the earlier

(6)

7

application, which the State Department had to deny on January 18, 2012, because a previous, ill-conceived legislative attempt to force the President to make a premature decision on the Keystone XL pipeline did not afford sufficient time to make the national interest determination.

TransCanada filed its current application less than 3 years ago, on May 4, 2012. On January 31, 2014, less than a year ago, the State Department completed a Final Supplemental Environmental Impact Statement on the project, at which point it promptly began the agency comment process required by President Bush's executive order for making the national interest determination.

The process has been delayed for the understandable reason that the route of the pipeline through Nebraska had yet to be settled. TransCanada originally proposed building the pipeline through the environmentally sensitive Nebraska Sandhills in its September 2008 application, but subsequently proposed rerouting the pipeline around the Sandhills in its May 2012 application. Following the rejection of TransCanada's 2008 application, the Nebraska Legislature amended Nebraska's pipeline siting law to permit the Governor, rather than the Public Service Commission, to approve the route and enable TransCanada to take private property under Nebraska eminent domain law. The Governor of Nebraska approved TransCanada's revised route under the 2012 law. Meanwhile, a number of Nebraska landowners challenged the constitutionality of the law, and on February 14, 2014, a Nebraska district court judge held that the 2012 law violated the Nebraska Constitution by divesting the Public Service Commission of control over the routing decisions for the Keystone XL pipeline within Nebraska. On January 9, 2015, the day after the Committee ordered the Keystone XL Pipeline Approval Act reported, the Supreme Court of Nebraska vacated the district court's decision and held that the 2012 law "must stand by default." A majority of the Court, four of its seven judges, concluded that the law was unconstitutional. The other three concluded that the landowners who brought the suit lacked standing and declined to address the constitutional question. Under the Nebraska Constitution, a supermajority of five judges must concur to hold a law unconstitutional, so the 2012 siting law, and with it the Governor's routing decision, "must stand by default," even though none of the seven judges found it to be constitutional.

Simply put, the State Department could not have reasonably determined whether or not the pipeline is in the national interest as long as it did not know where the pipeline would ultimately be sited. Nor was it unreasonable for the State Department to question the validity of the Governor's approval of the proposed route, as evidenced by the fact that a majority of the Nebraska Supreme Court has now concluded the law under which the route was approved is unconstitutional.

Nor does the Nebraska Supreme Court's decision upholding the route "by default" dispense with the State Department's responsibility for making the national interest determination under President Bush's executive order. Although the executive order does not specify the factors the Department must consider in determining whether a project would serve the national interest, the Department has taken the position that the determination of national in-

8

terest involves consideration of "many factors, including energy security; environmental, cultural, and economic impacts; foreign policy; and compliance with relevant state and federal regulations." Left alone, the Department will now have to consider and weigh all of these factors in arriving at its national interest determination.

The Committee bill, however, dispenses with the national interest determination. The majority simply assumes that the pipeline is in the national interest because it will create jobs and provide an additional source of Canadian oil to the U.S. market. Undoubtedly, some jobs will be created. How many, in which trades, and how long they will last is disputed. And undoubtedly, some part of the oil that would flow through the pipeline would be used in the United States. But how much will be refined in the United States and how much of it will be exported, and how much of the refined product will be used in the United States and how much of the refined product will be exported are also in dispute. These are questions best left to the objective analysis of the technical experts in the Department of State rather than answered by intuition in the political arena.

Serious questions also remain about the effect the greenhouse gas emissions associated with the production, refining, and consumption of oil produced from tar sands will have on the climate and the environmental consequences of potential oil spills from the pipeline. The State Department's Final Supplemental Environmental Impact Statement is, in fact, favorable to the proposed pipeline on these questions. But it assumed, based upon the price of oil when it was prepared, that the oil would be produced whether or not the pipeline is built, and would be shipped to market by rail or other means, even if the proposed pipeline is not built. The sharp decrease in the price of oil since the Final Supplemental Environmental Impact Statement was released has, of course, undermined that assumption. Oil prices are now approximately half what they were during the time period that the State Department was conducting its oil market analysis. The State Department observed that a number of conditions, including unexpectedly low oil prices, could result in the Keystone XL actually increasing gasoline prices to some Midwestern consumers. These factors must also be analyzed and weighed by the State Department in making its national interest determination.

Moreover, if the State Department is able to make its national interest determination, President Bush's executive order will require the permit to contain "such terms and conditions as the national interest may . . . require." Under this authority, the Secretary may be able to ensure that that construction of the pipeline does, in fact, generate jobs in this country, by requiring, for example, that the steel for the pipeline be made in this country rather than imported from abroad, or that oil be refined in this country rather than exported, or that the refined product be used in this country, to the extent permitted by our international trade agreements. Or the Secretary may ensure that TransCanada contributes its fair share to the Oil Spill Liability Trust Fund, from which tar sands oil is currently exempt. The Committee bill, in stark contrast, would authorize the pipeline without any national interest conditions.

9

Undoubtedly, enactment of the Committee bill and construction of the Keystone XL pipeline is in TransCanada's interest. But the proper test is, and should remain, whether it is in the national interest, not TransCanada's interest. By circumventing the requirement for a national interest determination, the Committee bill forecloses the consideration of the serious, substantive questions directly affecting the national interest, and it forecloses the Administration's ability to attach conditions to the permit that would protect the national interest.

Congress might better serve the national interest by ensuring that the State Department adheres to the established decision-making process and engages in reasoned decision-making rather than by circumventing that process and substituting its judgment for that of the agency experts.

MARIA CANTWELL.

10

CHANGES IN EXISTING LAW

In compliance with paragraph 12 of rule XXVI of the Standing Rules of the Senate, the Committee notes that no changes in existing law are made by the bill as ordered reported.

○